**FAEGRE DRINKER BIDDLE & REATH LLP**
JEREMY M. PELPHREY (CA Bar # 249862)
Jeremy.Pelphrey@faegredrinker.com
RYAN M. SALZMAN (CA Bar #299923)
Ryan.Salzman@faegredrinker.com
1800 Century Park East, Suite 1500
Los Angeles, CA  90067
Telephone: (310) 500-2090
Facsimile: (310) 229-1285

*Proposed Counsel for the Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA – NORTHERN DIVISION

| | |
|---|---|
| In re: | Lead Case No. 9:20-bk-10554-DS |
| Community Provider of Enrichment Services, Inc. d/b/a CPES Inc., *et al.*, | (Proposed to Be) Jointly Administered With: Case No. 9:20-bk-10553-XX |
| Debtors. | Chapter 11 Cases |
| [•] Affects All Debtors | **DECLARATION OF MARK G. MONSON IN SUPPORT OF EMERGENCY FIRST DAY MOTIONS** |
| [ ] Affects Community Provider of Enrichment Services d/b/a CPES Inc. [ ] Affects Novelles Developmental Services, Inc. | |
| Debtors and Debtors in Possession | |

I, Mark G. Monson, hereby state and declare as follows:

1.      I am the President and Chief Executive Officer of Community Provider of Enrichment Services, Inc., d/b/a CPES Inc. ("CPES AZ") and Novelles Development Services, Inc. ("Novelles" and, together with CPES AZ, the "Debtors" or "CPES").  I became the Debtors' President and CEO in January 2015.  I submit this declaration (this "Declaration") in support of the Debtors' emergency requests for relief contained in certain "first day" motions filed in this case (the "First Day Motions").

2.      I have over 25 years of executive healthcare and human service experience with a specialty focus in behavioral health, employment and developmental services, early education and special needs education, and acute/post-acute medical rehabilitation.

3.      Prior to joining CPES, from 2012-2014, I was the President and CEO of Fairbanks Hospital/Hope Academy in Indianapolis, Indiana.  Fairbanks Hospital is a 110-bed specialty

FAEGRE DRINKER
BIDDLE & REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

DECLARATION OF MARK G. MONSON ISO
EMERGENCY FIRST DAY MOTIONS

CASE NO. 9:20-BK-10554-DS

1  hospital and the oldest not-for-profit alcohol and drug treatment center in the U.S.  It provides a

2  full continuum of care and support services for men, women, and adolescents who struggle with

3  addiction.  Fairbanks Hospital also sponsors Hope Academy, a charter school.

4        4.        From 2009 to 2012, I was the Chief Operations Officer of Beaver Dam

5  Community Hospital in Beaver Dam, Wisconsin, where I was responsible for various hospital

6  operations including physician recruitment and practice management.  From 2007 to 2009, I

7  served as the Vice President of Clinical Services and Operations for Sharp Healthcare in the San

8  Diego, California area, where I managed a team of more than 1,000 full time employees and was

9  responsible for an annual operating budget of approximately $140 million dollars.  From 1996 to

10  2007, I was the President and CEO of Community Care Network/Rutland Mental Health Services

11  and from 1999 to 2007 I served concurrently as the Vice President of Clinical Operations at

12  Rutland Regional Medical Center in Rutland, Vermont.  From 1985 to 1996, I was the Vice

13  President of Behavioral Health and Rehabilitative Services at Bay Regional Medical Center,

14  where I managed the day-to-day operations of a behavioral health service provider with 90

15  medical rehabilitation, psychiatric and substance abuse beds, a freestanding comprehensive

16  outpatient rehabilitation and wellness facility, several urgent care facilities, multiple outpatient

17  clinics, and physical medicine and rehabilitation product lines.

18        5.        I have a Bachelor of Arts degree in Psychology from the University of Minnesota

19  and a Master of Science degree from the University of Arizona.  I am a Fellow of the American

20  College of Healthcare Executives, a Senior Member and Certified Quality Manager of the

21  American Society for Quality; and a National and State Examiner for the Malcolm Baldrige

22  National Quality Award Program.

23        6.        On April 24, 2020 (the "Petition Date"), the Debtors each filed a voluntary petition

24  for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the

25  United States Bankruptcy Court for the Central District of California, Northern Division (the

26  "Court").  I am knowledgeable and familiar with the Debtors' day-to-day operations, business and

27  financial affairs, and the circumstances leading to the commencement of these chapter 11 cases

28  (the "Chapter 11 Cases").

FAEGRE DRINKER
BIDDLE & REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

DECLARATION OF MARK G. MONSON ISO
EMERGENCY FIRST DAY MOTIONS

CASE NO. 9:20-BK-10554-DS

7.      Except as otherwise indicated herein, this Declaration is based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtors or the Debtors' legal advisors, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and the healthcare industry.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

8.      I make this declaration for the purpose of apprising the Court and parties in interest of the circumstances that compelled the commencement of these Chapter 11 Cases and in support of the First Day Motions (as defined below).  Any capitalized term used but not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motion.

9.      To enable the Debtors to minimize the adverse effects of the commencement of these Chapter 11 Cases on their business, the Debtors have requested various types of relief in a number of applications and motions (each a "First Day Motion," and, collectively, the "First Day Motions"). The First Day Motions seek relief intended to maintain the Debtors' business operations; to preserve value for the Debtors, their stakeholders, and parties in interest; and, most importantly, to protect the health and wellbeing of the patients, residents, and other persons who are being treated at the facilities operated by the Debtors or who are receiving support services provided by the Debtors' organization and employees.  Each First Day Motion is crucial to the Debtors' reorganization efforts and to the health and wellbeing of the patients, residents, and other persons relying on the Debtors to provide support services.

10.      Section I provides an overview of the Debtors' business operations and corporate structure.  Section II describes the circumstances that led the Debtors to commence these Chapter 11 Cases.  Section III provides a summary of the First Day Pleadings and factual bases for the relief requested therein.

## I.      COMPANY AND BUSINESS OVERVIEW

11.      CPES is a community human services and healthcare organization and the leading provider of person-centered, trauma-informed care.  With several residential treatment facilities and programs and over 960 employees in Arizona and California, CPES is committed to

FAEGRE DRINKER
BIDDLE & REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

DECLARATION OF MARK G. MONSON ISO
EMERGENCY FIRST DAY MOTIONS

CASE NO. 9:20-bk-10554-DS

1  promoting independence, growth, community connections, and financial sustainability through

2  inspiration, education, and innovation.

3  **A.      Business Operations**

4  12.    CPES offers a comprehensive array of behavioral health services, including

5  outpatient mental health services, an intensive outpatient therapy program, employee assistance

6  program services, individual and group counseling, addiction recovery programs, child and

7  family services, foster care, training and support for people with intellectual and developmental

8  disabilities, and vocational services.  CPES' counselors and clinicians have a variety of

9  experience and specialization.  CPES also integrates their counseling services with overall

10  healthcare services, and one of CPES' core competencies is working with people who experience

11  multiple and severe co-occurring disorders.

12  **B.      Corporate and Capital Structure**

13  13.    Novelles and non-Debtor CPES California, Inc., a California corporation, are

14  wholly owned subsidiaries of CPES AZ.  The Debtors have no secured debt.  Since 1994, the

15  shares of CPES AZ have been held by an Employee Stock Ownership Plan (an "ESOP") for the

16  benefit of employees.  The ESOP is a qualified retirement plan that is governed by many complex

17  rules and regulations.  Once an employee meets the eligibility requirements, the employee

18  automatically becomes an ESOP Plan Participant.  Additional information on the ESOP is

19  provided in the Debtors' Employee Wage Motion (defined below).

20  **II.   EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES**

21  14.    The financial and operational issues facing CPES are born out of a confluence of

22  historical challenges and the recent state-wide shutdowns related to Covid-19.  Operating losses

23  have plagued CPES for some time due to, among other things, challenging cost structure, low

24  reimbursement rates, and the changing healthcare landscape.  CPES AZ has been operating at a

25  loss for years and can no longer continue to absorb these operating losses and remain a going

26  concern.

27  15.    In the months prior to the Petition Date, the Debtors held several meetings with the

28  state of Arizona, seeking additional state funding and a path for CPES AZ to continue its Arizona

FAEGRE DRINKER
BIDDLE & REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

DECLARATION OF MARK G. MONSON ISO
EMERGENCY FIRST DAY MOTIONS

CASE NO. 9:20-BK-10554-DS

1  operations.  Unfortunately, none of these efforts resulted in a viable financial solution.  The

2  Debtors seek in cooperation with the State of Arizona to enter into and implement a

3  comprehensive plan to transition its programs and services in the state of Arizona to new

4  operators. The company is working closely with the state of Arizona and the Division of

5  Developmental Disabilities to ensure a smooth transition process.  Under the current transition

6  plan, CPES AZ's day center programs will be gradually phased out by July 31, 2020, with all

7  other programs to be transitioned to new operators by December 31, 2020.  The Debtors will

8  provide all employees of the Arizona day center programs the opportunity to transition to one of

9  the company's residential treatment facilities.  The Debtors anticipate that non-management

10  employees at CPES' Arizona residential facilities and other programs will be offered employment

11  by the new operators as part of the transition plan with the state of Arizona.

12        16.     The Debtors intend to undertake an orderly wind-down of all of its residential

13  facilities and outpatient treatment programs and support services in Arizona.  To that end, CPES

14  is working closely with the Arizona Department of Developmental Services, regional centers, and

15  county mental health agencies to ensure that all the needs of patients and supported persons are

16  met.  The Debtors' goal is to transition all of its facilities and programs to other providers without

17  closing any facilities to ensure that there is no interruption in patient services, and that the

18  employees continue to work at the same locations since they have the knowledge and

19  relationships with the patients. The Debtors are committed to an orderly and complete transition

20  of its clients and patients to alternate providers before terminating any service or closing any

21  facility.

22        17.     The Debtors' goals in these Chapter 11 Cases are to seamlessly transition CPES

23  AZ's programs and services in Arizona to new providers, to efficiently wind-down and close the

24  day centers in Arizona and California, and to preserve value for the Debtors' creditors,

25  employees, and other parties-in-interest.  While the Debtors are still assessing the Novelles day

26  center programs in California, the company believes that its remaining operations in California

27  are viable and can be preserved and reorganized through a restructuring plan.

28

DECLARATION OF MARK G. MONSON ISO
EMERGENCY FIRST DAY MOTIONS

CASE NO. 9:20-bk-10554-DS

18.    The Debtors seek to preserve and capitalize on the going concern value of the company, and critically, to maintain continuity and quality of care for their patients and supported persons.  I believe the Debtors can successfully reorganize their California operations after transitioning their Arizona operations, and, to that end, the Debtors aim to pay their creditors in full, and reorganize their California operations under CPES AZ with the ESOP in place.

19.    In the near term, however, the Debtors' immediate objective is to continue operating their business during the early stage of these Chapter 11 Cases with as little interruption or disruption to the Debtors' operations as possible.  In conjunction with the filing, the Debtors have filed various first day pleadings to ensure the timely payment of employee wages and benefits, to maintain operational and cash management functions, and to otherwise complete a smooth transition into operating under the protections of chapter 11.  I believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving these objectives will be substantially enhanced.

## III.    FIRST DAY PLEADINGS

### A.    Operational Motions Requesting Immediate Relief

**i.    Emergency Motion of Debtors for the Entry of an Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 507, and Fed. R. Bankr. P. 6003 and 6004 Authorizing Debtors to (I) Pay Prepetition Wages, Salaries, Withholding Obligations and Other Compensation and Benefits; (II) Maintain Employee Wages and Benefits Programs; and (III) Pay Related Administrative Obligations**

20.    In the Employee Wages Motion, the Debtors seek interim and final authority to (i) authorizing the Debtors, in their discretion, to (a) pay prepetition employee wages and salaries, and (b) pay and honor employee benefits and other workforce obligations (including remitting withholding obligations, maintaining workers' compensation and benefits programs, paying related administration obligations, making contributions to retirement plans, and paying reimbursable employee expenses); (ii) authorizing and directing the applicable bank to pay all checks and electronic payment requests made by the Debtors relating to the Employee Obligations; and (iii) granting such other and further relief as is just and proper under the circumstances.  Further, the Debtors request that the Court authorize and direct all applicable banks and financial institutions

FAEGRE DRINKER
BIDDLE & REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

DECLARATION OF MARK G. MONSON ISO
EMERGENCY FIRST DAY MOTIONS

CASE NO. 9:20-BK-10554-DS

(the "Banks") to receive, process, honor, and pay all checks issued or to be issued and electronic funds transfers requested or to be requested relating to the Employee Obligations.

21.     As of the Petition Date, the Debtors have approximately 962 employees (the "Employees"):  CPES AZ has approximately 697 Employees, and Novelles has approximately 265 Employees.  The Debtors' next payroll is scheduled for Friday, May 1, 2020, and the average bi-weekly payroll is approximately $1,209,153.43.  The Debtors do not use a third-party payroll processor, and payroll is funded on the Wednesday prior to the pay day.

22.     All of the Employees are owed or have accrued various sums of Prepetition Compensation.  The Prepetition Compensation remains unpaid on the Petition Date because, among other things, (1) the Debtors commenced these Chapter 11 Cases at the end of their customary payroll period, and (2) checks previously issued on account of Prepetition Compensation and Benefits Program Obligations may not have been presented for payment, or may not have cleared the banking system.

23.     Payment of, and otherwise honoring, the Employee Obligations are necessary to prevent employees from terminating their employment with the Debtors and to maintain the employees' morale pending resolution of these Chapter 11 Cases.  The Employees covered by the Wages Motion are still employed by the Debtors and I believe that the payments to these Employees are absolutely necessary.  No Employee is owed Prepetition Compensation in excess of $13,650 established by section 507(a)(4) of the Bankruptcy Code, and the Debtors do not seek to pay any Employee in excess of such amount.  The Debtors do not seek to pay prepetition claims of insiders at this time.  I do not believe payment to the Employees will render the Debtors' estates administratively insolvent for the reasons set forth in the Motion.  I believe it is essential to pay the Employees as set forth above, or the Debtors' chances of successfully reorganizing will be diminished.  I also believe that the Employees and the Debtors will benefit greatly from the relief sought in the Wages Motion.

FAEGRE DRINKER
BIDDLE & REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

DECLARATION OF MARK G. MONSON ISO
EMERGENCY FIRST DAY MOTIONS

CASE NO. 9:20-bk-10554-DS

  **ii.**  **Emergency Motion of Debtors for the Entry of an Order (I) Authorizing Debtors to (A) Continue to Operate Their Cash Management System, (B) Maintain Existing Business Forms, and (C) Continue Intercompany Arrangements; (II) Granting an Extension of Time to Comply with Requirements of 11 U.S.C. § 345(b); and (III) Granting Related Relief**

  24.  In the Cash Management Motion, the Debtors request an emergency order: (1) authorizing the Debtors (a) to continue to operate their existing cash management system (the "Cash Management System"), as described herein, including the continued maintenance of their existing bank accounts (the "Bank Accounts") with BBVA, Bank of the West, Chase Bank, National Bank of Arizona, Wells Fargo and Mutual of Omaha (the "Banks"), (b) maintain existing Business Forms (as defined herein), and (c) continue certain intercompany arrangements, including transferring funds among the Debtors; (ii) granting an extension of time to comply with the requirements of 11 U.S.C. § 345(b); and (iii) granting related relief.  The Debtors also request that the Court authorize the Banks to continue to charge Bank Fees (as defined in the Cash Management Motion) and to charge back returned items to the Bank Accounts, whether such items are dated before, on, or after their commencement of these Chapter 11 Cases.

  25.  In the ordinary course of business, the Debtors use a centralized cash management system (the "Cash Management System") to collect funds from their operations and pay operating and day-to-day expenses.  The Cash Management System is carefully maintained through controls implemented by the Debtors.  Through the use of the Cash Management System, the Debtors are able to monitor the collection and disbursement of funds, forecast revenues and expenses, and monitor reporting to tax authorities.

  26.  The Cash Management System includes 16 Bank Accounts. Of those Bank Accounts (i) two primary "operating" Bank Accounts serve as the Debtors' main revenue collecting and disbursement accounts (ii) two Bank Accounts serve as the Debtors' primary payroll accounts, (iii) two "operating" Bank Accounts that are being phased out, (iv) two payroll Bank Accounts that are being phased out; (v) one Bank Account is a money market savings account; (vi) three Bank Accounts serve as deposit accounts for Debtors' remote thrift stores; (vii) three Bank Accounts serve as consumer trust accounts; and (viii) one Bank Account that

FAEGRE DRINKER
BIDDLE & REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

DECLARATION OF MARK G. MONSON ISO
EMERGENCY FIRST DAY MOTIONS

CASE NO. 9:20-BK-10554-DS

1    serves as the Employee Stock Ownership Plan distribution account.

2    27.    In the ordinary course of business, intercompany transactions ("Intercompany

3    Transactions"), and any intercompany receivables and payables generated pursuant to an

4    Intercompany Transaction, "Intercompany Claim") occur when, among other things (i) CPES AZ

5    receives funds into its Operating Account on behalf of Novelles; (ii) CPES AZ makes payments

6    and disbursements out of its Operating Account on behalf of Novelles, and (iii) funds are

7    transferred between the Debtors.

8    28.    Intercompany Transactions and Intercompany Claims between Debtors are

9    generally not settled by actual transfers of cash among the Debtors.  Instead, the Debtors track all

10   Intercompany Transactions and Intercompany Claims electronically filed in their centralized

11   accounting system, the result of which are records concurrently on the applicable Debtor's

12   balance sheets and regularly reconciled.  The accounting system requires that all general ledger

13   entries be balanced at the legal-entity level; therefore, when the accounting system enters an

14   intercompany receivable on the entity's balance sheet, it also automatically creates a

15   corresponding intercompany payable on the applicable affiliate's balance sheet.  This results in a

16   net balance of zero when consolidating all intercompany accounts.

17   29.    The Debtors maintain records of all transactions processed through their Cash

18   Management System.  During these Chapter 11 Cases, the Debtors will keep records of any

19   postpetition Intercompany Transactions and implement any additional accounting procedures

20   required to identify and distinguish between prepetition and postpetition Intercompany

21   Transactions so that claims arising from postpetition Intercompany Transactions can be afforded

22   administrative expense priority.

23   30.    The Debtor also uses in the ordinary course of business company-paid credit cards

24   issued by American Express (collectively, the "Credit Cards") for items and services best

25   purchased with credit.  The Debtors regularly pay down the Credit Cards' balance to enable

26   access to Credit Cards to use in the ordinary course of business.  In general, the Debtors' Credit

27   Cards are used for various corporate expenses including, but not limited to, certain travel, meals,

28   vehicle maintenance, and other required business expenses that are essential to the Debtors'

FAEGRE DRINKER
BIDDLE & REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

DECLARATION OF MARK G. MONSON ISO
EMERGENCY FIRST DAY MOTIONS

CASE NO. 9:20-BK-10554-DS

1    operations.

2    31.    The Debtors' Employees also use the Credit Cards as needed for transportation

3    costs and other essential expenditures. As of the Petition Date, the Debtors' Employees use, in

4    the aggregate, 185 Credit Cards issued by American Express. The Debtors receive separate

5    statements for Novelles and CPES AZ. The Credit Card statements are reviewed and paid

6    monthly by the Debtors out of the Novelles and CPES AZ Operating Accounts (No. x5045 and

7    No. x4388). The Debtors' Employees are not liable for expenses incurred under the Credit Cards.

8    32.    On average, Novelles incurs approximately $16,000.00 per month and CPES AZ

9    incurs approximately $135,000.00 per month on the Credit Cards. The Debtors believe that as of

10    the Petition Date, $150,000.00 relating to prepetition purchases is outstanding on account of the

11    Credit Cards. The Debtors request authority to continue to make all payments to American

12    Express in connection with the Credit Cards on a postpetition basis in the ordinary course of

13    business and consistent with the Debtors' past practices.

14    33.    Each form of relief requested in the Cash Management Motion will help ensure the

15    Debtors' smooth transition into chapter 11 and prevent the possible disruptions and distractions

16    that could otherwise divert the Debtors' attention from more pressing matters during the initial

17    days of these Chapter 11 Cases. For these reasons and as more thoroughly provided in the

18    Motion, I believe, and the Debtors submit, that the emergency relief requested in the Motion is in

19    the best interest of the Debtors, their estates, and creditors, and should therefore be approved.

20
21
22    **iii.    Emergency Motion of Debtors for Interim and Final Orders
       (I) Authorizing Debtors to (A) Continue Insurance Programs
       and (B) Pay All Obligations with Respect Thereto; and
       (II) Granting Related Relief**

23    34.    By the Insurance Motion, the Debtors seek entry of an order (i) authorizing the

24    Debtors (a) to continue their Insurance Programs (as defined below) in accordance with their

25    applicable insurance policies and agreements and to continue to perform their obligations with

26    respect thereto during these Chapter 11 Cases, and (b) pay prepetition obligations arising under

27    the Insurance Programs, if any, and (ii) granting related relief.

28    35.    In the ordinary course of business, the Debtors maintain workers' compensation

FAEGRE DRINKER
BIDDLE & REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

DECLARATION OF MARK G. MONSON ISO
EMERGENCY FIRST DAY MOTIONS

CASE NO. 9:20-BK-10554-DS

insurance and third party liability, property, and other insurance programs (each, an "Insurance Program") and incur certain obligations to pay premiums and other obligations related thereto, including, but not limited to, broker and advisor fees, taxes, other fees, and deductibles (collectively, the "Insurance Obligations"), in accordance with or relating to their respective insurance policies (each, an "Insurance Policy") through several insurance carriers (each, and "Insurance Carrier"). The Debtors' Insurance Programs include: (i) coverage of workers' compensation and employer's liability (the "Workers' Compensation Insurance"); (ii) coverage of potential third-party liability in connection with Debtors' business operations (the "General Liability Program"); (iii) coverage of the Debtors' vehicles (the "Automobile Liability Program"); (iv) coverage of the Debtors' real and personal property (the "Commercial Property Liability Program"); (v) coverage of directors' and officers' liability, management liability, fiduciary liability, and professional liability (the "D&O Liability Program"); (vi) coverage of potential professional liability claims (the "Professional Liability Program"); (vii) coverage of potential liability in connection with cyber security related to Debtors' business operations (the "Cyber Program"); (viii) coverage of potential liability in connection with criminal acts related to the Debtors' business operations ("Crime Program"); and (ix) umbrella and excess coverage for various casualty Insurance Policies, as described below (the "Excess Liability Program").

36. The Debtors' premiums for their General Liability and Excess Liability Insurance programs are financed through First Insurance Funding (the "Premium Finance Agreement"). The total amount financed by the Debtors, including all finance charges, was approximately $1.9 million. Under the terms of the Premium Finance Agreement, the Debtors agreed to make ten equal payments for $194,263.36, with the first installment being due on February 1, 2020. To date, the outstanding amount owed by Debtors under the Premium Finance Agreement is $1,359,843.52.

37. The Debtors also retain the services of the Insurance Broker (as defined below) in connection with maintaining the Debtors' Insurance Programs. The Insurance Programs and the role of the Insurance Broker are discussed below.

38. The Debtors maintain Workers' Compensation Insurance through a policy with

DECLARATION OF MARK G. MONSON ISO
EMERGENCY FIRST DAY MOTIONS

CASE NO. 9:20-bk-10554-DS

Surety Insurance (the "Workers' Compensation Insurance Policy").  The coverage period is

October 2, 2019 through October 2, 2020, and the annual premium is approximately $391,492.68,

which was paid in full prior to the Petition Date.  Accordingly, to the best of their knowledge, the

Debtors do not owe any prepetition amounts on account of the Workers' Compensation Insurance

as of the Petition Date.

39.     Under the Workers' Compensation Insurance Policy, Sentry Insurance is obligated

to pay all or part of a Workers' Compensation Claim directly to an employee, his or her medical

providers, or his or her heirs or legal representatives.  As of the Petition Date, the Debtors are not

aware of any open or potential Workers' Compensation Claims.  Although unlikely, it is possible

that an event giving rise to an obligation of Sentry Insurance to make a payment on account of a

Workers' Compensation Claim – for example, for injury or disease of an employee – could have

occurred prepetition without the Debtors' knowledge.  Accordingly, out of an abundance of

caution, the Debtors seek modification of the automatic stay (i) to the extent necessary to permit

the Debtors' employees to proceed with any Workers' Compensation Claims they may have

under the Workers' Compensation Insurance Program and (ii) to allow Sentry Insurance to pay

such Workers' Compensation Claims and related costs.

40.     As of the Petition Date, Debtors owe $1,359,843.52 under the Premium Finance

Agreement. Pursuant to the terms of the Premium Finance Agreement, the Debtors have a

payment due on May 1, 2020 for $194,263.36. Except as set forth herein, Debtors do not believe

that they owe any amounts with respect to the prepetition Insurance Obligations, including

amounts owed to the Insurance Broker, and do not expect that any other prepetition Insurance

Obligations will come due in the first 21 days of these Chapter 11 Cases.  However, out of an

abundance of caution, the Debtors are seeking relief to pay (i) any such prepetition amounts, to

the extent that it is later determined that such amounts are owed under the Insurance Policies, and

(ii) any postpetition amounts that become due during these chapter 11 cases in the ordinary course

of business.

41.     I believe that the continuation of the Insurance Policies is essential to the operation

and preservation of the value of the Debtors' operations, and it is my understanding that it is

FAEGRE DRINKER
BIDDLE & REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

DECLARATION OF MARK G. MONSON ISO
EMERGENCY FIRST DAY MOTIONS

CASE NO. 9:20-BK-10554-DS

1   required under the U.S. Trustee Guidelines, the federal laws and regulations applicable to the

2   Debtors' businesses, and the laws of the States of Arizona and California, as well as certain of the

3   Debtors' various contractual commitments.  The Debtors, as employers and operators of

4   residential and behavioral health programs, must maintain workers' compensation insurance

5   coverage.  *See, e.g.*, Cal. Lab. Code § 3700 (requiring workers' compensation coverage).  Also, as

6   a practical and legal matter, the Debtors cannot provide support services and continue to operate

7   their residential treatment programs without professional and general liability insurance, among

8   other coverage.

9            **iv.      Emergency Motion of Debtors for an Order (I) Approving Debtors'**
10                    **Proposed Form of Adequate Assurance of Payment to Utility**
                     **Companies; (II) Establishing Procedures for Resolving Objections by**
11                   **Utility Companies; (III) Prohibiting Utility Companies from Altering,**
                     **Refusing, or Discontinuing Service; and (IV) Granting Related Relief**

12           42.     In the Utilities Motion, the Debtors seek an emergency order (i) approving the

13   Debtors' proposed form of adequate assurance of payment to the Utility Companies (as defined

14   below); (ii) establishing procedures for resolving objections by the Utility Companies relating to

15   the adequacy of the proposed adequate assurance; (iii) prohibiting the Utility Companies from

16   altering, refusing, or discontinuing service to, or discriminating against, the Debtors on the basis

17   of the commencement of these Chapter 11 Cases; and (iv) granting related relief.

18           43.     To operate their business and manage their properties, the Debtors obtain

19   telecommunications, information technology services, water, fuel and power, electricity, and

20   other utility services (collectively, the "Utility Services") from a number of utility companies

21   (collectively, the "Utility Companies").

22           44.     Uninterrupted Utility Services are essential to the Debtors' ongoing operations

23   and, therefore, the success of the Debtors' reorganization.  Should any Utility Company alter,

24   refuse, or discontinue service, even briefly, the Debtors' business operations could be severely

25   disrupted.  The Debtors have significant operations in California and Arizona. Interruption of the

26   Utility Services provided at any of their locations would disrupt necessary communication and

27   coordination between the Debtors' employees and the Debtors' vendors, customers, and various

28   regulatory authorities, and would prevent the provision of necessary support to these same parties.

FAEGRE DRINKER
BIDDLE & REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

DECLARATION OF MARK G. MONSON ISO
EMERGENCY FIRST DAY MOTIONS                                    CASE NO. 9:20-BK-10554-DS

Such interruption would negatively impact the Debtors' reorganization efforts and parties-in-interest.

45.     The Debtors have a good historical payment record with the Utility Companies. To the best of the Debtors' knowledge, there are no material defaults or arrearages of any significance for the Debtors' undisputed invoices for prepetition Utility Services, other than payment interruptions that may be caused by the commencement of these Chapter 11 Cases. Based on a monthly average for the 12 months prior to the Petition Date, the Debtors estimate that their cost of Utility Services for the next 30 days will be approximately $85,000.

46.     To provide the Utility Companies with adequate assurance pursuant to section 366 of the Bankruptcy Code, the Debtors propose to deposit $47,000.00, which is equal to two weeks' cost of Utility Services, calculated using the historical average for such payments during the past 12 months (the "Adequate Assurance Deposit"), into a newly created, segregated account for the benefit of the Utility Companies (the "Utility Deposit Account"). The Adequate Assurance Deposit may be adjusted by the Debtors if the Debtors terminate any of the Utility Services provided by a Utility Company, make other arrangements with certain Utility Companies for adequate assurance of payment, determine that an entity listed on the Utility Services List is not a utility company as defined by section 366 of the Bankruptcy Code, or supplement the Utility Services List to include additional Utility Companies. The Adequate Assurance Deposit will be held by the Debtors in the Utility Deposit Account for the benefit of the Utility Companies on the Utility Services List during the pendency of these Chapter 11 Cases. No liens will encumber the Adequate Assurance Deposit or the Utility Deposit Account.

47.     The Utilities are essential to the Debtors' ongoing operations. Any interruption in service of the Utilities would negatively affect the Debtors' businesses and jeopardize their ability to reorganize, which directly impacts creditors' recovery in these Chapter 11 Cases. Thus, it is critical that the Utilities continue uninterrupted in these Chapter 11 Cases.

FAEGRE DRINKER
BIDDLE & REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

DECLARATION OF MARK G. MONSON ISO
EMERGENCY FIRST DAY MOTIONS

CASE NO. 9:20-BK-10554-DS

**B.    Administrative Motions**

      **i.    Emergency Motion of Debtors for an Order Limiting Scope of Notice; Memorandum of Points and Authorities**

48.    By the Motion to Limit Notice, the Debtors seek the entry of an order authorizing them to limit the scope of service of all notices, motions, or applications, including, but not limited to, the Limited Notice Matters.  The Limited Notice Matters are described in detail in the Motion to Limit Notice, and generally comprise all other pleadings, papers, and requests for relief or other order of the Court, except for notice of the following proceedings: (i) the date fixed for filing proofs of claim; (ii) the time fixed for filing objections to any disclosure statement and any hearing to consider approval of any disclosure statement; (iii) the time fixed for accepting, rejecting, or objecting to confirmation of a plan or any modification thereof and the hearing thereon; (iv) the entry of an order confirming a plan; and (v) a hearing regarding the dismissal or conversion of these Chapter 11 Cases.

49.    Specifically, the Debtors propose that notices regarding the Limited Notice Matters that will be heard on regular notice be served by first class mail upon only: (a) the Office of the United States Trustee; (b) the top 20 creditors holding general unsecured claims against each of the Debtors, unless and until a Committee is appointed and it retains counsel, then in such event, to counsel for the Committee; (c) the United States of America, by service to the Attorney General of the United States and the United States Attorney for the Central District of California, and any department or agency of the United States of America that is affected by the Limited Notice Matter until counsel for the United States makes an appearance on behalf of that department or agency, and, thereafter on that counsel; (d) the State of California, by service to the Attorney General of California, and any department or agency of the State that is affected by the Limited Notice Matter until counsel for the State makes an appearance on behalf of that department or agency, and thereafter on that counsel; (e) parties that file with the Court and serve upon the Debtors requests for notice of all matters in accordance with Bankruptcy Rule 2002(i); and (f) any party with a pecuniary interest in the subject matter of the particular Limited Notice Matter or its counsel (collectively, the "Limited Service List"). The Debtors further propose that,

FAEGRE DRINKER
BIDDLE & REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

DECLARATION OF MARK G. MONSON ISO
EMERGENCY FIRST DAY MOTIONS

CASE NO. 9:20-BK-10554-DS

1    to the extent necessary, notice and service to current and former employees be by email.

2        50.    The Debtor's Creditor Matrix has thousands of creditors. Limiting notice in the

3    fashion described in the Motion to Limit Notice will prevent the unnecessary waste of time and

4    resources required to serve notice of certain pleadings and other documents on all creditors, and

5    will allow the Debtors to conduct these Chapter 11 Cases in a more efficient manner so that they

6    can focus on caring for their patient and supported persons, the orderly transition of CPES AZ's

7    programs and services, and winding down the Debtors' day center programs and facilities.

8        51.    Limiting notice will not materially prejudice any party because parties will have an

9    opportunity to respond to the Motion to Limit Notice and to request special notice in the Debtors'

10   Chapter 11 Cases. Furthermore, any party with a pecuniary interest in the matters affected by the

11   Motion to Limit Notice will be served by the Debtors as a matter of course. Requiring notice to,

12   and service upon, so many parties, therefore, would substantially augment the cost and

13   administrative burden of the Debtors, without conferring any meaningful benefit to the Debtors'

14   estates, and thus would diminish the assets ultimately available for the operations of the Debtors

15   and distributions to creditors. Further, allowing service of an emergency motion by overnight

16   delivery in the instances outlined above provides parties on the Limited Service List with

17   adequate notice and preserves the Debtors' ability to bring such matters on a timely and efficient

18   basis. Therefore, the relief requested in the Motion to Limit Notice will not prejudice any party

19   with an interest in these bankruptcy proceedings, and ultimately, due to cost savings, will benefit

20   creditors of the Debtors' estates.

21        **ii.    Emergency Motion of Debtors for an Order Authorizing Procedures to
         Maintain and Protect Confidential Client Information; Memorandum
22       of Points and Authorities**

23        52.    The Debtors provide community-based behavioral health services, substance abuse

24   treatment, foster care, and intellectual and developmental disability supports. In the ordinary

25   course of their business, the Debtors have access to and receive "protected health information"

26   and other sensitive data relating to current and former clients, which the Debtors are required to

27   confidentially maintain pursuant to HIPAA. Notwithstanding, some of the Debtors' current and

28   former clients could potentially hold actual or contingent claims against the Debtors' estates, and

FAEGRE DRINKER
BIDDLE & REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

DECLARATION OF MARK G. MONSON ISO
EMERGENCY FIRST DAY MOTIONS

CASE NO. 9:20-BK-10554-DS

1  as such, under Bankruptcy Code section 521(a), the Debtors have a duty to list all such creditors

2  on the Debtors' mailing matrices and bankruptcy schedules.

3       53.     In addition, I am informed and believe that (a) the Debtors are required to serve

4  notice of the filing of its case, a bar date notice, and other critical case related documents on

5  parties with an interest in the case or who may have a claim against the Debtors, (b) to show

6  proper notice has been provided, the Debtors are required to file service lists showing the names

7  and addresses of those who have been served, and (c) former patients and supported persons are

8  usually among the parties entitled to such notice.  However, the Privacy Rule of the Health

9  Insurance Portability and Accountability Act of 1996 ("HIPAA"), Public Law 104-191, protects

10  all individually identifiable health information, which includes information such as the names or

11  addresses of current or former patients.  Thus, HIPAA's requirements to protect the privacy and

12  security of protected health information require that the names and addresses of current and

13  former patients not be publicly disclosed.  The Debtors are covered entities under HIPAA and

14  must comply with HIPAA's requirements to protect the privacy of health information.  However,

15  I am informed and believe that HIPAA permits the use and disclosure of protected health

16  information, without an individual's authorization or permission, as part of a judicial proceeding,

17  if the information is disclosed pursuant to a court order.

18      **iii.    Emergency Motion of Debtors for the Entry of an Order Extending**
19               **Time to File Schedules of Assets and Liabilities and Statements of**
             **Financial Affairs Pursuant to 11 U.S.C. §§ 105(a) and 521(a), Fed. R.**
20               **Bankr. P. 1007(c), and Local Rule 1007-1(b)**

21       54.     The Debtors require more time to fully analyze their assets and liabilities with the

22  assistance and advice of counsel in order to prepare full and accurate schedules of assets and

23  liabilities and statements of financial affairs (collectively, the "Schedules and Statements"), and

24  by this motion have requested a 30-day extension of the deadline to file the Schedules and

25  Statements from May 8, 2020, to June 7, 2020.

26       55.     I believe that this extension is necessary to allow CPES to prepare the Schedules

27  and Statements and that no creditors will be prejudiced by the extension of time requested.  As

28  discussed, the Debtors operate a robust mental health care system offering a full range of

DECLARATION OF MARK G. MONSON ISO
EMERGENCY FIRST DAY MOTIONS

CASE NO. 9:20-bk-10554-DS

1    community-based behavioral health services, substance abuse treatment, foster care, and

2    intellectual and developmental disability supports throughout California and Arizona.  The

3    Debtors' management have dedicated the approximate first week of these Chapter 11 Cases to the

4    critical tasks of ensuring that the Debtors can continue to use their cash management program,

5    meet their payroll obligations, and have sufficient funds and authority to use funds in order to

6    operate their programs and facilities during the transition period, and that the Debtors are in

7    compliance with all of the Court's orders and requirements.  During this same time period, the

8    Debtors must also prepare the 7-Day Package for submission to the Office of the United States

9    Trustee, which will require significant time and attention.  The Debtors are also preparing other

10   emergency motions, employment applications and applications for compensation, and will be

11   responding to inquiries regarding these bankruptcy cases.  All the while, the Debtors must attend

12   to various matters critical to the Debtors operations and to administration of these Chapter 11

13   Cases—most notably, the transition plan for the Debtors' Arizona programs and the shutdown

14   plan for the Debtors' day center programs.  Therefore, I believe that an extension of the deadline

15   to file Schedules and Statements until June 7, 2020, is necessary to allow CPES to prepare these

16   documents while continuing to operate their residential facilities and provide support services to

17   its clients.

18
19                    iv.    **Debtors' Application Pursuant to 28 U.S.C. § 156(c) for Appointment
                             of BMC Group, Inc. as Claims and Noticing Agent**

20           56.    The Debtors seek to appoint BMC Group, Inc. ("BMC") as claims and noticing

21   agent ("Claims and Noticing Agent") in these Chapter 11 Cases pursuant to 28 U.S.C. § 156(c).

22   The Debtors request entry of an order appointing BMC as the Claims and Noticing Agent for the

23   Debtors and their Chapter 11 Cases, including assuming full responsibility for the distribution of

24   notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors'

25   Chapter 11 Cases.

26           57.    As the Debtors' Claims and Noticing Agent, BMC would assume full

27   responsibility for the distribution of statutory notices to creditors and other parties in interest and

28   the maintenance, processing and docketing of proofs of claim filed in these Chapter 11 Cases.

DECLARATION OF MARK G. MONSON ISO
EMERGENCY FIRST DAY MOTIONS

CASE NO. 9:20-BK-10554-DS

1  Given the complexity of these Chapter 11 Cases and the number of creditors and other parties in

2  interest involved, I believe that retaining BMC as the Claims and Noticing Agent in these Chapter

3  11 Cases will maximize the value of the Debtors' estates for all of its stakeholders.  Accordingly,

4  on behalf of the Debtors, I respectfully request that the Court approve the Debtors' Application to

5  appoint BMC as the Claims and Noticing Agent in these Chapter 11 Cases.

6  **IV.    <u>CONCLUSION</u>**

7      58.    I hereby certify that the foregoing statements are true and correct to the best of my

8  knowledge, information and belief, and respectfully request that all of the relief requested in the

9  First Day Motions be granted, together with such other and further relief as is just.

10      *[Remainder of Page Intentionally Left Blank]*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FAEGRE DRINKER
BIDDLE & REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

DECLARATION OF MARK G. MONSON ISO
EMERGENCY FIRST DAY MOTIONS

CASE NO. 9:20-bk-10554-DS

1       I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true

2   and correct to the best of my knowledge, information and belief.

3       Respectfully submitted this 27th day of April, 2020.

4

5

6                        Mark G. Monson

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Mark G. Monson ISO
Emergency First Day Motions

Case No. 9:20-bk-10554-DS

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
FAEGRE DRINKER BIDDLE & REATH LLP, 90 South 7ᵗʰ St, Ste 2200, Minneapolis, MN  55402

A true and correct copy of the foregoing document entitled (*specify*): **DECLARATION OF MARK G. MONSON IN
SUPPORT OF EMERGENCY FIRST DAY MOTIONS** will be served or was served **(a)** on the judge in chambers in the
form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
4/27/2020, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the
following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:
Steve Ordaz, BMC Group, Inc., email: sordaz@bmcgroup.com; tfeil@bmcgroup.com
Brian D. Fittipaldi, Office of the US Trustee, email: brian.fittipaldi@usdoj.gov
United States Trustee, email: ustregion16.nd.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy
case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail,
first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the
judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method
for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) __4/27/2020_____, I
served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in
writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a
declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the
document is filed.
Honorable Deborah J. Saltzman
U.S. Bankruptcy Court
255 E. Temple St, Ste 1634
Courtroom 1639
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 4/27/2020 | Susan Carlson | /e/ Susan Carlson |
|-----------|---------------|-------------------|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.