**FAEGRE DRINKER BIDDLE & REATH LLP**
JEREMY M. PELPHREY (CA Bar # 249862)
jeremy.pelphrey@faegredrinker.com
RYAN M. SALZMAN (CA Bar #299923)
Ryan.Salzman@faegredrinker.com
1800 Century Park East, Suite 1500
Los Angeles, California  90067
Telephone:    +1 310 203 4000
Facsimile:    +1 310 229 1285
*Attorneys for Debtors and Debtors-in-Possession*

## UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA – NORTHERN DIVISION

In re:

Community Provider of Enrichment Services,
Inc. d/b/a CPES Inc., *et al.*,
EIN: 86-0804057

Novelles Developmental Services, Inc.
EIN: 27-5174435

CPES California, Inc.
EIN: 27-2315212

    Debtors.

---

[ ] Affects All Debtors

[•] Community Provider of Enrichment
Services, Inc. d/b/a CPES Inc.
[ ] Novelles Developmental Services, Inc.
[ ] CPES California, Inc.

Debtors and Debtors in Possession

Lead Case No. 9:20-bk-10554-DS

Jointly Administered With:
Case No. 9:20-bk-10553-DS
Case No. 9:20-bk-10994-DS

Chapter 11 Cases

**DEBTOR'S NOTICE OF MOTION AND
MOTION FOR ENTRY OF (I) AN ORDER
(A) AUTHORIZING AND APPROVING THE
DEBTOR'S ENTRY INTO THE STALKING
HORSE ASSET PURCHASE AGREEMENT,
(B) AUTHORIZING AND APPROVING
BIDDING PROCEDURES AND BREAK-UP
FEE, (C) APPROVING NOTICE
PROCEDURES, (D) SCHEDULING A SALE
HEARING, AND (E) APPROVING
PROCEDURES FOR ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES AND
DETERMINING CURE AMOUNTS; AND
(II) AN ORDER (A) AUTHORIZING THE SALE
OF SUBSTANTIALLY ALL OF THE
DEBTOR'S ASSETS FREE AND CLEAR OF
ALL LIENS, CLAIMS, ENCUMBRANCES, AND
INTERESTS, (B) AUTHORIZING THE
ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT
THEREOF**

**Hearing:**
Date:    September 8, 2020 [requested]
Time:    11:30 a.m.
Place:    Courtroom 201
         United States Bankruptcy Court
         1415 State Street
         Santa Barbara, CA 93101

**PLEASE TAKE NOTICE** that at the above-referenced date, time, and location, Community Provider of Enrichment Services, Inc. d/b/a CPES Inc. ("CPES AZ" or the "Debtor") as Debtor and debtor in possession in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), will move (the "Motion") pursuant to sections 105, 363, and 365 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 and Rules 9013-1 through 9013-4 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Central District of California (the "Local Rules"), for entry of an order (the "Bidding Procedures Order"):

a) authorizing and approving the Debtor's entry into (but not consummation of) the Stalking Horse Agreement, attached to the Motion as Exhibit A, subject only to higher and better offers submitted in accordance with the Bidding Procedures;

b) approving CTB AZ, LLC (the "Stalking Horse Bidder") as the stalking horse bidder and approving the Stalking Horse Agreement as the form to be used by all other bidders, as provided in the Bidding Procedures Order;

c) authorizing and approving the Bidding Procedures, substantially in the form attached to the Motion as Exhibit B;

d) authorizing and approving (i) certain bid protections and (ii) payment of the Break-up Fee to the Stalking Horse Bidder, as an administrative expense of the Debtor's estate under sections 503(b) and 507(a)(2) of the Bankruptcy Code, subject to the occurrence of certain conditions set forth in the Stalking Horse Agreement;

e) setting the deadline for potential bidders to submit a proposal for the Purchased Assets (the "**Bid Deadline**"), scheduling the auction for the Purchased Assets (the "**Auction**"), and scheduling the hearing with respect to the approval of the sale and notices related thereto (the "**Sale Hearing**");

f) authorizing and approving (i) notice of the Auction and the Sale Hearing, substantially in the form attached to the Motion as Exhibit C (the "**Sale Notice**"), and (ii) notice of the proposed cure costs and the assumption and assignment of certain contracts of the Debtor, substantially in the form attached to the Motion as Exhibit D (the "**Cure Notice**");

g) authorizing and approving the procedures set forth in the Motion and Bidding Procedures Order for the assumption and assignment of certain of the Debtor's executory contracts and unexpired leases and the determination of cure costs (the "**Assignment Procedures**").

The Debtor also seeks, pursuant to sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006, entry of an order (the "Sale Order") at the Sale Hearing:

a) authorizing and approving the sale of the Purchased Assets (the "**Sale**") free and clear of all liens, claims, encumbrances, and interests;

b) authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection therewith; and

c) granting related relief.

**PLEASE TAKE FURTHER NOTICE** that the Motion is based on and supported by this Notice, the attached Memorandum of Points and Authorities, and the Declaration of Mark G. Monson, President and Chief Executive Officer of the Debtor. In addition, the Debtor requests that the Court take judicial notice of the record of these cases.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to LBR 6004-1(b)(4), any opposition and accompanying memorandum of points and authorities and declarations must be filed with the Court and served upon counsel for the Debtor at least one (1) day prior to the hearing on the relief requested in the Bidding Procedures Order, unless otherwise ordered by the Court.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to LBR 9013-1(h), the Court may deem the failure of any party to timely file and serve an opposition or response to the Motion to constitute granting consent of the relief requested.

**WHEREFORE** the Debtor respectfully requests that the Court enter an order approving the Motion and granting such other and further relief as this Court deems just and proper.

Dated: September 4, 2020

**FAEGRE DRINKER BIDDLE & REATH LLP**

By: */s/ Ryan M. Salzman*
Ryan M. Salzman (CA Bar #299923)
Ryan.Salzman@faegredrinker.com
Jeremy M. Pelphrey (CA Bar #249862)
Jeremy.Pelphrey@faegredrinker.com
1800 Century Park East, Suite 1500
Los Angeles, CA 90067
Telephone: (310) 203-4000
Facsimile: (310) 229-1285

Vince Slusher (TX Bar # 00785480)
1717 Main Street, Suite 5400
Dallas, Texas 75201
Telephone: (469) 357-2500
Facsimile: (469) 327-0860
Vince.Slusher@faegredrinker.com
*Admitted Pro Hac Vice*

*Counsel for the Debtors and Debtors in Possession*

## MOTION

The Debtor hereby moves (the "Motion") pursuant to sections 105, 363, and 365 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 and Rules 9013-1 through 9013-4 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Central District of California (the "Local Rules"), for entry of an order (the "Bidding Procedures Order"):

a) authorizing and approving the Debtor's entry into (but not consummation of) the Stalking Horse Agreement, attached to the Motion as Exhibit A, subject only to higher and better offers submitted in accordance with the Bidding Procedures;

b) approving CTB AZ, LLC (the "Stalking Horse Bidder") as the stalking horse bidder and approving the Stalking Horse Agreement as the form to be used by all other bidders, as provided in the Bidding Procedures Order;

c) authorizing and approving the Bidding Procedures, substantially in the form attached to the Motion as Exhibit B;

d) authorizing and approving (i) certain bid protections and (ii) payment of the Break-up Fee to the Stalking Horse Bidder, as an administrative expense of the Debtor's estate under sections 503(b) and 507(a)(2) of the Bankruptcy Code, subject to the occurrence of certain conditions set forth in the Stalking Horse Agreement;

e) setting the deadline for potential bidders to submit a proposal for the Purchased Assets (the "**Bid Deadline**"), scheduling the auction for the Purchased Assets (the "**Auction**"), and scheduling the hearing with respect to the approval of the sale and notices related thereto (the "**Sale Hearing**");

f) authorizing and approving (i) notice of the Auction and the Sale Hearing, substantially in the form attached to the Motion as Exhibit C (the "**Sale Notice**"), and (ii) notice of the proposed cure costs and the assumption and assignment of certain contracts of the Debtor, substantially in the form attached to the Motion as Exhibit D (the "**Cure Notice**");

g) authorizing and approving the procedures set forth in the Motion and Bidding Procedures Order for the assumption and assignment of certain of the Debtor's executory contracts and unexpired leases and the determination of cure costs (the "**Assignment Procedures**").

By this Motion, the Debtor also seeks, pursuant to sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006, entry of an order (the "Sale Order") at the Sale Hearing:

a) authorizing and approving the sale of the Purchased Assets (the "**Sale**") free and clear of all liens, claims, encumbrances, and interests;

b) authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection therewith; and

c) granting related relief.

## **ADDITIONAL INFORMATION**

The Motion is based on the attached Memorandum of Points and Authorities and the *Declaration of Mark G. Monson*, the arguments of counsel, and other admissible evidence properly brought before the Court at or before the hearing on this Motion.  In addition, the Debtor requests that the Court take judicial notice of all documents filed with the Court in this Case.

Counsel to the Debtor will serve this Motion, Notice of Motion, and the attached Memorandum of Points and Authorities on the following parties: (i) the Office of the United States Trustee, (ii) the 20 largest creditors appearing on the list filed by the Debtor in accordance with Federal Rule of Bankruptcy Procedure 1007(d), unless and until a committee is appointed and it retains counsel, then in such event, to counsel for the committee, (iii) the United States of America, by service to the Attorney General of the United States and the United States Attorney for the Central District of California, and any department or agency of the United States of America that is affected by the Limited Notice Matter until counsel for the United States makes an appearance on behalf of that department or agency, and thereafter on that counsel, (iv) the State of California, by service to the Attorney General of California, and any department or agency of the State of California that is affected by the Limited Notice Matter until counsel for the State of California makes an appearance on behalf of that department or agency, and thereafter on that counsel, (v) the State of Arizona, by service to the Attorney General of Arizona, and any department or agency of the State of Arizona that is affected by the Limited Notice Matter until counsel for the State of Arizona makes an appearance on behalf of that department or agency, and thereafter on that counsel, (vi) parties that file with the court and serve upon the Debtor requests for notice of all matters in accordance with Bankruptcy Rule 2002(i), (vii) all secured lenders and lenders providing debtor-in-possession financing, (viii) any party filing and serving upon the Debtor a request for receive special notice, and (ix) any party with a pecuniary interest in the subject matter of a particular Limited Notice Matter or its counsel.

1    In the event that the Court grants the relief requested by the Motion, the Debtor shall provide

2    notice of the entry of the order granting such relief upon each of the foregoing parties and any other

3    parties in interest as the Court directs. The Debtor submits that such notice is sufficient and that no

4    other or further notice be given.

5    WHEREFORE, the Debtor respectfully requests that this Court enter an order granting the

6    relief requested in the Motion and such other and further relief as may be just and proper.

7

8    Dated: September 4, 2020

**FAEGRE DRINKER BIDDLE & REATH LLP**

9
By: */s/ Ryan M. Salzman*

10
Ryan M. Salzman (CA Bar #299923)
Ryan.Salzman@faegredrinker.com
Jeremy M. Pelphrey (CA Bar #249862)

11
Jeremy.Pelphrey@faegredrinker.com
1800 Century Park East, Suite 1500

12
Los Angeles, CA 90067
Telephone: (310) 203-4000

13
Facsimile: (310) 229-1285

14
Vince Slusher (TX Bar # 00785480)

15
1717 Main Street, Suite 5400
Dallas, Texas 75201

16
Telephone: (469) 357-2500
Facsimile: (469) 327-0860
Vince.Slusher@faegredrinker.com

17
*Admitted Pro Hac Vice*

18
*Counsel for the Debtors and Debtors in Possession*

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................. 1

I.    JURISDICTION AND VENUE ................................................................................. 1

II.   BACKGROUND ..................................................................................................... 1

III.  SUMMARY OF THE REQUESTED RELIEF ........................................................ 2

    A.   The Stalking Horse Agreement .................................................................... 2

    B.   The Bidding Procedures ............................................................................... 4

    C.   Key Dates And Deadlines ........................................................................... 12

    D.   Notice Procedures ....................................................................................... 13

    E.   Assignment and Cure Procedures .............................................................. 14

IV.   ARGUMENT ........................................................................................................ 17

    A.   Approval of the Bidding Procedures Is Appropriate and in the Best
        Interests of the Debtor's Estates ................................................................. 17

    B.   The Break-Up Fee Is Necessary and Should Be Approved ........................ 20

    C.   The Debtor's Assumption of the Stalking Horse APA Should Be Approved**Error!
        Bookmark not defined.**

    D.   The Notice Procedures Should Be Approved .............................................. 22

    E.   The Procedures for Assumption and Assignment of Executory Contracts
        and Unexpired Leases Should Be Approved .............................................. 23

    F.   Approval of the Sale Is Appropriate Under Sections 105(a) and 363(b) of
        the Bankruptcy Code ................................................................................... 25

        i.    The Sale Is a Sound Exercise of the Debtor's Business Judgment .......... 25

        ii.   The Sale Satisfies the Requirements for a Sale Free and Clear of
            Interests ................................................................................................... 27

        iii.  The Winning Bidder Should Be Entitled to the Protections of
            Section 363(m) of the Bankruptcy Code................................................ 27

    G.   Relief from Certain Requirements of Bankruptcy Rules 6004(h) and
        6006(d) Is Appropriate ................................................................................ 29

THE APPLICABLE REQUIREMENTS OF LBR 6004-1 HAVE BEEN SATISFIED ............. 30

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*In re 995 Fifth Ave. Assocs.*,
  96 B.R. 24 (Bankr. S.D.N.Y. 1989) ................................................................21

*In re Abbotts Dairies of Pennsylvania, Inc.*
  788 F.2d 143 (3d Cir. 1986).................................................................18, 27, 29

*In re Alpha Industries, Inc.*,
  84 B.R. 703 (Bankr. D. Mont. 1988) ...............................................................19

*In re Apex Oil Co.*,
  92 B.R. 847 (Bankr. E.D. Mo. 1988) ...............................................................19

*In re Bon Ton Rest. & Pastry Shop, Inc.*,
  53 B.R. 789 (Bankr. N.D. Ill. 1985)..................................................................25

*In re Bygaph, Inc.*,
  56 B.R. 596 (Bankr. S.D.N.Y. 1986) ................................................................25

*Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl, Energy, Inc.)*,
  181 F.3d 527 (3d Cir. 1999)..............................................................................21

*Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*,
  103 B.R. 524 (Bankr. D.N.J. 1989)...................................................................25

*In re Christ Hosp.*,
  No. CIV.A. 14-472 ES, 2014 WL 4613316 (D.N.J. Sept. 12, 2014)...............29

*Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
  60 B.R. 612 (Bankr. S.D.N.Y. 1986) ................................................................23

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*,
  722 F.2d 1063 (2d Cir. 1983)............................................................................27

*In re Continental Airlines, Inc.*,
  780 F.2d 1223 (5th Cir. 1986).....................................................................27, 28

*In re CXM, Inc.*,
  307 B.R. 94 (Bank. N.D. Ill. 2004)...................................................................22

*Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*,
  242 B.R. 147 (D. Del. 1999).............................................................................27

*In re Dan River Dan River, Inc.*,
  No. 0-10990 (Banker.N.D.Ga. December 17, 2004) ........................................22

*In re Delaware & Hudson Ry. Co.*,
  124 B.R. 169 (D. Del. 1991).............................................................................27

*In re Exennium, Inc.*,
715 F.2d 1401 (9th Cir. 1983)...............................................................................19

*In re Filtercorp, Inc.*,
163 F.3d 570 (9th Circ. 1998)...............................................................................19

*FutureSource LLC v. Reuters, Ltd.*,
312 F.3d 281 (7th Cir. 2002)................................................................................29

*In re Global Motorsport Group, Inc. et al.*,
(Case No. 08-10192 (KJC) (Bankr. D. Del. February 14, 2008) ........................22

*In re Huntington, Ltd.*,
654 F.2d 578 (9th Cir. 1981)................................................................................27

*In re Hupp Indus.*,
140 B.R. 191 (Bankr. N.D. Ohio 1997) ...............................................................21

*In re Industrial Valley Refrig. and Air Cond. Supplies, Inc.*,
77 B.R. 15 (Bankr. E.D. Pa. 1987) .......................................................................18

*In re Integrated Res., Inc.*,
147 B.R. 650 (S.D.N.Y. 1992) .............................................................................21

*In re Lake Burton Development, LLC*,
No. 09-22830 (Bankr.N.D.Ga. April 1, 2010) .....................................................22

*In re M Capital Corp.*,
290 B.R. 743 (B.A.P. 9th Circuit, 2003) ..............................................................19

*In re Marrose Corp.*,
No. 89 B 12171 (CB), 1992 WL 33848 (Bankr. S.D.N.Y. Feb. 15, 1992)...........21

*Myers v. Martin (In re Martin)*,
91 F.3d 389 (3d. Cir. 1996)..................................................................................26

*In re Natco Indus., Inc.*,
54 B.R. 436 (Bankr. S.D.N.Y. 1985) ....................................................................25

*Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*,
78 F.3d 18 (2d Cir. 1996)......................................................................................25

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*,
4 F.3d 1095 (2d Cir. 1993).............................................................................23, 25

*In re Qintex Entertainment, Inc.*,
950 F.2d 1492 (9th Cir. 1991)..............................................................................27

*In re Reliant Energy Channelview LP*,
594 F.3d 200 (3d Cir. 2010).................................................................................21

*In re Rock Indus. Mach. Corp.*,
572 F.2d 1195 (7th Cir. 1978)..............................................................................18

FAEGRE DRINKER
BIDDLE & REATH LLP
ATTORNEYS AT LAW
LOS ANGELES (CENTURY
......)

- iii -    CASE NO. 9:20-BK-10554-DS

*In re Walter*,
   83 B.R. 14 (9th Cir. B.A.P. 1988).................................................................................27, 28

*In re Wilde Horse Enterprises*,
   136 B.R. 830 (Bankr. C.D. Cal. 1991).................................................................................18

**STATUTES, RULES & REGULATIONS**

11 U.S.C. § 101 .................................................................................................................12

11 U.S.C. § 105(a) .....................................................................................................1, 19, 26

11 U.S.C. § 363 ...................................................................................................1, 12, 17, 27

11 U.S.C. § 363(b) ....................................................................................................... *passim*

11 U.S.C. § 363(f) ...................................................................................................3, 28, 29

11 U.S.C. § 363(m) ...............................................................................................19, 29, 30

11 U.S.C. § 365 ...................................................................................................1, 15, 16, 26

11 U.S.C. § 365(a) .................................................................................................23, 24, 25

11 U.S.C. § 365(b) .................................................................................................16, 17, 24

11 U.S.C. § 365(f) .......................................................................................................25, 26

11 U.S.C. § 365(k) ...............................................................................................................17

11 U.S.C. § 503(b) .......................................................................................................21, 22

11 U.S.C. § 507(a)(2) ..........................................................................................................22

11 U.S.C. § 1107(a) ...............................................................................................................1

11 U.S.C. § 1108 ....................................................................................................................1

11 U.S.C. § 1129 ..................................................................................................................18

11 U.S.C. § 1146(a) ...............................................................................................................3

28 U.S.C. § 157 .....................................................................................................................1

28 U.S.C. § 157(b) ................................................................................................................1

28 U.S.C. § 1334 ...................................................................................................................1

28 U.S.C. § 1408 ...................................................................................................................1

28 U.S.C. § 1409 ...................................................................................................................1

Fed. R. Bankr. P. 2002 ................................................................................................. *passim*

Fed. R. Bankr. P. 2002(a) .............................................................................................20, 23, 24

Fed. R. Bankr. P. 2002(c) ..................................................................................20, 23, 24

Fed. R. Bankr. P. 6004 ...........................................................................................1

Fed. R. Bankr. P. 6004-1 ........................................................................................1

Fed. R. Bankr. P. 6004(a) ........................................................................................3

Fed. R. Bankr. P. 6004(h) ...........................................................................3, 12, 30, 31

Fed. R. Bankr. P. 6006 ...........................................................................................1

Fed. R. Bankr. P. 6006(d) .................................................................................30, 31

Fed. R. Bankr. P. 9007 ...........................................................................................1

Fed. R. Bankr. P. 9013-1 through 9013-4 ...................................................................1

Fed. R. Bankr. P. 9014 ...........................................................................................1

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.    JURISDICTION AND VENUE

3

4

5

6

7

The United States Bankruptcy Court for the Central District of California has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference from the United States District Court for the Central District of California.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8

9

10

11

12

13

The bases for the relief requested herein are sections 105(a), 363, and 365 of the United States Bankruptcy Code (the "Bankruptcy Code"), sections 2002, 6004, 6006, 9007 and 9014 of the United States Bankruptcy Rules (the "Bankruptcy Rules"), and Rule 6004-1 and Rules 9013-1 through 9013-4 of the Bankruptcy Local Rules for the Central District of California (the "LBR"), and the *Guidelines and Requirements for Chapter 11 California Debtors In Possession (For all Cases Filed in the  Central District-CA)* effective January 1, 2020 (the "Guidelines").

14

### II.    BACKGROUND

15

16

17

18

19

20

21

22

23

24

25

On April 24, 2020, Community Provider of Enrichment Services, Inc. d/b/a CPES Inc. ("CPES AZ" or the "Debtor") and Novelles Developmental Services, Inc. ("Novelles") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On August 11, 2020 (together with April 24, 2020, the "Petition Date"), CPES California, Inc. ("CPES CA," and together with CPES AZ and Novelles, the "Debtors") filed a voluntary petition under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee has been appointed in these Chapter 11 Cases.  Additional information regarding the circumstances leading to the commencement of the Chapter 11 Cases and information regarding the Debtors' businesses and capital structure is set forth in the *Declaration of Mark G. Monson in Support of Emergency First Day Motions* [Dkt. No. 16].

26

27

28

III.    **SUMMARY OF THE REQUESTED RELIEF**

The Debtor seeks entry of an order (a) authorizing and approving the Debtor's entry into the Stalking Horse Asset Purchase Agreement, (b) authorizing and approving the bidding procedures, certain bid protections and payment of the break-up fee, (c) approving notice procedures, (d) approving procedures for assumption and assignment of certain executory contracts and unexpired leases, and (e) scheduling a hearing to approve the sale (the "<u>Sale</u>") of substantially all assets owned by Debtor ("<u>Purchased Assets</u>") more fully described in the Asset Purchase Agreement dated as of September 3, 2020 (the "<u>Stalking Horse Agreement</u>") by and among the Stalking Horse Bidder and the Debtor (each as defined herein).

Approval of the bidding and potential auction process contemplated by the Bidding Procedures will result in a sale of substantially all of the assets of the Debtor in these chapter 11 cases. As in any successful all-asset sale, the bidding and sale process set forth below is open and fair, will maximize the value of the Debtor's estate, and provides the best possible outcome for the Debtor's creditors and other stakeholders.

A.    **The Stalking Horse Agreement**

The Debtor has been in discussions with potential buyers since late 2019. In June 2020, the Debtors engaged CohnReznick Capital ("<u>CRC</u>") to identify potential buyers for some or all of the Debtors' assets and commenced discussions with those parties. CRC prepared a Confidential Investment Memorandum (the "CIM") and an online data room to facilitate the sharing of information with potential buyers. CRC contacted a number of potential buyers to solicit their interest in exploring a transaction regarding the Debtor's assets, and for the past several weeks, the Debtor, its counsel, and CRC have been in negotiations with various parties who expressed interest in acquiring some or all of the Debtor's assets.

A copy of the Stalking Horse Agreement entered into between the Debtor and the Stalking Horse Purchaser is attached here as **<u>Exhibit A</u>**. The salient terms of the Stalking Horse Agreement are as follows:

| Provision | Summary |
|---|---|
| Purchase Price | The aggregate consideration payable at Closing for the Purchased Assets (the "Purchase Price") shall be a cash amount equal to $420,000.00, calculated by the number of DDD Licenses anticipated to be included in the Purchased Assets at Closing multiplied by $7,500 per DDD License; provided, however, that should the number of DDD Licenses of the Debtor increase or decrease between the date of the Stalking Horse Agreement and Closing, the Purchase Price shall be adjusted accordingly. |
| Sale to Insider | The Stalking Horse Bidder is not an insider of the Debtor. |
| Agreements with Management | The Stalking Horse Bidder has not discussed or entered into any agreements with management or key employees regarding compensation or future employment. |
| Releases | To be provided in the Sale Order.[1] |
| Private Sale/Competitive Bidding | The sale transaction is subject to higher and better bids, as set forth in the bidding procedures below. |
| Closing and Other Deadlines | Closing Date: The later of (a) thirty days after the date upon which the Sale Order becomes the Final Order; (b) the first business day after the date upon which all of the conditions set forth in Article VI are satisfied or waived; or (c) such other date as the parties may mutually agree, upon which the Closing takes place. |
| Deposit | $42,000.00. Stalking Horse Agreement § 2.5. |
| Interim Agreement with Proposed Buyer | Not applicable. |
| Use of Proceeds | Not applicable. |
| Tax Exemption | If any transfer taxes, stamp taxes, or similar taxes are ultimately payable, notwithstanding section 1146(a) of the Bankruptcy Code or for any other reason, Debtor shall pay any and all such transfer, stamp, or similar taxes, which may be payable by reason of the transaction contemplated in the Stalking Horse Agreement and any and all claims, charges, interest or penalties assessed, imposed, or asserted in relation to any such taxes. |
| Record Retention | Not applicable. |
| Sale of Avoidance Actions | Not applicable. |
| Requested Findings as to Successor Liability | Not applicable. |

---

[1] The Sale Order will be filed at least twenty-one (21) days prior to the Sale Hearing.

| Provision | Summary |
|---|---|
| Sale Free and Clear | Except as otherwise provided in the Winning Bidder's or Bidders' purchase agreement, the Purchased Assets shall be sold and transferred free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests therein pursuant to section 363(f) of the Bankruptcy Code. |
| Credit Bid | Not applicable. |
| Relief from Bankruptcy Rule 6004(h) | None in Stalking Horse Agreement. This Motion contains Debtor's requested waiver of Bankruptcy Rule 6004(a)&(h). |

The Debtor believes that the process proposed hereby is designed to generate maximum interest in the Purchased Assets within the limited time available by offering maximum flexibility with respect to Sale proposals. The Debtor developed the Bidding Procedures in consultation with its advisors to preserve flexibility in this marketing process and generate the greatest level of interest and the highest or best value for the Debtor's assets.

**B.    The Bidding Procedures**

Preserving value for the benefit of the Debtor's estate depends in large part on the Debtor proceeding swiftly to consummation of a sale of its assets, to be followed by confirmation of a plan by which the proceeds of such sale will be distributed to minimize the effects of the Debtor's Chapter 11 Cases on the value of the Debtor's businesses.

To govern the bidding and Auction process, the Debtor has developed and proposed the Bidding Procedures attached hereto as **Exhibit B**.[2] The Debtor designed the Bidding Procedures to encourage all entities to put their best bids forward and to maximize the value of the Debtor's estate. The Bidding Procedures will maximize the likelihood of an acceptable overbid for the benefit of enterprise-wide stakeholders. The Debtor also seeks authority to pay or incur the

---

[2] This summary is qualified in its entirety by the Bidding Procedures. All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings in the Bidding Procedures. To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

1    obligation to pay a break-up fee, as more fully described in the Stalking Horse Agreement (the

2    "Break-up Fee").[3]  Stalking Horse Agreement § 5.4(c).

3            In consultation with CRC, the Debtor has developed a list of parties whom they believe may

4    be interested in, and whom the Debtor reasonably believes would have the financial investors to do

5    so (collectively, the "Contact Parties").  The Debtor and/or its advisors will contact (subject to

6    Section 7.2 of the Stalking Horse Agreement) the Contact Parties to explore their interest in

7    purchasing the Debtor's assets.  The Contact Parties may include parties whom the Debtor or its

8    advisors previously contacted regarding a transaction, regardless of whether such parties expressed

9    any interest at such time in pursuing a Sale.

10           The Debtor believes that the auction process and the time periods set forth in the Bidding

11    Procedures are reasonable and will provide parties with sufficient time and information necessary

12    to formulate a bid to purchase the Purchased Assets.  In formulating the procedures and time

13    periods, the Debtor balanced the need to provide adequate and appropriate notice to parties in

14    interest and to potential purchasers with the need to quickly and efficiently sell the Debtor's assets

15    while they have realizable value and can be maintained as a going concern.  Furthermore, potential

16    bidders have had and will, in accordance with the Bidding Procedures, continue to have access to

17    comprehensive information prepared by the Debtor and its advisors compiled in an electronic data

18    room.

19           Completion of the sale process in a timely manner will maximize the value of the Purchased

20    Assets.  The time periods set forth in the Bidding Procedures were negotiated by the Stalking Horse

21    Bidder, and failure to adhere to such time periods could jeopardize the closing of the Sale, which

22    the Debtor believes is the best means of maximizing the value of its assets and maintaining the

23    business as a going concern, which could enable its employees to retain their jobs and will reduce

24    claims against the Debtor's estate.  Thus, the Debtor has determined that pursuing the Sale in the

25    manner and with the procedures proposed is in the best interest of the Debtor's estate and will

26    provide all interested parties with sufficient opportunity to participate.

27

28

---

[3] The Break-up Fee is equal to approximately 3% of the Purchase Price.

The key provisions of the Bidding Procedures and required disclosures pursuant to LBR 6004-1 are set forth below:

| Provision | Summary |
| --- | --- |
| Qualification of Bidders | a) To participate in the bidding process, the auction for a Proposed Transaction (as defined below), if any (the "Auction"), or otherwise be considered for any purpose hereunder, a person or entity interested in acquiring the Purchased Assets (each, a "Potential Bidder") must first deliver the following materials to the Debtor and its advisors: <br><br> i) An executed confidentiality agreement in form and substance acceptable to the Debtor and its advisors (the "Confidentiality Agreement") (to be delivered prior to the distribution of any confidential information by the Debtor to any Potential Bidder), whereby the Potential Bidder agrees that all non-public information about the Debtor received by a Potential Bidder will be kept strictly confidential in accordance therewith and used only in connection with analyzing a proposed transaction (a "Proposed Transaction") for the purchase of the Purchased Assets pursuant to section 363 of the Bankruptcy Code. <br><br> ii) Written evidence that enables the Debtor and its advisors to reasonably determine whether a Potential Bidder has the financial and other ability to close a Proposed Transaction and provide adequate assurance of future performance under all contracts and leases to be assumed in connection therewith. <br><br> iii) Full disclosure of whether the Potential Bidder and any members of its investor group, if applicable, or any equity holders in the case of a Potential Bidder which is an entity specially formed for the purpose of effectuating a Proposed Transaction, has any connections or relationships (business or otherwise) to, or agreements or understandings with, the Debtor or any of its Affiliates and/or any officer, director or equity security holder of the Debtor or any of its Affiliates and, if so, the complete nature of such connections or relationships and the complete terms of such agreements or understandings. <br><br> See Bidding Procedures at § 1. |
| Qualified Bids | Any Potential Bidder interested in a Proposed Transaction must submit a Bid prior to 4:00 p.m. prevailing Pacific Time on September 24, 2020 (or such later date and time as the Debtor may announce, subject to the terms of the Stalking Horse Agreement) (the "<u>Bid Deadline</u>").    In order for a Bid to be considered, it must be a "Qualified Bid".    A Potential Bidder will be deemed to be a |

| Provision | Summary |
|-----------|---------|
|  | "<u>Qualified Bidder</u>" if the Debtor and its advisors, in their sole discretion, determine that such Potential Bidder submitted a Qualified Bid.  For the avoidance of doubt, the Stalking Horse Bidder is deemed a Qualified Bidder and may, but is not required to, participate in the Auction. The Stalking Horse Bid is a Qualified Bid. |

A Bid, other than the Stalking Horse Bid, will be considered a "<u>Qualified Bid</u>" only if the Bid (w) is in writing; (x) is for an acquisition of either (I) all or substantially all of the Purchased Assets (an "<u>All Assets Bid</u>") pursuant to a purchase agreement in the form of the Stalking Horse Agreement that contains substantially all of the terms and conditions contained in the Stalking Horse Agreement (except for an increased purchase price) and otherwise contains terms no less favorable to the Debtor's estate than the Stalking Horse Agreement, as determined by the Debtor, and (y) fulfills, <u>inter alia</u>, at a minimum, the following requirements prior to the Bid Deadline:

i) Provides that the Bid shall remain irrevocable until the consummation of the Proposed Transaction (the "<u>Effective Date</u>") implementing the Winning Bid(s) or the Backup Bid(s) (each, as defined below) (such date, the "<u>Bid Expiration Date</u>");

ii) Is made by a person or entity that reasonably demonstrates evidence of fully committed and unconditional financing for such Bid and other ability to consummate the applicable Proposed Transaction, in each case solely as acceptable to the Debtor;

iii) Provides written evidence, in form and substance reasonably satisfactory to the Debtor, that the Potential Bidder has obtained authorization and approval from the Potential Bidder's board of directors (or comparable governing body) or, if required, the equity holders of the Potential Bidder, with respect to the submission of its Bid and the execution, delivery, performance and closing of the agreements associated therewith, or a representation that no such authorization or approval is required;

iv) Provides that the total consideration for all of the Purchased Assets in the aggregate will be an amount or value equal to or greater than: (1) $500,000 (such sum, the "<u>Initial Overbid Amount</u>"), and otherwise has a value to the Debtor, in the exercise of its reasonable business judgment, after consultation with its advisors, that is greater or otherwise better than the value offered under the Stalking Horse Agreement; or (2) such other combination of cash, assumed liabilities and/or excluded assets that, in the Debtor's

| Provision | Summary |
|---|---|
| | determination, exceeds the value of the Stalking Horse Agreement to the Debtor; |
| | v) Is accompanied by, or is followed prior to the Bid Deadline by, a wire transfer of immediately available funds to an escrow agent designated by the Debtor at least two business days before the Bid Deadline (the "Escrow Agent") of an earnest money cash deposit of not less than ten percent (10%) of the total purchase price proposed by the competing Bid (a "Good Faith Deposit"); |
| | vi) Provides written evidence satisfactory to the Debtor that the Potential Bidder or group of Potential Bidders has existing experience, expertise, and sophistication in managing and providing behavior healthcare services for organizations of similar size. The Potential Bidder must be reasonably likely to obtain prompt regulatory approval from DDD and any other regulatory body that might be required to approve the Proposed Transaction prior to Closing; |
| | vii) Is submitted in the form of a legally binding purchase agreement, together with such exhibits, schedules, annexes, appendices and attachments thereto as required by the Debtor in their reasonable discretion and all in the form of those documents used in the Stalking Horse Agreement, fully executed by the Potential Bidder in a clean copy and accompanied by a redlined version of all such documents, marked to show the proposed changes from the Stalking Horse Agreement and applicable exhibits, schedules, annexes, appendices and attachments thereto, that further: |
| | (1) Fully discloses the identity of the Potential Bidder and any members of its investor group, if applicable, or any equity holders in the case of a Potential Bidder which is an entity specially formed for the purpose of effectuating the Proposed Transaction, and whether any such person or entity is an insider (as defined in section 101 of the Bankruptcy Code) of the Debtor; |
| | (2) Is not subject to any conditions, representations, or terms that the Debtor determines to be unacceptable; |
| | (3) Describes with specificity the total consideration proposed to be paid for the Purchased Assets; |
| | (4) Is not conditioned upon the Bankruptcy Court's approval of, and includes an express acknowledgement and representation that the Potential Bidder is not entitled to, any Bid |

| Provision | Summary |
|---|---|
| | protections, such as a break-up fee, termination fee, expense reimbursement, working fee or similar type of payment in connection with its Bid; |
| | (5) Is not conditioned upon tax or other due diligence or the receipt of financing; |
| | (6) Does not contain any condition to closing of a Proposed Transaction relating to the receipt of any third party approvals (excluding required Bankruptcy Court approval and any required governmental and/or regulatory approval or third party consents required under the Stalking Horse Agreement); |
| | (7) Expressly acknowledges and represents that the Potential Bidder: (A) has had an opportunity to conduct any and all due diligence regarding the Debtor (as defined in the Stalking Horse Agreement) and the applicable Proposed Transaction prior to making its Bid, (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Debtor in making its Bid, and (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets, the business of the Debtor or the Proposed Transaction, or the completeness or accuracy of any information provided in connection therewith or with the Auction, except as expressly stated in the representations and warranties contained in the purchase agreement ultimately accepted and executed by the Debtor; |
| | (8) Identifies with particularity each and every executory contract and unexpired lease that the Potential Bidder desires the Debtor to assume and assign at the closing and provides evidence of such Potential Bidder's ability to provide adequate assurance of future performance to counterparties to such contracts or leases to be assumed (as required by section 365(b)(1)(C) of the Bankruptcy Code) along with the Bid, which shall include: (i) the Potential Bidder's most recent audited financial statements (or unaudited, if audited financials are not available); and (ii) financial projections or financial pro-formas for the Potential Bidder (collectively, the "Adequate Assurance Information"); |

| Provision | Summary |
|---|---|
|  | (9)   States that the Potential Bidder consents to the jurisdiction of the Bankruptcy Court; |
|  | (10) Includes a commitment to close the applicable Proposed Transaction within the timeframe contemplated by the Stalking Horse Agreement; and |
|  | (11) Contains such other information reasonably requested by the Debtor and its advisors; |
|  | viii) Provides that the Potential Bidder agrees to serve as a Backup Bidder (as defined below) if such bidder's Qualified Bid is selected as the next highest or otherwise best bid (or one of a combination of Qualified Bids) after the Winning Bid; |
|  | ix) Sets forth the representatives who are authorized to appear and act on behalf of the Potential Bidder at the Auction |
|  | x) Contains written confirmation that the Potential Bidder has not engaged in any collusion with respect to the bidding or the sale process; and |
|  | xi) Represents that the Bid constitutes a good faith, *bona fide* offer to effectuate the Proposed Transaction. |
|  | *See* Bidding Procedures at § 2. |
| No-Shop or No-Solicitation Provisions | The Bidding Procedures do not limit the Debtor's ability or right to solicit higher or otherwise better bids upon entry of the Bidding Procedures Order. The Sale contemplated by this Motion and the Bidding Procedures calls for a fair and open bidding and auction process. |
| Break-up Fee | If the Stalking Horse Bidder is not the Winning Bidder for the Purchased Assets, then the Debtor will pay the Stalking Horse Bidder, pursuant to and in accordance with the terms of the Stalking Horse Agreement the Break-up Fees (as defined therein). |
| Initial Overbid and Bidding Increments | With respect to the Purchased Assets, the first Qualified Bid at the Auction shall be deemed to have been made by the Initial Highest Bidder for the applicable assets in the amount of the Initial Highest Bid. Thereafter, the Auction will continue in the manner determined by the Debtor above; provided, however, (i) additional Bids must be Qualified Bids (except that subsequent Qualified Bids made at the Auction by a Qualified Bidder need not be received by the Bid Deadline) and (ii) additional Qualified Bids must be made in higher increments of at least $25,000 in cash above the immediately preceding Bid (the |

| Provision | Summary |
|-----------|---------|
| | "Minimum Bid Increment"). The Debtor may modify the Minimum Bid Increment from time to time as necessary to the extent the Debtor deems appropriate, which modification (if any) will be announced on the record at the Auction.<br><br>*See* Bidding Procedures at § 5. |
| Treatment of Break-up Fee at Auction | Not applicable. The Bidding Procedures do not include a requirement that the Stalking Horse Bidder receive a credit equal to the Break-up Fee when bidding at the auction, or that in such case the Stalking Horse Purchaser will be deemed to have waived the Break-up Fee upon submitting additional Bids at the Auction. |
| Modification of Bidding and Auction Procedures | Other than the Stalking Horse Bidder and the Stalking Horse Bid, the Debtor may disqualify any Qualified Bidder and Qualified Bid from participation in the Auction in the Debtor's discretion. *See* Bidding Procedures at § 3.<br><br>The Auction shall be conducted by the Debtor in accordance with such procedures and requirements as may be established at the discretion of the Debtor and its advisors to result in the highest or otherwise best offer for the Purchased Assets, which rules shall be announced prior to commencement of the Auction and may include the determination of the amount of time between Qualified Bids, the conducting of multiple rounds of open bidding, and to declare that the Auction has ended when no further Bids are timely made or otherwise. The Debtor may, after consultation with its advisors, from time to time waive and/or employ and announce at the Auction additional rules that are reasonable under the circumstances for conducting the Auction provided that such rules are: (i) not inconsistent with the Bidding Procedures Order, the Stalking Horse Agreement, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules of the Bankruptcy Court, or any order of the Bankruptcy Court entered in connection with the Debtor's chapter 11 case and (ii) disclosed to each Qualified Bidder. *See* Bidding Procedures at § 5. |
| Closing with Alternative Back-Up Bidders | At the conclusion of the Auction, the Debtor shall: (i) notify the Qualified Bidder(s) that made the Winning Bid(s) (the "Winning Bidder(s)") that such Bid or Bids have been determined by the Debtor to be the Winning Bid(s), subject only to Bankruptcy Court approval; (ii) notify the Qualified Bidder(s) that made the Backup Bid(s) (the "Backup Bidder(s)") that such Bid has been |

| Provision | Summary |
|---|---|
| | determined by the Debtor to be the Backup Bid(s), subject only to Bankruptcy Court approval; and (iii) file a notice with the Bankruptcy Court announcing the Winning Bidder(s) and Backup Bidder(s) and approval of the same at a hearing to consider approval of the sale of the Purchased Assets (the "Sale Hearing"). Prior to the commencement of the Sale Hearing, the Winning Bidder(s) shall, collectively (X) provide, by wire transfer of immediately available funds, to the Escrow Agent an additional earnest money cash deposit of not less than an additional five percent (5%) of the total value of the purchase price of the Winning Bid(s), or, in the case of Backup Bid(s), an additional earnest money cash deposit of not less than an additional five percent (5%) of the total value of the purchase price for the Backup Bid(s), and (Y) complete and sign all agreements and documents as necessary to bind the Winning Bidder(s) to all of the terms and conditions contemplated by the Winning Bid(s). The Stalking Horse Bidder has the option, but is not obligated, to increase its Bid at the Auction. In the event the Stalking Horse Bidder is not selected as the Winning Bidder and is not the Backup Bidder for the Purchased Assets at the conclusion of the Auction, its Good Faith Deposit shall be returned to the Stalking Horse Bidder in accordance with the terms of the Stalking Horse Agreement and the escrow agreement among the Stalking Horse Bidder, the Debtor and the escrow agent (the "Stalking Horse Deposit Escrow Agreement").

The Backup Bid(s) shall remain irrevocable until the Effective Date or the Bid Expiration Date.

*See* Bidding Procedures at § 5. |
| Relief from Bankruptcy Rule 6004(h) | This Motion seeks relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h). |
| Credit Bidding | Not applicable. |

## C.  <u>Key Dates And Deadlines</u>

The Debtor proposes the following key dates and deadlines for the sale process, certain of which dates and deadlines may be subject to extension in accordance with the Bidding Procedures:

| September 8, 2020 at 10:00 a.m. prevailing Pacific Time | Hearing on Bidding Procedures Motion |
|---|---|
| September 24, 2020 at 4:00 p.m. prevailing Pacific Time | Bid Deadline |
| September 29, 2020 at 10:00 a.m. prevailing Pacific Time | Auction to be held at the offices of Debtor's counsel, 1800 Century Park East, Suite 1500, Los Angeles, California 90067 or such other location as may be announced prior to the Auction to the Auction Participants (including a virtual location) |
| [·], 2020 at 4:00 p.m. prevailing Pacific Time | Deadline to object to the transactions contemplated by the Stalking Horse Agreement or to entry of the Sale Order |
| October 1, 2020 | Target date for Sale Hearing (subject to the Bankruptcy Court's schedule) Deadline for Debtor to return any Good Faith Deposit(s) to Qualified Bidders other than the Winning Bidder and the Back-up Bidder |

Importantly, the Bidding Procedures recognize the Debtor's fiduciary obligations to maximize sale value, and, as such, do not impair the Debtor's ability to consider all qualified bid proposals, and, as noted, preserve the Debtor's right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtor's estate on the terms set forth in the Bidding Procedures.

**D.    Notice Procedures**

If one or more Qualified Bids have been submitted for the Purchased Assets, the Auction shall take place at 10:00 a.m., prevailing Pacific time on September 29, 2020 (or such later time as the Debtor shall timely notify the Auction Participants), with respect to such Qualified Bids in order to determine the Winning Bid(s) and the Backup Bid(s) to submit for approval by the Bankruptcy Court. The Auction shall be organized and conducted by the Debtor at the offices of the Debtor's counsel, Faegre Drinker Biddle & Reath LLP, 1800 Century Park East, Suite 1500, Los Angeles, California 90067 or such other location (including a virtual location) as may be announced prior to the Auction to the Auction Participants. The Auction will be recorded by stenographic means by an authorized court reporter.

The Debtor further submits that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order constitutes good and adequate notice of the Auction and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.

In addition, within three (3) days of entry of the Bidding Procedures Order, the Debtor will serve a sale notice substantially in the form attached as **Exhibit C** (the "Sale Notice") upon (i) the U.S. Trustee, (ii) the Internal Revenue Service, (iii) any parties who have expressed a written interest in the Debtor's assets; (iv) parties who are known or reasonably believed to have asserted any lien, encumbrance, claim or other interest in the Debtor's assets that are the subject of the proposed sale of the Purchased Assets, if any, (v) all applicable state and local taxing authorities in the jurisdictions in which the Debtor may have tax liability, (vi) each governmental agency that is any interested party with respect to the sale of the Purchased Assets contemplated by the Stalking Horse Agreement and the transactions proposed thereunder, (vii) counsel to the Stalking Horse Bidder, and (viii) all parties who have requested notice under Bankruptcy Rule 2002.

The Debtor proposes that no other or further notice of the Auction or Sale shall be required. Accordingly, the Debtor requests that the Court approve the form and manner of the Sale Notice.

### E.     Assignment and Cure Procedures

In connection with the sale process, the Debtor will seek to assume and assign certain executory contracts and unexpired leases identified in the Winning Bidder's Purchase Agreement(s) (collectively, the "Assumed Contracts").

On or before the date that is fourteen (14) days prior to the Sale Objection Deadline (as defined in the Bidding Procedures Order), the Debtor shall file with the Court and serve via first class mail the Cure Notice, substantially in the form attached hereto as **Exhibit D**, on all non-Debtor counterparties to all Assumed Contracts, and their respective known counsel, and provide a copy of same to the Stalking Horse Bidder.  Upon request by a counterparty under any Assumed Contracts, the Debtor shall serve, by electronic mail, the evidence of adequate assurance of future performance under the Assumed Contracts provided by the Stalking Horse Bidder.  Objections, if

any, to the proposed assumption and assignment by the Stalking Horse Bidder of any Assumed Contract or to the cure amount proposed with respect thereto must be filed with the Court and served in accordance with the Assignment Procedures so as to be actually received before the Sale Objection Deadline (as defined in the Bidding Procedures Order).

If the Stalking Horse Bidder is not the Winning Bidder, or if the Winning Bid identifies different executory contracts or unexpired leases for assumption and assignment, or rejection, the Debtor will provide counterparties to the Assumed Contracts with an opportunity to object to the assumption and assignment of any Assumed Contract by no later than two (2) days before the Sale Hearing, solely on the issue of whether the Winning Bidder or Backup Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code.

The Debtor will file with the Court and serve the Cure Notice, substantially in the form of **Exhibit D** hereto, upon each counterparty to the Assumed Contracts.  The Cure Notice will state the date, time and place of the Sale Hearing as well as the date by which any objection to the assumption and assignment of Assumed Contracts (including the Cure Amount (defined below)) must be filed and served.  The Cure Notice also will identify the amounts, if any, that the Debtor believes are owed to each counterparty to an Assumed Contract in order to cure any defaults that exist under such contract (the "Cure Amounts").  Upon request by a counterparty under any Assumed Contracts, the Debtor shall serve, by electronic mail, the evidence of adequate assurance of future performance under the Assumed Contracts provided by the Stalking Horse Bidder.

The inclusion of a contract, lease, or other agreement on the Cure Notice shall not constitute or be deemed a determination or admission by the Debtor and its estate or any other party in interest that such contract, lease, or other agreement is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, and any and all rights with respect thereto shall be reserved.

If an Assumed Contract is assumed and assigned pursuant to Court Order, then unless the Assumed Contract counterparty properly files and serves an objection to the Cure Amount contained in the Cure Notice by the Assumption Objection Deadline (defined below), the Assumed Contract counterparty will receive at the time of the Closing of the sale (or as soon as reasonably

practicable thereafter), the Cure Amount as set forth in the Cure Notice, if any.  If an objection is filed by a counterparty to an Assumed Contract, the Debtor proposes that such objection must set forth a specific default in the executory contract or unexpired lease, claim a specific monetary amount that differs from the amount, if any, specified by the Debtor in the Cure Notice, and set forth any reason why the counterparty believes the executory contract or unexpired lease cannot be assumed and assigned to the Winning Bidder.

If any counterparty objects for any reason to the assumption and assignment of an Assumed Contract (including to a Cure Amount) (an "Assumption Objection"), the Debtor proposes that the counterparty must file the objection and serve it so as to be actually received on or before the Assumption Objection Deadline established in the Bidding Procedures Order, provided, however, as to any Winning Bidder who is not the Stalking Horse Purchaser, any counterparty may raise at the Sale Hearing an objection to the assumption and assignment of the Assumed Contract solely with respect to the Winning Bidder's ability to provide adequate assurance of future performance under the Assumed Contract.  After receipt of an Assumption Objection, the Debtor will attempt to reconcile any differences in the Cure Amount or otherwise resolve the objection with the counterparty.

If and only if the Stalking Horse Bidder is not the Winning Bidder for the Purchased Assets, counterparties to the executory contracts or unexpired leases listed on the Cure Notice shall have until two (2) days before the Sale Hearing to object to the assumption and assignment of an executory contract or unexpired lease listed on the Cure Notice solely on the issue of whether the Winning Bidder or Backup Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code.  For the avoidance of doubt, if the Stalking Horse Bidder is the Winning Bidder, all adequate assurance objections must be filed by the Assumption Objection Deadline.

The Winning Bidder shall be responsible for satisfying any requirements regarding adequate assurance of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assumed Contract, and the failure to provide adequate assurance of future performance to any counterparty to any Assumed

Contract shall not excuse the Winning Bidder from performance of any and all of its obligations pursuant to the Winning Bidder's Purchase Agreement. The Debtor proposes that the Court make its determinations concerning adequate assurance of future performance under the Assumed Contacts pursuant to section 365(b) of the Bankruptcy Code at the Sale Hearing. Cure Amounts disputed by any counterparty will be resolved by the Court at the Sale Hearing or such later date as may be agreed to or ordered by the Court. In the event that the Debtor and the counterparty cannot resolve an Assumption Objection, and the Court does not otherwise make a determination at the Sale Hearing regarding an Assumption Objection related to a Cure Amount, the Debtor shall segregate from the sale proceeds any disputed Cure Amounts pending the resolution of any such Cure Amount disputes by the Court or mutual agreement of the parties.

Except to the extent otherwise provided in the Winning Bidder's Purchase Agreement, the Debtor and the Debtor's estate shall be relieved of all liability accruing or arising after the assumption and assignment of the Assumed Contracts pursuant to section 365(k) of the Bankruptcy Code.

## IV.    ARGUMENT

### A.    Approval of the Bidding Procedures Is Appropriate and in the Best Interests of the Debtor's Estates

The Bidding Procedures satisfy each of the remaining requirements for approval under section 363 of the Bankruptcy Code by (a) providing sufficient notice, (b) facilitating a sale that will maximize value, and (c) ensuring an unbiased and good faith sale process.

The Bidding Procedures provide notice designed to fully inform all parties with a stake in the sale process regarding the portions of the sale process most relevant to their interests. Likewise, the Bidding Procedures detail all material aspects of the potential purchaser notification, bid qualification, due diligence, bid submission, bid selection and auction process, including the timing for each. Accordingly, the Bidding Procedures offer assurance to all potentially interested parties that their rights will be protected and the Sale will be fair and reasonable.

Further, as assurance of value, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform

1    due diligence and acquire the information necessary to submit a timely and well informed bid.  The

2    Debtor will consider all competing offers and Qualified Bids will be tested through the Auction

3    consistent with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and pursuant to

4    the Bidding Procedures approved by the Court.    The fairness and reasonableness of the

5    consideration to be paid by the Winning Bidder ultimately will be demonstrated by adequate

6    "market exposure" and an open and fair auction process – the best means, under the circumstances,

7    for establishing whether a fair and reasonable price is being paid.  The Debtor has the ability to

8    select, in its reasonable business judgment, the highest and best offer for the Purchased Assets.

9    Finally, the Bidding Procedures empower the Debtor to modify the Bidding Procedures (to the

10    extent set forth in the Bidding Procedures) to maximize value for the Debtor's estate.

11        Adoption of the Bidding Procedures is a valid exercise of the Debtor's business judgment.

12    When a bankruptcy court authorizes a sale of assets pursuant to Section 363(b)(1), it is required to

13    make a finding with respect to the "good faith" of Purchaser. *In re Abbotts Dairies of Pennsylvania,*

14    *Inc.* 788 F.2d 143, 149 (3d Cir. 1986); Such a procedure ensures that Section 363(b)(1) will not be

15    employed to circumvent the creditor protections of Chapter 11, and as such, it mirrors the

16    requirement of Section 1129, that the Bankruptcy Court independently scrutinizes the debtor's

17    reorganization plan and makes a finding that it has been proposed in good faith. *Id*. at 150.

18        "Good faith" encompasses fair value, and further speaks to the integrity of the transaction.

19    *In re Wilde Horse Enterprises*, 136 B.R. 830, 842 (Bankr. C.D. Cal. 1991).  With respect to the

20    debtor's conduct in conjunction with the sale, the good faith requirement "focuses principally on

21    the element of special treatment of the Debtor's insiders in the sale transaction." *See In re Industrial

22    Valley Refrig. and Air Cond. Supplies, Inc.*, 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987).  With respect

23    to the buyer's conduct, this Court should consider whether there is any evidence of "fraud, collusion

24    between the purchaser and other bidders or the [debtor], or an attempt to take grossly unfair

25    advantage of other bidders." *In re Abbotts Dairies*, 788 F.2d at 147; *In re Rock Indus. Mach. Corp.*,

26    572 F.2d 1195, 1198 (7th Cir. 1978); *In re Wilde Horse Enterprises*, 136 B.R. 830, 842 (Bankr.

27    C.D. Cal. 1991); *In re Alpha Industries, Inc.*, 84 B.R. 703, 706 (Bankr. D. Mont. 1988).  In short,

28    "[l]ack of good faith is generally determined by fraudulent conduct during the sale proceedings."

*In re Apex Oil Co.*, 92 B.R. 847, 869 (Bankr. E.D. Mo. 1988), citing *In re Exennium, Inc.*, 715 F.2d 1401, 1404-1405 (9th Cir. 1983). *See also In re M Capital Corp.*, 290 B.R. 743 (B.A.P. 9th Circuit, 2003).

In *In re Filtercorp, Inc.*, 163 F.3d 570 (9th Circ. 1998), the Ninth Circuit set forth the following test for determining whether a buyer is a good faith purchaser:

> A good faith buyer "is one who buys 'in good faith' and 'for value.' [citations omitted.] [L]ack of good faith is [typically] shown by 'fraud, collision between the purchaser and other bidders of the trustee, or an attempt to take grossly unfair advantage of other bidders.' [citations omitted]. *Filtercorp*, 163 F.3d at 577.

The Ninth Circuit made clear in Filtercorp that this standard for determining the good faith is applicable even when the buyers is an insider.

The Debtor is not aware of any insider who is contemplating being a potential overbidder. The Debtor is not aware of any fraud, collusion or attempt to take unfair advantage of other bidders. Based on the foregoing, and subject to a satisfactory declaration being submitted by Purchaser describing its relationship with the Debtor, if any, as well as its good-faith conduct throughout the sale process, the Debtor submits that the Court should find that Purchaser (or a successful overbidder) constitutes a good faith purchaser entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code.

The Debtor's decision to pursue a sale of the Purchased Assets represents a reasonable exercise of the Debtor's business judgement, and accordingly, the Debtor should be authorized to sell the Purchased Assets, subject to the outcome of the auction process described herein, under sections 105(a) and 363(b) of the Bankruptcy Code. The Debtor believes that the optimal result for all stakeholders will be reached by preserving its business and Purchased Assets as a going concern. The open and fair auction and sale process contemplated by the Bidding Procedures will ensure that the Debtor's estate receives the highest or otherwise best value available for the Purchased Assets by allowing the market to determine the purchase price of the Purchased Assets and, the Debtor believes, will provide greater recovery than would be provided by any other available alternative. Moreover, the Debtor and its advisors are committed to entertaining and pursuing all

1  value-maximizing alternatives and, accordingly, will be soliciting interest for both sales of the

2  Purchased Assets or alternative restructuring proposals to ensure that they derive the highest or

3  otherwise best value for the Purchased Assets.   Furthermore, compliance with the Bidding

4  Procedures will ensure the fairness and reasonableness of the consideration to be paid by the

5  Stalking Horse Purchaser or other Successful Bidder, and establish that the Debtor and such bidder

6  have proceeded in good faith.

7          The Debtor believes the notice procedures described above are reasonable and adequate

8  under the circumstances. Bankruptcy Rules 2002(a) and (c) require the Debtor to notify creditors

9  of the Sale, the terms and conditions of the Sale, the time and place of the Auction, and the deadline

10  for filing any objections.   The Debtor believes the proposed notice procedures fully comply with

11  Bankruptcy Rule 2002, and are reasonably calculated to provide timely and adequate notice of the

12  Stalking Horse Agreement, the Sale, Bidding Procedures, Auction and the Sale Hearing to the

13  Debtor's creditors and all other parties in interest that are entitled to notice, as well as those parties

14  that have expressed a bona fide interest in acquiring the Purchased Assets.

15          The Debtor submits that the proposed Bidding Procedures will encourage competitive

16  bidding are appropriate under the relevant standards governing auction proceedings and bidding

17  incentives in bankruptcy proceedings, and are consistent with the controlling legal standard.

18  Accordingly, the Debtor requests that the Court approve the Bidding Procedures as a valid exercise

19  of the Debtor's business judgment.

20  **B.**          <u>**The Break-Up Fee Is Necessary and Should Be Approved**</u>

21          The Debtor also seeks authority, pursuant to the Bidding Procedures, to pay the Break-up

22  Fee. In *O'Brien Environmental Energy*, the Third Circuit found that bidding incentives like break-

23  up fees may be paid to a "stalking horse" when (a) such fees are necessary to preserve the value of

24  the estate by promoting competitive bidding, and (b) the stalking horse provided a benefit to the

25  debtor's estate by encouraging interest and increasing the likelihood that the selling price reflected

26  the true value of the company.   *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl.*

27  *Energy, Inc.)*, 181 F.3d 527, 533-37 (3d Cir. 1999).   Such bidding incentives must meet the

28

1    standards applicable to the allowance of administrative expenses under section 503(b) of the

2    Bankruptcy Code.  *See In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010)

3    (citing *Calpine Corp. v. O'Brien Envt'l Energy, Inc. (In re O'Brien Envt'l. Energy, Inc.)*, 181 F.3d

4    527 (3d Cir. 1999)).  For the reasons set forth herein, approval of the Break-up Fee fosters the

5    competitive bidding process encouraged by *O'Brien Environmental Energy*.

6         First, the Break-up Fee promotes competitive bidding and will encourage potential

7    purchasers to invest the requisite time, money, and effort to conduct due diligence and sale

8    negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process.

9    *See, e.g.*, *In re Integrated Res., Inc.*, 147 B.R. 650, 660 (S.D.N.Y. 1992) (noting that fees may be

10   legitimately necessary to convince a "white knight" to offer an initial bid by providing some form

11   of compensation for the expenses such bidder incurs and the risks such bidder faces by having its

12   offer held open, subject to higher and better offers); *In re Hupp Indus.*, 140 B.R. 191, 194 (Bankr.

13   N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant to make an initial bid

14   for fear that their first bid will be shopped around for a higher bid from another bidder who would

15   capitalize on the initial bidder's . . . due diligence"); *In re Marrose Corp.,* No. 89 B 12171 (CB),

16   1992 WL 33848, at *5 (Bankr. S.D.N.Y. Feb. 15, 1992) (stating that "agreements to provide

17   reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as

18   a catalyst or 'stalking horse' which attracts more favorable offers"); *In re 995 Fifth Ave. Assocs.*,

19   96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding that bidding incentives may be "legitimately

20   necessary to convince a white knight to enter the bidding by providing some form of compensation

21   for the risks it is undertaking") (citations omitted).

22        The proposed Break-up Fee is fair and reasonably compensates the Stalking Horse Bidder

23   for incurring costs associated with completing diligence, negotiating terms and entering into the

24   Stalking Horse Agreement, acts that result in a direct benefit to the Debtor's estate.  By conducting

25   due diligence, participating in negotiations for a potential transaction and entering into the Stalking

26   Horse Agreement, the Stalking Horse Bidder has established a bid standard, including a price floor,

27   that provides sufficient proceeds to pay all creditors in full (or to the extent otherwise agreed by

28   such creditor) and will infuse new money into the Debtor's estate.  The Debtor submits that, through

1    its Stalking Horse Bid, the Stalking Horse Bidder has initiated a sales process that will increase the

2    likelihood that the best possible price for the Purchased Assets will be received.

3        Moreover, the Break-up Fee will only be paid if the Debtor consummates an Alternative

4    Transaction (as defined in the Stalking Horse Agreement) that is higher or better than the Stalking

5    Horse Bid, having taken into account the cost of the Break-up Fee.  Thus, payment of the Break-

6    up Fee will not reduce the amount paid to the estate and consequently the Debtor will have

7    benefitted from the Stalking Horse Bidder's agreement to act as a "stalking horse" bidder.

8        The Break-up Fee in the amount of approximately 3% of the Purchase Price is consistent

9    with termination fees approved by bankruptcy courts in chapter 11 cases. *See, e.g. In re CXM, Inc.*,

10   307 B.R. 94, 103-04 (Bank. N.D. Ill. 2004) (Court approved break-up fee in amount equal to actual

11   expenses that the stalking horse incurred in connection with its bid to buy the Sale Assets, subject

12   to a maximum cap of $200,000, which equaled 3% of the cash purchase price of $5,914,000); *In re*

13   *Global Motorsport Group, Inc. et al.*, (Case No. 08-10192 (KJC) (Bankr. D. Del. February 14,

14   2008) (approving a break-up fee of approximately 4%, or $500,000 in connection with sale); *In re*

15   *Dan River Dan River, Inc.*, No. 0-10990 (Banker. N.D. Ga. December 17, 2004) (Court approved

16   break-up fee equal to 5.3% of the cash purchase price); and *In re Lake Burton Development, LLC*,

17   No. 09-22830 (Bankr. N.D. Ga. April 1, 2010) (Court approved break-up fee equal to 4.75% of

18   cash purchase price).

19       The Break-up Fee should be approved and afforded superpriority administrative expense

20   status under sections 503(b) and 507(a)(2) of the Bankruptcy Code because they provide a clear

21   benefit to the Debtor's estate, as they are each reasonable under the circumstances and will enable

22   the Debtor to maximize the value for the Purchased Assets without a chilling effect on the Sale

23   process.

24   **C.    The Notice Procedures Should Be Approved**

25       Pursuant to Bankruptcy Rule 2002(a), the Debtor is required to provide creditors with 21

26   days' notice of the Sale.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the time

27   and place of the Sale and the deadline for filing any objections to the relief requested herein.

28

1    The Debtor submits that notice of this Motion and service of the Sale Notice and the related

2    hearings to consider entry of the Bidding Procedures Order and the Sale Order constitute good and

3    adequate notice of the Sale and the proceedings with respect thereto in compliance with, and

4    satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  Accordingly, no further

5    notice is necessary and the Debtor requests that this Court approve the form and manner of notice

6    of the Auction.

7
**D.    The Procedures for Assumption and Assignment of Executory Contracts and
Unexpired Leases Should Be Approved**
8

9    The Debtor submits that the proposed procedures for assumption and assignment of certain

10   executory contracts and unexpired leases should be approved.  Section 365(a) of the Bankruptcy

11   Code provides that, subject to the court's approval, a trustee "may assume or reject any executory

12   contracts or unexpired leases of the debtor." 11 U.S.C. § 365(a).  Upon finding that a trustee has

13   exercised its sound business judgment in determining to assume an executory contract or unexpired

14   lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code.  *See Nostas*

15   *Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996); *see also Orion*

16   *Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir.

17   1993).

18   Pursuant to section 365(f)(2) of the Bankruptcy Code, a trustee may assign an executory

19   contract or unexpired lease of nonresidential real property if:

20          (A) the trustee assumes such contract or lease in accordance with the
                   provisions of this section; and
21

22          (B) adequate assurance of future performance by the assignee of such
                   contract or lease is provided, whether or not there has been a
                   default in such contract or lease.
23

24   11 U.S.C. § 365(f)(2).

25   The meaning of "adequate assurance of future performance" depends on the facts and

26   circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle*

27   *Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see*

28

*also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *In re Bygaph, Inc.*, 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

The Debtor and the Winning Bidder will present evidence at the Sale Hearing to prove the financial credibility, willingness, and ability of the Winning Bidder to perform under the Assumed Contracts. The Court and other interested parties therefore will have the opportunity to evaluate the ability of any Winning Bidder to provide adequate assurance of future performance under the contracts or leases, as required by section 365(b)(1)(C) of the Bankruptcy Code.

In addition, the Debtor submits that the cure procedures set forth herein are appropriate, reasonably calculated to provide notice to any affected party, and afford the affected party to opportunity to exercise any rights affected by the Motion, and consistent with section 365 of the Bankruptcy Code. To the extent that any defaults exist under any Assumed Contracts, any such defaults will be cured pursuant to the Winning Bidder's Purchase Agreement. Except as otherwise limited by section 365 of the Bankruptcy Code, any provision in the Assumed Contracts that would restrict, condition, or prohibit an assignment of such contracts will be deemed unenforceable pursuant to section 365(f)(1) of the Bankruptcy Code. Accordingly, the Debtor submits that the cure procedures for effectuating the assumption and assignment of the Assumed Contracts as set forth herein are appropriate and should be approved.

**E.**     **Approval of the Sale Is Appropriate Under Sections 105(a) and 363(b) of the Bankruptcy Code**

As discussed above, section 363(b)(1) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

**i.     The Sale Is a Sound Exercise of the Debtor's Business Judgment**

The Sale should be approved as a sound exercise of the Debtor's business judgment. Pursuant to section 105(a) of the Bankruptcy Code, a "[c]ourt may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have required that such use, sale or lease be based upon the sound business judgment of the debtor.  *See e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d. Cir. 1996) (internal citation omitted); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983); *In re Abbott Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147-48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *In re Lionel Corp.*);  *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (holding that the Third Circuit adopted the "sound business judgment" test in Abbotts Dairies); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (same).

In the Ninth Circuit, "cause" exists for authorizing a sale of estate assets if it is in the best interest of the estate, and a business justification exists for authorizing the sale.  *In re Huntington, Ltd.*, 654 F.2d 578 (9th Cir. 1981); *In re Walter*, 83 B.R. 14, 19-20 (9th Cir. B.A.P. 1988).  The Ninth Circuit has also held that section 363 allows the sale of substantially all assets of a debtor's bankruptcy estate after notice and a hearing. *In re Qintex Entertainment, Inc.*, 950 F.2d 1492 (9th Cir. 1991).

1    There must be some articulated business justification, other than appeasement of major

2  creditors, for using, selling or leasing property out of the ordinary course of business before the

3  bankruptcy court may order such disposition under Section 363(b).  *In re Lionel Corp.*, 722 F.2d at

4  1070.  The Ninth Circuit Bankruptcy Appellate Panel in *Walter v. Sunwest Bank (In re Walter)*, 83

5  B.R. 14, 19 (9th Cir. B.A.P. 1988) has adopted a flexible case-by-case test to determine whether

6  the business purpose for a proposed sale justifies disposition of property of the Fifth circuit in *In re*

7  *Continental Airlines, Inc.*, 780 F.2d 1223 (5th Cir. 1986) and the Second Circuit in *In re Lionel*

8  *Corp., supra*, articulated the standard to be applied under Section 363(b) as follows:

9
10
11
12
13
14
15
> Whether the proffered business justification is sufficient depends on the case. As the Second Circuit held in Lionel, the bankruptcy judge should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the Debtor, creditors and equity holders, alike. He might, for example, look to such relevant facts as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value. The list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

16  *In re Walter*, 83 B.R. at 19-20, citing *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th

17  Cir. 1986).

18    The Debtor submits that a strong business justification exists for the Sale.  As set forth

19  herein, the Debtor has determined that the best method of maximizing the recovery of the Debtor's

20  creditors is through the sale of the Purchased Assets to the Stalking Horse Bidder, or the Winning

21  Bidder.  Further, the Debtor believes that the value of its estate (and, thus, that the Debtor's creditors

22  will receive from the Sale) exceeds any value of the Debtor's estate could obtain for the Purchased

23  Assets if the Debtor is required to liquidate its assets in a piecemeal fashion.  As assurance of value,

24  bids will be tested through the Auction consistent with the requirements of the Bankruptcy Code,

25  the Bankruptcy Rules, and pursuant to the Bidding Procedures approved by the Court.

26    In addition to the Debtor's prior marketing efforts, CRC has been contacting potential

27  interested parties and has assembled a data room which is available upon the execution of an

28

FAEGRE DRINKER
BIDDLE & REATH LLP
ATTORNEYS AT LAW
LOS ANGELES (CENTURY PARK)

CASE NO. 9:20-BK-10554-DS

appropriate confidentiality agreement.  There is a limited universe of potential acquirers of the Purchased Assets, and the Debtor and its advisors have been in active discussions with many of these potential purchasers.

ii.      **The Sale Satisfies the Requirements for a Sale Free and Clear of Interests**

The Sale also meets the requirements for a sale free and clear of liens, claims, interests and encumbrances.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in *bona fide* dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

The Debtor submits that the Sale will satisfy the requirements of section 363(f) of the Bankruptcy Code.  The Debtor will provide all parties asserting claims against the Purchased Assets, if any, with notice of, and an opportunity to object to, the Sale.  Absent objection, each such party will be deemed to have consented to the Sale. *See, e.g., FutureSource LLC v. Reuters, Ltd.*, 312 F.3d 281 (7th Cir. 2002) (failure to object may constitute consent, if there was adequate notice; *In re Christ Hosp.*, No. CIV.A. 14-472 ES, 2014 WL 4613316, at *14 (D.N.J. Sept. 12, 2014) ("Silence by affected claim holders may constitute consent for purposes of section 363(f)(2)").

iii.     **The Winning Bidder Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code**

Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property acquired from a debtor notwithstanding that the sale is later reversed or modified on appeal. Specifically, section 363(m) of the Bankruptcy Code states the following:

> The reversal or modification on appeal of an authorization under [section 363(b) of the Bankruptcy Code] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) of the Bankruptcy Code fosters the "policy of not only affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and judgments upon which third parties rely."  *In re Abbotts Dairies*, 788 F.2d at 147. While the Bankruptcy Code does not define "good faith," courts have held that "the phrase encompasses one who purchases in 'good faith' and for 'value.'" *Id.* (explaining that to lack good faith, a party's conduct in connection with sale must usually amount to fraud, collusion between purchaser and other bidders or attempt to take grossly unfair advantage of other bidders).

The Debtor submits that the Stalking Horse Bidder is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and there have been no allegations to the contrary.   The Debtor and the Stalking Horse Bidder have entered into the Stalking Horse Agreement without collusion, in good faith and through extensive arm's-length negotiations. Indeed, the Stalking Horse Bidder and the Debtor have engaged separate counsel and other professional advisors to represent their respective interests in the negotiation of the Stalking Horse Agreement and in the sale process generally.  In addition, CRC is an independent investment banker retained by the Debtor for the purpose of exploring strategic alternatives and marketing the Debtor's businesses.  Accordingly, to the best of the Debtor's knowledge, information and belief, no party has engaged in any conduct that would cause or permit the Stalking Horse Agreement to be set aside under section 363(m) of the Bankruptcy Code.

Further, as set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process.  Each Qualified Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding or the sale of any of the Purchased Assets.  Any asset purchase agreement with a Winning Bidder executed by the Debtor will be negotiated at arm's-length and in good faith.  Accordingly, the Debtor seeks a finding that any Winning Bidder (including the Stalking Horse Bidder) is a good faith purchaser and is entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

**F.**    **Relief from Certain Requirements of Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate**

To implement the foregoing successfully, the Debtor seeks a waiver of the 14-day stay of an order authorizing the use, sale, or lease or property under Bankruptcy Rule 6004(h), and the 14-day stay of an order authorizing the assignment of a contract or unexpired lease under Bankruptcy Rule 6006(d).

Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtor requests that the Order be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, *Collier* suggests that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." *Collier on Bankruptcy*, ¶ 6004.11 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). Furthermore, *Collier* provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

The Debtor believes that the Sale should be consummated as soon as practicable to preserve jobs and maximize the value of the Purchased Assets. Accordingly, the Debtor hereby requests that the Court waive the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the Sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

1

## THE APPLICABLE REQUIREMENTS OF LBR 6004-1 HAVE BEEN SATISFIED

2

Here all of the applicable requirements of LBR 6004-1(b) pertaining to the Motion and the

3

request therein to approve the Bidding Procedures and Break-up Fee have been satisfied.  First, as

4

required by LBR 6004-1(b)(2), the Notice of Motion describes the proposed Bidding Procedures

5

and Break-up Fee and includes a copy of the Stalking Horse Agreement.  Second, as required by

6

LBR 6004-1(b)(2), the Notice of Motion and this Memorandum describe marketing efforts

7

undertaken and the anticipated marketing of the Purchased Assets through the deadline for

8

prospective bidders to submit bids for the Auction.  Third, the Debtor provided notice of and served

9

the Notice of Motion, Motion, and this Memorandum pursuant to LBR 6004-1(b)(3) and the *Order*

10

*Granting Emergency Motion of Debtors for Order Limiting Scope of Notice* [Dkt. No. 75].

11

Therefore, the Debtor submits that service of the Notice of Motion, Motion, and this Memorandum

12

by such means was adequate and appropriate.

13

**WHEREFORE**, the Debtor respectfully requests that the Court enter orders granting the

14

relief requested herein and providing the Debtor such other and further relief as is just and proper.

15

Dated: September 4, 2020

**FAEGRE DRINKER BIDDLE & REATH LLP**

16

17

By:  */s/ Ryan M. Salzman*
Ryan M. Salzman (CA Bar #299923)
Ryan.Salzman@faegredrinker.com
Jeremy M. Pelphrey (CA Bar #249862)

18

Jeremy.Pelphrey@faegredrinker.com
1800 Century Park East, Suite 1500

19

Los Angeles, CA  90067
Telephone: (310) 203-4000

20

Facsimile: (310) 229-1285

21

Vince Slusher (TX Bar # 00785480)
1717 Main Street, Suite 5400

22

Dallas, Texas 75201
Telephone: (469) 357-2500

23

Facsimile: (469) 327-0860
Vince.Slusher@faegredrinker.com

24

*Admitted Pro Hac Vice*

25

*Counsel for the Debtors and Debtors in Possession*

26

27

28

## **Exhibit A**

**Stalking Horse Agreement**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>Exhibit B</u>**

**Bidding Procedures**

1

## Exhibit C

**Sale Notice**

FAEGRE DRINKER
BIDDLE & REATH LLP
ATTORNEYS AT LAW
LOS ANGELES (CENTURY PARK)

CASE NO. 9:20-BK-10554-DS

**<u>Exhibit D</u>**

**Cure Notice**