# ASSET PURCHASE AGREEMENT

**dated as of**

**September 3, 2020**

**by and between**

**Community Provider of Enrichment Services, Inc. ("CPES"),**

**and**

**CTB AZ, LLC**

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT ("**Agreement**") is entered into as of September 3, 2020 by and between CTB AZ, LLC, an Arizona limited liability company having a place of business at 2075 South Cottonwood Drive, Tempe, AZ, 85282 (the "**Purchaser**"), and Community Provider of Enrichment Services, Inc., an Arizona corporation having a place of business at 4825 North Sabino Canyon Road, Tucson, AZ  85750 ("**Debtor**"), as debtor and debtor-in-possession in the chapter 11 (Lead Case No. 9:20-bk-10554-DS) (the "**Bankruptcy Case**"), pending in the United States Bankruptcy Court for the Central District of California, Northern Division (the "**Bankruptcy Court**").

## RECITALS

WHEREAS, Debtor operates Group Homes through 56 licenses over 47 sites, offering a comprehensive array of developmental disability services (the "**Business**");

WHEREAS, on April 24, 2020 (the "**Filing Date**"), Debtor filed a voluntary petition with the Bankruptcy Court under chapter 11 of title 11 of the United States Code, Section 101, *et seq.* (the "**Bankruptcy Code**");

WHEREAS, the transactions contemplated by this Agreement will be consummated pursuant to a Sale Approval Order (as defined below) to be entered in the Bankruptcy Case under Sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code, and this Agreement and the transactions contemplated herein are subject to the approval of the Bankruptcy Court; and

WHEREAS, Debtor wishes to sell to Purchaser and Purchaser wishes to acquire from Debtor certain assets related to the Business as set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises in this Agreement and for other good and valuable consideration, the parties hereby agree as follows.

## AGREEMENT

1.    **DEFINITIONS**

1.1    "**Actions**" has the meaning set forth in **Section 3.4** hereof.

1.2    "**Affiliate**" of a Person means any other Person that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with such Person.

1.3    "**Agreement**" means this Asset Purchase Agreement among the parties set forth on the first page hereof, including, without limitation, all Exhibits and Schedules hereto, as the same may be amended from time to time.

1.4    "**Ancillary Agreements**" means any agreement, instrument or other document to be executed and delivered in connection with the consummation of the transactions contemplated

by this Agreement and shall include, without limitation, any agreement, instrument, or other document that is set forth in **Section 2.6** hereof.

1.5    "**Apportioned Obligations**" has the meaning set forth in **Section 5.5** hereof.

1.6    "**Assumed Contracts**" has the meaning set forth in **Section 2.1(d)** hereof.

1.7    "**Assumed Liabilities**" has the meaning set forth in **Section 2.3(a)** hereof.

1.8    "**Auction**" means the auction of the Purchased Assets.

1.9    "**Bankruptcy Case**" has the meaning given to it in the premises hereto.

1.10    "**Bankruptcy Code**" has the meaning given to it in the recitals hereto.

1.11    "**Bankruptcy Court**" has the meaning given to it in the premises hereto.

1.12    "**Break-up Fees**" has the meaning set forth in **Section 5.4(c)** hereof.

1.13    "**Business**" has the meaning given to it in the recitals hereto.

1.14    "**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City are required or authorized by law to be closed.

1.15    "**Closing**" means the closing of the transactions contemplated by this Agreement.

1.16    "**Closing Date**" means the later of (a) thirty (30) days after the date upon which the Sale Order becomes the Final Order; (b) the first business day after the date upon which all of the conditions set forth in Article VI are satisfied or waived; or (c) such other date as the parties may mutually agree, upon which the Closing takes place.

1.17    "**Code**" means the Internal Revenue Code of 1986, as amended.

1.18    "**Consent**" means any consent, approval, authorization, license or order of, registration, declaration or filing with, or notice to, or waiver from, any federal, state, local, foreign or other Governmental Entity or any Person, including, without limitation, any security holder or creditor which is necessary to be obtained, made or given in connection with the execution and delivery of this Agreement and/or any Ancillary Agreement, the performance by a Person of its obligations hereunder and/or thereunder and the consummation of the transactions contemplated hereby and/or thereby.

1.19    "**Contract Assumption Order**" has the meaning set forth in **Section 5.4(e)** hereof.

1.20    "**CRC**" has the meaning set forth in **Section 3.3** hereof.

1.21    "**Cure Cost Escrow**" has the meaning set forth in **Section 5.4(a)** hereof.

1.22    "**DDD**" means and includes the Arizona Department of Economic Security, its Division of Developmental Disabilities.

**1.23**    "**DDD Licenses**" means the approximately 56 operating licenses currently issued by DDD to Debtor and required to operate the Purchased Assets as further described on **Schedule 2.1(b)**.

**1.24**    "**Debtor**" has the meaning given to it in the premises hereto.

**1.25**    "**Debtor Plans**" means, with respect to the Debtor and its ERISA Affiliate, the "employee pension benefit plans" within the meaning of Section 3(2) of ERISA and which are intended to meet the qualification requirements of Section 401(a) of the Code have received determination letters from the Internal Revenue Service to the effect that such plans are qualified and exempt from federal income taxes under Sections 401(a) and 501(a) of the Code, respectively, and nothing has occurred that would reasonably be expected to adversely affect the qualification of such plans.

**1.26**    "**Debtor's Representative**" has the meaning set forth in Section 7.15 hereof.

**1.27**    "**Deposit**" has the meaning set forth in **Section 2.5** hereof.

**1.28**    "**Disclosure Schedules**" or "**Schedule**" means the disclosure schedules attached to this Agreement as **Exhibit A**, and includes but is not limited to each of the Schedules expressly referred to in **Section 3** of this Agreement.

**1.29**    "**Encumbrances**" means collectively and without limitation, any and all mortgages, security interests, conditional sales or title retention agreements, pledges, hypothecations, rights, liens, judgments, interests, encumbrances or claims of any kind or nature whatsoever, including, without limitation, any and all "claims" as defined in Section 101(5) of the Bankruptcy Code, whether arising by agreement, any statute or otherwise and whether arising before, on or after the Filing Date.

**1.30**    "**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

**1.31**    "**ERISA Affiliate**" means any Person required at any particular time to be aggregated with any of Debtor or any Debtor Affiliate under Sections 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

**1.32**    "**Excluded Assets**" has the meaning set forth in **Section 2.2** hereof.

**1.33**    "**Excluded Liabilities**" has the meaning set forth in **Section 2.3(b)** hereof.

**1.34**    "**Filing Date**" has the meaning given to it in the recitals hereto.

**1.35**    "**Final Order**" means an order, judgment or other decree, the operation or effect of which has not been reversed, stayed, modified or amended and any and all appeal periods with respect to such order, judgment or other decree have expired.

**1.36**    "**GAAP**" means United States generally accepted accounting principles, applied on a consistent basis.

**1.37**   "**Governmental Entity**" means any federal, state, local or foreign government, political subdivision, legislature, court, agency, department, bureau, commission or other governmental regulatory authority, body or instrumentality, including any industry or other non-governmental self-regulatory organizations.   Without limiting the foregoing, the term Governmental Entity shall include the DDD.

**1.38**   "**Intellectual Property Rights**" means all proprietary rights and privileges of any kind or nature, however known or denominated, whether arising by operation of law, contractual obligation, or other means, throughout the world, including the right to distribute, exhibit, broadcast, and market by all means now known or hereafter devised (including over the Internet, World Wide Web, or other computer network), copyrights, patent rights, rights in logos, service marks, trademarks, trade names, trade dress, trade secret rights, rights of privacy, publicity and biography, moral rights, and all other similar rights and collateral, ancillary and subsidiary rights of every kind and nature, together with the goodwill associated therewith, all remedies against infringements thereof and rights to protect any interest therein, unless otherwise identified in **Section 2.2** hereof.

**1.39**   "**Interim Management Agreement**" means the Interim Management Agreement to be entered into by Debtor and Purchaser pursuant to **Section 6.1(h)** hereof.

**1.40**   "**Knowledge of Debtor**" or any other similar knowledge qualification in this Agreement means all facts actually known by the Chief Financial Officer of the Debtor.

**1.41**   "**Material Adverse Effect**" means a material adverse effect (financial or otherwise) on (a) the Business, the Purchased Assets or on the results of operations, condition or prospects of the Business or the Purchased Assets, taken as a whole, or the ability of Purchaser to succeed to or exercise rights or interests of Debtor that are necessary to operate the Business, taken as a whole, or (b) the ability of Debtor to consummate the transactions contemplated by this Agreement, including material delays of the Closing, other than effects directly arising as a result of (i) the performance of this Agreement or (ii) events, changes or developments relating to the financial, banking or capital markets or the economy in general or industry-wide developments affecting Persons in businesses similar to the Business.

**1.42**   "**Minimum Bidding Procedures**" has the meaning set forth in **Section 5.4(b)** hereof.

**1.43**   "**Permits**" means all licenses, certificates of authority, permits, orders, consents, franchises, approvals, registrations, clearances, variances, exemptions, local siting approvals, authorizations, qualifications and filings under any laws or with any Governmental Entities or other private Persons.

**1.44**   "**Person**" means an individual, corporation, partnership, limited liability company, firm, joint venture, association, joint stock company, trust, unincorporated organization or other entity, or any Governmental Entity or quasi-governmental body or regulatory authority.

**1.45**   "**Post-Closing Tax Period**" shall mean (i) any Tax period beginning any time after the Closing Date and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period beginning the day after the Closing Date.

1.46    "**Purchased Assets**" has the meaning set forth in **Section 2.1** hereof.

1.47    "**Purchase Price**" has the meaning set forth in **Section 2.5** hereof.

1.48    "**Purchaser**" has the meaning given to it in the premises hereto.

1.49    "**Sale Approval Order**" has the meaning set forth in **Section 5.4(d)** hereof.

1.50    "**Sale Hearing**" means the hearing to approve the sale of the Purchased Assets.

1.51    "**Subsidiary**" or "**Subsidiaries**" means, with respect to any Person, any other Person (i) of which the first Person owns directly or indirectly fifty percent (50%) or more of the equity interest in the other Person; (ii) of which the first Person or any other Subsidiary of the first Person is a general partner or (iii) of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions with respect to the other Person are at the time owned by the first Person and/or one or more of the first Person's Subsidiaries.

1.52    "**Tangible Personal Property**" has the meaning set forth in **Section 2.1(f)** hereof.

1.53    "**Taxes**" (or "**Tax**" where the context requires) shall mean all federal, state, county, provincial, local, foreign and other taxes (including, without limitation, income, profits, premium, estimated, excise, sales, use, occupancy, gross receipts, franchise, ad valorem, severance, capital levy, production, transfer, withholding, employment and payroll related and property taxes and other governmental charges and assessments), whether attributable to statutory or non-statutory rules and whether or not measured in whole or in part by net income, and including, without limitation, interest, additions to tax or interest, charges and penalties with respect thereto, and expenses associated with contesting any proposed adjustment related to any of the foregoing.

2.    PURCHASE AND SALE OF ASSETS

2.1    Purchase and Sale of Assets.  Subject to the terms and conditions of this Agreement together with any Bankruptcy Court approval that may be required, including the payment by Purchaser of the Purchase Price, at the Closing, Debtor hereby agrees to sell, assign, transfer, convey and deliver to Purchaser, and Debtor hereby sells, assigns, transfers, conveys and delivers to Purchaser, free and clear of any and all Encumbrances, good, valid and marketable title and interest in and to all of the assets, properties and rights of Debtor, but not its Subsidiaries, to the maximum extent permitted by Section 363 of the Bankruptcy Code (such assets, properties and rights are hereinafter collectively referred to as the "**Purchased Assets**"), including, but not limited to, the following assets, properties and rights:

(a)    Except as specifically excluded under Section 2.2, all claims, causes of action, rights of recovery and rights of set-off owned by Debtor, including, but not limited to, any and all enforcement rights to pursue damages, injunctive relief and other remedies, whether currently pending, filed, or otherwise, for the Intellectual Property Rights of Debtor, and all rights to profits and damages due or accrued, arising out of or in connection with, any and all past, present or future infringement, misappropriation or other violation of the Intellectual Property Rights of Debtor, including all rights to pursue damages, injunctive relief and other remedies for past, current

and future infringement of the Intellectual Property Rights, and all rights of Debtor to collect royalties under the Intellectual Property Rights and those causes of action and rights of recovery and rights of set-off set forth on **Schedule 2.1(a)**;

      **(b)**      All rights and privileges of Debtor under the contracts, agreements, leases, Permits and DDD Licenses listed on **Schedule 2.1(b)** (the "**Assumed Contracts**");

      **(c)**      All vested rights and privileges of Debtor under or relating to any contracts or leases to which Debtor is or was a party that are not capable of being assumed and/or assigned under Section 365 of the Bankruptcy Code, including but not limited to those set forth on **Schedule 2.1(c)**;

      **(d)**      All owned equipment (including, but not limited to, office equipment), computers, servers, workstations, printers, machines, materials, prototypes, tools, supplies, vehicles, furniture, fixtures, all physical embodiments of the Works, and improvements to the foregoing (including, but not limited to, the tangible assets identified on **Schedule 2.1(d)**) (collectively, "**Tangible Personal Property**"); provided, however, that, Debtor and any successor to Debtor, including any trustee appointed in the Bankruptcy Case, shall be provided with reasonable access to any information on Debtor's computer system in existence as of the Closing Date for a period of six (6) months thereafter;

      **(e)**      All personal or mixed property, whether tangible or intangible, including but not limited to those set forth on **Schedule 2.1(e)**;

      **(f)**      All files, documents, instruments, papers, books and records (whether in paper, digital or other tangible or intangible form) that are now, or at the time of the Closing will be, used or held for use in or otherwise related to, useful in or necessary for the conduct of, the Business, the Purchased Assets or the Assumed Liabilities, including all financial records, technical information, operating and production records, quality control records, blueprints, research and development notebooks and files, customer credit data, manuals, engineering and scientific data, business development, positioning, marketing and sales related material, drawings, technical plans, business plans, budgets, price lists, and lists of customers and suppliers;

      **(g)**      Debtor's registered domain name of www.cpes.com; and

      **(h)**      All goodwill and other intangibles owned by Debtor;

    **2.2**    <u>Excluded Assets</u>.  Notwithstanding anything to the contrary herein, Debtor shall not cause to be sold, assigned, transferred, conveyed or delivered, to Purchaser, and Purchaser shall not purchase, and the Purchased Assets shall not include, any right, title or interest of Debtor or its Subsidiaries in, any of the following assets (the "**Excluded Assets**"):

      **(a)**      Debtor's cash, securities, and accounts receivable as of the Closing Date;

      **(b)**      All corporate records, including without limitation, the organizational documents of Debtor, accounting documents, human resources and employee records, tax returns, audit materials, legal records, board and member minutes and related correspondence, stock transfer books, blank stock certificates and other documents, qualification to conduct business as

a foreign corporation; provided, however, that Purchaser shall be granted reasonable access to, and the right to make copies of, any such documents;

(c)     Any personal or real property interests that may be reflected on any schedule hereto but subsequently excluded by designation of Purchaser in Purchaser's sole and absolute discretion prior to Closing.

(d)     All executory contracts and unexpired leases that are not Assumed Contracts, including, but not limited to, those set forth on **Schedule 2.2(d)**;

(e)     All current and prior director, officer and fiduciary (whether pursuant to ERISA or otherwise) insurance policies of Debtor and all rights of any nature with respect thereto running in favor of Debtor, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, in each case, as the same may run in favor of Debtor and arising out of actions taking place prior to the Closing Date;

(f)     All bankruptcy avoidance claims of Debtor, including, without limitation, any claims arising under Sections 544, 545, 547, 548 549, 550 and 551 of the Bankruptcy Code;

(g)     All causes of action that the Debtor may hold against any current or former director, officer, employee, advisor, or fiduciary (whether pursuant to ERISA or otherwise) of the Company for breach of fiduciary duty or claims of a similar nature;

(h)     All Debtor Plans and all assets owned or held by any of the Debtor Plans; and

(i)     Any and all claims, deposits, prepayments, refunds, rebates, causes of action, rights of recovery, rights of set-off and rights of recoupment relating to or in respect to an or the Excluded Assets.

**2.3**     Assumed and Excluded Liabilities.

(a)     Subject to the terms and conditions of this Agreement, Purchaser shall, on the Closing Date assume, perform and discharge when due the responsibilities, liabilities and obligations of Debtor under the Assumed Contracts and the Purchased Assets accruing and arising after the Closing (the "**Assumed Liabilities**"); provided, however, that Purchaser shall have no obligation to designate any executory contracts or unexpired leases for assumption and assignment or to pay any minimum amount of cure obligations.

(b)     Debtor shall retain, and shall be responsible for paying or performing when due, or discharging, and shall pay or perform when due, or discharge, and the Purchaser shall not assume or have any responsibility for, all liabilities of Debtor or its Affiliates not expressly assumed by Purchaser pursuant to **Section 2.3(a)** of this Agreement (the "**Excluded Liabilities**"). The term Excluded Liabilities shall specifically include, without limitation:

(i)     Taxes accruing during the Pre-Closing Tax Period or any Post-Closing Tax Period;

**(ii)**    Any and all liabilities accruing and/or arising out of or relating to the Excluded Assets;

**(iii)**    any and all liabilities of Debtor under this Agreement and all legal, accounting, brokerage, investment banking and finder's fees or other fees and expenses incurred by or on behalf of Debtor in connection with this Agreement and the transactions contemplated hereby;

**(iv)**    any and all liabilities and obligations of Debtor arising out of, relating to or caused by any breach of contract, tort infringement or violation of law by Debtor prior to the Closing, whether a claim with respect thereto is brought prior to, on or after the Closing;

**(v)**    any and all liabilities and obligations to current and former employees or contractors of Debtor, or arising under or in connection with any Debtor Plans, and including commissions payable, deferred compensation, past due wages, or interest payable;

**(vi)**    any and all liabilities and obligations arising out of or relating to any line-of-credit or other payable or debt facility or instrument;

**(vii)**    any and all trade payables or other accounts payable of Debtor;

**(viii)**    all liabilities related to, associated with or arising out of any action, claim, suit or proceeding with respect to the operation of the Business prior to the Closing, whether such action, claim, suit or proceeding is brought prior to, on or after the Closing; and

**(ix)**    any liabilities and obligations under contracts or agreements between Debtor and any other party, including any obligation to cure defaults arising and/or accruing under the Assumed Contracts prior to the Closing.

**2.4**    Closing.  Subject to the terms and conditions of this Agreement, the Closing shall take place at the offices of, or at such other place and time as the parties agree orally or in writing.

**2.5**    Consideration.  The aggregate consideration to be paid by Purchaser for the Purchased Assets (the "**Purchase Price**") shall be the following:

**(a)**    a cash amount equal to $420,000.00, calculated by the number of DDD Licenses anticipated to be included in the Purchased Assets at Closing multiplied by $7,500.00 per DDD License.  Should the number of DDD Licenses of the Debtor increase or decrease between the date of this Agreement and Closing, the Purchase Price shall be adjusted accordingly.  The Purchase Price is payable by Purchaser to Debtor at Closing by wire transfer or immediately available funds; and

**(b)**    assumption of the Assumed Liabilities, if any.

The parties agree to allocate the Purchase Price among the Purchased Assets for all purposes, including financial, accounting and tax purposes, as set forth on **Schedule 2.5**.

As of the date hereof, Debtor shall have received evidence of a deposit from Purchaser in the amount of $42,000.00 (the "**Deposit**"), representing ten percent (10.0%) of the anticipated Purchase Price.  In the event of a termination of this Agreement by Debtor pursuant to **Section 7.1(b)(i)**, the Deposit shall be disbursed to Debtor as provided in **Section 7.2(b)(iii)**.  In the event that the Purchaser is not (a) the successful bidder at the Auction or (b) the bidder with the next highest and best bid for the Purchased Assets after the successful bidder, Debtor shall authorize the return the Deposit to Purchaser in accordance with the sale procedures approved by the Bankruptcy Court.

**2.6**    <u>Delivery</u>.  Subject to entry of the Sale Approval Order, at the Closing:

**(a)**    Purchaser shall deliver the Purchase Price to Debtor;

**(b)**    Debtor shall deliver to Purchaser the Purchased Assets;

**(c)**    Debtor shall deliver and properly assign, with consent of the DDD, the DDD Licenses;

**(d)**    Debtor shall deliver to Purchaser an executed Bill of Sale in the form attached as **Exhibit B** hereto;

**(e)**    Debtor and Purchaser shall execute and deliver the Assignment and Assumption Agreement in the form attached as **Exhibit C** hereto;

**(f)**    Debtor shall deliver to Purchaser an executed and notarized original of the Power of Attorney in the form attached as **Exhibit D** hereto;

**(g)**    Debtor shall deliver to Purchaser all necessary consents to assignment related to the Assumed Contracts and Permits;

**(h)**    Debtor shall deliver to Purchaser such other and further documents as Purchaser shall reasonably request to demonstrate the purchase and sale of the Purchased Assets by the Purchaser as contemplated herein and to vest in Purchaser all right, title and interest in, to and under the Purchased Assets;

**(i)**    Debtor shall deliver a certified copy of the Sale Approval Order; and

**(j)**    Debtor shall deliver a copy of the Bankruptcy Court's docket sheet for the Bankruptcy Case evidencing that the Sale Approval Order is a Final Order.

**2.7**    <u>Possession</u>.  Subject to entry of the Sale Approval Order, right to possession of the Purchased Assets shall transfer to Purchaser on the Closing Date.  Debtor shall transfer and deliver to Purchaser on the Closing Date such keys, lock and safe combinations and other similar items as Purchaser shall require to obtain immediate and full occupation and control of the Purchased Assets, and shall also make available to Purchaser at Debtor's then existing locations all documents in Debtor's possession that are required to be transferred to Purchaser by this Agreement.

**2.8**    <u>Transfer Taxes</u>. Provided that the Sale Approval Order includes the finding set forth in **Section 5.5(c)(xiii)** in accordance with section 1146(a) of the Bankruptcy Code, the making or delivery of any instrument of transfer, including the filing of any deed or other document of transfer to evidence, effectuate or perfect the rights, transfers and interest contemplated by this Agreement, shall be in contemplation of a plan to be confirmed under section 1129 of the Bankruptcy Code in the Bankruptcy Case, and such shall be free and clear of any and all transfer tax, stamp tax or similar taxes. Such instruments, orders and agreements transferring the Purchased Assets to Purchaser shall contain the following endorsement:

> "Because this [instrument] has been authorized pursuant to an order of the United States Bankruptcy Court for the California Central District, Northern Division in contemplation of a chapter 11 plan of the [Debtor], it is exempt from transfer taxes, stamp taxes or similar taxes pursuant to 11 U.S.C. §1146(a)."

If such transfer, stamp or similar taxes are ultimately payable, notwithstanding section 1146(a) of the Bankruptcy Code or for any other reason, Debtor shall pay any and all such transfer, stamp or similar taxes, which may be payable by reason of the transaction contemplated in this Agreement and any and all claims, charges, interest or penalties assessed, imposed or asserted in relation to any such taxes.

**3.    REPRESENTATIONS AND WARRANTIES OF DEBTOR**

Debtor hereby represents and warrants to Purchaser that, subject to entry of the Sale Approval Order and except as set forth in the Disclosure Schedule, which identifies exceptions only by the specific Section or subsection to which each entry relates, the statements in this **Section 3** are correct and complete as of the date hereof and shall be correct and complete as of the Closing Date.

**3.1**    <u>Authority</u>. Debtor is a corporation duly organized and in good standing under the laws of the State of Arizona. Debtor has all requisite power and authority to execute and deliver this Agreement and the Ancillary Agreements to which it is or shall, pursuant to this Agreement, be a party, and to perform, carry out and consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement and the Ancillary Agreements to which it is or shall, pursuant to this Agreement, be a party have been duly authorized by all necessary action on the part of Debtor. This Agreement has been duly executed and delivered by Debtor and constitutes the valid and legally binding obligation of Debtor, enforceable against Debtor in accordance with its terms and conditions.

**3.2**    <u>"As Is/Where Is" Transaction</u>. Purchaser acknowledges and agrees that it has conducted its own independent investigation, review and analysis of the Business, the Purchased Assets and the Assumed Liabilities, and acknowledges that it has been provided reasonable access to the personnel, properties, assets, premises, books and records, and other documents and data of the Debtor for such purpose. Purchaser acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Purchaser has relied solely upon its own investigation and the express representations and warranties of the Debtor set forth in Article 3 of this Agreement; and (b) neither Debtor, nor any other Person, has

made any representation or warranty as to Debtor, the Business, the Purchased Assets, the Assumed Liabilities or this Agreement, except as expressly set forth in Article 3 of this Agreement (as qualified by the Debtor Disclosure Schedules).   SUCH REPRESENTATIONS AND WARRANTIES MADE BY THE DEBTOR IN ARTICLE 3 CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES OF THE DEBTOR TO PURCHASER IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY, AND PURCHASER UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN ARTICLE 3 OF THIS AGREEMENT, ALL OTHER REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE EXPRESS OR IMPLIED, WRITTEN OR ORAL (INCLUDING ANY REPRESENTATION OR WARRANTY AS TO THE ACCURACY OR COMPLETENESS OF ANY INFORMATION REGARDING ANY DEBTOR, ANY AFFILIATES OF ANY DEBTOR, THE BUSINESS, THE PURCHASED ASSETS OR THE ASSUMED LIABILITIES FURNISHED OR MADE AVAILABLE TO PURCHASER AND ITS REPRESENTATIVES AND ANY INFORMATION, DOCUMENTS OR MATERIAL MADE AVAILABLE TO PURCHASER, MANAGEMENT PRESENTATIONS OR IN ANY OTHER FORM IN EXPECTATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR AS TO THE FUTURE REVENUE, PROFITABILITY OR SUCCESS OF THE BUSINESS, OR ANY REPRESENTATION OR WARRANTY ARISING FROM STATUTE OR OTHERWISE IN LAW OR RELATING TO MERCHANTABILITY OR FITNESS FOR USE) ARE SPECIFICALLY DISCLAIMED BY THE DEBTOR.   PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT PURCHASER IS PURCHASING THE PURCHASED ASSETS ON AN "AS IS, WHERE IS", "WHERE IS," AND "WITH ALL FAULTS" BASIS AFTER GIVING EFFECT TO THE TERMS CONTAINED HEREIN.

3.3    Title.  Debtor has good and marketable title to, or a valid interest in, all of the Purchased Assets and, upon the Closing will convey and transfer to Purchaser all of the Purchased Assets, and Purchaser shall receive good and marketable title to, or a valid interest in, all of the Purchased Assets free and clear of any Encumbrances, pursuant to sections 105 and 363 of the Bankruptcy Code and any other applicable sections of the Bankruptcy Code and as set forth in the Sale Approval Order.

3.4    Brokers.  Other than the Debtor's retention of CohnReznick Capital Markets Securities, LLC ("CRC"), pursuant to a prior order of the Bankruptcy Court, Debtor has no liability or obligation to pay any broker, finder or investment banker, any brokerage, finder's or other fee or commission in connection with the origination, negotiation or execution of this Agreement and the Ancillary Agreements or the transactions contemplated by this Agreement and the Ancillary Agreements based upon arrangements made by or on behalf of Debtor for which Purchaser could become liable or obligated.  Debtor is responsible for and shall pay any and all amounts due and owing to CRC arising from the origination, negotiation or execution of this Agreement and the Ancillary Agreements or the transactions contemplated by this Agreement and the Ancillary Agreements and Purchaser has no obligation to CRC.

3.5    Litigation.  Except as set forth in Section 3.5 of the Disclosure Schedules, other than the Bankruptcy Case, there is no claim, action, suit, proceeding, opposition, challenge,

cancellation proceeding or investigation (collectively, "**Actions**") pending or, to the Knowledge of Debtor, currently threatened against Debtor or the Business that would prohibit Debtor from entering into this Agreement or any Ancillary Agreement, or to consummate the transactions contemplated hereby or thereby, or that, to the Knowledge of Debtor, could result, either individually or in the aggregate, in any Material Adverse Effect, nor, to the Knowledge of Debtor, is there any basis for the foregoing.  There are no outstanding orders, writs, judgments, decrees, injunctions or settlements that restrict the Business, the Purchased Assets or the Assumed Liabilities in any material respect.  Section 3.4 of the Disclosure Schedules sets forth the caption and summary description of all Actions to which Debtor or any Affiliate is a party or the Purchased Assets, Assumed Liabilities or the Business is subject.

      3.6    Contracts.

      (**a**)    Other than with respect to Debtor's cure obligations under Section 365 of the Bankruptcy Code, each Assumed Contract, is in full force and effect in all material respects and constitutes a legal, valid, binding agreement, enforceable against Debtor or its Affiliates and, to the Knowledge of Debtor, each other party thereto, in accordance with its terms.  Other than with respect to Debtor's cure obligations under Section 365 of the Bankruptcy Code, neither Debtor nor any Affiliate of Debtor nor, to the Knowledge of Debtor, any other party to each such contract is in violation or material breach of, or in default under, nor has there occurred an event or condition that with the passage of time or giving of notice (or both) would constitute a default under, or permit the termination of, any such contract.  Debtor has made available to Purchaser, correct and complete copies of all Assumed Contracts set forth on Section **Schedule 2.1(d)**.

      3.7    Tangible Personal Property.  The Tangible Personal Property of Debtor is free from material defects, subject to normal wear and tear and continued repair and replacement in accordance with past practice, and Debtor has not received notice that any of the Tangible Personal Property is in violation of any existing law or order of any Governmental Authority.  No approval or consent of any Person is needed so that the interest of Debtor and its Affiliates in the Tangible Property shall continue to be in full force and effect and enforceable by Purchaser following the Closing.

      3.8    Subsidiaries.  Debtor has no Subsidiaries or any other equity interest in any other Person.

      3.9    Real Property.  Debtor does not own any real property.  Section 3.9 of the Disclosure Schedule contains a correct and complete list of each parcel of real property leased, subleased, licensed or occupied to or by Debtor that is now, or at the time of Closing will be, used or held for use in or otherwise related to, or necessary for the conduct of, the Business ("**Leased Real Property**"), and includes the parties to such lease, sublease or license, any amendments thereto, the expiration date of such lease or sublease and any consents, approvals or other documents necessary or required such that each lease and sublease will be in full force and effect and remain binding on all parties thereto in accordance with the terms of such lease, sublease or license as of the Closing Date.  Neither Debtor nor any of its Affiliates owes any brokerage commissions with respect to any such leased space (including any contingent obligation in respect of future lease extensions).  Debtor has valid leasehold interests in all Leased Real Property and Debtor is in possession of each parcel of Leased Real Property.  Debtor has made available to

Purchaser prior to the execution of this Agreement correct and complete copies of all leases set forth in <u>Section 3.9 of the Disclosure Schedule</u> (including any amendments and renewal letters) to the Leased Real Property.

**3.10**    <u>Insurance</u>.    <u>Section 3.10 of the Disclosure Schedule</u> sets forth a complete and correct list of all insurance policies held by or on behalf of Debtor relating to the Business and a brief description of such policies.  The insurance policies listed on <u>Section 3.10 of the Disclosure Schedule</u> include all policies of insurance that are required by material commercial contracts relating to the Business, in the amounts required under the Assumed Contracts.  All the insurance policies listed on <u>Section 3.10 of the Disclosure Schedule</u> are in full force and effect, all premiums due and payable thereon have been paid and no notice of cancellation or termination has been received by Debtor with respect to any such policy.

**3.11**    <u>Assets Held by Debtor</u>.  Without limiting any of the representations and warranties set forth in **Section 3** of this Agreement, the Purchased Assets include all tangible and intangible assets, property and rights held for use, used in or required for use in the operation of the Business as currently conducted and are sufficient for the operation of the Business as currently conducted.

**4.**    **REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser hereby represents and warrants to Debtor as follows:

**4.1**    <u>Authority</u>.  Purchaser is a limited liability company organized and in good standing under the laws of the State of Arizona.  Purchaser has the right and authority to enter into, execute, deliver and perform this Agreement and the Ancillary Agreements and to carry out the obligations hereunder and thereunder, without the need for any further approval of its officers and directors. All action on Purchaser's part required for the lawful execution and delivery of this Agreement and the License Agreement has been taken.  Upon its execution and delivery by Purchaser, this Agreement and the License Agreement will be valid and legally binding obligations of the Purchaser in accordance with their respective terms.

**4.2**    <u>Compliance with Other Instruments</u>.  The execution, delivery and performance of this Agreement and the Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby will not result in any such violation or default or be in conflict with or constitute, with or without the passage of time and giving of notice, either a default under any such provision, instrument, judgment, order, writ, decree or contract or an event that results in the creation of any lien, charge or encumbrance upon any of its material properties or assets.

**4.3**    <u>Brokers</u>.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the origination, negotiation or execution of this Agreement and the Ancillary Agreements or the transactions contemplated by this Agreement and the Ancillary Agreements based upon arrangements made by or on behalf of Purchaser.

**4.4**    <u>Litigation</u>.  There is no action, suit, proceeding or investigation pending or, to Purchaser's knowledge, currently threatened in writing against Purchaser that questions the validity of this Agreement or any Ancillary Agreement, or the right of Purchaser to enter into such agreements, or to consummate the transactions contemplated hereby or thereby.

**4.5**    <u>Financial Assurance</u>.  The Purchaser has sufficient cash, available lines of credit or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it hereunder.

**4.6**    <u>Good Faith Purchaser</u>.    This Agreement and all Ancillary Agreements were negotiated and entered into at arm's length and, to the Purchaser's knowledge, in good faith, and Debtor and Purchaser did not engage in any collusion with respect to setting or fixing the Purchase Price, and to the knowledge of Purchaser, there are no facts to support a finding that Debtor negotiated and entered into this Agreement and all Ancillary Agreements other than in good faith as described in Section 363(m) of the Bankruptcy Code.

## 5.    COVENANTS

**5.1**    <u>Debtor Records</u>.    Prior to the Closing Date, Debtor shall afford Purchaser, its attorneys, accountants and representatives, free and full access to Debtor's Business, books, records and employees, and shall provide to Purchaser and its representatives such additional financial and operating data and other information as Purchaser shall from time to time reasonably request.

**5.2**    <u>Filings and Authorizations</u>.    Each of Debtor and Purchaser, as promptly as practicable, (i) shall make, or cause to be made, all such filings and submissions under laws, rules and regulations applicable to it, as may be required to consummate the transactions contemplated herein, in accordance with the terms of this Agreement, (ii) shall use all commercially reasonable efforts to obtain, or cause to be obtained, all authorizations, approvals, consents and waivers from all Governmental Entities and non-governmental Persons necessary to be obtained by it, in order to consummate the transactions contemplated herein; provided, however, that, any provision hereof to the contrary notwithstanding, Debtor shall have no obligation to pay any fee to any third party (other than any lawful fees assessed by a Governmental Entity) for the purpose of obtaining any Consent or any costs and expenses of any third party resulting from the process of obtaining such Consent, and (iii) shall use commercially reasonable efforts to take, or cause to be taken, all other actions necessary, proper or advisable in order for him, her or it to fulfill his, her or its obligations hereunder.  Debtor and Purchaser shall coordinate and cooperate with one another in exchanging such information and supplying such reasonable assistance as may be reasonably requested by each in connection with the foregoing.

**5.3**    <u>Further Assurances; Accounts</u>.

**(a)**    Debtor shall take such steps as may be necessary to put Purchaser in possession and operating control of the Purchased Assets and the Business on the Closing Date. At or after the Closing, Debtor shall, at the reasonable request of Purchaser, without further consideration, promptly execute and deliver, or cause to be executed and delivered, to Purchaser such assignments, bills of sale, consents and other instruments in addition to those required by this Agreement, in form and substance reasonably satisfactory to Purchaser, and take all such other actions as Purchaser may reasonably deem necessary or desirable to implement any provision of this Agreement and to more effectively transfer to and vest in Purchaser, ownership in, and to put Purchaser in possession of, all of the Purchased Assets, free and clear of any and all Encumbrances.

**(b)**     Purchaser and Debtor each shall use its commercially reasonable efforts to obtain as promptly as practicable all Permits required by law for Purchaser to conduct the Business following the Closing and to own the Purchased Assets.  Notwithstanding the foregoing, neither Purchaser nor Debtor shall be required to expend any material sum or agree to a material concession to any Governmental Entity to obtain any such Permits.

**(c)**     Debtor shall use its commercially reasonable efforts to cooperate with Purchaser to deliver instructions for its employees to provide information for Purchaser's use to obtain quotes for insurance coverage, including without limitation, automobile and worker's compensation coverage, such that Purchaser can secure all insurance coverages necessary to operate the Purchased Assets prior to Closing.

**(d)**     Debtor agrees to execute and deliver all documents and take all action requested by Purchaser or the registrars, including, without limitation, providing Purchaser with passwords, usernames, account numbers, and authorization codes, and assist Purchaser in any reasonable manner to obtain, perfect and enforce, for Purchaser's benefit, Purchaser's right, title and interest in and to the Purchased Assets.

**(e)**     Debtor hereby appoints Purchaser as Debtor's attorney in fact to execute any instruments which Debtor shall fail for any reason to execute and deliver for a period of five (5) business days following Debtor's receipt of written request therefor, it being acknowledged that such appointment is coupled with an interest and is irrevocable.  Purchaser will provide Debtor with copies of any documents so executed on Debtor's behalf.

**5.4**    <u>Bankruptcy Covenants</u>.

**(a)**     <u>Cure of Defaults</u>.  Debtor shall, as soon as reasonably practicable after the Closing Date, cure any and all defaults and breaches and satisfy any liability or obligation arising and/or accruing from or relating to pre-Closing periods under the Assumed Contracts from the Cure Cost Escrow (defined below), so that such Assumed Contracts may be assigned by Debtor to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code, the Sale Approval Order, any other orders of the Bankruptcy Court effectuating such assignments, and this Agreement.  In connection with the above, on the Closing Date the Debtor shall establish a cure cost escrow with Debtor's bankruptcy counsel (the "**Cure Cost Escrow**").  The Cure Cost Escrow will be funded with cash from the Purchase Price in an amount sufficient to pay all cure costs related to the Assumed Contracts.  In the event that there is a dispute between the Debtor and a non-debtor third party to an Assumed Contract, the Debtor shall place into the Cure Cost Escrow cash in the amount of the cure demand from such non-debtor third party, which amounts shall remain in escrow pending an agreement between the parties or further order of the Bankruptcy Court.

**(b)**     <u>Motions, Orders, etc</u>.  Debtor shall promptly provide Purchaser with the proposed final drafts of all documents, motions, orders, or pleadings that Debtor proposes to file with the Bankruptcy Court relating to the approval of this Agreement, approval of the Minimum Bidding Procedures attached as **Exhibit E** (the "**Minimum Bidding Procedures**"), the Purchased Assets, or the consummation of the transactions contemplated hereby, or any provision therein or herein, and shall provide Purchaser and its counsel with a reasonable opportunity to review and

comment on such documents, motions, orders, or pleadings.  Debtor shall not file any such proposed drafts without Purchaser's prior approval, which may be granted or withheld in Purchaser's reasonable discretion.

        **(c)**   <u>Break-up Fees</u>.  In the event that Purchaser is not the successful bidder for the Purchased Assets, Purchaser shall be entitled to: (1) a fee of 3% of the Purchase Price provided in Section 2.5(a); (2) a refund of the Deposit; and (3) reimbursement by Debtor of Purchaser's reasonable out of pocket fees and costs up to $25,000.00, including, but not limited to, Purchaser's legal fees and costs (collectively the "**Break-up Fees**").  The Break-up Fees shall be paid by Seller to Purchaser from sale proceeds at Closing.<u>Sale Approval Order</u>.  Without limiting the generality of the foregoing **Section 5.4(b)**, the sale approval order, in the form annexed hereto as **Exhibit F** (the "**Sale Approval Order**"), shall be reasonably acceptable in form and substance to Purchaser and shall include provisions, among other things (i) providing that Purchaser shall not incur any liability as a successor to the Business, (ii) approving the sale of the Purchased Assets to Purchaser on the terms and conditions set forth in this Agreement and authorizing Debtor to proceed with this transaction, (iii) stating that any objections filed with respect to the sale of the Purchased Assets, which have not been withdrawn, are overruled or the interests of such objections have been otherwise satisfied or adequately provided for by the Bankruptcy Court, (iv) finding that the Purchase Price represents fair value for the Purchased Assets, (v) finding that the sale is in the best interests of Debtor's estate and creditors, (vi) finding that Purchaser is a good faith purchaser of the Purchased Assets under section 363(m) of the Bankruptcy Code and that the provisions of section 363(n) of the Bankruptcy Code have not been violated, (vii) providing that the sale of the Purchased Assets to Purchaser shall be free and clear of all Encumbrances whatsoever under section 363 of the Bankruptcy Code and any other applicable sections of the Bankruptcy Code, (viii) providing that the Bankruptcy Court shall retain jurisdiction, among other things, for the purpose of enforcing the provisions of the Sale Approval Order including, without limitation, compelling delivery of the Purchased Assets to Purchaser and protecting Purchaser against any Encumbrances against Debtor or the Purchased Assets, (ix) finding that, other than CRC, there are no brokers involved in consummating the sale and, other than the fees approved by the Bankruptcy Court in connection with CRC's retention, no brokers' commissions are due, (x) providing that the parties hereto shall be authorized to close this transaction immediately upon execution of the Sale Approval Order pursuant to Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure, (xi) authorizing and directing Debtor to execute, deliver, perform under, consummate and implement this Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the foregoing and (xii) determining that Purchaser is not a successor to Debtor or otherwise liable for any of the Excluded Liabilities or Excluded Assets and permanently enjoining each and every holder of any of the Excluded Liabilities or Excluded Assets from commencing, continuing or otherwise pursuing or enforcing any remedy, claim, cause of action or Encumbrance against Purchaser or the Purchased Assets related thereto.  Debtor shall use its best efforts to obtain the earliest available date for a hearing to approve the Sale Approval Order.  To the extent that there is any inconsistency between this paragraph and the Sale Approval Order, the Sale Approval Order shall govern.

        **(e)**   <u>Sale Order Termination Date</u>.  If the Sale Approval Order has not been issued by the Bankruptcy Court by that date which is ninety (90) days after the date of this Agreement, then at any time thereafter prior to the issuance of the Sale Approval Order, Purchaser may terminate this transaction by giving notice to Debtor with the consequences set forth in

**Section 7.1(a)** below.  Notwithstanding any other provision in this Agreement, if the Bankruptcy Court does not approve the Minimum Bidding Procedures in the form attached as **Exhibit E**, Purchaser shall have the sole right to terminate this Agreement and receive its entire Deposit back and shall have no further obligations under this Agreement.

(f)     <u>Assumed Contracts</u>.  Debtor shall obtain an order or orders (which may include the Sale Approval Order) in a form reasonably satisfactory to Purchaser (collectively the "**Contract Assumption Order**"), among other things (i) approving the assumption and assignment of the Assumed Contracts to Purchaser pursuant to, and subject to the provisions of, section 365 of the Bankruptcy Code; (ii) providing that all defaults of Debtor under the Assumed Contracts arising or accruing prior to the Closing Date or the Contract Designation Deadline (if assumed after the Closing), without giving effect to any acceleration clauses or any default provisions in such contracts of a kind specified in section 365(b)(2) of the Bankruptcy Code, have been cured or will be promptly cured by Debtor so that Purchaser shall have no liability or obligation with respect to any default or obligation arising or accruing prior to the date of the Closing or in respect of any cure obligations; and (iii) providing that the Assumed Contracts shall be transferred to, and remain in full force and effect for the benefit of, Purchaser, notwithstanding any provision in any such Assumed Contract or in applicable Law (including those described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or limits in any way such assignment or transfer.

(g)     <u>Other Bankruptcy Covenants</u>.  Debtor shall promptly make any filings, take all actions, and use commercially reasonable efforts to obtain any and all other approvals and orders necessary or appropriate for consummation of the sale of the Purchased Assets, subject to its obligations to comply with any order of the Bankruptcy Court.  In the event an appeal is taken, or a stay pending appeal is requested, from any of the foregoing orders of the Bankruptcy Court, Debtor shall immediately notify Purchaser of such appeal or stay request and, upon Purchaser's request, shall provide to Purchaser within one (1) business day after Debtor's receipt thereof a copy of the related notice of appeal or order of stay.  Debtor shall also provide Purchaser with written notice of any motion, application, brief or other pleading filed in connection with any appeal from any of such orders.

**5.5**     <u>Apportioned Obligations</u>.  Debtor has no real property taxes.  All personal property Taxes and similar ad valorem obligations levied with respect to the Purchased Assets for a taxable period which includes (but does not end on) the Closing Date (collectively, the "**Apportioned Obligations**") shall be apportioned between Debtor and Purchaser based on the number of days of such taxable period included in the Pre-Closing Tax Period and the number of days of such taxable period included in the Post-Closing Tax Period.  Debtor shall be liable for the proportionate amount of such Taxes that is attributable to the Pre-Closing Tax Period, and Purchaser shall be liable for the proportionate amount of such Taxes that is attributable to the Post-Closing Tax Period.  Upon receipt of any bill for personal property taxes relating to the Purchased Assets, each of Debtor and Purchaser shall present a statement to the other setting forth the amount of reimbursement to which each is entitled under this **Section 5.5** together with such supporting evidence as is reasonably necessary to calculate the proration amount.  The proration amount shall be paid by the party owing it to the other within ten (10) Business Days after delivery of such statement.  In the event that either Debtor or Purchaser shall make any payment for which it is entitled to reimbursement under this **Section 5.5**, the other party shall make such reimbursement promptly but in no event later than

ten (10) Business Days after the presentation of a statement setting forth the amount of reimbursement to which presenting party is entitled along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement. Purchaser shall notify Debtor's Representative of any audit or examination of the Apportioned Obligations. The Debtor's Representative shall have the right to participate in any such audit or examination and Purchaser shall not settle any such audit or examination without the consent of Debtor's Representative, which consent shall not be unreasonably withheld.

      **5.6**    <u>Notification</u>. From time to time prior to the Closing, Debtor shall notify Purchaser in writing with respect to any matter hereafter arising or any information obtained after the date hereof that, if existing, occurring or known at or prior to the date of this Agreement, would have been required to be set forth or described in the Disclosure Schedule or that is necessary to complete or correct any information in such schedule or in any representation and warranty of Debtor that has been rendered inaccurate thereby. Debtor shall promptly inform Purchaser of any claim by a third party that a contract has been breached, is in default, may not be renewed or that a consent would be required as a result of the transactions contemplated by this Agreement.

## 6.    CONDITIONS PRECEDENT TO CLOSING.

      **6.1**    <u>Conditions Precedent to Obligations of Purchaser</u>. The obligation of Purchaser under this Agreement to consummate the transactions contemplated by this Agreement on the Closing Date shall be subject to the satisfaction, at or prior to the Closing Date, of all of the following conditions, any one or more of which may be waived by Purchaser:

      **(a)**    <u>Representations and Warranties Accurate</u>. The representations and warranties of Debtor contained in this Agreement which are qualified as to materiality shall be correct and complete in all respects, and those not so qualified shall be correct and complete in all material respects, as of the Closing Date with the same force and effect as though made on and as of the Closing Date (except in any case that representations and warranties that expressly speak as of a specified date or time need only be correct and complete as of such specified date or time).

      **(b)**    <u>Performance by Debtor</u>. Debtor shall have performed and complied in all material respects with all covenants and agreements required to be performed or complied with by such Person hereunder on or prior to the Closing Date.

      **(c)**    <u>Consents</u>. All Consents required in connection with the consummation of the transactions contemplated by this Agreement and the Closing (including those set forth on **Schedule 6.1(c)** hereto) shall have been duly obtained, made or given and shall be in full force and effect, without the imposition upon Purchaser or Debtor of any condition, restriction or required undertaking. Without limiting the foregoing, prior to the Closing Date, the DDD shall have approved and shall be prepared to assign and transfer the DDD Licenses to Purchaser, or made other reasonable accommodations to effectuate the same, at Closing so that Purchaser may continuously operate the Purchased Assets in full compliance with all required DDD licensing from and after the Closing Date.

      **(d)**    <u>No Legal Prohibition</u>. No suit, action, investigation, inquiry or other proceeding by any Governmental Entity or other Person shall have been instituted or threatened

which arises out of or relates to this Agreement, or the transactions contemplated hereby and no injunction, order, decree or judgment shall have been issued and be in effect or threatened to be issued by any Governmental Entity of competent jurisdiction, and no statute, rule or regulation shall have been enacted or promulgated by any Governmental Entity and be in effect, which in each case restrains or prohibits the consummation of the transactions contemplated hereby.

(e)    Completion of Schedules.  Debtor shall have completed and delivered the Disclosure Schedules and all other schedules to be provided pursuant to this Agreement to Purchaser, and the Disclosure Schedules and such other schedules shall be updated and supplemented as may be requested by  Purchaser prior to Closing in Purchaser's sole discretion.

(f)    Minimum DDD Licenses and Residents in Care.  On the Closing Date, the Purchased Assets shall include a minimum of 30 DDD Licenses and operating facilities providing services and care for a minimum of 100 residents.

(g)    Insurance Contracts Costs.  Purchaser shall have secured all insurance coverage necessary to operate the Purchased Assets, as may be determined at Purchaser's sole and absolute discretion, for total annual premiums not to exceed $1,000,000 for the first twelve months after Closing, provided, however, that Purchaser shall exclude such portion of the annual premiums relating to any employee (as referenced in Section 5.1(c) hereof) that would result in total annual premiums of the Purchaser exceeding $1,000,000 for the first twelve months after Closing in the aggregate.

(h)    No Material Adverse Effect.   No Material Adverse Effect shall have occurred and no other event, loss, damage, condition or state of facts of any kind shall exist which has a Material Adverse Effect or can reasonably be expected to have a Material Adverse Effect.

(i)    Additional Documents, etc.  There shall have been delivered to Purchaser each of the agreements, documents, certificates and other items set forth **on Schedule 6.1(g)** of this Agreement, including those required by **Section 2.6** of this Agreement.

(h)    Interim Management Agreement.  In the event that Purchaser should elect to close on the sale of the Purchased Assets prior to the DDD's final approval and transfer of the DDD Licenses from Debtor to Purchaser, Debtor and Purchaser shall negotiate in good faith and shall have duly executed an Interim Management Agreement, in form and substance acceptable to Debtor and Purchaser in their respective sole and absolute discretion that provides for the ongoing operation and management of the Purchased Assets under Debtor's DDD licensing scheme, through and until such time as the DDD has approved the sale and has transferred the DDD Licenses to Purchaser.

(i)    Approval of Minimum Bidding Procedures; Entry of Order; Appeal.  The Bankruptcy Court shall have approved the Minimum Bidding Procedures and entered the Sale Approval Order in accordance with **Section 5.5(c)** and any other order in accordance with **Section 5.5(d)** relating to the assignment of the Assumed Contracts, all in form and substance acceptable to Purchaser, and the Sale Approval Order and any other order in accordance with **Section 5.5(d)** relating to the assignment of the Assumed Contracts, shall not have been stayed, and shall have

become a Final Order, unless the finality of such orders is waived by Purchaser in Purchaser's sole discretion.

      **6.2**    <u>Conditions Precedent to Obligations of Debtor</u>.  The obligations of Debtor under this Agreement to consummate the transactions contemplated by this Agreement on the Closing Date shall be subject to the satisfaction, at or prior to the Closing Date, of all of the following conditions, any one or more of which may be waived by Debtor:

      **(a)**    <u>Representations and Warranties Accurate</u>.  The representations and warranties of Purchaser contained in this Agreement which are qualified as to materiality shall be correct and complete in all respects, and those not so qualified shall be correct and complete in all material respects, as of the Closing Date with the same force and effect as though made on and as of the Closing Date (except in any case that representations and warranties that expressly speak as of a specified date or time need only be correct and complete as of such specified date or time).

      **(b)**    <u>Performance by Purchaser</u>.  Purchaser shall have performed and complied in all material respects with all covenants and agreements required to be performed or complied with by such Person hereunder on or prior to the Closing Date.

      **(c)**    <u>Consents</u>.  All Consents required to be obtained by Purchaser in connection with the purchase and sale of the Purchased Assets and the Closing shall have been duly obtained, made or given and shall be in full force and effect.

      **(d)**    <u>No Legal Prohibition</u>.  No suit, action, investigation, inquiry or other proceeding by any Governmental Entity or other Person shall have been instituted or threatened which arises out of or relates to this Agreement or the transactions contemplated hereby and no injunction, order, decree or judgment shall have been issued and be in effect or threatened to be issued by any Governmental Entity of competent jurisdiction, and no statute, rule or regulation shall have been enacted or promulgated by any Governmental Entity and be in effect, which in each case restrains or prohibits the consummation of the transactions contemplated hereby.

      **(e)**    <u>Additional Documents, etc</u>.  There shall have been delivered to Debtor's Representative each of the agreements, documents and other items set forth on **Schedule 6.1(g)** of this Agreement to be delivered to Debtor, including those required by **Section 2.6** of this Agreement.

      **6.3**    <u>Entry of Order; Appeal</u>.  The Sale Approval Order shall have been entered by the Bankruptcy Court and shall not have been stayed.  If an appeal of the Sale Approval Order is filed and Purchaser elects in its sole discretion to waive the condition to Closing that the Sale Approval Order shall be a Final Order, then Debtor shall be obligated to proceed with the Closing notwithstanding the pendency of any such appeal, unless the Sale Approval Order is stayed.

**7.**    **MISCELLANEOUS**

      **7.1**    <u>Termination</u>.  This Agreement may be terminated, and the transactions contemplated herein may be abandoned:

(a)    any time before the Closing, by mutual written agreement of Debtor and Purchaser; or

(b)    any time before the Closing, by Debtor, on the one hand, or Purchaser, on the other hand, (i) in the event of a material breach hereof by any non-terminating party if such non-terminating party fails to cure such breach within five (5) Business Days following notification thereof by the terminating party, or (ii) upon notification to the non-terminating party by the terminating party that the satisfaction of any condition to the terminating party's obligations under this Agreement becomes impossible or impracticable with the use of commercially reasonable efforts if the failure of such condition to be satisfied is not caused by a breach hereof by the terminating party.

**7.2**    Effect of Termination.

(a)    If this Agreement is validly terminated pursuant to **Section 7.1**, this Agreement will forthwith become null and void, and there will be no liability or obligation on the part of any party (or any of their respective officers, directors, employees, partners, agents or other representatives or Affiliates), except that the provisions with respect to expenses in **Section 7.3** will continue to apply following any such termination.

(b)    Notwithstanding the provisions of **Section 7.2(a)**, above:

(i)    if Purchaser or Debtor terminate this Agreement pursuant to **Section 7.1(a)**, Purchaser shall receive, as its sole and exclusive remedy available under any Law, including the Bankruptcy Code, the prompt return of the Deposit;

(ii)    if Purchaser terminates this Agreement pursuant to **Section 7.1(b)(i)** or Debtor terminates this Agreement pursuant to **Section 7.1(b)(ii)**, Purchaser shall receive, as its sole and exclusive remedy available under any Law, including the Bankruptcy Code, the prompt return of the Deposit;

(iii)    if Debtor terminates this Agreement pursuant to **Section 7.1(b)(i)** or Purchaser terminates this Agreement pursuant to **Section 7.1(b)(ii)**, Debtor shall receive, as its sole and exclusive remedy available under any Law, including the Bankruptcy Code, the Deposit.

**7.3**    Expenses.  Except as otherwise set forth herein, each party hereto shall pay its own expenses incurred in connection with this Agreement and the transactions contemplated hereby.

**7.4**    Compliance with Laws.  Notwithstanding anything contained in this Agreement to the contrary, the obligations of the parties shall be subject to all laws, present and future, of any government having jurisdiction over the parties and this transaction, and to orders, regulations, directions or requests of any such government.

**7.5**    Further Cooperation.  At the request and expense of Purchaser, at any time following the Closing Date, Debtor shall execute and deliver such other instruments and documents and do and perform such other acts as may be reasonably necessary for the operation of the Business by Purchaser and effecting completely the consummation of the transactions contemplated hereby, including execution, acknowledgment and recordation of other such papers

(which shall include as necessary the execution by Debtor of the Power of Attorney in the form attached hereto as **Exhibit D**), using reasonable efforts to obtain the same from the respective inventors or authors as necessary for perfecting and conveying unto Purchaser the benefit of the transactions contemplated hereby; provided, however, that Debtor shall not be obligated to pay any consideration or incur any costs to provide such cooperation.

7.6    Governing Law; Jurisdiction.    All disputes arising out of or related to this Agreement, including, without limitation, any dispute relating to the interpretation, meaning or effect of any provision hereof, will be resolved in the Bankruptcy Court and the parties hereto will each submit to the exclusive jurisdiction of the Bankruptcy Court for the purposes of adjudicating any such dispute, to the extent the jurisdiction of the Bankruptcy Court is applicable.  If the jurisdiction of the Bankruptcy Court is not applicable, any legal action, suit or proceeding arising out of or relating to this Agreement, each and every agreement and instrument contemplated hereby or the transactions contemplated hereby and thereby shall be instituted in any Federal court of the Central District of California.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Arizona (i.e., without regard to its conflicts of law rules).

7.7    Entire Agreement; Interpretation.    The terms and conditions of this Agreement, including its exhibits and the Ancillary Agreements, constitute the entire agreement between the parties with respect to the subject matter hereof, and merge and supersede all prior and contemporaneous agreements, understandings, negotiations and discussions.  Neither of the parties shall be bound by any conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof other than as expressly provided herein.  The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  No oral explanation or oral information by either party hereto shall alter the meaning or interpretation of this Agreement.  The terms "includes" and "including" are not limiting.  These terms and conditions will prevail notwithstanding any different, conflicting or additional terms and conditions which may appear on any purchase order, acknowledgment or other writing not expressly incorporated into this Agreement.  Unless a contrary intention appears, (i) the words "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision, and to any certificates delivered pursuant hereto; and (ii) reference to any Article or Section means such Article or Section hereof.  Any accounting terms used in this Agreement shall, unless otherwise defined in this Agreement, have the meaning ascribed thereto by GAAP.

7.8    Notices: All notices required or permitted to be given hereunder shall be in writing, shall make reference to this Agreement, and shall be delivered by hand, or dispatched by prepaid air courier or by registered or certified airmail, postage prepaid, addressed as follows:

| If to Purchaser | If to Debtor |
|---|---|
| CTB AZ, LLC<br>2075 South Cottonwood Drive | Community Provider of Enrichment Services, Inc.<br>4500 E. Speedway Blvd.<br>Tucson, AZ 85712 |

Tempe, AZ 85282                         Attention: Mark G. Monson
Attn: Robert Adamo                      Phone: (520) 495-6203
Phone: (602) 909-8442

with a copy to:                         with a copy to:

Steadfast Law, PLLC                     Faegre Drinker Biddle & Reath LLP
Attn: Eric Walberg, Esq.                Attn: Jeremy Pelphrey
2929 N. Power Rd., Suite 101            1800 Century Park East, Suite 1500
Mesa, Arizona 85215                     Los Angeles, CA 90067
(480) 285-1907 tel.                     (310) 203-4000 tel.
(480) 355-5292 fax                      (310) 229-1285 fax
eric@steadfastlawyers.com               jeremy.pelphrey@faegredrinker.com

Such notices shall be deemed served when received by addressee or, if delivery is not accomplished by reason of some fault of the addressee, when tendered for delivery.  Either party may give written notice of a change of address and, after notice of such change has been received, any notice or request shall thereafter be given to such party at such changed address.

     **7.9**   <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

     **7.10**   <u>No Ongoing Obligations</u>.  Purchaser shall not have any obligations solely by virtue of the provisions of this Agreement to support, maintain or otherwise continue the business operations of Debtor or to otherwise market, promote or develop the Purchased Assets after the Closing Date.

     **7.11**   <u>Survival of Representations and Warranties</u>.  None of the representations and warranties of Debtor contained in this Agreement, other than those set forth in Section 3.1 and 3.4, shall survive until the Closing Date.  None of the representations and warranties of Purchaser contained in this Agreement, other than those set forth in Section 4.1, 4.2 and 4.4, shall survive until the Closing Date

     **7.12**   <u>Amendment</u>.  This Agreement may not be amended or modified except by an instrument in writing signed by, or on behalf of, Debtor and Purchaser.

     **7.13**   <u>Purchaser Indemnification Obligation</u>.  After the Closing, Purchaser shall indemnify Debtor against and shall hold it harmless from any and all liabilities, losses, damages, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) that Debtor may suffer or incur by reason of (i) Debtor's defense of any claim, suit or proceeding made or commenced against it arising out of obligations of Debtor that were expressly assumed by Purchaser hereunder and only expressly for liabilities, claims or amounts arising or accruing after the Closing Date; or (ii) any finder's fee or broker's fees incurred by Debtor in connection with the transactions contemplated hereby, other than expressly provided for herein.  Debtor shall provide written notice to Purchaser of any claim or dispute as to which indemnification is provided

under this Section within 10 days of receipt of written notice by Debtor of the commencement, or threatened commencement, of any such action; provided that the failure to provide such notice will not affect any rights hereunder except to the extent Purchaser is materially prejudiced thereby. Debtor, on not less than thirty (30) days' notice to Purchaser, may make settlement of such claim, litigation or other proceeding with Purchaser's consent, such consent not to be unreasonably withheld, and such settlement shall be binding on Debtor and Purchaser for the purposes of this Section; provided, however, that, if within said thirty-day period Purchaser shall, in writing, have requested Debtor to contest such claim, or to defend against such litigation or other proceeding, then Purchaser shall have the right and obligation to contest such claim or to defend against such litigation or other proceeding on its own behalf and on behalf of Debtor, with counsel of its own choosing, but Debtor may also, in its discretion, participate in such contest or defense on its own behalf and with counsel of its own choosing. If Purchaser shall have failed, neglected or refused to contest such claim or to defend against such litigation or other proceeding, Purchaser shall reimburse Debtor for the expenses incurred by Debtor in such contest or defense. Any payment or settlement resulting from such contest or defense, together with Debtor's costs thereof, shall be binding on Debtor and on Purchaser for the purposes of this Section.

**7.14** <u>No Agency</u>. The parties hereto are independent contractors. Except as may be provided in this Agreement, neither party has any express or implied right or authority to assume or create any obligations on behalf of the other or to bind the other to any contract, agreement or undertaking with any third party. Nothing in this Agreement shall be construed to create a partnership, joint venture, employment or agency relationship between Debtor and Purchaser.

**7.15** <u>Debtor's Representative</u>. Debtor hereby irrevocably appoints Mark G. Monson (herein called the "**Debtor's Representative**") as its true and lawful attorney-in-fact and agent, with full power of substitution or re-substitution, to act solely and exclusively on behalf of Debtor with respect to any matters relating to this Agreement and any document, certificate or other agreement to be executed and delivered by or on behalf of Debtor pursuant hereto, with the full power, without the consent of Debtor, to exercise as it in its sole discretion deems appropriate, all of the powers which Debtor could exercise under the provisions of this Agreement or any document, certificate or other agreement to be executed and delivered by or on behalf of Debtor pursuant hereto, including, without limitation, to (i) accept and give notices hereunder or thereunder on behalf of Debtor, (ii) consent to any modification or amendment hereof or thereof or (iii) give any waiver or consent hereunder or thereunder. Debtor's Representative does hereby accept such appointment. Purchaser shall be entitled to rely exclusively upon such notices, waivers, consents, amendments, modifications and other acts of Debtor's Representative as being the binding acts of Debtor, and Purchaser shall be entitled to deliver any notices, payments or other items required to be delivered by it to Debtor hereunder or thereunder only to Debtor's Representative, and any such delivery shall be fully effective as if it were made directly to Debtor. Debtor's Representative shall not affect any substitution for himself as Debtor's Representative without the prior written consent of Purchaser, which consent shall not be unreasonably withheld.

**7.16** <u>Specific Performance</u>. Notwithstanding anything to the contrary contained herein (other than **Section 7.2(b)** hereof), each party hereto acknowledges that money damages would be incalculable and an insufficient remedy for any breach of this Agreement by such party and that any such breach would cause the other party hereto irreparable harm. Accordingly, each party hereto also agrees that, in the event of any breach or threatened breach of the provisions of this

Agreement by such party, the other party hereto shall (except to the extent **Section 7.2(b)** is applicable) be entitled to equitable relief without the requirement of posting a bond or other security, including in the form of injunctions and orders for specific performance.

**7.17** <u>Severability</u>.    Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction, and any such provision, to the extent invalid or unenforceable, shall be replaced by a valid and enforceable provision which comes closest to the intention of the parties underlying such invalid or unenforceable provision.

**7.18** <u>Waivers</u>.    Waiver by any party of any breach of or failure to comply with any provision of this Agreement by the other party shall not be construed as, or constitute, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any other provision of this Agreement.    No waiver of any such breach or failure or of any term or condition of this Agreement shall be effective unless in a written notice signed by the waiving party and delivered, in the manner required for notices generally, to each affected party.

**7.19** <u>Binding Effect; Third Party Beneficiaries; Assignment</u>.    This Agreement shall be binding upon, inure to the benefit of, and be enforceable by, the parties hereto and their respective successors and permitted assigns.    Except as expressly set forth herein, nothing expressed or referred to in this Agreement is intended or shall be construed to give any Person other than the parties to this Agreement, or their respective legal representatives, successors and permitted assigns, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein.    Neither party may assign this Agreement nor any of its rights hereunder, other than any right to payment of a liquidated sum, nor delegate any of its obligations hereunder, without the prior written consent of the other, except that Purchaser may assign its rights under this Agreement to any Affiliate or to any Person providing financing for the transaction.

**7.20** <u>Knowledge Qualifications</u>.    Except as otherwise provided in this Agreement, whenever any party makes any representation, warranty or other statement to such party's knowledge, such party will be deemed to have made due inquiry into the subject matter of such representation, warranty or other statement, including due inquiry of each officer and director of such party as well as any other person who has responsibility with respect to the relevant subject matter.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties have executed this Asset Purchase Agreement as of the date first written above:

**DEBTOR:**                                                      **PURCHASER:**

**COMMUNITY PROVIDER OF ENRICHMENT**        **CTB AZ, LLC**
**SERVICES, INC.**

By: _____        By: _____

Name: Mark Morson                          Name:

Title: President/CEO                       Title:

For Purposes of Section 7.15 only:

_____

Name:

IN WITNESS WHEREOF, the parties have executed this Asset Purchase Agreement as of the date first written above:

DEBTOR:

COMMUNITY PROVIDER OF ENRICHMENT SERVICES, INC.

By: _____

Name:

Title:

PURCHASER:

CTB AZ, LLC

By: _____
Feras aldaoud (Sep 3, 2020 14:36 PDT)

Name: Feras aldaoud

Title: Chief medical officer

For Purposes of Section 7.15, only:

_____

Name:

{0006244.0000/01124020.DOCX / 8}
DM3\2053650.2
ACTIVE.124842237.07

# Purchaser Execution

Final Audit Report                                    2020-09-03

| | |
|---|---|
| Created: | 2020-09-03 |
| By: | Eric Walberg (ewalberg@ericwalberglaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA8YqzqIArI224IEGxNZ1r6mNjNLfU08jc |

## "Purchaser Execution" History

📄 Document created by Eric Walberg (ewalberg@ericwalberglaw.com)
   2020-09-03 - 9:32:29 PM GMT- IP address: 72.201.230.42

✉ Document emailed to Feras aldaoud (firas.david@gmail.com) for signature
   2020-09-03 - 9:33:01 PM GMT

📄 Email viewed by Feras aldaoud (firas.david@gmail.com)
   2020-09-03 - 9:35:58 PM GMT- IP address: 184.186.217.61

✍ Document e-signed by Feras aldaoud (firas.david@gmail.com)
   Signature Date: 2020-09-03 - 9:36:44 PM GMT - Time Source: server- IP address: 184.186.217.61

✅ Signed document emailed to Eric Walberg (ewalberg@ericwalberglaw.com) and Feras aldaoud
   (firas.david@gmail.com)
   2020-09-03 - 9:36:44 PM GMT



# <u>EXHIBIT A</u>

Disclosure Schedules

# **EXHIBIT B**

Bill of Sale

## BILL OF SALE

This BILL OF SALE (this "**Bill of Sale**") is made and entered into as of [●], 2020, by and among CTB AZ, LLC, an Arizona limited liability company ("**Purchaser**") and Community Provider of Enrichment Services, Inc., an Arizona corporation ("**Seller**").  Purchaser and Seller are each referred to herein individually as a "**Party**" and collectively, as the "**Parties**."

## <u>RECITALS</u>

WHEREAS, pursuant to that certain Asset Purchase Agreement dated as of September 3, 2020 (the "**Asset Purchase Agreement**"), by and among Purchaser and Seller, among other things, Seller agreed to sell, assign, convey and deliver to Purchaser the Purchased Assets and Purchaser agreed to purchase and accept such Purchased Assets from the Seller, for the consideration and upon the terms and subject to the conditions set forth in the Asset Purchase Agreement; and

WHEREAS, pursuant to the Asset Purchase Agreement, Seller agreed to execute and deliver to Purchaser at the Closing this Bill of Sale with respect to the Purchased Assets.

## <u>AGREEMENT</u>

NOW THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the Parties hereto agree as follows:

1.      <u>Defined Terms</u>. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed thereto in the Asset Purchase Agreement.

2.      <u>Asset Transfer</u>. The Seller hereby sells, conveys, transfers, sets over, delivers and assigns to Purchaser, free and clear of any Lien, all right, title, and interest of the Seller in and to all of the Purchased Assets and such Purchased Assets are transferred unto Purchaser and its successors and assigns to its and their own use forever.

3.      <u>No Additional Representations</u>.  Except as otherwise set forth in this Bill of Sale, Seller is not making any additional representations, warranties, or covenants in this Bill of Sale other than those contained in the Asset Purchase Agreement.

4.      <u>Further Assurances</u>. Each of the Parties hereto covenants and agrees, at its own expense, to execute and deliver, at the request of the other Party hereto, all such further instruments of transfer and assignments and to take such other action as such other Party may reasonably request to more effectively consummate the transfers contemplated by this Bill of Sale.

5.      <u>Further Actions</u>.  The Seller hereby authorizes Purchaser, its successors and assigns, for the benefit and at the expense of Purchaser, to institute and prosecute all proceedings which Purchaser may deem proper in order to collect, assert or enforce any claim, right or title of any kind in or to any of the Purchased Assets, to defend or compromise any and all actions, suits

or proceedings in respect of any of the Purchased Assets, and to do all such acts and things in relation thereto as Purchaser shall deem advisable, all subject to the requirements of the Asset Purchase Agreement.

6.      <u>No Third Party Beneficiaries</u>. Nothing in this instrument, expressed or implied, is intended or shall be construed to confer upon or give to any Person, other than Purchaser and Seller and each of their respective successors and assigns, any remedy or claim under or by reason of this instrument or any agreement, term, covenant or condition hereof, and all of the agreements, terms, covenants and conditions contained in this instrument shall be for the sole and exclusive benefit of Purchaser and Seller and their respective successors and assigns.

7.      <u>Modification</u>. This Bill of Sale may not be modified except by a writing executed by the Parties hereto.

8.      <u>Assignment.</u> The terms of this Bill of Sale shall be binding upon, inure to the benefit of, and be enforceable by each of the Parties hereto and each of their respective successors and permitted assigns.

9.      <u>Governing Law</u>. All questions concerning the construction, validity, and interpretation of this Bill of Sale shall be governed by and construed in accordance with the federal Bankruptcy Law, to the extent applicable, and the domestic laws of the State of Arizona, without giving effect to any choice of law or conflict of law provision (whether of the State of Arizona or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than Arizona.

10.      <u>Counterparts</u>. This Bill of Sale may be executed in multiple counterparts, each of which shall be deemed an original but all of which taken together shall constitute one and the same instrument. This Bill of Sale and any signed agreement or instrument entered into in connection with this Bill of Sale, and any amendments hereto or thereto, to the extent delivered by means of a facsimile machine, Internet mail or other electronic means readily available to each of the parties hereto (any such delivery, an "**Electronic Delivery**"), shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any Party hereto or to any such other agreement or instrument, each other Party hereto or thereto shall re-execute original forms thereof and deliver them to all other Parties. No Party hereto or to any such other agreement or instrument shall raise the use of Electronic Delivery to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of Electronic Delivery as a defense to the formation of a contract, and each such party forever waives any such defense, except to the extent such defense related to lack of authenticity.

*[Signatures appear on the following page]*

2

IN WITNESS WHEREOF, the parties have executed and delivered this Bill of Sale as of the date first written above.

**PURCHASER:**

**CTB AZ, LLC**

By: _____

Name: _____

Title: _____

**SELLER**:

**COMMUNITY PROVIDER OF ENRICHMENT SERVICES, INC.**

By: _____

Name: _____

Title: _____

*Signature Page to Bill of Sale*

# **EXHIBIT C**

Assignment and Assumption Agreement

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Agreement**") is made and entered into as of [●], 2020, by and among CTB AZ, LLC, an Arizona limited liability company ("**Purchaser**") and Community Provider of Enrichment Services, Inc., an Arizona corporation ("**Seller**").  Purchaser and Seller are each referred to herein individually as a "**Party**" and collectively, as the "**Parties**."

## RECITALS

WHEREAS, pursuant to that certain Asset Purchase Agreement dated as of September 3, 2020 (the "**Asset Purchase Agreement**"), by and among Purchaser and Seller, among other things, Seller agreed to assign to Purchaser the Assumed Liabilities, and Purchaser agreed to accept such Assumed Liabilities from Seller, for the consideration and upon the terms and subject to the conditions set forth in the Asset Purchase Agreement; and

WHEREAS, pursuant to the Asset Purchase Agreement, Seller agreed to execute and deliver to Purchaser at the Closing this Agreement with respect to the Assumed Liabilities.

## AGREEMENT

NOW THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the Parties hereto agree as follows:

1.     <u>Defined Terms</u>. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed thereto in the Asset Purchase Agreement.

2.     <u>Assignment and Assumption</u>. The Seller hereby assigns and Purchaser hereby accepts the Assumed Liabilities, and agrees to pay, perform and discharge, as and when due, all of the obligations under the Assumed Liabilities accruing on and after Closing.  Notwithstanding the foregoing, Purchaser assumes no Excluded Liabilities, and the Parties agree that all Excluded Liabilities shall remain the sole responsibility of Seller.

3.     <u>Further Assurances</u>. Each of the Parties hereto covenants and agrees, at its own expense, to execute and deliver, at the request of the other Party hereto, all such further instruments of transfer and assignments and to take such other action as such other Party may reasonably request to more effectively consummate the transfers contemplated by this Agreement.

4.     <u>No Third Party Beneficiaries</u>. Nothing in this instrument, expressed or implied, is intended or shall be construed to confer upon or give to any Person, other than Purchaser and Sellers and each of their respective successors and assigns, any remedy or claim under or by reason of this instrument or any agreement, term, covenant or condition hereof, and all of the agreements, terms, covenants and conditions contained in this instrument shall be for the sole and exclusive benefit of Purchaser and Seller and their respective successors and assigns.

5.      <u>Modification</u>. This Agreement may not be modified except by a writing executed by the Parties hereto.

6.      <u>Assignment.</u> The terms of this Agreement shall be binding upon, inure to the benefit of, and be enforceable by each of the Parties hereto and each of their respective successors and permitted assigns.

7.      <u>Governing Law</u>. All questions concerning the construction, validity, and interpretation of this Agreement shall be governed by and construed in accordance with the federal Bankruptcy Law, to the extent applicable, and the domestic laws of the State of Arizona, without giving effect to any choice of law or conflict of law provision (whether of the State of Arizona or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than Arizona.

8.      <u>Counterparts</u>. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which taken together shall constitute one and the same instrument. This Agreement and any signed agreement or instrument entered into in connection with this Agreement, and any amendments hereto or thereto, to the extent delivered by means of a facsimile machine, Internet mail or other electronic means readily available to each of the parties hereto (any such delivery, an "**Electronic Delivery**"), shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any Party hereto or to any such other agreement or instrument, each other Party hereto or thereto shall re-execute original forms thereof and deliver them to all other Parties.  No Party hereto or to any such other agreement or instrument shall raise the use of Electronic Delivery to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of Electronic Delivery as a defense to the formation of a contract, and each such party forever waives any such defense, except to the extent such defense related to lack of authenticity.

*[Signatures appear on the following page]*

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first written above.

**PURCHASER:**

**CTB AZ, LLC**

By: _____

Name: _____

Title: _____


**SELLER**:

**COMMUNITY PROVIDER OF ENRICHMENT SERVICES, INC.**


By: _____

Name: _____

Title: _____

*Signature Page to Assignment and Assumption Agreement*

## **EXHIBIT D**

Power of Attorney

## POWER OF ATTORNEY

Pursuant to that certain Asset Purchase Agreement dated as of September 3, 2020 (the "**Asset Purchase Agreement**"), by and among Community Provider of Enrichment Services, Inc., an Arizona corporation (the "**Seller**") and CTB AZ, LLC, an Arizona limited liability company (the "**Purchaser**"), the Seller hereby irrevocably designates and appoints the Purchaser and its successors and assigns as the Seller's true and lawful agent and attorney-in-fact with full power of substitution and with the power and authority to prepare, sign, execute and deliver, on the Seller's behalf, any consent, certificate, agreement, application, document or instrument necessary, convenient or appropriate, to consummate, perfect or register, under applicable law, the transfer of the Purchased Assets (as such term is defined in the Asset Purchase Agreement), to Purchaser.

The Purchaser shall not have any power or authority except those expressly set forth herein and in the Asset Purchase Agreement.

The Purchaser shall not have any liability to any Person (as such term is defined in the Asset Purchase Agreement) as a result of any action taken or failure to take action pursuant to the foregoing power of attorney except for any action or failure to take action not taken or omitted in good faith or which involves intentional misconduct or a knowing violation of applicable law.

The Seller affirms that this power of attorney is given for the mutual agreements contained in the Asset Purchase Agreement.

This power of attorney shall expire on [•].

This power of attorney shall be governed by the substantive laws of the State of Arizona, without regard to its conflicts of law rules.

IN WITNESS WHEREOF, the Seller has caused this power of attorney to be duly authorized and executed by its duly authorized officer this [•] day of [•], 2020.

**<u>SELLER</u>**:

**COMMUNITY PROVIDER OF ENRICHMENT SERVICES, INC.**


By: _____
Name: _____
Title: _____

STATE OF ARIZONA                )
                                )
COUNTY OF [•]                   )

      I hereby certify that on this [•] day of [•], 2020, personally appeared [•], the chief executive officer of Community Provider of Enrichment Services, Inc., a corporation organized under the laws of the State of Arizona, who is personally known to me or who produced the following identification [•], and he acknowledged before me that he executed the foregoing document as his free act and deed as such officer, for the uses and purposes therein mentioned, and that said instrument is the act and deed of said corporation.

      IN WITNESS WHEREOF, I have hereunto set my hand and seal in the County and State aforesaid as of this [•] day of [•], 2020.


_____
(Name of Notary)
Notary Public
State of
Commission or Serial No.:


My commission expires:

## **EXHIBIT E**

Minimum Bidding Procedures

## Bidding Procedures

CTB AZ, LLC, an Arizona limited liability company (the "Stalking Horse Bidder") has submitted a Qualified Bid (as defined below) to acquire, directly or indirectly (including through one or more Affiliates (as defined in the Bankruptcy Code)), from Community Provider of Enrichment Services, Inc., an Arizona corporation ("CPES" or "Debtor") substantially all of the assets owned by the Debtor (the "Purchased Assets"), as set forth more fully in, and pursuant to the terms and conditions of, the Asset Purchase Agreement dated September 3, 2020 between the Stalking Horse Bidder and Debtor (the "Stalking Horse Agreement") and related documents and agreements (the "Stalking Horse Bid").[1]  As approved by the Bidding Procedures Order dated _____, 2020 (the "Bidding Procedures Order"), the following procedures shall govern any competing bids that may be made with respect to the Purchased Assets (the "Bidding Procedures"):

1) ***Participation Requirements and Due Diligence***

   a) To participate in the bidding process, the auction for a Proposed Transaction (as defined below), if any (the "Auction"), or otherwise be considered for any purpose hereunder, a person or entity interested in acquiring the Purchased Assets (each, a "Potential Bidder") must first deliver the following materials to the Debtor and its advisors:

   i) An executed confidentiality agreement in form and substance acceptable to the Debtor and its advisors (the "Confidentiality Agreement") (to be delivered prior to the distribution of any confidential information by the Debtor to any Potential Bidder), whereby the Potential Bidder agrees that all non-public information about the Debtor received by a Potential Bidder will be kept strictly confidential in accordance therewith and used only in connection with analyzing a proposed transaction (a "Proposed Transaction") for the purchase of the Purchased Assets pursuant to section 363 of the Bankruptcy Code.

   ii) Written evidence that enables the Debtor and its advisors to reasonably determine whether a Potential Bidder has the financial and other ability to close a Proposed Transaction and provide adequate assurance of future performance under all contracts and leases to be assumed in connection therewith.

   iii) Full disclosure of whether the Potential Bidder and any members of its investor group, if applicable, or any equity holders in the case of a Potential Bidder which is an entity specially formed for the purpose of effectuating a Proposed Transaction, has any connections or relationships (business or otherwise) to, or agreements or understandings with, the Debtor or any of its Affiliates and/or any officer, director or equity security holder of the Debtor or any of its Affiliates and, if so, the complete nature of such connections or relationships and the complete terms of such agreements or understandings.

   b) The Debtor or its advisors shall post in the Debtor's electronic data room (the "Data Room") these Bidding Procedures, together with a WORD copy of the Stalking Horse Agreement (as approved by the Bankruptcy Court pursuant to the Bidding Procedures

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Stalking Horse Agreement.

Order as the "stalking horse" bid for the Purchased Assets). All Potential Bidders, whether deemed Qualified Bidders (as defined below) or not, consent to the jurisdiction of the Bankruptcy Court to determine matters concerning a Proposed Transaction and their bids (each, a "Bid") (whether or not one is made), the Auction, or the marketing process generally and waive any right to any other venue.

c) Any qualified Potential Bidder wishing to conduct due diligence concerning a Proposed Transaction shall be granted (subject to execution and delivery of the required Confidentiality Agreement) (i) reasonable access to the Debtor's management during normal business hours and (ii) access to all relevant information regarding the business of the Debtor and its Affiliates reasonably necessary to enable a Potential Bidder to evaluate a Proposed Transaction. The Debtor shall make such document access available to Potential Bidders through the Data Room as soon as reasonably practicable following (x) execution of the Confidentiality Agreement and (y) the Potential Bidder's provision of preliminary proof of its financial capacity to close a Proposed Transaction. Potential Bidders interested in conducting due diligence should contact Jeffrey R. Manning, CohnReznick Capital, 500 East Pratt Street, Ste. 400 Baltimore MD. 21202, 410-690-8788, jeff.manning@cohnreznickcapital.com. Notwithstanding the foregoing, CohnReznick Capital is not required to provide confidential, business-sensitive or proprietary information to any person or entity if the Debtor reasonably believes that such disclosure would be detrimental to the interests of the Debtor's estate. All due diligence must be completed before the Bid Deadline (as defined below). No condition(s) allowing or regarding further due diligence after the Bid Deadline will be permitted in any Bid unless otherwise determined by the Debtor, provided that the Debtor shall continue to provide due diligence to the Stalking Horse Bidder. Potential Bidders are required to exercise their own discretion before relying on any information provided by the Debtor regarding a Proposed Transaction. Neither the Debtor nor its representatives or advisors (X) are responsible for, or will bear any liability with respect to, any information obtained by Potential Bidders pursuant hereto and (Y) shall be obligated to furnish any information of any kind whatsoever to any person or entity that is not a Potential Bidder.

d) The Debtor and its advisors shall, in their reasonable discretion: (i) receive and evaluate any Bids from Potential Bidders; (ii) negotiate offers made to purchase the Purchased Assets; (iii) request information from Potential Bidders, engage in discussions with Potential Bidders, and take such other actions to determine whether any Bid constitutes or could lead to a Qualified Bid; and (iv) take any other actions contemplated under these Bidding Procedures.

2) *Submission of Bids*

a) Any Potential Bidder interested in a Proposed Transaction must submit a Bid prior to 4:00 p.m. prevailing Pacific Time on [_____], 2020 (or such later date and time as the Debtor may announce, subject to the terms of the Stalking Horse Agreement) (the "Bid Deadline"). In order for a Bid to be considered, it must be a "Qualified Bid". A Potential Bidder will be deemed to be a "Qualified Bidder" if the Debtor and its advisors, in their sole discretion, determine that such Potential Bidder submitted a Qualified Bid. For the

avoidance of doubt, the Stalking Horse Bidder is deemed a Qualified Bidder and may, but is not required to, participate in the Auction.  The Stalking Horse Bid is a Qualified Bid.

b)  A Bid, other than the Stalking Horse Bid, will be considered a "Qualified Bid" only if the Bid (w) is in writing; (x) is for an acquisition of all or substantially all of the Purchased Assets (an "All Assets Bid") pursuant to a purchase agreement in the form of the Stalking Horse Agreement that contains substantially all of the terms and conditions contained in the Stalking Horse Agreement (except for an increased purchase price) and otherwise contains terms no less favorable to the Debtor's estate than the Stalking Horse Agreement, as determined by the Debtor, and (y) fulfills, inter alia, at a minimum, the following requirements prior to the Bid Deadline:

   i)  Provides that the Bid shall remain irrevocable until the consummation of the Proposed Transaction (the "Effective Date") implementing the Winning Bid(s) or the Backup Bid(s) (each, as defined below) (such date, the "Bid Expiration Date");

   ii)  Is made by a person or entity that reasonably demonstrates evidence of fully committed and unconditional financing for such Bid and other ability to consummate the applicable Proposed Transaction, in each case solely as acceptable to the Debtor;

   iii)  Provides written evidence, in form and substance reasonably satisfactory to the Debtor, that the Potential Bidder has obtained authorization and approval from the Potential Bidder's board of directors (or comparable governing body) or, if required, the equity holders of the Potential Bidder, with respect to the submission of its Bid and the execution, delivery, performance and closing of the agreements associated therewith, or a representation that no such authorization or approval is required;

   iv)  Provides that the total consideration for all of the Purchased Assets in the aggregate will be an amount or value equal to or greater than $500,000 (such sum, the "Initial Overbid Amount"), and otherwise has a value to the Debtor, in the exercise of its reasonable business judgment, after consultation with its advisors, that is greater or otherwise better than the value offered under the Stalking Horse Agreement; or (2) such other combination of cash, assumed liabilities and/or excluded assets that, in the Debtor's determination, exceeds the value of the Stalking Horse Agreement to the Debtor.

   v)  Is accompanied by, or is followed prior to the Bid Deadline by, a wire transfer of immediately available funds to an escrow agent designated by the Debtor at least two business days before the Bid Deadline (the "Escrow Agent") of an earnest money cash deposit of not less than ten percent (10%) of the total purchase price proposed by the competing Bid (a "Good Faith Deposit");

   vi)  Provides written evidence satisfactory to the Debtor that the Potential Bidder or group of Potential Bidders has existing experience, expertise, and sophistication in managing and providing behavior healthcare services for organizations of similar size.  The Potential Bidder must be reasonably likely to obtain prompt regulatory approval from

DDD and any other regulatory body that might be required to approve the Proposed Transaction prior to closing;

vii) Is submitted in the form of a legally binding purchase agreement, together with such exhibits, schedules, annexes, appendices and attachments thereto as required by the Debtor in their reasonable discretion and all in the form of those documents used in the Stalking Horse Agreement, fully executed by the Potential Bidder in a clean copy and accompanied by a redlined version of all such documents, marked to show the proposed changes from the Stalking Horse Agreement and applicable exhibits, schedules, annexes, appendices and attachments thereto, that further:

(1) Fully discloses the identity of the Potential Bidder and any members of its investor group, if applicable, or any equity holders in the case of a Potential Bidder which is an entity specially formed for the purpose of effectuating the Proposed Transaction, and whether any such person or entity is an insider (as defined in section 101 of the Bankruptcy Code) of the Debtor;

(2) Is not subject to any conditions, representations, or terms that the Debtor determines to be unacceptable;

(3) Describes with specificity the total consideration proposed to be paid for the Purchased Assets;

(4) Is not conditioned upon the Bankruptcy Court's approval of, and includes an express acknowledgement and representation that the Potential Bidder is not entitled to, any Bid protections, such as a break-up fee, termination fee, expense reimbursement, working fee or similar type of payment in connection with its Bid;

(5) Is not conditioned upon tax or other due diligence or the receipt of financing;

(6) Does not contain any condition to closing of a Proposed Transaction relating to the receipt of any third party approvals (excluding required Bankruptcy Court approval and any required governmental and/or regulatory approval or third party consents required under the Stalking Horse Agreement);

(7) Expressly acknowledges and represents that the Potential Bidder: (A) has had an opportunity to conduct any and all due diligence regarding the Debtor (as defined in the Stalking Horse Agreement) and the applicable Proposed Transaction prior to making its Bid, (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Debtor in making its Bid, and (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets, the business of the Debtor or the Proposed Transaction, or the completeness or accuracy of any information provided in connection therewith or with the Auction, except as expressly stated in the representations

and warranties contained in the purchase agreement ultimately accepted and executed by the Debtor;

(8) Identifies with particularity each and every executory contract and unexpired lease that the Potential Bidder desires the Debtor to assume and assign at the closing and provides evidence of such Potential Bidder's ability to provide adequate assurance of future performance to counterparties to such contracts or leases to be assumed (as required by section 365(b)(1)(C) of the Bankruptcy Code) along with the Bid, which shall include: (i) the Potential Bidder's most recent audited financial statements (or unaudited, if audited financials are not available); and (ii) financial projections or financial pro-formas for the Potential Bidder (collectively, the "Adequate Assurance Information");[2]

(9) States that the Potential Bidder consents to the jurisdiction of the Bankruptcy Court;

(10) Includes a commitment to close the applicable Proposed Transaction within the timeframe contemplated by the Stalking Horse Agreement; and

(11) Contains such other information reasonably requested by the Debtors and its advisors;

viii) Provides that the Potential Bidder agrees to serve as a Backup Bidder (as defined below) if such bidder's Qualified Bid is selected as the next highest or otherwise best bid (or one of a combination of Qualified Bids) after the Winning Bid;

ix) Sets forth the representatives who are authorized to appear and act on behalf of the Potential Bidder at the Auction;

x) Contains written confirmation that the Potential Bidder has not engaged in any collusion with respect to the bidding or the sale process; and

xi) Represents that the Bid constitutes a good faith, *bona fide* offer to effectuate the Proposed Transaction.

c) A Potential Bidder that desires to make a Bid must deliver written electronic copies of its Bid prior to the Bid Deadline to (x) the Debtor, Mark Monson, President/CEO, 4805 Speedway Blvd, Tucson, Arizona, 85712, 520-495-6203, mmonson@cpes.com and (y) the following representatives of the Debtor: (i) Faegre Drinker Biddle & Reath LLP, Vincent P. Slusher, Esq., 1717 Main Street, Suite 5400, Dallas, Texas 75201, 469-357-2500; vince.slusher@faegredrinker.com; and (ii) Jeffrey R. Manning, CohnReznick Capital, 500

---

[2]    By submitting a Bid, Potential Bidders agree that the Debtor may disseminate its Adequate Assurance Information to affected contract and lease counterparties in the event the Debtor determines such Bid to be a Qualified Bid.

East Pratt Street, Ste. 400 Baltimore MD. 21202, 410-690-8788, jeff.manning@cohnreznickcapital.com.

d) Promptly after the Bid Deadline, the Debtor shall determine, in consultation with its advisors, and notify each Potential Bidder whether such Potential Bidder has submitted acceptable Bid documents such that it is deemed a Qualified Bidder.

e) A Qualified Bid will be valued based upon several factors including, without limitation: (i) the amount of such Bid; (ii) the form of consideration of such Bid; (iii) the risks and timing associated with consummating such Bid; (iv) any proposed revisions to the Stalking Horse Agreement (including any additional conditions to closing); and (v) any other factors deemed relevant by the Debtor including, without limitation, those factors identified in in Section 2(a) of these Bidding Procedures.

f) After the Bid Deadline, the Debtor shall determine which Qualified Bid represents the then-highest or otherwise best bid (the "Initial Highest Bid" and the person(s) or entit(y)(ies) submitting such Bid, collectively, the "Initial Highest Bidder") for the Purchased Assets, taking into account the factors that may be considered by the Debtor under Section 2(b) of these Bidding Procedures. At least one business day prior to the Auction, each Qualified Bidder that timely submitted a Qualified Bid will be advised of such Initial Highest Bid and, to the extent not previously received, shall receive from the Debtor copies of such Initial Highest Bid.

g) If a Qualified Bid for fewer than all of the Purchased Assets is submitted by the Bid Deadline or during the Auction with a proposed purchase price of at least the Initial Overbid Amount plus any applicable Minimum Bid Increment(s), the Stalking Horse Bidder may amend its Qualified Bid to encompass only the assets included in such Qualified Bid.

3) *Due Diligence From Potential Bidders or Qualified Bidders*

Each Potential Bidder shall comply with all reasonable requests for additional information by the Debtor or its advisors regarding such Potential Bidder's financial wherewithal to consummate and perform obligations in connection with a Proposed Transaction. Failure by a Potential Bidder to comply with reasonable requests for additional information may be a basis for the Debtor and its advisors to determine that a Potential Bidder is not a Qualified Bidder. Similarly, each Qualified Bidder shall comply with all reasonable requests for additional information by the Debtor or its advisors regarding such Qualified Bidder's financial wherewithal to consummate and perform obligations in connection with a Proposed Transaction as the Auction progresses. Failure by a Qualified Bidder to comply with reasonable requests for additional information may be a basis for the Debtor and its advisors to determine that the Qualified Bidder may no longer participate in the Auction. Other than the Stalking Horse Bidder and the Stalking Horse Bid, the Debtor may disqualify any Qualified Bidder and Qualified Bid from participation in the Auction in the Debtor' discretion.

4) *"As Is, Where Is"*

The sale and transfer of the Purchased Assets shall be without representations or warranties of any kind, nature or description by the Debtor, its advisors, agents or estates or any other party, except to the extent set forth in the purchase agreement between the Debtor and the Winning Bidder(s).  Except as otherwise provided in the purchase agreement between the Debtor and the Winning Bidder(s), the Purchased Assets shall be sold and transferred free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests therein (collectively, the "Claims") pursuant to section 363(f) of the Bankruptcy Code.

5) **The Auction**

   a) If one or more Qualified Bids has been submitted for the Purchased Assets in accordance with these Bidding Procedures, the Debtor will conduct an Auction **on [_____], 2020, at [_____] prevailing Pacific time** (or such later time as the Debtor shall timely notify the Auction Participants (as defined below)), with respect to such Qualified Bids in order to determine the Winning Bid(s) and the Backup Bid(s) to submit for approval by the Bankruptcy Court.  The Auction shall be organized and conducted by the Debtor at the offices of its counsel, Faegre Drinker Biddle & Reath LLP, 1800 Century Park East, Suite 1500, Los Angeles, California 90067 or such other location (including a virtual location) as may be announced prior to the Auction to the Auction Participants.  The Auction will be recorded by stenographic means by an authorized court reporter.

   b) The only persons or entities who will be permitted to Bid at the Auction are the authorized representatives of each Qualified Bidder and of any otherwise Qualified Bidder identified by the Debtor pursuant to Section 2(h) of these Bidding Procedures (the "Auction Participants").  While only the Auction Participants may make Qualified Bids at the Auction, the Auction may be attended and viewed also by (i) the Debtor; (ii) the United States Trustee; (iii) CohnReznick; (iv) any statutory committee appointed in the Debtor's chapter 11 case or, if no such committee is appointed, the entities holding the twenty largest unsecured claims against each Debtor's estate in this chapter 11 case, and (v) all Qualified Bidders, and their respective advisors and/or other authorized representatives.  Any such person wishing to attend the Auction may do so by contacting, no later than three (3) days prior to the start of the Auction, Faegre Drinker Biddle & Reath LLP, Kaitlin W. MacKenzie, 222 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801, 302-467-4200, kaitlin.mackenzie@faegredrinker.com.

   c) Each Qualified Bidder shall be required to confirm on the record that it has not engaged in any collusion with respect to the marketing process or the Proposed Transactions, including communicating with other Potential Bidders during the Auction, concerning any aspect of the Auction or bidding without the consent of the Debtor on the record of the Auction.

   d) The Auction shall be conducted by the Debtor in accordance with such procedures and requirements as may be established at the discretion of the Debtor and its advisors to result in the highest or otherwise best offer for the Purchased Assets, which rules shall be announced prior to commencement of the Auction and may include the determination of the amount of time between Qualified Bids, the conducting of multiple rounds of open

bidding, and to declare that the Auction has ended when no further Bids are timely made or otherwise. The Debtor may, after consultation with its advisors, from time to time waive and/or employ and announce at the Auction additional rules that are reasonable under the circumstances for conducting the Auction provided that such rules are: (i) not inconsistent with the Bidding Procedures Order, the Stalking Horse Agreement, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules of the Bankruptcy Court, or any order of the Bankruptcy Court entered in connection with the Debtor's chapter 11 case and (ii) disclosed to each Qualified Bidder. Subject to the Debtor' fiduciary duties as Debtor and debtor-in-possession, the Debtor will present and request Bankruptcy Court approval of the Winning Bid(s) (as defined below) from the Auction at the Sale Hearing (as defined below).

e) With respect to the Purchased Assets, the first Qualified Bid at the Auction shall be deemed to have been made by the Initial Highest Bidder for the applicable assets in the amount of the Initial Highest Bid. Thereafter, the Auction will continue in the manner determined by the Debtor above; provided, however, (i) additional Bids must be Qualified Bids (except that subsequent Qualified Bids made at the Auction by a Qualified Bidder need not be received by the Bid Deadline) and (ii) additional Qualified Bids must be made in higher increments of at least $25,000 in cash above the immediately preceding Bid (the "Minimum Bid Increment"). The Debtor may modify the Minimum Bid Increment from time to time as necessary to the extent the Debtor deems appropriate, which modification (if any) will be announced on the record at the Auction.

f) The Debtor shall determine whether a Qualified Bid by a Qualified Bidder at the Auction is higher or otherwise better than the prior Qualified Bid.

g) At the conclusion of the Auction, the Debtor, in the exercise of its reasonable, good faith business judgment, shall select the highest or otherwise best Bid or Bids (the "Winning Bid(s)") and the second highest or otherwise best Bid or Bids (the "Backup Bid(s)") that, in the exercise of their fiduciary duties, the Debtor in good faith believe are in the best interests of the Debtor's estate and stakeholders, which will be determined by considering, among other things:

   i)   the total expected consideration to be received by the Debtor;

   ii)  the likelihood of the Qualified Bidder's or Qualified Bidders' ability to close the Proposed Transaction and the timing thereof;

   iii) the ability of each Qualified Bidder to satisfy necessary regulatory approvals and the timing for obtaining such; and

   iv)  the expected net benefit to the Debtor's estate, including enhanced treatment of the Debtor's creditors and other parties in interest.

In addition, at the conclusion of the Auction, the Debtor shall: (i) notify the Qualified Bidder(s) that made the Winning Bid(s) (the "Winning Bidder(s)") that such Bid or Bids have been determined by the Debtor to be the Winning Bid(s), subject only to Bankruptcy Court approval; (ii) notify the Qualified Bidder(s) that made the Backup Bid(s) (the

"Backup Bidder(s)") that such Bid has been determined by the Debtor to be the Backup Bid(s), subject only to Bankruptcy Court approval; and (iii) file a notice with the Bankruptcy Court announcing the Winning Bidder(s) and Backup Bidder(s) and approval of the same at a hearing to consider approval of the sale of the Purchased Assets (the "Sale Hearing").  Prior to the commencement of the Sale Hearing, the Winning Bidder(s) shall, collectively (X) provide, by wire transfer of immediately available funds, to the Escrow Agent an additional earnest money cash deposit of not less than an additional five percent (5%) of the total value of the purchase price of the Winning Bid(s), or, in the case of Backup Bid(s), an additional earnest money cash deposit of not less than an additional five percent (5%) of the total value of the purchase price for the Backup Bid(s), and (Y) complete and sign all agreements and documents as necessary to bind the Winning Bidder(s) to all of the terms and conditions contemplated by the Winning Bid(s).  The Stalking Horse Bidder has the option, but is not obligated, to increase its Bid at the Auction. In the event the Stalking Horse Bidder is not selected as the Winning Bidder and is not the Backup Bidder for the Purchased Assets at the conclusion of the Auction, its Good Faith Deposit shall be returned to the Stalking Horse Bidder in accordance with the terms of the Stalking Horse Agreement and the escrow agreement among the Stalking Horse Bidder, the Debtor and the escrow agent (the "Stalking Horse Deposit Escrow Agreement").

h)  The Backup Bid(s) shall remain irrevocable until the Effective Date or the Bid Expiration Date.

i)  If Debtor does not receive any Qualified Bids for the Purchased Assets other than the Stalking Horse Bid by the Bid Deadline , the Debtor shall not hold an Auction; the Stalking Horse Agreement shall be deemed the Winning Bid with respect to the Purchased Assets, and the Debtor shall seek approval of a sale of the Purchased Assets to the Stalking Horse Bidder at the Sale Hearing.

j)  The Good Faith Deposit(s) of the Winning Bidder(s) shall be applied by the Debtor against the purchase price to be paid by the Winning Bidder(s) or held by the Debtor and forfeited, as the case may be, in accordance with the terms of the purchase agreement(s) associated with the Winning Bid(s).

k)  The Debtor shall not be deemed to have finally accepted any Qualified Bid(s) unless and until such Qualified Bid(s) and the Debtor's acceptance thereof have been authorized by order of the Bankruptcy Court following the conclusion of the Sale Hearing.

**6)  *Sale Hearing***

A hearing to consider approval of the Winning Bid(s) and Backup Bid(s) (if any) will take place at a Sale Hearing, which will be held on [_____], 2020 at [_____] (prevailing Pacific Time), which may be adjourned (subject to the terms of the Stalking Horse Agreement, if applicable) to a later date by the Debtor by filing a notice of adjournment or making an announcement at the hearing.  No further notice of any such continuance will be required to be provided to any party.

**7) *Good Faith Deposit(s)***

No later than three (3) business days after the Auction, the Debtor (or the Escrow Agent) shall return to each Qualified Bidder(s) other than the Winning Bidder(s) and the Backup Bidder(s) their respective Good Faith Deposit(s).  If a Winning Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Winning Bidder, the Debtor will not have any obligation to return the Good Faith Deposit deposited by such Winning Bidder, which may be retained by the Debtor as liquidated damages, in addition to any and all rights, remedies and/or causes of action that may be available to the Debtor at law or in equity, and, the Debtor shall be free to consummate the applicable Proposed Transaction with the applicable Backup Bidder, without the need for an additional hearing or order of the Bankruptcy Court.  Notwithstanding any provision hereof, the terms pertaining to (a) any good faith deposit submitted by the Stalking Horse Bidder pursuant to the Stalking Horse Agreement (including, without limitation, the entitlements of the Stalking Horse Bidder and Debtor to such good faith deposit and the timing of return of any good faith deposit to the Stalking Horse Bidder) and (b) any rights, remedies and causes of action of the Stalking Horse Bidder and the Debtor against one another shall be governed by the terms of the Stalking Horse Agreement, the Stalking Horse Deposit Escrow Agreement and the Bidding Procedures Order.

**8) *Bid Protections***

a) In recognition of the expenditure of time, energy, and resources, and because the agreement to make payment thereof is necessary to preserve the value of each of the Debtor's estate, the Debtor has agreed that, among other triggering events, if the Stalking Horse Bidder is not the Winning Bidder for the Purchased Assets, then the Debtor will pay the Stalking Horse Bidder, pursuant to and in accordance with the terms of the Stalking Horse Agreement the Break-up Fees (as defined therein, the "Break-up Fees"). The Break-up Fees shall be payable as provided for pursuant to the terms of the Stalking Horse Agreement, and nothing herein shall be deemed to limit or otherwise modify the terms thereof.

b) Except for the Stalking Horse Bidder, no Qualified Bidder or other party submitting a bid shall be entitled to any expense reimbursement, break-up fee, termination or other similar fee or payment.

**9) *Miscellaneous***

a) The Auction and the Bidding Procedures are solely for the benefit of the Debtor and the Stalking Horse Bidder, and nothing contained in the Bidding Procedures Order, the Bidding Procedures or the Stalking Horse Agreement shall create any rights in any other person or bidder (including, without limitation, rights as third-party beneficiaries or otherwise) other than the rights expressly granted to the Winning Bidder(s) under the Bidding Procedures Order.

b) Notwithstanding anything herein to the contrary, the Debtor reserves its rights to modify these Bidding Procedures in any manner that will best promote the goals of the bidding process or impose, at or prior to the Auction but not prior to the Bid Deadline, additional

customary terms and conditions on the applicable Proposed Transaction; <u>provided however</u>, that the Debtor may not modify the Break-up Fees or other bid protections afforded to the Stalking Horse Bidder in accordance with the Stalking Horse Agreement or otherwise modify these Bidding Procedures in a manner that would adversely affect the Stalking Horse Bidder, unless agreed in writing by the Stalking Horse Bidder.  For the avoidance of doubt, the Debtor may not modify the rules, procedures, or deadlines set forth herein, or adopt new rules, procedures, or deadlines that would impair in any material respect the Stalking Horse Bidder's right to payment of the Break-up Fees or otherwise adversely affect the Stalking Horse Bidder without the express written consent of the Stalking Horse Bidder. All such modifications and additional rules will be communicated to each of the Potential Bidders and Qualified Bidders (including the Stalking Horse Bidder) or announced at the Auction.

c) The Bankruptcy Court shall retain exclusive jurisdiction to hear and determine all matters arising from or relating to implementation of the Bidding Procedures Order.

# **EXHIBIT F**

Sale Approval Order