1  Jennifer C. Kalvestran - CA Bar #242157
   Sean P. O'Brien - AZ Bar #010540
2  *Admitted Pro Hac Vice*
   Robert C. Williams – AZ Bar #033213
3  *Admitted Pro Hac Vice*
   **GUST ROSENFELD, PLC**
4  11900 W. Olympic Boulevard, Suite 800
   Los Angeles, CA 90064
5  Tel: (310) 620-3083
   Tel: (602) 257-7460
6  Fax: (602) 254-4878
   E-Mail: jkalvestran@gustlaw.com
7  E-Mail: spobrien@gustlaw.com
   E-Mail: rwilliams@gustlaw.com
8  Attorneys for the ***Arizona Department***
   ***of Economic Security, Division of Developmental Disabilities***

9

10              **UNITED STATES BANKRUPTCY COURT**

11      **CENTRAL DISTRICT OF CALIFORNIA – NORTHERN DIVISION**

| | |
|---|---|
| 12  In re: | Lead Case No. 9:20-bk-10554-DS |
| 13  Community Provider of Enrichment Services, Inc. d/b/a/ CPES Inc., et al., | Jointly Administered With: Case No. 9:20-bk-10553-DS Case No. 9:20-bk-10994-DS |
| 14        Debtors. | |
| 15  | Chapter 11 |
| 16  Movant: | **Hearing**: |
| 17  Arizona Department of Economic Security, Division of Developmental Disabilities ("DES/DDD"). | Date:   September 24, 2020 Time:   2:00 p.m. Pace:   Via Zoom for Government Courtroom 201 United States Bankruptcy Court 1415 State Street Santa Barbara, CA 93101 |
| 18  | |
| 19  This Filing Applies To: | |
| 20  Community Provider of Enrichment Services, Inc. d/b/a/ CPES Inc. et al, Debtors-In-Possession. | |
| 21  | |
| 22  | |

23      **SUPPLEMENTAL BRIEF IN SUPPORT OF ARIZONA DEPARMTNET OF
        ECONOMIC SECURITY, DIVISION OF DEVELOPMENTAL DISABILITIES':**

24
25      **(A) MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11
        U.S.C. § 362 (ACTION IN NONBANKRUPTCY FORUM) [DKT. 308]; AND**

26      **(B) OBJECTION TO THE DEBTOR'S "ARIZONA SALE MOTION" [DKT. 318]**

3903435.1

1

## TABLE OF CONTENTS

2    TABLE OF CITATIONS ................................................................4

3    MEMORANDUM OF POINTS AND AUTHORITIES ................................................7

4    I.    INTRODUCTION ................................................7

5    II.   CPES AZ'S BUSINESS OPERATIONS WOULD NOT BE POSSIBLE
6          WITHOUT DES/DDD'S QVA SYSTEM AND CPES AZ WAS ALWAYS
          SUBJECT TO DES/DDD'S DISCRETION .................................. 10
7
          A. The Unique Arizona Medicaid Plan ........................................ 11
8
9         B. The DES/DDD QVA Program ................................................ 13

10        C. How the QVA Program Protects the Developmentally Disabled
             Members ........................................................................ 14
11
12        D. The DES/DDD Process for Placing Eligible Members ........................... 19

13        E. Why Using a Contracted QVA Vendor or Associate Would Not Be
             Appropriate ..................................................................... 21
14
15    III.  DES/DDD SEEKS CONFIRMATION THAT IT IS A VALID EXERCISE
          OF ITS POLICE AND REGULATORY POWERS TO COMPLETE ITS
16         STATUTORY AND REGULATORY OVERSIGHT AND
          COORDINATION OF ITS MEMBER TRANSITION PLAN................... 22
17
      IV.  THE COURT LACKS AUTHORITY TO INTERFERE WITH ARIZONA'S
18         DISCRETE, REASONED, AND VALID EXERCISE OF ITS POLICE AND
          REGULATORY POWERS WITH RESPECT TO ITS QVA SYSTEM AND
19         THE TRANSITION OF THE DES/DDD MEMBERS TO QUALIFIED
          VENDORS ........................................................................ 26
20
      V.   DES/DDD IS NOT DISCRIMINATING AGAINST CPES AZ IN
21         VIOLATION OF 11 U.S.C. § 525(a) .......................................... 28

22    VI.  CONCLUSION ........................................................................ 30

23

## APPENDICES

24    Exhibit 1.   Section 5 – Service Requirements/Scope of Work

25    Exhibit 2.   Excerpts from DES/DDD's Operations Manual of § 6002

26    Exhibit 3.   DES/DDD's Provider Policy Manual – Chapter 33

3903435.1

1      Exhibit 4.   Section 7 - Habilitation, Group Home – of Request for Qualified Vendor

2                          Application

3      Exhibit 5.   Group Home Bulletin about restraints

4      Exhibit 6.   Bulletin about health

5      Exhibit 7.   Group Home Bulletin about abuse

6      Exhibit 8.   Meeting Minutes

7      Exhibit 9.   First Vendor Call dated June 8, 2020

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1

# TABLE OF CITATIONS

2

**Cases**

3

*Federal Communications Commission v. NextWave Personal Communications Inc.*,
    537 U.S. 293 (2003) ................................................................................ 29

4

*In re D.H. Overmyer Telecasting co., Inc.*,
    35 B.R. 400, 404 (Bankr. N.D. Ohio 1983) ........................................... 26

5

6

*In re Union Golf of Fla., Inc.*,
    242 B.R. 51, 58 (Bankr. M.D. Fla. 1998) .............................................. 26

7

*Parkview Adventist Med. Ctr. v. United States*,
    842 F.3d 757 (1st Cir. 2016) ................................................................... 29

8

9

**Statutes**

10

A.R.S. § 12-2297 ............................................................................................ 17

11

A.R.S. § 35-214 .............................................................................................. 17

12

A.R.S. § 35-215 .............................................................................................. 17

13

A.R.S. § 36-554(A) ........................................................................................ 27

14

A.R.S. § 36-554(C)(6) ................................................................................... 28

15

11 U.S.C. § 362 ........................................................................................... 7, 31

16

11 U.S.C. § 362(b)(4) .......................................................... 10, 26, 28, 30, 31

17

11 U.S.C. § 362(d)(1) ................................................................................... 30

18

11 U.S.C. § 525(a) ................................................................................... 28, 29

19

42 C.F.R. 434.34............................................................................................. 27

20

42 C.F.R. 438.66 ............................................................................................ 12

21

42 C.F.R. 438.68 ............................................................................................ 12

22

42 C.F.R. 438.206 .......................................................................................... 12

23

42 C.F.R. 438.207 .......................................................................................... 12

24

42 C.F.R. 457.1218 ........................................................................................ 12

25

42 C.F.R. 457.1230 ........................................................................................ 12

26

1  **Rules**

2  Ariz. Admin. Code R6-6-806.G ................................................................... 18

3  Ariz. Admin. Code R6-6-806.K ................................................................... 18

4  Fed. R. Bankr. P. 4001(a)(3) ...................................................................... 31

5  **Other Authorities**

6  3 Collier on Bankruptcy ¶ 525.02
     (Richard Levin & Henry J. Sommer eds., 16th ed.) .................................... 29

7  Declaration of Nicolette Fidel, Dkt. No. 318-1 ................................. 8, 9, 11, 12

8  Qualified Vendor Agreement Section 6: DES/DDD Standard Terms and Conditions for
9     Qualified Vendors, Dkt. No. 318-3 .......................................... 14, 16, 17, 18

10 Exhibit 1.   Section 5 – Service Requirements/Scope of Work................... 14, 16, 20, 24

11 Exhibit 2.   Excerpts from DES/DDD's Operations Manual of § 6002.......................... 17

12 Exhibit 3.   DES/DDD's Provider Policy Manual – Chapter 33..................................... 17

13 Exhibit 4.   Section 7 - Habilitation, Group Home – of Request for Qualified Vendor
14    Application........................................................................................ 18

15 Exhibit 5.   Group Home Bulletin about restraints........................................... 18

16 Exhibit 6.   Bulletin about health.................................................................. 18

   Exhibit 7.   Group Home Bulletin about abuse ............................................... 18

17 Exhibit 8.   Meeting Minutes....................................................................... 20

18 Exhibit 9.   First Vendor Call dated June 8, 2020 ......................................... 20

19 Motion for Relief from the Automatic Stay under 11 U.S.C. § 362 (Action In Non
20 Bankruptcy Forum) and Memorandum of Points and Authorities in support thereof,
   Dkt. No. 308 ............................................................................. 7, 22, 31

21 Objection by Arizona Department of Economic Security, Division of Developmental
22 Disabilities to Debtor's Notice of Motion and Motion for Entry of (I) an Order (A)
   Authorizing and Approving the Debtor's Entry into the Stalking Horse Asset Purchase
23 Agreement, (B) Authorizing and Approving Bidding Procedures and Break-Up Fee, (C)
   Approving Notice Procedures, (D) Scheduling a Sale Hearing, and (E) Approving
24 Procedures for Assumption and Assignment of Certain Executory Contracts and
   Unexpired Leases and Determining Cure Amounts: and (II) an Order (A) Authorizing
25 the Sale of Substantially all of the Debtor's Assets Free and Clear of All Liens, Claims,
   Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of

26

3903435.1

5

Certain Executory Contracts and Unexpired Leases: Memorandum of Points and
Authorities in support thereof. (Dkt. No. 296)
Dkt. No. 318 .................................................................................................................. 7

3903435.1

## **MEMORANDUM OF POINTS AND AUTHORITIES**

### **I.    INTRODUCTION**

The Arizona Department of Economic Security, Division of Developmental Disabilities ("DES/DDD"), submits this Supplemental Brief in support of it's:

A.  Motion for Relief from the Automatic Stay Under 11 U.S.C. § 362 (Action In Nonbankruptcy Forum) (the "DES/DDD Stay Relief Motion"), Dkt. No. 308; and

B.  Objection to the Debtors':

> Motion for Entry of (I) an Order (A) Authorizing and Approving the Debtor's Entry Into the Stalking Horse Asset Purchase Agreement, (B) Authorizing and Approving Bidding Procedures and Break-Up Fee, (C) Approving Notice Procedures, (D) Scheduling a Sale Hearing, and (E) Approving Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Determining Cure Amounts; and (II) an Order (A) Authorizing the Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; Memorandum of Points and Authorities in Support Thereof.

(the "DES/DDD Objection to the Arizona Sale Motion"), Dkt. No. 318.

The Court justifiably expressed concern in the hearing held Monday, September 14, 2020 about who is looking out for the interests of the vulnerable, developmentally disabled Arizona citizens (the "Members") who are in the care of 53 group homes operated by the Debtor, Community Provider of Enrichment Services, Inc. ("CPES AZ"). The Arizona Department of Economic Security, Division of Developmental Disabilities ("DES/DDD") supplements its briefing to assure the Court that protection and care for the disabled Members using the fine-tuned Arizona Medicaid processes is the sole objective of DES's filings in this case.  Significantly, since the September 14, 2020 hearing, Dr. Timothy J. Stacy DNP, ACNP-BC was appointed as the Patient Care Ombudsman (the "PCO").

3903435.1

7

The Court's concerns appreciate that the Members currently in the 53 CPES AZ group homes share a vast array of serious and complicating cognitive, physical, communication, and emotional disabilities and illnesses.    These include serious intellectual and physical disabilities, debilitating psychological conditions, as well as a host of physical illnesses or conditions that frequently require pharmacological interventions. Members are sometimes prone to serious self-harm or violent and assaultive behavior toward others.    And their common psychological and physical isolation and communication challenges create heightened risks for them becoming victims of every range of harm from physical and emotional neglect to sexual abuse, physical assault and even death. [*See* Doc. 318, at Exhibit A (Declaration of Nicolette Fidel), at ¶ 12].

The Court's concerns also appreciate that such extra-vulnerable persons require service from a special class of qualified providers. They are providers:

1. whose management, supervisory and direct care staff are fully background-checked and screened to assure personal integrity and responsibility, as well as psychological and physical stability, emotional intelligence, compassion, patience, and strong problem-solving skills;

2. whose management, supervisory and direct care staff are trained, both initially and through ongoing training in critical aspects of Member physical and emotional healthcare, use of medication, individual nutrition demands, personal safety, hygiene, behavioral and emotional assessment, discipline techniques, behavioral modification, diversion and restraint techniques, and enrichment, entertainment and education needs and delivery methods;

3. whose management, supervisory and direct care staff are sufficient in number to always meet the intricate mandatory staffing ratios demanded

3903435.1

1    by the unique needs of each Member or household group of Members;

2    4. whose management, supervisory and direct care staff have long-term

3        experience in addressing the unique care and protection needs of a diverse

4        group home and with the unique set of care needs assigned to the provider;

5    5. who are committed both institutionally and legally (through contractual

6        and other legal commitments to the state and federal governments) to full

7        compliance with the federal and state law governing the nature of care and

8        protection for their Members, as well as to full transparency and reporting

9        to government officials responsible for Member safety, health and welfare

10       of any threats to, risks to or failures to protect or fully care for any

11       Members; and

12   6. who are directly and immediately accountable to, correctable by,

13       sanctionable by, or terminable by government officials who provide

14       oversight and enforcement with all federal and state care expectations.

15  It is no exaggeration to say that without such robust qualifications, daily oversight and

16  accountability among care providers, Members are at risk of serious physical and

17  emotional harm and even death.

18       The Qualified Vendor Agreement ("QVA") program run by DES's Division of

19  Developmental Disabilities is the sophisticated, state-mandated system operated by DES

20  to match developmentally disabled Members with qualified and experienced service

21  providers who must demonstrate they meet the qualifications listed above. [*See* Doc. 318,

22  at Exhibit A, at ¶¶'s 17-19].  DES has objected to the sale process proposed by CPES AZ

23  because: (1) it eliminates the carefully constructed layers of protection, care, oversight

24  and intervention by which DES serves its developmentally disabled citizens; (2) it puts

25  the Members that are being housed and cared for by CPES AZ at grave risk of harm; and

26  (3) it forces DES into violation of federal law, Arizona's State Medicaid Plan, state law,

3903435.1

9

1   and DES's contractual obligations to Arizona's state Medicaid agency. By encouraging

2   the sale and transfer of Member care throughout CPES AZ's 53 group homes to an entity

3   that neither has a DES QVA nor has the proven experience to handle such a heavy load

4   of Member services, the proposed sale process puts disabled and vulnerable members at

5   serious risk of harm.  And by requesting that the Court sanction the interim operation of

6   Member care by an unlicensed, non-DES approved vendor that is not subject to any of

7   the oversight and regulation assured by the QVA program, CPES AZ asks that the Court

8   subject some 150 or more developmentally disabled Members to the highly disruptive

9   eradication of a well-constructed care system that ensures compliance, accountability and

10   oversight in protecting their health and safety.

11         DES/DDD's request for a ruling that it is a valid and reasoned exercise of its police

12   and regulatory powers pursuant to 11 U.S.C. § 362(b)(4) to transition the Members to

13   Qualified Vendors became a necessity just a few weeks ago.  At that time, CPES AZ filed

14   its Arizona Sale Motion to pursue its illegal sale strategy and abandoned the prior course

15   of cooperation by multiple CPES employees with DES in properly transitioning its

16   Members to care by other fully vetted, reliable and experienced QVA vendors.

17   DES/DDD's objections and requests for relief are therefore not mere protections of the

18   agency's regulatory "turf" or bureaucratic muscle-flexing.  They are a legal necessity and

19   are critical to ensuring that Arizona's most vulnerable citizens are properly protected from

20   a vast set of serious dangers.

21   **II.    CPES AZ'S BUSINESS OPERATIONS WOULD NOT BE POSSIBLE
22         WITHOUT DES/DDD'S QVA SYSTEM AND CPES AZ WAS ALWAYS
          SUBJECT TO DES/DDD'S DISCRETION.**

23         CPES AZ is not like a privately-owned hospital that provides only some services

24   reimbursed by public funds. Instead, group home programs like CPES AZ's exist just to

25   deliver Medicaid program services to Members who are eligible for health services that

26   DES provides and oversees pursuant to federal and state law. Because the Arizona group

3903435.1

1   home services are dependent on DES/DDD approval and Member choice, CPES AZ's

2   group homes have always been subject to and dependent upon DES/DDD's discretion

3   and the discretion of those legally responsible for the Members (i.e., Member choice).  In

4   other words, CPES AZ has always known that its group home business was never

5   guaranteed, that it had no contractual expectation to any continuation of that business,

6   and that whether and when it would receive Members would always be dependent on

7   complete compliance with DES/DDD requirements, DES/DDD assessments of the

8   appropriateness of its facilities and programs for Members, and the direction or requests

9   of the guardians making decisions for care of those Members. Most importantly, CPES

10  AZ has always known that DES/DDD could not, and would not, assign Members to any

11  setting that was operated by anyone who was not a vetted and approved QVA provider, or

12  even to any approved QVA provider(s) that DES/DDD did not consider appropriately

13  experienced and capable to handle all the specific Members' safety and health needs

14  involved.

15      **A.    The Unique Arizona Medicaid Plan.**

16          Arizona participates in the federal Medicaid program, which grew out of Title XIX

17  of the Social Security Act enacted in 1965.  The Medicaid laws allow for federal/state

18  cost sharing for a variety of possible state health programs for low income citizens. [*See*

19  Doc. 318, at Ex. A, at ¶¶'s 8-10].    Each state is entitled to establish its own unique

20  Medicaid State Plan for delivery of the jointly funded health services set by the federal

21  Medicaid statutes and regulations.  The State Plan must be approved by, and is regulated

22  and enforced by, the federal Centers for Medicare & Medicaid Services ("CMS").  The

23  State Plan provides assurances to the federal government that the state will abide by

24  federal rules required to obtain matching federal funds, indicates which optional services,

25  or programs the state has chosen to cover, and describes the state's specific standards for

26  service eligibility, its methods for reimbursing service providers, and its processes for

3903435.1

1  administering the state Medicaid program.

2       Among the various federal legal standards each state must meet are federal

3  standards for establishing a sufficient network of providers from which the state's eligible

4  citizens may obtain timely and adequate Medicaid-reimbursed services. *See, e.g.,* 42 CFR

5  § 438.66, § 438.68, § 438.206, § 438.207; § 457.1218, and § 457.1230. Therefore, states

6  are not allowed to create small groups of favored providers, but are encouraged and

7  required to provide broader networks of qualified, optional providers. Arizona has done

8  just that through its robust QVA program.

9       The State of Arizona has adopted a unique Member-directed managed care model

10  for its Medicaid program, and has elected under the Arizona State Medicaid Plan to

11  provide health services, including group home care services, for eligible developmentally

12  disabled citizens. The Arizona Healthcare Cost Containment System ("AHCCCS") is the

13  principle state agency assigned responsibility for the state's Medicaid plan. DES is a

14  separate state agency. But, pursuant to state statute empowering DES to provide services

15  to developmentally disabled Arizonans, AHCCSS has contracted with DES to act as the

16  state's managed care organization for services to Medicaid-eligible developmentally

17  disabled citizens.

18       DES is therefore responsible by both statutory law and contractual commitments

19  to determine eligibility of developmentally disabled citizens for services. DES is also

20  responsible to establish and maintain a network of providers sufficient to meet federal

21  and state legal standards, and to manage and audit the network of providers to ensure their

22  full compliance with all legal and contractual obligations they have in providing services

23  to the eligible Members. DES has set up DDD as its division for managing its Medicaid

24  service program for developmentally disabled persons. The mission of DES/DDD is to

25  empower individuals with developmental disabilities to lead self-directed, healthy and

26  meaningful lives. [*See* Doc. 318, at Ex. A, at ¶¶'s 8-11, 17].

3903435.1

### B.    The DES/DDD QVA Program.

Any failure by Arizona to ensure compliance with federal law and the State Medicaid Plan by the State and the private contractors it uses to deliver Medicaid-funded services puts continued State participation in Medicaid funding in jeopardy or risks discipline or sanctions against the State.  To help meet its specific federal obligations to maintain an adequate network of qualified providers for services to eligible developmentally disabled Members, DES established its Qualified Vendor program in March 2003. The QVA program is therefore part of the Arizona State Medicaid Plan.  If DES/DDD were to allow an entity that did not have a QVA to provide Medicaid-reimbursable services, it would be a violation of the Arizona State Plan, a violation of Arizona's commitment to the federal government, and would subject Arizona to sanction by the federal government and threaten its eligibility for further federal Medicaid funding.

The Qualified Vendor program was designed to allow companies who could prove they comply fully with DES/DDD's standard QVA terms to obtain eligibility to provide services to eligible DDD members.  To be eligible for a QVA, a provider must also qualify for and enter into a Provider Participation Agreement ("PPA") with AHCCCS.  To operate group homes like CPES AZ does, the provider must also obtain a license from a separate Arizona state agency—the Arizona Department of Health Services ("ADHS")—and additionally obtain a home-specific license from ADHS for each home the provider operates.

The QVA application and award process itself occurs on a rolling basis, rather than in response to specific government contract solicitations. A qualified vendor application is typically valid for multiple years, then the vendor has to submit a new application to the DES/DDD contract management unit which determines whether it will award and issue a new QVA contract. There are no guarantees that an applying vendor will be awarded a new contract.  Similarly, QVA vendors like CPES AZ have always been

1   informed that DES/DDD has no obligation to renew or extend a contract. Section 6.3.9

2   of the QVA specifically states, "The Procurement Officer may exercise the Division's

3   option to extend or renew the Agreement by unilateral Agreement amendment; a written

4   amendment signed by both parties shall not be necessary. **The Division has no obligation**

5   **to extend or renew this Agreement.**"    [Doc. 318, at Exhibit C, at 6-13 (emphasis

6   added)].

7           Per the governing Arizona State Plan and QVA terms, no vendor may provide

8   services for developmentally disabled Members that are reimbursable through Arizona's

9   Medicaid Plan unless they have been awarded a PPA with AHCCCS, awarded a QVA

10  with DES/DDD, certified as a provider of home and community-based provider services,

11  and have obtained all other appropriate licenses to operate a group home at a particular

12  location through ADHS.    [*See* Ex. 1, attached hereto, (Section 5 – Service

13  Requirements/Scope of Work), at §§ 5.1.1; 5.1.2; 5.1.3]. And, before any Member is

14  assigned to any QVA provider that otherwise has all the applicable awards, certifications

15  and licenses, DES/DDD must still "confirm that the member's needs can be met by the

16  Qualified Vendor" given its authorized program, staffing, supervision, training, reporting,

17  and experience characteristics.    [*Id.* at § 5.6.3].    In other words, the QVA program

18  recognizes that not all qualified vendors are created equal and DES/DDD support

19  coordinators and other personnel must still assure that each individual Member's care and

20  service needs are addressed by the assigned Qualified Vendor.

21

22      **C.    How the QVA Program Protects the Developmentally Disabled**
        **Members.**

23          The QVA award process, and the prerequisite that a company hold a QVA before

24  performing any Member services, are the methods by which Arizona ensures the

25  protection of its eligible developmentally disabled Members who are, by definition,

26  highly vulnerable to health, safety and personal welfare dangers and harms.

3903435.1

Consider, for example, that the Members serviced by DES/DDD QVA vendors sometimes have dual diagnoses of both cognitive disability and mental or emotional conditions.   And they frequently experience multiple health challenges, disease, or conditions requiring healthcare treatment or medication. It would not be uncommon for a Member to be dependent on two or three (or more) prescription medications.   This requires group home staff to be vigilant about both stocking the appropriate medication and ensuring it is taken when and how required.  It also requires staff to understand the purposes of all Member medication needs.

The Members could also have significant mobility issues, requiring a wheelchair or other devices or aids for movement and transportation.  And, they may be prone to self-harm or physical attacks or aggression against others, including severely biting themselves or others, as well as kicking, punching or otherwise assaulting those around them.  The Members may be at risk to try and throw themselves into objects or be injured during transportation, and can be prone to injury from falls. These combinations of conditions may cause a variety of difficulties and care needs, such as significant communication difficulties, self-care and hygiene assistance needs, behavioral monitoring and diversion needs, as well as application of discipline and restraint techniques.

The specific conditions and needs of DES/DDD Members will dictate whether they can be placed with other members in group home settings, and, if so, what type of staff experience and skills they require around them at all times. The unique needs of each Member will also dictate the staffing ratios suggested or required under federal and state standards to ensure protection of the health and safety of the Member and those around them. For instance, it is not uncommon for members to act violently and strike or attack other Members or staff, endangering themselves and others with physical harm. And, even everyday activities like eating, showering or bathing, and exercise can present

3903435.1

substantial challenges and dangers that require monitoring, assistance, and intervention by well-trained and highly experienced staff.

Especially because of their cognitive disabilities, compromised emotional states, communication difficulties, pharmacological interventions, and physical disabilities and infirmities, DES/DDD Members are often especially susceptible of neglect or abuse by non-Members, including provider staff, who are not adequately screened, trained or supervised. Threats of physical or emotional neglect, verbal abuse, physical or emotional assault or abuse, sexual abuse, and even severe physical harm or death can exist in group home settings. Given the foregoing unique, sometimes unpredictable care challenges and risks, the stakes are extremely high in providing care to developmentally disabled Members.

DES/DDD's QVA process and contract terms apply multiple layers of protection against the foregoing categories of risk or danger. The QVA itself includes specific performance obligations for the vendor, and it reserves specific rights of oversight and control with DES/DDD. [Ex. 1 (Section 5), at § 5.1; Doc. 318, at Ex. C]. For instance, the QVA requires broad compliance with the Arizona Administrative Code, applicable Federal and State laws, and DDD's own policies, procedures and administrative directives. [Ex. 1 at §§ 5.1 and 5.2]. It also demands strict compliance with a variety of additional performance and protection standards, violations of which can be punished contractually by DES/DDD as a breach.

Among these protective standards is the command that approved QVA providers and their staff members promptly and accurately report to DES/DDD, and sometimes to Arizona Adult Protective Services or police, risks or threats or harms to Members in their care. The QVA incorporates DES/DDD's Operations Policy Manual ("Policy Manual"), and an entire section of the Policy Manual, § 6002, is dedicated to incident management and reporting should any threat or risk to a Member materialize at any qualified vendor's

group home locations.  [Ex. 2 (examples of pages from § 6002)].  This incident reporting mandate brings risks to the health, safety and welfare of DDD members to the prompt attention of responsible senior management and owners of the provider so that they can take appropriate investigative action and corrective actions, and so they can report issues appropriately and promptly to DDD, Adult Protective Services, or law enforcement.[1] This also gives DES/DDD a mechanism for promptly identifying and taking actions to hold Qualified Vendors accountable for their contractual and legal obligations to DES/DDD and the DDD Members. Section 6002-A of the Policy Manual defines an "Incident" as "an occurrence, which could potentially affect the health and well-being of a member enrolled with the Division or poses a risk to the community."  [Ex. 2, at § 6002-A].

Other key Member protections imposed against QVA awardees are the contractual record-keeping duties set by Arizona statutes.  *See* A.R.S. § 12-2297; A.R.S. §§ 35-214 and 35-215. The QVA incorporates these statutory duties and the provider must maintain all original copies of incident reports submitted to it by employees or others throughout its operations under the QVA and for a contractually specified time thereafter and cannot shred or discard such reports.  [Doc. 318, at Ex. C, at § 6.3.1.1]. The QVA also sets minimum requirements relevant to the care of DES/DDD Members, which will include nutrition and dietary standards. [*See* Exhibit 3]. By commanding compliance with the Arizona Administrative Code, the QVA commands control, regular oversight, and logging of "all prescribed and nonprescribed medications administered to a client by or

---

[1] Mandatory reporting includes "[a]llegations of sexual, physical, programmatic, verbal/emotional abuse; …. [a]llegations of inappropriate sexual behavior" and all incidents "must be reported … by close of the next business day following the incident…" and must be inputted into the Incident Management System, the computerized database for incidents and reports, with "Serious Incidents" being "reported and written as soon as possible, but no later than 24 hours after the incident."  [Ex. 2, at § 6002-C; § 6002-E(A)].

3903435.1

1    under the supervision of direct care staff." [A.A.C. R6-6-806.G, K].

2        The QVA terms further command that a provider's direct staff must "[h]ave access

3    to either direct or consultative staff resources who have been trained and or possess skills

4    in . . . the recognition and proper response to inappropriate sexual behavior." [Ex. 4, at §

5    4.7]. Moreover, the QVA commits providers to comply with the DES/DDD guidance on

6    use of physical restraints against members, including prohibitions DES/DDD has issued

7    against certain tactics, like prone restraints that can lead to serious injury or death by

8    suffocation. [Exs. 5-7]. The foregoing are just some key examples of the mandatory

9    protective standards the QVA sets to ensure the protection, health and safety of its eligible

10   Members in provider group homes.

11       The DES/DDD QVA program also provides multiple avenues for DES/DDD to

12   actively monitor and ensure provider compliance with the many Member care and

13   protection standards. For instance, DES/DDD maintains a quality assurance staff whose

14   members monitor both data and direct input from providers to assess compliance with

15   minimum Member care and protection standards. DES/DDD also employs group home

16   monitoring teams that are deployed for home visits, and can be used for heightened

17   supervision and investigation of providers suspected of non-compliance with their

18   minimum Member protection and care obligations.

19       To provide insurance protection for Members, the QVA sets minimum insurance

20   type and coverage requirements that the qualified vendor "shall procure and maintain

21   until all of their obligations have been discharged…" [Doc. 318, at Ex. C, at § 6.7.6.1.1

22   and § 6.7.6.1.3].

23       Finally, DES/DDD can conduct or initiate more formal investigations, including

24   potential crime investigation, based on information learned through its monitoring of a

25   qualified vendor's conduct or incident reporting. Per the QVA, "the Qualified Vendor

26   shall cooperate with all Division investigations…" [*Id.* at § 6.8.2.6]. This creates a

3903435.1

1  compelling incentive and legal obligation to assist DES/DDD in investigating any failures

2  in protection, servicing or safety of developmentally disabled members. Without these

3  many layers of legally enforceable care standards and the layers of active compliance and

4  quality care monitoring DES/DDD is legally entitled to apply to a QVA provider's

5  performance, and without the sanctions DES/DDD can levy against a contractually

6  committed qualified vendor, DES/DDD's power to protect and safeguard the health and

7  welfare of its Members is severely compromised. And, developmentally disabled

8  Members are severely endangered.

9    **D.    The DES/DDD Process for Placing Eligible Members.**

10    Because Member care and protection is such a complex and critical priority, and

11  Members' unique needs dictate whether a particular provider is sufficiently capable of

12  providing the types of protection needed, DES/DDD does not grant mass groups of DDD

13  Members to newly awarded QVA vendors.  It would be highly irresponsible to turn over

14  the care of dozens of Members to a single new QVA awardee who had not yet proven, in

15  real service delivery, that it can even employ the level or types of direct care service

16  required, let alone that it can supply sufficient staff trained in the nutritional, medicinal,

17  first aid, discipline, behavioral monitoring, and diversion, discipline and restraint

18  mandates to fulfill DES's obligations to maintain the health, safety and welfare of its

19  Members.

20    So, DES/DDD traditionally starts new QVA awardees with small authorizations

21  of just a few members until they have proven their ability to really comply with the QVA

22  care standards.  DES/DDD certainly would not be justified in granting any new QVA

23  provider over 100 Members or approving their management of over 50 group homes

24  given the heavy Member care risks involved.  Instead, DES/DDD has traditionally

25  exercised great restraint with new QVA awardees, only authorizing them to a handful of

26  Members and one or two service locations.  Then, after the qualified provider has proven

1   its ability and willingness to comply with all the required governmental reporting and

2   cooperation requirements, DES/DDD is willing to judiciously authorize expansion of the

3   provider's service authority.

4           DES/DDD also has a long-established and detailed process for reassigning

5   members to Qualified Vendors when a QVA vendor is no longer able to continue

6   performing its agreement or chooses to leave the system. Per the express terms of the

7   QVA at Section 6.5.14 and Section 6.6.4 any change in ownership, proposed merger,

8   reorganization, or affiliation by a vendor must be approved in advance with the written

9   consent of DES/DDD.  And, "the Qualified Vendor shall not assign any right nor delegate

10  any duty under this Agreement." [*Id.* at § 6.6.4].  CPES AZ also agreed through its QVA

11  that a number of circumstances, including its voluntary termination of its business, could

12  require transition of assigned Members to other, existing QVA vendors, and that CPES

13  AZ "shall assist the Division in the transition of the member to the new provider[,

14  including by] working closely with the member and family, providing all necessary

15  support services to ensure a smooth transition, and transferring of pertinent records to the

16  new provider." [Ex. 1, at § 5.9.1].  Just as the assignment of any Member to a QVA in

17  the first instance is a searching process to fit the Member's unique circumstances and

18  needs, the transition process is a highly detailed inquiry about the exact needs and

19  conditions of the Members being served by the qualifications, experience, size, resources

20  and reliability of the qualified vendors who express interest in accepting new members

21  after DES/DDD conducts a mass vendor call to alert all other QVA vendors in the system

22  to the potential availability of new members to be served.

23          That is precisely what DES/DDD did here—with CPES's consent.  The Court can

24  see from Exhibits 8 and 9 that DES/DDD issued a program-wide vendor call to investigate

25  who might express interest in transitioning some of the CPES AZ Members.  It then

26  engaged for several months in a series of weekly transitional meetings with CPES AZ

3903435.1

1    officials, potential alternative QVA vendors, and DES/DDD personnel to identify the

2    particular needs of each Member CPES AZ was serving and where their health, safety,

3    welfare, and enrichment needs would best be served.

4          DES/DDD is prepared to go forward very shortly with completion of that process

5    and transition of the members according to their individual needs, the approval of their

6    families and guardians, and the certainty afforded by the QVA program that each Member

7    and group of Members will be fully served, protected and cared for.  Importantly, the

8    transition process does *not* require moving all the Members from their current Group

9    Homes.  Instead, each selected Qualified Vendor is free to negotiate with the current

10   landlords for the CPES AZ group homes to take over the leases, to negotiate to acquisition

11   of CPES AZ personal property and vehicles, and they may negotiate to keep appropriate

12   CPES AZ employees who know the Members and their needs, and they may work directly

13   with CPES AZ to make the transition virtually seamless to the Members and their

14   families.   The transition process affords the exact process needed to avoid any disruption

15   to the Members' daily lives, routines and care and to do so with properly vetted and

16   legally committed and experienced Qualified Vendors accountable to the Members, the

17   government and the public.

18         The proposed sale process upends all this careful work and denies DES/DDD its

19   legal authority to ensure that its QVA system works as designed and the Members are

20   placed only with established, trained, experienced Qualified Vendors who can assure the

21   unique care and protection each Member requires.

22
23   **E.    Why Using a Contracted QVA Vendor or Associate Would Not Be Appropriate.**

24         The stalking horse bidder's asset purchase agreement is invalid and legally

25   impossible because it proposes the use of interim group home management by someone

26   other than the holder of a QVA that has been specifically selected by DES/DDD, in

3903435.1

1   consultation with each Member's care team, responsible family and guardians, with

2   careful consideration and confirmation that the care provider will meet every one of each

3   Member's care and service needs in accordance with their best interests and the federal

4   and state law.  It is also invalid and impossible because it removes DES/DDD from the

5   process of Member need evaluation and placement with the experienced and approved

6   QVA holder for each Member.

7          But even if the stalking horse bidder or any higher and better bidder somehow

8   associated with or contracted with an existing QVA vendor, identical legal and care

9   problems would still exist.  First, such arrangements would implicate complex payment

10  prohibitions under federal Medicaid law and corollary state law that would be triggered

11  by paying for services where reimbursements were eventually shared with a non-QVA

12  company.  Second, there is no guarantee the QVA vendor or vendors the stalking horse

13  might try to coopt would even qualify under DES/DDD standards for the care of the

14  Members the stalking horse bidder would try to assign to them, and the process would

15  entirely remove DES/DDD, the Members' assigned care teams, and the Members' family,

16  guardians and healthcare professionals from deciding what QVA vendors they trust to

17  care for the Members.   In other words, there is no way for the stalking horse bidder's

18  asset purchase agreement to comply with the law as it exists or to provide all the

19  protections and assurances for unique care respecting the desires and needs of each

20  individual Members that is demanded by the Arizona Medicaid Plan and the QVA process

21  that implements it.

22  **III.    DES/DDD SEEKS CONFIRMATION THAT IT IS A VALID**

23  **EXERCISE OF ITS POLICE AND REGULATORY POWER TO
       COMPLETE ITS STATUTORY AND REGULATORY OVERSIGHT**

24  **AND COORDINATION OF ITS MEMBER TRANSITION PLAN.**

25         DES/DDD's Stay Relief Motion seeks confirmation that DES/DDD may take all

26  actions necessary to complete the timely <u>operational transition, not physical transition,</u> of

3903435.1

1   Members residing in Group Homes operated by CPES AZ.  DES/DDD plans to simply

2   transition Members to DES/DDD authorized care by carefully selected replacement

3   DES/DDD Qualified Vendors to minimize the transitional impact on those Members who

4   are wholly dependent upon DES/DDD services and ensure they are placed under the care

5   of authorized providers who are both accountable to DES/DDD and especially proven

6   over time to be able to meet the myriad care, healthcare, protection and enrichment needs

7   of the specific Members being cared for in CPES AZ homes.

8        Importantly, the process routinely followed by DES/DDD in circumstances similar

9   to this one – and that DES/DDD has worked hard to prepare to complete in this case -

10  does not require Members to physically relocate.   The process envisions issuing

11  authorizations to specifically identified existing QVA providers who have the specific

12  abilities, experience, and resources to provide the precise care needed by each of the

13  Members or groups of Members presently being housed in 53 CPES AZ homes.  That

14  will not involve some sort of wholesale transition of all the Members served by CPES AZ

15  to a single QVA provider, or some sort of competition to replace CPES AZ.  It instead

16  has involved first identifying the specific care and other service needs of the Members at

17  CPES AZ homes, identifying existing QVA vendors who have an interest in potentially

18  serving some of those Members, and then matching the members with interested and

19  qualified QVA vendors whose proven abilities, experience, and resources meet the

20  specific needs of each Member that would be assigned to them.

21        When DES/DDD issues the authorizations to the existing QVA vendors for the

22  transitions of the Members, those providers would be free to negotiate with CPES AZ to

23  purchase its personal property (furniture, equipment, vehicles, etc.) and consumable

24  resources (food, household goods, etc.)  that are being used to care for the transitioned

25  Members, and free to negotiate with CPES AZ's employees to stay employed and

26  working with the transitioned Members they are already providing care to.  The QVA

3903435.1

23

1    providers assuming care of the Members would also be free to (and would logically be

2    expected to) negotiate with CPES AZ and its landlords to take over the leases CPES AZ

3    currently has for the 53 group homes their new Members are residing in so the transitioned

4    members need not be relocated.    Given the experience DES/DDD has with similar

5    transitions of Members in the past, and the hard ground work already put in by DES/DDD

6    to find just the right mix of existing and proven QVA vendors for the 150-plus Members

7    whose lives are involved here, DES/DDD expects that it will likely not be necessary to

8    physically move Members if CPES AZ cooperates in the process just like it is

9    unconditionally committed to do in its QVA.    [Ex. 1 at § 5.9.1 ("All Qualified Vendors

10   shall assist the Division in the transition of the member to the new provider. This may

11   include working closely with the member and family, providing all necessary support

12   services to ensure a smooth transition, and transferring of pertinent records to the new

13   provider.")]

14       Further, as affirmed above, DES/DDD <u>does not</u> seek to interfere with CPES AZ's

15   ability to sell its personal property assets or assume and assign its Group Home real

16   property leases as part of CPES AZ's Chapter 11 bankruptcy proceedings.  CPES AZ may

17   negotiate directly with the DES/DDD Qualified Vendors who are ultimately awarded

18   authorizations from DES/DDD to render residential services to the Group Home

19   Members.  Thus, the transition process DES/DDD has created and operates in accordance

20   with federal and state law does not diminish CPES AZ's property rights.  CPES AZ is

21   still in the position to realize the value of its personal property and real property leases.

22       However, <u>the DES/DDD Members and the legal authorizations from DES/DDD</u>

23   <u>for their care and reimbursement are not for sale</u>.  DES/DDD's sole interest is securing

24   an appropriate alternative Qualified Vendor(s) to care for each of the DES/DDD Members

25   – which must be one whose company and staff are properly screened, experienced in

26   providing the care and services needed by each Member in accordance with the rigorous

1    Medicaid and QVA care standards, and already committed to and bound by the required

2    DES/DDD standards and processes for transparency, incident reporting, and performance

3    correction.

4         DES/DDD has worked cooperatively with multiple employees of CPES AZ over

5    the past several months to complete the transition process.  CPES AZ has been aware of

6    the process and its employees have participated in the transition efforts, as it had to be

7    under the terms of its QVA.  At this time, DES/DDD has already: (A) created a transition

8    roster for the CPES AZ Group Home Members; (B) analyzed the specific care needs of

9    each Group Home Member affected by CPES AZ's upcoming transition out of

10   DES/DDD's service network; (C) informed each CPES AZ Group Home Member of the

11   forthcoming CPES AZ transition; (D) conducted group vendor calls, to those eligible to

12   receive Vendor Calls, to identify Qualified Vendors who are able to meet the specific and

13   diverse service care needs of the CPES AZ Group Home Members with the consent of

14   CPES AZ; and (E) coordinated Group Home Member and family meetings with Qualified

15   Vendors in the DES/DDD service network.

16        DES/DDD seeks only limited relief so the remaining steps of its Group Home

17   Member transition process can be completed.  Those remaining steps will include: (A)

18   DES/DDD issuing award letters to Qualified Vendors documenting Group Home

19   capacity, any required Group Home modifications, and member specific criteria; (B) the

20   selected Qualified Vendors moving forward to: (i) negotiate acquisition of necessary

21   personal property and residential lease assets—including those from CPES AZ and only

22   after negotiating with CPES AZ and obtaining the Court's approval; (ii) make Group

23   Home modifications, especially in light of COVID-19; (iii) obtain ADHS licensing for

24   the group home operations; and (v) obtain and complete requisite DES/DDD on-site

25   reviews by DES/DDD's Quality Monitoring Team—all of which is incumbent upon the

26   selected Qualified Vendors; (C) the DES/DDD Contracts Team verifying completion of

3903435.1

1   all necessary transition requirements and receipt of necessary insurance documentation;

2   and (D) DES/DDD's assistance with the Member's service transition to the new Qualified

3   Vendor, including: (i) a pre-placement meeting with the Qualified Vendor; (ii) finalizing

4   the transition date; (iii) ending CPES AZ's authorizations and commencing the

5   replacement Qualified Vendor's new authorizations; and (iv) updating DES/DDD's

6   transition roster.

7   **IV.   THE COURT LACKS AUTHORITY TO INTERFERE WITH ARIZONA'S
       DISCRETE, REASONED, AND VALID EXERCISE OF ITS POLICE AND
8      REGULATORY POWERS WITH RESPECT TO ITS QVA SYSTEM AND
       THE TRANSITION OF THE DES/DDD MEMBERS TO QUALIFIED
9      VENDORS.**

10          The Bankruptcy Code does not grant authority to CPES AZ or the Court to

11   authorize acts in contravention of those provisions of the Arizona Revised Statutes, the

12   Arizona Administrative Code, the federal Medicaid statutes, or the Code of Federal

13   Regulations that are reasonably necessary to protect the health, safety, and welfare of the

14   DES/DDD Group Home Members.   By enacting 11 U.S.C. § 362(b)(4), Congress

15   demonstrated an "overriding congressional intent that the Bankruptcy Court should not

16   interfere with the valid exercise of a state's police power." *In re Union Golf of Fla., Inc.*,

17   242 B.R. 51, 58 (Bankr. M.D. Fla. 1998) (citation omitted).   It demonstrates "'a

18   Congressional deference to states and a policy not to permit the bankruptcy laws to

19   interfere too greatly with state regulatory or police power proceedings.'" *Id.* (citation

20   omitted).   Absent clear intent by Congress to place the care and oversight of DES/DDD

21   members in the hands of the Court, the Court lacks authorization over DES/DDD's charge

22   to protect the health, safety, and welfare of DES/DDD members.   "[T]he injunctive

23   powers of the bankruptcy court should not be used to force a licensing agency to prefer

24   one applicant over the other." *In re D.H. Overmyer Telecasting Co., Inc.*, 35 B.R. 400,

25   404 (Bankr. N.D. Ohio 1983).   "Any attempt by a licensee or permit holder to use

26   bankruptcy proceedings to limit the discretion of the regulatory body would be an attempt

to enhance the debtor's property rights, contrary to the purpose of the Code." *Id.* (citation omitted).  Pursuant to A.R.S. § 36-554(A), the Director of the Arizona Department of Economic Security *shall*:

> 1. Be responsible for developing and annually revising a statewide plan and initiating statewide programs and services for persons with developmental disabilities in locations where the programs and services are necessary, which shall include:
>
> . . .
>
> (c) Residential services, including various community residential settings [Group Homes], Arizona training program facilities and state operated service centers which provide varying levels of supervision in accordance with the developmental disability levels of the persons placed at such settings, facilities or centers. <u>The department shall contract with private profit or nonprofit agencies to provide appropriate residential settings for persons with developmental disabilities which provide for regular assistance and supervision of such persons and which provide varied developmental disability programs and services on or near the community residential setting</u> [Group Home].
>
> (d) Resource services, which may include comprehensive evaluation services, information and referral services and outpatient rehabilitation and social development services. The department in providing developmental disability programs and services shall whenever practicable utilize qualified private contractors. <u>In selecting private contractors, the department shall utilize those contractors which can clearly demonstrate an ability to perform such contract</u> ***in accordance with standards and specifications adopted by the department***.
>
> 2. Establish standards, provide technical assistance, and supervise all developmental disability programs and services operated by or supported by the department.
>
> 3. Coordinate the planning and implementation of developmental disability programs and activities . . . of all state agencies . . .
>
> 4. <u>Periodically assess the effectiveness of the quality assurance system as required by 42 Code of Federal Regulations section 434.34 as it pertains to developmental disabilities programs</u>.
>
> 5. <u>License community residential settings [Group Homes] pursuant to this chapter</u>.
>
> 6. <u>Develop rules establishing a procedure for handling complaints about community residential settings</u> [Group Homes].
>
> 7. Inform in writing every parent or guardian of a client with a developmental

3903435.1

disability residing at or transferring to a community residential setting [Group Home] of the complaint handling procedure.

. . .

9. In conjunction with the division [the DDD], individuals with developmental disabilities and their families, advocates, community members and service providers, develop, enhance and support environments that enable individuals with developmental disabilities to achieve and maintain physical well-being, personal and professional satisfaction, participation as family and community members and safety from abuse and exploitation.

10. Do all other things reasonably necessary and proper to carry out the duties and the provisions of this chapter.

11. Adopt rules regarding procurement procedures similar to those found in title 41, chapter 23. . . .

Further, the Director of the Arizona Department of Economic Security may:

Make and amend rules from time to time as deemed necessary for the proper administration of programs and services for the treatment of persons with developmental disabilities, for the admission of persons with developmental disabilities to the programs and services and to carry out the purposes of this chapter.

A.R.S. § 36-554(C)(6) (emphasis added).

All of the forgoing provisions, in addition to the specific implementing regulations and contractual provisions that govern the QVA vendors are designed to protect the health, safety, and welfare of the DES/DDD Members and satisfy both the pecuniary purpose and public policy tests under 11 U.S.C. § 362(b)(4).

## V.    DES/DDD IS NOT DISCRIMINATING AGAINST CPES AZ IN VIOLATION OF 11 U.S.C. § 525(a).

CPES AZ asserts that DES/DDD is in violation of 11 U.S.C. § 525(a).  In pertinent part 11 U.S.C. § 525(a) provides that:

a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title

1
2
3

*. . . . solely because such bankrupt or debtor is or has been a debtor under
this title . . . . has been insolvent before the commencement of the case
under this title*, or during the case but before the debtor is granted or denied
a discharge, *or has not paid a debt that is dischargeable in the case under
this title* . . . . (emphasis added).

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

"[S]ection 525(a) is designed to protect persons from discriminatory treatment based *solely on past financial difficulty*." 3 Collier on Bankruptcy ¶ 525.02 (Richard Levin & Henry J. Sommer eds., 16th ed.) (emphasis added). "[I]f there is a reason for the governmental action taken that is not based upon prohibited discrimination, then there has not been discrimination based solely on one of the prohibited criteria." *Id. Se*e, e.g., *Parkview Adventist Med. Ctr. v. United States*, 842 F.3d 757 (1st Cir. 2016) (termination of Medicare based on closing of inpatient facility, not filing of bankruptcy). In *Federal Communications Commission v. NextWave Personal Communications Inc.*, 537 U.S. 293 (2003), cited by CPES AZ, the Supreme Court found that NextWave's licenses had been revoked *solely because of the debtor's failure to pay a dischargeable debt incurred for the purchase of the licenses*. The Court rejected the argument that the government's motive in acting could be *an additional cause* for its actions that negated the nonpayment of the debt being the sole cause. The FCC did not deny that the proximate cause for its cancellation of the licenses was NextWave's failure to make the payments that were due. Essentially, if the government's action would not have occurred but for the failure to pay the dischargeable debt, the action is prohibited—here, that is not the case. DES/DDD is not discriminating against the Debtor *solely* due to the Debtor's bankruptcy or insolvency. In fact, *DES/DDD is not discriminating against the Debtor at all*. As previously discussed, DES/DDD's sole interest is securing Qualified Vendor(s) who are screened, background-checked, trained, experienced, accountable, have the appropriate competencies, staffing levels, are within the DES/DDD provider network, and who have been selected by the DES/DDD Member. It is also important to note that DES/DDD is

3903435.1

1  continuing to pay CPES AZ an enhanced COVID-19 reimbursement rate (above the

2  published rate schedule), beyond the original August 31, 2020 expiration date in order for

3  CPES AZ to maintain their existing employees.  There is no discriminatory treatment

4  because CPES AZ desires to leave the DES/DDD system.  DES/DDD is simply exercising

5  its police and regulatory authority to act as a managed care organization to AHCCCS for

6  the State's services to developmentally disabled individuals—including vendor

7  compliance with all legal expectations for the QVA process to ensure DES/DDD fulfills

8  its obligations to protect the health, safety, and welfare of DES/DDD members.  Failure

9  to do so would not only threaten a violation of multiple aspects of federal and state law,

10  but equally important puts the safety of DES/DDD members at risk.

11  **VI.    CONCLUSION**

12       CPES AZ's proposed sale process of its Arizona assets is not only untenable, but

13  legally impossible, it exposes DES/DDD Members to risks of harm inconsistent with the

14  federal and state Medicaid law and process that are trying so hard to protect them.

15  Further, DES/DDD's proposed actions to transition the Members to Qualified Vendors

16  are a valid exercise of its police and regulatory powers, exempt from the automatic stay

17  pursuant to 11 U.S.C. § 362(b)(4).  In the alternative, DES/DDD should be granted

18  limited relief from the automatic stay under 11 U.S.C. § 362(d)(1) because it is imperative

19  that DES/DDD move expeditiously to take all actions necessary to complete transition of

20  the DES/DDD Members to Qualified Vendors by enforcing DES/DDD's QVA process.

21  Finally, doing so is not adverse to CPES AZ's bankruptcy estate because CPES AZ will

22  be able to conduct good faith negotiations for the sale of CPES AZ's personal property

23  and real property leases directly with the DES/DDD approved Qualified Vendor(s) who

24  are ultimately awarded the authorizations to render the residential group home services.

25  Based on all of the foregoing, DES/DDD respectfully urges that the Court enter an order:

26       A.    Denying CPES AZ's Arizona Sale Motion and the relief sought therein;

3903435.1

B.    Granting DES/DDD's Stay Relief Motion and the limited requested relief;

C.    Confirming that DES/DDD may continue enforcement of its police and regulatory powers pursuant to 11 U.S.C. § 362(b)(4) including, without limitation, transitioning the DES/DDD Members to suitable and experienced Qualified Vendors.

D.    In the alternative, terminate all applicable stays and injunctions, including the automatic stay of 11 U.S.C. § 362 on a limited basis, as to DES/DDD, CPES AZ, and the CPES AZ's bankruptcy estate, to permit DES/DDD to complete its Member transition process to shift the CPES AZ Group Homes Members to suitable and experienced Qualified Vendors.

E.    Direct that DES/DDD is entitled to enforce all of its available police and regulatory powers in connection with the CPES AZ Group Homes Members;

F.    Waive the 14-day stay under Rule 4001(a)(3), Fed. R. Bankr. P.; and

G.    Grant DES/DDD such other and further relief as the Court deems just and proper under the facts and circumstances of these cases.

Respectfully submitted this 18th day of September, 2020.

**GUST ROSENFELD P.L.C.**

By: */s/ Séan P. O'Brien - 010540*
    Jennifer C. Kalvestran - CA Bar #242157
    Séan P. O'Brien - AZ Bar #010540
    *Admitted Pro Hac Vice*
    Robert C. Williams – AZ Bar #033213
    *Admitted Pro Hac Vice*
    Attorneys for ***Arizona Department of***
    ***Economic Security, Division of***
    ***Developmental Disabilities***

3903435.1