# EXHIBIT 7



# Group Home Bulletin

**DIVISION OF DEVELOPMENTAL DISABILITIES**  **PROGRAM MONITORING**

**ISSUE 11 • WINTER 2011**

**CONTENTS:**

| | |
|---|---|
| DHS Licensing Requirements | 1 |
| Incident Reporting Protocol | 1 |
| ABUSE: Our Shared Responsibility | 2 |
| Prone Restraints | 2 |

**Equal Opportunity Employer/Program**

Under Titles VI and VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act of 1990 (ADA), Section 504 of the Rehabilitation Act of 1973, and the Age Discrimination Act of 1975, the Department prohibits discrimination in admissions, programs, services, activities, or employment based on race, color, religion, sex, national origin, age, and disability.

The Department must make a reasonable accommodation to allow a person with a disability to take part in a program, service or activity. For example, this means if necessary, the Department must provide sign language interpreters for people who are deaf, a wheelchair accessible location, or enlarged print materials. It also means that the Department will take any other reasonable action that allows you to take part in and understand a program or activity, including making reasonable changes to an activity. If you believe that you will not be able to understand or take part in a program of activity because of your disability, please let us know of your disability needs in advance, if at all possible.

To request this document in alternative format, or for further information about this policy, contact the Division of Developmental Disabilities ADA Coordinator at (602) 542-6825; TTY/TTD Services: 7-1-1.

## DHS LICENSURE REQUIREMENTS

In concurrence with the regulatory process of the Department of Health Services (DHS), we want to alert you to the requirement that a timely application must be received by the Department of Health Services – Office of Special Licensure for the renewal of **all** site licenses:

*According to the Department of Health Services (DHS), and in compliance with ARS 41-1092.11 **an application is required for all inspections prior to licensure or renewal**.*

In reviewing the license, you will see an excerpted portion of ARS 41-1092.11, regarding the license renewal:

*Pursuant to ARS 41-1092.11 (A) upon submittal of a timely and sufficient application, this license will remain in effect until <u>Reissued</u> or <u>Revoked</u>.*

It has been brought to the Division's attention that some providers are experiencing delays with the DHS inspections; however, a timely application will prevent gaps in the licensure process. **"Timely" is defined as at <u>least 30 days</u> prior to license expiration.** A link to the DHS application is provided below. It is critical that the application be received by DHS timely. The application can be mailed, faxed or sent electronically.

As you are probably aware, the DDD Quality Assurance Unit has been contacting agencies regarding group homes whose licenses are due for renewal in the near future. It is DDD's protocol to check licenses at every review. We will continue with this courteous, proactive approach to alerting agencies in advance in order to assist providers in timely submittals.

Vendors should have systems in place to monitor the expiration dates of licenses and submit applications within the timeframes indicated above. In addition, group home settings should be prepared for the inspection to prevent delays, as all corrections must be verified prior to the issuing of the renewal license.

For more DHS licensing information, please visit:
  http://www.azdhs.gov/als/grouphm/index.htm
http://azdhs.gov/als/formsdd_licenseapplication.pdf
  http://www.azdhs.gov/als/forms/dd_checklist1.pdf

## INCIDENT REPORTING PROTOCOL

Incident Reporting to the Division is instrumental in promoting the Health, Safety and Welfare of the individuals we serve. An **INCIDENT** is defined as *"an occurrence, which could potentially impact the health and well being of an individual enrolled with the Division or in the community."*

The list of what can be identified as an "incident" is extensive. Please refer to DES/DDD POLICY CHAPTER 2100 for a list of what is considered an incident and a serious incident. It is imperative that all incidents be <u>reported timely</u> to the Division.

**First**, and foremost, when an incident occurs, take whatever actions are necessary to resolve the emergency and ensure the individual's health and safety. This may include calling 911 and taking any appropriate emergency action.

**Secondly,** be sure to comply with the Division's timelines for reporting the incident. Serious incidents are to be reported to the Division as soon as possible, but <u>no later than</u> **twenty-four (24) hours** after the incident occurs. All other incidents must be reported to the Division by the close of the <u>next</u> business day following the incident. After reporting the incident to the Division, please be sure to follow up with a written explanation of the incident. Ensure that the incident is written clearly, objectively, and in order of occurrence, **without** reference to the writer's opinion. Keep in mind incident reports are available to family members and/or guardians and are considered legal documentation.

**Thirdly,** after reporting the incident, the Division uses the information to collect data. Incidents may result in an Internal Investigation by the Provider Agency and/or the Division. Investigations are used to collect additional facts and to identify tends. Your cooperation is required to ensure a timely resolution process of the incident.

For information, please visit: Department of Economic Security, Division of Developmental Disabilities Policy and Procedure Manual Chapter 2100—Incident Management:
   https://www.azdes.gov/uploadedFiles/Developmental_Disabilities/2100.pdf



# ABUSE: OUR SHARED RESPONSIBILITY

—Vicenté Benjamin
PROGRAM MONITOR



**ABUSE!** You probably heard that word at least once and probably have had more discussions about it than you care to think about. Is this word overused? Have we heard it too much, so much in fact that we have become desensitized? Well, that is debatable, but "abuse" is an issue that is not going away. Abuse is very real in the day-to-day operations of the business in which we find ourselves—the business of supporting persons with developmental disabilities. Granted, this might not be an issue in the specific environment in which you do operate, but rest-assured it rears its ugly head all too often.

For the sake of this discussion, however, let us go beyond the actual act of abuse and talk about the responsibility for abuse. In the context of the problem of abuse, responsibility simply means Who is to be held accountable? However, more importantly, maybe we should be asking ourselves "Do I, as part of this organization, share the responsibility for this or any aspect of abuse?"

Of course, no one is saying that you should take responsibility for the actions of a colleague/co-worker. We do our best when "working" with our colleagues and the people we support to respect the rights of others. We assure no one is hurt. We do not yell at each other. We do not use obscenities or use derogatory or degrading names—not even in jest. Nevertheless, by doing all this have we met our responsibility for abuse prevention, but when abuse happens, do you share any responsibility for it happening?

Well, consider this. You work alongside John Doe who supports persons with developmental disabilities everyday. You have gotten to know him very well and, in fact, you have become good friends. You know him so well that you can detect when he is having a bad day, even to the extent that at times, you are careful to temper your interactions with him because you are unsure, given his mood, how they may react. You notice that he is involved with a challenging consumer and is beginning to show signs that he may "lose his cool." Do you have a responsibility to bring this to his attention? You can greatly assist him in dealing with the situation/consumer by suggesting that he take a break or step back from the situation. It would be better to defuse the situation before he possibly crosses the line and/or abuses the individual. Knowing what you "know", if you do nothing and an act of abuse occurs, do you share any responsibility for what happens?

Remember: As a **leader,** your commitment to providing support is not restricted to the consumer. It also extends to supporting your co-workers. In some instances this might mean defusing a possibly difficult situation, or, at the very least, being open and honest in communicating to your co-worker that s/he is on the verge of losing it and needs to "check" him/herself. If you do nothing, you certainly share the responsibility for it happening. You knew it was coming and did nothing to stop it. Moreover, if you do indeed do something to prevent possible incident of abuse from taking place, you share the responsibility for the positive outcome. Keep in mind that abuse does not just affect the person being abused and the abuser. It affects the consumer's family, the organization as a whole, and the staff who are charged with providing the positive supports needed for growth and development—especially those staff associated with that specific home. All of us share in the responsibility.

Yes! There is such a thing as "**Shared Responsibility**". We all share the responsibility for abuse—for the Prevention of and Reporting Abuse whenever it may occur.

# PRONE RESTRAINTES: NOT AN APPROVED CIT PROCEDURE



—Dr. Bob Klaehn, M.D.
MEDICAL DIRECTOR

A prone restraint — in which a person is held face down on the stomach or chest — is a dangerous procedure and the deadliest form of restraint. A 2002 study by Protection & Advocacy, Inc. in California suggests "sudden death during prone restraint … is not an uncommon phenomenon." **In 2000, the Division removed prone restraints as an acceptable form of intervention from the Client Intervention Training (CIT) curriculum.** Prone restraints were removed from CIT due to increasing recognition that instead of keeping individuals safe, this type of restraint was endangering them. The Division continues to prohibit this type of restraint and encourages vendors to provide staff with training on alternative behavior management procedures for controlling and resolving difficult situations. To learn more about effective behavior management strategies and support, consult with your provider agency's training instructor.

**FOR ADDITIONAL RESOURCE INFORMATION:**
http://www.disabilityrightsca.org/pubs/701801.pdf

---

### We Want To Know

**The Quality Assurance Unit has a CUSTOMER SATISFACTION SURVEY available for your feedback in response to your recent Program Monitoring review.**
**YOUR FEEDBACK IS IMPORTANT TO US!**
**A convenient & user-friendly website has been set up for the use of your agency staff in completing the survey:**
http://www.surveymonkey.com/s/LLRHDND

---

**GROUP HOME BULLETIN PUBLISHED BY**
**Department of Economic Security**
**DIVISON OF DEVELOPMENTAL DISABILITIES**
**PROGRAM MONITORING UNIT**

**EDITORS**
**Central Office Quality Assurance Staff:**
**Vincenté Benjamin & Nicole Morong**

**PLEASE SEND FEEDBACK/COMMENTS TO**
dddmonitoring@azdes.gov

