Roksana D. Moradi-Brovia (Bar No. 266572)
Matthew D. Resnik (Bar No. 182562)
**RESNIK HAYES MORADI LLP**
17609 Ventura Blvd., Suite 314
Encino, CA 91316
**Telephone:** (818) 285-0100
**Facsimile:** (818) 855-7013
roksana@RHMFirm.com
matt@RHMFirm.com

*Attorneys for*
Patient Care Ombudsman,
Timothy J. Stacy, DNP, ACNP-BC

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## NORTHERN DIVISION

| | |
|---|---|
| In re:<br><br>COMMUNITY PROVIDER OF<br>ENRICHMENT SERVICES, INC.,<br><br>                                    Debtor.<br>_____<br><br>[ ] Affects all Debtors<br><br>[X] NOVELLES DEVELOPMENTAL<br>SERVICES, INC.<br><br>[X] CPES CALIFORNIA, INC. | LEAD CASE NO. 9:20-bk-10554-DS<br><br>Jointly administered with:<br>Case No. 9:20-bk-10553-DS and<br>Case No. 9:20-bk-10994-DS<br><br>Chapter 11<br><br>**EMERGENCY PRELIMINARY REPORT BY PATIENT CARE OMBUDSMAN, DR. TIMOTHY J. STACY DNP, ACNP-BC, PURSUANT TO 11 U.S.C. §333(b)(2)**<br><br>[NO HEARING REQUIRED] |

**TO THE HONORABLE DEBORAH J. SALTZMAN, UNITED STATES BANKRUPTCY JUDGE; THE UNITED STATES TRUSTEE AND HIS COUNSEL OF RECORD; THE DEBTORS AND THEIR COUNSEL OF RECORD; AND ALL PARTIES IN INTEREST:**

Dr. Timothy J. Stacy DNP, ACNP-BC, the Patient Care Ombudsman appointed under Section 333 of the Bankruptcy Code in the above referenced Chapter 11 bankruptcy

cases of Community Provider of Enrichment Services, Inc., Novelles Developmental

Services, Inc., and CPES California, Inc. (collectively, the "Debtors"), hereby submits his

first report to the Court regarding the quality of patient care provided to the Debtors'

patients.

Dated: September 23, 2020                              **RESNIK HAYES MORADI LLP**

                                                       By:  **/s/ Roksana D. Moradi-Brovia**
                                                            **Roksana D. Moradi-Brovia**
                                                            **Matthew D. Resnik**
                                                            *Attorneys for*
                                                            Patient Care Ombudsman,
                                                            Timothy J. Stacy, DNP, ACNP-BC

## I. PATIENT CARE OMBUDSMAN'S APPOINTMENT AND SCOPE OF REVIEW

Community Provider of Enrichment Services, Inc., Novelles Developmental Services, Inc., and CPES California, Inc. (collectively, the "Debtors"), operate group homes and regional day program centers. These facilities address the needs of developmentally delayed patients with diagnoses including autism, down syndrome and other genetic diseases that cause severe cognitive development and difficulty with activities of daily living. Thus, categorizing this population of patients, as a vulnerable population with at risk health and safety concerns.

Because the Debtors operate facilities which provide care and medical service to patients, the estate therefore is a "health care business" as that term is defined in Bankruptcy Code §101(27)(A). Under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, a patient care ombudsman must be appointed in the bankruptcy case of a "health care business" to ensure that the medical care provided to patients is not declining or being materially compromised during the bankruptcy.

Following due diligence and interviews by the United States Trustee ("UST") and based on his substantial experience as a licensed hospitalist and critical care provider and on his highly regarded credentials as an Associate Chief Hospitalist and Chair of the Interdisciplinary Committee at Sherman Oaks and Encino Hospitals for the past six years, on or around August 26, 2020, the UST and Debtors entered into a *Stipulation for the Appointment of a Patient Care Ombudsman* (Docket No. 286) which resulted in entry of the *Order Directing the Appointment of a Patient Care Ombudsman* on August 28, 2020 (Docket No. 290) and pursuant to which the UST appointed Timothy J. Stacy, DNP, ACNP-BC to serve as the Patient Care Ombudsman (the "PCO" and sometimes "Dr. Stacy") in this case, as of September 15, 2020 (Docket No. 333).

As a licensed medical provider, the PCO must comply with all rules governing the practice of medicine and Health Insurance Portability and Accountability Act of 1996

("HIPAA"). By virtue of his medical license and the related requirements of compliance and duties pursuant to HIPAA, he is required to protect the confidentiality of patient records.

A patient care ombudsman appointed under 11 U.S.C. §333 must: (1) monitor the quality of patient care provided to patients of the debtor, to the extent necessary under the circumstances, including interviewing patients and physicians; (2) not later than 60 days after the date of appointment, and not less frequently than at 60-day intervals thereafter, report to the court after notice to the parties in interest, at a hearing or in writing, regarding the quality of patient care provided to patients of the debtor; and (3) if such ombudsman determines that the quality of patient care provided to patients of the debtor is declining significantly or is otherwise being materially compromised, file with the court a motion or a written report, with notice to the parties in interest immediately upon making such determination. 11 U.S.C. §333(b).

**This Report consists of the PCO's in-depth evaluation of the Debtors' health care facilities in Arizona (California has yet to be reviewed).**

The focus and objective of  the PCO's evaluation is to verify the Debtors' ability to adhere and comply with the applicable medical standard of patient care as defined by the Institute of Medicine ("IOM") [Medicare & Lohr] during the bankruptcy proceedings.

This Report describes the specific medical standards and review criteria applied by the PCO to conduct his review and details the results of the PCO's review and conclusion.

Subsequent to the PCO's evaluation as identified in the Report, the PCO will continue to perform contemporaneous monitoring of any issues and the global issues identified requiring Debtor's immediate attention, as required by 11 U.S.C. § 333(b) and (c).

If deemed necessary and prudent, the PCO will utilize medical operation consultants to assist him in performing his duties and responsibilities. Preliminary, it is apparent that the PCO will require the assistance of National Board-Certified behavioral analyst Julie Richards, and Dr. Nathan Rubin, MD, JD.

Further, in order for the PCO to timely and competently comply with his duties within the relatively small amount of time allotted for him to do so under the applicable Bankruptcy Code and Bankruptcy Rule provisions, he needs an opportunity to focus primarily on patient care issues without having to spend any significant amount of time on the legal and procedural aspects of the case. As such, he has retained Resnik Hayes Moradi, LLP to assist him with his appointment in this case. Having bankruptcy counsel will streamline the PCO's ability to focus primarily on patient care issues, while facilitating his need to understand the relevant facts and circumstance of theses case and timely reporting the Court as to patient care matters.

Pursuant to the *Notice of Appointment of PCO* (Docket No. 333), the PCO estimates that he has already spent in the range of 40-hours pursuant to his appointment in this case.

## II.    PATIENT POPULATION AND RISK TO HEALTH AND SAFETY

At the time of his appointment on September 15th, 2020, the PCO learned that the patient population has moderate to severe disabilities and are completely dependent on Arizona and California's Department of Disability for basic needs, health, safety, and activities of daily living.

**Both Arizona and California law define these persons as members, not patients; however, these terms are used interchangeably in this Report.**

The members served are developmentally disabled persons with comorbid medical conditions such as epilepsy, heart disease, cerebral palsy, severe cognitive impairment, and diabetes mellitus to name a few. *They are completely dependent on state services.*

Transfer Trauma as the name implies is the condition that results from a change in a patient's living environment or caretaker.

The symptoms of Transfer Trauma can manifest in behavioral changes, appetite changes, refusal of treatment, severe depression and in multiple studies reviewed by the PCO, increase overall morbidity and mortality.

The Debtors' members have variable and individualized care plans that include but are not limited to medication administration, protection from other group members with exacerbated behavioral conditions, supervision and assistance with meals, and transport to outside day care centers and medical/psychiatric facilities.

Some members can be medically classified as functional quadriplegics, patients that require assistance to the level of what would be required to care for a quadriplegic individual. *These members do not have the capability to call 911, exit a burning or endangered dwelling, take medication, perform activities of daily living such as bathing, defend themselves from harm, or complain of pain or illness.* **These members require staff that understand nonverbal expressions and indicators recognized from time spent with the families and members.**

### III.    METHODOLOGY

#### A. Quality of Care

It is the responsibility of the PCO to evaluate the quality of care of Debtor's patients. As defined by the Institute of Medicine Committee,

"[Q]uality of care is the degree to which health services for individuals and populations increase the likelihood of desired health outcomes and are consistent with current professional knowledge." 1(Medicare, Institute of Medicine) & Lohr, K. N. (1990a). Critical Attributes of Quality-of-Care Criteria and Standards. National Academies Press (US). Retrieved from https://www.ncbi.nlm.nih.gov/books/NBK235456/) ("Medicare and Lohr")

Quality healthcare delivery requires technical proficiency, the means to deliver services correctly, the cognitive and communication skills necessary to elicit and evaluate needed information, and the ability to decide which mix of available services is most likely to achieve desired health outcome for patients. When these requirements are not met patients are at risk.

In order to evaluate the processes of the Debtors, the PCO surveyed and evaluated the critical systems in place to assess the Debtors' ability to provide the standard of care during the bankruptcy process. Elements of care delivery were evaluated against criteria that reflect professional standards of good quality care (and, increasingly, patient-oriented measures of satisfaction.)

Data about processes can be obtained in numerous ways. These include patient reports of care rendered, direct observation of care, review of medical records (or abstracts of records) and similar documents, and analysis of accreditation and monitoring agencies' claims or other utilization data. This review was conducted by the PCO.

The advantages of process-of-care evaluation are several. It has great appeal to practitioners because it is directly related to what they do. It is easy to explain and to interpret the approach and its findings. Reliable, valid criteria and methods are available. In some cases, review of care against process criteria can be nearly "real time," meaning that corrective actions can be very timely. Thus, process measurement can point directly to specific areas needing performance improvement, which is a fundamental aim of quality assurance. The PCO reviewed issues in real time with the Debtors and State Agencies to allow rapid discussion and problem solving as required.

### B. Detection of Quality of Care

Quality assessment was accomplished through the PCO's review of governmental agency reports, along with the Debtors' own quality assurance program results.

### C. Retrospective Evaluation of Process of Care

Retrospective review of quality assurance tools using explicit criteria is the classic approach to assessing quality in healthcare settings. (Medicare & Lohr, 1990c.) The PCO examined incident reports to understand past concerns as an initial starting point.

///

///

#### D.  Case-Finding Screens

Real time case-finding screens include the evaluation of incident reports and the debtors internal Quality Assurance processes as a starting point to identify potential quality-of-care problems that warrant further evaluation. These screens are objective, and clinical.

## IV.    INTERVIEWS AND DATA REVIWED

Upon his appointment, the PCO immediately contacted the California State Department of Disability Services ("CADDS") and the Arizona Department of Economic Security Division of Developmental Disabilities ("AZ DES/DDD").

The following is a summary of the PCO's communications:

1.  Contemporaneously with his appointment, Vince Slusher, Debtors' counsel and AZ DDD counsel, Sean O'Brien contacted the PCO to set up urgent conference calls to update the PCO on case status.

2.  Discussions with Mr. Slusher; Mr. O'Brien; AZ DDD counsel, Bill Richards; Chief General Counsel AZ DES, Nicole Davis – all took place within 24-hours of appointment.

3.  During the conference call with AZ DES/DDD, the PCO was offered a concise but detailed report of Arizona Law, DES/DDD regulations, DES/DDD concerns secondary to the bankruptcy and DES/DDD position on the Debtors' proposed *Motion to Approve Sale* (Docket No. 296) [the "Sale Motion"].

    a.  PCO was informed that at the time the bankruptcy case was filed, the Debtors and AZ DES/DDD collaboratively developed workshops that focused on the best methods to transition the members to other qualified vendor applicants. *Qualified Vendor Applicants ("QVA") are potential companies that are awarded licenses to deliver care to the members after a rigorous vetting process by AZ DES/DDD.*

b. The PCO subsequently reviewed the meeting minutes thereafter offered in Exhibit 8 to the *Supplemental Brief in Support of Arizona Department of Economic Security, Division of Developmental Disabilities': Motion for Relief from the Automatic Stay Under 11 U.S.C. § 362 (Action in Nonbankruptcy Forum) [DKT. 308]; and Objection to the Debtor's "Arizona Sale Motion" [DKT. 318]* filed on September 18, 2020 (Docket No. 343) [the "AZ Supplemental Brief"], by AZ DES.

c. The details of the conference call are conveniently detailed in the AZ Supplemental Brief.

d. It appears that the workshops and meetings have since been postponed since the filing of the Debtors' Sale Motion seeking approval of a single vendor. **AZ DES/DDD has never awarded a single vendor 53 group homes with over 100 lives.** Specifically, a vendor that **does not** have a completed and approved QVA.

4. CADDS Deputy Chief Ann Stigelmayer, was also contacted to discuss the legislative processes of the CADDS and to assess their position on the Debtors' California quality of care and the Sale Motion regarding the Debtors' California properties.

a. According to Ms. Stigelmayer, the CADDS supervises and monitors Regional Center Directors who are responsible for the day to day operations and care of their members. Unfortunately, the PCO has been unable to contact the Regional Directors that cover all of the Debtors' California Group Homes and Day Care Centers despite several emails and phone calls to the Regional Directors. Ms. Stigelmayer continues to maintain contact with the PCO and is working on avenues to allow the PCO to formally assess the health and safety of the Debtors' California members.

5. In contrast, AZ DES General Counsel/Chief Governance Officer, Ms. Davis, and the staff of AZ DES, have expeditiously offered a concise background with respect to AZ DES's authority and position in this case. The PCO was greatly assisted by the production of numerous documents.

   a. The PCO was limited in his ability to perform independent site visits specific to the Debtors' Arizona group homes because of the COVID-19 pandemic. AZ DES, on PCO request, set up specifically identified group homes that were chosen based on the reviewed incident report documents provided by AZ DES.

   b. **AZ DES teams provided detailed, member ID protected, Incident Report documents for 53 of the Debtors' homes. The Incident Report highlights 799 minor to severe incidents that occurred over the CPES AZ system from December 15, 2019 to August 26, 2020. The PCO reviewed each incident for severity and requested that AZ DES perform onsite health and safety inspections at 17 out of the remaining 49 occupied group homes.**

   c. Immediately upon the PCO request, Ms. Davis, in collaboration with her teams, performed 17 onsite health and safety inspections.

   d. Following the site visit inspections, a conference call took place with the onsite inspectors to discuss findings that may suggest immediate danger to the members and to determine the severity level of any incidents.

6. The PCO spoke with Mary Lynn Greenhow, VP of Operations and Quality Control for the Debtors. Ms. Greenhow has knowledge of the internal operations of Arizona and California. The Debtors' quality control is extensive.

   a. Ms. Greenhow provided numerous internal corrective action reports with detailed process instructions to the PCO for those group homes

that were found to be partially or non-compliant during the last AZ DES/DDD survey. These internal corrective action reports reveal immediate corrective action plans. Generally, corrective action from state surveyors will have a longer time horizon.

b. The PCO received numerous internal corrective action reports from the debtor that included comprehensive models to implement and effect immediate change. Action plans, goals and objectives are clear and measured. Each module is associated with an educational plan, evaluation, and validation. It was clear to the PCO that the efforts to correct any incident that posed risk to the members triggered a robust and expedient response from the debtor.

c. Ms. Greenhow shares the concern of the PCO and AZ DES/DDD. As the transition process moves closer to the scheduled mandated transition date of December 31, 2020, the financial structure of the business will continue to deteriorate. Employees and Managers will continue to resign to seek more stable employment. *This will greatly destabilize the Debtors' systems and compromise the health and safety of the members.*

d. It is clear to the PCO that Ms. Greenhow's primary goal and concern is the expeditious safe transfer of the members to qualified vendors authorized by AZ DES/DDD.

7. The PCO performed an exhaustive and careful review of court and AZDES/DDD Incident Report documents, performed multiple phone calls with stakeholders, and in cooperation with AZDES, performed an emergent health and safety inspection on key Arizona group homes.

8. On the request of the PCO, AZDES sent 17 inspectors to 17 homes to perform health and safety surveys. Following the visits and submission of their reports, the PCO met with the inspectors via a conference call.

The individual inspector reports and conversations with each inspector confirm that the Debtors are performing to the standard of care and is consistent with the multiple incident reports reviewed.  However, the inspectors found lack of staffing related to staff illness and inability to fill the vacancy in one on the homes. This is considered a moderate to severe violation. The majority of untoward events described by the inspectors were related to deficiencies in individual care plans and medication errors that were not found to be life threatening. In addition, the inspectors found a delay in filing a mandated Adult Protective Service Report ("APS"). The inspectors confirmed that the APS report was eventually filed by the regional director satisfactorily. The investigation into the abuse allegation is ongoing. The inspections confirmed that staffing, medication errors, and staff education remain a significant health risk to the members.

9. The PCO has reviewed Debtors' 779 related self-reported incidents since December 15, 2019 to date, that constitute potential immediate danger to the health and safety of the members. Selected incidents:

   a. 132 Accidental Injuries occurring in the presence of providers that have knowledge of potential behavioral triggers that mitigate the frequency of events.

   b. 22 Physical Abuse allegations performed by staff.

   c. 25 Human Rights violations that compromised the dignity, respect, or personal choice of the members.

   d. 34 approved Emergency restraint and 2 unapproved (prone position or other unapproved restraint measures) of a member from trained staff.

   e. 77 Neglect allegations that compromise the health and safety of the members.

f.   13 Missing member events.  These events are those where the group homes report a member that is missing from supervised status and reported to the police as a person in imminent danger.

g.   354 Member Behavioral events that required trained staff to intervene using approved de-escalation techniques.

h.   1 unexpected death. The PCO does not have the details of this event. A rigorous and complete examination into the death was immediately performed by inspectors of the AZ DES/DDD.

i.   124 Medication administration errors that included wrongly administered medication dose, member administered wrong medication, missing medication, and incorrectly administered medications.

  i.   Members under the care of CPES and AZ DES/DDD are prescribed Department of Drug Enforcement ("DEA") Scheduled Controlled substances that are considered dangerous, such as benzodiazepines, opioids, hypnotics, and stimulants.

  ii.   In addition, and possibly more critical, the members are prescribed highly active psychotropic and psychiatric medication that are required to relieve a member of psychotic thoughts, behavior, and debilitated depression.

  iii.   The PCO recognizes that there is a possibility that some of the 354 behavioral events listed above were a sequelae of medication errors.

10.  Interviewed Dr. Aldaoud, principal of the "stalking horse bidder," who reports that he is prepared to consummate the takeover of all the Debtors' Arizona group homes. Further, he reports that per his due diligence, each of the group homes is economically viable as a standalone entity. In addition,

Dr. Aldaoud confirms that vital staff are leaving, and this transaction should be closed quickly to shield the members from harm.

## V.    DATA RELIABILITY

The PCO was provided with the 779 incident reports (most of minor to moderate in severity) occurring January 1, 2020 to August 26, 2020. Most of the incidents were self-reported, as mandated by law, by the group homes to AZ DES/DDD.

The experience of providers, a positive organizational milieu towards reporting, and diligence of organization to make reporting a non-punitive act of transparency all influence accuracy and reliability.

The PCO was interested in the accuracy and reliability of mandated self-reporting specific to developmentally disabled group homes.  A comprehensive literature review was performed that yielded several studies performed by Centers for Disease Control and Prevention ("CDC"), Centers for Medicare and Medicaid Services ("CMS") and private institutions. Although not specific to Arizona or CPES, mandated self-reporting accuracy and reliability range from 65%-85% at the highest across all studies, demonstrating that there is under reporting of incidents that endanger patients.

**Thus, potential harm is not theoretical, but a reality as evidenced by 779 incidents reports, ranging from moderate to severe.** Adjusting for incidents that are not self-reported, this number could be as much as 35% higher with unknown severity.

## VI.    STAFFING CONCERNS

The members are persons with significant developmental disabilities that require around the clock supervision by trained state mandated and monitored staff. Staff are initially certified by the state to care for this vulnerable population of members and have hours of continuing education that is monitored by both the state and the vendors that provide care.

It is clear to the PCO that Arizona DES/DDD administrative stakeholders and legislative bodies implemented detailed and rigorous measures to protect the health and safety of their most vulnerable populations.

In conversations with CEO Mark Monson and Ms. Greenhow, the PCO found that the Debtors' remain diligent in ensuring the health and safety of members under their care and are working through all options to stay viable during the bankruptcy.

However due to job insecurity, COVID-19 fears, and increased unemployment reimbursement, staff are leaving. **The financial impact of staff vacancies is significant. _The Debtors are now spending 40% of payroll on overtime to fill vacancies._**

## VII.   **CONCLUSION**

The PCO submits this preliminary Report for review, after collaboration with the Debtor, CADDS, AZ DES, and AZ DDD.

At the request of the PCO, AZ DES issued comprehensive documents that outlined incident reports occurring at CPES AZ group homes. One of the documents summarized incidents, per category, occurring over a three-year period (2018-8/2020) for comparison. The PCO was interested if any specific category of incidents increased recently, specific to the bankruptcy filing. *It appears that the incidents reported are consistent over the examined three-year period and reveal no increase in incidence related to the bankruptcy.* The incidents are consistent with the prior operations of group homes.

**The PCO established that the vulnerability of these members is paramount to this case and should be considered an emergent and defining objective in determining the transition of the members from the Debtors' facilities.**

Changes in environment or staff have the potential to exacerbate behavioral changes in the members that risk the health and safety of the members.

The PCO considers the staff a crucial variable as these employees have unique knowledge of member behavioral triggers and it is this knowledge that prevents escalation to violence against self or others.

The PCO is aware of several critical positions in quality improvement, human resources, and on-site group home supervisors that were vacated and remain open.

Further, Transfer Trauma effects persons diagnosed with intellectual and developmental disabilities that can increase morbidity and mortality.

**The PCO is of the opinion that the current finances (bankruptcy protection) of the Debtor will likely impact the ability of the Debtor to provide a safe environment for their members.** As time moves closer to the current transition date of December 31, 2020, critical staff will continue to seek employment elsewhere, therefore placing the health and safety of the members at risk. The debtor and the stalking horse bidder confirm the above. It is the awareness of the bankruptcy that is motivating vital staff exodus.

The current care and monitoring processes of the debtor meet the standard of care.

After careful review, the PCO recommends that the members, under the immediate care of CPES Arizona, be transitioned to qualified vendors established in collaboration with CPES and AZ DES/DDD. *AZ DES is currently ready to award qualified vendors the licenses that will allow a safe transition of CPES AZ members if authorized by the Court to proceed.*

Being certified as a Qualified Vendor is a necessary, but not sufficient condition, to taking over the healthcare of the members and management of the group homes.  It is up to the Court and AZ DES/DDD to decide as to which Qualified Vendors will best serve the needs of the members.

*///*

*///*

*///*

*///*

*///*

*///*

*///*

*///*

**The transition of the members should be considered urgent.**  The PCO recommends that the Debtors and the state work together to ensure that the members continue to receive care in their current environment with current care givers.

Dated: September 23, 2020

By: _____ **SEE NEXT PAGE** _____
                    **Patient Care Ombudsman**
              Dr. Timothy J. Stacy DNP, ACNP-BC

**17**

**The transition of the members should be considered urgent.** The PCO recommends that the Debtors and the state work together to ensure that the members continue to receive care in their current environment with current care givers.

Dated: September 23, 2020

By: _____

**Patient Care Ombudsman**
Dr. Timothy J. Stacy DNP, ACNP-BC

17

## **Bibliography**

– The Health Insurance Portability and Accountability Act of 1996 (HIPAA) P.L. No. 104-191, 110 Stat. 1938 (1996).

– 11 U.S. Code § 333 - Appointment of patient care ombudsman.

– Johnston v. St. Francis Medical Center, Inc., No. 3 5, 236-CA, Oct. 31, 2001.

– Medicare, I. of M. (US) C. to D. a S. for Q. R. and A. in, & Lohr, K. N. (1990a). *Critical Attributes of Quality-of-Care Criteria and Standards*. National Academies Press (US). Retrieved from https://www.ncbi.nlm.nih.gov/books/NBK235456/

– Medicare, I. of M. (US) C. to D. a S. for Q. R. and A. in, & Lohr, K. N. (1990b). *Health, Health Care, and Quality of Care*. National Academies Press (US). Retrieved from https://www.ncbi.nlm.nih.gov/books/NBK235460/

– Medicare, I. of M. (US) C. to D. a S. for Q. R. and A. in, & Lohr, K. N. (1990c). *Methods of Quality Assessment and Assurance*. National Academies Press (US). Retrieved from https://www.ncbi.nlm.nih.gov/books/NBK235459/

– Medicare, I. of M. (US) C. to D. a S. for Q. R. and A. in, & Lohr, K. N. (1990d). *Settings of Care and Payment System Issues for Quality Assurance*. National Academies Press (US). Retrieved from https://www.ncbi.nlm.nih.gov/books/NBK235452/

– Moffett, P., & Moore, G. (2011). The Standard of Care: Legal History and Definitions: the Bad and Good News. *Western Journal of Emergency Medicine*, *12*(1), 109–112. Retrieved from https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3088386/

– Chen, H.-M., Tu, Y.-H., & Chen, C.-M. (2017). Effect of Continuity of Care on Quality of Life in

– Older Adults With Chronic Diseases: A Meta-Analysis. Clinical Nursing Research, 26(3), 266–284. https://doi.org/10.1177/1054773815625467

– Chan, K. E., Thadhani, R. I., & Maddux, F. W. (2014). Adherence barriers to chronic dialysis in the United States. *Journal of the American Society of Nephrology : JASN*, *25*(11), 2642–2648. doi:10.1681/ASN.2013111160

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

17609 Ventura Blvd., Suite 314, Encino, CA 91316.

A true and correct copy of the foregoing document entitled (*specify*): <u>FIRST REPORT BY PATIENT CARE OMBUDSMAN, DR. TIMOTHY J. STACY DNP, ACNP-BC, PURSUANT TO 11 U.S.C. §333(b)(2)</u> will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) <u>9/23/2020</u>, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) <u>9/23/2020</u>, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**:  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) <u>9/23/2020</u>, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 9/23/2020 | Ja'Nita Fisher | /s/ Ja'Nita Fisher |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF) [CONTINUED]:

Kyra E Andrassy    kandrassy@swelawfirm.com,
lgarrett@swelawfirm.com;gcruz@swelawfirm.com;jchung@swelawfirm.com
Lisa D Angelo    langelo@murchisonlaw.com, cthomas@murchisonlaw.com
Scott B Cohen    sbc@eblawyers.com, mkk@eblawyers.com
UNITED STATES TRUSTEE'S COUNSEL: Brian D Fittipaldi    brian.fittipaldi@usdoj.gov
David R Johanson    djohanson@hpylaw.com, drubel@hpylaw.com;rthompson@hpylaw.com
Jennifer Kalvestran    jkalvestran@gustlaw.com, spobrien@gustlaw.com
Kelsey L Maxwell    kmaxwell@murchisonlaw.com
PCO'S COUNSEL: Roksana D. Moradi-Brovia    roksana@rhmfirm.com,
matt@rhmfirm.com;janita@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;priscilla@rhmfirm.com;pardis@rhmfirm.com;russ@rhmfirm.com;rebeca@rhmfirm.com;david@rhmfirm.com;sloan@rhmfirm.com
Sean P O'Brien    spobrien@gustlaw.com
Steven P Ordaz    sordaz@bmcgroup.com, tfeil@bmcgroup.com
Agustin R Pina    pina@schinner.com
DEBTOR'S COUNSEL: Ryan M Salzman    ryan.salzman@faegredrinker.com,
willie.ackart@faegredrinker.com;susan.carlson@faegredrinker.com
United States Trustee (ND)    ustpregion16.nd.ecf@usdoj.gov
Scott L Whitman    slw@mwlegal.com, holly@mwlegal.com

2.  SERVED BY UNITED STATES MAIL [CONTINUED]:

No Judge's Copy required for documents less than 25-pages per GENERAL ORDER 20-06 - IN RE:
PROCEDURES FOR PHASED REOPENING DURING COVID-19 PUBLIC EMERGENCY.

Debtor:

Community Provider of Enrichment Services, Inc.
4805 East Speedway Boulevard
Tucson, AZ 85712