**FAEGRE DRINKER BIDDLE & REATH LLP**
JEREMY M. PELPHREY (CA Bar # 249862)
Jeremy.Pelphrey@faegredrinker.com
RYAN M. SALZMAN (CA Bar #299923)
Ryan.Salzman@faegredrinker.com
1800 Century Park East, Suite 1500
Los Angeles, CA  90067
Telephone:    (310) 203-4000
Facsimile:    (310) 229-1285
*Counsel for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA – NORTHERN DIVISION**

| | |
|---|---|
| In re: | Lead Case No. 9:20-bk-10554-DS |
| Community Provider of Enrichment Services, Inc. d/b/a CPES Inc., et al., <br> EIN: 86-0804057 | Jointly Administered With: <br><br> Case No. 9:20-bk-10553-DS |
| Novelles Developmental Services, Inc. <br> EIN: 27-5174435 | Case No. 9:20-bk-10994-DS |
| CPES California, Inc. <br> EIN: 27-2315212 | Chapter 11 Cases |
| Debtors. | **DECLARATION OF JEFFREY R. MANNING IN SUPPORT OF DEBTOR CPES INC.'S ASSET SALE UNDER SECTION 363 OF THE BANKRUPTCY CODE AND IN SUMMARY OF THE OCTOBER 15, 2020 AUCTION** |
| [] Affects All California Debtors <br><br> [•] Community Provider of Enrichment Services, Inc. d/b/a CPES Inc. <br> [ ] Novelles Developmental Services, Inc. <br> [ ] CPES California, Inc. <br><br> Debtors and Debtors in Possession | **RELATED DOCKET NOS. 296, 386, 398, 399, 407** |

Jeffrey R. Manning, hereby declares to the Court as follows:

1.    I am a Managing Director of CohnReznick Capital Market Securities, LLC ("CRC"), a limited liability company, investment bank, and FINRA member firm, with offices located at 500 East Pratt Street, Baltimore, MD 21202.  To provide investment banking services as required by SEC and FINRA Rule 1032(a), I have qualified as a General Securities Representative (S7), an Investment Banking Representative (S79), and as a General Securities Principal (S24) under FINRA licenses. I also hold the Certified Turnaround Professional designation. CRC is the affiliated investment banking subsidiary of CohnReznick, LLP.

ACTIVE.125317932.01

2. I make this Declaration in further support of the motion, pursuant to 11 U.S.C. § 363, to sell substantially all of the assets (the "Assets") of the above-referenced debtor CPES, Inc., and to advise the Court of the results of the auction sale (the "Auction") conducted virtually via Zoom Conference on October 15, 2020.

## BACKGROUND

3. On April 24, 2020 (the "Petition Date"), Community Provider of Enrichment Services, Inc. d/b/a CPES Inc. ("CPES AZ" or the "Debtor") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Central District of California, Northern Division (the "Court").

4. On September 4, 2020, CPES AZ filed the *Motion for Entry of (I) an Order (A) Authorizing and Approving the Debtor's Entry Into the Stalking Horse Asset Purchase Agreement, (B) Authorizing and Approving Bidding Procedures and Break-Up Fee, (C) Approving Notice Procedures, (D) Scheduling a Sale Hearing, and (E) Approving Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Determining Cure Amounts; and (II) an Order (A) Authorizing the Sale of Substantially all of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* [Docket No. 296] (the "Motion").[1] The Motion sought approval of the bidding procedures as well as the form of Asset Purchase Agreement and approval of CTB AZ, LLC ("CTB") as the "stalking horse" bidder for the Assets, with a bid of $420,000.00 (the "Stalking Horse Bid").

5. On October 5, 2020, the Court entered the *Order Granting Motion for Entry of (I) an Order (A) Authorizing and Approving the Debtor's Entry Into the Stalking Horse Asset Purchase Agreement, (B) Authorizing and Approving Bidding Procedures and Break-Up Fee, (C) Approving Notice Procedures, (D) Scheduling a Sale Hearing, and (E) Approving Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Determining Cure Amounts* [Docket No. 386] (the "Bidding Procedures Order").

---

[1] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion.

6. On September 3, 2020, this Court entered the *Order Approving Application to Employ CohnReznick Capital Markets Securities, LLC as Investment Banker* [Docket No. 295] pursuant to which CRC was appointed to act as the investment banker for the Debtor for the purpose of marketing the Assets for sale to qualified prospective purchasers.

### MARKETING THE DEBTORS' ASSETS

7. Since the execution of an Engagement Letter on June 11, 2020, CRC has been engaged in significant efforts to market Assets in both California and Arizona. Results of the California marketing efforts are reported in the *Notice of Completion of Auction and Winning Bidder* [Docket No. 373].

8. The challenge in Arizona was particularly daunting. Despite the Debtor and CRC reaching out proactively to the Arizona Department of Economic Security: Division of Developmental Disabilities (hereafter known as "DDD"), including one conference call with DDD counsel on July 14th and one conference call with representatives of DDD and the State Attorney General's office on July 27th, CRC's efforts to pursue a coordinated process that linked potential new healthcare providers ("Agencies") with the Assets of the Debtor's estate required to deliver that care were rebuffed by DDD.

9. Since 1980 CPES AZ has been providing behavior healthcare services through a series of Group Homes to clients, referred to as "members," often working with people who experience multiple and severe co-occurring disorders. These Group Homes typically have four or fewer occupants and are staffed 24 hours a day.

10. To be perfectly clear, instead of a coordinated and cooperative process between DDD and the Debtor to maximize the protection of the members that allowed members to transition to new healthcare providers at the same physical location, the DDD process lead to several gross errors (e.g., assigning two Agencies the award to provide service at the same site on three occasions), considerable confusion with guardians, landlords, and the Agencies, and exposing a number of members to potential "transfer risk."

11. In addition, based on a number of factors – including direct conversations with potential bidders, an apparent lack of financial sophistication, the absence of a website or email

address, and lack of routine contact information in promotional materials – CRC would be reticent, without additional information, to recommend to the Court that some of the Agencies awarded service by the DDD would meet the "adequate assurance" test under chapter 11.

12. Leading up to the Auction, as a part of a highly intentional marketing process, CRC contacted nineteen Agencies that had been <u>pre-approved by DDD</u> to participate in the CPES transition process. Several parties pre-approved by DDD could not be found, either because they did not have websites or contact information in their proposals. Of those contacted, ten executed NDAs and got access to a data room and proprietary information. Six became "Qualified Bidders" per the Bidding Procedures, and, with CTB AZ, LLC (the court-appointed "Stalking Horse"), the Qualified Bidders included AIRES, Cornerstone, Hatch Haven, Preferred Healthcare, ResCare, and Rise Services. CRC undertook a broad range of activities to market these Assets, including sending direct emails, compiling a fulsome data room, and participating in numerous telephone conferences with prospective pre-qualified Agencies.

13. Because of uncertainties surrounding regulatory approval of the Stalking Horse Bid, in consultation with the Debtor and Debtor's counsel, CRC ran an Auction for each individual Group Home location in Arizona.

14. Working with the Debtor, CRC developed a "Master Bid File" that for each Group Home included: DDD District, DDD Agency Designate, the Opening Bid & Bidder, Street Address, City, Zip, County, House Name, No. of Bedrooms, Max Capacity, Current Census, Vacancy, Staffing Range, Name of the Landlord, Monthly Rent, Cure Costs, Vehicle Make/Model, VIN#, approximate mileage, estimated Kelly Blue Book Value, noting whether the vehicle was Leased or Owned, and finally specific Notes on that site, if any.

15. CRC set a reserve price of $10,000 for each Group Home, reflecting several variables, i.e., Cure Costs, the value of the vehicle and other assets, incremental legal costs to the Estate involved with assuming or rejecting real estate leases, and other factors. The reserve price proved reasonable after the market test, as the average for Group Home that "traded" was over $16,000.

## THE AUCTION

16. The Auction commenced on October 15, 2020 at 10:02 a.m. (Pacific Daylight Time), with a court reporter recording. Because of the pandemic, the Auction was conducted through a Zoom video conference.

17. On the morning of the Auction, CRC and the Debtor faced a conundrum -- DDD had notified twelve Agencies that they could provide member care, but those awards by DDD did not authorize control of the Assets at those specific Group Homes. These critical Assets included the real estate lease, owned and leased vehicles, computers, and other non-member furniture, fixtures, and equipment inside of each Group Home. The DDD process also did not address the treatment of members by healthcare providers at those locations.

18. Background information was put into the official record at the beginning of the Auction, and each Bidder was given the opportunity to put comments into the official record. Professionals representing DDD were also permitted to observe, ask questions, and note the record.

19. As Dr. Timothy J. Stacy, the Patient Care Ombudsman ("PCO"), noted on the record, member well-being may be jeopardized by moving members to new locations, and, working with the Debtor, CRC attempted to transition these Assets in an orderly fashion to Agencies with the healthcare experience, operating sophistication, and financial footings to deliver care at the existing locations.

20. The chart on Exhibit I summaries the results of the October 15th Auction. Exhibit II shows Agencies that declined to participate in the Auction. Bidding was brisk, with locations getting between a single and up to 26 bids to acquire control over those Assets. As a general observation, reflecting on the five parties that currently are designated by CRC, in consultation with the Debtor, as the "Prevailing Bidder" on the Assets of the Group Homes, the sophistication and financial footings of that group are generally superior to the previously DDD designated twelve Agency Awards. Each Agency designated in the CRC process has committed to providing healthcare services at the current physical location for at least one year, subject to the requirements of each individual member.

21. At the current time, fifteen Group Homes did not receive an opening bid, although since the conclusion of the auction CRC has been contacted by two of the seven Qualified Bidders

expressing an interest in acquiring those locations, subject to DDD approval. Subject to consultation with DDD, the Debtor intends to define a transition strategy for those fifteen locations within the week.

22. Of the six Agencies given awards by DDD that decided not to participate in the auction process per the court-approved Bidding Procedures, the Debtor has been told that in four of those Group Homes those Agencies have notified staff and guardians of their intent to relocate members, in one case as soon as November 30th. This move is in direct conflict with the advice of the court-appointed PCO.

23. Over my 35+ years of experience in corporate recovery, I have worked with healthcare regulators in three other states to transition Assets controlled by debtors operating in a chapter 11. My experience in Arizona has been unique. The sale process led by CRC, and the Auction conducted by CRC pursuant to the court-approved Bidding Procedures, I believe has identified a resolution of the challenge by linking physical Assets of the Estate with qualified healthcare providers, consistent with the recommendations by the PCO, and, subject to review and approval by DDD, we recommend that the Court approve the results of this auction.

24. The proposed sale of the Assets was conducted with a broad market test, in good faith, and on an arms-length basis. I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 19, 2020

*/s/ Jeffrey R. Manning*

Jeffrey R. Manning, CTP

# EXHIBIT I

| Qualified Bidders Who Participated in the CPES Auction | | | | |
|---|---|---|---|---|
| Agency Name | Prevailing Bidder | Back Up Bidder | Original DDD Awards | Current AZ Group Homes |
| ResCare Arizona, Inc. | 19 | 0 | 6 | 30 |
| RISE Services | 10 | 3 | 7 | 8 |
| CTB AZ, LLC - Stalking Horse | 8 | 6 | 0 | 6* |
| AIRES | 2 | 0 | 3 | 56 |
| Cornerstone Health Care | 0 | 0 | 1 | 2 |
| Hatch Haven, LLC | 0 | 1 | 1 | 6 |
| Preferred Health Choice | 0 | 6 | 0 | 5 |

*Subject to confirmation of recent acquisition.

ACTIVE.125317932.01

# **Exhibit II**

| Invited to Bid, Conducted Due Diligence, Chose not to Participate ||
|---|---|
| Agency Name | Original DDD Awards |
| Community Options, Inc | 14 |
| Active Friendly Care LLC | 5 |
| Advanced Supported Living Services | 5 |
| Danville Services of Arizona LLC | 3 |
| Healthy Homes LLC | 3 |
| AJ's Safe Place | 1 |
| Arizona Health Care Contract Management Services (AHCCCMS) | 1 |
| Desert Horizons Communities | 1 |
| On Angels Wings | 1 |
| Care and Dignity Services | 0 |
| Meadows Cataline | 0 |
| Pathway to Hope Homes | 0 |
| Proverbs Group Homes LLC | 0 |
| Starlink Services | 0 |
| VISIT-N-CARE dba ELEVATE OTHERS | 0 |