Jennifer C. Kalvestran - CA Bar #242157
Sean P. O'Brien - AZ Bar #010540, *Admitted Pro Hac Vice*
Robert C. Williams - AZ Bar #033213, *Admitted Pro Hac Vice*
**GUST ROSENFELD, PLC**
11900 W. Olympic Boulevard, Suite 800
Los Angeles, CA 90064
Tel: (602) 257-7460
Fax: (602) 254-4878
E-Mail: jkalvestran@gustlaw.com
E-Mail: spobrien@gustlaw.com
E-Mail: rwilliams@gustlaw.com

**RICHARDS & MOSKOWITZ PLC**

1850 North Central Avenue, Suite 2010

Phoenix, Arizona 85004

Telephone: 602-595-7800

Facsímile: 602-812-7995

E-mail: brichards@rmazlaw.com

William A. Richards – AZ Bar #013381, *Admitted Pro Hac Vice*

Attorneys for the *Arizona Department*
*of Economic Security, Division of Developmental Disabilities*

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – NORTHERN DIVISION

| | |
|---|---|
| In re: | Lead Case No. 9:20-bk-10554-DS |
| Community Provider of Enrichment Services, Inc. d/b/a/ CPES Inc., et al., | Jointly Administered With: Case No. 9:20-bk-10553-DS Case No. 9:20-bk-10994-DS |
| Debtors. | Chapter 11 |
| Movant: | **Hearing**: |
| Arizona Department of Economic Security, Division of Developmental Disabilities ("DES-DDD"). | Date:  November 3, 2020 Time:  11:30 a.m. (Pacific Time) Pace:  Via Zoom for Government Courtroom 201 United States Bankruptcy Court 1415 State Street Santa Barbara, CA 93101 |
| This Filing Applies To: | |
| Community Provider of Enrichment Services, Inc. d/b/a/ CPES Inc. et al, Debtors-In-Possession. | |

**ARIZONA DEPARTMENT OF ECONOMIC SECURITY, DIVISION OF DEVELOPMENTAL DISABILITIES' ("DES-DDD") OBJECTION TO THE SALE OF CPES AZ HOMES TO NON-DES-DDD DESIGNATED VENDORS**

**AND**

**RESPONSE AND OPPOSITION TO DECLARATION OF JEFFREY R. MANNING IN SUPPORT OF DEBTOR CPES INC.'S ASSET SALE UNDER SECTION 363 OF THE BANKRUPTCY CODE AND IN SUMMARY OF THE OCTOBER 15, 2020 AUCTION [DOC. 412]**

The Arizona Department of Economic Security, Division of Developmental Disabilities ("DES-DDD"), objects to Community Provider of Enrichment Services, Inc. d/b/a CPES Inc.'s ("CPES AZ's"):

> *Motion for Entry of (I) an Order (A) Authorizing and Approving the Debtor's Entry Into the Stalking Horse Asset Purchase Agreement, (B) Authorizing and Approving Bidding Procedures and Break-Up Fee, (C) Approving Notice Procedures, (D) Scheduling a Sale Hearing, and (E) Approving Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Determining Cure Amounts; and (II) an Order (A) Authorizing the Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; Memorandum of Points and Authorities in Support Thereof.*

**Dkt. No. 296, (the "Arizona Sale Motion").**

For all the reasons more fully set forth herein, DES-DDD respectfully urges the Court to deny CPES AZ's Arizona Sale Motion and the relief sought therein. DES-DDD's Objection is supported by DES-DDD's Notice of Motion and Motion for Relief from the Automatic Stay Under 11 U.S.C. § 362 (Action In Nonbankruptcy Forum), Dkt. No. 308; DES-DDD's earlier objection to the "Arizona Sale Motion," Dkt. No. 318; DES-DDD's Supplemental Brief in Support of DES-DDD's: (A) Motion for Relief from the Automatic Stay Under 11 U.S.C. § 362 (Action In Nonbankruptcy Forum); and (B) Objection to the Debtor's "Arizona Sale Motion," Dkt. No. 343; the Order Granting Motion for Relief from the Automatic Stay Under 11 U.S.C. § 362 (Action In Nonbankruptcy Forum), Dkt. No. 375 (the "362(b)(4) Order"); the Declaration of

Nicolette Fidel attached hereto as Exhibit "A"; the Communication Exchange with Mr. Jeffrey Manning of CohnReznick Capital attached hereto as Exhibit "B"; William Richard's Letter to Vincent Slusher attached hereto as Exhibit "C"; the Qualified Vendor Agreement, Section 6:   DES-DDD Standard Terms and Conditions with Qualified Vendors; and more generally, the DES-DDD Managed Care Contract for the Arizona Health Care Cost Containment System (AHCCCS), Arizona's Medicaid Agency; the Arizona Revised Statutes; and the Arizona Administrative Code, incorporated by this reference, together with all matters of record, and such other evidence, oral or documentary, as may be presented by DES-DDD at the November 3, 2020 hearing on the Arizona Sale Motion.

/ / /

1

# TABLE OF CONTENTS

2    TABLE OF CITATIONS .................................................................6

3    I.    The Personal Property Sales and Lease Assumptions and Assignments
          DES-DDD <u>Does Not</u> Object To ....................................................7

4

5    II.   The Personal Property Sales and Lease Assumptions and Assignments
          DES-DDD <u>Does</u> Object To  .........................................................9

6

7    III.  Neither the Court Nor DES-DDD Can, or Should, Change Any of the
          DES-DDD Qualified Vendor Designations Selected by the Members
8         to Fit the Results of the Auction ...............................................14

9          A. The Vendor Selection Process is Thorough, Carefully Designed to
             Match Members with Appropriate Qualified Vendors, and Member-
10            Directed ..............................................................................15

11         B. The Court Has No Jurisdiction to Compel Any Changes in the
             DES-DDD Designated Qualified Vendors.............................18

12

13         C. Even if the Court Had Jurisdiction, Any Actions That Would
             Require Members, or their Family and Guardians to Reconsider
             Their Qualified Vendor Selections or Force Members to Move
14            Without Good Reasons Would Violate the Federal and State Law
             and Policies Governing the Medicaid Program at Issue Here and
15            Create Substantial Risks of Harm to the Members ................21

16         D. Any Arguments About the Relative Merits of Any DES-DDD
             Designated Qualified Vendor and a Successful Bidder are Irrelevant,
17            Uninformed, Speculative and Illogical .................................24

18         E. The Stalking Horse Bidder's Arguments for Enforcement of its Bid
             for All the Lease Rights and Personal Property Across the CPES
19            Group Homes is Not Viable .................................................27

20

21   IV.   Immediate Action by the Court is Required ...............................27

22   V.    The Court Should Not Waive the Requirements of Rules 6004(h) and
          6006(d), Federal Rules of Bankruptcy Procedure .......................28

23

24   VI. Conclusion .........................................................................29

25

26

1

**APPENDICES**

2

Exhibit A.   Declaration of Nicolette Fidel.

3

Exhibit B.   Communication Exchange with Mr. Jeffrey Manning of CohnReznick
Capital.

4

5

Exhibit C.   William Richard's Letter to Vincent Slusher.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1

# TABLE OF CITATIONS

2

**Cases**

3

*Matter of Taylor,* 913 F.2d 102, 106 (3d Cir. 1990) .......................................... 19

4

*In re Aerobox Composite Structures, LLC,* 373 B.R. 135, 141 (Bankr. D.N.M. 2007).. 19

5

*In re First Prot., Inc.,* 440 B.R. 821, 832 (B.A.P. 9th Cir. 2010) ................................. 20

6

*In re XMH Corp.*, 647 F.3d 690, 695 (7th Cir. 2011) ............................................. 20

7

*In re Trump Entertainment Resorts*, 526 B.R. 116, 123 (Bankr. D. Del 2015) ............. 20

8

*In re C.W. Mining Co.*, 422 B.R. 746, 761 (B.A.P. 10th Cir. 2010), *aff'd*,
  641 F.3d 1235 (10th Cir. 2011) ................................................... 20

9

**Statutes**

10

11 U.S.C. § 365(c) ...................................................................... 19, 20

11

11 U.S.C. § 365(c)(1) ................................................................ 19, 20, 21

12

11 U.S.C. §365(e)(2)(A) .................................................................... 20

13

11 U.S.C. § 365(c)(1)(A)................................................................... 20

14

**Rules**

15

Rule 6004(h), Fed. R. Bank. P.. .................................................... 28, 29

16

Rule 6006(d), Fed. R. Bankr. P. .. ................................................ 28, 29

17

**Other Authorities**

18

3 Collier on Bankruptcy ¶ 365.07 (Richard Levin & Henry J. Sommer eds., 16th ed.). 19

19

3 Collier on Bankruptcy ¶ 365.07.*Id*. at ¶ 365.07[1][d] (Richard Levin & Henry J.
  Sommer eds., 16th ed.) ................................................................. 20

20

21

Exhibit A, Declaration of Nicolette Fidel,
  ("Decl. of Nicolette Fidel") ...................................8, 9, 10, 11, 13, 16, 22, 26

22

23

Exhibit B, Communication Exchange with Mr. Jeffrey Manning of CohnReznick
  Capital .................................................................................. 8

24

Exhibit C, William Richard's Letter to Vincent Slusher ................................. 11

25

26

1     **I.     The Personal Property Sales and Lease Assumptions and Assignments DES-**
2            **DDD <u>Does Not</u> Object To.**

3        Well before this Court had issued its October 5, 2020 Order authorizing CPES to

4 hold its October 15, 2020 virtual auction for personal property and lease rights associated

5 with its Arizona group homes, the Arizona Department of Economic Security, Division

6 of Developmental Disabilities ("DES-DDD") had executed its well-established qualified

7 vendor matching and member selection procedures to determine who would take over the

8 Medicaid-reimbursed care and service for the vulnerable, developmentally disabled DES-

9 DDD members ("Members") residing in each CPES group home. The Members and their

10 responsible family and guardians had therefore selected and approved their new qualified

11 vendors long before the October 15, 2020 virtual auction. And, based on those Member

12 selections, DES-DDD had issued service award letters telling those selected qualified

13 vendors of their designations to transition servicing of specific Members in CPES group

14 homes.

15        As CPES acknowledged, the DES-DDD designated qualified vendors had no

16 obligation to participate in the virtual auction. Instead, CPES was obligated by the

17 express terms of its Qualified Vendor Agreement ("QVA") with DES-DDD to cooperate

18 in the transition of member care to the new qualified vendors selected by the Members'

19 family and guardians. So, CPES was expected under the law and agreements governing

20 Arizona's Medicaid program for services to the developmentally disabled to assist,

21 among other things, the new designated vendors in negotiating with CPES's group home

22 landlords over the assumption and assignment of the relevant leases for the CPES group

23 homes at which each new vendor's designated Members resided. And, CPES was further

24 required to negotiate in good faith with the new DES-DDD designated qualified vendors

25 over the sale of personal property (including furnishings, equipment, consumables, and

26 vehicles) ("Personal Property") associated with those group homes. CPES has asserted

1    to DES that it has complied with those obligations and has been facilitating those separate

2    negotiations.  [Exh. A (Declaration of Nicolette Fidel), at ¶¶'s 12 and 13].

3        Still, the Court's authorization of the separate auction process and various

4    statements made to the DES-DDD designated vendors proved confusing to designated

5    vendors selected by the Members [Exh. A, at ¶ 14], and a handful of the DES-DDD

6    designated vendors participated in the virtual auction.  Some were even the highest

7    bidders for the leases and Personal Property associated with group homes whose residents

8    DES-DDD had designated them to serve.  DES-DDD has no objection to the Court

9    approving any sale of Personal Property and authorizing the assumption and assignment

10   of any leases for CPES group home locations in those specific instances where the DES-

11   DDD designated qualified vendor was the highest bidder at the virtual auction.  DES-

12   DDD would not consider approval of those sales, assumptions and assignments

13   inconsistent with the best interests of the DES-DDD Members who have selected those

14   qualified vendors for their ongoing care and service.[1]  Nor should approval of such

15   Personal Property sales and lease assignments interfere with the qualified vendor

16   selections made by the Members and their responsible family members and guardians.

17   Indeed, the approval may, in some circumstances, promote an expedited transition of

18   DES-DDD service providers for particular group home residents before CPES terminates

19   its services entirely on December 31, 2020.  The DES-DDD qualified vendors and group

20   homes that fit this category, and for which DES-DDD offers no objection to Court action

21   supporting the auction results are listed in the following Table 1.

22

23   _____

24   [1] DES-DDD bases its perceptions on confirmation provided through CPES and its
     auctioneer, Cohn Reznick Capital, that all bidders were assured of their right to try and
25   negotiate unique terms with the relevant landlords and to reject the leases if acceptable
     terms could not be reached.  [*See* Exh. B (communication exchange with Mr. Jeffrey
26   Manning of CohnReznick Capital].

**Table 1**

**Highest Bidder = DES-DDD Designated Qualified Vendor**

| DES-DDD Designated Qualified Vendor | Home # (As Designated in Auction Spreadsheet [Exh. 1 to Exh. A]) | Home Name (As Designated in Auction Spreadsheet [Exh. 1 to Exh. A]) | Home Address |
|---|---|---|---|
| ResCare | 13 | Hamilton | 1960 N. Hamilton Pl. |
| ResCare | 15 | Cactus | 1142 E. San Pedro Ave. |
| ResCare | 16 | West Monte | 1509 S. Winthrop |
| ResCare | 17 | North Palms | 614 W. Portobello Ave. |
| RISE | 20 | Hidalgo | 8132 W. Sepia Rd. |
| RISE | 21 | Casa Alegre | 110 Ocotillo St. |
| AIRES | 22 | Hobbit | 2116 E. 8th St. |
| RISE | 23 | Paradise | 660 E. 16th St. |
| RISE | 24 | Respite House | 1249 Andrea Dr. |
| RISE | 25 | Casa San Pedro | 2942 Golden Eagle Dr. |
| ResCare | 29 | Silverado 21 | 1821 E. Silver St. |
| ResCare | 33 | Montrose | 1830 W. Mountain Oak |
| RISE | 37 | Sapphire | 2600 N. Conestoga Ave. |
| RISE | 45 | Katalina | 5254 E. 5th St. |

## II. The Personal Property Sales and Lease Assumptions and Assignments DES-DDD <u>Does</u> Object To.

All other possible results from the October 15, 2020 virtual auction for each of the CPES Arizona group homes fall into one of three discrete categories:

1. The highest or back-up bidder has no approved and active QVA with DES-DDD, was not selected by any of the responsible family members or guardians as the next qualified vendor for their Member, and was not the recipient of a service award letter from DES-DDD designating the bidder as the next service provider for the Members in the group homes for which they are the highest or back-up bidder.   This was the case with CTB AZ, LLC, the so-called "Stalking Horse Bidder", which has no QVA and, despite suggestions it intends to acquire a different vendor that does have a QVA, has not obtained any approval for

1          transfer or expansion of any QVA.  [Exh. A, at ¶ 16].

2     2.  The highest or back-up bidder for a group home has a QVA with DES-DDD

3          but is not the qualified vendor carefully matched by DES-DDD and selected

4          by the Member, or their responsible family members or guardians, to provide

5          services to the Members residing in that group home, and the bidder was not

6          the recipient of the service award letter from DES-DDD for the Members in

7          that group home.   The following table identifies every group home to which

8          this scenario applies:

| Home # (As Designated in Auction Spreadsheet) | Home Name (As Designated in Auction Spreadsheet) | Home Address |
|---|---|---|
| 1 | Huntington A | 1716 W Sequoia Dr # A |
| 2 | Huntington B | 1716 W Sequoia Dr # B |
| 3 | North Haven | 3072 W. Patrick Lane |
| 4 | Quail Point Ctr | 4108 E. Coronado Rd |
| 5 | Mohria II | 916 W Saint Charles Ave |
| 6 | Lodge | 1124 E. Lodge Dr |
| 7 | Labelle | 1909 E. Carson Dr. |
| 8 | Freedom | 5255 S. Mill Ave |
| 9 | Elliotts Crossing 1017 | 6445 S. Maple # 1017 |
| 10 | West 1019 | 6445 S. Maple #1019 |
| 11 | Elliotts Crossing 1031 | 6445 S. Maple #1031 |
| 12 | Longmore | 1720 E Tulsa St |
| 14 | Hamilton | 1960 N. Hamilton Pl. |
| 18 | Shavon | 7953 E. Onza Ave. |
| 19 | Juniper | 7740 E. Olla Ave. |
| 28 | Mica | 1500 W. Nevins Dr. |
| 30 | Silverado 23 | 1823 E. Silver St. |
| 31 | Silverado 25 | 1825 E. Silver St. |
| 32 | Silverado 27 | 1827 E. Silver St. |
| 36 | 2nd St. | 2401 N. Indian Ridge Dr. |
| 41 | Landings | 4225 E. Frankfort Stra. |
| 42 | 29th St. | 4450 W. Meggan Pl. |
| 46 | Vaquero | 5612 E. Kelso St. |
| 53 | Acacia | 7921 N. Casimir Pulaski |
| 54 | Brentwood North | 3924    Quail Ave. |

3.  The virtual auction generated no bids for the lease rights and Personal Property associated with a particular group home.   These group homes are referred to hereafter as the "No Bid Homes".

If the Court were to approve any sale to a bidder in category 1 like CTB AZ, LLC, the "Stalking Horse Bidder", it would be authorizing the transfer of property used to care for vulnerable, disabled Arizonans to an entity that could not legally house, care for or service those citizens under the law, policies, and programmatic requirements applicable here. [Exh. A, at ¶ 16].  There is also no practical reason or legal justification for DES-DDD to consider terminating the designation of a different, existing and experienced qualified vendor voluntarily selected by the Member or their family and guardians who know each Member best and instead transfer responsibilities for caring for such Members to a non-authorized entity.  More specifically, DES-DDD could not legally authorize CTB AZ, LLC to provide Medicaid-reimbursable services to the Members currently in CPES's care, and DES-DDD could not authorize or make any payments of federal or state money to CTB AZ, LLC for such services.  Also, as transition of care of any Member to CTB AZ, LLC would not be lawful, the Court could not compel, or even suggest that DES-DDD consider, such an illegal act.

Moreover, in each of the categories outlined above, DES-DDD has clearly expressed to CPES that it intends generally to support and enforce the qualified vendor designations it has carefully chosen and made before the auction by the Member or their responsible family members and guardians of its vulnerable Members.  [Exh. A, at ¶¶'s 10, 11, and 17; and Exh. C, (William Richard's Letter to Mr. Vincent Slusher dated October 23, 2020)].  This would make DES-DDD's designations of the vendors for transition subject only to the normal oversight and discipline processes by which DES-DDD continuously monitors and investigates QVA holder compliance and actions to ensure the QVA holder continues to uphold the requirements of a QVA vendor and to

properly protect and serve members in compliance with the vendor's QVA and relevant law.  Thus, if the Court approved an assignment of a specific group home's lease to any bidder that is not the DES-DDD designated qualified vendor for the Members residing in that group home, the group home could no longer be used for servicing of the DES-DDD Members residing there and the assignee would lose the Members and any reimbursements from DES-DDD that previously helped cover the costs of that lease.  That makes the sale of the Personal Property and assignment of the lease an economic loss for the highest or backup bidder.  DES-DDD understands that because the bidders did not want to be forced to accept Personal Property and lease obligations that did not come with the promise of income from a DES-DDD service authorization for specific Member care, all bids were made expressly conditioned on DES-DDD somehow changing the existing qualified vendor designations to a company that was the high or backup bid on the lease and Personal Property at each group home.  Given DES-DDD's decision to support wherever appropriate the Members' and their family's and guardian's selections of qualified vendors that are not the highest or back-up bidders, CPES cannot either practically or legally force the non-DES-DDD designee highest or backup bidders to close agreements for the sale of the Personal Property and assignment of leases.

Furthermore, given DES-DDD's general decision to uphold qualified vendor selections made by Member families and guardians, the qualified vendors that might most highly value the Personal Property or lease rights may be the qualified vendors designated by DES-DDD who have been acting under specific instructions from DES-DDD that they negotiate in good faith regarding the takeover of the lease and purchase of relevant Personal Property for the CPES group homes at which their DES-DDD designated Members reside.  Thus, the Court should recognize that in the final analysis, the highest and best outcome for the CPES estate and the creditors is to have CPES continue and complete the presently ongoing negotiations outside the auction process with the DES-

1    DDD designated qualified vendors for all group homes on which a DES-DDD designated

2    bidder was not the high bidder at the auction.

3        Nor would approving any sales of Personal Property or lease assumptions and

4    assignments to non-DES-DDD designated qualified vendors be consistent with the best

5    interests of the Members if the DES-DDD designated vendors are able to retain the leases

6    and obtain the Personal Property assets through good faith negotiations with CPES and

7    the relevant landlords.    As noted by the Patient Care Ombudsman in his Emergency

8    Preliminary Report [Doc. 354], movement of Members from their current group homes

9    can have serious negative health, safety and welfare consequences for specific Members.

10   So, the Court should work to encourage conditions that allow the new qualified vendors

11   selected by the Members, wherever appropriate, to keep the Members in their current

12   homes.[2] Given the choice between (1) approving a possible sale of Personal Property and

13   assignment of a lease that has no possibility of helping the current Member residents of

14   the affected group home, or (2) allowing and encouraging continuing negotiations

15

16   ─────────────────────

17   [2] Through the negotiation processes CPES has been facilitating for the DES-DDD
     designated qualified vendors selected by the Members, DES-DDD has learned that there
18   may be some CPES group home locations that are not appropriate for lease assignment
     or property purchase by the DES-DDD designated vendors due to physical conditions that
19   pose risks to the health, safety and welfare of Members, or due to the unwillingness of
     the landlord to either continue a short-term lease or to compromise terms that make the
20   lease economically unreasonable.   In those limited cases, the DES-DDD system is
     designed to require assessment and execution on careful plans for Member transfer to a
21   different care location with the least possible disruption or risk of harm. [Exh. A, at ¶ 20].
     DES-DDD is already implementing the study and development of such contingency plans
22   for those unique circumstances where it is not appropriate or possible for the new DES-
     DDD designated qualified vendor selected by the Members to keep their assigned
23   members in their current CPES group home.  [*Id.*].   DES-DDD will continue to monitor
     and regulate vendors that the Members have selected to ensure that they remain
24   appropriate and properly comply with the Members' rights and needs and fulfill their
25   obligations to DES-DDD.
26

between CPES, its landlords and the DES-DDD qualified vendors already selected by member families and guardians, the Court should encourage the latter in the best interests of the Members.

For all the foregoing reasons, DES-DDD objects to the approval by the Court of sales of Personal Property or lease assumptions and assignments to entities other than the appropriate DES-DDD designated vendors selected by the Members.  And, DES-DDD respectfully recommends that the Court instead encourage the expedited conclusion of negotiations among CPES, its landlords and those DES-DDD designated vendors selected by the Members.  The necessity for a truly expedited conclusion of such negotiations for the Member's health and safety is explained further below.

**III.    Neither the Court Nor DES-DDD Can, or Should, Change Any of the DES-DDD Qualified Vendor Designations Selected by the Members Just to Fit the Results of the Auction.**

It is possible that the Stalking Horse Bidder – CTB AZ, LLC - or another of the high or back-up bidders might argue that the Court should or must order DES-DDD to consider changing its qualified vendor designations in favor of the high auction bidders. However, the detailed, careful and time-intensive efforts made by DES-DDD's expert and experienced member care officials and the caring family and guardians of its Members to identify and designate well-matched qualified vendors for the Members cannot and should not be disturbed.  Instead, it must be supported and encouraged by this Court's orders because:

1. As already determined in the Court's Order granting DES-DDD's Motion for Stay Relief [Doc. 375], the qualified vendor designation process is a matter of DES-DDD's exclusive police and regulatory powers delegated to DES-DDD by federal and state law;

2. The DES-DDD service award letters were issued only upon approval and selection of the new qualified vendors by the Member or by their responsible

family members and guardians who, by law, have the final say over who provides the Members' Medicaid-reimbursed services and who are not even parties here whose decisions the Court could suspend, second guess, or redirect;

3. Any suggestion to DES-DDD that it must or should reject the selections already carefully made by the Member or their family members and guardians responsible for the vulnerable Members' welfare and force them to instead reconsider their decisions to try and fit the virtual auction results puts dollars for the bankrupt vendor (CPES AZ) who has already let them down above the Member-choice care imperatives of the Arizona Medicaid process; and

4. Any argument by either CPES, its auctioneer, or any highest or back up bidder that the qualified vendors selected by the Member, or their families and guardians are less adequate caregivers for the DES-DDD Members than the auction's high or backup bidders is grossly uninformed, unjustifiable speculation, and illogical given that CPES's failure itself proves that bigger is often not better, but often riskier when it comes to caregiving in Medicaid programs.  And, such arguments plainly ignore that some of the highest bidders had already pitched themselves to the Member, and their family and guardians of Members whose homes the bidder bid on but had not been selected by those Members, or their family members and guardians.

   A.    **The Vendor Selection Process is Thorough, Carefully Designed to Match Members with Appropriate Qualified Vendors, and Member-Directed.**

The well-established member-driven selection process set up by DES-DDD when it needs to transfer services to a new qualified vendor is a highly detailed inquiry about the exact needs and conditions of the Members being served in the group homes and the qualifications, experience, size, resources and reliability of the qualified vendors who

express interest and capacity to serve new members.  [Exh. A, at ¶¶'s 3-4].  This is why the statements in Mr. Manning's declaration [Doc. 412 at ¶ 8, ¶ 10, ¶ 17] are misinformed and misleading.  Mr. Manning suggests that DES-DDD had some obligation to consider allowing "new vendors" not previously approved by DES-DDD to provide DES-DDD Medicaid services into the DES-DDD system to accommodate CPES and Mr. Manning's firm.  He also suggests that DES-DDD somehow acted irresponsibly or sowed confusion by following its member matching and member-directed selection process for the new vendors who would have to take over the care of DES-DDD members CPES is serving.  But the DES-DDD process is a well-established process incorporated into DES-DDD's police and regulatory powers, with transition cooperation obligations undertaken expressly by CPES as part of its QVA with DES-DDD.

DES-DDD commenced and completed its member matching and vendor selection process, with DES-DDD member families and guardians having selected the new vendors for their Members, long before CPES conducted its auction.  [Exh. A, at ¶ 6].  It was the order placing the auction process in the path of the standard DES-DDD transitions process that created unnecessary confusion that has delayed critical steps in the care transition process.  Mr. Manning's suggestions that somehow DES-DDD failed to cooperate as it should have or created confusion are not accurate.

A more detailed understanding of the process for DES-DDD qualified vendor matching and member selections of their new vendors will help the Court understand the options it faces today.  Through its case management staff and using its established service planning processes, each member is assessed each 90 days by DES-DDD to determine the exact physical and psychological conditions, disabilities, health issues, treatment and service needs, enrichment needs, and behavioral challenges, risks and triggers of each member residing in a CPES group home.  [*Id.*].  DES-DDD also placed a "Vendor Call" to interested, existing qualified vendors with capacity, ability and willingness to undertake

1    services for the Members being served by CPES AZ and CPES AZ expressly consented

2    to the Vendor Call. [*Id.* at ¶ 7].

3            The qualified vendors who responded to the Vendor Call were then assessed to see

4    that they met the qualifications outlined in the Vendor Call which are needed to

5    appropriately and safely perform the unique critical care needs of those Members whose

6    servicing they were interested in. [*Id.* at ¶ 8]. Then, to encourage and facilitate an

7    informed selection by Members, or their family and guardians of the most appropriate

8    vendors for the Members they are responsible for, DES-DDD afforded all potentially

9    appropriate, capable, and qualified vendors who had answered the Vendor Call the

10   opportunity to present their qualifications, advantages, service model, and portfolio of

11   services to the Members' guardians/family. [*Id.* at ¶ 9]. At that point, the Members, and

12   their guardians/family carefully selected which qualified vendor the family or guardians

13   believed would be the most appropriate fit for each Member's care. [*Id.* at ¶ 10]. Based

14   upon those selections, DES-DDD then issued service award letters to the selected

15   qualified vendors chosen by the Members. [*Id.* at ¶ 11]. This well-established transition

16   process employed exacting procedures needed to best protect the health, safety and

17   welfare of the vulnerable Members, to avoid any disruption to the Members' daily lives,

18   routines and care, and to do so with contracted, properly experienced and legally

19   committed qualified vendors accountable to the Members, their family and guardians, the

20   government and the public.

21           All of the bidders at CPES's virtual auction were or should have been aware that

22   this detailed matching and member selection process had already taken place. After all,

23   all but one of the bidders (CTB AZ, LLC) were active QVA holders who received the

24   Vendor Call, and several of them had been designated by DES-DDD as the new qualified

25   vendor for certain Members residing in specific CPES group homes. Thus, any entity

26   that bid at the virtual auction on a group home or homes for which they were not the

1    designated DES-DDD qualified vendor knew that a different qualified vendor had already

2    become the selected choice of the family and guardians of Members in those group

3    homes.  They knew they would not close any agreement reflected by those high or backup

4    bids without the Member, family and guardian selections being entirely upended, and they

5    knew neither they, the bidders, nor the Court could require that disruption of Member

6    choice.

7          **B.**    **The Court Has No Jurisdiction to Compel Any Changes in the DES-**

8                  **DDD Designated Qualified Vendors.**

9            CPES AZ's auction process upends the careful Member-selected process and

10    denies DES-DDD its legal authority and responsibility to ensure that its QVA system

11    works as designed and as required by federal and state law. But more importantly,

12    allowing the sale of CPES group homes and placement of DES-DDD Members to the

13    highest bidders denies the Members' guardians/parents the right to choose which trained,

14    experienced qualified vendor they specifically want for each Member to assure the unique

15    care and protection the Member requires.

16            DES-DDD has participated in these bankruptcy proceedings to protect the health,

17    safety and wellness of its vulnerable adult Members as required by its legal

18    responsibilities.  But the Members themselves and their guardians/families have not

19    appeared nor participated in these bankruptcy proceedings.  The Court has already agreed

20    in its ruling on DES-DDD's Motion for Stay Relief [Doc. 375] that it has no authority

21    under the bankruptcy statutes or rules to interfere with the qualified vendor healthcare

22    choices of the Members and their families and guardians who are not joined in these

23    proceedings.

24            More specifically, while the lot auctions conducted at the October 15, 2020 virtual

25    auction did not include CPES AZ's qualified vendor agreement and ADHS licenses (and

26    no one bid at the virtual auction on the entirety of the assets of CPES AZ), to the extent

1    CPES AZ seeks a sale of its operations as a going concern and, therefore, the CPES AZ

2    qualified vender agreement and ADHS licenses, 11 U.S.C. § 365(c)(1) precludes the

3    assumption and assignment of an executory contract if applicable non-bankruptcy law

4    excuses the other party from accepting performance or rendering performance to an entity

5    other than the Debtor or the Debtor-in-Possession, whether or not the contract or lease

6    prohibits or restricts assignment.  In relevant part, 11 U.S.C. § 365(c) provides:

7           The trustee [debtor-in-possession] may not assume or assign any executory
            contract or unexpired lease of the debtor, whether or not such contract or
8           lease prohibits or restricts assignment of rights or delegation of duties, if—
            (1)(A) applicable law excuses a party, other than the debtor, to such contract
9           or lease from accepting performance from or rendering performance to an
            entity other than the debtor or the debtor in possession, whether or not such
10          contract or lease prohibits or restricts assignment of rights or delegation of
            duties; and
11

12          (B) such party does not consent to such assumption or assignment . . .

13   "When an executory contract is based upon the provision of personal services or skills,

14   or upon personal trust or confidence, or otherwise requires the debtor's performance

15   rather than any substitute performance, the trustee [debtor-in-possession] has traditionally

16   been unable to assume or assign the rights of the debtor in such contracts."  3 Collier on

17   Bankruptcy ¶ 365.07 (Richard Levin & Henry J. Sommer eds., 16th ed.).

18          It is clear that contracts for personal services fall within (c)(1)(A), since
            "applicable law" excuses the parties from accepting performance from, or
19          rendering performance to, non-signatories.  Thus, § 365(a) permits a trustee
            to *assume or reject* any executory contract, but § 365(c) adds the limitation
20          that a trustee may not *assume or assign* an executory contract for personal
            services unless the parties consent.
21
     *Matter of Taylor*, 913 F.2d 102, 106 (3d Cir. 1990).
22

23          "[T]he limitation contained in § 365(c)(1) is aimed at protecting non-debtor parties

24   to personal services contracts from being forced to accept service from or render service

25   to an entity other than the entity with whom it originally contracted.  *In re Aerobox*

26   *Composite Structures, LLC*, 373 B.R. 135, 141 (Bankr. D.N.M. 2007).  Sections 11

1    U.S.C. §§ 365(c)(1) and (e)(2)(A) "were designed 'to protect non-debtor third parties

2    whose rights may be prejudiced by having a contract performed by an entity other than

3    the one with which they originally contracted.'" *In re First Prot., Inc.*, 440 B.R. 821, 832

4    (B.A.P. 9th Cir. 2010) (citations omitted).

5          The intent of 11 U.S.C. § 365(c):

6          was to relieve the non-debtor party to the contract from having to deal with
           a party other than the debtor in situations in which, under non-bankruptcy
7          law, the non-debor party would be relieved of any obligation to continue such
           dealings.  The thought was that the non-debtor party contracted for the
8          personal attention of the debtor or for a relationship with the debtor, not a
           third-party trustee.

9

10   3 Collier on Bankruptcy ¶ 365.07.*Id.* at ¶ 365.07[1][d] (Richard Levin & Henry J.

11   Sommer eds., 16th ed.).

12         More, under 11 U.S.C. § 365(c)(1)(A) an executory contract may not be assumed

13   or assigned if applicable non-bankruptcy law excuses non-debtor performance—whether

14   or not the contract restricts assignment.  Applicable non-bankruptcy law means any law

15   applicable to a contract, other than bankruptcy law. *In re XMH Corp.*, 647 F.3d 690, 695

16   (7th Cir. 2011); *In re Trump Entertainment Resorts*, 526 B.R. 116, 123 (Bankr. D. Del

17   2015).  Therefore, if CPES AZ's DES-DDD QVA and Group Home Licenses cannot be

18   assigned under applicable non-bankruptcy law, they may not be assumed and assigned by

19   CPES AZ to CTB AZ, LLC or any other potential buyer of all assets of CPES AZ.  Here,

20   that is exactly the case because "the identity of the contracting party is crucial to the

21   contract or public safety at issue." *In re C.W. Mining Co.*, 422 B.R. 746, 761 (B.A.P.

22   10th Cir. 2010), *aff'd*, 641 F.3d 1235 (10th Cir. 2011) (citations omitted) (emphasis

23   added).

24         The goal of § 365(c)(1) is to 'protect non-debtor third parties whose rights
           may be prejudiced by having a contract performed by an entity other than the
25         one with which it originally contracted, but the exception is limited to cases
           where non-bankruptcy law so states.' As such, for § 365(c)(1) to apply, the
26         applicable law 'must specifically state that the contracting party is excused

from accepting performance from a third party under circumstances where it is clear from the statute that the identity of the contracting party is crucial to the contract or public safety is at issue.' The determination of whether a particular contract fits within § 365(c)(1) will generally depend on the 'sui generis attributes of the performance.' *Id.* (citations omitted).

Here CPES AZ's QVA and Group Home Licenses are unquestionably based on the personal needs of the DES-DDD members and therefore cannot be assigned and assumed as part of any sale of substantially all of CPES AZ's assets.

Nor does the Court have any jurisdiction over the DES-DDD actions which involve DES-DDD's exclusive police and regulatory powers. If a Member's guardian were dissatisfied with a qualified vendor recommended or designated by DES-DDD the guardian might apply to a different type of court to possibly enforce the guardian's superior rights to select the servicing vendor. However, a stranger to that relationship like CPES, its bidders or its auctioneer have no standing at all to question or demand court interference with DES-DDD's reasoned exercise of its police and regulatory powers.

**C.    Even if the Court Had Jurisdiction, Any Actions That Would Require the Members or Their Family and Guardians to Reconsider Their Qualified Vendor Selections or Force Members to Move Without Good Reason Would Violate the Federal and State Law and Policies Governing the Medicaid Program at Issue Here and Create Substantial Risks of Harm to the Members.**

Even if this Court could find that it had the appropriate jurisdiction to force, direct or encourage changes in the qualified vendor selections that Members' families and guardians have made for them, the Court should not approve the auction sale outcome in favor of vendors who had not been selected as service providers by the Member, or their family and guardians. First, it is clear that the highest or backup bidders each intended their bids as a vehicle for obtaining authorizations from DES-DDD to service the Members residing in the CPES group homes on which they bid.[3]   And the bidders who

---

[3] DES-DDD communications with the bidders who have QVAs with DES-DDD indicate that some bidders were confused that the virtual auction process might supersede the

1    actually have a QVA with DES-DDD knew of and had the opportunity to participate fully

2    in the member matching and selection process.  If they were not the follow-on qualified

3    vendor selected for the Members at a particular group home they know that is because

4    they did not adequately convey or prove their interest, capacity or care services to DES-

5    DDD and the Members' families and guardians.

6        Bidder ResCare demonstrates this concept.  ResCare responded to the Vendor Call

7    and sought consideration as the new qualified vendor for all Members in the CPES group

8    homes.  But, while families or guardians of various Members being serviced by CPES

9    did select ResCare, many others did not, despite ResCare having the opportunity to

10    specifically demonstrate its value and reliability to them and their members.  [Exh. A, at

11    ¶ 18].  If the Court were to approve Personal Property sales and lease assignments to

12    ResCare for group homes whose Members had purposefully not selected ResCare as the

13    next qualified vendor it would not only have to ignore and undermine the Member choices

14    but would be rewarding a vendor about whom the Court, DES-DDD and the Member

15    families and guardians could now have substantial suspicions.

16        After all, by continuing to pursue a bid in hopes of pressuring the Member

17    families or guardians or DES-DDD into a different qualified vendor selection they would

18    _____

19    member-directed selections and were bidding to hedge against losing their designations.

20    [Exh. A, at ¶ 14-15].  And, some bidders may have been bidding in hopes that DES-DDD
      might force member families and guardians to reconsider their selections based on the

21    virtual auction process.  DES-DDD would be acting irresponsibly and in violation of its
      obligations to facilitate and honor member-driven vendor selections if it did so, and has

22    made it clear it will not do that.  [Exh. A, at ¶¶'s 10, 11, and 17; and Exh. C].  DES-DDD

23    also understands that with this post-auction clarity some or all of the bidders that have
      DES-DDD QVAs do not intend to close any agreements associated with their bids on

24    group homes that serve Members such bidders have not been designated by DES-DDD
      and the Members' families and guardians to serve.  DES-DDD offers its comments here

25    on any QVA-holding bidders that might, to DES-DDD's surprise, demand enforcement

26    of their high bids.

1   be simply affirming their disinterest in complying with the careful DES-DDD Medicaid

2   procedures.  The interest of any qualified vendor in ignoring processes they know have

3   been carefully structured to meet the requirements of federal and state law, to ensure

4   maximum protection of the health and safety of the vulnerable Members, and to honor

5   the Member choice that is the fundamental policy of the Arizona Medicaid program

6   demonstrates they are improperly motivated by financial gain and dismissive of member

7   care and protection.  It also logically calls into serious question any such vendors'

8   willingness to comply with the myriad other laws, regulations, rules, policies and contract

9   terms governing the QVA process for the robust protection of the Members.  Putting the

10  Member families and guardians in a position where they would need to consider changing

11  their vendor care selection to an entity that was not their first choice and has now put

12  income interests ahead of its legal responsibilities to place Member care and protection

13  as its absolute foremost duty would be a jarring, insulting and fearful rejection of the legal

14  rights of the Members and their guardians.  Such action by the Court would not only

15  immediately create distress among those closest to the Members, but would allow the

16  Members and their care to be used as a pawn in a purely economic strategy.  The Court

17  has no jurisdiction to encourage such harm and risks to Members, and in fact would be

18  directly violating both DES-DDD's rights and police and regulatory powers and the rights

19  and powers of the Members, their families and guardians.

20      DES-DDD assures every stakeholder in its network of critical care service

21  providers, including CPES and the qualified vendors who participated in the virtual

22  auction, that its Members as well as the qualified vendor selection process is never for

23  sale. DES-DDD also assures its Members and their guardians/families that it will never

24  subject Members to the disruption, emotional distress and insult of putting them through

25  the careful and thoughtful vendor selection process only to later pull the rug out from

26  under the Member guardian's deliberate selections of responsible vendors just because

1    some other vendor decided to "out-bid" the uniquely matched and experienced qualified

2    vendor the Member guardian/parent had consciously selected.  DES-DDD has elected,

3    therefore, to press forward with member service transition without any sort of wholesale

4    reversal of the qualified vendor designations made by the Members.

5        Given this, if the Court were to authorize Personal Property sales or lease

6    assignments to non-DES-DDD designated vendors, the selected qualified vendors for all

7    the Members in the affected group homes would need to immediately seek to move the

8    Members elsewhere.  The Patient Care Ombudsman has already alerted the Court to the

9    healthcare disaster that such wholesale moves of Members for no good reason could

10   cause.  Thus, the DES-DDD legal obligations and Member rights create a stark choice for

11   the Court if it is faced with any demands for approval by bidders who are not the DES-

12   DDD designated qualified vendors chosen by the Members– either opt to reject the

13   auction process and encourage completion of CPES's negotiations with the DES-DDD

14   designated qualified vendors or force the move of potentially dozens of Members for no

15   reason other than obtaining the relatively small assured payments promised by the high

16   bids.   The Court should consider the Member healthcare needs and find it in the highest

17   and best option here to be: (1) ordering that CPES may complete transactions for Personal

18   Property and lease assignments with DES-DDD designated qualified vendors in Table 1

19   above that were the highest bidders for group homes whose Members they have been

20   designated by DES-DDD to serve; and (2) directing that as to all other Arizona group

21   homes CPES proceed with the separate negotiations with the relevant DES-DDD

22   designated qualified vendors that can result in agreements that keep DES-DDD members

23   in their current group home environments.

24       **D. Any Arguments About the Relative Merits of Any DES-DDD Designated**
         **Qualified Vendor Chosen by the Member and a Successful Bidder are**
25       **Irrelevant, Uninformed, Speculative and Illogical.**

26       CPES, its auctioneer and perhaps others may argue that somehow the DES-DDD

1    designated qualified vendors chosen by the Members are less qualified or desirable for

2    the Members than the bidders at the auction.  However, there are several flaws with that

3    argument.

4        First, it makes no difference here because the Court cannot compel the family

5    members and guardians who selected the DES-DDD designated qualified vendors to

6    reconsider their decisions.  As noted above, they are not even parties to this proceeding

7    and the Court has no jurisdiction over them.  Moreover, to do so would violate the rights

8    of the Members and their guardians, as well as DES-DDD's exclusive police and

9    regulatory powers. And, it would place vulnerable Members at unacceptable risk of harm.

10       Second, any arguments about the relative capacity, responsibility and quality of

11   care of the qualified vendors must be left to the regulatory oversight and determination of

12   the DES-DDD officials who are experts in such issues and legally charged with enforcing

13   qualify of care and member choice standards.  DES-DDD undertakes continuous and

14   ongoing monitoring of such factors and the Court can trust that DES-DDD will address

15   any instances in which it may suspect a designated vendor is not sufficiently responsible,

16   capable or compliant with its legal obligations.   Neither the Court, CPES, its auctioneer,

17   or any other entity outside DES-DDD is either qualified to make such comparisons among

18   vendors, and none of them can demonstrate they have actual, verifiable data that somehow

19   demonstrates a particular vendor is not appropriate for care of particular Members.  Again,

20   those determinations are unequivocally delegated by law to DES-DDD.

21       Any arguments about the qualifications or reliability or even the financial

22   responsibility of the DES-DDD designated vendors are also uninformed. Those

23   arguments, like that contained in Mr. Manning's declaration [Doc. 412] are rank

24   speculation which do not offer insights into any particulars concerning the experience,

25   personnel, resources, training programs, supervisory systems, financial resources or

26   operational models for the DES-DDD designated qualified vendors *or* the bidders that

1    Mr. Manning and perhaps others may argue are more qualified. The Court has no factual

2    basis on which to make any comparison of the relative merits of the vendors, or any

3    standards or factors by which such relative merits should be weighed.

4        Moreover, any insistence that the DES-DDD designated vendors are somehow

5    dangerously inferior to the bidders who just happened to prevail at the virtual auction

6    unjustifiably insults the astuteness, care and consideration exercised by both DES-DDD

7    member care and compliance specialists along with the Members' family and guardians

8    who were directly involved in the DES-DDD matching and selection process. [*See* Exh.

9    A, at ¶¶'s 10, 11 and 17].

10        Such arguments are also illogical. The most compelling evidence the Court has

11    right now is the situation CPES finds itself in. CPES was obviously a large, outwardly

12    successful vendor that amassed large operations and responsibilities within the DES-

13    DDD network. Yet, it abjectly failed financially and has left the Members it was supposed

14    to serve precariously in danger of losing care entirely and of suffering a variety of traumas

15    caused by employee departures, physical moves, or moves mandated by Member

16    guardians who may reasonably fear leaving their Members in CPES's care any longer

17    given its imminent demise. CPES proves that bigger is not always better, but can in fact

18    be more dangerous. A larger entity has larger financial responsibilities and can more

19    easily be impacted by small decreases in income. In light of CPES's failure of the

20    Members, it is dubious for anyone to claim that DES-DDD should always look to the

21    largest vendor with the highest expense demands. Thus, DES-DDD asks this Court to

22    acknowledge the fallacy of the notion that it takes a vendor of a particular financial or

23    administrative size to provide proper care for the DES-DDD Members or that any of the

24    high or backup bidders might be better suited for care of the Members just because they

25    claim some undefined level of greater "sophistication" or financial wherewithal.

26    / / /

**E.  The Stalking Horse Bidder's Arguments for Enforcement of its Bid for All the Lease Rights and Personal Property Across the CPES Group Homes is Not Viable.**

DES-DDD understands that CPES will argue the Stalking Horse Bidder waived its claim to have made a valid and binding bid for all the lease and Personal Property assets associated with the CPES Arizona group homes.  After all, the total bid value exceeded the amount of the Stalking Horse Bidder's bid for all the lease and Personal Property assets and the Stalking Horse Bidder (CTB AZ, LLC) failed to bid any higher.  DES-DDD expects that CPES will assert that per the terms of the auction the Stalking Horse Bidder waived and lost any rights to claim a bid for the total Arizona group home assets.  DES-DDD agrees with and supports that analysis.

DES-DDD reiterates, however, that irrespective of CTB AZ, LLC's waiver, CTB AZ, LLC could never be considered by DES-DDD or the Members and their families and guardians as an appropriate vendor to take over any care at the CEPS group homes.  CTB AZ, LLC has no QVA with DES-DDD and has never operated as a qualified vendor for DES-DDD services.

## IV.     Immediate Action by the Court is Required.

Substantial logistical efforts are involved in transitioning the care of DES-DDD Members from CPES to other selected qualified vendors, not the least of which is arrangement of the new licenses for the group homes that must be issued by the Arizona Department of Health Services – an entirely separate state agency – and provider approvals that must be obtained from Arizona's state Medicaid agency – the Arizona Health Care Cost Containment System.  The new vendors must also arrange appropriate employment relationships with the group home direct caregivers, CPES AZ employees, and must arrange for all appropriate levels of insurance to satisfy minimum DES-DDD requirements and landlord requirements.  All these things take time, which DES-DDD and its Members now have precious little of.

1    CPES has affirmed to DES-DDD its intent to stop all caregiving services in the

2    Arizona group homes by December 31, 2020, and has told DES-DDD that it will no

3    longer have liability or other insurance after that date.  That creates the real prospect that

4    total vendor service termination is just around the corner.  The extensions and confusions

5    created by the CPES virtual auction process have already made it dubious that full

6    transitions of care can be accomplished in time in the CPES group homes.  DES-DDD

7    and the Members and their families and guardians need the Court to move as quickly as

8    possible, decide all issues raised by the virtual auction, and order no later than November

9    3rd that CPES move with all deliberate speed to complete the negotiations and transition

10   processes with qualified vendors selected by the Member guardians and families and

11   designated by DES-DDD.

12   But the Court must also set up procedures to allow for continuation of service by

13   CPES beyond December 31, 2020 if those processes cannot be completed in time.

14   Member protection demands this, and DES-DDD is willing to work with CPES and the

15   Court to find appropriate solutions.

16
17   **V.    The Court Should Not Waive the Requirements of Rules 6004(h) and 6006(d), Federal Rules of Bankruptcy Procedure.**

18   The Debtor, not CTB AZ, LLC in the Asset Purchase Agreement, seeks waiver of

19   the 14-day day of an order authorizing the use, sale, or lease of property under Rule

20   6004(h), Fed. R. Bank. P., and the 14-day stay of an order authorizing the assignment of

21   a contract or unexpired lease under Rule 6006(d), Fed. R. Bankr. P.

22   Rule 6004(h) states that:

23   (h) *Stay of Order Authorizing, Use, Sale or Lease of Property*.  An order
     authorizing the use, sale, or lease of property other than cash collateral is
24   stayed until the expiration of 14 days after entry of the order, unless the court
     orders otherwise.

25

26   / / /

1  Rule 6006(d) states that:

2  (d) *Stay of Order Authorizing Assignment*.  An order authorizing the trustee
3  to assign an executory contract or unexpired lease under § 365(f) is stayed
   until the expiration of 14 days after the entry of the order, unless the court
4  orders otherwise.

5      Waiver of Rules 6004(h) and 6006(d) is not necessary and would severely impede

6  DES-DDD's appeal rights—in additional to the appeal rights of any other interested party.

7  The Debtor even admits that "[t]he purpose of Bankruptcy Rules 6004(h) and 6006(d) is

8  to provide sufficient time for an objecting party to appeal before an order can be

9  implemented." Dkt. No. 296 at 40, 14–15 (citation omitted).  The Debtor further cites

10 *Collier on Bankruptcy* for the proposition that "the 14-day stay period should be

11 eliminated to allow a sale or other transaction to close immediately 'where there has been

12 no objection to the procedure" and "if an objection is filed and overruled, and the objecting

13 party informs the court of its intent to appeal, the stay may be reduced to the amount of

14 time actually necessary to file such appeal."  Dkt. No. 296 at 296, 18–23, *citing Collier*

15 *on Bankruptcy*, ¶ 6004.11 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).  Here, an

16 objection has been filed and the Court should, therefore, not waive the 14-day stay

17 provisions of Rules 6004(h) and 6006(d).  To the extent that the Court overrules DES-

18 DDD's objection, DES-DDD asserts that, due to the extremely complex nature of this

19 matter, the full 14-day appeal window is necessary and an appropriate amount of time for

20 DES-DDD to lodge a Notice of Appeal.

21 **VI.    Conclusion.**

22      DES-DDD has no objection to the Court approving the sales of Personal Property

23 and the assumption and assignment of leases based on the bids listed in Table 1 above.

24 However, as to all other bids (high and backup) received at the auction, and as to any

25 argument by CTB AZ, LLC that it may still have some right to claim the entire set of

26 CPES leases and Personal Property, the sales urged would not legally tie in any way to,

1    or assure, the continued care in the CPES group homes of the Members.  The designation

2    of qualified vendors is a matter of Member-directed choice which has already been

3    exercised and should be honored consistent with the law that commands it.  Plus, the facts

4    plainly demonstrate that the Member best interests here would be to take steps to assure

5    that in attempting to sell the lease rights and Personal Property for the group homes in

6    Arizona, the process encourages negotiation with the DES-DDD vendors that have

7    already been approved and selected by the Members' responsible family members and

8    guardians.  To encourage those negotiations, the Court must deny any further approval of

9    sales through the auction bids to any non-DES-DDD-designated vendors that were not

10   previously chosen by the members.

11          The Court must also require that CPES cooperate with DES-DDD in the best

12   interests of the Members CPES serves and develop a continuity of services plan that will

13   allow for the servicing and protection of the Members even if CPES is unable to fully

14   transition all Members in CPES's care by December 31, 2020 as previously planned.

15          Respectfully submitted this 28th day of October, 2020.

16                                    **GUST ROSENFELD P.L.C.**

17                                    By: */s/ Séan P. O'Brien - 010540*
                                          Jennifer C. Kalvestran - CA Bar #242157
18                                        Séan P. O'Brien - AZ Bar #010540
                                          *Admitted Pro Hac Vice*
19                                        Robert C. Williams - AZ Bar #033213
                                          *Admitted Pro Hac Vice*
20
                                      **RICHARDS & MOSKOWITZ PLC**
21
                                          */s/ William A. Richards - 013381*
22                                        William A. Richards- AZ Bar #013381
                                          *Admitted Pro Hac Vice*
23                                        1850 N. Central Avenue, Suite 2010
24                                        Phoenix, Arizona 85004

25                                    ***Attorneys for the Arizona Department***
                                      ***of Economic Security, Division of***
26                                    ***Developmental Disabilities***