# EXHIBIT C



William Richards
brichards@rmazlaw.com

Shayna Stuart
sstuart@rmazlaw.com

October 23, 2020

**VIA ELECTRONIC MAIL**

Vincent Slusher
vince.slusher@faegredrinker.com
FAEGRE DRINKER BIDDLE & REATH LLP
1800 Century Park East, Suite 1500
Los Angeles, CA 90067

Re: COMMUNITY PROVIDER OF ENRICHMENT SERVICES, INC. D/B/A CPES INC., ET AL., U.S. Bankruptcy Court, Central District of California – Northern Division, Case No. 9:20-bk-10554-DS

Dear Vince:

I write on behalf of the Arizona Department of Economic Security, Division of Developmental Disabilities (DES-DDD) to provide notice to your client Community Provider of Enrichment Services, Inc. D/B/A CPES Inc. (CPES) that DES-DDD has elected to continue and support the service award letters issued by DES-DDD to various qualified vendor providers of services previously designated by DES-DDD to transition Medicaid services for eligible DES-DDD members residing in group homes managed by CPES. It is DES-DDD's mission and responsibility to support member choice, and the awarded vendors were selected by members and guardians. This means DES-DDD does *not* intend to reconsider the award letters it has issued to qualified vendors chosen by the members, or to designate different qualified vendors, based solely on the bids submitted at the virtual auction CPES held this week.

**Group Homes Where Entity Other Than DES-DDD Designated Qualified Vendor Was a Bidder**

More specifically, regarding group homes for which CPES received highest or back-up bids during the virtual auction from an entity other than the qualified vendor to which DES-DDD had previously issued a service award letter, DES-DDD does not approve of any transfer of services for members being serviced by CPES to any vendor other than the vendors that previously

October 23, 2020
Page 2

received a service award letter from DES-DDD, and only then consistent with all necessary transition requirements. The group homes relevant to this decision are:

| Home # (As Designated in Auction Spreadsheet) | Home Name (As Designated in Auction Spreadsheet) | Home Address |
|---|---|---|
| 1 | Huntington A | 1716 W Sequoia Dr # A |
| 2 | Huntington B | 1716 W Sequoia Dr # B |
| 3 | North Haven | 3072 W. Patrick Lane |
| 4 | Quail Point Ctr | 4108 E. Coronado Rd |
| 5 | Mohria II | 916 W Saint Charles Ave |
| 6 | Lodge | 1124 E. Lodge Dr |
| 7 | Labelle | 1909 E. Carson Dr. |
| 8 | Freedom | 5255 S. Mill Ave |
| 9 | Elliotts Crossing 1017 | 6445 S. Maple # 1017 |
| 10 | West 1019 | 6445 S. Maple #1019 |
| 11 | Elliotts Crossing 1031 | 6445 S. Maple #1031 |
| 12 | Longmore | 1720 E Tulsa St |
| 14 | Hamilton | 1960 N. Hamilton Pl. |
| 18 | Shavon | 7953 E. Onza Ave. |
| 19 | Juniper | 7740 E. Olla Ave. |
| 28 | Mica | 1500 W. Nevins Dr. |
| 30 | Silverado 23 | 1823 E. Silver St. |
| 31 | Silverado 25 | 1825 E. Silver St. |
| 32 | Silverado 27 | 1827 E. Silver St. |
| 36 | 2nd St. | 2401 N. Indian Ridge Dr. |
| 41 | Landings | 4225 E. Frankfort Stra. |
| 42 | 29th St. | 4450 W. Meggan Pl. |
| 46 | Vaquero | 5612 E. Kelso St. |
| 53 | Acacia | 7921 N. Casimir Pulaski |
| 54 | Brentwood North | 3924 W. Quail Ave. |
|  |  |  |

DES-DDD understands from commitments made on the record by CPES's sales agent and auctioneer at the virtual auction that a condition precedent to any of the bids (the highest bids or any back-up bids) being binding on the bidders or capable of being accepted by CPES was DES-DDD approval of the bidder and designation of them for service of the DES-DDD members residing in the home(s) on which the bid was made. Consequently, DES-DDD understands that CPES has no binding bids for assignment of the group home leases and sale of the personal property associated with the group home leases for the properties listed in the table above. DES-DDD further understands from our prior conversations with you and your team that CPES would not seek authorization from the Bankruptcy Court to accept any of the bids received at the virtual auction associated with the above-listed homes due to the unmet conditions to the bids being binding. And, therefore, DES-DDD understands that CPES does not intend to proceed with any

October 23, 2020
Page 3

assignment of any lease or sale of personal property associated with such group homes to any of the bidders at the virtual auction, and instead that CPES will continue to facilitate negotiations between the relevant landlords for those group home properties and the relevant qualified vendors designated by DES-DDD and will further proceed with negotiations between CPES and those DES-DDD designated vendors regarding any such vendors' interest in acquiring personal property associated with the group homes.

**Group Homes on Which No Bid Was Received**

As for those CPES group home locations for which no bid was received at the virtual auction, DES-DDD again intends to proceed with and support DES-DDD qualified vendors who received service award letters concerning the members residing at those homes. DES-DDD does not intend to change its awards or to consider termination of such awards and issuance of alternative awards to any entity that may claim to have bid on the entire set of CPES group home leases and associated personal property. In fact, DES-DDD recalls that at the virtual auction, the stalking horse bidder had an opportunity to provide and other potential bidders had an opportunity to bid on the entire set of CPES group home leases and personal property but elected not to. What's more, DES-DDD understands that any offer by the stalking horse bidder or by any other entity for the entire set of leases and personal property would be contingent on DES-DDD approval of the assignments and sale and DES-DDD's termination of its qualified vendor designations for transition of services to members residing in such group homes. None of those contingencies has or will occur here. Therefore, DES-DDD asserts that CPES has no viable bid in connection with the group home properties for which no separate bids were received, and that CPES would have no basis to recommend to the Court any assignment of leases connected to such properties or sale of personal property associated with such group homes to any entities other than the DES-DDD designated vendors that may provide offers for such assignments or property sales. DES-DDD expects that CPES will continue to facilitate prompt and meaningful negotiations between the qualified vendors designated by DES-DDD for members in these "no bid" homes and the relevant landlords, and negotiations with such vendors concerning sales of any personal property associated with the relevant homes.

**Group Homes on Which DES-DDD Designated Qualified Vendors Submitted Highest Bid**

As for those CPES group homes for which the highest bidder was identical to the qualified vendor DES-DDD had issued a service award letter to concerning the members residing at the home, DES-DDD expects to approve of CPES selling the personal property subject to such bids to the DES-DDD designated vendors and seeking the authorization of the Bankruptcy Court to assume and assign the relevant leases in favor of those vendors, with the only caveat being that DES-DDD cannot and does not waive or limit any objections DES-DDD or such vendors may have to the auction process or the terms of the bids. DES-DDD encourages CPES to move forward immediately and not await the November 3rd hearing date. In the event that any highest or back-up bidders who were also DES-DDD designated vendors for members residing in the same locations might successfully object to the enforceability of their bid, DES-DDD nevertheless intends to maintain and support the designations and service award letters it has made and expects

October 23, 2020
Page 4

that CPES will continue to promptly and meaningfully negotiate in good faith with such vendors regarding sales of relevant personal property and to facilitate negotiations between such vendors and the relevant landlords regarding assignment of the leases.

**Additional Considerations**

DES-DDD is not obligated to express here the entire extent of its reasons for the decisions and notifications expressed in this letter.

However, it bears noting that the DES-DDD designations were made through a well-established process of which all the bidders at the virtual auction were or should have been aware. In that process DES issued a vendor call to interested, existing qualified vendors with capacity, ability and willingness to undertake services for the members being served by CPES. Though many DES-DDD qualified vendors answered the vendor call and participated in the vendor matching and selection process that followed, many did not. A qualified vendor who intentionally decided not to respond to the vendor call knowingly waived their right to be considered or participate, but more so indicated they did not have the capacity, ability and/or willingness to serve as the new vendor for members in the care of CPES. As the highest priority and responsibility of DES-DDD and the qualified vendors under law, regulation and existing policies and qualified vendor agreement terms is the protection of the health, safety and welfare of the members, it would be unreasonable for DES-DDD or the member guardians to consider a vendor who purposefully elected not to answer the vendor call for the specific members at issue.

CPES can understand also why those responsible for member care and safety like DES-DDD and the member guardians would not consider it necessary, appropriate or safe to now consider vendors who refused to responsibly participate in the member matching and member selection process, and instead decided to circumvent that process by simply submitting a bid at an auction and then claiming the right to obtain service authorization for the members. That also would reasonably appear to members, their guardians, the qualified vendor community, federal officials regulating the Medicaid program under which DES-DDD operates and the Arizona public in general that the DES-DDD Medicaid system for persons with developmental disabilities encourages the auctioning of members and forcing members and their guardians to consider and select a vendor who did not participate in the process they were legally and contractually bound to but was willing to pay more to the outgoing vendor who had proven itself financially incapable of providing the needed services. DES-DDD assures CPES and every other stakeholder in this critical care process that its members and the vendor selection process is never for sale and DES-DDD will never subject members or their caring families or guardians to the disruption, emotional distress and insult of putting them through a careful and thoughtful vendor selection process only to pull the rug out from under the member guardian's deliberate selections of responsible vendors just because some other vendor decided to "outbid" the uniquely matched and experienced qualified vendor the member guardian had consciously selected.

DES-DDD also notes that some of the highest or back-up bidders at the virtual auction *did* participate in the member matching and member selection process, but were *not* selected to provide

October 23, 2020
Page 5

services by the member guardians despite having the opportunity to present themselves to the member guardians and make their case for being selected. One example is ResCare which responded to the vendor call requesting consideration in all DES-DDD regions in which CPES operates. That means ResCare was able to be considered by the member guardians before the member guardians made the selections that resulted in the DES-DDD award letters. For those locations on which ResCare (or any similarly situated entity) bid but was not selected as the new provider by the member guardians, the notion that DES-DDD would now reverse course, tell the member guardians their selection decisions were no longer valid or enforceable, and that they should consider ResCare (or a different highest or back-up bidder) instead would mean telling many member guardians that their active and thoughtful choice was irrelevant and must be reconsidered. That contradicts entirely the member-directed system which DES-DDD is legally required to operate in the interests of the members, their family and their appointed guardians. This example is not intended to reflect adversely on ResCare, which was selected for service by many member guardians at multiple different group home locations. But it aptly reflects how misinformed, illegal and harmful it is to suggest that DES-DDD should now withdraw its awards and force member guardians to consider the highest or back-up bidders they had not selected.

DES-DDD respects and acknowledges that you and your client have acknowledged consistently that DES-DDD cannot award any services to an entity that does not have a valid qualified vendor agreement. So DES-DDD is confident CPES also appreciates that suggestions that DES-DDD expand significantly the scope of services offered by any other vendor just to accommodate the bid process forces on the DES-DDD Medicaid system extra-legal conditions that violate the established legal processes and can severely endanger members whose follow-on qualified vendor service providers have been identified by a careful, well-established member need matching and guardian selection process that involved careful analysis and interaction with DES-DDD care specialists, member guardians and family members, and even CPES officials who were able to provide substantial information about the individual member care needs.

Finally, DES-DDD understands that law and regulations governing the confidentiality of personal health information about DES-DDD members restricted the bidders from obtaining through the auction process complete information about the specific member needs at each location. As CPES understands from its years of running group home locations, a myriad of factors relevant to the service needs of each particular member and each particular group of members at a multi-member group home must be considered by a vendor in determining whether they are even qualified and capable, long-term, of providing the services to any particular member or group of members. DES-DDD therefore has real concerns whether all the bidders were even able to adequately determine whether servicing particular members or groups of members at homes they were bidding on might put the bidders in untenable situations that may require them to follow CPES's path into financial failure and abandonment of the members. We are confident CPES and others will understand the numerous critical member safety issues created by the bidding process.

DES-DDD also asks that CPES consider the fallacy of the notion that it takes a vendor of a particular financial or administrative size to provide proper care for the DES-DDD members or that any of the bidders might be better suited for care of the members than the DES-DDD

October 23, 2020
Page 6

designated qualified vendors just because they claim some undefined level of greater "sophistication" or financial wherewithal. The current situation CPES and the members it serves find themselves in provides the best evidence that size and supposed "sophistication" do not guarantee either business success of service success. Indeed, as CPES's situation proves, the larger the vendor is the higher are their competing financial obligations and priorities that can cause the vendor to divert funds intended for member care to other issues, understaff homes, underpay service care providers in violation of legal requirements, or impose other expanding debt and creditor pressures that endanger a large segment of members and leave them vulnerable to business shut-downs and care transitions. Any suggestions that DES-DDD should consider bidders just because they have higher gross revenue streams or manage more group homes than another qualified vendor ignores the legal and executed commitment of DES-DDD to carefully help their members and their guardians select the most stable, protective and enriching environments possible. And, it unfoundedly insults the astuteness, care and consideration exercised by family and public fiduciary guardians who were directly involved in the DES-DDD matching and selection process.

There are many other justifications we could elaborate for DES-DDD's decisions to not approve or consent to changing its decisions to issue award letters to qualified vendors chosen by member guardians, and to not require member guardians to consider selection of different vendors just because they happened to be the highest bidders at the CPES auction. But DES-DDD trusts that given CPES's extensive knowledge of member care and protection issues, the relevant Medicaid law and regulations, and the terms of the DES-DDD qualified vendor agreement program, CPES will respect DES-DDD decisions and take all appropriate cooperative actions to help DES-DDD and the vendors it designated carry out the established process and properly and promptly ensure transitions that protect the health, safety and welfare of all members currently in CPES group homes.

Please let me know if you have any questions.

Sincerely,

William A. Richards
For the Firm