1

**FAEGRE DRINKER BIDDLE & REATH LLP**
JEREMY M. PELPHREY (CA Bar # 249862)

2

Jeremy.Pelphrey@faegredrinker.com
RYAN M. SALZMAN (CA Bar #299923)

3

Ryan.Salzman@faegredrinker.com
1800 Century Park East, Suite 1500

4

Los Angeles, CA  90067
Telephone:      (310) 203-4000

5

Facsimile:      (310) 229-1285
*Counsel for the Debtors and Debtors in Possession*

6

7

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA – NORTHERN DIVISION**

8

| | |
|---|---|
| In re: | Lead Case No. 9:20-bk-10554-DS |
| Community Provider of Enrichment Services, Inc. d/b/a CPES Inc., et al., EIN: 86-0804057 | Jointly Administered With: Case No. 9:20-bk-10553-DS |
| Novelles Developmental Services, Inc. EIN: 27-5174435 | Case No. 9:20-bk-10994-DS |
| CPES California, Inc. EIN: 27-2315212 | Chapter 11 Cases |
| Debtors. | **DEBTOR'S REPLY IN SUPPORT OF THE SALE MOTION AND IN RESPONSE TO THE DES-DDD'S OBJECTION** |
| [] Affects All California Debtors | **RELATED DOCKET NOS. 296, 386, 398, 399, 407, 412, 425** |
| [•] Community Provider of Enrichment Services, Inc. d/b/a CPES Inc. [ ] Novelles Developmental Services, Inc. [ ] CPES California, Inc. | |
| Debtors and Debtors in Possession | |

9

10

11

12

13

14

15

16

17

18

19

20

Community Provider of Enrichment Services, Inc. d/b/a CPES Inc. (the "Debtor" or

21

"CPES"), by and through its undersigned counsel, submits this Reply in support of the Debtor's

22

*Motion for Entry of (I) an Order (A) Authorizing and Approving the Debtor's Entry Into the*

23

*Stalking Horse Asset Purchase Agreement, (B) Authorizing and Approving Bidding Procedures*

24

*and Break-Up Fee, (C) Approving Notice Procedures, (D) Scheduling a Sale Hearing, and (E)*

25

*Approving Procedures for Assumption and Assignment of Certain Executory Contracts and*

26

*Unexpired Leases and Determining Cure Amounts; and (II) an Order (A) Authorizing the Sale of*

27

*Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and*

28

*Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and*

1  *Unexpired Leases* [Docket No. 296] (the "Sale Motion") and in response to the *Arizona*

2  *Department of Economic Security, Division of Developmental Disabilities' ("DES-DDD")*

3  *Objection to the Sale of CPES AZ Homes to Non-DES-DDD Designated Vendors and Response*

4  *and Opposition to Declaration of Jeffrey R. Manning in Support of Debtor CPES Inc.'s Asset*

5  *Sale Under Section 363 of the Bankruptcy Code and in Summary of the October 15, 2020 Auction*

6  *[Doc. 412]* [Docket No. 425] (the "DES-DDD Objection").

7  **I.  PRELIMINARY STATEMENT**

8          The DES-DDD Objection is rife with gross mischaracterizations of the facts.  Since the

9  very early stages of these chapter 11 cases the DES-DDD has refused to engage with the Debtor

10  in meaningful discussions regarding the marriage of their preferred transition process with the

11  Debtor's pending bankruptcy case and the requirements of the bankruptcy that would need to be

12  followed to implement the transition of services from the debtor in order for members to avoid

13  forced relocation and maintain the comfort of their current surroundings.  To the extent DES-

14  DDD is now concerned about timing, that is an issue directly caused by DES-DDD's refusal to

15  communicate with (or even respond to) the Debtor for months.   The Sale Motion was filed on

16  September 4, 2020.  The Debtor requested an early October sale hearing.  As a result of litigation

17  filed by DES-DDD in response and opposition to Sale Motion, including their objection [Docket

18  No. 360] to the proposed sale hearing date in the original lodged bidding procedures order

19  requesting a later hearing date, the sale hearing was ultimately scheduled for November 3, 2020.

20          As reflected in the Debtor's *Notice of Auction Results* filed on October 19, 2020 [Docket

21  No. 413], the Debtor held an auction on October 15, 2020 (the "Auction").  Prior to the Auction,

22  the Debtor received Qualifying Bids from six additional Qualified Bidders in addition to the all-

23  assets Stalking Horse Bid from CTB AZ, LLC (as such terms as defined in the Bidding

24  Procedures Order, Docket No. 386).  At the Auction, the Debtor received individual bids for

25  many of its locations, the sum of which ($518,000) exceeded the Stalking Horse Bid; however, as

26  discussed further below, DES-DDD has since informed the Debtor in no uncertain terms that

27  DES-DDD is unwilling to amend its designated vendors (even though this may result in members

28  having to move to a new home).

FAEGRE DRINKER
BIDDLE & REATH LLP
ATTORNEYS AT LAW

1    Accordingly, the Debtor is left with no choice but to ask the Court to approve the results

2    of the Auction only to the extent the winning bidder is consistent with the DES-DDD's

3    designated vendor.  In all other instances where bids were received, the DES/DDD has refused to

4    approve otherwise approved vendors who were high bidders.  For the locations where the winning

5    bidder at the Auction was not the DES-DDD designated vendor are different, and the locations

6    that received no individual bids at the Auction, the Debtor seeks approval to assume and assign

7    the lease and transfer personal property to the respective DES-DDD awarded vendor, to the extent

8    each such vendor agrees.

9    As the total value of the property to be transferred to each DES-DDD designated vendor is

10    in most cases within the limits established by the *Order Granting Motion of the Debtors Pursuant*

11    *to 11 U.S.C. Sections 105(a), 363, and 554 and Fed. R. Bankr. P. 2002, 6004, 6007, and 9006*

12    *Establishing De Minimis Asset Sale Procedures* [Docket No. 159] (the "De Minimis Asset Sale

13    Procedures Order"), the Debtor respectfully requests authorization to proceed under those

14    procedures where appropriate.  With respect to the transactions that exceed the $100,000 cap set

15    by the De Minimis Asset Sale Procedures Order, the Debtor respectfully requests that the court

16    enter a sale order approving those transfers.

17    **II. RELEVANT BACKGROUND**

18    In an attempt to correct the extensive misstatements and misrepresentations in the DES-

19    DDD Objection, the Debtor has prepared a detailed outline of the relevant events and

20    communications over the past several months.

21    **A.  Debtor's Negotiations with DES-DDD**

22    As an initial matter, the DES-DDD's statement that "CPES AZ expressly consented to the

23    [June 8, 2020] Vendor Call" (DES-DDD Obj., p. 17:2) is a gross exaggeration of what the Debtor

24    actually consented to.  Shortly after the second day hearings in this case, and the initial status

25    conference held in this case on June 1, 2020, DES-DDD counsel contacted Debtor's counsel

26    seeking permission for the DES-DDD to send an email to various vendors advising that the

27    Debtor's services were going to be transitioned to a new provider.  The Debtor approved sending

28    the initial email and asked to see a copy of the email.  To date, the Debtor has only received a

1    copy of such correspondence in the form of the redacted exhibit to DES-DDD's Supplemental

2    Brief filed on September 18, 2020 [Docket No. 343].

3        The Debtor became aware in early June 2020 that DES-DDD and CPES staff members

4    were having meetings about certain details of the transition from CPES to other providers.  On

5    June 18, 2020, Debtor's counsel reached out to DES-DDD's counsel advising that the Debtor was

6    receiving expressions of interest from various third parties and requested a meeting to discuss the

7    process in its entirety, including obtaining bankruptcy court approval for the transfer and

8    transition to new operators. The Debtor's and DES-DDD's respective counsel had a discussion

9    regarding these issues on June 22, 2020, where it appeared the parties were moving in the same

10    direction.

11        Yet on June 24, 2020, Debtor's counsel notified DES-DDD counsel that the Debtor had

12    received a slide deck that indicated DES-DDD was acting entirely without consideration for the

13    bankruptcy court's approval process.

14        The Debtor further advised DES-DDD on July 1, 2020, that the Debtor had several

15    sophisticated, qualified, and well-financed parties that showed interest in substantially all of the

16    Debtor's ongoing group home operations, and that those parties were concerned that DES-DDD

17    was undertaking a process that was potentially harmful to the bankruptcy estate.  The Debtor also

18    advised DES-DDD that it remained committed to working with DES-DDD to accomplish the

19    transition of the Debtor's operations to best serve its current members, and urged that cooperation

20    between the parties was the best way to accomplish their objectives. Thereafter, on July 7, 2020,

21    the Debtor provided DES-DDD with a list of entities actively engaged in diligence in the Debtor's

22    data room and requested a call to discuss next steps.

23        On July 14, 2020, the Debtor contacted DES-DDD with concerns over reports that the

24    DES-DDD had scheduled a Town Hall meeting for July 21 and invited member guardians to

25    discuss transition issues. The Debtor expressed its concerns about the meeting and specifically

26    reminded DES-DDD counsel of the need for the bankruptcy court's approval of the transition

27    (and steps to implement the transition process).

28        The same day, DES-DDD counsel, Debtor's counsel, and the Debtor's investment banker,

FAEGRE DRINKER
BIDDLE & REATH LLP
ATTORNEYS AT LAW

- 4 -

Jeff Manning, of CohnReznick Capital, had a call to discuss the marketing process currently underway.  Mr. Manning's team pulled together a designated data room to give DES-DDD background information on prospective providers.  At the same time, the Debtor provided DES-DDD a list of parties interested in taking over the Debtor's services.  On July 15, 2020, Mr. Manning followed up with DES-DDD about accessing the data room.  The Debtor believes that DES-DDD did not attempt to access the data room until October 21, 2020.

On July 27, 2020, the Debtor, DES-DDD, and their respective professionals had a call to discuss several issues, including the marketing process in general and that the Debtor had identified a potential stalking horse bidder, CTB AZ, LLC.  Two days later, on July 29, Mr. Manning provided DES-DDD documentation regarding CTB AZ, LLC's qualified vendor agreement ("QVA").  At the time the information was provided Mr. Manning requested a response from DES-DDD as to the submitted qualifications of CTB AZ, LLC.

On August 17, 2020, the Debtor learned through CTB AZ, LLC that the DES-DDD was working to find replacement homes for all of the Debtor's members, and that DES-DDD had represented to CTB AZ, LLC that it was in the dark regarding the Debtor working with the qualified vendor on an agreement for an orderly transition of services.  Until learning this information, the Debtor had been operating under the assumption that DES-DDD was actively considering CTB AZ, LLC as a potential counterparty for an orderly transition to a new operator.  Despite the Debtor's repeated reminders that bankruptcy court approval would be required before finalizing a transition, DES-DDD continued to pursue its own process with no regard for the pending bankruptcy of the Debtor.

### B.  Debtor's Negotiations with Vendors

On October 2, 2020, DES-DDD issued award notices to 12 selected vendors notifying those vendors that they had been awarded members who were resident in CPES homes.  The DES-DDD scheduled an initial virtual meeting with those 12 vendors on October 7, 2020, to kick off their "transition "process".  Debtor and Debtor's counsel were invited to and attended that virtual meeting.  The very next day, October 8, 2020, in an effort to assist with the transition and ensure the smoothest transition possible, the Debtor designated one of its attorneys and a CPES

1   company representative to coordinate with each vendor who received an award from DDD to

2   service the members at the current CPES homes.  Each vendor was provided contact information

3   for CPES' attorney and CPES' designated representative, including cell phone numbers.  In the

4   first days following the October 7 kick-off meeting Debtor's representatives arranged with the 12

5   vendors for site visits at the CPES homes relating to each award.  Following site visits, these

6   same debtor representatives facilitated negotiations with each landlord of each CPES home.

7   Based on the number of calls and emails received over the last three weeks, it would be hard for

8   anyone to argue anything other than that CPES was cooperative and proactive in assisting

9   vendors with the transition.  CPES' correspondence with vendors over the last four weeks

10  regarding various transition issues includes, but was not limited to, lease negotiations, the

11  purchase of inventory, interest in vehicles, and staff information.  Either in response to a vendor's

12  request, or on its own volition, CPES provided staff information to each vendor over the course of

13  the last three weeks. CPES continues to coordinate with each vendor and provide staff

14  information on a daily basis.  In addition to corresponding with vendors, CPES has been in

15  correspondence with various property owners on a daily basis.  Although it is likely impossible to

16  capture the number of calls and emails that were exchanged between CPES' representatives and

17  the various vendors and landlords, below is a summary of CPES' correspondence with the

18  vendors and property owners regarding the transition process.

19          Community Options

20          CPES began communicating with Community Options on October , 2020.  During its call

21  on October 15, Community Options advised it was planning to move the members in all of the

22  CapGrow homes because they did not approve of the current lease terms.  After speaking with

23  CPES' representatives, Community Options agreed to negotiate the leases with Cap Grow.  CPES

24  has spoken to a representative from Community Options regarding transition issues 11 of the last

25  13 days (including weekends).  This correspondence includes communications with the vendor,

26  its attorney, calls with property owners and various email correspondence.  CPES has continued

27  to facilitate and participate in lease negotiations with RISE and CapGrow on almost a daily basis.

28          RISE

1    CPES began communicating with RISE on October 5, 2020.  CPES had a follow up call

2    with vendor on October 22, 2020, regarding outstanding transition issues.  Vendor requested

3    and/or inquired about employee information, vehicle information, securing insurance on the

4    home, inventory, utility records and maintenance records.  CPES has continued to facilitate and

5    participate in lease negotiations with RISE and CapGrow.  A follow up call between RISE and

6    CapGrow was scheduled for October 29, 2020.

7    ResCare

8    CPES began communicating with ResCare starting the week of October 12, 2020.  On

9    October 19, CPES communicated with ResCare regarding site inspections and employee

10    information.  On October 23, CPES communicated with vendor award of HPD homes.  CPES

11    reached a resolution regarding a resolution of the HPD homes and began providing staff

12    information immediately.

13    Active Friendly Care

14    CPES began communicating with Active Friendly Care on October 6, 2020.  On October

15    14, CPES had a call with vendor regarding property leases and transition issues.  CPES also

16    corresponded with one of the property owners to initiate lease negotiations.  On October 15,

17    CPES had a follow up call with vendor regarding transition issues.  On October 19, 20, and 21

18    CPES scheduled calls with Active Friendly Care and all of the property owners at play with this

19    vendor.  On October 22, CPES communicated with vendor regarding its request to communicate

20    with guardians via virtual means.  On October 26, CPES participated in a call with Active

21    Friendly Care and CapGrow regarding transition of leases to Active Friendly Care.  CPES was

22    advised on October 28 that Active Friendly Care's representative handling the transition was no

23    longer with the company.  CPES immediately reached out to Active Friendly Care to coordinate

24    transition issues with a new representative.  On October 29, 2020, CPES communicated with

25    Active Friendly Care regarding outstanding transition issues.

26    The Debtor has also been advised that two landlords at locations where members were

27    awarded by DES-DDD to Active Friendly Care have serious concerns about Active Friendly

28    Care's ability to provide adequate assurance of future performance under the leases.  Apparently,

1   Active Friendly Care is start up entity with no operating history and no financial statements or

2   other evidence of ability to perform under the leases.  Active Friendly Care was awarded

3   members at 5 CPES locations.  Three of those locations are under leases with CapGrow, and

4   CapGrow is one of the two landlords questioning adequate assurance. ResCare and CTB were the

5   high bidders on these locations at the Auction.  In addition to these concerns, the Debtor

6   understands that there has been a management shakeup at Active Friendly Care and the person

7   who was the point person on all discussions regarding transition issues is no longer with the

8   company.  The Debtor believes that DES-DDD has been advised of this development as

9   well.  The Debtor's attempts to reach someone else at Active Friendly Care to address transition

10   issues have met with no success.

11        Advanced Support Living

12        CPES began communicating with Advanced Support Living on October 8, 2020.  On

13   October 15, CPES and vendor participated in a call to discuss transition issues.  During the call,

14   the vendor advised that would prefer to start fresh somewhere else and it had no interest in

15   obtaining the vehicles located at the property.  After some discussion with CPES' representatives,

16   vendor expressed a willingness to speak with property owners.  On October 20, 2020, CPES

17   communicated with Advanced Supportive Living regarding vendor's request to negotiate leases.

18   CPES coordinated discussions and calls with property owners over the next four days and was in

19   contact with vendor eight days straight regarding transition issues.  On October 26, CPES had

20   follow up discussions with vendor regarding the purchase of inventory and the vehicle lease.  On

21   October 27, CPES participated in a call with CapGrow (the landlord) and vendor regarding lease

22   negotiations.  CPES was again in correspondence with vendor regarding the purchase of CPES

23   inventory.  On October 28 and 29, CPES was in correspondence with vendor regarding lease

24   negotiations and finalizing the purchase of inventory.

25        Healthy Homes

26        CPES began communicating with Healthy Homes the week of October 12, 2020. On

27   October 19, CPES had a call with vendor to discuss various transition issues. Vendor started by

28   informing the CPES representatives that it was advised by DDD that it had no obligation to move

1   forward with CPES assets so they were just going to move the members to new locations.  After

2   some discussion, vendor indicated a willingness to consider staying in the homes, taking over the

3   leases and purchasing the inventory.  The same day, CPES had a call with La Estancia apartment

4   regarding transition of the leases.  On October 21, CPES scheduled a call with vendor and

5   CapGrow to discuss transition of the CapGrow leases.  On October 26, CPES had a follow up call

6   with La Estancia apartments.  La Estancia agreed to the assignment of both leases.  On October

7   29, vendor and CapGrow had a call regarding lease negotiations.  CPES followed up with Healthy

8   Homes numerous times the same day.

9       Danville Services

10      CPES began communicating with Danville Services the week of October 12, 2020.  On

11  October 15, 2020, CPES had a call with Danville to discuss various transition issues.  On October

12  21, CPES reached out to vendor to schedule a call with CapGrow to discuss the transition of

13  certain leases.  On October 22, CPES received a call from Danville Services in response to

14  CapGrow's request adequate assurance.  Danville advised it was not able to afford the level of

15  insurance coverage required by CapGrow.  During the call, CPES also discussed Danville's

16  interest in the inventory and vehicles at various locations.  Danville advised it was busy over the

17  next week and not able to discuss transition issues until October 29.  As such, CPES scheduled a

18  follow up call for October 29.

19      On October 23, 2020, CPES had a call with CapGrow to discuss Danville's inability to

20  secure the required amount of umbrella insurance coverage.  CapGrow advised its lender did not

21  permit them to go below $2 million in coverage.  The week of October 25, CPES and Danville

22  exchanged correspondence regarding the collection of staff information.  On October 29, CPES

23  had a follow up call with vendor and property owner.  At this point, lease negotiations with

24  CapGrow came to a halt, as an agreement was not reached regarding insurance coverage.

25      Danville was awarded the members at 3 locations but has been unable to arrange site visits

26  for any of the 3 locations and has indicated they are not able to do so until the first week of

27  November.  CPES understands that Danville intends to relocate all of the members that DES-

28  DDD awarded them and has shared this information with DES-DDD.

1

Aires

2      CPES began communicating with Aires on October 8, 2020.  On October 12, 2020, CPES

3  had a call with Aires to discuss various transition issues.  Aires advised of certain issues it had

4  with the leases and its intent for each of the homes.  CPES and Aires had various correspondence

5  over the next week related to these issues.  On October 21, 2020, CPES scheduled a call between

6  Aires and CapGrow.  On October 22, 2020, Aires advised it was available for a call on October

7  26 or 27.  At the same time, Aires stated they were only interested in negotiating leases and two

8  of the three homes at issue.  CPES scheduled a call with CapGrow and Aires on October 26,

9  which went forth as planned.  On October 27 and 28, CPES followed up with Aires regarding the

10  inventory and vehicles at the homes in which they were purchasing the leases.  CPES reached an

11  agreement with Aires regarding inventory and vehicles on October 28.  On October 29, CPES and

12  Aires exchanged correspondence regarding the status of negotiations on the CapGrow leases.

13

Desert Horizon

14      CPES began communicating with Desert Horizons on October 5, 2020.  On October 15,

15  2020, CPES had a call with Desert Horizon to discuss transition issues.  During the initial call,

16  Desert Horizons requested staff information, indicated its intent was to move from North West

17  side of town, it was not interested in assuming a vehicle lease and that it was interested in

18  purchasing inventory from CPES.  On October 22, 2020, CPES received a call from Desert

19  Horizons requesting a chance to visit with the members.  CPES offered a virtual inspection to

20  accommodate Desert Horizons request and protect the members' health in light of COVID.  On

21  October 26, 2020, CPES had a follow up call with Desert Horizons discuss the property lease,

22  purchase of inventory and staff information.  Desert Horizons agreed to take the lease under

23  current terms.  Desert Horizons and CPES also exchanged correspondence regarding staff

24  information.  On October 29, 2020, CPES reached an agreement with Desert Horizons on the

25  lease and purchase of inventory.

26

Hatch Haven

27      CPES began communicating with Hatch Haven the week of October 12, 2020.  During its

28  call with Hatch Haven on October 21, 2020, Hatch Haven advised CPES it was prepared to move

forward with the lease under the current terms, offered to purchase the inventory, and expressed interest in purchasing the vehicle.  CPES also agreed to coordinate an inspection of the property and provide staff information.

On October 28, 2020, in response to an email sent to Hatch Haven regarding staff information, CPES was advised that Hatch Haven was not participating in CPES transition.  CPES followed up with DES-DDD on October 29, 2020, regarding this representation but has received no response.  CPES is now under the impression that Hatch Haven is planning to move the members to a different location.

AHCCMS

CPES began communicating with AHCCMS the week of October 12, 2020.  CPES had a call with AHCCMS on October 15, 2020, to discuss various transition issues.  After discussing AHCCMS' interest in the property lease, purchase of inventory and vehicles leases, CPES set a follow up call to discuss resolution of these transactions.  On October 21, 2020, CPES and AHCCMS had a follow up call and CPES scheduled a call with the property owner to discuss transition of the lease.  On October 22, 2020, CPES participated in a call between AHCCMS and property regarding lease negotiations.  AHCCMS and the property owner agreed to the assignment of the lease with the current lease terms.  CPES also provided AHCCMS information regarding the inventory and vehicle at the property.  CPES and AHCCMS reached an agreement regarding the purchase of inventory and transition of the vehicle the following day.  CPES has been in constant correspondence with AHCCMS regarding staff information.

On Angel's Wings

CPES began communicating with On Angel's Wings on October 5, 2020.  CPES had a call with On Angel's Wings on October 14, 2020, to discuss various transition issues.  On the call, Angel's Wings indicated it was not interested in the vehicle lease.  On October 19, 2020, CPES had a follow up call with On Angel's Wings to discuss outstanding transition issues.  On Angel's Wings advised that it was interested in both leases and its intent was to stay in both homes.  On October 21, 2020, CPES corresponded with On Angel's Wings regarding scheduling call with Cap Grow to discuss transition of the lease.  On October 22, 2020, CPES participated in

1    a call with On Angel's Wings and the property owner for the other home in which On Angel's

2    Wings was planning to take over the lease.  On Angel's Wings would like to enter a four year

3    lease and follow up call was scheduled for October 26 to discuss the proposed modification.  On

4    October 26, 2020, On Angel's Wings advised CPES it was willing to take on the CapGrow lease

5    under the current terms.  On Angel's Wings began the process of collecting adequate assurance

6    for CapGrow.  CPES followed up on the collection of adequate assurance on October 29, 2020.

7    CPES also inquired about finalizing the lease with the other property owner.

8        <u>AJ's Safe Place</u>

9        CPES began communicating with AJ's Safe Place the week of October 12, 2020.  CPES

10    had a call with AJ's Safe Place on October 15 to discuss various transition issues.  After

11    discussing AJ's Safe Place's interest in the property lease, purchase of inventory and vehicles

12    leases, CPES set a follow up call to discuss resolution of these transactions.  After hearing

13    nothing from AJ's Safe Place, CPES sent an email on October 22 and October 27 requesting a

14    status update.  On October 28, 2020, CPES had a follow up call with AJ's Safe Place on leases,

15    inventory and vehicles.  AJ's Safe Place is only interested in the property lease.

16        <u>Cornerstone</u>

17        CPES began communicating with Cornerstone the week of October 12, 2020.  CPES had

18    an initial call with Cornerstone on October 19, 2020, to discuss various transition issues.  During

19    a follow up call on October 23, 2020, Cornerstone advised it was planning to move the members

20    to a different home.  After some discussion, on October 23, 2020, Cornerstone advised it was

21    planning to continue the lease under the current terms. CPES and Cornerstone discussed purchase

22    of inventory and the collection of staff information.  Cornerstone is not interested in the vehicle.

23    The lease assignment was confirmed with property owner on October 29, 2020.

24        <u>Vema Corp</u>

25        CPES began communicating with Vema Corp the week of October 12, 2020.  CPES had

26    an initial call with Vema Corp on October 15, 2020, to discuss various transition issues.  At this

27    time, Vema Corp advised it was interested in the current property and vehicle lease and it was

28    considering the purchase of CPES inventory.  On October 16, 2020, CPES had a conversation

1    with La Estancia apartments regarding the transition of the lease.  CPES and La Estancia were in

2    correspondence over the course of several days and La Estancia advised it was good with the

3    transition on October 19, 2020.  On October 23, 2020, CPES had a follow up call with Vema

4    Corp.  On the call, Vema requested additional staff and vehicle information and advised it was

5    performing an inspection the following week.  Vema requested a minor modification to lease

6    related to pets being permitted at property.  On October 24, 2020, CPES spoke with the property

7    owner regarding the requested lease modification and was advised that a pet was permitted on the

8    property.  On October 25, 2020, CPES coordinated a call between Vema and the property owner

9    to discuss transition of the property.  On October 26, 2020, the call took place as scheduled and

10    an agreement was finalized to transition lease under the current terms.  CPES and Vema reached

11    an agreement the same day regarding the purchase of CPES inventory.

12    In their objection DES-DDD directly state and/or infer that CPES did not engage in

13    communications with vendors until shortly before the Auction.  As the above narrative clearly

14    establishes nothing could be further from the truth.   The Auction was scheduled for October 15,

15    2020.  The DES-DDD award letters were sent out on October 2, 2020, and the kick-off meeting

16    was held on October 7, 2020.  Immediately thereafter, the two CPES-designated parties began to

17    have substantive discussions with each and every vendor.  Communications regarding the

18    Auction were handled exclusively by the Debtor's Investment Banker Mr. Manning.  All other

19    communications with vendors by anyone other than Mr. Manning had nothing to do with the

20    Auction.  Rather, in every case these many and detailed conversations and communications

21    involved transition issues facing each vendor who had received an award from DES-DDD.  So

22    while the period of time between the kick-off meeting on October 7 and the Auction on October

23    15 is not lengthy period of time, the Debtor wasted none of it before initiating discussions with

24    vendors.

25    **III.  ADDITIONAL BIDDER ISSUES AND TRANSITION-RELATED MATTERS**

26    **A.  Mr. Manning's Declaration**

27    On October 19, 2020 the Debtor caused to be filed the Declaration of Jeffery Manning in

28    which declaration Mr. Manning relates the events leading up to and concluding with a description

of the Auction and its results.  Apparently, DES-DDD had taken exception to certain of Mr.

Manning's statements in his declaration.  Mr. Manning is an extremely experienced investment

banker and has been representing debtors and other parties in extremely complicated bankruptcy

cases for over 35 years.  CohnReznick Capital is a highly respected Investment Banking firm.

The qualifications of both CohnReznick Capital and Mr. Manning were presented to this court

when approval of their employment was sought by the Debtor and obtained.  No matter how

many times DES-DDD pettily refer to Mr. Manning as an "auctioneer" his investment banking

credentials are not subject to legitimate challenge.  His opinions regarding the events leading up

to the sale process, the sale process itself, and the aftermath of the Auction are based upon his

personal participation in numerous meetings and discussions with the parties implicated as well as

conducting the Auction.  They are further based upon his broad and extensive experience in

managing section 363 sales in bankruptcy cases.  The concerns he expressed about certain DES-

DDD selected vendors ability to satisfy adequate assurance standards were (i) qualified by the

factors he identified in the Declaration; and (ii) have in certain cases been borne out by the

ensuing transition process.  While DES-DDD may disagree with Mr. Manning's conclusions he is

entitled to disagree with the DES-DDD as well.

**B.  Bidder Confusion**

To the extent there was any bidder confusion, it was almost certainly caused by DES-

DDD.  Since August, CohnReznick Capital has received questions from landlords asking for

guidance, and potential new providers were told by DES-DDD to contact landlords to renegotiate

leases.  This despite the fact that there are current leases for these same properties which are

assets of this estate,

**C.  DES-DDD Visits**

The Debtor's efforts to facilitate transition issues have been made increasingly difficult by

DES-DDD's repeated inspections and monitor visits, which are now occurring on more or less a

daily basis.  Furthermore, DES-DDD monitors have refused to follow the Debtor's COVID

protocols (implemented at the direction of DES-DDD) and have created concerns about COVID

transmission to the members.

FAEGRE DRINKER
BIDDLE & REATH LLP
ATTORNEYS AT LAW

**D.  Request for Immediate Action**

In their objection DES-DDD drop the "bombshell" that CPES intends to stop providing caregiving services in the group homes January 1, 2021.  This revelation is no surprise to anyone.  In fact when this case began at the first day hearings back in April, the Debtor was clear in its intent to complete the transition of all services in Arizona by the end of the year.  DES-DDD was not only aware of this deadline, but was supportive of—if not insistent on—CPES terminating all of its operations within that timeframe.  DES-DDD states on the one hand that their vendor selection process is outside of the Court's jurisdiction and on the other that the Court-approved bidding procedures and auction process are the cause of a delay in the transition process creating some sort of emergency.

Had the DES-DDD been willing to engage in discussions with the Debtor following the July 27, 2020 meeting between Debtor and DES-DDD, the two processes could conceivably have been blended together, preserving both the member/guardian selection/approval process mandated by DES-DDD and the bankruptcy approval process.  Indeed, the timeline suggested by the Debtor during the July 27 meeting was to dovetail the process with the sale process in the California Debtors' cases.  Had that occurred, there would be no fear of lingering transition issues as the closing for the California sale transaction is scheduled to occur on November 16, 2020, 45 days before the date that so concerns DES/DDD.  Alas, no such discussions occurred.  The Debtor was finally notified by DES-DDD that they were unwilling to revisit or reconsider their own award process on October 23, 2020.

Nevertheless, the Debtor is committed to completing the transition process by December 31, 2020.  From the DES-DDD Objection it would appear that the major stumbling block to reaching that objective is the State of Arizona's own process in issuing licenses to the vendors selected by the State of Arizona in its own selection process.  Perhaps that impediment is a more appropriate target for insuring completion of the transition before December 31, 2020.

**E.  Executory Contracts**

While DES-DDD's eleventh hour concession that the licenses and QVAs are executory contracts subject to section 365 is appreciated, its relevance to the Debtor at this point is

1  questionable.  As the bidding procedures followed at the Auction clearly provide, and as the DES-

2  DDD concede, the Debtor is not seeking to assume or assign QVAs or licenses.  Therefore the

3  entire discussion is not pertinent to the relief sought by the Debtor here. While other future debtors

4  encountering these issues with DES-DDD could find the admission useful, here it is not relevant.

5           **F.  Waiver of Rule 6004**

6           DES-DDD's Rule 6004 argument is ludicrous on its face.  Much of the DES-DDD

7  Objection is spent complaining about the time constraints that they orchestrated, and yet they

8  threaten to appeal and further delay the transition process.  Moreover, DES-DDD only objects to

9  the Debtor's requested waiver of the 14-day stay period to the extent that DES-DDD does not get

10 what it wants; if DES-DDD does not get what it wants and seeks to appeal, they ask the court to

11 deny the Debtor's requested waiver and further delay the member transition.  Whether or not the

12 court waives the Rule 6004 stay period, it should not be based on whether DES-DDD wins or

13 loses.

14 **IV.  CONCLUSION**

15          The Debtor respectfully requests that the court authorize the Debtor's assumption and

16 assignment of the leases and transfer of related personal property under either a sale order

17 submitted in connection with the November 3 hearing or under the De Minimis Asset Sale

18 Procedures Order.

19 Dated: October 30, 2020                        **FAEGRE DRINKER BIDDLE & REATH LLP**
                                                 By: */s/ Ryan M. Salzman*

20                                               Ryan M. Salzman (CA Bar #299923)
                                                 Ryan.Salzman@faegredrinker.com

21                                               Jeremy M. Pelphrey (CA Bar #249862)
                                                 Jeremy.Pelphrey@faegredrinker.com

22                                               1800 Century Park East, Suite 1500
                                                 Los Angeles, CA  90067

23                                               Telephone: (310) 203-4000
                                                 Facsimile: (310) 229-1285

24                                               Vince Slusher (TX Bar # 00785480)
                                                 1717 Main Street, Suite 5400

25                                               Dallas, Texas 75201
                                                 Telephone: (469) 357-2500

26                                               Facsimile: (469) 327-0860
                                                 Vince.Slusher@faegredrinker.com

27                                               *Admitted Pro Hac Vice*

28                                               *Counsel for the Debtors and Debtors in Possession*

FAEGRE DRINKER
BIDDLE & REATH LLP
ATTORNEYS AT LAW

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
FAEGRE DRINKER BIDDLE & REATH LLP, 90 South 7th St, Ste 2200, Minneapolis, MN 55402

A true and correct copy of the foregoing document entitled (*specify*): **DEBTOR'S REPLY IN SUPPORT OF THE SALE MOTION AND IN RESPONSE TO THE DES-DDD'S OBJECTION** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) October 30, 2020, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Brian D. Fittipaldi, Office of the U.S. Trustee, brian.fittipaldi@usdoj.gov
United States Trustee, ustregion16.nd.ecf@usdoj.gov
Steve Ordaz, BMC Group, Inc., sordaz@bmcgroup.com; tfeil@bmcgroup.com
Scott L. Whitman, slw@mwlegal.com; holly@mwlegal.com
Agustin R. Pina, pina@schinner.com
Jennifer C. Kalvestran, Gust Rosenfeld, jkalvestran@gustlaw.com; spobrien@gustlwa.com
David R. Johanson, djohanson@hpylaw.com; drj@esop-law.com
Kelsey L. Maxwell, kmaxwell@murchisonlaw.com
Lisa D. Angelo, langelo@murchisonlaw.com; cthoms@murchisonlaw.com
Abram Feuerstein, abram.s.feuerstein@usdoj.gov
Everett L. Green, Everett.l.green@usdoj.gov
Cameron Ridley, cameron.ridley@usdoj.gov
Scott B. Cohen, sbc@eblawyers.com
Roksana D. Moradi-Brovia, roksana@RHMFirm.com
Chelsea Mikula, chelsea.mikula@tuckerellis.com

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| October 30, 2020 | Susan Carlson | /s/ Susan Carlson |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**