SCOTT MCNUTT (CSB 104696)
324 Warren Road
San Mateo, California 94402
Telephone: 415-760-5601
smcnutt@ML-SF.com

DAVID R. JOHANSON (CSB 164141)
DOUGLAS A. RUBEL (NC 29824)
HAWKINS PARNELL & YOUNG LLP
1776 Second Street
Napa, CA 94559
Telephone: (707) 299-2470
Facsimile: (707) 581-1704
djohanson@hpylaw.com
drubel@hpylaw.com

Attorneys for Bob Bennetti, Linki Peddy, Linda Mariano,
Chip Foust, and in excess of 92 other CPES Employee
Stock Ownership Plan and Trust Participants

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
NORTHERN DIVISION

| | |
|---|---|
| In re<br><br>CPESAZ Liquidating, Inc., fka Community Provider of Enrichment Services, Inc.<br><br>NDS Liquidating, Inc. fka Novelles Developmental Services, Inc.,<br><br>CPESCA Liquidating, Inc., fka CPES California, Inc.<br><br>　　　　Debtors. | Lead Case No. 9:20-bk-10554-DS<br><br>Jointly Administered With:<br>Case No. 9:20-bk-10553-DS<br>Case No. 9:20-bk-10994-DS<br><br>Chapter 11 Cases<br><br>**DECLARATION OF SCOTT McNUTT IN SUPPORT OF THE INDIVIDUAL CPES ESOP PARTICIPANTS' NOTICE OF MOTION AND MOTION TO DISQUALIFY FAEGRE DRINKER BIDDLE & REATH, LLC AND REQUEST FOR ISSUANCE OF SHOW CAUSE ORDER** |

I, Scott McNutt, declare as follows:

1.　　I am an attorney-at-law, duly admitted to practice before this Court.  I am counsel of

record for Bob Bennetti, Linki Peddy, Linda Mariano, Chip Foust, and in excess of 92 other CPES

Employee Stock Ownership Plan and Trust Participants (the "Individual CPES ESOP Participants")
in the above-captioned matter. I am over the age of 18 and I could and would competently testify to
the matters contained herein if so required.

2. I submit this amended declaration in support of the Individual CPES ESOP
Participants' Notice of Motion and Motion to Disqualify Faegre Drinker Biddle & Reath LLP
("Faegre Drinker") and Request for Issuance of a Show Cause Order.

3. Attached hereto as Exhibit "1" is a true and correct copy of the previous CPES ESOP
Trustee's, Mr. Alberto J. Tarajano's, Trustee Services Agreement, dated August 6, 2019, that was
produced by Prudent Fiduciary in response to the Individual CPES ESOP Participants' Rule 2004
*subpoena duces tecum.*

4. Attached hereto as Exhibit "2" is a true and correct copy of Mr. Tarajano's
resignation letter, dated April 16, 2020 that was produced by Prudent Fiduciary in response to the
Individual CPES ESOP Participants' Rule 2004 *subpoena duces tecum.*

5. Attached hereto as Exhibit "3" is a true and correct copy of the relevant excerpts of
the deposition of Miguel Paredes in *Secretary of Labor v. Heritage, et al.*, 1:18-cv-155-SOM-WRP
(D. Haw.).

6. Attached hereto as Exhibit "4" is a true and correct copy of the current CPES ESOP
Trustee's, Mr. Miguel Paredes', successor trustee proposal letter from Miguel Paredes to Mark
Monson, CEO, Community Provider of Enrichment Services, seeking to be retained as CPES ESOP
Trustee, and the April 14, 2020, e-mail to which it was attached successor trustee proposal for the
CPES ESOP Trustee position, that was produced by Prudent Fiduciary in response to the Individual
CPES ESOP Participants' Rule 2004 *subpoena duces tecum.*

7. Attached hereto as Exhibit "5" is a true and correct copy of Mr. Paredes' Retention
Agreement with CPES-AZ that was produced by Prudent Fiduciary in response to the Individual
CPES ESOP Participants' Rule 2004 *subpoena duces tecum.*

8.     Attached hereto as Exhibit "6" is a true and correct copy of Mr. Paredes' August 5, 2020 e-mail with Jeremy Pelphrey of Faegre Drinkers that Prudent Fiduciary produced in response to the Individual CPES ESOP Participants' Rule 2004 *subpoena duces tecum*.

9.     Attached hereto as Exhibit "7" is a true and correct copy of the relevant excerpts from the Transcript of June 18, 2020, Continued 341(a) Meeting of Creditors.

10.     Attached hereto as Exhibit "8" is a true and correct copy of the conflict of interest waiver in favor of Faegre Drinker, dated August 12, 2020, and executed by Mr. Paredes on August 13, 2020, that was produced by Prudent Fiduciary in response to the Individual CPES ESOP Participants' Rule 2004 *subpoena duces tecum*.

11.     Attached hereto as Exhibit "9" is a true and correct copy of the Appraisal Report of CPES, Tucson, Arizona, Valued as of December 31, 2017", issued on April 30, 2018.

12.     Attached hereto as Exhibit "10" is a true and correct copy of the CPES ESOP's 2017 Form 5500, Annual Return/Report of Employee Benefit Plan, for the CPES ESOP, dated October 3, 2018, obtained from the U.S. Department of Labor EFAST2 website, https://www.efast.dol.gov/welcome.html".

13.     Attached hereto as Exhibit "11" is a true and correct copy of the September 30, 2020, e-mail from Mary Lynn Greenhow to Mr. Paredes, copy to Douglas Zimmerman, David Johnson, Mark Monson and Tiki Thompson, with respect to the November 2, 2020, meeting of the CPES Board of Directors.[1]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct on this 7th day of October 2021.

*/s/ Scott McNutt*

---

[1] Paredes and Prudent Fiduciary have not produced the responsive e-mail, if one exists, or the minutes of the board of directors' meeting, if such minutes were e-mailed to him.

CASE NO. 9:20-BK-10554-DS
DECLARATION OF SCOTT MCNUTT IN SUPPORT OF THE INDIVIDUAL CPES ESOP PARTICIPANTS' NOTICE OF MOTION AND MOTION TO DISQUALIFY FAEGRE DRINKER BIDDLE & REATH LLP AND REQUEST FOR ISSUANCE OF SHOW CAUSE ORDER

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on October 7, 2021, I caused the foregoing and the attachments thereto to be served via this Court's NEF system, which provided notice of same to all parties of record, including counsel for the Liquidating Trustee, the U.S. Trustee, the Debtors, and the CPES ESOP Trustee.

*/s/ Scott McNutt*
Scott McNutt

Case No. 9:20-bk-10554-DS
Declaration of Scott McNutt In Support of the Individual CPES ESOP Participants' Notice of Motion and
Motion to Disqualify Faegre Drinker Biddle & Reath LLP and Request for Issuance of Show Cause Order



Exhibit "1"

## TRUSTEE SERVICES AGREEMENT

**THIS TRUSTEE SERVICES AGREEMENT** (this "**Agreement**") is made and entered into this 6th day of August, 2019 (the "**Effective Date**") by and among ALBERTO J. TARAJANO, an individual domiciled in the State of Florida (the "**Trustee**"); COMMUNITY PROVIDER OF ENRICHMENT SERVICES, INC., an Arizona corporation (the "**Company**"); NOVELLES DEVELOPMENTAL SERVICES, INC., a California corporation ("**Novelles**"); and CPES, INC., a California corporation ("**CPES**," and together with Novelles, the "**Subsidiaries**,"). The Trustee, Company, Novelles and CPES are sometimes referred to in this Agreement individually as a "**Party**," and collectively as the "**Parties**".

## RECITALS

**WHEREAS**, the Board of Directors (the "**Board**") of the Company is evaluating a transaction or series of transactions whereby National Mentor Holdings LLC or its affiliate (in either case, the "**Buyer**") would either (a) acquire the stock of the Company from the CPES Employee Stock Ownership Trust (the "**Trust**"), which implements and forms a part of the CPES Employee Stock Ownership Plan (the "**Plan**," and together with the Trust, the "**ESOP**") or (b) acquire all or substantially all of the assets of the Company and its Subsidiaries (in either case, the "**Contemplated Transactions**");

**WHEREAS**, the Board desires to appoint the Trustee to serve as trustee of the Trust, subject to the terms and conditions of this Agreement;

**WHEREAS**, the Board acknowledges its status as an appointing fiduciary under Section 3(21)(A) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") and its fiduciary duties to prudently qualify, select and monitor other fiduciaries of the ESOP; and

**WHEREAS**, the Trustee desires to accept his appointment to serve as trustee of the Trust, subject to the terms and conditions of this Agreement.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

Section 1.    **Engagement**.

(a)    Appointment. The Board duly appoints the Trustee to serve as trustee of the Trust and the Trustee hereby accepts his appointment, effective as of the Effective Date, subject to the terms and conditions of this Agreement and the Plan and Trust documents. Within five (5) calendar days immediately following the Effective Date, the Company and each Subsidiary shall deliver to the Trustee a certified copy of written resolutions duly adopted by their respective boards and in form and substance reasonably satisfactory to the Trustee

the day of the consummation of the Contemplated Transactions and (ii) December 31, 2019, whether or not the Contemplated Transactions are consummated.

(b)     Annual Fee. From and after the effective date of the termination or consummation of the Contemplated Transactions, in consideration of the Trustee discharging his fiduciary responsibilities in respect of the Trust, the Company shall pay to the Trustee an annual fee of $20,000. The annual fee shall be paid in annual installments in advance with the first annual installment being prorated from the effective date of the termination or consummation of the Contemplated Transactions to December 31st. The annual fee is deemed earned, non-refundable (subject to this Section 2(b)) and due (i) within thirty (30) calendar days immediately following the effective date of the consummation or termination of the Contemplated Transactions and on (ii) January 1st of each calendar year thereafter. In the event of the resignation or removal of the Trustee, the Trustee is entitled to retain that portion of the annual fee equal to (A) the product of the annual fee and (B) the ratio (expressed as a percentage) of (1) the number of calendar days that have elapsed to and including the effective date of such resignation or removal and (2) the number of calendar days in such calendar year, and the Trustee shall remit the balance of such annual fee to the Company within thirty (30) calendar days immediately following the effective date of such resignation or removal. For clarity, nothing in this Agreement obligates the Board to appoint the Trustee as successor trustee following the termination or consummation of the Contemplated Transactions.

(c)     Expenses and Advances. In addition to fees, the Company shall promptly reimburse the Trustee for all reasonable and documented out-of-pocket expenses and advances (including travel (airfare and mileage), lodging, meals and charges or copying, postage and private mail deliveries) incurred by or on behalf of the Trustee and relating to his appointment as trustee or the discharge of his fiduciary responsibilities. The Trustee shall not incur a single expense or advance in excess of $1,000 without the express, prior and written consent of the Company.

(d)     Payments. The Company will make all payments via ACH transfer or wire transfer in accordance with the instructions contained within invoices provided to it from time to time.

(e)     Modifications of Scope of Services. In the event of a substantial modification of the scope of services initially contemplated hereunder, the Trustee shall provide written notice to the Company of such potential modification and the Trustee and the Company shall negotiate in good faith to calculate a new fee commensurate with the modification of the scope of services. Events necessitating a modification in the scope of services, include events described in Section 409(e) of the Internal Revenue Code of 1986, as amended (i.e. a corporate merger or consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all assets of a trade or business, or such similar transaction), solicited and unsolicited offers to acquire equity or assets of the Company or any Subsidiary and other fundamental corporate transactions.

Section 3.     **Qualified Independent Appraiser**. To properly discharge his fiduciary responsibilities, the Trustee shall be entitled to retain the services and rely on the advice of an independent appraiser. The independent appraiser will report solely to the Trustee and not to the

(e)    Exempt Loans. Each loan that has been made by a disqualified person or party in interest to the ESOP, whether or not such shall have been repaid on, before or after the Effective Date, is an "exempt loan" within the meaning of Code Section 4975(d)(3), Treasury Regulation Section 54-4975-7(b), ERISA Section 408(b)(3), and Department of Labor Regulation Section 2550.408b-3.

(f)    No Breaches of Fiduciary Duties. At all times during the Limitation Period each fiduciary of the ESOP has discharged his, her or its duties in respect of the ESOP in compliance with ERISA and the Code. None of the officers or directors of the Company or any Subsidiary and none of the fiduciaries of the ESOP have any knowledge, after reasonably inquiry, of any fact, circumstance, situation or event that is or reasonably would be regarded as the basis for an allegation or claim that any fiduciary of the ESOP has breached any of its fiduciary duties under ERISA with respect to the ESOP.

(g)    No Nonexempt Prohibited Transactions. At no time during the Limitation Period, has a "prohibited transaction" within the meaning of Code Section 4975(c) or ERISA Section 406(a) for which no statutory exemption is available occurred with respect to the ESOP. None of the officers or directors of the Company or any Subsidiary and none of the fiduciaries of the ESOP have any actual knowledge, after reasonable inquiry, of any fact, circumstance, situation or event that is or reasonably would be regarded as the basis for an allegation or claim that a "prohibited transaction" within the meaning of Code Section 4975(c) or ERISA Section 406(a) for which no statutory exemption is available has occurred.

(h)    Employer Securities; Qualifying Employer Securities. At all times during the Limitation Period, the shares of stock held of record by the ESOP have satisfied the requirements for "employer securities" under Code Section 409(l) and "qualifying employer securities" within the meaning of ERISA Section 407(d)(5) and Department of Labor Regulation Section 2550.407d–5.

Section 6.    **Obligations of the Company and the Subsidiaries**.

(a)    Information. To enable the Trustee to properly discharge his fiduciary duties: (i) the Company and each Subsidiary shall deliver to the Trustee and his agents and representatives all information regarding the Company and each Subsidiary and their respective business operations that the Trustee shall request from time to time and shall grant to the Trustee and his agents and representatives access to the directors, officers and other management personnel of the Company and each Subsidiary; (ii) all information provided by or on behalf of the Company or any Subsidiary shall be true, accurate and complete in all material respects and shall not contain any untrue statement of a material fact or omit to state a material fact necessary to in order to make the statements made therein, in light of the circumstances under which they were made, not misleading; and (iii) all projected financial information provided by or on behalf of the Company or any Subsidiary shall be prepared by one or more of the management personnel of the Company or its Subsidiaries, shall be prepared in good faith utilizing assumptions that are reasonable and shall represent a reasonable estimate of the future financial performance of the Company and each Subsidiary.

Case 9:20-bk-10554-DS    Doc 1020    Filed 08/08/21    Entered 08/08/21 08:18:33    Desc
Exhibit N: Trustee's Declaration    Page 9 of 338

Case 9:20-bk-10554-DS    Claim 3-1 Part 3    Filed 05/08/20    Desc Attachment 2    Page
7 of 17

consequently, each Party hereby designates each Indemnitee an express, intended third party beneficiary of this Agreement with the right to enforce the entirety of this Agreement.

"**Loss**" includes any and all past, present or future loss, liability, damage (including consequential damages sustained by a third party which are an element of Loss subject to indemnification hereunder), awards of attorneys' fees and costs and dispute resolution costs, judgements, arbitration awards, settlements, Expense and other losses of any kind or nature whatsoever.

"**Proceeding**" includes any and all threatened, pending or completed action, cause of action, mediation, arbitration, litigation, hearing, informal or formal request for information, subpoena or other proceeding of any kind or nature whatsoever, whether of a civil, criminal, administrative or investigative nature, and any appeals therefrom. For clarity, "**Proceeding**" includes a fact-finding investigation commenced by U.S. Department of Labor in respect of the ESOP or any of its fiduciaries, whether or not identifying the Trustee or any other Indemnitee as the subject of such investigation, and whether or not alleging a breach of fiduciary duty or prohibited transaction, and any subsequent enforcement actions and appeals.

(b)    Indemnification. Subject to the terms of this Section 8, from and after the Effective Date, whether or not involving one or more direct Proceedings (including Proceedings by, in the name of or derivative of the rights of the Company or any other Indemnitor) or third party Proceedings, the Indemnitors, jointly and severally, shall indemnify and hold harmless, to the fullest extent permitted by law, the Indemnitees from and against, and shall advance and pay on behalf of the Indemnitees, any and all Loss to which any one or more of them may become subject under applicable Federal or state law or otherwise relating in any way to this Agreement (including any breach or inaccuracy in a representation or statement made by the Company and contained in this Agreement, or a breach or failure to perform any covenant, obligation or agreement to be performed by the Company or any Subsidiary and contained in this Agreement) the Trust or the Contemplated Transactions (including events occurring prior to the appointment of the Trustee or subsequent to the resignation or removal of the Trustee) (the "**Right of Indemnification**"). The Right of Indemnification survives consummation or termination of any Contemplated Transaction and the resignation or removal of the Trustee and extends to (i) any action taken or not taken in good faith by one or more of the Indemnitees, (ii) Expense incurred by any Indemnitee to construe or interpret, establish the validity, legality or enforceability of or to enforce this Agreement (including the Right to Indemnification) and (iii) Expense incurred by any Indemnitee (whether in mediation, arbitration, litigation, appeal or settlement) to recover, to determine the amount of or to determine the reasonableness of any Expense. However, the Right of Indemnification does not extend to the specific portion of Loss only if and solely to the extent such specific portion of Loss is held by a court of competent jurisdiction in a final judgment from which no appeal can be taken to be the exclusive result of (A) the sole negligence, bad faith, gross negligence or willful misconduct of the specific Indemnitee seeking to enforce the Right of Indemnification; (B) a violation of, or breach of fiduciary duty imposed under, Title I, Part 4 of ERISA, including a non-exempt prohibited transaction, or other law by the specific Indemnitee seeking to enforce the Right of Indemnification; or (C) a material breach of the obligations contained in this Agreement and to be performed by the specific Indemnitee seeking to enforce the right of Indemnification. For purposes of this Agreement, the term "negligence"

maintained by one or more of the Indemnitors from time to time in accordance with <u>Section 6(b)</u> and actually received by the Indemnitee in connection with the indemnifiable event (less the Expenses incurred by the Indemnitee to recover, including deductibles and uninsured retentions and reasonable attorneys' fees and expenses). In the event that an Indemnitee actually receives recovery under such policies of fiduciary liability insurance with respect to Loss for which the Indemnitee has been indemnified, then the Indemnitee shall remit to the applicable Indemnitor an amount equal to the lessor of (i) the amount of such insurance recovery (less the Expenses incurred by the Indemnitee to recover, including deductibles and uninsured retentions) and (ii) the amount previously paid by the Indemnitor as indemnification for such Loss. Nothing in this <u>Section 8(f)</u> obligates an Indemnitee to seek recovery under polices of fiduciary liability insurance maintained by any Indemnitor.

(g) <u>Cumulative Remedies</u>. The Right of Indemnification is non-exclusive and in addition to any and all other rights and remedies, whether at law or in equity, available to such Indemnitee, including rights and remedies arising under the Plan and Trust documents, any written agreement involving the Parties and insurance of any kind or nature whatsoever.

(h) <u>Construction; Severability</u>. Each Party agrees that this <u>Section 8</u> is deemed the result of substantial negotiations between sophisticated parties who have relatively equal bargaining power. Consequently, this <u>Section 8</u> is interpreted and construed without application of any rule or principle permitting or requiring the construction of a term against a Party (i) who drafted such term or (ii) where the main purpose of an agreement is not for indemnification of such Party. In the event that a term of this <u>Section 8</u> is invalid, illegal or unenforceable, all other terms of this <u>Section 8</u> remain in full force and effect and such invalid, illegal or unenforceable term is deemed replaced with a term that results in the indemnification of the Indemnitees and advancement of Expenses for the benefit of the Indemnitees to the maximum extent permitted by law.

Section 9. **Dispute Resolution**.

(a) <u>Governing Law</u>. This Agreement is deemed negotiated, made and delivered entirely within the State of Florida and is to be performed substantially within the State of Florida. The laws of the United States of America, if and to the extent applicable, and the laws of the State of Florida (including its statutes of limitations and Florida Statutes Section 685.101), without regard to the principles or rules of conflict of laws of the State of Florida, the State of Arizona or any other jurisdiction to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Florida govern this Agreement (including its negotiation, execution, interpretation, construction, validity and performance), and any action, litigation or proceeding of any kind or nature whatsoever in any way arising from or relating to this Agreement or the transactions it contemplates, including contract, equity, tort, fraud and statutory claims.

(b) <u>Permitted Forum</u>. Any Party may (but shall not be obligated to) commence any action, litigation or proceeding of any kind or nature whatsoever in any way arising from or relating to this Agreement or the transactions it contemplates, including contract, equity, tort, fraud and statutory claims, against any other Party in the United States District Court for the Southern District of Florida or the United States District Court for the District of Arizona or, if

Tucson, AZ 85750
Attention: Mark G. Monson, Chief Executive Officer
Email: mmonson@cpes.com

To the Trustee or any Indemnitee:

Alberto J. Tarajano
260 Crandon Blvd #32-134
Key Biscayne, FL 33149
E-mail: atarajano@custosfiduciary.com

With a copy (which copy shall not constitute notice):

Holzman Horner PLLC
1300 I Street NW, Suite 400E
Washington, DC 20005
Attention: Christopher T. Horner II, Member
Email: chorner@holzmanhorner.com

      (b)    <u>Assignment and Delegation</u>. No Party may assign any of its rights or delegate any of its obligations under this Agreement without the express, prior and written consent of each other Party.

      (c)    <u>Third Party Beneficiaries</u>. Except for each Indemnitee identified in <u>Section 8</u>, the Parties do not confer any rights or remedies upon any person or entity other than the Parties and, in the case of Alberto J. Tarajano, his spouse, estate planning vehicles, heirs, executors, administrators and legal representatives, and, in the case of each other Party, its permitted successors and assigns.

      (d)    <u>Successors and Assigns</u>. This Agreement binds and benefits Alberto J. Tarajano, his spouse, estate planning vehicles, heirs, executors, administrators and legal representatives, and each other Party hereto and its permitted successors and assigns. The preceding sentence does not address whether a Party may assign its rights or delegate its performance under this Agreement, such matters being expressly addressed in <u>Section 10(b)</u>. No Indemnitor shall merge or consolidate with any other entity in a transaction (including the Contemplated Transactions) after which the Indemnitor is not the surviving entity, and no Indemnitor shall sell all or substantially all of its assets to any other person or entity in a transaction (including the Contemplated Transactions) unless such other person or entity expressly assumes all of the obligations of the Indemnitor under this Agreement. Moreover, no Indemnitor shall liquidate or distribute a material portion of its assets to equity holders unless and until arrangements satisfactory to the Indemnitees have been made to preserve the obligations of the Indemnitor under this Agreement.

      (e)    <u>Effective Date</u>. The effective date of this Agreement is (i) the earlier of the date upon which the Trustee begins providing professional services and (ii) Effective Date.

    (l) <u>Authorization</u>. Each natural person executing (whether manually or electronically) this Agreement on behalf of an entity represents to each Party that such natural person has all requisite capacity and legal authority to bind such entity to this Agreement.

    (m) <u>Public Announcements and Marketing Disclosures</u>. The Company may issue a press release or include a description of the transaction for use in marketing materials and a public website following the consummation of the Contemplated Transactions with the express, prior and written consent of the Trustee.

<div align="center">Signature Pages Follow</div>

Company Signature Page to Trustee Services Agreement

**IN WITNESS WHEREOF**, the Company acknowledges that this Agreement contains a legally binding waiver of jury trial and has caused this Agreement to be duly executed and delivered in its name and on its behalf by its authorized agent as of the Effective Date.

COMMUNITY PROVIDER OF
ENRICHMENT SERVICES, INC.,
an Arizona corporation

_Mark G. Monson_
Signature

Mark G. Monson
Printed Name

Chief Executive Officer
Title

Case 9:20-bk-10554-DS    Doc 1620    Filed 08/08/21    Entered 08/08/21 08:48:33    Desc
Exhibit N: Trustee Retention Agreement    Page 14 of 338

Case 9:20-bk-10554-DS    Claim 3-1 Part 3    Filed 05/08/20    Desc Attachment 2    Page
17 of 17

Subsidiary Signature Page to Trustee Services Agreement

**IN WITNESS WHEREOF,** the Subsidiary acknowledges that this Agreement contains a legally binding waiver of jury trial and has caused this Agreement to be duly executed and delivered in its name and on its behalf by its authorized agent as of the Effective Date.

CPES, INC.,
a California corporation

*Mark G. Monson*
_____
Signature

Mark G. Monson
_____
Printed Name

President & CEO
_____
Title



Exhibit "2"

**Alberto Tarajano**
**260 Crandon Blvd. 32-134**
**Key Biscayne, FL 33149**


April 16, 2020

Mark Monson, CEO
Community Provider of Enrichment Services
4825 N Sabino Canyon Road
Tucson, AZ 85750

RE: ESOP Trustee Services

Mark:

Effectively today, I resign as Trustee of the CPES ESOP due to non-payment of fees.

As discussed in our call, I agree to waive the 30-day notice period for termination of the agreement.

I am happy to coordinate a transition with another fiduciary.

Thank you,

Alberto Tarajano



Exhibit "3"

1               UNITED STATES DISTRICT COURT

2                    DISTRICT OF HAWAII

3

4   --------------------------------
    EUGENE SCALIA, Secretary of      ) CASE NO. 1:18-cv-155-SOM-WRP
5   Labor, United States             )
    Department of Labor,             )
6                                    )
            Plaintiff,               )
7                                    )
        vs.                          )
8                                    )
    SHARON L. HERITAGE; NICHOLAS     )
9   L. SAAKVITNE, A LAW              )
    CORPORATION; BRIAN J. BOWERS;    )
10  DEXTER C. KUBOTA; BOWERS +       )
    KUBOTA CONSULTING, INC.;         )
11  BOWERS + KUBOTA CONSULTING,      )
    INC. EMPLOYEE STOCK OWNERSHIP    )
12  PLAN,                            )
                                     )
13          Defendants.              )
    --------------------------------

14

15          VIDEOTAPED DEPOSITION OF MIGUEL PAREDES

16          Taken on behalf of the Defendants Brian J. Bowers

17   and Dexter C. Kubota via Zoom video conference, commencing at

18   8:58 a.m., on September 16, 2020, pursuant to Notice.

19

     BEFORE:  SANDRA J. GRAN, CSR NO. 424
20            Registered Professional Reporter

21

22

23

24

25

```
 1    APPEARANCES:

 2    For the Plaintiff Eugene Scalia, Secretary of Labor, United
          States Department of Labor:
 3
          JING ACOSTA, ESQ.
 4        RUBEN P. CHAPA, ESQ.
          Office of the Solicitor
 5        U.S. Department of Labor
          230 S. Dearborn, Room 844
 6        Chicago, Illinois 60604
          Email acosta.jing@dol.gov
 7        Email chapa.ruben@dol.gov

 8        And

 9        AUSTIN CASE, ESQ.
          Office of the Solicitor
10        U.S. Department of Labor
          2300 Main Street, Suite 1020
11        Kansas City, Missouri 64108
          Email case.austin@dol.gov

12

13    For the Defendants NICHOLAS L. SAAKVITNE, A LAW CORPORATION
          and SHARON L. HERITAGE, as successor to Nicholas L.
14        Saakvitne, Deceased:

15        SEAN K. McMAHAN, ESQ.
          Morgan Lewis & Bockius LLP
16        1111 Pennsylvania Avenue, NW
          Washington, D.C. 20004
17        Telephone 202-739-5520
          Email sean.mcmahan@morganlewis.com

18

19    For the Defendant BRIAN J. BOWERS and DEXTER C. KUBOTA:

20        DAVID R. JOHANSEN, ESQ.
          DOUGLAS A. RUBEL, ESQ.
21        ROBERT THOMPSON, ESQ.
          Hawkins, Parnell & Young, LLP
22        1776 Second Street
          Napa, California 94559
23        Telephone 707-299-2470
          Email djohanson@hpylaw.com

24

25
```

```
 1    For the Defendant BOWERS + KUBOTA CONSULTING, INC.:

 2         SCOTT I. BATTERMAN, ESQ.
           Clay Chapman Iwamura Pulice & Nervell, AAL, ALC
 3         700 Bishop Street, Suite 2100
           Honolulu, Hawaii 96813
 4         Telephone 808-535-8400
           Email sib@paclawteam.com
 5

 6    Video Technician:  Mark Seo

 7

 8    Also Present:  Michael Wen and Norman Garcia

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                   P R O C E E D I N G S :

 2          (Reporter's Disclosure available to counsel.)

 3                       MIGUEL PAREDES

 4      Having been first duly sworn, testified as follows:

 5              THE REPORTER:  Okay.  I would like to do appearances

 6      for the record, please.

 7              MR. JOHANSON:  Mr. David Johanson on behalf of Brian

 8      J. Bowers and Dexter C. Kubota.

 9              THE REPORTER:  Ms. Acosta?

10              MS. ACOSTA:  Oh.  Jing, J-I-N-G, Acosta,

11      A-C-O-S-T-A, on behalf of Eugene Scalia, Secretary of Labor,

12      United States Department of Labor, Plaintiff.

13              THE REPORTER:  Thank you.  Do you want introduce the

14      other parties that are on or --

15              MR. JOHANSON:  I'd like everyone to acknowledge

16      who's on the line right now.  Thank you.

17              MR. BATTERMAN:  Scott Batterman appearing on behalf

18      of defendant Bowers + Kubota Consulting, Inc.

19              MR. McMAHAN:  Sean McMahan for Sharon Heritage and

20      Saakvitne Law.

21              MR. RUBEL:  Douglas Rubel on behalf of Messrs.

22      Bowers and Kubota.

23              MR. CHAPA:  Ruben Chapa on behalf of the Secretary

24      of Labor, U.S. Department of Labor.

25              MR. CASE:  Austin Case on behalf of the Secretary of
```

1    Q.   By the way, do you get work from McDermott --

2    McDermott Will & Emery?

3         MS. ACOSTA:   I'm going to make a relevance

4    objection.

5         MR. JOHANSON:   Go ahead and answer.

6         THE WITNESS:   I've never been hired by McDermott

7    Will & Emery, no.

8    MR. JOHANSON:

9    Q.   Have they ever referred you in to act as a trustee

10   or fiduciary of an ESOP?

11   A.   I have never been -- I have never been hired as a

12   trustee or performed any other services as a result of a

13   McDermott Will & Emery referral.

14   Q.   Okay.  How about with respect to Drinker Biddle?  Or

15   I guess now they're Faegre Drinker Biddle.

16   A.   I have never been hired by Faegre Drinker Biddle,

17   but I have in the past been introduced to an ESOP that

18   interviewed me, among other ESOP trustees, and did select me

19   as an ESOP trustee, yes.

20   Q.   And how about the Groom Law Group, have they

21   referred you in to serve as an institutional trustee or an

22   independent fiduciary in any ESOP?

23   A.   No, not -- no, not as a -- not to serve as

24   independent fiduciary or an ESOP trustee, no.

25   Q.   How about in any other capacity?

```
 1                W I T N E S S   C E R T I F I C A T E

 2

 3              I, MIGUEL PAREDES, hereby certify that I have read

 4     the foregoing typewritten pages 1 through 177, inclusive, and

 5     corrections, if any, were noted by me, and the same is a true

 6     and correct transcript of my testimony.

 7

 8              Dated this _____ day of _____, 2020.

 9

10     _____

11              MIGUEL PAREDES

12

13     Signed before me this _____ day of _____, 2020.

14

15

16     _____

17

18

19

20

21     EUGENE SCALIA, Secretary of Labor, United States Department of
            Labor vs. SHARON L. HERITAGE; NICHOLAS L. SAAKVITNE, A
22          LAW CORPORATION; BRIAN J. BOWERS; DEXTER C. KUBOTA;
            BOWERS + KUBOTA CONSULTING, INC.; BOWERS + KUBOTA
23          CONSULTING, INC. EMPLOYEE STOCK OWNERSHIP PLAN, CASE
            NO. 1:18-cv-155-SOM-WRP
24     September 16, 2020, S. Gran

25
```

1                    C E R T I F I C A T E

2    STATE OF HAWAII              )
                                  )   SS.
3    COUNTY OF MAUI               )

4           I, SANDRA J. GRAN, do hereby certify:

5           That on September 16, 2020, at 8:58 a.m. appeared
     before me MIGUEL PAREDES, the witness whose deposition is
6    contained herein; that prior to being examined he was by me
     duly sworn or affirmed pursuant to Act 110 of the 2010 Session
7    of the Hawaii State Legislature.

8           That the deposition was taken down by me in machine
     shorthand and was thereafter reduced to typewritten form under
9    my supervision; that the foregoing represents, to the best of
     my ability, a true and correct transcript of the proceedings
10   had in the foregoing matter.

11          That pursuant to Rule 30(e) of the Hawaii Rules of
     Civil Procedure, a request for an opportunity to review and
12   make changes to the transcript:

13      X    Was made by the deponent or a party (and/or
             their attorney) prior to the completion of the
14           deposition.
        ____ Was **not** made by the deponent or a party (and/or
15           their attorney) prior to the completion of the
             deposition.
16      ____ Was waived.

17          I further certify that I am not an attorney for any
     of the parties hereto, nor in any way concerned with the
18   cause.

19          DATED this 24th day of September, 2020, in Maui,
     Hawaii.

20

21

22   _____
     SANDRA J. GRAN, RPR, HI CSR 424
23

24

25

RALPH ROSENBERG COURT REPORTERS, INC.
808-524-2090 courtreporters@hawaii.rr.com



Exhibit "4"

**PRUDENT FIDUCIARY**
——— S E R V I C E S ———

Mr. Mark Monson, CEO                                                April 14, 2020
Community Provider of Enrichment Services, Inc.
4825 N. Sabino Canyon Rd.
Tucson, AZ 85750

Dear Mr. Monson:

I am submitting this proposal to be retained as Trustee for the CPES Employee Stock Ownership Plan and associated Trust (ESOP). If I am retained as ESOP Trustee, I would perform the services necessary to safeguard the assets of the plan trust and help ensure the proper administration of the plan. These services include, but are not limited to the following:

- Managing the assets of the ESOP trust
- Establishing the annual stock price of Community Provider of Enrichment Services, Inc. (Company)
- Voting the ESOP Company stock shares
- Administering employee "pass through" voting of ESOP shares when legally required
- Satisfying the Trustee's ERISA fiduciary responsibilities of acting prudently, solely in the interest of the plan's participants, and acting in accordance with the plan documents

The fee for all services related to the duties as the Trustee of the ESOP on an ongoing basis would be an annual fee of $13,000, plus any reasonable expenses incurred, which are expected to be nominal. This annual fee amount would be guaranteed for the first two years of the ongoing engagement but may be revisited in subsequent years.

Navigating the complex plan fiduciary requirements set forth by ERISA can be difficult, and at times fraught with peril. Hiring a highly-qualified professional Independent Fiduciary is an effective way to help ensure that your employee benefit plan is being governed effectively and in accordance with the law. My expertise, experience, and robust due diligence approach make me the ideal fit as the Independent ESOP Trustee.

If selected, I will be committed to a collaborative and transparent relationship with the Company leadership to ensure that the ESOP is governed effectively and that the firm achieves its strategic goals and creates value for the employee shareholders.

Thank you for considering my firm's Trustee services.

Sincerely,

Miguel Paredes, MBA, CPFA
Prudent Fiduciary Services, LLC

---

| 100 N. Barranca St., Suite 870 | T. (626) 549-1410 | mparedes@fiduciaryservices.com |
| West Covina, CA 91791 | F. (626) 384-3342 | www.fiduciaryservices.com |

| From: | Paul Zielinski |
|---|---|
| To: | mmonson@cpes.com |
| Cc: | djohnson2185@cox.net; Pelphrey, Jeremy M.; Miguel Paredes; Ty Fukumoto |
| Subject: | CPES ESOP - Successor Trustee Proposal |
| Date: | Tuesday, April 14, 2020 10:13:07 PM |
| Attachments: | CPES - Successor Trustee Proposal.pdf |
| | CPES - Successor Trustee Engagement Letter.docx |
| | CPES - Successor Trustee Engagement Letter.pdf |

Mr. Monson,

My name is Paul Zielinski, and I am a director with Prudent Fiduciary Services.  Attached please find our firm's proposal for successor ongoing trustee services.  Please don't hesitate to let us know if you have any questions or would like to further discuss our proposal.

We greatly appreciate your consideration of our firm for this opportunity.

Sincerely,



**Paul Zielinski, JD**
Director
Prudent Fiduciary Services, LLC
100 N. Barranca St., Suite 870
West Covina, CA 91791
Main: (626) 549-1410
Fax:  (626) 384-3342
www.fiduciaryservices.com

*This message (including any attachments) may contain confidential, proprietary, privileged, and/or private information.  The information is intended to be for the use of the individual or entity designated above.  If you are not the intended recipient of this message, please notify the sender immediately, and delete the message and any attachments.  Any disclosure, reproduction, distribution, or other use of this message or any attachments by an individual or entity other than the intended recipient is prohibited.*

PAREDES-0001971

| From: | Mark G. Monson |
|---|---|
| To: | Paul Zielinski |
| Cc: | djohnson2185@cox.net; Pelphrey, Jeremy M.; Miguel Paredes; Ty Fukumoto |
| Subject: | RE: CPES ESOP - Successor Trustee Proposal |
| Date: | Thursday, April 16, 2020 9:23:27 AM |
| Attachments: | image002.png |
| | Action By Unanimous Consent.pdf |
| | Prudent Fiduciary Agreement.pdf |

Paul,

I look forward to working with your firm! Please sign and review the attached documents and forward to my attention.

Mark



cpes

Mark Monson
President/CEO
4825 N Sabino Canyon Road
Tucson, AZ 85750
(520) 495-6203
(317) 771 8782

**From:** Paul Zielinski <pzielinski@fiduciaryservices.com>
**Sent:** Tuesday, April 14, 2020 10:13 PM
**To:** Mark G. Monson <mmonson@cpes.com>
**Cc:** djohnson2185@cox.net; Pelphrey, Jeremy M. <jeremy.pelphrey@faegredrinker.com>; Miguel Paredes <mparedes@fiduciaryservices.com>; Ty Fukumoto <tfukumoto@fiduciaryservices.com>
**Subject:** CPES ESOP - Successor Trustee Proposal

Mr. Monson,

My name is Paul Zielinski, and I am a director with Prudent Fiduciary Services. Attached please find our firm's proposal for successor ongoing trustee services. Please don't hesitate to let us know if you have any questions or would like to further discuss our proposal.

We greatly appreciate your consideration of our firm for this opportunity.

Sincerely,



**Paul Zielinski, JD**
Director
Prudent Fiduciary Services, LLC
100 N. Barranca St., Suite 870
West Covina, CA 91791
Main: (626) 549-1410
Fax: (626) 384-3342
www.fiduciaryservices.com
*This message (including any attachments) may contain confidential, proprietary, privileged, and/or private information. The information is intended to be for the use of the individual or entity designated above. If you are not the intended recipient of this message, please notify the sender immediately, and delete the message and any attachments. Any disclosure, reproduction, distribution, or other use of this message or*

PAREDES-0001972

*any attachments by an individual or entity other than the intended recipient is prohibited.*

PAREDES-0001973

| From: | Miguel Paredes |
|---|---|
| To: | Mark G. Monson |
| Cc: | djohnson2185@cox.net; Pelphrey, Jeremy M.; Ty Fukumoto; Paul Zielinski |
| Subject: | RE: CPES ESOP - Successor Trustee Proposal |
| Date: | Thursday, April 16, 2020 12:05:31 PM |
| Attachments: | Prudent Fiduciary Agreement - fully executed 4.16.20.pdf |
| | image001.png |
| | image002.png |

Thank you, Mark! We look forward to working with you as well. Attached is the fully executed engagement letter. If you can please forward the ESOP Trust Agreement at your earliest convenience, I can then sign and return the Joinder Agreement (along with the Acceptance of Appointment). We are excited to be part of the CPES team.

Best Regards,
-Miguel



**Miguel Paredes, MBA, CPFA**
President & Founder
Prudent Fiduciary Services, LLC
100 N. Barranca St., Suite 870
West Covina, CA 91791
T. (626) 549-1410 M. (626) 329-1373
www.fiduciaryservices.com

*This message (including any attachments) may contain confidential, proprietary, privileged, and/or private information. The information is intended to be for the use of the individual or entity designated above. If you are not the intended recipient of this message, please notify the sender immediately, and delete the message and any attachments. Any disclosure, reproduction, distribution, or other use of this message or any attachments by an individual or entity other than the intended recipient is prohibited.*

**From:** Mark G. Monson <mmonson@cpes.com>
**Sent:** Thursday, April 16, 2020 9:17 AM
**To:** Paul Zielinski <pzielinski@fiduciaryservices.com>
**Cc:** djohnson2185@cox.net; Pelphrey, Jeremy M. <jeremy.pelphrey@faegredrinker.com>; Miguel Paredes <mparedes@fiduciaryservices.com>; Ty Fukumoto <tfukumoto@fiduciaryservices.com>
**Subject:** RE: CPES ESOP - Successor Trustee Proposal

Paul,

I look forward to working with your firm! Please sign and review the attached documents and forward to my attention.

Mark



Mark Monson
President/CEO
4825 N Sabino Canyon Road
Tucson, AZ 85750

PAREDES-0001974

(520) 495-6203
(317) 771 8782

**From:** Paul Zielinski <pzielinski@fiduciaryservices.com>
**Sent:** Tuesday, April 14, 2020 10:13 PM
**To:** Mark G. Monson <mmonson@cpes.com>
**Cc:** djohnson2185@cox.net; Pelphrey, Jeremy M. <jeremy.pelphrey@faegredrinker.com>; Miguel
Paredes <mparedes@fiduciaryservices.com>; Ty Fukumoto <tfukumoto@fiduciaryservices.com>
**Subject:** CPES ESOP - Successor Trustee Proposal

Mr. Monson,

My name is Paul Zielinski, and I am a director with Prudent Fiduciary Services. Attached please find
our firm's proposal for successor ongoing trustee services. Please don't hesitate to let us know if you
have any questions or would like to further discuss our proposal.

We greatly appreciate your consideration of our firm for this opportunity.

Sincerely,



**Paul Zielinski, JD**
Director
Prudent Fiduciary Services, LLC
100 N. Barranca St., Suite 870
West Covina, CA 91791
Main: (626) 549-1410
Fax: (626) 384-3342
www.fiduciaryservices.com

*This message (including any attachments) may contain confidential, proprietary, privileged, and/or private
information. The information is intended to be for the use of the individual or entity designated above. If
you are not the intended recipient of this message, please notify the sender immediately, and delete the
message and any attachments. Any disclosure, reproduction, distribution, or other use of this message or
any attachments by an individual or entity other than the intended recipient is prohibited.*

# PRUDENT FIDUCIARY
## ──── S E R V I C E S ────

Mr. Mark Monson, CEO                                                April 14, 2020
Community Provider of Enrichment Services, Inc.
4825 N. Sabino Canyon Rd.
Tucson, AZ 85750

Dear Mr. Monson:

This Engagement Agreement (Agreement) is made and entered into by Community Provider of Enrichment Services, Inc. (Company) and Miguel Paredes (Trustee), a professional fiduciary under the Employee Retirement Income Security Act of 1974 as amended (ERISA). Prudent Fiduciary Services, LLC is the Trustee's operating company.

The Company has established and sponsors the CPES Employee Stock Ownership Plan and associated Trust (ESOP or Plan) for the benefit of its employees.

The Company desires to retain Miguel Paredes as Trustee for the ESOP. Miguel Paredes agrees to serve as Trustee of the ESOP subject to the terms and conditions set forth in this Agreement and the Plan's Trust Agreement.

### AGREEMENT

In consideration of the mutual covenants and agreements set forth in this Agreement, the parties agree to the following:

### APPOINTMENT AND DUTIES

1.      The Company hereby appoints Miguel Paredes to serve as Trustee of the Plan, pursuant to the provisions of the Trust Agreement, and Paredes hereby accepts this appointment. Paredes shall adopt all the powers, authority, and obligations of a Trustee under ERISA and the terms of the Plan. Paredes shall be authorized to take all actions reasonably necessary to carry out his duties under this Agreement and the Trust Agreement.

2.      Paredes, as Trustee, shall perform the services in accordance with this Agreement and the Trust Agreement in order to safeguard the assets of the plan trust and help ensure the proper administration of the Plan. These services include, but are not limited to:

- Managing the assets of the ESOP trust
- Evaluating and selecting an independent valuation firm
- Establishing the annual Company stock price
- Voting the ESOP Company stock shares
- Administering employee "pass through" voting of ESOP shares when legally required
- Satisfying the Trustee's ERISA fiduciary responsibilities of acting prudently, solely in the interest of the plan's participants, and acting in accordance with the plan documents

---

100 N. Barranca St., Suite 870          T. (626) 549-1410          mparedes@fiduciaryservices.com
West Covina, CA 91791                   F. (626) 384-3342          www.fiduciaryservices.com

## INDEMNIFICATION

3.    The Company hereby agrees to fully indemnify the Trustee and hold him harmless from any and all loss or liability, including reasonable legal fees, which the Trustee sustains in discharging his duties and responsibilities under this Agreement. However, this indemnification provision shall not apply to the extent that any loss or liability is found, in a final judgment by a court of competent jurisdiction from which no appeal can be taken, to have resulted from either the gross negligence or willful misconduct of the Trustee, or to the extent prohibited by ERISA.

## FEES FOR SERVICES

4.    Compensation for the services to be performed by the Trustee pursuant to this Agreement shall be an annual fee of thirteen thousand dollars ($13,000). The Trustee fees shall be paid by the Company, or paid by the ESOP to the extent legally chargeable as Plan administrative expenses. This annual fee amount shall be guaranteed for the first two years of the ongoing engagement but may be revisited in subsequent years.

## EXPENSES

5.    All reasonable expenses incurred by the Trustee in the performance of his duties hereunder shall be paid by the Company or paid by the ESOP to the extent legally chargeable as Plan administrative expenses. Expenses are expected to be primarily related to reasonable transportation, meals, and lodging if necessary.

## RESIGNATION OR REMOVAL

6.    Miguel Paredes will continue to serve as the Trustee of the Plan until Paredes resigns or is removed by the Company. The Company may remove Paredes as the Trustee of the Plan at any time by providing Paredes with 30 days advance written notice.

## ALTERNATE DISPUTE RESOLUTION

7.    The Company and the Trustee hereby agree that any and all disputes that cannot be resolved in a reasonable time by discussions between the Trustee and the Company that arise pursuant to this Agreement, or that relate in any way to the services provided by the Trustee to the Company, shall be submitted to binding arbitration pursuant to the Federal Arbitration Act, before the American Arbitration Association pursuant to its then existing rules, except that discovery may be conducted in accordance with the Federal Rules of Civil Procedure. Any arbitration award shall be binding and enforceable in any court of competent jurisdiction.

## CONFIDENTIALITY

8.    The Trustee shall use the information disclosed to him by the Company only for the purposes of evaluating the Company and its ongoing performance. The Trustee shall restrict disclosure of the information that he obtains from the Company to those persons who require knowledge of the information in order to help the Trustee to evaluate the Company (including, but not limited to, officers, directors, employees, and professional advisors of the Trustee). Neither the Trustee nor any of his agents or advisors shall disclose any confidential information

2

regarding the Company to any third parties, except as may be required by ERISA or other laws or if required by the U.S. Department of Labor, the Internal Revenue Service, the Securities and Exchange Commission, or any other federal or state agencies. Neither the Trustee nor any of his agents or employees shall be obligated to maintain the confidentiality of any information that is publicly available or that becomes publicly available without violation by the Trustee or any of his agents or employees of the terms of this Section 8 of this Agreement. If the Trustee resigns or is removed after signing the Agreement, the Trustee shall remain subject to the confidentiality provisions of this Agreement and shall return to the Company all documents delivered to him by the Company upon request.

## OTHER MATTERS

9.      This Agreement shall constitute the entire Agreement between the Company and the Trustee on the subject matter herein and, except for the Plan, supersedes any and all other agreements, whether oral or written, between the parties hereto with respect to the rendering of services by the Trustee. This Agreement cannot be amended or modified except by a written agreement signed by both parties.

10.     The provisions of this Agreement are intended to be severable. Should any provision of this Agreement be declared invalid or illegal for any reason, such declaration shall not affect the validity of the remainder of this Agreement.

## CONCLUSION

11.     If you find this Agreement acceptable, please sign in the space provided below.

Sincerely,

Miguel Paredes, MBA, CPFA
Prudent Fiduciary Services, LLC

--Signatures on next page--

3

The Company has reviewed, accepts, and agrees to the terms of this Agreement.

**Community Provider of Enrichment Services, Inc.**

Signed: _____    Date: 4/15/20

Name: Mark Monson

Title: President/CEO

The Trustee has reviewed, accepts, and agrees to the terms of this Agreement.

**Trustee**

By: _____    Date: 4/16/2020
  Miguel Paredes

4

## ACTION BY UNANIMOUS WRITTEN CONSENT
## OF THE BOARD OF DIRECTORS
## FOLLOWING A SPECIAL MEETING

The undersigned, constituting all of the directors serving on the Board of Directors (the "Board") of Community Provider of Enrichment Services, Inc., an Arizona corporation (the "Corporation"), acting by written consent following a special meeting pursuant to the Bylaws of the Corporation and Title 10, Chapter 10 of the Arizona General Corporations Code, hereby waive notice and consent to the adoption of the following resolutions as adopted at a special meeting duly called and held with a quorum being present and acting throughout:

### RECITALS

WHEREAS, the Board deems it advisable and in the best interests of the Corporation to remove Custos Fiduciary Services, LLC, acting by and through Alberto J. Tarajano (the "Trustee") from the position of trustee of the CPES Employee Stock Ownership Trust (the "Trust"), which implements and forms a part of the CPES Employee Stock Ownership Plan (the "Plan," and together with the Trust, the "ESOP");

WHEREAS, Paragraph M of the CPES Employee Stock Ownership Trust Agreement, made as of February 5, 2016 (the "Trust Agreement"), provides that the Trustee may be removed at any time by the Corporation upon written notice to the Trustee;

WHEREAS, Paragraph M of the Trust Agreement also provides that, upon resignation or removal of any Trustee, the Board may appoint a successor individual Trustee or Trustees or institutional Trustees;

WHEREAS, the Board deems it advisable and in the best interests of the Plan participants to remove the Trustee of the Trust effective as of April 15, 2020, pursuant to the terms of that certain Removal of Trustee, Waiver of Notice and Appointment of Successor Trustee Agreement, dated as of April 15, 2020, substantially in the form attached hereto as EXHIBIT A and presented to the Board for its consideration and approval ("Removal of Trustee, Waiver of Notice and Appointment of Successor Trustee Agreement");

WHEREAS, the Board deems it advisable and in the best interests of the Plan participants to appoint Prudent Fiduciary Service, LLC, by and through Miguel Paredes, as successor trustee of the Trust effective as of April 16, 2020, pursuant to the terms of that certain Trustee Engagement Agreement, dated as of April 15, 2020, substantially in the form attached hereto as EXHIBIT B and presented to the Board for its consideration and approval (the "Trustee Engagement Agreement"); and

WHEREAS, Miguel Paredes, not in his individual capacity, but solely in his capacity as successor trustee of the Trust (the "Successor Trustee"), has accepted his appointment as Successor Trustee in accordance with the terms of that certain Joinder Agreement, substantially in the form attached hereto as EXHIBIT C and presented to the Board for its consideration and approval (the "Joinder Agreement").

## RESOLUTIONS

NOW, THEREFORE, BE IT:

RESOLVED, that the removal of the Trustee effective as of April 15, 2020, as trustee of the Trust, be, and hereby is, approved pursuant to the terms of the Removal of Trustee, Waiver of Notice and Appointment of Successor Trustee Agreement, substantially in the form attached hereto as EXHIBIT A.

RESOLVED FURTHER, that the Corporation be, and hereby is, authorized and directed to adopt the Removal of Trustee, Waiver of Notice and Appointment of Successor Trustee Agreement, substantially in the form attached hereto as EXHIBIT A, with such changes, if any, as shall be acceptable to the Authorized Officers (as herein defined) of the Corporation in their sole discretion, execution and delivery of those documents by the Corporation to be conclusive evidence of the approval of the Board, and to perform its obligations thereunder.

RESOLVED FURTHER, that the appointment of the Successor Trustee, as successor trustee of the Trust effective as of April 16, 2020, be, and hereby is, approved, and the Successor Trustee be, and hereby is, vested with the authority to manage and control assets of the Trust as expressly specified in the Plan and Trust documents and the Trustee Engagement Agreement, substantially in the form attached hereto as EXHIBIT B.

RESOLVED FURTHER, that the Corporation be, and hereby is, authorized and directed to adopt the Trustee Engagement Agreement, substantially in the form attached hereto as EXHIBIT B, and the Joinder Agreement, substantially in the form attached hereto as EXHIBIT C, with such changes, if any, as shall be acceptable to the Authorized Officers (as herein defined) of the Corporation in their sole discretion, execution and delivery of those documents by the Corporation to be conclusive evidence of the approval of the Board, and to perform its obligations thereunder.

## GENERAL AUTHORIZATION

RESOLVED FURTHER, that the Chairman of the Board, President, Vice President, Chief Financial Officer, Secretary and any other officer of the Corporation (each such person, an "Authorized Officer") be, and each of them hereby is, authorized and empowered to take all such further action and to execute, deliver and file all such further agreements, certificates, instruments and documents, in the name and on behalf of the Corporation, and if requested or

ACTIVE.122465138.01

required, under its corporate seal duly attested by the Secretary; to pay or cause to be paid all expenses; to take all such other actions as they or any one of them shall deem necessary, desirable, advisable or appropriate to carry out the full intent and purposes of the foregoing resolutions.

RESOLVED FURTHER, that in connection with the transactions contemplated in the preceding resolutions, the Secretary or the Assistant Secretary of the Corporation be, and hereby is, authorized in the name and on behalf of the Corporation, to certify any more formal or detailed resolutions as such officer may deem necessary, desirable, advisable or appropriate to carry out the full intent and purposes of the foregoing resolutions; and that thereupon, such resolutions shall be deemed adopted as and for the resolutions of the Board as if set forth at length herein.

RESOLVED FURTHER, that the omission from these resolutions of any agreement or other arrangement contemplated by any of the agreements or instruments described in the foregoing resolutions or any action to be taken in accordance with any requirements of any of the agreements or instruments described in the foregoing resolutions shall in no manner derogate from the authority of the Authorized Officers to take all actions necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the foregoing resolutions.

RESOLVED FURTHER, that all actions heretofore taken by any member of the Board or any officer or agent of the Corporation for and on behalf of the Corporation, in entering into, executing, acknowledging or attesting any arrangements, agreements, instruments or documents which carry out the terms and intentions of any of the foregoing resolutions are hereby in all respects ratified, approved and confirmed by the Board.

RESOLVED FURTHER, that these resolutions may be executed in two or more counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall constitute one and the same instrument, and that an executed copy of this Unanimous Written Consent shall be filed with the Secretary and included in the minutes of the proceedings of the Board.


[Signature Page to Follow]


ACTIVE.122465138.01

IN WITNESS WHEREOF, the undersigned hereby duly executes and delivers these resolutions as of the date first written above to be effective as of the date first written above unless otherwise specified herein.

BOARD OF DIRECTORS:

_____
David Johnson, Chairman

_____
Mark G. Monson

_____
Douglas Zimmerman

_____
Michele Ferrall

_____
Tiki Thompson

IN WITNESS WHEREOF, the undersigned hereby duly executes and delivers these resolutions as of the date first written above to be effective as of the date first written above unless otherwise specified herein.

BOARD OF DIRECTORS:

_____
David Johnson, Chairman

_____
Mark G. Monson

_____
Douglas Zimmerman

_____
Michele Ferrall

_____
Tiki Thompson

ACTIVE.122465138.01

IN WITNESS WHEREOF, the undersigned hereby duly executes and delivers these resolutions as of the date first written above to be effective as of the date first written above unless otherwise specified herein.

BOARD OF DIRECTORS:

_____

David Johnson, Chairman

_____

Mark G. Monson

_____

Douglas Zimmerman

_____

Michele Ferrall

_____

Tiki Thompson

ACTIVE.122465138.01

IN WITNESS WHEREOF, the undersigned hereby duly executes and delivers these resolutions as of the date first written above to be effective as of the date first written above unless otherwise specified herein.

BOARD OF DIRECTORS:

_____
David Johnson, Chairman


_____
Mark G. Monson


_____
Douglas Zimmerman


_____
Michele Ferrall


_____
Tiki Thompson

ACTIVE.122465138.01

**EXHIBIT A**
**REMOVAL OF TRUSTEE, WAIVER OF NOTICE AND APPOINTMENT OF**
**SUCCESSOR TRUSTEE AGREEMENT**

See attached

**EXHIBIT B**
**TRUSTEE ENGAGEMENT AGREEMENT**

See attached

ACTIVE.122465138.01

**EXHIBIT C**
**JOINDER AGREEMENT**

See attached

## JOINDER AGREEMENT

THIS JOINDER AGREEMENT (this "Joinder Agreement") to the CPES Employee Stock Ownership Trust Agreement, as most recently amended and restated effective on February 5, 2016 (the "Trust Agreement"), is made effective April 16, 2020 (the "Effective Date"), by and between Community Provider of Enrichment Services, Inc., an Arizona corporation (the "Corporation") and Miguel Paredes, not in his individual capacity, but solely in his capacity as successor trustee (the "Successor Trustee") of the CPES Employee Stock Ownership Trust (the "Trust"), which implements and forms a part of the CPES Employee Stock Ownership Plan (the "Plan," and together with the Trust, the "ESOP").

### RECITALS

WHEREAS, by action taken by Unanimous Written Consent of the Board of Directors Following a Special Meeting, dated as of April 15, 2020, the Board of Directors of the Corporation appointed the Successor Trustee to serve as successor trustee of the Trust, pursuant to the terms and subject to the limitations of that certain Trustee Engagement Agreement, dated as of April 16, 2020, by and between the Corporation and the Successor Trustee; and

WHEREAS, the Successor Trustee desires to accept his appointment as successor trustee of the Trust and succeed to the title of the assets of the Trust vested in the predecessor trustee.

### AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows effective as of the Effective Date:

Section 1.    Agreement to be Bound. The Successor Trustee hereby (a) acknowledges that he has received and reviewed a complete copy of the Trust Agreement and (b) agrees that upon execution of this Joinder Agreement, he shall become a party to the Trust Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Trust Agreement as though an original party thereto and shall be deemed, and is hereby appointed as, trustee of the Trust for all purposes thereof and entitled to all the rights incidental thereto, and shall hold the status of trustee of the Trust.

Section 2.    Notice Information. For purposes of delivering any notice under the Trust Agreement, the address of the Successor Trustee is as follows:

> Miguel Paredes
> Prudent Fiduciary Services, LLC
> 100 N. Barranca Street, Suite 870
> West Covina, CA 91791
> E-mail: mparedes@fiduciaryservices.com

ACTIVE.122466576.01

Section 3.    <u>Governing Law</u>.  This Joinder Agreement and the rights of the parties hereunder shall be interpreted in accordance with the laws of the State of California, and all rights and remedies shall be governed by such laws without regard to principles of conflicts of laws.

Section 4.    <u>Descriptive Headings</u>.    The descriptive headings of this Joinder Agreement are inserted for convenience only and do not constitute a part of this Joinder Agreement.

Section 5.    <u>Counterparts</u>.  This Joinder Agreement may be executed in counterparts each of which, taken together, shall constitute one and the same original.

[Signature Page to Follow]

IN WITNESS WHEREOF, the undersigned hereby causes this Joinder Agreement to be duly executed and delivered by its authorized officer as of the date first written above.

COMMUNITY PROVIDER OF
ENRICHMENT SERVICES, INC.,
an Arizona corporation

Mark G. Monson, CEO

Joinder Agreement
Signature Page 1 of 2

IN WITNESS WHEREOF, the undersigned hereby causes this Joinder Agreement to be duly executed and delivered as of the date first written above.

<div style="margin-left: 50%;">

MIGUEL PAREDES, not in his individual capacity, but solely in his capacity as trustee of the CPES Employee Stock Ownership Trust

_____

Miguel Paredes

</div>

Joinder Agreement
Signature Page 2 of 2

# REMOVAL OF TRUSTEE, WAIVER OF NOTICE

## AND

## APPOINTMENT OF SUCCESSOR TRUSTEE

THIS REMOVAL OF TRUSTEE, WAIVER OF NOTICE AND APPOINTMENT OF SUCCESSOR TRUSTEE is entered into between Community Provider of Enrichment Services, Inc., an Arizona corporation (the "Corporation") and Custos Fiduciary Services, LLC, by and through Alberto J. Tarajano, not in his individual capacity, but solely in his capacity as trustee (the "Trustee") of the CPES Employee Stock Ownership Trust (the "Trust") which forms a part of the CPES Employee Stock Ownership Plan (the "ESOP"), on April 15, 2020, on the terms and conditions set forth below:

1.    Removal of Trustee.  Pursuant to Section M of the Trust, the Corporation hereby removes the Trustee as trustee of the Trust and as fiduciary of the ESOP, effective as of midnight Pacific Time on April 15, 2020 (the "Effective Date").

2.    Acceptance of Removal and Waiver of Notice.  The Trustee hereby accept his removal as Trustee of the Trust as of the Effective Date and, pursuant to Section M of the Trust, waives the requirement for notice under the Trust and any trustee services agreement between the Corporation and the Trustee.

3.    Appointment of Successor Trustee.  The Corporation hereby appoints Miguel Paredes ("Paredes") as successor trustee (the "Successor Trustee") pursuant to Section M of the Trust, effective as of 12:01 AM Pacific Time on April 16, 2020 (the "Appointment Date").

4.    Indemnification.  The Corporation hereby agrees to indemnify and hold harmless the Trustee against any and all liabilities, damages, losses, costs, expenses (including reasonable attorneys' fees and court costs), causes of actions, claims, regulatory investigations or audits, and penalties arising after the Effective Date related to matters undertaken by the ESOP or the Trust from and after the Effective Date.

5.    Entire Agreement.  This agreement sets forth the entire understanding between the parties and supersedes all previous proposals, oral or written, and all other communications, oral or written, between the parties relating to the subject matter of this agreement.

6.    Incorporation by Reference.  Sections H, J and M of the Trust are incorporated herein by reference as though fully set forth herein.

[Signature Page to Follow]

1

ACTIVE.122464903.01

IN WITNESS WHEREOF, the parties have signed this Removal of Trustee, Waiver of Notice and Appointment of Successor Trustee on the date above written.

COMMUNITY PROVIDER OF
ENRICHMENT SERVICES, an
Arizona corporation

TRUSTEE

By: _____
    David Johnson, Chairman of the Board
    of Directors of the Corporation

_____
    Alberto J. Tarajano

[not in his individual capacity, but solely in his capacity as Trustee of the CPES Employee Stock Ownership Trust]

## ACCEPTANCE OF APPOINTMENT

The undersigned, acting pursuant to Section M of the Trust hereby accepts his appointment as Successor Trustee of the ESOP and the Trust as of the Appointment Date.

_____
    Miguel Paredes

[not in his individual capacity, but solely in his capacity as Trustee of the CPES Employee Stock Ownership Trust]

2

ACTIVE.122464903.01

**Alberto Tarajano**
**260 Crandon Blvd. 32-134**
**Key Biscayne, FL 33149**

April 16, 2020

Mark Monson, CEO
Community Provider of Enrichment Services
4825 N Sabino Canyon Road
Tucson, AZ 85750

RE: ESOP Trustee Services

Mark:

Effectively today, I resign as Trustee of the CPES ESOP due to non-payment of fees.

As discussed in our call, I agree to waive the 30-day notice period for termination of the
agreement.

I am happy to coordinate a transition with another fiduciary.

Thank you,

Alberto Tarajano



Exhibit "5"



Mr. Mark Monson, CEO                                                     April 14, 2020
Community Provider of Enrichment Services, Inc.
4825 N. Sabino Canyon Rd.
Tucson, AZ 85750

Dear Mr. Monson:

This Engagement Agreement (Agreement) is made and entered into by Community Provider of Enrichment Services, Inc. (Company) and Miguel Paredes (Trustee), a professional fiduciary under the Employee Retirement Income Security Act of 1974 as amended (ERISA). Prudent Fiduciary Services, LLC is the Trustee's operating company.

The Company has established and sponsors the CPES Employee Stock Ownership Plan and associated Trust (ESOP or Plan) for the benefit of its employees.

The Company desires to retain Miguel Paredes as Trustee for the ESOP. Miguel Paredes agrees to serve as Trustee of the ESOP subject to the terms and conditions set forth in this Agreement and the Plan's Trust Agreement.

### AGREEMENT

In consideration of the mutual covenants and agreements set forth in this Agreement, the parties agree to the following:

### APPOINTMENT AND DUTIES

1.    The Company hereby appoints Miguel Paredes to serve as Trustee of the Plan, pursuant to the provisions of the Trust Agreement, and Paredes hereby accepts this appointment. Paredes shall adopt all the powers, authority, and obligations of a Trustee under ERISA and the terms of the Plan. Paredes shall be authorized to take all actions reasonably necessary to carry out his duties under this Agreement and the Trust Agreement.

2.    Paredes, as Trustee, shall perform the services in accordance with this Agreement and the Trust Agreement in order to safeguard the assets of the plan trust and help ensure the proper administration of the Plan. These services include, but are not limited to:

- Managing the assets of the ESOP trust
- Evaluating and selecting an independent valuation firm
- Establishing the annual Company stock price
- Voting the ESOP Company stock shares
- Administering employee "pass through" voting of ESOP shares when legally required
- Satisfying the Trustee's ERISA fiduciary responsibilities of acting prudently, solely in the interest of the plan's participants, and acting in accordance with the plan documents

---

100 N. Barranca St., Suite 870      |  T.  (626) 549-1410  | mparedes@fiduciaryservices.com
West Covina, CA 91791               |  F.  (626) 384-3342  | www.fiduciaryservices.com

PAREDES-0000369

## INDEMNIFICATION

3.      The Company hereby agrees to fully indemnify the Trustee and hold him harmless from any and all loss or liability, including reasonable legal fees, which the Trustee sustains in discharging his duties and responsibilities under this Agreement. However, this indemnification provision shall not apply to the extent that any loss or liability is found, in a final judgment by a court of competent jurisdiction from which no appeal can be taken, to have resulted from either the gross negligence or willful misconduct of the Trustee, or to the extent prohibited by ERISA.

## FEES FOR SERVICES

4.      Compensation for the services to be performed by the Trustee pursuant to this Agreement shall be an annual fee of thirteen thousand dollars ($13,000). The Trustee fees shall be paid by the Company, or paid by the ESOP to the extent legally chargeable as Plan administrative expenses. This annual fee amount shall be guaranteed for the first two years of the ongoing engagement but may be revisited in subsequent years.

## EXPENSES

5.      All reasonable expenses incurred by the Trustee in the performance of his duties hereunder shall be paid by the Company or paid by the ESOP to the extent legally chargeable as Plan administrative expenses. Expenses are expected to be primarily related to reasonable transportation, meals, and lodging if necessary.

## RESIGNATION OR REMOVAL

6.      Miguel Paredes will continue to serve as the Trustee of the Plan until Paredes resigns or is removed by the Company. The Company may remove Paredes as the Trustee of the Plan at any time by providing Paredes with 30 days advance written notice.

## ALTERNATE DISPUTE RESOLUTION

7.      The Company and the Trustee hereby agree that any and all disputes that cannot be resolved in a reasonable time by discussions between the Trustee and the Company that arise pursuant to this Agreement, or that relate in any way to the services provided by the Trustee to the Company, shall be submitted to binding arbitration pursuant to the Federal Arbitration Act, before the American Arbitration Association pursuant to its then existing rules, except that discovery may be conducted in accordance with the Federal Rules of Civil Procedure. Any arbitration award shall be binding and enforceable in any court of competent jurisdiction.

## CONFIDENTIALITY

8.      The Trustee shall use the information disclosed to him by the Company only for the purposes of evaluating the Company and its ongoing performance. The Trustee shall restrict disclosure of the information that he obtains from the Company to those persons who require knowledge of the information in order to help the Trustee to evaluate the Company (including, but not limited to, officers, directors, employees, and professional advisors of the Trustee). Neither the Trustee nor any of his agents or advisors shall disclose any confidential information

2

PAREDES-0000370

regarding the Company to any third parties, except as may be required by ERISA or other laws or if required by the U.S. Department of Labor, the Internal Revenue Service, the Securities and Exchange Commission, or any other federal or state agencies. Neither the Trustee nor any of his agents or employees shall be obligated to maintain the confidentiality of any information that is publicly available or that becomes publicly available without violation by the Trustee or any of his agents or employees of the terms of this Section 8 of this Agreement. If the Trustee resigns or is removed after signing the Agreement, the Trustee shall remain subject to the confidentiality provisions of this Agreement and shall return to the Company all documents delivered to him by the Company upon request.

## OTHER MATTERS

9.     This Agreement shall constitute the entire Agreement between the Company and the Trustee on the subject matter herein and, except for the Plan, supersedes any and all other agreements, whether oral or written, between the parties hereto with respect to the rendering of services by the Trustee. This Agreement cannot be amended or modified except by a written agreement signed by both parties.

10.     The provisions of this Agreement are intended to be severable. Should any provision of this Agreement be declared invalid or illegal for any reason, such declaration shall not affect the validity of the remainder of this Agreement.

## CONCLUSION

11.     If you find this Agreement acceptable, please sign in the space provided below.

Sincerely,

Miguel Paredes, MBA, CPFA
Prudent Fiduciary Services, LLC

--Signatures on next page--

3

PAREDES-0000371

The Company has reviewed, accepts, and agrees to the terms of this Agreement.

**Community Provider of Enrichment Services, Inc.**

Signed: _Mark Monson_   Date: _4/15/20_

Name: _Mark Monson_

Title: _President/CEO_

The Trustee has reviewed, accepts, and agrees to the terms of this Agreement.

**Trustee**

By: _____   Date: _4/16/2020_
    Miguel Paredes

4

PAREDES-0000372



Exhibit "6"



faegredrinker.com

Jeremy M. Pelphrey
Partner
jeremy.pelphrey@faegredrinker.com
310-203-4084 direct

Faegre Drinker Biddle & Reath LLP
1800 Century Park East, Suite 1500
Los Angeles, California 90067
+1 310 203 4000 main
+1 310 229 1285 fax

August 12, 2020

Miguel Paredes
Prudent Fiduciary Services, LLC
100 N. Barranca Street, Suite 870
West Covina, CA 91791

**Re:    Conflict Waiver**

Dear Miguel:

This letter is following-up our telephone conversation of April 13, 2020 during which I informed you that we represent Community Provider of Enrichment Services, Inc. (the "Company") in various matters, including a potential sale of the Company and any financial restructuring that may result. I also informed you the Company was considering engaging you to act as trustee of the Community Provider of Enrichment Services, Inc. Employee Stock Ownership Trust, and the accompanying Community Provider of Enrichment Services, Inc. Employee Stock Ownership Plan (the "ESOP"). The Company thereafter engaged your services to act as trustee of the ESOP. As you know, we represent you in other matters relating to employee stock ownership plan transactions; however, we will not be representing you in any matter with the Company. This may involve a conflict of interest, and the firm could not continue to undertake the representation without both clients consent.

We do not believe that our representation of the Company regarding the potential sale of the Company or any financial restructuring that may result will adversely affect our representation of you in other matters in which we represent you. We discussed this more fully on our telephone conversation of April 13, 2020. The matters that we represent you are transactional in nature and do not pertain to the Company. However, we ask that you acknowledge your express and informed consent to our continued representation of the Company.

By giving your consent, you acknowledge that we have made full disclosure to you of the facts and circumstances surrounding any conflict of interest or potential conflict which may exist now or in the future with regard to our representation of the Company.

We are also requesting the Company to consent to our continuing representation of you in matters in which your interests do not conflict with those of the Company and we will not continue the representation of the Company unless we obtain that consent.

Despite any such conflict which may exist, you hereby agree to our continued representation of the Company. You further agree to our right to withdraw our continued representation if, in our opinion, it might violate applicable rules of professional conduct.

ACTIVE.124831637.01

Miguel Paredes, Trustee                    -2-                    August 12, 2020


        I will be pleased to answer any questions you may have concerning this requested consent.
You are, of course, free to consult independent counsel about this consent.  If you wish to consent,
please sign below "Agreed and Approved" and return it to me via email.

                                            Very truly yours,

                                            Jeremy M. Pelphrey

AGREED AND APPROVED:

By: _____
        Miguel Paredes, Trustee


Dated: 8/13/2020

| | |
|---|---|
| **From:** | Paul Zielinski |
| **To:** | Pelphrey, Jeremy M. |
| **Cc:** | Miguel Paredes; Kirk Soto |
| **Subject:** | RE: Conflict Waiver - CPES |
| **Date:** | Thursday, August 13, 2020 8:46:22 AM |
| **Attachments:** | Paredes - Conflict Waiver (executed).pdf |

Jeremy,

Attached please find the executed conflict waiver. Please let us know if you need anything else.

 **PRUDENT FIDUCIARY**
───── S E R V I C E S ─────

**Paul Zielinski, JD**
Director
Prudent Fiduciary Services, LLC
100 N. Barranca St., Suite 870
West Covina, CA 91791
Main: (626) 549-1410
Fax:  (626) 384-3342
www.fiduciaryservices.com

*This message (including any attachments) may contain confidential, proprietary, privileged, and/or private information. The information is intended to be for the use of the individual or entity designated above. If you are not the intended recipient of this message, please notify the sender immediately, and delete the message and any attachments. Any disclosure, reproduction, distribution, or other use of this message or any attachments by an individual or entity other than the intended recipient is prohibited.*

**From:** Pelphrey, Jeremy M. <jeremy.pelphrey@faegredrinker.com>
**Sent:** Wednesday, August 12, 2020 5:43 PM
**To:** Miguel Paredes <mparedes@fiduciaryservices.com>
**Cc:** Kirk Soto <ksoto@fiduciaryservices.com>
**Subject:** Conflict Waiver - CPES

Miguel-

        Good afternoon.  Attached is the conflict waiver in the CPES matter that we discussed previously but I don't recall sending to you after our call about it in April.  Please review it and let me know if you have any questions.  Otherwise, please execute it and return it to me at your earliest convenience.

All the best,
Jeremy

**Jeremy M. Pelphrey**
Partner
jeremy.pelphrey@faegredrinker.com
+1 310 203 4084 direct

Faegre Drinker Biddle & Reath LLP
1800 Century Park East, Suite 1500
Los Angeles, California 90067 USA

PAREDES-0002014

This message and any attachments are for the sole use of the intended recipient(s) and may
contain confidential and/or privileged information. Any unauthorized review, use, disclosure
or distribution is prohibited. If you are not the intended recipient, please contact the sender
by reply email and destroy all copies of the original message and any attachments.

PAREDES-0002015



Exhibit "7"

<div style="text-align:center">

1                UNITED STATES BANKRUPTCY COURT

2        CENTRAL DISTRICT OF CALIFORNIA - NORTHERN DIVISION

3                       --oOo--

</div>

```
 4   In Re:                       )   Case No. 9:20-bk-10554-DS
                                  )
 5   CPASAZ LIQUIDATING, INC., fka )   Chapter 11
     Community Provide of          )
 6   Enrichment Services, Inc.,    )   Jointly Administered with:
                                  )   Case No. 9:20-bk-10553-DS
 7   NDS LIQUIDATING INC., fka     )   Case No. 9:20-bk-10994-DS
     Novelles Development Services )
 8   Inc.,                         )
                                  )   June 18, 2020
 9   CPESCA LIQUIDATING, INC., fka )
     CPES CALIFORNIA, INC.,        )
10                                 )
     Debtors,                      )
11   ----------------------------X
```

<div style="text-align:center">

12

13       TRANSCRIPT OF TELEPHONIC 341(a) PROCEEDING
          BEFORE BRIAN D. FITTIPALDI, ESQ.
14             CHAPTER 11 TRUSTEE

</div>

15

<u>APPEARANCES:</u>

16

```
For the Debtors:        KAITLIN MCKENZIE, ESQ.
17                      JEREMY PELPHREY, ESQ.
                        Faegre Drinker Biddle & Reath
18                      1800 Century Park East
                        Suite #1500
19                      Los Angeles, California  90067

20   For Bob Bennetti, Linki  DOUGLAS A. RUBEL, ESQ.
     Peddy, Linda Mariano,    DAVID R. JOHANSON, ESQ.
21   Chip Foust and in excess 1776 Second Street
     Of 92 other CPES         Napa, California  94559
22   Employee Stock Ownership
     Plan and Trust           SCOTT MCNUTT, ESQ.
23   Participants:            324 Warren Road
                             San Mateo, California  94402
```

24

25



1 | Court Transcriptionist:  Ruth Ann Hager, C.E.T.**D-641
                               Ben Hyatt Certified Deposition
2 |                             Reporters
                               17835 Ventura Boulevard
3 |                             Suite #310
                               Encino, California  91316
4 |

5 |

6 |

7 |

8 |

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |



Page                                                                          3

1                    TRANSCRIPT OF PROCEEDINGS

2                           --oOo—

3           MR. FITTIPALDI:  Good morning.  Today's date is

4    June 18th, year 2020.  The time is 9:15 a.m.  This is the

5    continued 341(a) in two bankruptcy cases.  The case names

6    are Community Provider of Enrichment Services, Inc.  The

7    case number is 9:20-10554-DS.  The other case is Novelles,

8    case number 9:20-10553-DS.  These cases are jointly

9    administered under the 10554 number.

10          The voluntary petitions in this case were filed

11   on April 24th of this year.  This 341(a) is continued and

12   from our March -- from our May 28th date and what I'm going

13   to do first is I want to make it clear on the record that

14   what I'm doing now is recording this on our U.S. Trustee

15   machine.  That will serve as our official record.  Anybody

16   needs a copy, they can contact me and I'll tell you how you

17   can obtain one.

18          We are appearing because of the COVID-19

19   pandemic.  We're doing this hearing remotely.  No one is

20   here live in Santa Barbara, so we're on the phone.  And so

21   what I'm going to do is take a roll call of everybody

22   before we start formal.  Well, we are formally.  We're on

23   the record.

24          Okay.  So first I'd like to have appearance of

25   counsel for the debtor.

Page                                                                    4

1              MS. MCKENZIE:  Good morning.  This is Kaitlin

2     McKenzie, Faegre Drinker, on behalf of the debtor.

3              MR. FITTIPALDI:  Okay.

4              MR. PELPHREY:  Good morning.  This is Jeremy

5     Pelphrey with Faegre Drinker on behalf of the debtors.

6              MR. FITTIPALDI:  Okay.  Thank you.

7              And how about the principal of the debtor?  May I

8     have your appearance, please?

9              MR. MONSON:  This is Mark Monson, President and

10    CEO of Novelles in the state of California.

11             MR. FITTIPALDI:  Okay.  Thank you.  All right.

12             Anyone else appearing on behalf of the debtor,

13    either counsel, principals or otherwise -- other

14    professionals?

15             MS. GREENHOW:  Mary Lynn Greenhow, Vice President

16    with CPESCA and Novelles.

17             MR. FITTIPALDI:  Could you spell your last name,

18    please, ma'am?

19             MS. GREENHOW:  Yes.  G-R-E-E-N-H-O-W.

20             MR. FITTIPALDI:  Greenhow.

21             MS. GREENHOW:  Correct.

22             MR. FITTIPALDI:  Okay.  And you're the vice

23    president of?

24             MS. GREENHOW:  My title is vice president of

25    administration of CPES, Inc., and Novelles Developmental

Page                                                                    5

1   Services.

2          MR. FITTIPALDI:  Okay.  Thank you.  All right.

3   Anyone else on the debtor's behalf?

4          (Simultaneous conversation.)

5          MS. GROVE:  Nancy Grove, administrator of

6   corporate affairs, CPES.

7          MR. FITTIPALDI:  Okay.  Ma'am, could you spell

8   your last name, please?

9          MS. GROVE:  G-R-O-V-E.

10          MR. FITTIPALDI:  Okay.  And you're administrative

11   corporate affairs?

12          MS. GROVE:  Correct.

13          MR. FITTIPALDI:  Okay.  Thank you.  Anyone else

14   on behalf of the debtor?

15          MR. WHEELER:  Curt Wheeler, Assistant Controller,

16   CPES and Novelles.

17          MR. FITTIPALDI:  Okay.  Anyone else on behalf of

18   the debtor?

19          (No response.)

20          Okay.  Now let's turn -- anyone else out there?

21   Just don't rush to the door, but -- so I need the

22   appearances of the others that are on the line.

23          MR. HYDE:  Charles Hyde from Tucson, Arizona,

24   appearing on behalf of Norma Allavez (phonetic), who is a

25   landlord for the property located at 110 Acacio Street,

Page                                                                    6

1   Bisbee, Arizona.

2           MR. FITTIPALDI:  Okay.

3           MR. HYDE:  And Norma Allavez may also be on the

4   line and you can say, present, Norma, if you're on the

5   line.

6           MS. ALLAVEZ:  Present.

7           MR. FITTIPALDI:  Okay.  So you got my email then.

8   Okay.  Good.  All right.  She had asked about it.  Okay.

9   Great, thank you.

10          Who else is on the line?

11          MS. GIRER:  Ramona Girer.

12          UNIDENTIFIED VOICE:  Hi, this is --

13          MR. FITTIPALDI:  Well, okay.  Ms. Girer, go

14  ahead.

15          MS. GIRER:  Yes.  Former employee.

16          MR. FITTIPALDI:  Okay.  Thank you.

17          MS. GIRER:  CPES, Inc.

18          MR. FITTIPALDI:  Who else?

19          MR. FUKOMOTO:  This is Ty Fukomoto (phonetic)

20  sitting in on behalf of Miguel Perretes (phonetic), the

21  ESOP trustee.

22          MR. FITTIPALDI:  Okay.  Thank you.

23          MR. GALINSKI:  And this is Paul Galinski

24  (phonetic), also sitting in on behalf of the ESOP trustee.

25          MR. FITTIPALDI:  Okay.  Anyone else?

Page                                                                    7

 1          MR. RUBEL:  Douglas Rubel.  I'm appearing on

 2   behalf of David Johanson, who sends his apologies.  He's

 3   not able to appear today.  He's on vacation.  We represent

 4   a number upwards of not more than 50 of the ESOP

 5   participants.

 6          MR. FITTIPALDI:  Okay.  Anyone else?

 7          MS. GOSS:  Susan Goss, former employee, Novelles.

 8          MR. FITTIPALDI:  Okay.  Thank you.

 9          Anyone else?  Anybody else?

10          (No response.)

11          Okay.  So let's get back to it.  So what I --

12   let's see.  We have four persons who are employed by the

13   debtor.  So what I'd like to do is swear all four in unless

14   there's an objection to that.  Okay.

15          So what I'm going to ask you to do, raise your

16   right hands so that I might administer the oath and then

17   I'm going to get the roll call from you again once -- okay.

18   So the four parties that are employed by the debtor, please

19   raise your right hands.

20              NANCY GROVE, MARY LYNN GREENHOW,

21              MARK MONSON, CURT WHEELER, Sworn

22          MR. FITTIPALDI:  Okay.  So again, just for the

23   record, Mr. Monson, could you state your title with these

24   debtors?

25          MR. MONSON:  Mark Monson, President and CEO.

Page                                                                      8

1            MR. FITTIPALDI:  Of both debtors?

2            MR. MONSON:  Of both debtors, yes.

3            MR. FITTIPALDI:  Okay.  Ms. Greenhow, could you

4    please state your connection to the debtor again, please?

5            MS. GREENHOW:  I am employed as the vice

6    president of administration for both entities.

7            MR. FITTIPALDI:  Okay.  And Miz -- is it Grove?

8            MS. GROVE:  It's Grove.

9            MR. FITTIPALDI:  And again, what is your

10   connection to the debtor?

11           MS. GROVE:  I'm the administrator of corporate

12   affairs for CPES.

13           MR. FITTIPALDI:  For CPES only?

14           MS. GROVE:  Only.

15           MR. FITTIPALDI:  Okay.  And then Mr. Wheeler.

16           MR. WHEELER:  Yeah, Curt Wheeler.  I'm the

17   assistant controller of CPES and Novelles.

18           MR. FITTIPALDI:  Okay.  All right.  Thank you,

19   all.

20           All right.  What we're going to do first is get a

21   refresher of why the debtor filed and then where we are

22   right now.

23   EXAMINATION OF MR. MONSON BY MR. FITTIPALDI:

24       Q.   So, Mr. Monson, could you please state to us what

25   do CPES and Novelles do?  And would it be easier, perhaps,

Page                                                                                           9

1   if I separated the debtors, one and then the other?

2       A.   Yes.

3       Q.   Okay.  So let's go with CPES or may we call

4   Community Provider of Enrichment Services, Inc., we'll call

5   CPES.  Okay.  So what does CPES do?

6       A.   CPES provides services for developmentally

7   disabled consumers.  We have 64 residential sites within

8   the state of Arizona.  We are actually working with the

9   State terminating our employment and foster care services

10  effective July 31st, so beyond July 31st we will have 64

11  residential group homes.

12          Two of them are specialty group homes for

13  individuals that have multiple co-morbidities, behavioral

14  medical health issues, et cetera.

15      Q.   Okay.  Just so we're clear, so CPES just involves

16  Arizona, is that correct?

17      A.   Yes, but CPES, Inc., is the holding company for

18  two other entities.

19      Q.   Okay.  And what are the two entities that CPES,

20  Inc. is the holding company for?

21      A.   Novelles, which is one of the debtors and CPES,

22  California, which is not part of the bankruptcy.

23      Q.   Okay.  So CPES, Inc., again, you said there's 64

24  residential sites in Arizona.

25      A.   Yes.

Page                                                              10

1        Q.    How many clients do you have at those sites right

2   now approximately?

3        A.    Typ -- I mean, approximately there's usually

4   about three individuals per home, so about 180.

5        Q.    180?

6        A.    Um-hum.

7        Q.    Approximately.  Okay.  That's approximate number

8   currently?

9        A.    Yes, that's an approximate number.

10       Q.    And are these developmentally disabled adults?

11       A.    Yes.  There are several individuals that we serve

12   that are below the age of 18 as well, but for the most part

13   they're all adults.

14       Q.    And the ones that you serve under the age of 18

15   are they developmentally disabled as well?

16       A.    Yes.

17       Q.    Okay.  And these residential sites, are they --

18   and again, we need this for the record.  We know some of

19   these answers, but --

20       A.    Sure.

21       Q.    Are these clients permanent residents or

22   temporary residents at the 64 residential sites?

23       A.    In 62 of those sites they are permanent residents

24   and two of the supportive homes they are temporary

25   residents, but that temporary could be up to a couple of

Page                                                                    11

1    years.

2         Q.   Okay.  So the approximately 180 clients that you

3    have at the 64 residential sites, these people are going

4    to -- on average -- 62 of the sites have permanent

5    residents and then two of the sites have temporary,

6    although that could be -- do I still have you there?

7         A.   Yes.

8         Q.   I'm sorry.  Okay.  So 62 of these 64 sites are

9    permanent.  And would that encompass maybe -- well, let's

10   see.  So it's almost 180 residents at 62 sites, I would

11   imagine.

12        A.   Yes.

13        Q.   Okay.  And you stated that by the end of July the

14   debtor has an agreement with the State of Arizona to do

15   what exactly?

16        A.    To basically transition all of our other

17   services, which is employment.  We've already closed our

18   day treatment programs.  We closed behavioral health

19   services as well.  So what the state wanted us to do is

20   transition out of all of our services minus the 64 group

21   homes by July 31st.

22        Q.   Okay.

23        A.   Of this year.

24        Q.   So at the end of July the debtor will have how

25   many group homes in Arizona?

Page                                                                    12

1          A.    Sixty-four.

2          Q.    Still have 64 and still have approximately three

3    residents per home?

4          A.    Yes.

5          Q.    Okay.  And what -- just so we're clear, what

6    specific services is the debtor transitioning out of in

7    Arizona?

8          A.    Basically employment services is that, you know,

9    we provide individual support.  We have a long-care

10   program.  We actually recycle for Raytheon (phonetic).  We

11   have our developmental homes known as First Family

12   (phonetic) that are under the foster care umbrella.  We're

13   transitioning from those and we've done traditional kind of

14   foster care placement as well.  And, you know, we closed

15   out of that service.

16         Q.    So the day services, I don't -- stop me if this

17   is too broad of a stroke, but in Arizona by the end of July

18   this debtor will be out of the day services, so to speak,

19   in Arizona?

20         A.    Yeah.  CPES, Incorporated, will be out of the day

21   services in Arizona.

22         Q.    Okay.  Does the -- is there a -- in Arizona is

23   there a care ombudsman that is assigned to these sites or

24   does the debtor have a private ombudsman?

25         A.    Well, we report through, you know, basically the

Page                                                                13

1  State and the State does annual licensing visits.  We

2  actually -- any kind of variance of occurrence we have to

3  report to the State, so there's continual feedback with the

4  State themselves.

5      Q.   And then as far as patient records, so I'm

6  talking about the patients connected to this debtor or

7  clients.

8      A.   Yes.

9      Q.   Where are those maintained?

10     A.   The active records are all maintained within the

11 homes.

12     Q.   Okay.  So the individual home has the records for

13 each client that's in residence there?

14     A.   Correct.  And, you know, some of these

15 individuals have been within the company for 30, 40 years.

16 Some of those records, the older records are stored.

17     Q.   Okay.  And who at each site is responsible for

18 maintaining those records?

19     A.   We have basically site coordinators and area

20 managers that are responsible for the records, as well as

21 their quality assurance department.

22     Q.   Okay.  And then what about the day clients that

23 the debtor has in Arizona?  Are there records maintained

24 for those clients?

25     A.   Yes.

 www.benhyatt.com

Page                                                                14

 1     Q.  And where would those be maintained?

 2     A.  They're all stored currently because we've shut

 3 down all of our day treatment programs.

 4     Q.  Okay.  Is it fair to say that you mentioned that

 5 there's going to be a transition at the end of July, that

 6 the debtor is transitioning out of the day services.

 7 Between now and the end of July, will the debtor in Arizona

 8 be providing any day services?

 9     A.  No.

10     Q.  So even if there were restrictions to the

11 pandemic or any other -- so the debtor is not in the

12 business of day services -- active day services right now

13 in Arizona?

14     A.  That's correct.

15       MS. GREENHOW:  Excuse me.  This is Mary Lynn.  I

16 need to add -- I need to make a correction.  We are

17 currently providing day employment services to the Raphia

18 (phonetic) location here in Tucson.

19       MR. FITTIPALDI:  Okay.  In --

20       MR. MONSON:  I reclassify it as employment

21 services, but --

22 BY MR. FITTIPALDI:

23     Q.  And where is that located?

24       MS. GREENHOW:  In Tucson, Arizona.

25       MR. FITTIPALDI:  Okay.



Page                                                                    15

1   BY MR. FITTIPALDI:

2       Q.   And so that's the only day -- kind of day

3   services that the debtor is providing in Arizona right now?

4       A.   Yes.

5            MS. GREENHOW:  Yes.

6            MR. FITTIPALDI:  Okay.  Okay.

7   BY MR. FITTIPALDI:

8       Q.   Let me take a look here.  Let me turn to

9   Novelles.  So what does Novelles do?

10      A.   Novelles has one group home and they have units

11  served, actually children under the age of 22.  And we have

12  state prison programs to provide the Court of Living

13  Services, which is really 24-hour support, in homes that we

14  don't own because it's typically apartments that are

15  provided by the participants.  And we have what's called

16  IDLA services.  Just kind of intermittent kind of case

17  management services for a handful of residents as well.

18      Q.   In -- so -- and these are in California?

19      A.   Yes.  They're all in California.

20      Q.   Okay.  And how many clients does the -- Novelles

21  have that are in residence in California right now?

22      A.   You know, I'm just asking now.  It's probably

23  about 250 to 300.

24      Q.   And how widespread -- let me back up just to be

25  clear.  These clients, how would you categorize them?  Are



Page                                                                16

1   they developmentally disabled or there's various other --

2       A.   Yes.   They're all developmentally disabled.

3       Q.   And are they -- where do they reside?  Where are

4   the various places in which they reside, these in-residence

5   clients?

6       A.   Well, we have one group home and that is in Santa

7   Maria.  The other clients have lived actually -- we're in

8   Goleta, Lompoc, Santa Maria, San Luis Obispo, Paso Robles,

9   and then the -- kind of the east bay of the Oakland area.

10      Q.   Okay.

11      A.   Hayward.

12      Q.   The group home in Santa Maria, how many clients

13  does that house?

14      A.   Up to six.

15      Q.   Okay.  And then the other locations that you

16  mentioned, that would be the balance?  So one's in group --

17  there's up to six in a group home in Santa Maria and then

18  the balance of the clients in residence are in these other

19  locations you described?

20      A.   Yes.

21      Q.   And what kind of locations are these, apartments

22  or --

23      A.   Well, the supportive living clients typically

24  live in their own apartment.  I think we have one family

25  that owns a home.  They have two individuals there with



Page                                                                    17

1   developmental disabilities, but the majority of clients

2   live in a home that they rent.  And what we do as the

3   pros -- provide 24-hour support to those individuals.

4        Q.   So the majority of these -- you mentioned the 250

5   to 300 of the clients are in residence, but they're

6   primarily in their own residence?

7        A.   They're primarily in their own residence and then

8   we have treatment programs which currently in California

9   they're not operational because they can't because of

10  COVID.  There aren't any operating day treatment programs,

11  but the State is getting us reimbursed currently for those

12  programs.

13       Q.   Okay.  The -- so you mentioned this in-residence

14  and you mentioned the treatment programs.  And so all the

15  treatment programs, those are because of COVID in suspense

16  right now, so to speak?

17       A.   Yes.

18       Q.   All right.  And when -- if I could just get a

19  little clarity here.  When -- does the debtor intend to

20  restart those treatment programs when the COVID

21  restrictions are less -- are taken away, so to speak?

22       A.   Yes.  We have -- or officially by the end of the

23  month we'll be closing two permanently and there are

24  active -- are pre-bidders (phonetic) currently for those

25  two, but -- and they're in Burlingame, but the remaining

Page                                                                    18

1    day treatment programs we plan to (indiscernible).

2         Q.   Okay.  And again, what are those day treatment

3    programs?  What are the services provided there when

4    they're open?

5         A.   Typically it's six hours a week and, you know,

6    the norm is maybe five days a week.  We provide a whole

7    host of individualized services.  Some individuals are

8    managed on a one-to-one basis, have active medical co-

9    morbidity.  Other individuals, you know, are managed

10   probably in a one-to-three, one-to-four staffing ratio.

11   And so there are a variety of group learning-type

12   activities that we provide.  Some of the programs are also

13   coordinating with outside resources, so we actually would

14   take individuals out to the library, you know, a zoo, a

15   potential working relationship, a pizza parlor, you know,

16   whatever it might be.

17        Q.   Okay.  And the -- other than the in-res -- so

18   again, with Novelles, other than the in-residence program

19   and the treatment programs that are currently suspended are

20   there any other programs that Novelles provides?

21        A.   Well, I did mention IDLA and -- which is, you

22   know, we provide a few hours a week of individual supports

23   in the community, but that's it.

24        Q.   What does I -- is it IDLA?  What does that stand

25   for?

Page                                                                    19

1       A.    Individualized -- and I can't remember what

2  the -- maybe my team can remember, but I'd have to look it

3  up.

4            MS. GREENHOW:  This is Mary Lynn --

5            MR. MONSON:  (Indiscernible)

6            MS. GREENHOW:  IDLA in Arizona stands for

7  Individualized -- Individually Designed Living

8  Arrangement -- Individually Designed Living Arrangements.

9            MR. FITTIPALDI:  Okay.

10  BY MR. FITTIPALDI:

11      Q.    And does that mean the same in California?

12      A.    I don't know, but I'd have to look it up.

13            MR. FITTIPALDI:  Okay.

14            MS. GREENHOW:  If we're going to California it's

15  called either Supportive Living Service, Dependent Living

16  Service.

17            MR. FITTIPALDI:  Okay.  Thank you.

18  BY MR. FITTIPALDI:

19      Q.    And then sticking with Novelles is there any

20  ombudsman that the debtor reports to from the State or the

21  debtor has internally that tracks patient care?

22      A.    Yes.  Well, our quality department actually is

23  responsible for care in California as well.  California is

24  a little different than Arizona.  We report to regional

25  centers and in Novelles there are two active regional

Page                                                                  20

1   centers.  Those regional centers have quality control

2   programs and frequent the programs on a very-often basis as

3   well as we're licensed by the State and we're subject to

4   licensing reviews.  We report on a variance of occurrence

5   reports -- incident reports to our regional centers on an

6   ongoing basis.

7        Q.   Okay.

8        A.   So there's a lot of two-way dialogue in

9   California as well.

10       Q.   Well, when you say regional center who runs these

11  regional centers?

12       A.   There are, I believe, 21 or 22 regional centers

13  in the state.  They're non-profit entities that contract

14  with the State of Arizona.  They administer the funding and

15  they provide a lot of quality supports, so in your area I

16  know there is one regional center that has offices in Santa

17  Barbara, Santa Maria, you know, et cetera, and --

18       Q.   I think you -- I don't want to put words in your

19  mouth, but I think you might have misspoke.  You said in

20  Arizona. Did you mean these regional centers in California?

21       A.   Oh, I meant California.

22       Q.   Okay.  All right.  And what about the patient

23  files and such?  For the in-residence clients, where are

24  those maintained?

25       A.   They're maintained within the individual home

Page                                                                    21

1  and, again, if they're really old records we maintain those

2  records off site.  So we have current records within the

3  cites themselves.

4       Q.   Okay.  All right.  Now, again, we have a run-

5  down, broad brush of CPES and Novelles.  What about the

6  company that didn't file that you mentioned?  What's the

7  name of that one?  Is it CP --

8       A.   CPES California.

9       Q.   So what does that entity do?

10      A.   It's a developmental disability provider.  We

11 have 14 licensed group homes in this -- in the greater LA

12 area.

13      Q.   A broader question would be, CPES, Inc., and

14 Novelles filed bankruptcy but CPES California didn't.  So

15 why did that -- why did it work that way?

16      A.   Because our reimbursement is much better on the

17 residential homes because individuals that were in

18 (indiscernible) positions and a lot of those

19 (indiscernible) positions so our reimbursement rates are

20 significantly higher.  They're -- and we have a profit

21 margin of eight to twelve percent on a monthly basis.

22      Q.   Okay.  And again, just rehashing some of what we

23 did last time, why did CPES and Novelles file?  Let's start

24 with CPES.  Why did CPES file bankruptcy, CPES, Inc.?

25      A.   Well, we filed in essence because of we were

Page                                                                22

1  unable to -- in June basically make payroll.  We ran out of

2  cash.  Why did we run out of cash in Arizona in the last

3  decade?  We received about two percent out of 30 percent

4  inflation.  We've had four cost-of-living -- or four

5  minimum wage increases and the State has not covered those

6  minimum wage increases.  And we also have our insurance

7  premiums go up for professional liability about 1.2 million

8  dollars in the last year.  So we just ran out of cash.

9       Q.   And so broad brush, both debtors have filed

10  bankruptcy.  What's the goal for the Chapter 11s?

11       A.   Well, the goal is to actually restore

12  profitability.  In Arizona the state basically has given us

13  a mandate (indiscernible) by December 31st and in

14  California and Novelles our intent is to restore

15  profitability.  We go through it with regional centers for

16  three separate rates and we're on the course of profit.  We

17  did actually contract with CohnReznick to basically help us

18  essentially sell our California entity.

19       Q.   I'm sorry.  I didn't -- you contracted with whom?

20  You mentioned a person.

21       A.   No, it's a company.  An investment bank called

22  CohnReznick.

23       Q.   Oh, right.  Okay.

24       A.   So, you know, I -- either we --

25            MR. RUBEL:  I'm sorry, I couldn't hear.  I'm



Page                                                                    23

1  sorry, this is Douglas Rubel.  It's hard to hear Mr.

2  Monson.  Could you speak up?  You contracted with who?

3          MR. MONSON:  CohnReznick.

4          MR. FITTIPALDI:  Okay.

5  BY MR. FITTIPALDI:

6      Q.  And so the goal in hiring them, what -- what are

7  you marketing again?

8      A.  We're marketing all of our services.  It's our

9  hope is (indiscernible) we sell California and Novelles.

10     Q.  Okay.  So now, market your services.  Can you be

11 more specific?

12     A.  Well, they're an investment broker.  They will

13 reach out to basically investment, you know, other

14 organizations that provide services or would be interested

15 in services, so they've already identified roughly 45

16 people that they would solicit.

17     Q.  Okay.  So just so we're clear, the goal is to

18 solicit additional clients or to solicit additional

19 investors in --

20     A.  To solicit investors for the sale of the company.

21 And if the company doesn't sell, then we will continue to

22 operate the services.

23     Q.  Okay.  Would -- is the debtor -- and I don't mean

24 to put words in your mouth, but is the debtor contemplating

25 a sale of both debtors, of all assets, part of it or just

Page                                                                24

1  at this point too early to tell?

2       A.   Too early to tell.

3       Q.   Okay.  All right.  And let's just see here.  And

4  are there any active -- so at this point are there any

5  shooters identified -- I mean, you mentioned this company

6  was reaching out on the debtor's behalf to possible

7  acquires.  But is anything far enough along to contemplate

8  setting up a sale motion?

9       A.   We have essentially one buyer that is providing a

10 bid that will be a stalking horse, but that process is not

11 completed yet.

12          MR. FITTIPALDI:  Okay.  Without holding anybody

13 to any -- if counsel can help us, is there any -- do you

14 contemplate filing a sale motion within the next month or

15 just at this point unclear?

16          MS. MCKENZIE:  I expect that prob -- yes, in the

17 next month we will file some sort of petition.

18          MR. FITTIPALDI:  Okay.  I'm sorry.  Also,

19 everybody, I wasn't clear at the beginning and I apologize.

20 Just when everybody talks could they please identify

21 themselves before talking just so we're clear -- we have a

22 clear record.  That's my mistake.

23          MR. MCNUTT:  Brian?

24          MR. FITTIPALDI:  Yes.

25          MR. MCNUTT:  Hi, this is Scott McNutt.  I



1   represent a number of the ESOP participants.  I have not --

2   I had problem with my mute button earlier, so I didn't jump

3   in.  I've been waiting for you to invite questions, so

4   if -- don't let me miss that if you are inviting questions

5   and I'm not responding.

6            MR. FITTIPALDI:  No, no, no, no.

7            MR. MCNUTT:  (Indiscernible) questions.

8            MR. FITTIPALDI:  No, no, there'll be time for

9   questions.  I'm going through -- what I'm going to do now

10  is go through the schedules that have been filed since we

11  met the last time after we've established everything.

12  First --

13           MR. MCNUTT:  Thank you.

14           MR. FITTIPALDI:  Okay.  No problem.  So everybody

15  will have a chance to ask a questions.  Not a problem.

16  BY MR. FITTIPALDI:

17       Q.   Now, Mr. Monson can answer anybody on behalf of

18  the debtor that's been sworn in can answer, counsel can

19  answer.  But again, some of these answers we already know

20  what you're going to say perhaps, but we need it for the

21  record.  So with what bank does CPES have its debtor-in-

22  possession accounts?

23       A.   The Bank of the West.

24       Q.   Okay.  Does CPES have any -- let me back up.

25  Bank of the West; is that a debtor-in-possession account?

Page                                                                        26

1        A.    Yes.

2        Q.    Okay.  So that's an operating account and that's

3    a payroll account?

4        A.    Yes.

5        Q.    Okay.  What about the Chase Bank Thrift Store

6    deposit account?  Is that still active?

7        A.    Curt, could you answer that?  I believe it's

8    close, but --

9             MR. WHEELER:  Curt Wheeler.  Yeah, the funds have

10   been transferred out of Chase.  The Chase is now closed.

11            MR. FITTIPALDI:  Okay.  And where were they

12   transferred to?

13            MR. WHEELER:  Bank of the West debtor account.

14            MR. FITTIPALDI:  Okay.  How about -- maybe I can

15   stick with you, Mr. Wheeler.

16   EXAMINATION OF MR. WHEELER BY MR. FITTIPALDI:

17       Q.    National Bank of Arizona, the Thrift Store

18   deposit account, has that been closed?

19       A.    That has been closed.

20       Q.    And where were the depos -- the funds transferred

21   to?

22       A.    Bank of the West debtor account.

23       Q.    Okay.  Thank you.  And then Wells Fargo Thrift

24   Store deposit account has that been closed?

25       A.    That account has been closed.  Wells Fargo has

Page                                                                    27

1   been closed and it's been transferred to Bank of the West

2   debtor account.

3        Q.   Okay.  There's a number of -- on the CPES

4   schedules, a number of security deposits.  Where are those

5   housed?

6        A.   They are in BBVA operating account, but I believe

7   that those funds have been transferred over to Bank of the

8   West debtor account as well.

9        Q.   Okay.  So the BBVA -- does the debtor have any

10  active BBVA accounts right now?

11       A.   Yes.

12       Q.   Okay.  How many?

13       A.   Two.  We have a BBVA operating and a BBVA

14  payroll.  They are currently open to cover outstanding

15  checks that have not been cleared yet.

16       Q.   Okay.

17       A.   And that's in CPES Arizona, one each.  And then

18  also we have BBVA and BBVA operating and payroll account

19  that's also in Novelles.

20       Q.   Okay.  So --

21       A.   (Indiscernible), yeah.

22       Q.   Wait, wait, hold on, hold on.  So -- I'm sorry.

23  Let me get it straight.  So there's also here on the

24  schedules a BBVA money market account.  Is that still open?

25       A.   The BBVA money market has been closed.

Page                                                                                          28

1      Q.    Okay.  So you still have for CPES now an

2  operating and a payroll account for BBVA, is that correct?

3      A.    That is correct.

4      Q.    And any other BBVA accounts for CPES?

5      A.    Not that I'm aware of at this point in time.

6      Q.    Okay.  Now, is the debtor -- anybody for the

7  debtor can chime in on this.  The goal was to transition

8  away from BBVA at the earliest possible time.  Is that

9  being done?

10      A.    Curt Wheeler, that is being done.

11      Q.    So for example, are monies being swept from the

12  BBVA operating account currently to another account?

13           MR. MONSON:  Yes.

14  EXAMINATION OF MR. MONSON BY MR. FITTIPALDI:

15      Q.    Is that Mr. Monson?

16      A.    Yes, sorry.

17      Q.    Okay.  So are monies -- so we've identified that

18  there's still some BBVA accounts open, so those monies are

19  being swept to the Bank of the West DIP account?

20      A.    That's correct.

21      Q.    Okay.

22      A.    This is Mr. Monson.

23      Q.    Okay.  And so when is it -- anybody can chime in

24  on this -- when is it -- when do you think it will be

25  possible to close out the BBVA accounts?  Just when this



Page                                                                        29

1   transition will be completed, do you think?

2        A.    This is Mr. Monson.   I believe in another 30

3   days.   We have that paired like UnitedHealth Care that we

4   made the transition to another bank over a year ago and

5   they still direct monies to an old account.   So we've been

6   reluctant   just to close it off because these payors still

7   owe us some cash and, you know, we've notified them I don't

8   know how many times and they still continue with their old

9   practice.

10       Q.    Okay.   So you've notified them to send it to the

11  Bank of the West account?   I'm unclear.   Mr. Monson, you

12  notified them to do what?

13       A.    We noti -- we notified them to send all of the

14  account information to basically the Bank of the West.

15       Q.    Okay.

16       A.    But I'm -- so I -- they don't comply.

17       Q.    Okay.   Is the various insurance that's required

18  to operate in Arizona is that still active?

19       A.    This is Mr. Monson, yes.

20       Q.    Okay.   How many employees does CPES have right

21  now?

22       A.    I -- this is Mr. Monson -- I believe it's close

23  to 900.

24       Q.    Close to how many?

25       A.    Close to 900.



Page                                                                          30

1      Q.   Okay.  When the debtor -- you mentioned that

2  there -- the debtor's intention to transition out of the

3  day services in Arizona by the end of July.  Will the

4  debtor have the same number of employees at the end of

5  July, more, less?

6      A.   Well, those employees have already received

7  notice and working so some of those employees have come

8  back to the organization to work in residential sites,

9  but -- and frankly, with the COVID situation they can

10  receive more money on unemployment than they can from us.

11      Q.   Well, no.  What I'm trying to do, Mr. Monson, is

12  figure out -- you said there's about 900 employees of CPES

13  right now.  And I'm just trying to figure out whether --

14  when the debtor transitions at the end of July to

15  transition out of services will that result in a net loss

16  of employees?

17      A.   Yes.

18      Q.   Approximately how many?

19      A.   I would say maybe 100.

20      Q.   Okay.  So the debtor -- CPES will have perhaps

21  800 employees at the end of July.

22      A.   Yes, that would be a fair assumption.

23      Q.   Okay.  Okay.  Zipping through the schedules here.

24          MR. MCNUTT:  Brian, this is Scott McNutt.  Can I

25  ask does that include the number -- the head count of



Page                                                                    31

1   employees does that include CPES California?

2           MR. MONSON:  This is Mark Monson.  I didn't hear

3   the question.

4           MR. FITTIPALDI:  All right.  Mr. Monson, I

5   appreciate that.  Let's hold the questions till the end,

6   but it's a fair question.

7   BY MR. FITTIPALDI:

8       Q.   When you gave us rundown of 900 employees for

9   CPES right now, Inc., does that include CPES California?

10      A.   No.

11      Q.   Okay.  How many CPES California have?

12      A.   Probably about --

13          MS. GROVE:  This is Nancy Grove.  Approximately

14  250.

15          MR. FITTIPALDI:  250 for CPES California.

16          MS. GROVE:  Approximately.  It fluctuates a

17  little bit, but it's in the range.

18          MR. FITTIPALDI:  Okay.  May I have -- perhaps

19  counsel for the debtor can help me with this.  Does the

20  debtor contemplate hiring any additional employees?  I

21  mean, any additional professionals, bankruptcy

22  professionals?

23          MS. MCKENZIE:  We will be filing a retention

24  application for CohnReznick investment bankers.

25          MR. FITTIPALDI:  Okay.

Page                                                                        32

1           MS. MCKENZIE:   Likely later.

2           MR. FITTIPALDI:   Any other professionals?

3           MS. MCKENZIE:   No, not that I -- I don't believe

4    so at this time.

5           MR. FITTIPALDI:   So is there active -- this

6    professional that's going to be hired to market the assets,

7    they've already been retained.   I mean, not by order of the

8    court, but the debtor has a retention agreement with that

9    entity?

10          MS. MCKENZIE:   Yes.

11          MR. FITTIPALDI:   What are the terms, broad brush?

12          MS. MCKENZIE:   Of the retention application.

13   Well, it will be on file by the end of the week.

14          MR. FITTIPALDI:   Okay.   But do you recall

15   anything like what kind of commission or is it some sort of

16   sliding scale?

17          MS. MCKENZIE:   I don't recall off the top of my

18   head.

19   BY MR. FITTIPALDI:

20       Q.   Mr. Monson, do you recall?

21       A.   It as a $50,000 retainer and there was a line

22   of -- regarding expenses.   They believe that there -- those

23   would be about $2,000.   I think there was a -- basically a

24   $200,000 fee for the sale and basically the assets exceeded

25   I think it was 4.4 or 4.6 million they would receive three

1  percent above that mark.

2          MR. FITTIPALDI:  Okay.  Well, we look forward to

3  receiving that, you know.  So if parties have any question

4  about that, as counsel said, it should be on file soon.  So

5  we'll just stay tuned for that.  Okay.  Let me just see

6  here.  I don't know about everybody else, but the computers

7  are -- connection to the court system has been awry today.

8          All right.  I'm turning over to Novelles here.

9  Again, parties will have an opportunity to ask questions at

10 the end.  Again, the schedules were filed in Novelles

11 June 8th as well.  Anybody on behalf of the debtor could

12 answer this one.

13 BY MR. FITTIPALDI:

14     Q.   With what bank did the debtors have their debtor-

15 in-possession accounts for Novelles?

16     A.   The Bank of the West.  Mark Monson.

17     Q.   Are there any non-debtor-in-possession accounts

18 still open for Novelles?

19     A.   No.

20     Q.   Was that a no?

21     A.   (No audible response.)

22     Q.   I didn't hear.  Let me ask it again.  Are there

23 any not -- are there any non-debtor-in-possession accounts

24 still open for Novelles?

25     A.   I think -- this is Mark Monson -- the only



Page                                                                34

1    accounts that we have are basically owned by our

2    participants and we manage those and they are frankly in

3    our name, but it's a contractual obligation that we have

4    with the regional center.

5        Q.    Okay.  But -- well, for example, the BBVA

6    operating account listed on the schedules for Novelles,

7    this is a different operating account than for CPES, I

8    imagine, right?  There's a different account number.

9    There's different -- it's a different account, right?

10       A.    Yes.

11       Q.    Okay.  And is that account still open?

12            MR. WHEELER:  This is Curt Wheeler.  Yes, they

13   are open.  We keep them open to have a minimum balance for

14   outstanding checks that might be cashed against them.

15            MR. FITTIPALDI:  And are those -- Mr. Wheeler,

16   those with -- as with CPES are the monies from BBV of A --

17   BBVA being swept into the Bank of the West DIP account for

18   Novelles?

19            MR. WHEELER:  Yes, they are.

20   EXAMINATION BY MR. WHEELER BY MR. FITTIPALDI:

21       Q.    Okay.  The vehicles -- let's stick with Novelles.

22   I'll have the same question to go back to CPES.  The

23   vehicles listed, are these leased for Novelles?

24       A.    Yes, they are leased.  This is Curt.

25       Q.    How about CPES?  They're leased as well?



P 888.272.0022  F 818.343.7119                    BENHYATT    www.benhyatt.com
                                                  Certified Deposition Reporters

Page                                                                35

1       A.   They are leased as well, yes.

2       (Off the record.)

3            MR. FITTIPALDI:  Hi, we're back on the record.

4   This is Track 2.  It's 10:08 a.m. in the CPES/Novelles

5   341(a).  All right.  I'm sorry.

6   BY MR. FITTIPALDI:

7       Q.   So, Mr. Wheeler, just again confirming it's

8   Enterprise Rent-A-Car that the debtors rent the cars from?

9       A.   Yes, Enterprise Rental Car is the company we rent

10  our vehicles from -- or lease our (indiscernible).

11      Q.   Okay.  Okay.  Got that.  Turning to the Statement

12  of Financial Affairs that was filed, I'm almost done with

13  my portion.  Okay.  Okay.  Okay.  I'm going through the

14  Statement of Financial Affairs, looking at my notes.  I

15  don't really have any in here.  For Novelles, the

16  storage -- hello?  For -- in Novelles, the off-premise

17  storage is listed as Beach Area Storage in Grove Beach,

18  California.  What is in that facility or what's in that

19  storage?

20      A.   This is Curt.  Those are financial records for

21  Novelles.

22      Q.   Okay.  So financial records for Novelles?

23      A.   Yes.

24      Q.   Okay.  Any patient records there?

25      A.   No.



Page                                                                36

1        Q.   Okay.  All right.  For Novelles where are any

2   patient records that wouldn't be maintained on site, you

3   know, the -- like storage where would that be, if there is

4   any?

5        A.   I would -- this is Curt.  I would have to follow

6   up.  I'm not sure on that.

7        Q.   Okay.

8            MR. MONSON:  Yeah, this is Mark Monson.

9   (Indiscernible) either.  I think many of the records are

10  stored in Santa Maria on site in one of our day treatment

11  programs, but they're put together at locations as well.

12           MR. FITTIPALDI:  Okay.  Okay.  That's all I have

13  right now.  I'd like to open up for questioning from

14  creditors and the audience.  Let's be orderly about it.

15  Let me go through first -- I'll go through how we did the

16  roll call.  Is it Mr. Hyde?

17           (No response.)

18           Are you there?

19           (No response.)

20           All right.  Let's put it this way.  Anybody like

21  to ask questions, just come forward, state your name and

22  I'll let you in and let you ask some questions.

23           MR. MCNUTT:  Brian, this is Scott McNutt.

24           MR. FITTIPALDI:  Okay.

25           MR. MCNUTT:  Can you hear me okay?



Page                                                                    37

1          MR. FITTIPALDI:  I can hear you.  Can everybody

2   else hear Mr. McNutt?

3          MR. MONSON:  Yes.

4          MR. MCNUTT:  Okay.  I'm Scott McNutt and I

5   represent like a number of CPES participants.  I believe

6   Doug Rubel is also on the phone somewhere if he got back

7   after the -- after your power strip failed.

8          MR. RUBEL:  This is Doug Rubel.  I am on the

9   line, Scott.

10         MS. MCNUTT:  And I thank everyone for coming back

11  to this continued meeting.  I have a couple of specific

12  questions and a couple of general questions.  Let me start

13  with sort of general.

14  EXAMINATION BY MR. MONSON BY MR. MCNUTT:

15     Q.   What people are saying is that of the three

16  entities -- CPES Arizona, Novelles, and CPES California --

17  CPES California is the only profit-making entity.  And

18  (indiscernible) saying that CPES Arizona holds 100 percent

19  of the shares of CPES California.  Is CPES California also

20  manages -- the same group that manages CPES Arizona if it

21  shares the same management and board structure?  That's a

22  question to anyone who wants to answer it.

23     A.   Sure.  This is Mark Monson.  I'll answer it.  You

24  know, we have a holding company that has a board of

25  directors in Arizona.  Ultimately that board is responsible

Page                                                              38

1   for the entity's performance but the entity also has a

2   board of directors that are managers of the company.  There

3   is a vice president in CPES California that is responsible

4   for the day-to-day operations.  There's also an associate

5   VP that is in that company as well.

6       Q.   Okay.  So that's very helpful.  In this -- the

7   reason this is a matter of interest is in reviewing the

8   schedules it's not entirely clear to me, but from reviewing

9   the schedules is it fair to say that CPES California is

10  (indiscernible) bankruptcy?

11      A.   This is Mark Monson.  Could you repeat the

12  question again?  You broke up a little bit.

13      Q.   Is it fair to say that CPES California is

14  (indiscernible) this bankruptcy?

15      A.   CPES Cal -- this is Mark Monson.  CPES California

16  is not part of the bankruptcy.

17      Q.   No, but is it (indiscernible) bankruptcy?  If

18  it's not, there's free cash.  I can't see that that cash

19  comes from anywhere but CPES California.

20      A.   It's -- well, this is Mark Monson.  CPES Cal does

21  not have the funds to come actually to bankruptcy.

22      Q.   Okay.  Well, I'm just challenging the inquiry,

23  clearing it to how cash moves between these entities.  Does

24  cash move from CPES California to the debtor entity?

25      A.   This is Mark Monson and there are times where we

Page                                                                39

1  have taken cash from CPES California and Novelles and

2  historically CPRES to fund (indiscernible).

3       Q.   Ah, so (indiscernible) has an actual statement

4  which current entities can consign with it for cash and

5  other purposes?

6       A.   This is Mark Monson.  Yes, we do have

7  consolidated financials, but there is an independent audit

8  of all three entities.

9       Q.   Okay.  I'm (indiscernible).  This is

10 (indiscernible) is described by you as being the only

11 passive-making entity.  It's highly run by a debtor entity.

12 To the extent the debtor entity has value it's primarily

13 coming from CPES California but there's no cash back to

14 CPES California.  In your schedule you don't even assign a

15 value to (indiscernible) and that's hard from these -- it

16 is therefore difficult for me to figure out what value CPES

17 California has.  And I'd point out I've seen

18 (indiscernible) like that.  Can you -- in your schedules

19 you still put the (indiscernible) the staff in CPES

20 California as undetermined.  Do you have a sense of its

21 value?

22      A.   So we do a valuation every year and there is a

23 specific valuation for the entire company, which includes

24 CPES California and Novelles.

25      Q.   Okay.  And I don't (indiscernible) position the

Page                                                                          40

1  U.S. Trustee takes on this.  I've just not seen this before

2  and I'm trying to evaluate how this works when the debtor

3  has a wholly-owned subsidiary and that subsidiary does not

4  provide any transparency as to its financing.  Let me ask a

5  couple questions about valuation.  As you noted last go-

6  round, CPES Arizona is an entirely (indiscernible) owned

7  entity.  Is that correct?

8       A.   That is correct.

9       Q.   Okay.  And speaking of valuations, every year a

10  tax form called a 5500 has to be filed with a value of the

11  ESOP participants' interest in the corporation is set

12  forth.  And those -- that's effective as of December 31st

13  of each year and those returns are generally -- those Form

14  5500s have to be filed by July of the following year.  Did

15  you file the 5500s for the period ending December 31st of

16  2017?

17       A.   Yes, we did.

18       Q.   And did you file one for the period ending

19  December 31st, 2018?

20       A.   Yes, we did.

21       Q.   Okay.  Will you be disclosing or we're going to

22  ask that you disclose the basis of the valuation set forth

23  in those Form 5500s because it's our understanding that

24  participants have a right to see those valuations?

25       A.   So you want to know what the value of the company

Page                                                                    41

1  was back at that time or do you want to know what the

2  profit and loss statement is from a consolidated basis?

3  I'm not sure how to (indiscernible) --

4       Q.   Well, we (indiscernible).  I'd like to know what

5  the valuations were and then we'd like to also see the

6  valuation reports that were the basis of your valuation

7  that is provided in the 5500s.

8            MS. MCKENZIE:  This is counsel for the debtor.

9  The valuations are physically property of the ESOP trustee

10 and trust.  You would need to contact the trustee.

11           MR. MCNUTT:  Oh, (indiscernible) --

12           MR. RUBEL:  Wait, wait.  This is Douglas Rubel.

13 They're on the phone.  Mr. Fukomoto is on the phone.  Are

14 you there?

15           MR. FITTIPALDI:  Hello?

16           MR. FUKOMOTO:  Yes, I'm here.  Yes, I'm here.

17           MR. RUBEL:  All right.

18           MR. FUKOMOTO:  So just to be clear I -- yeah,

19 just to be clear, I am not the actual ESOP trustee, but I

20 am sitting in on his behalf, so --

21           MR. RUBEL:  I --

22           MS. MCKENZIE:  Could even --

23           MR. FUKOMOTO:  Yeah, I didn't make -- mean to

24 imply that (indiscernible).

25           (Simultaneous discussion.)

Page                                                                    42

1           MR. RUBEL:  We were there on his behalf.  Does

2    the trustee -- will the trustee --

3           (Simultaneous discussion.)

4           Somebody is talking in the background.

5           MR. FITTIPALDI:  Okay.  Everybody, hi, everybody.

6    This is Brian Fittipal --

7           UNIDENTIFIED VOICE:  -- 15 and 28 (indiscernible)

8    evaluations and --

9           UNIDENTIFIED VOICE:  I'm sorry.  Mr. Fittipaldi?

10           MR. FITTIPALDI:  Yes, hi, everybody.  It's

11    Brian -- everybody, it's Brian Fittipaldi.  We're getting a

12    real muddled record here.

13           All right.  So could you restate the question.

14    Could the questioner please restate his name and restate

15    the question and we've got to keep the background noise at

16    a minimum.  In fact, if you're not talking, it'd be most

17    useful to mute until you talk, but -- so could you restate

18    the question and your identity, please?

19           MR. RUBEL:  This is Douglas Rubel and I'm asking

20    Mr. Fukomoto, who's here on behalf of the Trustee, if the

21    Trustee would please provide us with the year-end

22    valuations for 2017 and 2018.

23           MR. PELPHREY:  Mr. Fittipaldi, this is Jeremy

24    Pelphrey, counsel for the debtor.  I understand it's 341s

25    for the debtor, not for, you know, the non-debtor entity

Page                                                                  43

1  being ESOP trustee and ESOP trust.  Just don't understand

2  the line of question there.

3          MR. FITTIPALDI:  I mean, can one --

4          MR. RUBEL:  Could you say that again?  Doug

5  Rubel.

6          MR. FITTIPALDI:  Well, Mr. Rubel, what are you

7  asking for exactly?

8          MR. RUBEL:  I'm asking for the year end

9  valuations for December 31, 2017 and December 31, 2018,

10 which purportedly form the basis for the filings of the IRS

11 Form 5500s.  I represent a whole lot of ESOP participants

12 so we can make a separate formal request under Section 104,

13 Jeremy, and take care of it that way.  I'm just asking

14 that, you know, while we're all here, is it okay if

15 Mr. Fukomoto -- if your colleague provides us with that

16 now.

17         MR. FITTIPALDI:  All right.  Well, okay, so it's

18 noted on the record.  Okay.  But -- so you can make the

19 request.  You've made it on the record --

20         MR. RUBEL:  Can he answer the request?  I don't

21 mean to interrupt you, but let him answer.

22         MR. FUKOMOTO:  Yeah, well, this is Ty Fukomoto.

23 First of all, I wanted to make a point that Miguel Perretes

24 is the chapter trustee.  He was not the trustee during plan

25 years 2017 and 2018.  Just became the successor trustee

 1   recently and it turns into a request.  I'm going to have to

 2   discuss that with him.

 3           MR. RUBEL:  Okay.  So I understand -- this is

 4   Doug Rubel -- I understand you're making a distinction and

 5   I appreciate that.  I would also -- I guess I appreciate

 6   the circumstances but I would also understand that Mr.

 7   Perettes would as successor trustee necessarily have those

 8   valuations.  So thank you.

 9           MR. MCNUTT:  Let me --

10           MR. RUBEL:  Sorry to interrupt.

11           MR. MCNUTT:  This is Scott McNutt.  Let me ask a

12   follow-up and this is directed at Mr. Monson, but if

13   Mr. Fukomoto has any information that would be helpful.

14   BY MR. MCNUTT:

15       Q.  What about the year end December 31, 2019?  Is

16   there now a valuation?  Is that quantity (indiscernible)

17   due for the year ending December 31, 2019.  It should be

18   filed by July 31st.  Is there an intention to file a 5500?

19       A.  Yes, and we have contracted with (indiscernible)

20   Johnson in Indianapolis to do that valuation.

21       Q.  Okay.  So has that valuation been concluded?

22       A.  No.

23       Q.  Okay.  Another question about this relation

24   between CPES California and the other entity can you tell

25   us whether there are any inter-company accounts between

Page                                                                                        45

1  entities and are those accounts maintained with regularity?

2  It (indiscernible) from one or the other to keep track of

3  that.

4         MR. WHEELER:  This is Curt and, yes, we do have

5  inter-company GLs that are tied to each other amongst the

6  three entities.

7         MR. MCNUTT:  Okay.

8  BY MR. MCNUTT:

9     Q.  Are there -- referring to CPES California are its

10 direct assets -- are they (indiscernible) in favor of

11 either entity or vice versa?  In other words, if there's

12 debt in CPES Arizona or Novelles is CPES California libel

13 for that debt?

14        UNIDENTIFIED VOICE:  Are you referring to

15 Schedule H?

16        UNIDENTIFIED VOICE:  (Indiscernible)

17        MR. FITTIPALDI:  All right.  Pardon me,

18 everybody.  If you're not -- this is Brian Fittipaldi

19 again.  If you're not talking could you please mute it

20 because we've got a lot of sound coming from the background

21 and I have four kids myself, so I know how it is.

22        MR. WHEELER:  Agreed.

23        MR. FITTIPALDI:  Okay.  Could -- I'm sorry, could

24 you please restate the question?

25        MR. MCNUTT:  My question is CPES California libel

Page                                                                    46

1  for the debts of CPES Arizona?  Are they co-obligors or

2  guarantors of each other's debt?  And if that's in Schedule

3  A that includes -- direct me to that and tell me what the

4  answer is.

5           UNIDENTIFIED VOICE:  Yes.  The Schedule A is co-

6  debtors and -- no.  Is that what you're asking or is there

7  a separate --

8           MR. MCNUTT:  Yes.

9           UNIDENTIFIED VOICE:  -- question?

10          MR. MCNUTT:  I'm interested in the co-debtor

11 relationship and if each says that they're co-debtors

12 that's (indiscernible) information.  Also interested to

13 know whether if CPES California guarantees the debts of the

14 other entity.

15          UNIDENTIFIED VOICE:  Again I would point you to

16 Schedule H.

17          MR. MCNUTT:  All right.  I'll take a better look

18 at that.

19          UNIDENTIFIED VOICE:  Which says (indiscernible).

20 BY MR. MCNUTT:

21    Q.   Did the Department of Labor inform CPES that it

22 missed any investigation into the CPES ESOP?

23    A.   This is Mark Monson.  No, I don't believe so.

24    Q.   Okay.  In looking at the schedules -- and I --

25 regrettably I'm wasted a lot of my life looking at

Page                                                                        47

1  schedules -- there's a -- there are lots of disclaimers,

2  particularly disclaimers as to how they were prepared,

3  where they comply with (indiscernible) and so on.  Do you

4  have costables (phonetic) in your financial records that

5  pull -- I mean, that's been consistently maintained in the

6  same standard?  Have they always been consolidated?  Can

7  you give us some idea about your confidence in the

8  financial records of these three entities?

9      A.   This is Mark Monson.  I'm confident in the

10 records.  We have been audited by, you know, a copy audit

11 firm for the last probably 12 years and, you know, they are

12 within the organization probably almost a month out of the

13 year.  So, yes, I believe the records are accurate.

14     Q.   Okay.  One final question about CPES California.

15 Has there been any effort to move their bank accounts into

16 DIP accounts or otherwise change your banking relationship

17 to conform with requirements of Bankruptcy Code?

18     A.   This is Mark Monson.  No, we have not done that.

19         MR. MCNUTT:  Okay.  Those are all my questions.

20 Doug, did you have any follow-up questions?

21         MR. RUBEL:  Yeah, well, give me a minute.  I can

22 come back.

23         MR. MCNUTT:  Okay.  For now I'll back off.

24         MR. FITTIPALDI:  Okay.  Anyone else have

25 questions?

Page                                                                                  48

 1              UNIDENTIFIED VOICE:  (indiscernible)

 2              MR. FITTIPALDI:  Anyone else have questions of

 3   the debtors?

 4              MR. RUBEL:  Yeah, this is Doug Rubel.  I have a

 5   couple of questions, I guess.

 6   BY MR. RUBEL:

 7       Q.   You mentioned -- so when we met on May 28th you

 8   mentioned two possible suitors for the purchase of whatever

 9   is arising out of this bankruptcy, right?

10              (Background noises.)

11              MR. FITTIPALDI:  Okay.  Pardon me, pardon me.

12   I'm sorry, Mr. Rubel.

13              I'm sorry, whoever is on the line, please --

14   if --

15              (Background noises.)

16              If you're not talking -- par --

17              (Background noises.)

18              Pardon me, pardon me, if you're on -- okay.  I'm

19   sorry, we're just going to have pause until --

20              (Background noise.)

21              Pardon me.  Okay.  Hi.  This is Brian Fittipaldi.

22   If you're not speaking, if you're not Mr. Rubel or

23   representing the debtor, please mute your phone right now.

24              UNIDENTIFIED VOICE:  Are you still here?  We're

25   eating breakfast.

Page                                                                49

1          MR. FITTIPALDI:  I know, I know.  Okay.  All

2  right.

3          Mr. Rubel, go ahead.

4          MR. RUBEL:  Okay.

5  BY MR. RUBEL:

6     Q.   You mentioned by -- Mr. Monson, the last time we

7  were here in May you mentioned that you were having

8  discussions with one possible suitor and that there was a

9  possibility of another, right?  Do you remember that?

10    A.   Yes.

11    Q.   What happened to the other -- so there were two

12 at that point in time.  Are we saying there's only one now

13 or is there are possibly two?

14    A.   There is only one that has put an initial offer

15 together.  There are two other potential suitors, but they

16 have not asked -- put in any kind of offer.

17    Q.   Who's putting the offer together?

18    A.   The organization of the potential suitor.

19    Q.   Who's that?

20    A.   I --

21         MS. MCKENZIE:  Counsel, we'll be filing sale

22 documents with any information that we'll be disclosing

23 publicly.

24         MR. RUBEL:  You're not willing to disclose it

25 publicly now?  Is that what you're saying?  Are you --



P 888.272.0022  F 818.343.7119          www.benhyatt.com

Page                                                                    50

1          MS. MCKENZIE:  We have confidentiality of those

2    (indiscernible).  I can't disclose it.

3          MR. RUBEL:  There's a confidentiality agreement?

4          MS. MCKENZIE:  Yes.

5    BY MR. RUBEL:

6       Q.   How did you arrive at the 4.4 or 4.6 figure that

7    triggers -- 4.6 million-dollar figure that triggers this

8    three percent for the broker?

9       A.   It was related to an offer by a suitor.

10      Q.   And I'm sorry, I -- could you repeat who the

11   broker is again?

12      A.   CohnReznick.  That is the name of the firm.

13      Q.   And where are they located?

14      A.   We (indiscernible) exact location.

15      Q.   And is the ESOP trustee been involved in any of

16   the discussions with CohnReznick and/or whoever this suitor

17   is that you're not willing to publicly disclose right now?

18      A.   Yes, the trustee is aware of the one potential

19   offer.

20      Q.   Has he been involved in the discussions?

21      A.   I would defer to counsel.

22      Q.   Are you saying you don't know or you just want

23   the lawyer to answer for you?

24      A.   The lawyer is the one that's been working on this

25   arrangement, so I would like the lawyer to respond to the

Page                                                                    51

1  question.

2      Q.   Well, have you been involved -- have you been

3  involved in any conversations with the trustee?

4      A.   Yes, I have.

5      Q.   ESOP trustee?  And have you discussed the details

6  of these potential offers with Mr. Perretes?

7      A.   Not at this point.

8      Q.   So he doesn't know any details.  He just knows

9  that there's an offer out there or potential offer out

10 there, is that what you're saying?

11     A.   I'm saying the request needs to be directed to

12 our attorney.

13     Q.   I'm just asking what you discussed with the

14 trustee.  You're on the board of directors, right?

15     A.   Yes.

16          MS. MCKENZIE:  Counsel, what is the purpose of

17 the line of questioning?  How is it relevant to the 341?

18          MR. RUBEL:  Because I represent a number of ESOP

19 participants who are interested in knowing what's going on,

20 that's why.  And it's relevant to everything that's

21 happening in this and especially it's relevant to something

22 that you're about to file, I don't know, sometime within

23 the next month because you're pretty sure that you're going

24 to get an offer that you're just going to accept, so --

25          MR. FITTIPALDI:  Well, Mr. Rubel, I guess one of

Page                                                                52

1   the dilem --

2           MS. MCKENZIE:  It sounds like maybe you don't

3   understand how the process works.

4           MR. FITTIPALDI:  All right.  Everybody,

5   everybody, this is Brian Fittipaldi.  I'm sorry,

6   everybody --

7           MR. RUBEL:  Well, I --

8           MR. FITTIPALDI:  Everybody --

9           MR. RUBEL:  I will admit to you I'm not a

10  bankruptcy lawyer --

11          MR. FITTIPALDI:  Okay.  Will everybody --

12          MR. RUBEL:  -- and I realize that there are --

13          MR. FITTIPALDI:  Everybody --

14          MR. RUBEL:  -- way too many facts --

15          MR. FITTIPALDI:  Mr. Rubel.

16          MR. RUBEL:  -- (indiscernible) vary in bankruptcy

17  so I will defer to that --

18          MR. FITTIPALDI:  Mr. Rubel.

19          MR. RUBEL:  -- and (indiscernible) --

20          MR. FITTIPALDI:  Look, everyone.

21          MR. RUBEL:  Yeah.

22          MR. FITTIPALDI:  Okay.  The debtor is on record

23  as saying they're going to file this motion to appoint this

24  broker type.  So that will in theory disclose all the terms

25  and perhaps even identify the leading bidder at this point,

1   may or may not.  And it'll provide assuming -- I'm assuming

2   it will provide for overbids.  So we'll have that

3   information then, but we don't have it now.  And we -- for

4   the debtor to answer confidential information this isn't

5   the place to pry for that, so we'll have that.

6        Now, if people have objections to this -- to the

7   terms of this arrangement when it's filed many of us can

8   file an objection, ask for a hearing.  But right now it

9   seems premature because we don't have it in front of us and

10  especially Mr. Monson doesn't seem -- has to defer to his

11  attorneys who haven't even filed it yet.

12       So why don't we move on from this right now.

13       MR. RUBEL:  Okay.  I appreciate that and we

14  wouldn't have known about the confidentiality of all this,

15  although I suspect that that's fairly typical if I hadn't

16  asked the questions and we hadn't put it on the record, but

17  he doesn't want to answer that's fine.

18       MR. MCNUTT:  This is Scott McNutt again.  I'd

19  like to briefly follow up.  I think Mr. Rubel's questions

20  are great, but we respect confidentiality.  But let me cut

21  through and make this more of a 341 question.

22       We are intimately concerned with what the value

23  of this company is.  The schedules reveal no information

24  because they say that it -- they have absolutely no idea

25  what the value of CPES California is and they tell us that

Page                                                                          54

1  they're in the middle of trying to sell the companies

2  either broken up or as a consolidated group.  What sort of

3  value do they think they have?  That's a straightforward

4  simple question.  Based on all this information and talking

5  to investment bankers and potential bidders, what value do

6  you place on this company?  Why are you all --

7          MS. MCKENZIE:  Perhaps to clarify it so that

8  everyone understands how this process is expected to play

9  out, we will be filing an application to retain an

10 investment banker to represent the debtors to -- when we

11 have a sale offer or other sale procedures we will be

12 filing a motion for the court to approve those procedures,

13 which may or may not include a stalking horse bid.

14         MR. MCNUTT:  All of that is great and I applaud

15 and encourage that, but as of this time no one on the phone

16 today, including lawyers for the debtor or the debtor's

17 management, are willing to say what they think this

18 company's value looks like and I'd just like to say, you

19 have no idea or you have an idea and if so, what is it.

20         UNIDENTIFIED VOICE:  Well, I'll comment.

21 Ultimately we -- we'll have a fiduciary actually determine

22 the value before this is sold.  (Indiscernible) trustee has

23 to (indiscernible) -- I think it's nebulous to say

24 (indiscernible).

25         (Background noise.)

Page                                                                55

1          MR. MCNUTT:  I just want to go on the record

2    you've been actively trying to market this company for a

3    number of months.  You've hired an investment banker.

4    You've talked to other bankers and you do not want to

5    indicate at this time a range of values for these assets.

6          UNIDENTIFIED VOICE:  Yes (phonetic).

7          UNIDENTIFIED VOICE:  I don't want to guess.  That

8    is correct.

9          MS. MCKENZIE:  Counsel, we would defer to what is

10   in the schedules and statements that were filed with the

11   court.

12         MR. RUBEL:  Those schedules say undetermined.

13   Doug Rubel.

14         MR. MCNUTT:  I think that's as far as we can take

15   it.  Thank you.

16         MR. FITTIPALDI:  All right.  Any other questions

17   out there for the debtors?

18         (No response.)

19         Okay.  Well, if not then I'm ready to close it

20   out.  So again, last call for questions.

21         (No response.)

22         All right.  So -- well, thank you, everyone.  I

23   know this was difficult being on like this.  Thank you for

24   coming for our second rendition.  So what I'd like to do

25   now is for both cases in CPES and Novelles I'd like to

Page                                                                    56

1  close out the 341(a).

2          So the time is now 10:43 a.m.  The 341(a) in both

3  cases is hereby concluded.  Thank you, everyone.  Have a

4  good day.

5  (End at 10:43 a.m.)

6                    * * * * * * * *

7

8          I certify that the foregoing is a correct

9  transcript from the electronic sound recording of the

10  proceedings in the above-entitled matter.

11

12  *Ruth Ann Hager*

13  _____        Date:   6/17/2021

14  RUTH ANN HAGER, C.E.T.**D-641

15

16

17

18

19

20

21

22

23

24

25



Exhibit "8"



**Jeremy M. Pelphrey**
Partner
jeremy.pelphrey@faegredrinker.com
310-203-4084 direct

faegredrinker.com

**Faegre Drinker Biddle & Reath** LLP
1800 Century Park East, Suite 1500
Los Angeles, California 90067
+1 310 203 4000 main
+1 310 229 1285 fax

August 12, 2020

Miguel Paredes
Prudent Fiduciary Services, LLC
100 N. Barranca Street, Suite 870
West Covina, CA 91791

> **Re:    Conflict Waiver**

Dear Miguel:

This letter is following-up our telephone conversation of April 13, 2020 during which I informed you that we represent Community Provider of Enrichment Services, Inc. (the "Company") in various matters, including a potential sale of the Company and any financial restructuring that may result.  I also informed you the Company was considering engaging you to act as trustee of the Community Provider of Enrichment Services, Inc. Employee Stock Ownership Trust, and the accompanying Community Provider of Enrichment Services, Inc. Employee Stock Ownership Plan (the "ESOP").  The Company thereafter engaged your services to act as trustee of the ESOP.  As you know, we represent you in other matters relating to employee stock ownership plan transactions; however, we will not be representing you in any matter with the Company.  This may involve a conflict of interest, and the firm could not continue to undertake the representation without both clients consent.

We do not believe that our representation of the Company regarding the potential sale of the Company or any financial restructuring that may result will adversely affect our representation of you in other matters in which we represent you.  We discussed this more fully on our telephone conversation of April 13, 2020.  The matters that we represent you are transactional in nature and do not pertain to the Company.  However, we ask that you acknowledge your express and informed consent to our continued representation of the Company.

By giving your consent, you acknowledge that we have made full disclosure to you of the facts and circumstances surrounding any conflict of interest or potential conflict which may exist now or in the future with regard to our representation of the Company.

We are also requesting the Company to consent to our continuing representation of you in matters in which your interests do not conflict with those of the Company and we will not continue the representation of the Company unless we obtain that consent.

Despite any such conflict which may exist, you hereby agree to our continued representation of the Company.  You further agree to our right to withdraw our continued representation if, in our opinion, it might violate applicable rules of professional conduct.

ACTIVE.124831637.01

Miguel Paredes, Trustee                    -2-                    August 12, 2020


     I will be pleased to answer any questions you may have concerning this requested consent. You are, of course, free to consult independent counsel about this consent.  If you wish to consent, please sign below "Agreed and Approved" and return it to me via email.

Very truly yours,

Jeremy M. Pelphrey

AGREED AND APPROVED:

By: _____
    Miguel Paredes, Trustee

Dated: 8/13/2020 _____

| From: | Paul Zielinski |
|---|---|
| To: | Pelphrey, Jeremy M. |
| Cc: | Miguel Paredes; Kirk Soto |
| Subject: | RE: Conflict Waiver - CPES |
| Date: | Thursday, August 13, 2020 8:46:22 AM |
| Attachments: | Paredes - Conflict Waiver (executed).pdf |

Jeremy,

Attached please find the executed conflict waiver.  Please let us know if you need anything else.

 **PRUDENT FIDUCIARY**
————— S E R V I C E S —————

**Paul Zielinski, JD**
Director
Prudent Fiduciary Services, LLC
100 N. Barranca St., Suite 870
West Covina, CA 91791
Main: (626) 549-1410
Fax: (626) 384-3342
www.fiduciaryservices.com

*This message (including any attachments) may contain confidential, proprietary, privileged, and/or private
information.  The information is intended to be for the use of the individual or entity designated above.  If
you are not the intended recipient of this message, please notify the sender immediately, and delete the
message and any attachments.  Any disclosure, reproduction, distribution, or other use of this message or
any attachments by an individual or entity other than the intended recipient is prohibited.*

**From:** Pelphrey, Jeremy M. <jeremy.pelphrey@faegredrinker.com>
**Sent:** Wednesday, August 12, 2020 5:43 PM
**To:** Miguel Paredes <mparedes@fiduciaryservices.com>
**Cc:** Kirk Soto <ksoto@fiduciaryservices.com>
**Subject:** Conflict Waiver - CPES

Miguel-

        Good afternoon.  Attached is the conflict waiver in the CPES matter that we discussed previously
but I don't recall sending to you after our call about it in April.  Please review it and let me know if you
have any questions.  Otherwise, please execute it and return it to me at your earliest convenience.

All the best,
Jeremy

**Jeremy M. Pelphrey**
Partner
jeremy.pelphrey@faegredrinker.com
+1 310 203 4084 direct

Faegre Drinker Biddle & Reath LLP
1800 Century Park East, Suite 1500
Los Angeles, California 90067 USA

This message and any attachments are for the sole use of the intended recipient(s) and may
contain confidential and/or privileged information. Any unauthorized review, use, disclosure
or distribution is prohibited. If you are not the intended recipient, please contact the sender
by reply email and destroy all copies of the original message and any attachments.

PAREDES-0002015

Exhibit "9"

**APPRAISAL REPORT OF**



**Tucson, Arizona**
**Valued as of December 31, 2017**


**PREPARED BY**


Kevin R. Yeanoplos, CPA/ABV/CFF, ASA
*Valuation Analyst*


Clay S. Danielson, ASA
*Valuation Analyst*


**Brueggeman and Johnson Yeanoplos, P.C.**


**ISSUANCE DATE**
April 30, 2018

PAREDES-0000003

*Appraisal Report of*
**COMMUNITY PROVIDER OF ENRICHMENT SERVICES, INC.**

# TABLE OF CONTENTS

ANALYSTS' OPINION LETTER

INTRODUCTION ............................................................................................................... 1

   PURPOSE OF VALUATION ................................................................................. 1

   APPROACH TO VALUATION .............................................................................. 1

   IMPORTANCE OF LIMITING CONDITIONS ...................................................... 5

   DEFINITIONS ....................................................................................................... 5

   VALUATOR INDEPENDENCE ............................................................................ 5

   SUMMARY OF KEY VALUATION FACTORS .................................................... 5

FUNDAMENTAL INFORMATION ON

THE SUBJECT COMPANY ............................................................................................ 7

   BACKGROUND AND OPERATIONS ................................................................. 7

   COMPANY OWNERSHIP .................................................................................... 7

   ORGANIZATIONAL STRUCTURE ..................................................................... 7

   BOARD OF DIRECTORS AND MANAGEMENT ............................................... 8

   MANAGEMENT DEPTH ...................................................................................... 12

   PRODUCTS AND SERVICES ............................................................................ 12

   FACILITIES .......................................................................................................... 18

   EMPLOYEES ....................................................................................................... 18

   MARKETING AND DISTRIBUTION ................................................................... 18

      Customer Base ................................................................................................ 18

   COMPETITION ..................................................................................................... 18

   LITIGATION ......................................................................................................... 19

   FUTURE EXPECTATIONS .................................................................................. 19

   SUMMARY STATEMENT OF OPERATIONS (UNADJUSTED) ........................ 19

   SUMMARY OF BOOK VALUE OF SHAREHOLDERS' EQUITY (UNADJUSTED) ... 21

   SUMMARY ........................................................................................................... 21

ECONOMIC CONDITIONS ........................................................................................... 23

   INTRODUCTION .................................................................................................. 23

      The U.S. Economy ......................................................................................... 23

   THE ARIZONA ECONOMY ................................................................................. 32

   THE CALIFORNIA ECONOMY ........................................................................... 35

   SUMMARY ........................................................................................................... 37

INDUSTRY CONDITIONS ............................................................................................. 39

   OVERVIEW .......................................................................................................... 39

      Industry Outlook ............................................................................................. 43

   OVERVIEW .......................................................................................................... 46

      Industry Outlook ............................................................................................. 51

CONFIDENTIAL!

OVERVIEW ......................................................................................................................... 55
   Industry Outlook ............................................................................................................. 60
SUMMARY .......................................................................................................................... 62
FINANCIAL ANALYSIS ....................................................................................................... 65
OVERVIEW ......................................................................................................................... 65
FINANCIAL STATEMENT INFORMATION ............................................................................... 65
SOURCES USED IN COMPARISONS WITH PEERS .................................................................... 65
INCOME STATEMENT PROFITABILITY ANALYSIS .................................................................. 66
   Revenues ........................................................................................................................ 66
   Operating Expenses ........................................................................................................ 67
   Pre-Tax Earnings ............................................................................................................ 67
BALANCE SHEET ANALYSIS ................................................................................................ 68
   Financial Liquidity ......................................................................................................... 68
   Financial Leverage ......................................................................................................... 70
   Utilization of Assets and Capital ..................................................................................... 71
SUMMARY .......................................................................................................................... 71
VALUATION METHODS ...................................................................................................... 73
OVERVIEW ......................................................................................................................... 73
INCOME APPROACH ............................................................................................................ 73
   Capitalization Methods ................................................................................................... 74
   Excess Earnings Method ................................................................................................. 74
   Discounted Future Income Methods ................................................................................ 75
INDICATION OF VALUE USING THE DISCOUNTED CASH FLOWS METHOD .............................. 76
   Estimated Future Cash Flows .......................................................................................... 76
   Derivation of Rate of Return ........................................................................................... 79
   Riskless Rate .................................................................................................................. 80
   Combined General Equity Risk Premium and Size Premium ............................................. 80
   Specific Company Risk Premium ..................................................................................... 81
   Final Summarizing to Reach a Discount Rate ................................................................... 81
   Terminal Value Capitalization Rate ................................................................................. 82
   Discounted Cash Flows ................................................................................................... 83
   Derivation of Terminal Value .......................................................................................... 84
MARKET APPROACH ........................................................................................................... 86
   Search for Private Company ("Guideline") Comparables ................................................. 86
   Search for Public Company ("Guideline") Comparables .................................................. 87
   Guideline Companies Selected for Comparison ............................................................... 89
   General Trading Data ...................................................................................................... 92
   Comparisons of Guideline Companies
   With The Subject Company - Overview ........................................................................... 93
   Specific Comparisons ..................................................................................................... 93
   Summary of Market Valuation Multiples ......................................................................... 98
   Multiples Chosen & Resulting Conclusions ..................................................................... 99

PAREDES-0000005

COST APPROACH .................................................................................................................... 101
 Cost Method Considered ........................................................................................ 101
NON-OPERATING ASSETS ............................................................................................ 101
RECONCILIATION .......................................................................................................... 102
ADJUSTMENTS TO PRELIMINARY VALUE ..................................................... 104
 ADJUSTMENTS BASED ON CONTROL FACTORS .................................................... 104
 ADJUSTMENT FOR THE LACK OF MARKETABILITY .............................................. 107
  Applicable Discount ................................................................................................ 115
 APPLICATION OF DISCOUNT ............................................................................................ 115
 CONCLUSION ................................................................................................................ 116
APPENDIX 1 Financial Statements ........................................................................ 117
APPENDIX 2 Certification ......................................................................................... 124
APPENDIX 3 Curricula Vitae ................................................................................... 127
APPENDIX 4 Definitions ............................................................................................ 151
APPENDIX 5 Statement of Assumptions & Limiting Conditions .................. 162

PAREDES-0000006

# BRUEGGEMAN
### AND JOHNSON
# YEANOPLOS, P.C.

April 30, 2018

Mark G. Monson, President/CEO
Community Provider of Enrichment Services, Inc.
Employee Stock Ownership Trust
4825 North Sabino Canyon Road
Tucson, Arizona 85750

Re: Valuation of Community Provider of Enrichment Services, Inc.

Dear Mr. Monson:

We have prepared and enclosed herewith, our appraisal report of Community Provider of Enrichment Services, Inc., ("CPES" or "the Company") dated April 30, 2018. The purpose of this valuation is to establish the fair market value as of December 31, 2017 of a 100% ownership interest in the common stock of the Company on a controlling, non-marketable basis. We understand that the results of our analysis will be used in order to comply with regulatory requirements as defined by the U.S. Department of Labor related to the annual valuation of shares held by Community Provider of Enrichment Services, Inc. Employee Stock Ownership Trust ("ESOT" or "the Trust") for the Community Provider of Enrichment Services, Inc. Employee Stock Ownership Plan ("ESOP" or "the Plan").

CPES is a closely held company without a publicly traded market. As such, the objective of this valuation is not to determine the price or fair market value at which a controlling interest in the Company would sell if publicly traded. Rather, the objective is to quantify the fair market value of an ownership interest in CPES as a closely held entity, on a controlling basis.

The standard of value is "fair market value." Fair market value is defined by ERISA Section 3(18)(B) and the U.S. Department of Labor Proposed Regulation 29 CFR Part 2510 and IRS Revenue Ruling 59-60, 1959-1, C.B. 237 as "the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts." RR59-60 also states that "in addition that the hypothetical buyer and seller are assumed to be able, as well as willing, to trade and to be well informed about the property and the market for such property." We assume that the Company will continue as a going concern and that the character of its present business will remain intact.

This report is based on historical and prospective financial and economic information provided to us by management and other parties. Had we audited or reviewed the underlying financial data, matters may have come to our attention that would have resulted in our using amounts that differ from those provided. Accordingly, we take no responsibility for the underlying data, financial or otherwise, presented in this report.

**(520) 327-8258  Fax  (520) 327-7080**          **(206) 628-3100 Fax (206) 628-0106**
**7363 East Tanque Verde Road**          **601 Union Street, Suite 3501**
**Tucson, AZ 85715**          **Seattle, WA 98101**
**Toll Free 800-889-6890**

PAREDES-0000007

Mark G. Monson, President/CEO
Community Provider of Enrichment Services, Inc.
Page 2

Users of this valuation report should be aware that business valuations are based on future earnings potential and/or asset values that may or may not materialize. Therefore, the actual results achieved and/or asset values obtained during the forecast period will vary from the forecasts used in this report, and the variations may be material.

In our opinion, based on our study and analysis, and the assumptions and limiting conditions as described in this report, we have concluded that the fair market value of a closely held, controlling, non-marketable interest in the common shares of Community Provider of Enrichment Services, Inc., as a going concern as of December 31, 2017, is:

| Fair Market Value of Community Provider of Enrichment Services, Inc. As of December 31, 2017 | | |
|---|---|---|
| Interest Valued | Aggregate Value | Per Share Value |
| 100% Equity Interest in the Common Shares on a Controlling, Non-Marketable Basis | $  9,250,000 | $    10.14 |

We have no present or contemplated financial interest in Community Provider of Enrichment Services, Inc. Our fees for this valuation are based upon normal hourly billing rates, and are in no way contingent upon the results of our findings. We have no responsibility to update this report for events and circumstances occurring subsequent to the date of this report, although we will be pleased to perform an update valuation should you require one.

This letter and report are to be distributed only in their entirety, and are intended and restricted for use by the management of Community Provider of Enrichment Services, Inc. and their representatives relative to the aforementioned purpose. This report is not to be copied or made available to any persons without the express written consent of Brueggeman and Johnson Yeanoplos, P.C.

Brueggeman and Johnson Yeanoplos, P.C.

Kevin R. Yeanoplos, CPA/ABV/CFF, ASA
Tucson, Arizona
April 30, 2018

# INTRODUCTION

## PURPOSE OF VALUATION

Brueggeman and Johnson Yeanoplos, P.C. has been retained by the Community Provider of Enrichment Services, Inc. Employee Stock Ownership Trust and has prepared this report for the purpose of expressing its opinion as to the fair market value of the common shares of CPES on a controlling, non-marketable basis as of December 31, 2017. This report is intended to present an objective, unbiased opinion of value for the exclusive purpose mentioned previously.

This report is not designed or intended to be a document suitable for use in selling this business to outside individuals or other entities which may be uninformed about the entity being valued. Because this report is to be used for ESOP purposes, it may not contain sufficient descriptive information to satisfy an uninformed prospective buyer of the subject Company. It is also not designed to adequately portray all of the desirable qualities of the business, which should be addressed in an offering document designed for a potential buyer of the business.

## APPROACH TO VALUATION

Our approach has been to determine an indication of value that would provide a fair and reasonable return on investment to an investor or owner, in view of the facts that would have been reasonably available to them at the time. We based our opinion on, among other things, our assessment of the risks facing the Company and the return on investment that would be required on alternative investments with similar levels of risk.

In our determination of value, we have considered certain factors set forth by the Internal Revenue Service in Revenue Ruling 59-60 for the valuation of security interests in closely held businesses. These factors include:

- The nature of the business and the history of the enterprise from its inception;
- The general economic outlook and the condition and outlook of the specific industry in particular;
- The book value of the stock and the financial condition of the business;
- The earnings capacity of the company;
- Whether or not the enterprise has goodwill or other intangible value;
- Sales of the stock and the size of the block of stock to be valued;
- The market price of the stock of corporations engaged in the same or similar line of business, having their stock actively traded in a free and open market, either in an exchange or over-the-counter.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000009

We studied, analyzed, and interpreted both internal and external factors that could influence the value of CPES.

Internal factors included the Company's financial position, results of operations, and management, as well as the size and marketability of the interest being valued.

External factors included, among other things, the status of the industry and the position of the Company relative to the industry.

In performing our work, we were provided with and/or relied upon various sources of information, including but not limited to:

- ◆ Community Provider of Enrichment Services, Inc. audited and consolidated financial statements as of and for the years ended December 31, 2010 through 2017 (draft), prepared by CliftonLarsonAllen LLP;

- ◆ Community Provider of Enrichment Services, Inc. Form 1120S, U.S. Income Tax Return for an S Corporation as of and for the years ended December 31, 2010 through 2016, prepared by CliftonLarsonAllen LLP;

- ◆ Community Provider of Enrichment Services, Inc. forecast of revenues and expenses for the years ending December 31, 2018 through 2022;

- ◆ Community Provider of Enrichment Services, Inc. Repurchase Liability Study as of September 21, 2016, prepared by SES Advisors;

- ◆ Community Provider of Enrichment Services, Inc. management prepared repurchase liability analysis as of December 31, 2015;

- ◆ Community Provider of Enrichment Services, Inc. Employee Stock Ownership Plan as Amended and Restated, effective as of January 1, 2015;

- ◆ Amendment 2015-1 and 2015-2 to the Community Provider of Enrichment Services, Inc. Employee Stock Ownership Plan, effective as of January 1, 2015;

- ◆ Community Psychology & Education Services, Ltd. (prior name of Community Provider of Enrichment Services, Inc.) Employee Stock Ownership Trust Agreement, dated May 25, 2004;

- ◆ Articles of Amendment to the Amended and Restated Articles of Incorporation of Community Provider of Enrichment Services, Inc., dated November 29, 2005;

PAREDES-0000010

- Third Amended and Restated Bylaws of Community Provider of Enrichment Services, Inc., dated February 5, 2016;

- Unaudited supplemental information, including, but not limited to:
  - History of the Company;
  - Information on certain past transactions in the shares;
  - Sales and operating profitability statements;
  - Officer compensation;
  - Ownership breakdown of the shares;
  - General information on the Company's marketing, competitors, suppliers, customers, and other information from an interview with the Company's management;

- Surveys of industry peer financial results contained in *RMA Annual Statement Studies*, 2013/2014 through 2017/2018 Editions, published by the Risk Management Association (formerly Robert Morris Associates), a banking industry association. This study provides detailed financial ratio information on a variety of industry groupings, separated by company size;

- Analysis of information on possible publicly traded and privately held comparable companies and industry information including the following:
  - Search of the Electronic Data Gathering and Retrieval ("EDGAR") database of public company filings with the Securities and Exchange Commission;
  - Analysis of possible public company and industry information via computer database;
  - Specific company annual reports, 10-K's and 10-Q's;
  - Database searches and reviews of articles, forecasts and abstracts via the Internet;
  - Analysis of possible privately held comparable companies obtained from *Pratt's Stats*, *Mid-Market Comps* (*Done Deals*), and *BizComps*;

- Information regarding the economic outlook for the region, as well as the overall U.S. economy;

- Information regarding the present conditions and outlook for the industry in which the Company operates as contained in *IBIS World Industry Reports*;

- Resources regarding business valuation issues including, but not limited to the following:
  - *Business Valuation Review*, a publication of the Business Valuation Committee of the American Society of Appraisers;

---

COMMUNITY PROVIDER OF ENRICHMENT SERVICES, INC.                                    Page 3

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

- *ASA Business Valuation Standards* of the American Society of Appraisers, the *Uniform Standards of Professional Appraisal Practice,* published by the Appraisal Foundation, and the *Statement on Standards for Valuation Services 1*, issued by the AICPA Consulting Services Executive Committee;
- *Valuing A Business: The Analysis and Appraisal of Closely Held Companies,* Fifth Edition, by Shannon P. Pratt, FASA;
- *Financial Valuation Applications and Models,* Fourth Edition, edited by James Hitchner;
- *Duff & Phelps 2018 Online Navigator and Valuation Handbook - U.S. Guide to Cost of Capital,* published by John Wiley & Sons, Inc., updated annually; and,

◆ Other various relevant information.

The procedures employed in valuing the subject interest in the Company included such steps as we considered necessary, including but not limited to:

◆ A visit to the Company's headquarters located in Tucson, Arizona;
◆ Discussions with management (including a completed management questionnaire) regarding valuation related issues including the following items (not all inclusive):
  - past and future operations of the business;
  - discretionary expenses;
  - capital structure; and,
  - operational strengths and weaknesses.
◆ An analysis of the historical and estimated future financial condition of the Company;
◆ An analysis of the industry in which the Company operates;
◆ An analysis of the general economic environment as of the valuation date;
◆ A comparative analysis where possible of guideline companies; and,
◆ An analysis of the other pertinent facts and data resulting in our conclusion of value.

The approaches and methodologies used in our work did not comprise an examination in accordance with generally accepted auditing standards (GAAS). The objective of a GAAS examination is to express an opinion regarding the fair presentation of historical or prospective financial statements or other financial information presented in accordance with generally accepted accounting principles (GAAP). Since we did not perform an examination in accordance with GAAS, we express no opinion and accept no responsibility for the accuracy and completeness of the financial information or other data provided to us by others. We assume that the financial and other information provided to us is accurate and complete, and we have relied upon this information in performing our valuation.

PAREDES-0000012

## IMPORTANCE OF LIMITING CONDITIONS

We urge readers to study the *Statement of Assumptions and Limiting Conditions* contained in Appendix 5 of this report for important conditions, restrictions, and assumptions. Additionally, numerous assumptions are included throughout this report. Therefore, readers should study the entire report in order to obtain an understanding of the value estimate contained herein.

## DEFINITIONS

A summary of definitions as adopted by the American Society of Appraisers, Institute of Business Appraisers, American Institute of Certified Public Accountants, Canadian Institute of Chartered Business Valuators, and National Association of Certified Valuation Analysts is included in Appendix 4.

## VALUATOR INDEPENDENCE

This report was prepared in full by Brueggeman and Johnson Yeanoplos, P.C., Kevin R. Yeanoplos, CPA/ABV/CFF, ASA, Clay S. Danielson, ASA, and Aubrey L. Yeanoplos. Brueggeman and Johnson Yeanoplos, P.C. acted as an independent valuation firm and has not acted as an advocate for the Company or any other party. This valuation was prepared in accordance with the *Statement on Standards for Valuation Services 1* of the American Institute of Certified Public Accountants ("AICPA"), the *Business Valuation Standards and Code of Ethics* of the American Society of Appraisers, and the *Uniform Standards of Professional Appraisal Practice* ("USPAP"). Brueggeman and Johnson Yeanoplos, P.C.'s fee for this engagement was in no way determined by the fair market value estimate provided.

## SUMMARY OF KEY VALUATION FACTORS

Listed below is a summary of some of the positive and negative factors that we considered in this valuation (not all-inclusive):

**Positives:**

- The Company has a strong reputation for quality services and expertise in niche areas such as behavioral disorders;
- The Company has an experienced and capable workforce and management team;
- The Company's pre-tax profit as a percentage of revenues was approximately 4.0% and 3.7% in 2016 and 2017, respectively, and compared favorably to the industry peer median in both years;
- The Company's collection period improved in the most recent year ended December 31, 2017;
- The Company has recently made efforts to manage its highest operating expense, namely labor expense, by implementing limits on employee overtime;

PAREDES-0000013

- The Company responded to several Requests for Proposal in California during 2017 and was awarded a specialized residential facility in the Lancaster/Palmdale area, two community integration adult day programs in San Luis Obispo and Lompoc;
- The Company compared favorably to industry peers in terms of pre-tax returns on assets and shareholders' equity for the years ended December 31, 2016 and 2017;
- The Company reduced its level of interest bearing debt during the years ended December 31, 2016 and 2017;
- CPES is forecasting an increase in annual revenue of approximately 9.5% for the fiscal year ending December 31, 2018; and,
- Demand for the Company's services are expected to continue to experience steady growth going forward.

**Negatives:**

- The Company operates with considerable revenue concentration with approximately 53% of the Company's revenues being derived from a single agency in Arizona and approximately 31% of the Company's revenue being derived from a single agency in the state of California for the year ended December 31, 2017;
- Due to the recent passage of minimum wage legislation in Arizona, the Company is facing a significant increase to labor costs over the next five years;
- The Company reported a decrease in earnings of approximately 7% for the year ended December 31, 2017;
- CPES' financial operating performance for the year ended December 31, 2013 resulted in negative earnings; and,
- The Company operates within a heavily regulated environment in an industry that experiences a considerable degree of litigation.

# FUNDAMENTAL INFORMATION ON
# THE SUBJECT COMPANY

## BACKGROUND AND OPERATIONS

Community Provider of Enrichment Services, Inc. was incorporated under the laws of the state of Arizona on August 23, 1988, and later elected for S-Corporation status on July 1, 1998. Originally founded as Community Psychology and Education Services in 1980 by Dr. Thomas G. Schramski and Dr. David R. Harvey, the Company's earliest mission was to create community services for adults with developmental disabilities in the state of Arizona. In 2005, the Company expanded its operations through the acquisition of Counseling and Consulting Services, Inc., a behavioral health service provider owned by Dr. Harvey. Renamed Community Provider of Enrichment Services, Inc., the Company received its first foster care contract with the U.S. Department of Health and Human Services' Administration on Children, Youth and Families, the following year.

Since the Company's founding, Community Provider of Enrichment Services, Inc. has become one of Arizona's leading providers of services for children and adults with behavioral health challenges and development disabilities. Building upon this success, the Company established operations in the state of California through the incorporation of CPES California, Inc. on February 5, 2010, and the acquisition of Genesis Development Services, Inc on November 16, 2011 for an aggregate purchase price of $5.9 million. Genesis Development Services subsequently changed its name to Novelles Developmental Services, Inc. ("Novelles"). CPES California and Novelles are wholly-owned subsidiaries of Community Provider of Enrichment Services, Inc.

## COMPANY OWNERSHIP

The Company is 100% owned by the Community Provider of Enrichment Services, Inc. ESOP as of December 31, 2017.

## ORGANIZATIONAL STRUCTURE

The Company's organizational structure as of December 31, 2017 is illustrated as follows:

---

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000015



## BOARD OF DIRECTORS AND MANAGEMENT

On December 2, 2016, Mark G. Monson, Linki D. Peddy, and Michele Ferrall were appointed to the board of directors. On December 23, 2016, Maricela Solis De Kester, Tannya Gaxiola, and Reon Tesar were removed from the board of directors. Previously, the Company had a six-member board of directors, consisting of David Johnson as chairman, Mary Lynn Greenhow as secretary, and Cathy Hunt, Reon Tesar, Maricela Solis De Kester, and Tannya Gaxiola as directors.

The following changes were made to the board of directors in 2017:

- Ron Barber was appointed to the board in January;
- Ramona Durrer and Susan Martinez were appointed to the board in February;
- Douglas Zimmerman was appointed to the board and Susan Martinez was removed from the board in June;
- John W. Green was appointed to the board in August;
- Linki D. Peddy was removed from the board in November; and,
- Marjorie Reiter was appointed to the board in December.

The board typically meets on a monthly basis. The activities and responsibilities of the board include the appointment of officers and the ESOP Trustee, and setting officer compensation. The Company's executive officers are as outlined in the following table:

PAREDES-0000016

### Top Executives
**As of December 31, 2017**

| Name | Position |
| --- | --- |
| Mark G. Monson | President and Chief Executive Officer |
| Michele Ferrall | Regional Vice President of California Operations |
| Marjorie Reiter | Vice President of Arizona Operations |
| Mary Lynn Greenhow | Vice President of Administration |
| John W. Green | Vice President and Chief Financial Officer |
| Teresa Thienhaus | Vice President of Human Resources and ESOP |
| Ramona Durrer | Vice President of Clinical Services |

**Mark G. Monson, President and Chief Executive Officer** - Mr. Monson has over 25 years of executive healthcare and human service experience with a specialty focus in behavioral health, employment and developmental services, early education and special needs education, and acute/post-acute medical rehabilitation. His comprehensive management experience encompasses expertise in healthcare and human services operations management, strategic and facility planning, physician recruitment, business development and acquisitions, utilization review, advocacy and public policy, budget, performance improvement, managed care contracting, marketing, and governmental relations and regulatory compliance. Prior to joining CPES, Mr. Monson was the President and CEO of Fairbanks/Hope Academy, a 110-bed specialty hospital and charter school in Indianapolis, Indiana.

Mr. Monson received a Bachelor of Arts degree in Psychology from the University of Minnesota and a Master of Science degree from the University of Arizona. His certifications include Fellow, American College of Healthcare Executives; Senior Member and Certified Quality Manager, American Society for Quality; and National and State Examiner, Malcolm Baldrige National Quality Award Program.

**Michele Ferrall, Regional Vice President of California Operations** - Ms. Ferrall has more than 30 years of experience working in the field of developmental disabilities with adults, children, and infants. She is responsible for the oversight and development of programs for individuals with intellectual and developmental disabilities throughout the state of California, including supported living services, group homes, specialized residential facilities, and day programs. In addition, Ms. Ferrall establishes organizational priorities, secures resources, is an integral part of strategic planning, and promotes person centered practices to meet the organization and individual's goals.

PAREDES-0000017

Prior to joining CPES, Ms. Ferrall served as the Deputy Administrator for the State of Nevada's Aging and Disability Services Division, where she had oversight responsibility of three regional centers, over 6,200 persons with intellectual disabilities and related conditions, and more than 500 staff. Ms. Ferrall received her Master's in Special Education with a focus on autism and severe disabilities and a Bachelor's Degree in Psychology from the University of Nevada.

**Marjorie Reiter, Vice President of Arizona Operations** - Ms. Reiter is a healthcare leader, board certified in healthcare management and a fellow of the American College of Healthcare Executives. Her areas of responsibility at the Company include oversight and management of its developmental and intellectual disability services statewide, encompassing residential homes, day programs, work education programs, and foster care services.

Ms. Reiter began her career in Boston, Massachusetts, and held positions in hospital and physician practices in New York and New Jersey. After moving to Arizona in 1996, she held leadership positions in cardiology and ambulatory care, including ACA implementation work with Vice President Biden. After this period, Ms. Reiter directed dialysis clinics in central and southeastern Arizona for Fresenius Kidney Care. She serves on the board of Arizona Healthcare Executives, as well as the advisory boards of several university healthcare programs.

Ms. Reiter holds a Bachelor of Arts degree in Psychology from Brandeis University and a Master of Public Health in Health Systems from Boston University.

**Mary Lynn Greenhow, Vice President of Administration** - Ms. Greenhow oversees corporate facility issues, develops and revises service and operational policies, monitors changes in Federal and State regulations to determine their impact upon CPES and its subsidiaries, and supervises licenses, permits, contracts, data validation and billing concerns. In her current role, she has primary responsibility for compliance, legal issues, stewardship of corporate policy and procedures and maintenance of the corporate record.

Ms. Greenhow earned a Bachelor of Science degree in Public Administration and a Masters Certificate in Digital Information Management at the University of Arizona, where she was the recipient of the Institute of Museum and Library Sciences' Laura Bush 20th Century Librarian Scholarship. She currently serves as a co-trustee of the Company's ESOP.

**John W. Green, Vice President and Chief Financial Officer** - Mr. Green joined CPES in June 2017, and is responsible for internal and external financial reporting, treasury, cash management, budgeting, capital planning, and financial forecasting. He sits on the Company's risk management, governance, and finance committees, and interacts with other members of the executive management team on matters impacting CPES' finances and financial reporting. Mr. Green is a Certified Public Accountant with a 30-year career in public accounting, most recently at BDO USA LLP, where he served as an audit partner focused on investment partnerships, non-bank lenders, employee

PAREDES-0000018

benefit plans, and insurance companies including health insurers. He also managed numerous consulting engagements for clients, specifically installations of accounting and reporting programs.

Mr. Green is a graduate of Boston College and attended the Harvard Business School Executive Management Program. He is a member of the American Institute of Certified Public Accountants, the New York State Society of CPAs, the Arizona Society of CPAs, and Financial Executives and Associates of Tucson (FEAT).

**Teresa Thienhaus, Vice President of Human Resources and ESOP** - Ms. Thienhaus has worked in the field of employment law and human resources for over 15 years. As a Senior Deputy Attorney General for the State of Nevada, she represented the Nevada Department of Transportation and other state agencies in a number of personnel matters in state and federal courts, and in administrative hearings. Ms. Thienhaus has experience in Title VII discrimination cases involving race, gender, and national origin discrimination and sexual harassment, at both the EEOC stage and in federal court.

In addition to her litigation experience, Ms. Thienhaus has provided day to day advice and counsel to employers on matters concerning workers' compensation, unemployment, wrongful termination, the Fair Labor Standards Act, the Americans With Disabilities Act, and all aspects of leave under both the federal FMLA and the California FEHA, CFRA, and PDLA. She served as the Director of the Nevada Department of Personnel for three years, under appointment from two governors. Ms. Thienhaus' first career was in psychiatric nursing. She received her undergraduate degree from the University of Cincinnati, McMicken College of Arts and Sciences, and her Juris Doctor from the University of Cincinnati, College of Law. Ms. Thienhaus currently serves as a co-trustee of the Company's ESOP.

**Ramona Durrer, Vice President of Clinical Services** - Ms. Durrer is responsible for all aspects of the Company's behavioral health services, including psychological, outpatient, residential, and therapeutic foster care services. She maintains vast human services knowledge and experience, having provided oversight and leadership for case management, quality improvement, disease management programs, and utilization management. Additional expertise includes contracting, compliance, credentialing and accreditation activities with Joint Commission, National Committee for Quality Assurance, and Healthcare Effectiveness Data and Information Set reporting.

Ms. Durrer has provided strategic and operational oversight for allopathic, complementary, alternative medicine, and allied health programs. Specifically, she has overseen the development, and implementation of statewide quality improvement programs, health promotion, practice guidelines, utilization management, home care program startup, risk mitigation, credentialing, and legal nurse consulting.

PAREDES-0000019

Ms. Durrer holds a Master's Degree in Business Administration and a Bachelor of Science Degree in Microbiology and Chemistry from the University of Arizona, as well as an Associate's Degree in Nursing.

## MANAGEMENT DEPTH

The Company appears to have an appropriate level of management depth for the size of its operations and does not rely on any one key individual for the generation of new business.

## PRODUCTS AND SERVICES

The Company specializes in providing a continuum of behavioral health and developmental services for children and adults, including individual, group and family counseling, personal living skills training, employment programs, and the operation of community group homes.

### Behavioral Health (Arizona)

- ◆ **Counseling Services** - The Company's counselors have a variety of experience and specialization to meet individual, couple, and family needs. CPES also integrates counseling services with overall healthcare services.

  - *Individual Counseling (Adults, Adolescents, and Children)* - Counseling approaches are tailored to the strengths and goals of individual adults, adolescents, and children. Therapeutic techniques may include Cognitive Behavioral Therapy, Motivational Interviewing, Solution Focused, Art and Play therapy, and Dialectical Behavioral Therapy.

  - *Couples/Marriage Counseling* - Couples counseling helps those in a relationship to work through conflicts and differences, and to communicate more effectively to solve any challenges that may arise in the relationship. Techniques are used to help identify strengths and needs in the relationship and pathways to improvement.

  - *Family Counseling* - Family counseling focuses on the relationships between family members and how well the family system serves to meet the needs of all family members. Therapeutic strategies vary based on the needs of the family.

  - *Parenting Skills Group Counseling* - A skills group designed to teach and enhance skills parents must have to effectively shape their children's development. Topics include developing and clarifying clear expectations, consistent follow through with positive and negative consequences, discipline, communication, and childhood development.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000020

- *Healthy Relationships Group Counseling* - An all-male or all-female group designed to assist individuals in recognizing and keeping healthy relationships. This is for family, friendships, and romantic relationships. Topics include jealousy, boundaries, communication skills, and conflict resolution.

- *Anger Management Group Counseling* - A skills group designed to assist with conflict resolution, identifying emotions, coping skills, emotional management, and communication.

- *Dialectical Behavior Therapy* - Dialectical Behavior Therapy's main goal is to develop personal skills to cope with stress, regulate emotions, and improve relationships with others.

- *Trauma Counseling* - Emotional and psychological trauma is the result of extraordinarily stressful events that may affect a person's sense of security, and cause feelings of helplessness and vulnerability. Two of the Company's specialized treatment approaches are Prolonged Exposure Therapy, a treatment for chronic post-traumatic stress disorder, and Eye Movement Desensitization and Reprocessing, which incorporates elements of cognitive behavioral therapy with eye movements or other forms of rhythmic stimulation.

- **Positive Behavior Supports**

   - *Functional Behavioral Assessments* - A Functional Behavioral Assessment is a process of uncovering why a person engages in challenging behavior. It involves the systematic gathering of information derived from interviews, direct observations, records review, and various data collection methods.

   - *Behavior Treatment Plans* - Behavior Treatment Plans include interventions to teach individuals replacement behaviors and strategies for caregivers to use to support them in their current environment. They are based on the Functional Behavioral Assessment.

   - *Behavioral Consultation and Training* - Behavioral consultation includes training on the Functional Behavioral Assessment and Behavior Treatment Plan. It includes helping caregivers to teach replacement behaviors, changing the environment to support behavior change, and developing reinforcing consequences for replacement skills.

---

PAREDES-0000021

- *Psychological Evaluations for Children and Adults* - Psychological evaluations are performed for children older than five years of age, and adults. Evaluations can serve to assist with diagnostic clarification in areas including Attention Deficit Disorder, depression, anxiety, and other disorders such as Autism or Schizophrenia. Evaluations can also assist with treatment and placement recommendations.

## ◆ Training Services

- *Skills Training* - Skills training and development includes teaching independent living, social, and communication skills to persons and/or their families in order to maximize the person's ability to live and participate in the community and to function independently. Training can occur in the person's home or community.

- *Homecare Training* - Homecare training involves face to face interaction with family members directed toward restoration, enhancement, or maintenance of the family's ability to effectively interact and care for the person in the home and community.

## ◆ Forensic Services

- *Psychosexual Evaluations* - A comprehensive psychological evaluation which can assess level of risk and recommended types of interventions. Evaluations can be completed with adults and youth of varying developmental abilities.

- *Rule 11 Evaluations* - An evaluation to determine the individual's competency to stand trial. Evaluations are provided to adults aged 18 and older.

- *Domestic Violence Offender Treatment Program* - This program provides a series of group sessions designed to assist participants in preventing domestic violence and developing self-management, communication, and conflict resolution skills. Group membership is either all male or all female.

- *Substance Abuse Treatment Program* - Program sessions apply a combination of group counseling processes, education, and skills training to prevent substance abuse. Group sessions are co-ed or single gender. Sessions focus on a personal relapse prevention plan, triggers, coping skills, physiological changes with substance/sobriety and similar topics.

- *Sex Offender Treatment Program* - This program provides single gender groups which treat individuals either convicted, accused of, or wanting to prevent committing a

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000022

sexual offense. Group and individual sessions focus on learning specialized strategies for stopping abusive behavior, being accountable and taking responsibility for harm done.

- **Specialized Residential Services** - Residential supports are provided to children, adolescents, and adults in homes licensed by the Department of Licensing Services / Bureau of Residential Facilities Licensing. Psychological evaluations, functional behavioral assessments, behavior support plans, therapy, personal care, skills training, and wraparound supports may be provided following a Positive Behavioral Support Model, both residentially and at outpatient clinics. Program locations include Casa Grande and Tucson.

- **Consultation and Clinical Intervention (CCI)** - The CCI Project provides specialized behavioral consultation services to increase placement stability and quality of life for individuals with histories of severe problem behavior. Through work with behavioral health and long term care organizations, the Project's services have significantly reduced the incidence of hospitalization, emergency medical services, incarceration, and law enforcement contacts. The CCI Project has also provided adjunct support and training to clinical case management and direct care personnel.

## Developmental Services (Arizona)

- **Adult Developmental Homes** - Adult Developmental Homes and Shared Living are residential support models available to people who prefer to live with a family or individual, and can encompass a wide variety of living and support arrangements. Adult Developmental Home providers, either as a family or an individual, are independent contractors who open their homes to people so they may experience a more intimate and personal approach to teaching activities of daily living.

- **Individually Designed Living Arrangements** - Supports are provided in the home, and are tailored to the needs of the individual on an hourly or daily basis. The emphasis for these supports is to assist an individual in accomplishing those activities of daily living that facilitate living as independently as possible. In some cases, the uniquely designed living arrangement may be in partnership with members of the individual's family or friends providing some of the oversight and monitoring for quality.

- **Group Homes** - Group homes are located within a community and are designed to serve children or adults with higher support needs. Homes typically have four or fewer occupants, and are staffed 24 hours a day by trained caregivers. Group homes are licensed and monitored through the Department of Health Services.

---

PAREDES-0000023

- **Day Support Services** - Services are typically provided Monday through Friday during the day time hours. The service emphasis is placed on facilitating experiences for people based on individual and group interests, similar to those of other people their age. Activities include accessing retail providers, volunteer opportunities, and some paid work opportunities.

- **Employment-Related Programs** - CPES provides job training and job development and placement services through contracts with the Department of Economic Security's Rehabilitation Services Administration and Division of Developmental Disabilities. Job training occurs in an employment setting while fulfilling duties required through contracts with individuals and companies in the community. Individuals are compensated for the work they perform on behalf of these contracts. Placements are made with local employers and vary according to the interests of the person served.

- **Habilitation Services** - The intent is to teach an individual specific skills to increase his or her ability to live more independently.

## Developmental Services (California)

- **Supported Living Services** - Supported living services are offered by Novelles team members in the San Francisco Bay, Santa Maria, Paso Robles, San Luis Obispo, and greater Santa Barbara regions of California. Supported living services are individualized support services provided by Novelles team members to an individual in their own home. The type of service(s) offered is determined by the individual, in collaboration with his/her case management team, and are unique to the individual's training and support needs. Supported living services may be offered from as little as a few hours per week, to round the clock 1:1 support. The individual who is receiving supports has a central role in the recruitment, hiring, and retention of team members who provide services.

- **Adult Residential Services** - CPES California team members currently offer eight specialized adult residential settings in the greater Los Angeles communities of Moreno Valley, San Bernardino, and Northridge, California. These residential settings have been developed with local funding centers to provide specialized supports specific to individuals who are transitioning from large congregate state institutions to a community of their choice. Residential settings provide health and behavioral supports to a maximum of four adults, each of whom have a private bedroom, increased staffing, and connections to local community events and services. Specialized adult residential settings provide an opportunity for individuals to learn skills that may lead to living arrangements in their own homes. Each of the eight settings provide transportation and assist the individual in obtaining a day program activity of their choice.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000024

♦ **Adult Day Programs** - Adult day programs are offered by Novelles team members in the San Francisco Bay, Santa Maria, Paso Robles, and greater Santa Barbara regions of California. Adult day programs operate Monday through Friday, typically 6 hours per day, and offer training to individuals in areas of community skills training, personal care, health oversight, and skill acquisition, leading to greater inclusion with peers. In addition, Novelles offers one adult day program in the San Francisco Bay area that focuses on community integration for adults with significant healthcare needs, and employs two registered nurses to assist. Recently, an adult day program in Santa Maria was established to provide higher levels of staff engagement with individuals who have increased behavioral support needs. The healthcare and behavioral focused adult day programs utilize Person-Centered Thinking practices as a process to promote individual choice-making by the person supported. All Novelles adult day programs offer transportation to/from their respective locations.

♦ **Children's Residential Services** - Children's residential services are offered by Novelles team members in the Santa Maria region of California. The one children's residential setting is a large home and supports a maximum of six children in an established neighborhood, and also provides connections to the community. This setting provides around the clock staffing, including awake overnight coverage, and works collaboratively with local school districts to ensure instruction is maintained for the individual. The setting provides social integration skills training, personal care skills development, healthcare supports, and behavioral consultation, with the goal of reconnecting the child to his/her family. The age range of the children referred to the setting is between 12-18.

**Foster Care Arizona**

♦ **Child Development Homes** - CPES licenses individuals and families to provide safe home environments for children with developmental disabilities. The Company offers comprehensive training and on-going support for families interested in providing short or long-term care for these children.

♦ **Traditional Foster Care** - Foster care is temporary care for children who have been removed from their home by Department of Child Safety. CPES licenses individuals and families to provide regular foster care to children ages 0-17. Foster families may choose to provide emergency foster care, respite (short term), or foster care to adoption.

♦ **Therapeutic Foster Care: Home Care Training to Home Care Client (HCTC)** - HCTC is short-term foster care provided to children between the ages of 3 – 17 who have behavioral challenges preventing them from being successful in their family environment. Licensed professional foster parents provide care for children in a family

---

PAREDES-0000025

home setting and are supported by a CPES clinical team to help the children success-fully achieve behavioral goals that will enable them to return to family.

- ◆ **Adoption Certification** - CPES certifies families to adopt children who are enrolled in foster care and are currently in need of an adoptive family. The Company's licensing specialists are knowledgeable in all aspects of the adoption process and work closely with families to ensure successful adoptions.

- ◆ **Medically Fragile Children** - The Company provides specialized training to individuals and families interested in caring for medically fragile children. The particular health care needs of these children vary and may include cardiac, respiratory, or neurological conditions. The goal of this service is to provide a stable home environment with an emphasis on managing their healthcare concerns.

## FACILITIES

Community Provider of Enrichment Services, Inc. has facilities located in Benson, Tempe, Tucson, and Yuma, Arizona. The Company's corporate headquarters are located at 4825 North Sabino Canyon Road in Tucson, Arizona. CPES maintains recruitment and training centers in Tempe and Tucson, regional offices in Benson and Tempe, and administration offices in Casa Grande and Yuma. CPES California is headquartered in Ontario, California, and Novelles Developmental Services, Inc. in Santa Maria, California.

## EMPLOYEES

Management indicated that the Company currently employs approximately 1,400 employees.

## MARKETING AND DISTRIBUTION

### Customer Base

The Company provides services to children and adults with behavioral health diagnoses and development disabilities throughout the states of Arizona and California.

## COMPETITION

According to management, the Company's primary competitors within Arizona include Arizona MENTOR, Intermountain Centers for Human Development, and The Tungland Corporation.

## LITIGATION

Management indicated that the Company is involved in several ongoing litigation matters. Two lawsuits are currently pending where treatment errors have been alleged against certain employees and facilities maintained by the Company. According to management, one of these claims was in the process of being settled at the end of 2017. Additionally, an Arizona based CPES employee filed a claim with the Arizona Civil Rights Division ("ACRD") alleging discrimination as based on age. This claim was subsequently dismissed by the ACRD in July 2017. Further, two CPES California employees filed a class action lawsuit in December 2016, alleging the Company violated wage and hour laws related to rest breaks. This claim was settled in December 2017 and the class action was dismissed. Additionally, a Novelles employee filed a wage claim in September 2017, alleging she was entitled to penalties for missed meals and rest periods. This claim was settled in December 2017.

## FUTURE EXPECTATIONS

According to management, the Company is focusing on opportunities in California. In 2017, CPES responded to several Requests for Proposal ("RFP") in California and was awarded a specialized residential facility in the Lancaster/Palmdale area, two community integration adult day programs in San Luis Obispo and Lompoc, respectively, and supported and integrated living services in Paso Robles, San Luis Obispo, and Lompoc. The Company intends to actively study and respond to future RFP's as they are issued by the state.

Due to the passage of the minimum wage/mandatory sick leave legislation in Arizona, the Company is facing a significant increase to labor costs over the next five years. To mitigate losses, CPES will be considering acquisitions of like companies, and will close all sites in the Flagstaff area by the end of 2018. Additionally, the Company has recently made efforts to manage its labor expense by implementing limits on employee overtime.

## SUMMARY STATEMENT OF OPERATIONS (UNADJUSTED)

Summarized below are selected historical results of the Company for the fiscal periods ended December 31, 2013 through 2017:

---

PAREDES-0000027

### Summary of Selected Results
### Statement of Operations
#### (unadjusted)

| | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 | 2017 |
| Revenues | $ 51,222,604 | $ 52,030,637 | $ 52,921,338 | $ 53,838,789 | $ 54,677,906 |
| Operating Expenses | 51,235,745 | 50,805,303 | 50,750,600 | 51,892,758 | 54,071,470 |
| | | | | | |
| Operating Profit | (13,141) | 1,225,334 | 2,170,738 | 1,946,031 | 606,436 |
| Other Income | 3,871 | 199,028 | 535,890 | 519,995 | 1,584,971 |
| Interest and Other Expenses | 817,701 | 557,231 | 446,371 | 296,307 | 172,328 |
| | | | | | |
| Pre-Tax Earnings | (826,971) | 867,131 | 2,260,257 | 2,169,719 | 2,019,079 |
| Provision for Income Taxes | - | - | - | - | - |
| | | | | | |
| Net Income | $ (826,971) | $ 867,131 | $ 2,260,257 | $ 2,169,719 | $ 2,019,079 |

*Source: Summarized from audited and consolidated financial statements as of and for the years ended December 31, 2013 through 2017 (draft), prepared by CliftonLarsonAllen LLP.*



PAREDES-0000028

### SUMMARY OF BOOK VALUE OF SHAREHOLDERS' EQUITY (UNADJUSTED)

The total book value of the Company's reported shareholders' equity (total book assets less total book liabilities) was as follows:

| | | | As of December 31, | | |
|---|---|---|---|---|---|
| **Book Value of Shareholders' Equity** *(unadjusted)* | | | | | |
| | 2013 | 2014 | 2015 | 2016 | 2017 |
| Shareholders' Equity | $ 5,584,005 | $ 6,451,136 | $ 8,711,393 | $ 10,881,112 | $ 12,900,191 |
| Percent Change Over Prior Period | -12.90% | 15.53% | 35.04% | 24.91% | 18.56% |

*Source: Summarized from audited and consolidated financial statements as of and for the years ended December 31, 2013 through 2017(draft), prepared by CliftonLarsonAllen LLP.*



Book Value of Shareholders' Equity
As of December 31,
(unadjusted)

### SUMMARY

Community Provider of Enrichment Services, Inc. was incorporated under the laws of the state of Arizona on August 23, 1988. The Company was founded as Community Psychology and Education Services in 1980 by Dr. Thomas G. Schramski and Dr. David R. Harvey. CPES is a leading provider of services for children and adults with behavioral health challenges and development disabilities in the state of Arizona, and additionally offers services in California through its wholly-owned subsidiaries, CPES California, Inc. and Novelles Developmental Services, Inc.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000029

The Company has a good reputation for quality services and expertise in niche areas such as behavioral disorders. The Company reported an increase in revenue of approximately 1.6% while earnings decreased approximately 7% for the year ended December 31, 2017. The Company's book value of equity increased approximately 18.6% as of December 31, 2017 as compared to the same day in the prior year.

The above factors have been taken into consideration in assessing the risks associated with an investment in the Company. We will reflect any additional risk in our determination of an appropriate rate of return later in this report.

# ECONOMIC CONDITIONS

### *INTRODUCTION*

No individual company operates in isolation. Any company's performance depends on external variables over which it can exercise only limited influence. Macroeconomic variables such as the state of the international economy, decisions made by the Federal Reserve Board, and the relative cost of capital can affect a company's access to raw materials, governmental and agency rules, and the regulations and structure of the competitive environment in which the company operates. The Gross Domestic Product (GDP) level, a measure of overall supply and demand, is ultimately determined by changing demographics, customer attitudes and consumer spending patterns.

### *The U.S. Economy*

The following excerpts from The National Economic Review 4th Quarter 2017 (the most recent available) prepared by Mercer Capital and published by John Wiley & Sons, Inc. have been included in order to provide an overview of the national economy around the time of the valuation.

**General Economic Overview**



According to advance estimates released by the Department of Commerce's Bureau of Economic Analysis (the "BEA"), Real Gross Domestic Product ("GDP"), the output of goods and services produced by labor and property located in the United States, increased at an annualized rate of 2.6% during the fourth quarter of 2017. GDP growth in the fourth quarter was weaker than economists' expectations but was also the fifteenth straight quarter of growth.

---

PAREDES-0000031

Annualized GDP growth of 2.6% during the fourth quarter of 2017 compares to economists' projections of 3.0% and 2.7% (*Bloomberg* Survey and *Wall Street Journal* Survey, respectively). GDP growth in the second and third quarters of 2017 measured 3.1% and 3.2%, respectively. Real GDP grew 2.3% during 2017, compared to growth of 2.9% in 2015 and 1.5% in 2016.

Exports increased 6.9% in the fourth quarter, compared to increases of 3.5% and 2.1% in the second and third quarters of 2017, respectively. Durable goods expenditures increased at an annualized rate of 14.2% over the quarter, following increases of 7.6% and 8.6% in the second and third quarters of 2017, respectively. Economists expect GDP to increase at a stable rate in future quarters. A survey of economists conducted by *The Wall Street Journal* reflects an average GDP forecast of 2.5% annualized growth in the first quarter of 2018.

Economists believe that a portion of the GDP increase in the fourth quarter was attributable to a temporary boost in spending provoked by a pair of third quarter hurricanes in Texas and Florida. This temporary boost would be comprised of both delayed third quarter spending as well as replacement spending for goods destroyed by the hurricanes. A growing trade deficit as import growth exceeded export growth also impacted GDP. The total impact of the December 2017 tax cuts on GDP was indeterminate at the end of the quarter.



**Trends in Leading, Coincident, and Lagging Economic Indicators**
The Conference Board

Indices @ 2016 = 100

The Conference Board ("TCB") reported that the Leading Economic Index ("LEI"), the government's primary forecasting gauge, increased in December 2017, the third straight monthly increase. Over the six month period that ended December 2017, the LEI increased 3.1%, compared to 2.6% during the prior six month period.

Overall, the Conference Board economists view the LEI's recent movements as a sign of strengthening growth. According to the Director of Business Cycles and Growth Research at TCB, Ataman Ozyildirim, "The U.S. LEI continued rising rapidly in December, pointing to a continuation of strong economic growth in the first half of 2018. The passing of the tax plan is likely to provide even more tailwind to the current expansion." He added, "The gains among the leading indicators have been widespread, with most of the strength concentrated in new orders in manufacturing, consumers' outlook on the economy, improving stock markets and financial conditions." Seven of the LEI's ten

PAREDES-0000032

leading economic indicators increased during December 2017, one decreased, and two remained unchanged.

In September 2010, the Business Cycle Dating Committee of the National Bureau of Economic Research ("NBER") determined that the contraction that began in December 2007 had ended in June 2009. The 2008/2009 contraction represented the longest of 13 contractions subsequent to the Great Depression. December 2017 marks 101 months (about eight years) of expansion since the June 2009 trough. No economic expansion in U.S. history has lasted more than ten years.

A series of debt ceiling crises and budget battles has impacted the economy during the last several years. Through actions such as the Budget Control Act of 2011, the Supercommittee tasked with budget deficit reduction, and the 16-day government shutdown in October 2013, government fiscal policy has influenced economic performance. According to a report released by the White House in November 2013, the shutdown resulted in an estimated minimum of $2 billion in lost economic output.

Through most of 2016, budget battles were largely insignificant. In May 2017, President Trump proposed a budget that included lower tax rates and cuts to welfare programs. The budget was not passed. The proposed budget by President Trump relied on the repeal of the Affordable Care Act (the "ACA") to generate expense savings. In June 2017, Republican leaders proposed a bill that would repeal major parts of the ACA and cut funding for Medicaid. In September 2017, Senate Republicans canceled a vote on the bill, effectively tabling Republican efforts to repeal the ACA until at least 2018. Republicans then focused on tax reform. On December 21, 2017 a last-minute spending bill passed avoiding a government shutdown and funding the government through January 19, 2018. However, several policy issues were unresolved, setting the scene for policy battles in the new year.

On December 22, 2017, President Trump signed into law an extensive tax-code overhaul, the Tax Cuts and Jobs Act of 2017 ("TCJA"). The TCJA has different implications for households and corporations.

- The corporate tax rate was reduced from 35% to 21%. The tax bill also allows companies to write-off investments at a faster rate while limiting their abilities to deduct interest expenses.

- The TCJA introduced new rules for profits earned overseas - corporations will pay a one-time 15.5% tax on profits accrued abroad, while international income earned in future periods will not be subjected to U.S. taxes.

- Taxes for pass-through businesses such as partnerships, S corporations, and sole proprietorships were reduced.

- The top individual tax rate was reduced to 37% from 39.6% and the tax bill reduced the number of households impacted by the alternative minimum tax. The TCJA also increased the standard deduction, capped state and local tax deductions, and increased the child tax credit.

- Over 80% of households are expected to experience a tax cut in 2018, and 5% are expected to experience tax increases according to the Tax Policy Center. The Joint Committee on Taxation expects the overall tax burden to shift slightly to households in the $100,000 to $200,000 bracket and households in excess of $1 million by 2019. The household tax changes are not permanent and expire in 2025.

- The plan also eliminated the federal tax penalty for not having health insurance.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000033

According to the Joint Committee on Taxation, the tax bill will add $1 trillion to projected budget deficits during the next decade. The tax bill had mixed popular appeal, and the bill was passed largely along party lines.

The Congressional Budget Office (the "CBO") announced a $228 billion budget deficit during the first quarter of fiscal 2018 (ending December 2017), which was $18 billion more than the deficit in the same period of fiscal 2017. However, after accounting for the impact of payment and receipt timing, the CBO estimated that the difference would have been $20 billion. The CBO estimated that outlays (adjusted for timing shifts) were 5% higher during the first quarter of fiscal 2018 compared to the prior year.

International trade is also currently in a state of uncertainty. Fulfilling a campaign promise, President Trump formally withdrew from the Trans-Pacific Partnership (the "TPP") in January 2017. While the U.S. maintains trade treaties with several countries that were involved with the TPP, further deals are likely needed to boost imports to the region. President Trump largely backed away from campaign promises to rewrite or eliminate the North American Free Trade Agreement (also known as "NAFTA"). Instead of seeking a full repeal, the Trump administration has shifted its focus to modernizing the trade deal, including its treatment of state-owned enterprises, and intellectual property rights. Negotiations began in the third quarter of 2017 and drew on language from the TPP to address e-commerce and small business regulation. Throughout the fourth quarter, negotiations focused on energy efficiency standards, environmental standards, digital trade, energy, telecommunications, and regulatory practices. Canada and Mexico both rejected a U.S. proposal that would increase automobile production in the U.S., but did not offer counterproposals. President Trump continued to threaten a U.S. withdrawal from the deal if U.S. terms were not met. Talks will continue in January 2018 during a meeting in Montreal.

**Consumer Spending and Inflation**

According to the Bureau of Labor Statistics ("BLS"), the Consumer Price Index ("CPI") increased 0.1% in December 2017 (on a seasonally adjusted basis), following increases of 0.1% and 0.4% in October and November, respectively. The unadjusted CPI stood at 246.5 (CPI-U all urban consumers, 1982 1984 = 100). The CPI increased 2.1% over the previous twelve months on an unadjusted basis. The Core CPI, which excludes food and energy prices, increased 0.3% in December, following increases of 0.2% and 0.1% in October and November, respectively. The Core CPI increased 1.8% on an unadjusted basis over the previous twelve months.

The Producer Price Index ("PPI") is generally recognized as predictive of near term consumer inflation. The PPI for total final demand (seasonally adjusted), decreased 0.1% in December 2017, following increases of 0.4% in both October and November. The PPI for final demand excluding foods, energy, and trade increased 0.1% in December on a seasonally adjusted basis, and follows increases of 0.2% and 0.4% in October and November, respectively. On an unadjusted basis, the twelve month change in the final demand PPI was an increase of 2.6% through December 2017. The unadjusted PPI for final demand excluding foods, energy, and trade increased 2.3% in the last twelve months.

During a November 2016 meeting, the Organization of Petroleum Exporting Countries ("OPEC") instituted production cuts for the first time in eight years. OPEC and eleven other oil-producing countries (including Russia) ultimately reduced output by 1.8 million barrels a day. In May 2017, OPEC extended output cuts, with plans to continue output reduction for nine or twelve months. OPEC's stated goal was keeping the price of oil above $50 per barrel and to bring inventories down to 2.7 billion barrels. By June 2017, however, the price of crude oil had fallen to pre-agreement levels. Libya and Nigeria, exempt from cuts, had increased crude production, and Russia appeared unlikely to maintain production cuts in future months. Additionally, the reduced production of OPEC countries had been largely offset by North American shale oil production. Output fell in August for the first time since March, and by September 2017, crude inventories had fallen,

PAREDES-0000034

even though several member countries were producing at higher-than-agreed-upon levels. Oil prices rallied during the fourth quarter, reaching the highest prices since 2015 and exceeding the floor desired by OPEC. As a result, even though the production cuts were renewed through the end of 2018, OPEC has stated that the production cuts may be ended earlier if oil inventory levels stabilize by mid-2018.

Exploration and production activities have recovered significantly from their low in May 2016. The Baker Hughes North American (U.S.) total oil rig count decreased 1% during the fourth quarter of 2017 but increased 41% over rig counts twelve months ago. West Texas Intermediate ("WTI") crude traded on the New York Mercantile Exchange ("NYMEX") rose to $60 per barrel near the end of the quarter, and Brent Light Crude Oil ("LCO") ended the quarter at $65 per barrel. Both measures increased during 2017.

According to the Census Bureau of the U.S. Department of Commerce, the advance estimates of U.S. retail and food service sales (adjusted for seasonal, holiday, and trading day differences) for December 2017 increased 0.4% from the previous month and increased 5.4% relative to December 2016. Core retail and food service sales (which exclude motor vehicles & parts) increased 0.4% relative to the previous month and increased 6.3% relative to December 2016. In the fourth quarter of 2017, retail and food service sales increased 2.7% relative to the third quarter of 2017 and were 5.5% above the level observed in the fourth quarter of 2016.

Personal consumption spending represents approximately 70% of total economic activity and is a primary component of overall economic growth. Real personal consumption spending increased 3.8% in the fourth quarter of 2017, following increases of 3.3% and 2.2% in the second and third quarters, respectively. According to the Bureau of Economic Analysis, durable goods purchases increased 14.2% in the fourth quarter of 2017, following increases of 7.6% and 8.6 in the second and third quarters, respectively.

**Monetary Policy and Interest Rates**

The Federal Reserve's Open Market Committee ("FOMC") lowered its target for the federal funds rate to a range of 0% to 0.25% during the fourth quarter of 2008 in an effort to stimulate the economy throughout the Great Recession. Target rates were held steady during 2009 and remained unchanged for several years. The accommodative monetary policy actions used to keep interest rates low included the purchase of agency mortgage-backed securities and long-term Treasury securities. These asset purchases were reduced by $10 billion (in aggregate) per month beginning in January 2014, and the asset purchase program was officially terminated in October 2014. In December 2015, the FOMC increased the target range for the federal funds rate for the first time since the start of the Great Recession. The FOMC increased the range again in December 2016 and March 2017. In June 2017, the FOMC increased the target federal funds rate to a range of 1.0% to 1.25%, based on employment gains, inflation rates, household spending, and business investment. The FOMC elected to maintain this range at their September 2017 meeting. During the December 2017 meeting, the FOMC voted to increase the federal funds range again, increasing it to a range of 1.25% to 1.50%. Chair Janet Yellen noted that the FOMC expects the labor market to remain strong although the pace of jobs growth may moderate as monetary policy tightens. Tightening the Federal Reserve's monetary policy in December 2017 is expected to help prevent the economy from overheating and requiring a later and more abrupt tightening of monetary policy. Chair Yellen further noted the continuation of a strong economy may require additional rate increases. The FOMC noted that the neutral federal funds rate appears to be low by historical standards. Chair Yellen will remain on the Committee for its next meeting, but will be replaced as Chair by Jay Powell.

The following was excerpted from the Federal Reserve's December 13th press release:

---

PAREDES-0000035

*Consistent with its statutory mandate, the Committee seeks to foster maximum employment and price stability. Hurricane-related disruptions and rebuilding have affected economic activity, employment, and inflation in recent months but have not materially altered the outlook for the national economy. Consequently, the Committee continues to expect that, with gradual adjustments in the stance of monetary policy, economic activity will expand at a moderate pace and labor market conditions will remain strong. Inflation on a 12-month basis is expected to remain somewhat below 2 percent in the near term but to stabilize around the Committee's 2 percent objective over the medium term. Near-term risks to the economic outlook appear roughly balanced, but the Committee is monitoring inflation developments closely.*

*In view of realized and expected labor market conditions and inflation, the Committee decided to raise the target range for the federal funds rate to 1-1/4 to 1-1/2 percent. The stance of monetary policy remains accommodative, thereby supporting strong labor market conditions and a sustained return to 2 percent inflation.*

*In determining the timing and size of future adjustments to the target range for the federal funds rate, the Committee will assess realized and expected economic conditions relative to its objectives of maximum employment and 2 percent inflation. This assessment will take into account a wide range of information, including measures of labor market conditions, indicators of inflation pressures and inflation expectations, and readings on financial and international developments. The Committee will carefully monitor actual and expected inflation developments relative to its symmetric inflation goal. The Committee expects that economic conditions will evolve in a manner that will warrant gradual increases in the federal funds rate; the federal funds rate is likely to remain, for some time, below levels that are expected to prevail in the longer run. However, the actual path of the federal funds rate will depend on the economic outlook as informed by incoming data.*

### Business and Manufacturing Productivity



**Non-Farm Business  Productivity**
**Annualized Percentage Change (Per BLS)**

---

PAREDES-0000036

According to the BLS, seasonally adjusted nonfarm business productivity (as measured by the hourly output of all persons) decreased at an annual rate of 0.1% in the fourth quarter of 2017. The productivity decrease in the fourth quarter follows an increase of 2.7% in the third quarter. Productivity increased 1.1% in the fourth quarter of 2017 relative to the fourth quarter of 2016.

Productivity decreased 0.9% for the business sector (inclusive of farming activity) in the fourth quarter of 2017, while manufacturing productivity increased 5.7% during the quarter.

### Industrial Production and Capacity Utilization

According to the Federal Reserve, seasonally adjusted industrial production increased 0.9% in December 2017, following an increase of 1.8% in October and a decrease of 0.1% in November. Overall industrial production during the fourth quarter increased at an annualized rate of 8.2%, likely spurred by recovery from Hurricanes Harvey and Irma. This increase follows an increase of 5.6% in the second quarter and a decrease of 1.3% in the third quarter. During the fourth quarter of 2017, manufacturing output increased at an annualized rate of 7.0%, following an increase of 2.6% in the second quarter and a decrease of 2.0% in the third quarter. Mining output increased at an annualized rate of 12.7% during the fourth quarter of 2017.

Seasonally adjusted capacity utilization was 77.9% in December 2017, after measures of 77.4% and 77.2% in October and November, respectively. Capacity utilization in December was 2.0 percentage points below the long-run average from 1972 through 2016. Capacity utilization for the fourth quarter overall measured 77.5%, up from 76.6% and 76.2% in the second and third quarters, respectively. Capacity utilization in the fourth quarter of 2017 increased 1.1% relative to the fourth quarter of 2016.



Civilian Unemployment Rate (Per BLS)

**Unemployment and Payroll Jobs**

According to the BLS, the unemployment rate (U-3) was 4.1% in December 2017, unchanged from October and November. The U-3 unemployment rate matches the lowest rate since December 2000 for three months in a row. The underemployment rate (U-6), which includes workers who are involuntarily working part-time positions, rose to 8.1%, compared to 8.0% in both October and November. Economists surveyed by *The Wall Street Journal* anticipate unemployment rates of 4.0% and 3.9% in June 2018 and December 2018, respectively.

In December 2017, the labor force participation rate stood at 62.7% (relative to mid- to high- 60s prior to the recession). Excluding the recent trend, the last time the labor force participation rate was lower than its current level was 1978. The number of nonfarm payroll jobs increased by 148,000 in December 2017. December's gain follows increases of 211,000 and 252,000 jobs in October and November, respectively. During 2017, 2.1 million jobs were added to the economy, the seventh straight year of payroll gains in excess of 2 million. The only other time the economy has made similar payroll growth was during the 1990s. Population growth adds approximately 106,000 individuals to the workforce per month. Economists surveyed by *The Wall Street Journal* anticipate payroll gains of approximately 181,000 jobs per month over the next year.

**The Financial Markets**



**Major Stock Market Indices**
**Percent Change From Previous Month Close (Three-Year Trend)**

Legend: DJIA    S&P500    NASDAQ

The stock market experienced strong gains during the fourth quarter of 2017. All four major indices experienced quarterly gains of 5.0% or greater during the quarter.

- The Dow Jones Industrial Average ended the fourth quarter of 2017 at 24,719, up 10.3% for the quarter, following gains of 3.3% and 4.9% in the second and third quarters of 2017, respectively. The Dow was up 25.1% during 2017.

- The S&P 500 Index increased 6.1% during the fourth quarter to close at 2,674, following gains of 2.6% and 4.0% in the second and third quarters of 2017, respectively. The S&P 500 was up 19.4% in 2017.

---

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000038

- The NASDAQ Composite Index increased 6.3% during the fourth quarter to close at 6,903, following gains of 3.9% and 5.8% in the second and third quarters of 2017, respectively. During 2017, the NASDAQ rose 28.2%.

- The broad market Wilshire 5000 Index closed at 27,794, a gain of 5.9% over the quarter, following gains of 2.5% and 4.0% in the second and third quarters of 2017, respectively. The Wilshire 5000 Index was up 18.6% during 2017.

Treasury yields increased during the fourth quarter of 2017. For shorter-term Treasuries, this reflected a continuation of a year-long trend, while the increase in yields generally reflected a reversal in trend among longer-term Treasuries. Bond prices are negatively correlated with their respective yields. Bond prices can shift abruptly due to investor reactions to major variances in reported economic data versus market expectations (e.g., expected inflation, growth, monetary policy, and other Federal Reserve actions). Economists surveyed by *The Wall Street Journal* anticipate yields to rise steadily over the next several years.

**Housing Market**



Note: Permits at a given date are generally a leading indicator of future starts. Beginning with January 2004, building permit data reflects the change to the 20,000 place series.

Home building activity has traditionally been a primary driver of overall economic activity because new home construction stimulates a broad range of industrial, commercial, and consumer spending and investment. According to the U.S. Census Bureau, new privately owned housing starts were at a seasonally adjusted annualized rate of 1,192,000 units in December 2017, 8.2% below the revised November rate of 1,299,000 units and 6.0% below the December 2016 rate. The seasonally adjusted annual rate of private housing units authorized by building permits (considered the best indicator of future housing starts) was 1,302,000 units in December 2017, 0.1% below the revised November estimate of 1,303,000 but 2.8% above the December 2016 rate.

According to the National Association of Realtors ("NAR"), existing-home sales (at a seasonally adjusted annual rate) totaled 5.57 million in December 2017, 3.6% below the November level of 5.78 million, but 1.1% above the December 2016 level. During the entire year of 2017, existing

---

home sales increased 1.1%, reaching 5.51 million, the highest rate since 2006. First-time home buyers purchased 32% of existing homes. Housing inventory stood at 1.48 million existing homes, representing 3.2 months of supply at the current sales pace, which is down from 3.6 months in December 2016 and is the lowest level of inventory since data tracking began in 1999. Properties stayed on the market an average of 40 days in December 2017, unchanged relative to November but down from 52 days in December 2016. The national median existing-home price increased 5.8% relative to December 2016. Distressed sales, which include foreclosures and short sales, accounted for approximately 5% of sales in December 2017, up from 4% in November 2017 but down from 7% in December 2016.

### Summary and Outlook

The Great Recession reached its official end in mid-2009. The subsequent period of expansion was initially characterized by slow gains. A period of stronger and more consistent growth followed, although overall economic performance remained muted for several years. Equity markets have experienced significant growth over the past several months. The unemployment rate has remained stable for several months near long-term lows and payroll gains continue to be strong. Labor force participation remains low but has been stable for several months. Economic growth is expected to remain positive, though rising interest rates may dampen future growth. Inflation rates remain lower than expected and may interfere with the Federal Reserve's plans to increase interest rates. Hurricanes and adverse weather disrupted many economic activities in the third quarter, and some of the performance in the fourth quarter may be attributable to recovery from these weather events. GDP growth expectations from private economists surveyed by *The Wall Street Journal* are on the order of 2.5% and 2.7% for the first and second quarters of 2018, respectively, and 2.6% for all of 2018. This compares to annual GDP growth of 2.9%, 1.5%, and 2.3% in 2015, 2016, and 2017, respectively. The Federal Reserve is planning to reduce its balance sheet at a steady and predictable rate. Many aspects of the future economy remain uncertain, including future inflation, GDP performance, and the impact of the Tax Cuts and Jobs Act of 2017.

## THE ARIZONA ECONOMY

The following excerpts from Arizona's Economy - December 2017 Winter Issue (the most recent available) prepared by Dr. George W. Hammond, Director and Research Professor for the Economic and Business Research Center at the University of Arizona's Eller College of Management have been included in order to provide an overview of the state economy around the time of valuation.

Arizona is generating solid economic growth, outpacing the nation but not keeping up with our own past history. Job gains decelerated again in the third quarter, continuing the pattern begun at the end of 2016. Income gains have been a bit stronger so far this year, likely reflecting the increase in the state's minimum wage and tighter overall labor markets.

The outlook calls for the state to continue to grind out solid gains, assuming the national economy avoids recession. While those gains are expected to beat the national average, they will likely be slow compared to growth rates routinely posted during the 30 years before the Great Recession. Most of the job growth during the next decade will be in service-providing sectors, particularly education and health services; professional and business services; trade, transportation, and utilities; and leisure and hospitality.

Both of Arizona's largest metropolitan statistical areas (MSAs) are forecast to expand during the forecast period. The Phoenix MSA is expected to remain the economic engine of the state, driving job, income, and population growth. The Tucson MSA economy is expected to continue improving, but at a moderate pace.

PAREDES-0000040

*Arizona Recent Developments*

Arizona's job growth lost momentum in 2017, with over-the-year gains gradually decelerating throughout the year, at least according to preliminary estimates. The state added 40,200 jobs over the year in the third quarter of 2017, which translated into 1.5% growth. That was slightly above the U.S. rate of 1.4%, but well below state job gains in the third quarter of 2016 of 2.8%.

As Exhibit 1 shows, over-the-year job gains in the third quarter of 2017 were driven by leisure and hospitality; education and health services; financial activities; and manufacturing. These four sectors accounted for 87.6% of state job growth during the period. Gains in leisure and hospitality were concentrated in eating and drinking places. Health care and social assistance generated most of the gains in the larger education and health services sector. Finance and insurance jobs drove gains in financial activities, with little growth in real estate employment. Durable manufacturing jobs generated most of the increase in state manufacturing employment, thanks to increases other durable manufacturing (with a little help from aerospace and fabricated metals). Government (primarily state and local education); professional and business services; trade, transportation, and utilities; and construction also contributed to job gains over the year. Employment in natural resources and mining was stable.

Two industries lost jobs during the past year: other services, down 2,300, and information, down 2,500. Other services includes personal services (barbers, laundry services, etc.) and membership organizations. Information includes broadcasting, telecommunications, printing, and data processing, as well as a wide range of other technology-oriented industries.

As Exhibit 1 also shows, the recent slowdown in overall job growth was driven by decelerations in professional and business services; trade, transportation, and utilities; construction; other services; financial activities; information; education and health services; and government. Job gains accelerated recently in leisure and hospitality and manufacturing. The drag from job losses in natural resources and mining lessened during the past year.



**Exhibit 1:** Arizona's Job Growth Decelerated During The Past Year

On the international front, Arizona's merchandise exports continued to decline through the first nine months of 2017. They have fallen by 5.5% from the first nine months of 2016 and are down 10.0% from the same period of 2015 (the peak). Arizona exports to Mexico, our most important

PAREDES-0000041

export destination, have fallen 9.4% so far this year and have decline 19.4% from their 2015 peak. Exports to Canada have declined 3.8% this year and are off 11.9% from their peak. The export decline was likely driven in part by the strong U.S. dollar, which in September was up 13.9% versus major currencies since mid-2014. The dollar has risen even more dramatically against the Mexican peso, with a 37.2% increase since mid-2014. Other things the same, an increase in the U.S. dollar versus foreign currencies tends to depress exports and increase imports. However, it's important to keep in mind that many other factors may be influencing exports as well, including economic activity domestically and abroad and political events, among other factors.

While merchandise exports account for a large share of export activity, exports of services matter as well. One dimension of service exports in Arizona is the spending of Mexican visitors. While we do not have monthly estimates of Mexican visitor spending in the state, EBRC publishes data on legal northbound border crossings through our border ports of entry on the Arizona-Mexico Economic Indicators site (azmex.eller.arizona.edu). These data suggest that the number of people crossing the border into Arizona continues to increase, but at a somewhat slower pace than earlier in the decade. That slowdown may be connected to rising tourism costs driven by the appreciation of the U.S. dollar.

### Arizona Outlook

The outlook for the Arizona economy depends in part on global and national economic performance. Likewise, the Arizona, Phoenix, and Tucson forecasts depend on a forecast for the U.S. economy produced by IHS Markit in October 2017. This differs from forecasts released so far this year in that it no longer assumes that fiscal stimulus boosts growth in 2018-2019. Thus, real GDP growth is expected to average 2.2% in 2017, 2.4% in 2018, and then gradually decelerate to 1.7% by 2027.

The U.S. unemployment rate is expected to decline from 4.9% in 2016 to 4.4% this year and then to 4.3% in 2018. After 2020, the unemployment rate drifts up modestly, reflecting somewhat slower output gains. Nonetheless, the U.S. unemployment rate is expected to return to levels last seen in the late 1990s and early 2000s.

Sustained U.S. growth sets the stage for the Arizona economy to continue to expand, as Exhibit 2 shows. The forecast calls for state job growth to decelerate from 2.6% in 2016 to 1.9% in 2017, reflecting slowing job growth so far this year. Job gains accelerate modestly in 2018 and 2019, to 2.4% and 2.5% respectively. Overall, state job growth remains well above the national rate, but below average growth during the 30 years before the Great Recession.

Most job gains during the next decade are forecast to come in the service-providing sector, particularly education and health services; professional and business services; trade, transportation and utilities; and leisure and hospitality. These four sectors alone account for 72.7% of net job growth during the next 10 years.

With continued job growth during the forecast, the state unemployment rate is forecast to fall from 5.2% in 2016, to 4.5% by 2019.

Modestly accelerating job growth drives up net migration during the next two years, which contributes to stronger population gains. Population growth is forecast to accelerate from 1.1% last year to 1.6% by 2018. That's better than recent results and the national average, but still slow compared to the state's long-run growth.

Personal income gains accelerate in 2017, reflecting stronger growth in earnings from work; dividends, interest, and rent; and transfer payments. Accelerating earnings from work reflect both the state's increased minimum wage and tighter labor markets. Overall, personal income gains are

PAREDES-0000042

forecast to rise from 3.6% in 2016, to 4.8% this year, and then to 5.4% and 5.8% in 2018 and 2019, respectively.

Rising income gains drive up sales, with retail sales growth rising from 2.8% in 2016 to 3.8% this year, then just above 4.0% during 2018-2019.

Overall, Arizona is well positioned to continue to generate growth at a pace that exceeds the national average, but which also falls short of our own past history.

**Exhibit 2:** Arizona Outlook Summary

| | Actual | | Forecast | |
| --- | --- | --- | --- | --- |
| | 2016 | 2017 | 2018 | 2019 |
| Growth Rate | | | | |
| Nonfarm Jobs | 2.6 | 1.9 | 2.4 | 2.5 |
| Personal Income | 3.6 | 4.8 | 5.4 | 5.8 |
| Retail Sales Less Food | 2.8 | 3.8 | 4.2 | 4.4 |
| Population | 1.1 | 1.4 | 1.6 | 1.6 |
| Level | | | | |
| Unempl. Rate | 5.2 | 4.9 | 4.5 | 4.5 |
| Housing Permits | 35,578 | 38,318 | 43,766 | 45,298 |

## THE CALIFORNIA ECONOMY

The following excerpts from 2018-2019 Economic Forecast and Industry Outlook (the most recent available) prepared by the Los Angeles County Economic Development Corporation Institute for Applied Economics, have been included in order to provide an overview of the California state economy around the time of valuation.

California enjoys a remarkably diverse economy and is a global leader in a number of innovative industries, including information technology, aerospace, entertainment and the biosciences. California hosts millions of visitors each year who support the state's tourism industry, while farmers and ranchers across the state provide food for nations around the world.

In 2017, California's economy grew at an estimated rate of 2.5 percent, faster than the nation as a whole, which grew at 2.4 percent. While impressive, California's economy continued to slowdown from the 3.3 percent year-over-year growth achieved in 2016, and from the over 4 percent year-over-year percentage growth seen in 2014 and 2015. California currently accounts for 14.1 percent of the nation's GDP, far more than any other state, and its GDP is expected to expand by 2.7 percent in 2018 and 2.6 percent in 2019, again outpacing the nation.

**Employment**

In 2017, California's unemployment rate averaged 4.8 percent, the lowest since 2000. Unemployment is expected to decline further, though slowly over the next two years, reaching 4.2 percent in 2019, as the state perhaps reaches above full employment1, where the economy is producing goods and services at a higher level than normally expected.

PAREDES-0000043

Nonfarm employment was up in 2017 by 295,500 wage and salary jobs, reaching a total of 16.8 million jobs, an increase of 1.8 percent over 2016.

Over the course of 2017, nearly all major industry sectors in California added jobs. The largest private sector gains occurred in: health care and social assistance (62,300 jobs added); leisure and hospitality (47,100 jobs added); and construction (41,100 jobs added). The public sector added 46,400 new jobs last year.

While most sectors added jobs, two sectors continued shedding jobs. Manufacturing continued its long-term sectoral decline in jobs by shedding 6,900 jobs last year, and natural resources lost 1,600 jobs.

Looking ahead, the rate of job creation will rise slightly to 1.8 percent annually in 2018 and fall back to 1.7 percent in 2019. This equates to 324,700 new jobs this year and 311,800 jobs in 2019.

The sectors expected to add the largest number of jobs over the two years are administrative and support services (137,400 new jobs), and health care and social assistance (100,300 new jobs). After three years of falling job numbers, natural resources will stabilize and add over 1,400 jobs.

Importantly, manufacturing employment is also expected to grow through 2019 after falling 0.5 percent in 2017, which was on the heels of a consecutive six-year increase. Going forward, the net employment gain over the next two years in manufacturing is an expected 30,040 jobs. It's worth noting that California's manufacturing sector shed 166,700 jobs in the period from 2007 through 2017, so while higher jobs counts over the next two years are welcome, it remains unlikely they foretell a return to prerecession employment levels.

At 3.0 percent job growth in 2017, the Inland Empire generated jobs at the fastest pace among most metro regions in the state. This was followed by Ventura County (2.6 percent), San Francisco County (2.1 percent), Fresno County (2.0 percent); and Santa Clara County (1.7 percent).

In Southern California, nonfarm employment in San Diego County grew by 1.6 percent in 2017, Los Angeles County employment increased by 1.2 percent, and Orange County employment grew by 0.7 percent.

**Personal Income**

Along with employment growth, California's residents experienced modest gains in personal income. Total real personal income in the state increased by 3.9 percent in 2017 to almost $2.3 trillion, due to tight labor markets exerting upward pressure on wages. Per capita income in California was $58,063 in 2017. Over the next two years, additional wage gains of 2.9 percent in 2018 and 2.8 percent in 2019 are expected.

Still, it is a tale of two California's, as there are a number of regions within the state where the labor markets continue to struggle with high unemployment and low growth. As of December 2017, three of California's 58 counties still had unemployment rates of more than 10 percent, and nine more had rates higher than 8 percent. The highest recorded unemployment rates in California are in Imperial and Colusa counties with unemployment rates of 17.9 percent at 17.3 percent, respectively.

At the opposite end of the scale, the lowest unemployment rates are in San Mateo County (2.1 percent), followed by Marin County (2.3 percent) and San Francisco (2.4 percent).

PAREDES-0000044

**Health Care**

The health care and social assistance industry is California's largest industry sector by employment and one of the state's fastest growing, providing jobs across a wide range of skill and income levels. Jobs in health care are found in doctors' and dentists' offices, hospitals, outpatient centers, laboratories, nursing facilities, and organizations that provide social services like child daycare, vocational rehabilitation and family services.

With over 2.2 million workers, health care accounts for slightly more than 13 percent of the state's 16.8 million nonfarm wage and salary jobs. In 2017, the health care sector added 62,300 jobs, which represents an annual growth rate of 2.9 percent. Over the next two years, health care employment will continue to increase, but the rate is expected to slow to 2.5 percent in 2018 and 1.9 percent in 2019.

## SUMMARY

Economic measures indicate the recession officially ended in mid-2009, and the subsequent period of expansion was initially characterized by slow gains. Stronger, and more consistent growth followed this period, though economic performance remained muted for several years. Equity markets have improved significantly over the last several months. The unemployment rate reached pre-recession levels in December 2014 and has been stable for several months as solid long-term lows and payroll gains continued. Labor force participation remained low during the fourth quarter of 2017, but has been stable for multiple months. Overall, economic growth is expected by many economists to continue positively, though rising interest rates may hinder future progress.

Activity in the housing market showed improvement in the fourth quarter of 2017, with increases in private housing units authorized by building permits, existing-home sales, and the national median of existing-home prices, during the month of December as compared to December 2016. Specifically, existing-home sales rose 1.1% during 2017, its highest rate since 2006. The number of new privately owned housing starts and housing inventory declined during the month of December as compared to December 2016. Properties stayed on the market an average of 40 days in December 2017, down from 52 days in December 2016.

Consumer spending increased 3.8% in the fourth quarter of 2017, following increases of 3.3% and 2.2% in the second and third quarters of 2017, respectively. GDP rose 2.6% during the fourth quarter of 2017, following rises of 3.1% and 3.2% in the second and third quarters of 2017, respectively. Growth in GDP during the fourth quarter was attributable to gains in personal consumption expenditures, nonresidential fixed investment, exports, residential fixed investment, state and local government spending, and federal government spending. These factors were partially offset by negative contributions from private inventory investment and imports. GDP growth expectations from private economists are on the order of 2.5% and 2.7% for the first and second quarters of 2018, respectively, and 2.6% for all of 2018.

The Federal Reserve's outlook aligns with that of many private economists by suggesting that GDP growth is expected to remain positive, though rising interest rates are causes for concern. The unem-

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000045

ployment rate was 4.1% in December 2017, unchanged from October and November. Economists anticipate an unemployment rate of 4.0% and 3.9% in June 2018 and December 2018, respectively.

While the Arizona economy generated solid economic growth in 2017, outpacing the nation, it did not reach historic performance levels. Arizona's job growth lost momentum, with over-the-year gains decelerating throughout the year. The state added 40,200 jobs by the third quarter of 2017, primarily in the leisure and hospitality, education and health services, financial activities, and manufacturing industries. Government, professional and business services, trade, transportation, and utilities, and construction additionally contributed to job gains over the year. The strength of the U.S. dollar also weighed on Arizona's merchandise export performance, with exports falling 5.5% through September 2017, compared to the same period in the prior year.

The outlook for Arizona is dependent in part on national economic performance, with sustained U.S. growth anticipated to support the continued expansion of the Arizona economy. While state job growth is expected to decline from 2.6% in 2016 to 1.9% in 2017, employment gains are predicted to accelerate modestly in 2018 and 2019, to 2.4% and 2.5%, respectively. Employment gains over the next decade are forecast to be in the service-providing sector, particularly education and health services, professional and business services, trade, transportation and utilities, and leisure and hospitality. With such prolonged job growth, the state unemployment rate is projected to decrease to 4.5% by 2019. Both of Arizona's largest metropolitan statistical areas (MSAs) are expected to expand during the forecast period, with the Phoenix MSA remaining the economic engine of the state and the Tucson MSA continuing to improve, but at a moderate pace.

According to a number of indicators, the California economy is experiencing steady growth, with state GDP projected to further expand by 2.7% and 2.6% in 2018 and 2019, respectively. In 2017, California's unemployment rate averaged 4.8%, with additional declines expected over the next two years, reaching 4.2% in 2019 as the state reaches above full employment. Over the course of 2017, almost all significant industry sectors in California added jobs, with the largest private sector gains occurring in health care and social assistance. This industry is anticipated to add 100,310 new jobs in 2018 and 2019, despite the rate of job creation slowing to 2.5% in 2018 and 1.9% in 2019.

In addition to state employment growth, California residents have also experienced modest gains in personal income, rising by 3.9% in 2017. Further growth in personal income is expected in 2018 and 2019, increasing by 2.9% and 2.8%, respectively. However, there are still a number of regions within the state where the labor markets continue to struggle with high unemployment and low growth.

Although the economy is beginning to show signs of improvement with positive GDP growth forecasted in the near term, we believe an investor in CPES would assess some additional risk to an investment in the Company based on continuing uncertainty about the current state of the economy. We will reflect this risk in our determination of an appropriate rate of return later in this report.

PAREDES-0000046

# INDUSTRY CONDITIONS

In addition to giving consideration to the economy, we also consider the state of the industry in which the Company operates. The industrial climate can have significant effects on the value of a company. The factors influencing the industry can include technological change, fluctuations in supply and demand, price increases or decreases, and the competitive landscape. We analyzed information regarding the industry in which the Company operates. Excerpts from the materials we analyzed are included below.

Community Provider of Enrichment Services, Inc. specializes in providing a continuum of behavioral health and developmental services for children and adults, including counseling, specialized residential services, supported living, and day programs. Based on the nature of the Company's operations, we analyzed the residential intellectual disability facilities industry as reported by *IBISWorld Industry Reports*. The following excerpts from *IBISWorld Industry Reports* for "Residential Intellectual Disability Facilities in the US" dated around the time of valuation, are included below:

*OVERVIEW*

**INDUSTRY DEFINITION**

This industry primarily houses and tends to the daily needs of individuals diagnosed with intellectual and developmental disabilities. Industry operators focus on providing room, board, protective supervision and counseling. Additionally, some form of healthcare may be provided at industry facilities.

**The primary activities of this industry are:**
Providing campus living, community-based group homes and apartments or supported living arrangements
Providing education programs
Providing rehabilitation services
Providing vocational and employment services
Providing medical, dental, nursing, audiology, speech-language and nutrition services

**The major products and services in this industry are:**
Facilities for patients with mild disabilities
Facilities for patients with moderate disabilities
Facilities for patients with profound disabilities
Facilities for patients with severe disabilities

**KEY FACTS**

Competition in this industry is low
Volatility low (revenue fluctuations less than 3 points)
The life cycle stage is growth

---

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000047





PAREDES-0000048

**MARKET SIZE**

The Residential Intellectual Disability Facilities industry primarily houses and tends to the daily needs of individuals who have been diagnosed with intellectual and developmental disabilities. Federal funding for Medicare and Medicaid services and the number of Americans with access to private healthcare largely determines demand and growth for the industry. The number of adults aged 65 and older also influences industry demand; the elderly may lose the ability to care for intellectually disabled dependents, necessitating industry services. Over the five years to 2017, both funding for Medicare and Medicaid services and the number of adults over the age of 65 have steadily increased, boosting industry growth. Consequently, revenue for the industry is expected to increase at an annualized rate of 1.9% to $26.6 billion over the past five years, including growth of 2.0% in 2017.

During the five-year period, smaller private facilities increasingly replaced large state-run institutions. Consumers prefer smaller facilities because they are often locally based, have fewer residents and are able to provide a more personalized level of care. Since it takes multiple smaller facilities to meet the level of services provided by large, state-run institutions, the number of industry establishments has grown at an annualized rate of 3.2% to 60,630 over the five years to 2017. Additionally, as smaller facilities have higher staff-to-patient ratios, the number of industry employees is expected to rise at an annualized rate of 2.7% during the same period.

According to data from the Congressional Budget Office, healthcare reform is projected to reduce the number of uninsured Americas by 26.0 million in 10 years. As more Americans gain access to public or private healthcare, individuals who could not previously employ industry services because of cost will be able to do so. Similarly, as more Americans are diagnosed with an intellectual disability because of increased access to healthcare services, demand for industry services will rise. These factors, in addition to an increasing elderly population, are expected to drive revenue growth at an annualized rate of 3.3% to $31.3 billion over the five years to 2022.



*Recent Industry Performance*

Operators in the Residential Intellectual Disability Facilities industry provide a range of residential care facilities for intellectually disabled individuals. Industry services differ depending on the characteristics of the patients being cared for; generally, industry services include room, board, protective supervision, counseling, healthcare, recreational activities, educational programs and job placement services. Industry performance is largely tied to the number of Americans who have access to public or private health insurance, enabling them to afford industry services. Healthcare reform over the five years to 2017 has expanded federal funding for Medicare and Medicaid, decreasing the number of uninsured individuals and boosting growth for the industry. As a result, revenue for the industry is expected to increase at an annualized rate of 1.9% to $26.6 billion over the five years to 2017, including a 2.0% jump in 2017. The majority of industry operators are non-profit organizations; therefore, profit margins for the industry have remained low and steady over the past five years.

**Medicaid**

As most intellectually disabled individuals qualify for Medicare or Medicaid benefits, public funding is the largest source of funding for intermediate care facilities for individuals with intellectual disabilities (ICFs/IID). Residential facilities also receive payments from private health plans, and non-profit industry facilities can receive grants from the government and private corporations; however, these funds pale in comparison with the payments from public and private insurance payments. Federal funding for Medicare and Medicaid has grown at an annualized rate of 5.0% over the past five years. This increased government expenditure, driven largely by healthcare reform, has assisted industry growth.

To qualify for Medicare and Medicaid reimbursement, ICFs/IID must provide active treatment (meaning, consistently implement a program of specialized training, treatment and health services), be a state-certified care facility and comply with federal standards. Medicaid funds can also be provided for home- and community-based services (HCBS) for the intellectually disabled in the form of HCBS waivers. HCBS waivers enable states to put federal dollars toward alternative treatment facilities, such as small group homes or foster-care facilities.

**Baby Boomers and Babies**

Both the birthrate and life expectancy contribute to industry growth, as they influence the amount of people who may require industry services. The birthrate has been steady from over the five years to 2017, rising just 0.5%. At the other end of the age spectrum, the number of senior adults has grown in recent years. According to data from the US Census Bureau, the number of adults aged 65 and older is expected to increase at an annualized rate of 3.1% over the five years to 2017, significantly faster than overall population growth. There are two reasons for this growth: medical advancements that have extended the average lifespan of US citizens; and the baby-boomer generation reaching the age of retirement, creating a surge in the number of elderly Americans. As the families of the intellectually disabled grow older, many will no longer be able to provide care for their loved ones. These intellectually disabled individuals will then have to be placed in a care facility rather than receive care at home. The steady birthrate, combined with the increase in adults over the age of 65, has boosted demand for industry services over the past five years.

**Facility Growth**

To meet growing demand, the number of industry establishments is expected to increase at an annualized rate of 3.2% to 60,630 locations over the five years to 2017. The decline in the number of large facilities (accommodating at least 16 residents), due largely to a change in opinion of how to best care for intellectually disabled individuals, has left room for smaller private establishments in local communities across the country. The industry's trend away from large institutions and

---

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000050

toward smaller private-care facilities was driven by advocacy groups and industry associations promoting the benefits of specialized care, economic factors (community-based care generally costs less than institutional care) and litigation that required public funds to go toward noninstitutional care facilities.

The increase in HCBS waiver funding has given states the flexibility to develop and implement more alternative care facilities, further shifting away from large, state-run institutions. According to the American Health Care Association, as of October 2013, more than 88.0% of ICFs/IID are privately run facilities, while the remaining 12.0% are government-run facilities. Alternatives to state-run institutions include group homes, semi-independent and supported living homes, large private facilities and care provided at the homes of parents or relatives. These smaller care operators tend to have higher staff-to-patient ratios, causing the number of industry employees to rise at an annualized rate of 2.7% to 593,407 workers over the five years to 2017.

| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **Recent Industry Performance** | | | | | |
| **RESIDENTIAL INTELLECTUAL DISABILITY FACILITIES IN THE US** | | | | | |
| Revenue (in Millions) | $ 24,220.9 | $ 24,673.0 | $ 25,144.9 | $ 26,030.8 | $ 26,555.4 |
| Growth | N/A | 1.9% | 1.9% | 3.5% | 2.0% |

## Industry Outlook

Over the five years to 2022, revenue for the Residential Intellectual Disability Facilities industry is forecast to increase at an annualized rate of 3.3% to $31.3 billion, including growth of 2.2% in 2018. According to data from the Congressional Budget Office (CBO), healthcare reform is expected to significantly expand Medicare and Medicaid services and increase the number of people with access to healthcare over the next five years, boosting demand for industry services. As a result of increased demand, the number of industry establishments are expected to grow at an annualized rate of 3.5% to 72,102 facilities over the five years to 2022. Over the same period, industry profit is forecast to shrink slightly as Medicare and Medicaid payments to industry facilities decrease; wider public healthcare coverage will likely lead to decreased government spending.

### Facility and Demographic Shift

According to data from the US Census Bureau, the number of adults over the age of 65 in the United States is forecast to increase significantly faster than the overall population over the five years to 2022. This is due to the baby boomer generation progressively reaching the age of retirement and medical advances in recent years that have extend the average human lifespan. Elderly individuals may not be able to provide proper care for loved ones that have an intellectual disability; therefore, individuals that were previously cared for by the aging population will require care from industry facilities. The increase in the number of the elderly over the next five years is expected to increase demand for industry services.

The increasing trend toward small residential facilities and alternative forms of care is expected to continue over the five years to 2022, while the number of residents in large facilities and large facilities themselves will likely continue to decline. The intellectually disabled and their families tend to prefer smaller facilities, as they offer more personalized care and are often located close to home, whereas larger institutions may be far away and have a lower staff-to-patient ratio. The increase in

PAREDES-0000051

smaller facilities with higher staff-to-patient ratios is expected to lead to employment growth for the industry, rising at an annualized rate of 3.3% to 697,565 over the five years to 2022.

**Healthcare Reform**

In March 2010, President Obama signed the Patient Protection and Affordable Care Act (PPACA), which contains major funding for intellectual disability diagnoses and coverage services. The American Journal of Psychiatry estimates that 67.0% of adults and 80.0% of children need mental healthcare but do not receive it, largely because they are undiagnosed. Under sections of the PPACA that have been implemented recently or will be implemented in the coming years, new Medicare and Medicaid health assessment items will provide a framework to identify mental illness and promote medical treatment and preventive care measures for patients with intellectual disabilities. This increased funding for diagnosis and coverage of intellectual disabilities will likely boost demand for industry services.

However, the future of the PPACA is unclear, because there has been significant discussion about repealing and replacing the law, since the 2016 elections. While no plans have had the support to pass through Congress, proposals have included rolling back Medicaid expansion and deregulating the private insurance industry. If any plan is passed, it will drastically influence the industry. However, until a plan is passed, IBISWorld forecasts are based on the current state of healthcare legislation.

If an individual does not have health insurance or their private health insurance does not cover intellectual disability services, he or she must pay for industry services out of pocket. According to data from the Arc of the United States, an advocacy group for the intellectually disabled, 13.6% of intellectually disabled adults between 18 and 64 do not have insurance. For these individuals, the level of disposable income largely determines whether or not they use industry services. Disposable income is anticipated to have steady growth but lag behind the rising cost of medical services over the next five years, which may decrease demand for industry services. However, healthcare reform will likely decrease the number of uninsured individuals, shrinking the impact of disposable income on industry demand. It is important to note, however, that if the expansion of healthcare reform is hindered for any number of political or economic reasons, the Residential Intellectual Disability Facilities industry will likely experience slower growth than projected.



Forecasted Revenue Growth
Residential Intellectual Disability Facilities in the US

PAREDES-0000052

## FACTORS INFLUENCING THE INDUSTRY

External Drivers of Change
The key sensitivities affecting the performance of the Residential Intellectual Disability Facilities industry include:

### Federal Funding for Medicare and Medicaid
Medicare and Medicaid spending on intermediate care facilities and home- and community-based service programs make up the largest source of funding for industry facilities. Therefore, changes to federal funding for these services will affect the number of individuals that can afford industry services, greatly affecting industry growth. Federal funding for Medicare and Medicaid is expected to increase in 2017, providing a potential opportunity for the industry.

### Number of People with Private Health Insurance
Many private health insurance plans provide coverage for individuals with intellectual and developmental disabilities. Therefore, the rise in number of people with private health insurance may increase the number of individuals who can afford industry services. As a result of the recent healthcare reform, the number of people with private health insurance is expected to rise in 2017. However, growth is projected to slow over the five years to 2022, posing a potential threat to the industry.

### Federal Expenditure on Disability Benefits
The annual payouts from the Social Security Disability Insurance (SSDI) Trust Fund represent federal expenditure on disability benefits. The SSDI provides financial support to citizens whose disability restricts their ability to work. An increase in federal expenditure on disability benefits for these individuals will benefit the industry as more individuals who are not covered by private insurance or Medicaid or Medicare will be able to afford industry services. Federal expenditure on disability benefits is expected to increase in 2017.

### Per Capita Disposable Income
When individuals do not have health insurance or their private health insurance does not cover intellectual disability treatment services, industry services must be paid for out of pocket. As industry facility fees can be costly, disposable income largely determines whether these individuals can afford industry services. Per capita disposable income is anticipated to grow at a healthy rate in 2017.

### Number of Adults Aged 65 and Older
As family members and caretakers of individuals with intellectual disabilities grow older, they will become less able to care for these individuals. Intellectually disabled individuals will then need to be placed in industry establishments rather than being cared for at home. An increase in the number of adults aged 65 and older consequently leads to higher demand for industry services. The number of adults aged 65 and older is expected to increase in 2017.

Key Success Factors for Operators in the industry include:

### Must Comply with Government Regulations
An inability to comply with government regulations may result in penalties, including loss of government funding.

### Proximity to Key Markets
Facilities located close to referring doctors and close to the population are in a stronger position to attract patients.

PAREDES-0000053

**Access to Highly Skilled Workforce**
Companies rely on skilled staff to ensure good health and living outcomes of residents and compliance with regulations.

**Maintain Quality of Facilities**
Quality of facilities and procedural expertise can attract customers and staff while assisting companies in meeting licensing and accreditation requirements.

**Ability to Raise Revenue from Additional Sources**
The ability to raise donations and obtain government funding is particularly important for nonprofit organizations operating in the industry.

**Access to Volunteer Labor**
Volunteer labor is exceptionally important to nonprofit operators that often cannot afford many full-time paid staff.

Based on the nature of the Company's operations, we also analyzed the elderly and disabled services industry as reported by *IBISWorld Industry Reports*. The following excerpts from *IBISWorld Industry Reports* for "Elderly and Disabled Services in the US" dated around the time of valuation, are included below:

*OVERVIEW*

**INDUSTRY DEFINITION**

This industry provides outpatient social assistance services to improve the quality of life for the elderly, the mentally ill and people with disabilities. Operators provide services in such areas as day care, nonmedical home care or homemaker services, social activities, group support and companionship.

**The primary activities of this industry are:**
Operating day care centers
Providing nonmedical home care
Providing homemaker services
Providing social activities
Providing group support
Providing companionship

**The major products and services in this industry are:**
Day care services for the learning disabled
Day care services for the physically disabled
Disability support groups
Home-delivered meals and transportation
In-home personal care services
Senior community centers
Other services

**KEY FACTS**

Competition in this industry is medium
Volatility medium (revenue fluctuations between 3 and 10 points)
The life cycle stage is growth

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000054





PAREDES-0000055

## MARKET SIZE

The future is bright for the Elderly and Disabled Services industry. Fueled by an aging population, demand for industry services is abundant. However, a significant portion of the market has been receiving services from institutional providers (e.g. nursing care and assisted-living facilities) rather than from the industry's formal, noninstitutional providers. Moreover, difficult economic conditions during the recession encouraged elderly and disabled individuals to call on family and friends for care. The government has also historically supported institutional care over home- and community-based services through Medicaid reimbursement policies and other regulation. These factors have limited revenue growth; however, aided by the passage of healthcare reform, industry revenue is expected to grow an annualized 5.8% to $50.7 billion. In 2017 alone, revenue is expected to soar at a rate of 5.0%.

Changing demographic trends have been the primary source of industry growth, with the number of people aged 65 and older expected to increase an annualized 3.1% over the five years to 2017. Mounting demand from the aging population has also driven employment growth over this period, with the number of industry workers rising at an annualized rate of 5.8% to nearly 1.3 million people. While rising labor costs and constraints from various funding sources have limited profit growth, margins are expected to expand moderately with the increasing entry of for-profit operators into the industry. Nonetheless, changes in government reimbursement policies have pressured profitability despite strong demand for services, as Medicaid accounts for a significant portion of industry revenue.

Over the five years to 2022, industry revenue is expected to grow significantly, primarily due to the continued aging of the population. During this period, revenue is expected to increase at an annualized rate of 7.7% to $73.5 billion. The availability of family caregivers will continue to decline over the next five years as the unemployment rate drops, boosting demand for formal caregivers and driving growth in both industry operator numbers and employment. In addition, healthcare reform will incentivize states to rebalance their long-term care systems to transition the elderly and individuals with disabilities from institutional to community settings, further driving industry growth.



PAREDES-0000056

*Recent Industry Performance*

The US population's health and functional ability are constantly evolving, but the overarching trend during the past five years has been positive for the Elderly and Disabled Services industry. The aging population has driven demand for elderly care and disability services during the period, contributing to revenue growth of an annualized 5.8%. In 2017, revenue is expected to expand 5.0% to \$50.7 billion, representing a return to strong growth. Company and employee numbers have grown at even faster rates since 2012. Over the five years to 2017, the number of industry enterprises is expected to grow at an annualized rate of 8.5% to 127,757, while employment is projected to expand at an annualized rate of 5.8% to nearly 1.3 million workers.

Although the Elderly and Disabled Services industry has resumed strong growth, it has experienced significant challenges over the past five years as a result of the recession. Although industry profit has largely recovered to an estimated 4.5% of revenue in 2017, it has nonetheless been pressured by high labor costs and limited available funding. During the economic downturn, more people turned to family caregivers, who remain the largest caregiver group, competing with the formal care that industry operators provide. The recession also reduced the personal resources that fuel spending on industry services. Although demand is on the rise, baby boomers are hesitant to devote considerable funds to elder care, as many are uncertain about their pension plans, 401(k)s and future solvency. Some have consequently postponed making significant financial commitments to industry care. Long-term care insurance coverage has yet to grow to its potential, which would effectively reduce out-of-pocket expenses and boost demand for industry services.

**Demographic Trends**

Over the five years to 2017, the number of people aged 65 and older is expected to increase an annualized 3.1% to 47.3 million. As the population ages, more individuals require industry services because aging adults are more susceptible to injuries and illnesses that prevent them from performing daily activities. Medical advancements and superior nutrition have helped people live longer, contributing to the size of the baby-boomer demographic. As a result, an aging population and increased life expectancies are fueling demand for industry services.

According to the US Census Bureau, about 56.7 million people living in the United States had some kind of disability in 2010 (latest data available). Almost half of all people with disabilities have a severe disability that affects their ability to see, hear, walk or perform other basic functions. US Census Bureau data shows that about 12.0 million adults need assistance with one or more activities of daily living. Demand for industry services has been further underpinned by an increase in the number of individuals receiving disability payments. Disability payments have been on the rise because workers with modest health problems are, like many in the labor force, unable to find jobs, leading to an increase in the number of applicants who are approved for disability payments.

**Limited Insurance Coverage and Funding Pressures**

The private insurance market for long-term care (LTC) is woefully thin, partly due to the government's large role in paying for insurance and partly because of the difficulty in actuarially modeling how long-term insurance should be priced. LTC insurance helps provide the cost of care that is not covered by regular health insurance, Medicare or Medicaid. Individuals who develop a chronic illness or become disabled and are unable to care for themselves benefit from LTC insurance that pays for personal care, assisted-living facilities, adult day care or nursing homes. In 2012, only about 8.0 million Americans had private LTC insurance, according to the American Association for Long-Term Care Insurance. Medicaid is expected to continue covering more than half of LTC costs.

During the past five years, the United States took modest steps to expand private LTC insurance through tax incentives, government-funded marketing campaigns and by tying this coverage more closely to Medicaid. Yet participation in private insurance remains low. Out-of-pocket expendi-

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000057

tures, which include home equity, personal savings and income from adult children, have provided critical private funding. States have reduced spending in Medicaid as a result of declining resources and unprecedented budgetary shortfalls during the recession.

Only about 13.0% to 15.0% of elderly individuals are estimated to have private LTC insurance, according to AARP's 2009 report "Federal and State Income Tax Incentives for Private Long-Term Care Insurance" (latest data available). Many qualified seniors are unable to purchase LTC coverage due to its high cost. Furthermore, existing policyholders have been hit by increased premiums. To offer tax incentives, the Internal Revenue Service increased the amount LTC policyholders can deduct from their taxes as medical expenses. The amount individuals can deduct for LTC insurance increases with age and may encourage more people to obtain coverage, representing significant savings for the elderly and an opportunity for the industry.

### Competition for Government Funding

Community-based care providers (i.e. providers that focus on healthcare delivery in community settings), which include industry operators, have long competed with institutional care providers for government funding. The Elderly and Disabled Services industry has historically been at a disadvantage against other long-term care providers, such as nursing homes, due to Medicaid's "institutional bias"; nursing home care is an entitlement, while home-based care is not. Federal rules allow states to put limits on reimbursement for home-based care programs, and states can create waiting lists. States cannot, however, keep waiting lists for people who are eligible for nursing home care. In 2010, states spent 66.0% of their long-term care budgets on nursing home care for the disabled and elderly and 34.0% on home-based care (latest data available).

Most older and disabled Americans prefer community-based long-term care, according to a 2010 study by Home Instead Senior Care, a US-based international franchise network that provides high-quality, nonmedical home care for older adults. Also, the Supreme Court has ruled that individuals have the right to live in community settings if possible, rather than be institutionalized. Subsequent lawsuits have compelled states to expand access to community-based long-term care, and federal resources have assisted states in rebalancing their services from institutional to community care. Furthermore, different forms of community-based care have evolved in the hope that more people with different needs can be served without increasing costs.

### Healthcare Reform Boosts Community Care

The Patient Protection and Affordable Care Act signed by President Barack Obama in March 2010 expanded coverage for in-home services through the Community First Choice program. Since October 1, 2011, states have been able to receive a 6.0% increase in federal matching funds for providing community-based attendant services and support to Medicaid beneficiaries with disabilities. Under the program, a total of $3.7 billion was made available to states between 2011 and 2014. The plan requires states to make the services and support available under an individual-centered care plan that will help assist disabled people with activities of daily living and health-related tasks. These changes have boosted industry revenue over the five-year period, encouraging entry by new operators and expanding employment.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000058

**Recent Industry Performance**
**ELDERLY AND DISABLED SERVICES IN THE US**

|  | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Revenue (in Millions) | $ 39,112.6 | $ 41,993.9 | $ 43,787.7 | $ 48,300.6 | $ 50,719.0 |
| Growth | N/A | 7.4% | 4.3% | 10.3% | 5.0% |

## *Industry Outlook*

Demand for the Elderly and Disabled Services industry is expected to remain strong over the five years to 2022, driven by the growing number of adults aged 65 and older. Growth will also be spurred by government initiatives that will encourage more people to seek care at home instead of in an institutional setting. With disposable incomes continuing to rise over the next five years, more people will be able to afford formal care, reducing reliance on family caregivers and driving demand for industry services. Long-term care (LTC) insurance coverage is expected to increase moderately over the period, but additional room for growth in coverage will remain. As a result of these factors, industry revenue is projected to rise at an annualized rate of 7.7% to $73.5 billion during the five years to 2022, including strong growth of 7.4% in 2018.

As a result of strong demand for industry services, new operators will continue to enter the industry, with the number of enterprises forecast to grow at an annualized rate of 7.7% to 185,534 over the next five years. In addition, the falling unemployment rate will reduce the availability of family caregivers, driving demand for services provided by formal caregivers. To meet rising demand, industry employment is forecast to increase over the period at an annualized rate of 7.7% to nearly 1.9 million workers.

**Long-Term Care Insurance Coverage**

In addition to the aging population, moderate growth in LTC insurance coverage will cause demand for industry services to grow. Although coverage is projected to increase only moderately, it will lift industry profit margins because private insurers typically pay higher rates than Medicaid, which often reimburses providers at or below the cost of treatment. Over the five years to 2022, industry profitability is expected to improve because of this more favorable payment environment.

Nonetheless, the market for LTC insurance will remain below its long-term potential because providers will continue to struggle with pricing plans effectively. Cost remains a key barrier to expanding the role of private insurance; people who shop for but do not buy LTC insurance cite cost as the most important reason for their decision, according to the Kaiser Family Foundation. Unpredictable premium hikes are a key problem facing the industry. Long-term policies require that customers stay current on premium payments from the time of purchase until a claim is made, but do not guarantee that rates will not rise. Although 36 states and the District of Columbia have enacted tax subsidies for LTC insurance premiums, the level of assistance they provide varies significantly. Moreover, in the remaining 14 states, people who purchase long-term care insurance receive no subsidy whatsoever.

**Healthcare Reform Fuels Growth**

Changes in federal healthcare policy are expected to aid industry revenue growth over the following five years. The Patient Protection and Affordable Care Act (PPACA) will continue to expand

PAREDES-0000059

healthcare coverage for young adults, including individuals with disabilities and chronic conditions. Young adults are now allowed to stay on their parents' insurance plans until the age of 26. Insurance companies are also no longer able to deny coverage to those with pre-existing conditions, potentially causing demand for industry services to rise.

In addition, the PPACA expanded the Money Follows the Person (MFP) program to more states by providing an additional $2.3 billion in funding through 2016, according to the US Department of Health and Human Services. The MFP program helps states rebalance their long-term care systems to transition individuals with disabilities from institutional to community settings, a potential boon for industry operators. A new Medicaid program known as Community First Choice furthers these rebalancing efforts by providing states a 6.0% increase in their federal matching rate for offering patients community-based services and support as an alternative to nursing homes and other institutional services. Furthermore, states that have spent less than 50.0% of their Medicaid funding on long-term care and home- and community-based services qualify to receive additional Medicaid matching funds under the new Balancing Incentive Program. These favorable changes brought about by healthcare reform will boost demand for elderly and disabled services over the five years to 2022.

However, the regulatory environment of this industry has the potential to change significantly over the next five years. In 2017 the Republican party has control of both Congress and the presidency, better enabling it to make changes to the Patient Protection and Affordable Care Act (PPACA). Although the initial attempt to alter the PPACA stalled, the Republican party under the Trump Administration has suggested that they will continue to seek to repeal and replace the law. IBISWorld makes its forecasts based on the current regulatory environment; however, as changes are made to the PPACA, forecasts are subject to change.

**Growth of Franchise Brands**

The franchise model has gained traction as a way to capture the business of senior citizens who want to remain in their homes, a trend that is expected to accelerate during the next five years. There are now more than 60 brands selling industry-relevant healthcare franchises, which entice franchisees with moderate initial investment requirements and strong business support in key areas such as marketing and advertising. Instead of having to build reputations from the ground up, as is the case with nonfranchise businesses, franchisees benefit from the clout and name recognition of strong national brands.

Although the industry is highly fragmented, with no individual company commanding more than 5.0% of revenue, businesses operating under the franchise model represent the industry's largest players. For example, US-based franchises operating under the Home Instead Senior Care brand are expected to generate combined revenue of $819.5 million in 2017, making it the largest franchise brand in the industry. Other significant franchise brands include Comfort Keepers, Living Assistance Services Inc., and Griswold Special Care. The success of these brands is expected to spur more franchise brands into the industry over the next five years.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000060



## FACTORS INFLUENCING THE INDUSTRY

External Drivers of Change

The key sensitivities affecting the performance of the Elderly and Disabled Services industry include:

### Federal Funding for Medicare and Medicaid

Medicare and Medicaid pay for certain industry services. Medicaid is the nation's major source of financing for long-term care services. However, Medicaid's long-term care protections are limited to those with low incomes or those who incur catastrophic expenditures. As funding for these programs decreases, fewer individuals are able to afford industry services. Federal funding for Medicare and Medicaid is expected to increase in 2017.

### Number of Adults Aged 65 and Older

Americans aged 65 years and older are eligible for publicly funded services for the elderly, which includes Social Security benefits, Medicare, subsidized housing and a range of community programs. Growth in the elderly population will increase demand for industry services. The number of adults aged 65 and older is expected to increase in 2017, creating a potential opportunity for the industry.

### Per Capita Disposable Income

Most industry operators are nonprofit and depend on private contributions, which typically increase as disposable income increases. Additionally, many individuals pay for industry services out of pocket. Rising income thus increases demand. Per capita disposable income is expected to increase in 2017.

### External Competition for the Elderly and Disabled Service Industries

Family caregivers are the largest caregiver group. This group includes individuals who provide unpaid care for a chronically ill, disabled or aged family member. Industry operators also compete with the institutional care nursing homes and senior living facilities provide. Although external competition is expected to decrease in 2017, it remains significant, thus representing a potential threat to the industry.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000061

**Number of People with Private Health Insurance**

Disability insurance is designed to replace a percentage of earned income if accident or illness prevents the beneficiary from pursuing his or her livelihood. Long-term care insurance generally covers home care and the costs associated with a visiting or live-in caregiver, companion, house-keeper, therapist or private nurse. As the number of people with disability and long-term care insurance increases, more people are able to afford industry services. The number of people with private health insurance is expected to increase in 2017.

Key Success Factors for Operators in the industry include:

**Having an Integrated Operation**

It is important that industry operators are able to integrate the wide range of services they provide to avoid inefficiencies from duplication and gaps in service.

**Proximity to Key Markets**

Providing services in a geographic area of need is a key success factor for operators in this indus-try. The closer the providers of elderly and disabled services operate to patients, the more likely these patients will utilize their services.

**Must Comply with Government Regulations**

Operators must meet all regulations set by federal, state and regulatory bodies, especially pertain-ing to the management of funds.

**Ability to Provide Goods/Services in Diverse Locations**

Services for the elderly and persons with disabilities need to be provided in a range of diverse locations, including schools, local government, community and faith-based groups, private organi-zations and in rural areas.

**Ability to Alter Goods and Services Produced in Favor of Market Conditions**

Services for the elderly and persons with disabilities need to be provided in a range of diverse locations, including schools, local government buildings, community and faith-based group facili-ties, private organizations and in rural areas.

**Access to Highly Skilled Workforce**

Workers in this industry need to have the training necessary to deal with a broad range of prob-lems and implement innovative solutions in service delivery.

PAREDES-0000062

Based on the nature of the Company's operations, we also analyzed the family counseling and crisis intervention services industry as reported by *IBISWorld Industry Reports*. The following excerpts from *IBISWorld Industry Reports* for "Family Counseling and Crisis Intervention Services in the US" dated around the time of valuation, are included below:

*OVERVIEW*

**INDUSTRY DEFINITION**

This industry includes establishments that provide nonresidential individual and family social assistance services. This includes counseling and support groups for alcoholism and drug addiction, abuse, marriage and parenting, crisis centers and family welfare services.

**The primary activities of this industry are:**
Operating alcoholism self-help organizations
Operating drug addiction self-help organizations
Operating family welfare and social service agencies
Operating hotline centers
Providing marriage counseling services
Providing parenting support services
Operating private parole and probation offices
Operating suicide crisis centers
Providing support group services

**The major products and services in this industry are:**
Assistance services for immigrants and refugees
Counseling services
Crisis intervention services
Rehabilitative services
Self-help group services
Shelter and food services
Social assistance services

**KEY FACTS**

Competition in this industry is low
Volatility low (revenue fluctuations less than 3 points)
The life cycle stage is mature

PAREDES-0000063





Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000064

**MARKET SIZE**

The Family Counseling and Crisis Intervention Services industry provides a range of social ser-vices, including counseling for alcoholism and drug addiction; rehabilitation services; shelter and food services; marriage and parenting counseling; crisis centers; and self-help organizations. Demand for these services is countercyclical, meaning that the industry typical grows during times of economic recession. However, despite overall economic growth over the five years to 2017, the industry has expanded mainly due to budget increases at the state and local level, as well as an expanding budget for social services at the federal level. Over the five years to 2017, industry rev-enue is forecast to increase at an annualized rate of 1.2% to $33.1 billion, including a slight decrease of 0.3% in 2017.

Since 2013, the industry has been growing at a steady rate over the five years to 2017. Although economic conditions have improved and unemployment has decreased, the industry has contin-ued to grow. The majority of operators in this industry are nonprofit, government-funded agencies, therefore the industry is inexplicably tied to federal, state and local funding for social services. Local and state government investment increased over the past five years, while federal funding for social services increased as well. As a result, industry revenue grew throughout much of the current period. However, in 2017 industry revenue is projected to decrease 0.3%, mainly due to uncertainty about future policy changes regarding funding for social services.

Over the five years to 2022, revenue is expected to grow at an annualized rate of 0.8% to $34.4 billion. Government funding for the Substance Abuse and Mental Health Services Administration (SAMHSA) is expected to increase to address the rise in mental, behavioral and substance abuse, which will drive revenue growth during the period. SAMHSA's funding will increase by $590.0 mil-lion to $4.3 billion in fiscal 2017, with increases in key programs set to positively impact revenue for the industry over the period. As the economy continues to grow, industry services will focus on preventive programs for high-risk individuals from demand for need-based programs.



PAREDES-0000065

*Recent Industry Performance*

The Family Counseling and Crisis Intervention Services industry provides a range of different state and community-based services. This includes counseling for alcoholism and drug addictions; rehabilitation services for ex-offenders; shelter and food services; hotline centers; marriage counseling services; parenting support services; rape and suicide crisis centers; self-help organizations; support group services; travelers' aid centers; and job training programs. Typically, these organizations receive the majority of their funding through government grants and private donations. In addition, industry operators generally charge for services on a sliding scale, depending on an individual's income level. The majority of industry players operate as nonprofit organizations and are thus not subject to income taxes. According to the latest information from the US Census Bureau, 69.9% of industry operators are nonprofit establishments.

During the current five-year period, demand for family counseling and crisis intervention has increased, with federal funding keeping pace with the growth. Moreover, the increasing focus on drug addiction in the United States has resulted in greater demand for rehabilitative services for individuals suffering from substance abuse. Furthermore, as the suicide rate increases, crisis intervention services are demanded and are therefore given more funding at the federal and state level. Additionally, the Family Counseling and Crisis Intervention Services industry is countercyclical, meaning demand for the industry's services generally grows when the economy is in an economic downturn. However, industry revenue has not suffered as a result of the economic growth in the current five-year period.

As a result, revenue for the Family Counseling and Crisis Intervention Services industry is projected to increase over the five years to 2017 due to increased demand and an expanding budget for industry services at the local, state and federal level. With government funding comprising more than two-thirds of industry revenue, growth in government budgets throughout the period have contributed to the industry's growth. As a result, over the five years to 2017, industry revenue is projected to increase at an annualized rate of 1.2% to an estimated $33.1 billion, despite a projected decrease of 0.3% in 2017.

**Increases in Funding**

Although economic conditions improved, and both unemployment and poverty rates decreased throughout the period, funding for social services remains strong. The industry's growth has ultimately been a result of increases in budgets for different social services programs and organizations. For example, the Substance Abuse and Mental Health Services Administration (SAMHSA) budget increased by $510.1 million to $4.3 billion in 2017. SAMHSA funds a majority of organizations within this industry, such as the Suicide Prevention Resource Center, the Center for Mental Health Services and the Garrett Lee Smith Suicide Prevention and Early Intervention grant program.

Over the five years to 2017, the number of companies operating in the industry has increased an annualized 1.5% to an estimated 82,722. New operators were drawn in by heightened demand during the five-year period, mainly from substantial demand for substance abuse and crisis intervention services. As a result, employment increased, growing at an annualized rate of 1.0% to 466,962 people over the five years to 2017. The majority of family counseling and crisis intervention services in the United States continue to operate as nonprofit organizations. These institutions may generate a profit, but this money must be put back into the organization. In contrast to nonprofit organizations, for-profit organizations do not have the same access to federal funding, foundation grants or tax-exempt donations. According to the latest available US Census data, 30.1% of industry operators were for-profit institutions. In 2017, the average organization in the industry generates profit margins of 4.0%, compared with 3.4% in 2012. Profit margins have increased slightly due to an increase in government funding. Additionally, increased operating efficiencies and higher per capita disposable income have raised the amount that individuals are able to pay for services. Due to the industry's sliding scale, fee-based services, more individuals have been

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000066

able to pay the full price for industry services over the five-year period, allowing profit margins to grow.

**Government Funding Vehicles**

One of the primary federal agencies that distribute funds for the industry is the Department of Health and Human Services. For instance, the Temporary Assistance for Needy Families (TANF) program that provides funding to states for low-income Americans is overseen by this department. In fiscal 2017, spending on TANF is estimated at $17.3 billion, which includes the TANF Contingency Fund for states to draw upon during poor economic conditions. The TANF program provides states with grants to spend on basic assistance, such as cash benefits, work activities and food. TANF funds are also used by states for marriage counseling and career advancement activities, which are covered by this industry.

The Substance Abuse Prevention and Treatment Block Grant (SABG) program is the cornerstone of government funding for substance abuse programs administered by states. One of the primary agencies that provides rehabilitation and counseling is the Substance Abuse and Mental Health Services Administration. Funding for SABG is expected to reach $1.9 billion in fiscal 2017. The government also provides funding for the Suicide Prevention Resource Center, the Center for Mental Health Services and the Office on Violence Against Women.

**More Drugs but Less Crime**

Illicit drug use, also contributing to the increase in demand for industry services, has become more common over the past five years. According to the latest 2015 National Survey on Drug Use and Health, sponsored by the Substance Abuse and Mental Health Services Administration, an estimated 27.1 million Americans aged 12 or older use illicit drugs, representing 10.1% of the population. Increased drug use, as well as a greater focus on substance abuse as a mental health issue, has resulted in greater demand for substance abuse counseling and rehabilitative services provided by the industry.

Despite an increase in drug use, overall crime has declined during the five-year period, according to a report published in 2017 by the Pew Research Center based on data from the Federal Bureau of Investigations and the Bureau of Justice statistics. Although many people believe crime rates trend in line with economic downturn, crime actually sustained the downward trajectory it has been on since the early 1990s during this past recession. Therefore, industry services providing support to abused victims or counseling for ex-offenders has declined over the period. However, demand for other services, such as substance abuse facilities and crisis intervention, remains strong boosting industry revenue over the five years to 2017.

### Recent Industry Performance
### FAMILY COUNSELING AND CRISIS INTERVENTION SERVICES IN THE US

|  | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Revenue (in Millions) | $ 31,241.7 | $ 31,814.0 | $ 32,928.6 | $ 33,232.4 | $ 33,130.3 |
| Growth | N/A | 1.8% | 3.5% | 0.9% | -0.3% |

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000067

Over the five years to 2022, industry revenue is expected increase at an annualized rate of 0.8% to an estimated $34.4 billion. Given that the industry provides social services, a significant share of revenue is sourced through government grants. Government spending is projected to continue growing moderately throughout the period. Accordingly, projected growth in government spending will drive revenue growth over the period. As a result of this trend, industry revenue is expected to increase 0.7% in 2022.

**Poverty and Substance Abuse**

An estimated 8.4% of revenue is directed toward shelter and food services for disadvantaged children, youth or adults. Over the next five years, the poverty rate is projected to decline, which will lessen demand for shelter and food services provided by the industry. According to IBISWorld estimates, the poverty rate is currently at 14.2%. During the next five years, the poverty rate is projected to remain relatively unchanged. The poverty rate typically moves in tandem with the unemployment rate, which is also expected to remain low over the next five years. Consequently, with an improving economy and more jobs available, the poverty rate will gradually contract, leaving fewer individuals in need of shelter and food services.

Over the next five years, industry operators will continue to invest in programs that aid individuals suffering from substance abuse. An estimated 20.8 million Americans suffer from a substance abuse disorder, according to 2015 information from the Substance Abuse and Mental Health Services Administration (SAMHSA), a trend that is expected to continue over the next five years. Additionally, many individuals are indirectly affected, including families of abusers and those injured or killed by abusers. Many organizations will extend services and counseling to families and other individuals. As demand increases, industry operators will continue to expand their organizations into different geographic markets, as well as begin to offer a wider range of services. As a result, industry establishments are anticipated to increase at an annualized rate of 1.2% over the five years to 2022.

**Government Contributions**

In fiscal 2018, government funding for SAMHSA is expected to decrease. The agency oversees programs for rehabilitation and counseling for individuals suffering from mental and behavioral disorders, as well as substance abuse. According to the proposed budget, SAMHSA's funding will decrease by $399.1 million to $3.9 billion during fiscal 2018. However, certain budgets for specific programs are expected to increase. For example, the proposed budget has included an additional $500.0 million to combat the opioid crisis currently plaguing the United States. Anticipated increases in key programs are set to positively impact revenue for the industry over the period. Funding is expected to remain the same for Substance Abuse Prevention and Treatment Block Grants, which are set to continue to receive $1.9 billion. Furthermore, part of the budget is allocated to train additional specialists to work with children and youth struggling with mental illness and other behavioral health matters. This is expected to contribute to the increase in industry employment over the five years to 2022. Employment is projected to rise an annualized 0.8% during the period to 484,800 in 2022.

Over the five years to 2022, the number of enterprises is projected to increase at an annualized rate of 1.2% to an estimated 87,722 organizations. Combined with the projected increase in key government-funded programs over the period, improving economic conditions will yield greater per capita disposable income growth, which will favorably affect profit margins. Although more people with higher disposable income will purchase industry services from private organizations, more consumers with low income will be able to pay a higher price for industry services, which bolsters revenue. The increase in funding, from private donations and from the government for certain issues, as well as the ability for more consumers to pay for industry services, will encourage oper-

---

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000068

ators to join the industry. Over the five years to 2022, the average profit margins of for-profit organizations are projected to stagnate at 4.0% in 2022.



## FACTORS INFLUENCING THE INDUSTRY

External Drivers of Change
The key sensitivities affecting the performance of the Family Counseling and Crisis Intervention Services industry include:

**Federal Funding for Social Services**
Government grants are a key source of funding for social assistance programs provided by the industry. Federal funding for industry programs increased during the recession due to rising unemployment and the escalating poverty rate, which increased demand for industry services. Federal funding for social services is expected to increase in 2017, presenting the industry with a potential opportunity.

**Crime Rate**
Given that the industry provides crisis intervention services, such as telephone hotlines and in-person counselor sessions with individuals who have been abused, a rise in the crime rate increases demand for these services. Although the crime rate typically rises during recessionary periods, the most recent recession marked a turnaround from this trend, with the crime rate actually falling steadily. The crime rate is expected to decrease in 2017.

**National Unemployment Rate**
Another key measure of industry demand is the unemployment rate. When the unemployment rate rises, individuals are left with less disposable income and a greater number of individuals fall below the poverty line. Rising unemployment has resulted in greater demand for counseling services provided by the industry given the emotional distress of unemployment. Moreover, the industry also provides vocational rehabilitation services. Demand for these services has increased strongly, given rising competition for employment. The national unemployment rate is expected to decrease in 2017.

**Per Capita Disposable Income**
Social assistance programs are generally provided to individuals on sliding scale fees based on the individuals' ability to pay. During the recession, decreased disposable income resulted in fewer individuals being able to afford the full price of industry services, a factor that adversely affected

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000069

profit margins. However, with a slow improvement in economic conditions, this trend has begun to reverse. Per capita disposable income is expected to increase in 2017.

### Poverty Rate

Demand for industry services is highly correlated with changes in the poverty rate. There are currently an estimated 45.3 million people living in poverty in the United States. Individuals living under the poverty rate are eligible for basic assistance services provided by industry operators, such as food and shelter, as well as job assistance counseling and development programs. Consequently, when the number of people living under the poverty line decreases, demand for industry services generally declines. The poverty rate is expected to decrease in 2017, posing a potential threat to the industry.

Key Success Factors for Operators in the industry include:

### Ability to Control Size and Growth of Internal Bureaucracy

Government agencies must continually streamline their operations and ensure that management, accountability and evaluation procedures are in effect to ensure that programs deliver the best value for individuals.

### Access to Secure Revenue

Long term planning in this industry requires access to secure revenue from all levels of government.

### Ability to Alter Goods and Services Produced in Favor of Market Conditions

Federal and state governments must continually alter the funding allocations for various programs to best suit the needs of the target populations.

### Ability to Provide Goods/Services in Diverse Locations

The services provided by this industry need to be available in a range of diverse locations in order to ensure maximum accessibility.

### Having a Good Reputation

Family counseling and crisis intervention services are highly personal and, therefore, depend on clients feeling at ease while discussing their issues. A good reputation can assist in gaining referrals, while reassuring the client that help is possible.

## SUMMARY

The residential intellectual disability facilities industry primarily houses and oversees to the daily needs of individuals who have been diagnosed with intellectual and developmental disabilities. For this reason, industry demand is largely determined by federal funding for Medicare and Medicaid services and the number of Americans with access to private healthcare. In addition, the number of adults aged 65 and older also influences demand. The industry has thereby experienced steady growth over the five years to 2017 as both funding for Medicare and Medicaid services and the number of adults over the age of 65 steadily increased. As a result, industry revenue is projected to rise at an average annual rate of 1.9% to $26.6 billion over the most recent five year period through 2017.

PAREDES-0000070

During this same period, smaller private facilities consistently replaced large state-run institutions as these facilities are often locally based, have fewer residents, and are able to provide a more personalized level of care. As it takes multiple smaller facilities to meet the level of services provided by larger, state-run institutions, the number of both industry establishments and employees has grown. In addition to an increasing elderly population, future revenue growth is expected to be driven by a higher number of Americans gaining access to public or private healthcare, which may also lead to more citizens being diagnosed with intellectual disabilities. Forecasted revenue for the residential intellectual disability facilities industry is estimated to rise at an average annual rate of 3.3% to $31.3 billion over the five years to 2022.

The elderly and disabled services industry has experienced growth over the past five years as an aging population fueled the abundant demand for industry services. Despite these conditions, a significant portion of the market still receives services from institutional providers in place of the industry's formal, non-institutional providers. Moreover, challenging economic conditions surrounding the recession encouraged elderly and disabled individuals to depend on family and friends for care. Revenue growth has been limited further by the government's historical support of institutional care over home and community-based services through Medicaid reimbursement policies and other regulation. Aided by the passage of healthcare reform, industry revenue is projected to rise 5.0% in 2017.

Over the next five years, the continued aging of the population is expected to support industry growth. As the unemployment rate drops during this period, the availability of family caregivers is anticipated to decline further, increasing the demand for formal caregivers and generating growth in both the number of industry operators and employment. In addition, healthcare reform will incentivize states to rebalance their long-term care systems to transition the elderly and those with disabilities from institutional to community settings, driving industry growth further. Forecasted revenue for the elderly and disabled services industry is estimated to rise at an average annual rate of 7.7% to $73.5 billion over the five years to 2022.

The family counseling and crisis intervention services industry provides a range of social services including counseling for alcoholism and drug addiction, rehabilitation services, marriage and parenting counseling, and self-help organizations. As demand for these services is countercyclical, the industry generally experiences growth during times of economic recession. However, despite overall economic growth in the five years to 2017, the industry expanded during this period due to budget increases at the state and local level, as well as rises in the federal budget for social services. Over the five years to 2017, industry revenue is projected to grow at an average annual rate of 1.2%.

---

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000071

In the next five years, expected increases in government funding to address the rise in mental, behavioral, and substance abuse issues are anticipated to drive revenue growth. As a result of this additional funding, and as the economy continues to expand, industry services are predicted to focus on preventive programs for high-risk individuals from demand for need-based programs. Forecasted revenue for the family counseling and crisis intervention services industry is estimated to rise at an average annual rate of 0.8% to $34.4 billion over the five years to 2022.

We believe that an investor in CPES would assess some additional risk to an investment in the Company due to the industry's reliance on government funding. However, we believe the perceived risk would be somewhat mitigated because of the increasing need to address mental and behavioral health issues on a national level resulting in an increased demand for the Company's services.

The above factors have been taken into consideration in assessing the risks associated with an investment in the Company. We will reflect any additional risk in our determination of an appropriate rate of return later in this report.

# FINANCIAL ANALYSIS

## OVERVIEW

The purpose of this section is to examine the financial condition and performance of the Company in order to gain insight into trends affecting future earnings capacity, as well as to analyze various financial risks. We used the knowledge gained from this analysis, as well as other factors impacting the business (including those discussed elsewhere in this report) in valuing the Company.

## FINANCIAL STATEMENT INFORMATION

The exhibits found in Appendix 1 of this report contain spreadsheet summaries of the Company's financial statements as of and for the years ended December 31, 2013 through 2017.

## SOURCES USED IN COMPARISONS WITH PEERS

We compared CPES' financial performance with the closest available peer industry, using data from the *RMA Annual Statement Studies*, 2013/2014 through 2017/2018 Editions, published by the Risk Management Association (formerly Robert Morris Associates), a banking industry association. This study provides detailed financial ratio information on a variety of industry groupings and is stratified by size. We compared the Company against peers in the following industry:

| Peer Industry As of December 31, 2017 | | |
|---|---|---|
| **NAICS Code** | **Description** | **Sales** |
| 623210 | Residential Intellectual and Development Disability Facilities | $25 Million and Over |

The results from the latest RMA Study cover financial data through March 31, 2017 (latest available), and includes 47 companies having annual revenues of more than $25 million.

We also compared the Company to publicly traded guideline companies. Our discussion of how we selected these guideline companies is presented later in this report.

Although the companies included in these analyses have certain differences with CPES, they also have definite operational similarities. As such, the comparisons provide a reasonable idea as to the operational efficiency of CPES.

PAREDES-0000073

We analyzed the Company using financial ratios in relation to profitability, liquidity, working capital, asset efficiency, leverage, debt coverage, and return on equity. The purpose of this analysis was to assess the Company's performance relative to industry peers and financial risk for valuation purposes. The following analysis is comprised of two broad sections. The first, income statement profitability analysis, evaluates trends in the Company's revenues, expenses and profits, the various factors leading to the reported results, and the Company's results compared to industry peers. The second, balance sheet analysis, evaluates the financial strength of the Company, including trends and standing as compared to industry peers.

## *INCOME STATEMENT PROFITABILITY ANALYSIS*

Income statement profitability is a function of sales, the gross profit margin on those sales, and expenses. Following is an analysis of the Company's revenues, operating expenses, and pre-tax profit margins as compared to industry averages. Also included is a discussion of some of the factors leading to the results attained.

### *Revenues*



As shown in the graph above, revenues increased by approximately 1.6% for the year ended December 31, 2017, which followed a similar increase in 2015 and 2016. The Company's revenues over the past five years have ranged from a low of $51.22 million in 2013 to a high of $54.68 million in 2017. The compounded annual rate of growth in revenues over the past five years was approximately 1.6%.

---

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000074

*Operating Expenses*



The ability to manage operating expenses can be a critical variable impacting a company's overall profitability. As shown in the previous graph, the Company's operating expenses as a percentage of revenues were below the RMA industry peer median in 2014 and 2016, and approximated the median in 2015. However, the Company's operating expenses as a percentage of revenue were above the RMA industry peer medians in 2013 and 2017.

*Pre-Tax Earnings*



PAREDES-0000075

The Company's pre-tax earnings as a percentage of revenues exceeded the RMA peer industry medians in 2014, 2015, 2016, and 2017. CPES' pre-tax earnings as a percentage of revenues compared unfavorably to the RMA peer industry median for the year ended December 31, 2013.

## BALANCE SHEET ANALYSIS

We analyzed CPES' balance sheet with regard to financial liquidity and working capital, factors that are indicative of its ability to meet short-term obligations and support operations. Additionally, we analyzed qualitative factors related to current assets and liabilities, including the quality and turnover of receivables and working capital.

As indicators of financial risk, we analyzed the level of financial leverage, the degree of reliance on interest bearing debt to finance operations, and the Company's ability to service obligations through cash flows generated by the business.

We examined the Company's return on equity to determine the financial returns provided to investors. In addition, we analyzed the elements that comprise the Company's return on equity, including profit margins, asset utilization (turnover) and leverage.

### Financial Liquidity



The "current ratio," measured by total current assets divided by total current liabilities, is one measure of the Company's ability to meet is short-term cash requirements by using its current assets. Typically, the larger the current ratio, the greater the buffer between current liabilities and a company's ability to pay them through conversion of trading assets into cash (i.e., inventories generate receivables, which become cash upon collection).

As shown in the accompanying graph, the Company's current ratio has generally been comparable or superior to the industry peers during the analysis period. This suggests that the Company historically has had a similar or superior ability to meet its current obligations as compared to the industry peers. The Company's current ratio improved in both 2016 and 2017 and compared favorably to both industry peer medians.

PAREDES-0000076

Another measure of liquidity, the "quick ratio," is an indicator of more readily liquid assets available to meet current obligations. This ratio is computed by dividing the sum of cash, near cash and trade accounts receivable by total current liabilities. The importance of this ratio is that it excludes the less liquid assets, particularly inventory, to focus on ready liquidity.



As shown in the accompanying graph, the Company's liquidity, as measured by the quick ratio, historically has been similar to the industry peers. The Company's quick ratio also improved in 2016 and 2017 and compared favorably to both industry peer medians. The Company's quick ratio suggests that the Company has a superior ability to meet its current obligations compared to the industry peers. This, along with the current ratio, suggests that the Company operates with a higher level of working capital in comparison to industry peers.



"Receivables turnover" and quality are factors in evaluating operating efficiency and management. One measure of receivables turnover, "past days' sales in receivables," is calculated by dividing total fiscal year-end receivables (or average receivables) by total annual sales revenue for the same year, with the result multiplied by 365 days. This measures the average number of days that accounts receivable are outstanding.

The Company's receivables were outstanding, on average, 34 days while the industry peer medians ranged from 37 days to 49 days. This suggests that the Company's collection period is more similar to the RMA industry peers, and was relatively consistent during the analysis period.

The "sales to working capital" ratio can measure how efficiently a company is using its working capital. However, the ratio must be analyzed in conjunction with other liquidity ratios to get a true picture of its meaning. If working capital is average relative to peers, then the sales to working capital ratio can indicate the efficiency of generating revenue from working capital. A low ratio may indicate an inefficient use of working capital. If working capital is high relative to peers, then the sales to



PAREDES-0000077

working capital ratio will tend to be lower. If working capital is low, the sales to working capital ratio will tend to be higher. The Company's sales to working capital ratio was below the RMA median and approximated the public guideline companies.

### Financial Leverage



Leverage, as measured by total liabilities divided by total net worth (owners' equity), is a measure of the extent to which a company is dependent on external borrowing (debt capital) relative to its equity capital. A business with a high "debt to worth" is generally considered less able to cope with unexpected cash flow problems, sudden economic changes and similar factors impacting the company.

The Company's total liabilities to total equity ratio was lower than the RMA industry peers and the public guideline companies, which is a result of having a lower level of financial leverage (debt) in comparison to the industry peers. The Company's total liabilities to total equity ratio decreased in 2014, 2015, 2016, and 2017.

Leverage must also be analyzed in terms of the Company's ability to support such financial leverage with its cash flows and earnings, by evaluating its "times interest earned" ratio. This ratio is computed by dividing earnings before interest and taxes (EBIT) by interest expense. A ratio of 6, for example, indicates that a company has $6.00 in earnings to cover every $1.00 in interest charges. As such, the greater the ratio, the greater the ability to service debt.



The Company's coverage ratio for the year ended December 31, 2017 compared favorably to the public guideline companies and the RMA industry peer median. CPES' coverage ratio improved in 2014, 2015, 2016, and 2017 as compared to the prior year. This, along with the total liabilities to total equity ratio, suggest that CPES has a greater capacity for additional debt in comparison to the industry peers.

PAREDES-0000078

*Utilization of Assets and Capital*



Asset utilization can be measured by "pre-tax return on assets." This ratio is an indicator of a company's effectiveness in using its asset base in generating profits. Pre-tax return on assets is calculated by dividing pre-tax earnings by the total amount of assets.

The accompanying graph demonstrates that the Company's pre-tax return on assets has recently compared favorably to the industry peers and was positive for a fourth straight year. In 2013, CPES' pre-tax return on assets was negative and below the industry peers due to the Company's reported negative pre-tax profit.

Pre-tax income divided by total equity, or "return on equity," is a measure of a company's investment performance. A high return is often associated with effective management, although such a return could be the result of a company under capitalization. Therefore, return on equity must be viewed in conjunction with a company's leverage and its balance sheet.



As shown in the graph above, the Company's pre-tax return on equity for the year ended December 31, 2017 was also positive for a fourth straight year and compared favorably to the industry peers. However, the Company's pre-tax return on equity decreased in 2016 and 2017. In 2013, CPES' pre-tax return on equity was negative and below the industry peers due to the Company's reported negative pre-tax profit.

### SUMMARY

CPES experienced modest increases in revenue for the years ended December 31, 2015, 2016, and 2017. The Company's pre-tax profit as a percentage of revenues was approximately 4.0% and 3.7% in 2016 and 2017, respectively, and compared favorably to the industry peer median in both years. The Company was comparable to the RMA industry peers in terms of its collection period and compared favorably to industry peers in terms of liquidity and financial leverage. The Company's pre-tax return on assets and shareholders' equity exceeded industry peers for the years ended December 31, 2015, 2016, and 2017, respectively. In 2013, the Company's pre-tax returns on assets and on shareholders' equity was negative due to the Company's reported negative pre-tax earnings for those years.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000079

We believe an investor in the Company would assess some additional risk to an investment in CPES based on historical volatility in operating performance. We will reflect this in our determination of an appropriate rate of return later in this report.



PAREDES-0000080

# VALUATION METHODS

## *OVERVIEW*

The appropriate application of a particular method of valuation in a given case is dependent upon the facts and circumstances surrounding the case. The factors applicable to a particular case that will impact the selection of the most appropriate method of valuation may include, but are not limited to the following:

- The purpose of the valuation;

- The existence or lack of adequate publicly traded comparable companies;

- The relative stability or irregularity of the historical earnings of the subject company;

- The premise of the valuation engagement (i.e., liquidation versus going concern).

In this valuation, we considered the use of the income, cost, and market approaches and corresponding methods in determining fair market value. Following is a general overview of the income, cost and market methods that we considered and the ones that we used. A detailed description of the application of the methods used to value the Company appears later in the report. While we considered various methods to value CPES, we specifically used the discounted cash flows method and the guideline public company method.

## *INCOME APPROACH*

The income approach is based upon the economic principle of "anticipation" (sometimes called the principle of "expectation"). In this approach, the value of the subject investment (i.e., the subject business interest) is the present value of the economic income expected to be generated by the investment. As the name of this economic principle implies, the investor "anticipates" the "expected" economic income to be earned from the investment. This expectation of prospective economic income is converted to a present worth – that is, the indicated value of the subject business interest.

There are numerous methods that make up the income approach, including capitalization of earnings, capitalization of dividends, capitalization of excess earnings, discounted future earnings, and discounted free cash flow. We used the discounted cash flows method for reasons that we will explain in the following section. A brief explanation of the various methods available within the income approach and how they are used to value a business follows.

---

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000081

*Capitalization Methods*

All capitalization methods estimate value by converting a company's estimated future income stream into value. This is accomplished through the application of an appropriate capitalization rate, which incorporates an investor's required rate of return based on perceived investment risk and a factor for expected growth in earnings. The result is that value is ultimately based on the present worth, today, of anticipated future benefits that the buyer will receive (in the form of earnings, cash flow, or dividends). Capitalization methods are most useful when economic income is stable and growing at an even rate. An offshoot of the Gordon-Shapiro dividend discount valuation model, the capitalization of an income stream is a "single period" valuation method that employs the following formula:

---

**Formula For Use of**

**The Capitalized Future Income Method**

$$PV = \sum_{i=1}^{n} \frac{E_i}{(k+1)^i}$$

Where:

$PV$ = Present Value.

$n$ = The last period for which economic income is expected.

$E_i$ = Expected amount of economic income in the period immediately ahead.

$k$ = Discount rate (required yield rate or total rate of return.)

$i$ = The future periods over which economic income is expected to be received.

---

We did not use this method in our calculations because the Company's short-term growth is expected to be different from its long-term sustainable growth.

*Excess Earnings Method*

The excess earnings ("formula method") method, as originally described in IRS Appeals and Review Memorandum 34 and updated by Revenue Ruling 68-609, is essentially a hybrid of the cost and income approaches. It involves the determination of earnings that are separately attributable to the tangible and intangible assets of a Company.

This method involves the following steps:

1. Multiplying the net tangible assets of the company by the rate of return such assets might reasonably be required to earn.

---

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000082

2. Deducting this estimate of "tangible earnings" from total earnings, to derive the portion of earnings attributable to the intangible assets.

3. Dividing the earnings attributable to intangible assets by a capitalization rate appropriate for intangibles, to estimate the total value attributable to the intangibles.

4. Summing the value attributable to intangible assets and the value of the net tangible assets of the company to estimate an overall value.

This method is a way of estimating the intangible value of a business. The Internal Revenue Service has stated that this method should only be used when other better methods are not available. We did not use this method in our valuation of the Company, as more appropriate methods were available.

### Discounted Future Income Methods

Discounted projected future income methods involve projecting possible future income streams (e.g., earnings, cash flow) on a year-by-year basis, usually for five or more years. Future income streams are then discounted at an appropriate discount rate (required rate of return on investment based on perceived investment risk) to a present value today. At the final projection year a "terminal value" is determined, representing an estimated value for all income streams occurring after the terminal period. The terminal value is then discounted (at the discount rate) to its present value today. The summation of the present value of the projected income streams and the terminal value yields a value estimate of the company.

When a "debt free" approach is employed, the income streams are discounted to present value at a "weighted average cost of capital," a measure incorporating the costs of debt and equity. The resulting value represents the value of the total capitalization of the company, including debt and equity. The total present value of debt is subtracted from this value in order to obtain the fair market value of equity in the company.

Shown below is the generalized formula for the discounted future income method. The formula shows the indicated value to be the sum of the present values of the annual income streams and the terminal value of the company:

PAREDES-0000083

<div style="border:1px solid black; text-align:center;">

**Formula for Use of**

**The Discounted Future Income Method**

$$PV = \frac{E_1}{(1+k)} + \frac{E_2}{(1+k)^2} + \dots + \frac{E_n}{(1+k)^n} + \frac{\frac{E_n(1+g)}{k-g}}{(1+k)^n}$$

Where:

$E_1 \dots E_n =$ Expected amounts of economic income in each period $E_1$ through $E_n$

$k =$ Discount Rate

$n =$ Number of periods in the discrete projection period

$g =$ Annually compounded growth rate in perpetuity for the prospective economic income, beyond the discrete projection period

</div>

If a company's earnings or cash flows are growing at a constant rate into perpetuity, the above method does not need to be used, as the formula is then mathematically equivalent to the results achieved by using the capitalization method discussed later. However, when a company is experiencing a normal near-term rate of growth that is above a sustainable long-term trend, or where there are cyclical or unusual near-term factors that are influencing results (which can be reasonably predicted), this method can more reliably capture the valuation impacts of the fluctuations than a capitalization method. Because management does not expect CPES' short-term growth in cash flows to reflect its sustainable long-term growth rate, we believe this method is an appropriate valuation method under the income approach.

### INDICATION OF VALUE USING THE DISCOUNTED CASH FLOWS METHOD

We used the discounted cash flows method to arrive at an opinion of value. The following sections detail how we used this method to value the Company including the expected future cash flows and the development of the discount rate used.

#### Estimated Future Cash Flows

Management provided forecasted revenues and expenses for the years ending December 31, 2018 through 2022 based on their future expectations. We calculated expected cash flows to invested capital based on management's projections and industry ratios. The expected cash flows to invested capital are as follows:

---

COMMUNITY PROVIDER OF ENRICHMENT SERVICES, INC.                    Page 76

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

### Computation of Estimated Future Cash Flows to Invested Capital

| | Future Periods Ending December 31, | | | | |
|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | 2022 |
| Revenues[1] | $ 58,508,513 | $ 63,160,207 | $ 67,726,849 | $ 71,612,993 | $ 75,585,450 |
| Operating Expenses[1] | 57,900,418 | 61,018,348 | 65,671,421 | 69,054,071 | 72,535,608 |
| Earnings Before Taxes[1] | 608,095 | 2,141,859 | 2,055,428 | 2,558,922 | 3,049,842 |
| Add Interest Expense[1] | - | - | - | - | - |
| Earnings Before Interest and Taxes | 608,095 | 2,141,859 | 2,055,428 | 2,558,922 | 3,049,842 |
| Less Income Taxes[2] | (182,429) | (642,558) | (616,628) | (767,677) | (914,953) |
| After Tax Earnings to Invested Capital | 425,667 | 1,499,301 | 1,438,800 | 1,791,245 | 2,134,889 |
| Add Depreciation and Amortization[1] | 252,811 | 266,718 | 274,607 | 282,652 | 291,306 |
| Less Incremental Change in Working Capital[3] | (241,000) | (293,000) | (287,000) | (244,000) | (250,000) |
| Less Ongoing Capital Expenditures[4] | (525,000) | (305,000) | (275,000) | (215,000) | (210,000) |
| **Cash Flows to Invested Capital** | $ (87,523) | $ 1,168,019 | $ 1,151,407 | $ 1,614,897 | $ 1,966,195 |

[1] From management prepared forecast for the years ending December 31, 2018 through 2022.

[2] Income taxes based on a combined federal and state rate of 30%.

[3] Change in working capital based on the median RMA sales to working capital ratio and the Company's forecasted annual revenues.

[4] Based on management's expectations of future annual capital expenditures.

We adjusted the earnings of the Company for income taxes at a combined federal and state rate of 30%. We made this adjustment to normalize the income tax expense and to present such expense on a consistent basis with comparative information. The Company has elected S-corporation status with the IRS.

PAREDES-0000085

As an S-corporation, the Company does not pay corporate income taxes. Additionally, as an ESOP the individual shareholders are not required to pay income taxes on their pro-rata share of the corporate income. However, in the normal course of valuing S-corporations, it is widely accepted that it is appropriate to tax-affect estimated ongoing cash flows due to adequate consideration required under the assumption of a hypothetical willing buyer and willing seller as defined by Revenue Ruling 59-60. Therefore, we tax affect the estimated ongoing cash flows to account for the most likely buyer being a C-corporation that would have cash flow requirements related to income taxes.

As a result of the passage of the Tax Cuts and Jobs Act of 2017, the corporate income tax structure and certain other provisions of the existing income tax code were changed as of January 1, 2018. As a result of these changes a number of the components of cash flow will potentially be impacted, such as the market cost of capital, expected long-term growth, and future reinvestment. In order to reflect these potential changes and to continue to be consistent with cost of capital resources, we have used an estimated combined Federal and State corporate income tax rate of 30%.

### Forecast Assumptions

Management's forecast reflects the following assumptions regarding future annual revenues and expenses:

**2018**
- Revenue growth - 7.0%
- Operating expenses as a percentage of revenue - 98.9%
- Earnings before interest and taxes as a percentage of revenue - 1.1%

**2019**
- Revenue growth - 8.0%
- Operating expenses as a percentage of revenue - 96.6%
- Earnings before interest and taxes as a percentage of revenue - 3.4%

**2020**
- Revenue growth - 7.2%
- Operating expenses as a percentage of revenue - 96.9%
- Earnings before interest and taxes as a percentage of revenue - 3.1%

**2021**
- Revenue growth - 5.7%
- Operating expenses as a percentage of revenue - 96.4%
- Earnings before interest and taxes as a percentage of revenue - 3.6%

PAREDES-0000086

<u>2022</u>
- Revenue growth - 5.5%
- Operating expenses as a percentage of revenue - 96.0%
- Earnings before interest and taxes as a percentage of revenue - 4.0%

In determining the reasonableness of management's forecast, we compared it to the Company's historical growth and operating performance, as well as historical versus expected growth for the relevant industry. Additionally, we considered the growth rates for expected earnings of the selected publicly traded guideline companies for the next five years, as indicated under the market approach section, which ranged from 7.9% to 20%. Based on these comparisons we believe management's forecast is a reasonable estimate of expected operating performance during the forecast period.

*Derivation of Rate of Return*

We used the "build-up" derivation of the "Capital Asset Pricing Model" (CAPM) in determining an appropriate discount and capitalization rate. Under the build-up method the rate of return required by an investor for investing in a particular company is the sum of the "riskless" rate, a risk premium required by the market in general, a risk premium for size, and a risk premium for any additional risks inherent to the specific company. The greater the risk for a specific company the greater the rate of return required to compensate an investor for incurring the risk. The result is a "discount rate" representing the annual investor-required rate of return, a measure of the cost of equity. The build-up method can be summarized by the following formula:



|   | **Build-up Pricing Model** |
|---|---|
|   | Riskless Rate |
| + | Combined Equity Risk Premium and Size Adjustment |
| +/- | <u>Specific Company Risk</u> |
| = | **Discount Rate** (i.e., Cost of Equity) |

This discount rate can then be used in several ways for valuation purposes:

**ESTIMATING THE WEIGHTED AVERAGE COST OF CAPITAL –** By weighting a company's relative cost of equity capital (using the fair market value of equity) and its relative after-tax cost of debt (using the fair market value of interest bearing debt), an overall "weighted average cost of capital" (WACC) can be determined. The WACC can then be used as the rate of return at which to discount projected future "debt free cash flows" (or earnings, if appropriate) to obtain a value for the total capitalization of the Company. This value includes debt and equity and is called "enterprise value."

PAREDES-0000087

*Riskless Rate*

Rates for U.S. Treasury Bills, Notes, and Bonds are often used as proxies for the riskless rate. According to the Federal Reserve Statistical Release dated January 2, 2018, the yield on actively traded long-term (20-year) U.S. Government Treasury Securities on December 31, 2017 was 2.58%.

*Combined General Equity Risk Premium and Size Premium*

In order to quantify the combined general equity risk and size premium we used the *Duff & Phelps Online Navigator* ("D&P Navigator") *and 2018 Valuation Handbook - U.S. Guide to Cost of Capital* ("D&P Handbook"), published by John Wiley & Sons, Inc. The D&P Navigator provides investment return data beginning in 1963 on publicly traded companies ranked by size and includes those companies that appear in both the Center for Research in Security Prices database and the Standard and Poor's Compustat database. The D&P Navigator and Handbook rank the companies into 25 portfolios based on several different measurements of size. The D&P Navigator and Handbook also provide the statistical formulae necessary to extrapolate a combined equity risk premium and size adjustment.

Investors generally expect an additional return on investment in smaller companies. Based on the D&P data, over the 1963-2017 time frame, investors in a company with similar size characteristics as CPES could expect returns above U.S. Treasury Coupon Bonds similar to those determined in the following table:

### Development of the Combined Equity Risk Premium and Size Adjustment
#### As of December 31, 2017

| Measure of Size | Company | Logarithm[1] | Slope | Constant | Indicated Premium[2] |
|---|---|---|---|---|---|
| Total Assets | $ 19,705,121 | 1.294579 | 0.02029 | 0.16132 | 13.51% |
| Total Revenue | $ 54,677,906 | 1.737812 | 0.01823 | 0.15579 | 12.41% |
| Number of Employees | 1,400 | 3.146128 | 0.01922 | 0.16777 | 10.73% |
| **Average** | | | | | **12.22%** |
| **Median** | | | | | **12.41%** |
| **Selected** | | | | | **12.50%** |

[1] *Sales and total assets are scaled by 1,000,000 (1,000,000 = 1.0) for comparison to the D&P portfolios. Next the logarithm of total assets and sales is computed to be consistent with the formulae provided by the D&P Report.*

[2] *Computed by multiplying the logarithm by the slope and subtracting the result from the constant. The result is an indicated premium over the riskless rate.*

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000088

*Specific Company Risk Premium*

In some cases, it may be appropriate to add or subtract an additional risk premium for company specific risk, representing the positive or negative risk other than the general equity risk premium, and size premium. In this specific instance we added a risk premium of 5%. We based the additional adjustment, in part, on the factors summarized in the "summary of valuation factors" section of this report and other factors discussed throughout this report. Additionally, the purpose of the specific company risk premium analysis is to quantify the risk associated with achieving management's forecast.

*Final Summarizing to Reach a Discount Rate*

The riskless rate and various premia are now summed to develop a discount rate, as shown below:

| Development of Equity Discount Rate As of December 31, 2017 | |
| --- | --- |
| Riskless Rate | 2.58% |
| Plus Combined Equity Risk Premium and Size Adjustment | 12.50% |
| Plus Company Specific Risk Premium | 5.00% |
| **Equals the Cost of Equity** | **20.08%** |

The above discount rate represents the cost of the Company's equity. We weighted the cost of equity with the cost of debt in order to determine the weighted average cost of the Company's invested capital. The following table demonstrates the computation of the weighted average cost of capital:



**Development of the Weighted Average Cost of Capital**
**As of December 31, 2017**

| | | | | | |
|---|---|---|---|---|---|
| Cost of Debt - Tax Effected | 4.20% [1] | Multiply by Weight | 18% [2] | Equals | 0.76% |
| Cost of Equity | 20.08% [3] | Multiply by Weight | 82% | Equals | 16.47% |
| **Weighted Average Cost of Capital Discount Rate** | | | **100%** | | **17.23%** |

[1] Based on a 6% effective borrowing rate and a 30% tax rate.
[2] Weightings based on industry capital structure, reported by Duff & Phelps. We assume that the controlling owner will work towards the "optimal" capital structure, i.e., the industry average.
[3] From the "Development of Equity Discount Rate" table.

### *Terminal Value Capitalization Rate*

The capitalization rate is based on the previously determined discount rate, less a long-term sustainable annual growth rate of 3%. For purposes of determining a capitalization rate it is appropriate to apply a long-term growth rate that is considered to be a "sustainable growth," that is, a level of continued growth that the enterprise can reasonably be expected to sustain (on average) over the long-term. We believe the estimated long-term growth rate is reasonable based on management's expectations of future growth and because the long-term growth rate of the industry is closely tied to the overall macro-economic growth rate of the economy.

We place primary emphasis on the expected long-term growth rate of the overall economy as measured by annual GDP as an indication of a reasonable estimate for the long-term sustainable growth rate. According to the Bureau of Economic Analysis (http://www.bea.gov), historical annual growth in GDP has averaged approximately 3% to 4% since 1929. In the near term, growth in cash flows may continue to be enhanced at a faster rate. When the long-term growth rate is subtracted from the discount rate, a capitalization rate results as follows:

| Development of the Capitalization Rate | |
| :--- | ---: |
| **As of December 31, 2017** | |
| Discount Rate | 17.23% |
| Less the Long-Term Sustainable Annual Growth Rate | -3.00% |
| **Equals the Capitalization Rate Applicable to Future Cash Flow** | **14.23%** |
| **Rounded** | **14.00%** |

*Discounted Cash Flows*

Using CPES' estimated future cash flows as computed previously and the discount rate of 17% (rounded), we calculated the preliminary value of an equity interest in CPES as follows:

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000091

### Discounted Cash Flows Method
#### As of December 31, 2017

| Future Period Ending | Future Cash Flows[1] | Discount Factor[2] at 17% | Present Value |
|---|---|---|---|
| 2018 | $    (87,523) | 0.9245 | $    (80,915) |
| 2019 | 1,168,019 | 0.7902 | 922,935 |
| 2020 | 1,151,407 | 0.6754 | 777,614 |
| 2021 | 1,614,897 | 0.5772 | 932,168 |
| 2022 | 1,966,195 | 0.4934 | 970,041 |
| Terminal Value | 14,286,129 | 0.4934 | 7,048,200 |
| Indication of Enterprise Value | | | 10,570,043 |
| Less Interest Bearing Debt[3] | | | (4,026,753) |
| **Indication of the Value of Operating Equity** | | | **$   6,543,290** |
| Non-Operating Assets, Controlling Basis[4] | | | 1,700,000 |
| **Indication of the Value of Total Equity, Controlling Basis** | | | **$   8,243,290** |
| **Rounded** | | | **$   8,243,000** |

[1] From the "Computation of Estimated Future Cash Flows to Invested Capital" table.

[2] Discount factor based on a half-year convention, which assumes cash flows are received throughout the year rather than at the end of the year.

[3] From audited and consolidated financial statements (draft) as of and for the year ended December 31, 2017.

[4] Reflects non-operating assets on a controlling basis (see discussion under the Cost Approach).

### Derivation of Terminal Value

It is impractical to estimate future cash flows into perpetuity and the longer the time period of the estimates the more difficult it becomes to estimate cash flows accurately. For these reasons the DCF method estimates cash flows for a finite number of years and then capitalizes the subsequent period cash flow. The capitalization of the subsequent period cash flow is called the terminal value. We computed the terminal value as follows:

PAREDES-0000092

### Terminal Value
**As of December 31, 2017**

| | |
|---|---:|
| Adjusted Cash Flow, 2022[1] | $ 1,941,804 |
| Multiply by Long-Term Growth Factor | 1.03 |
| Expected Cash Flow, 2023 | $ 2,000,058 |
| Divide by Terminal Value Capitalization Rate | 14% |
| **Terminal Value** | **$ 14,286,129** |

[1] *For purposes of determining the appropriate terminal value, we adjusted the cash flow in 2022 to reflect a reconciliation of depreciation and capital expenditures in perpetuity. This is an appropriate valuation adjustment in order to determine a normalized cash flow for purposes of calculating a terminal value.*

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000093

*MARKET APPROACH*

The market approach is based on the economic principle of efficient markets. The market approach estimates a value by comparing the subject business interest to comparative business interest that have been sold in an established market place.

There are numerous methods within the market approach, including the identification and analysis of comparable publicly-traded companies whose securities sell on a free and open market, definitive and verifiable transaction data available on actual sales of similar privately held concerns, actual or potential markets for a security such as buy/sell or shareholder agreements, and past transactions in the shares of the Company itself.

### *Search for Private Company ("Guideline") Comparables*

We searched private transaction databases to find comparable closely held companies that have sold in the private market. These databases included:

**Bizcomps -** This database provides information on thousands of small business sales over the past ten years. A "small business" is defined as one that was sold for less than five million dollars. Additionally, a majority of the transactions involve entities with less than $500,000 in annual gross revenue. The study includes data provided by business brokers with direct knowledge of the transactions.

**Mid Market Comps -** Published by ValuSource, this database provides information on thousands of mid-level companies sold over the past ten years. The sales prices for these transactions range from one million dollars to $250 million with a majority of the transactions occurring below ten million dollars. The information is compiled from data provided by business brokers with knowledge of the transactions.

**Pratt's Stats -** Published by Business Valuation Resources, LLC, this database includes transaction information on thousands of private and closely held companies from 1990 to the present. The sales prices for these transactions range from less than one million dollars to more than one billion dollars.

The following chart shows the selection criteria for sales of privately held companies:

| Private Company Comparable Selection Criteria |
| :-- |
| - Revenues not greater than 25 times the size of the subject company;<br>- Sales occurring within five years of the valuation date;<br>- Same or similar line of business; and,<br>- Not in financial distress. |

By analyzing these transactions, we determined that the following multiples were most relevant to the valuation of the Company:

| Valuation Multiples of<br>Private Company Comparables<br>As of December 31, 2017 | |
| :-- | --: |
| | Pratt's Stats |
| Number of Transactions | 22 |
| Price to Revenue | 0.50 |
| Price to Earnings | 3.11 |

The transactions in the various databases generally involve privately held businesses where a controlling interest (usually 100%) has been transferred. One difficulty with using the information is that we do not know the motivations of either the buyer or the seller. We do not know if the buyer had synergies or economies of scale to gain from the transaction, nor do we know if the seller was in distress or in a "fire" sale situation. In addition, the transactions in the databases may be somewhat dated. Therefore, we did not use the private company comparable method in our determination of value of CPES.

### Search for Public Company ("Guideline") Comparables

When valuing the shares of a closely held company, since no market exists, an alternative is to seek guidance from the prices investors are willing to pay for securities of similar companies that are publicly traded. Revenue Ruling 59-60 suggests that the valuation of an investment interest in a closely held security should be based on, or at least considered to be based on, trading prices of public

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000095

traded securities of "comparable" companies that are engaged in the same or similar lines of business.

There is an inherent difference between closely held companies and publicly traded companies. Closely held companies are often managed directly by their shareholders whereas publicly traded companies are usually not. A primary goal of management of a public company is to maximize the wealth of the company's shareholders through the payment of dividends or through capital appreciation. Earnings per share is a commonly used standard by which to evaluate the success of a public company's management. The owner/operators of private companies, however, can often maximize their benefits through salaries and other perquisites without regard to earnings, although earnings are still important to bankers, outside shareholders, and other third parties.

While RR 59-60 suggests the consideration of comparable companies, it does not clearly define "comparable." However, over the years, the valuation profession has defined several aspects of a publicly traded security that must exist before the security can be reasonably considered to be comparable to the closely held security. These factors include:

- companies are in the same or similar line of business.
- companies have similar competitive positions within the industry.
- companies have similar historical rates of growth.
- companies have similar historical and current levels of profitability.
- companies have similar capital structures.
- companies have similar product lines.
- companies are of similar size, relative to sales volume and total assets.

During the course of this engagement we analyzed the EDGAR database from the Securities and Exchange Commission, and other sources in order to attempt to locate guideline companies. These sources provide information related to publicly traded companies, including but not limited to:

- Standard Industrial Classification Code
- Name of the enterprise
- Exchange in which the security is traded
- Historical beta
- Total market capitalization
- Common equity
- Preferred equity
- Amount of deferred tax and credits
- Amount of other liabilities
- Amount of long-term debt
- Amount of current liabilities
- Amount of total assets
- Amount of total net sales

PAREDES-0000096

- Earnings growth
- Return on equity (ROE)

We searched for possible comparable public companies in the same or similar line of business as the Company. The purpose of this analysis was to determine their validity as possible comparables along the following criteria:

| Public Company Comparable Selection Criteria |
| :--- |
| - Freely and actively traded shares on the over-the-counter or national exchanges; <br> - Reasonably comparable capital structure; <br> - Same or similar line of business; and, <br> - Not in financial distress. |

Resources used to identify guideline companies included SIC and NAICS codes, the Directory of Companies Required To File With The Securities & Exchange Commission, Hoover's On-Line survey and other on-line searches via the Internet and the SEC EDGAR database. We reviewed a number of companies to determine if any of them were reasonably similar and met initial selection criteria. Based on the aforementioned criteria, we identified several guideline companies. After a closer analysis, we were able to narrow our selection. We identified six public companies as being comparable for valuation purposes. The guideline companies are all involved in a similar line of business and affected by many of the same market forces. We obtained the most recent Forms 10Q and 10K as filed with the SEC for the guideline companies in order to perform additional analysis.

### Guideline Companies Selected for Comparison

Following is a brief summary of the public companies identified as being in the same or similar line of business for valuation purposes that we selected for comparison with CPES:

**AAC Holdings, Inc. ("AAC") -** AAC Holdings, Inc. provides inpatient substance abuse treatment services for individuals with drug and alcohol addiction in the United States. Its therapy services include motivational interviewing, cognitive behavioral therapy, rational emotive behavior therapy, dialectical behavioral therapy, solution-focused therapy, eye movement desensitization and reprocessing, and systematic family intervention services. As of December 31, 2016, the company operated 12 residential substance abuse treatment facilities, 18 standalone outpatient centers, and 202 sober living beds. In addition, the company performs drug testing and diagnostic laboratory services; and provides physician services to its clients.

PAREDES-0000097

AAC Holdings, Inc. was incorporated in 2014 and is headquartered in Brentwood, Tennessee. Shares of AAC Holdings, Inc. are publicly traded on the New York Stock Exchange ("NYSE") under the ticker symbol AAC.

**Acadia Healthcare Company, Inc. ("ACHC") -** Acadia Healthcare Company, Inc. develops and operates inpatient psychiatric facilities, residential treatment centers, group homes, substance abuse facilities, and outpatient behavioral healthcare facilities to serve the behavioral health and recovery needs of communities in the United States, the United Kingdom, and Puerto Rico. Its acute inpatient psychiatric facilities offer evaluation and crisis stabilization of patients with severe psychiatric diagnoses; specialty treatment facilities include residential recovery facilities, eating disorder facilities, and comprehensive treatment centers that provide continuum care for adults with addictive disorders and co-occurring mental disorders; and residential treatment centers, which treat patients with behavioral disorders in a non-hospital setting, including outdoor programs.

The company also offers outpatient community-based services, such as community-based programs that are designed to provide therapeutic treatment to children and adolescents who have a clinically-defined emotional, psychiatric, or chemical dependency disorder. In addition, it offers mental health services; rehabilitation services comprising relapse prevention and social integration services, as well as vocational opportunities; acute services for patients at risk to themselves or others, as well as crisis intervention and treatment of behavioral emergencies; and care homes, which provide long-term and non-acute care for adults suffering from mental illness, addiction, learning disability, or brain injury. Further, the company provides other services that include education and children's services for children and young people with special education needs; adult and elderly care services; and care first services for employees.

As of December 31, 2016, the company operated a network of 573 behavioral healthcare facilities with approximately 17,100 beds. Acadia Healthcare Company, Inc. was founded in 2005 and is headquartered in Franklin, Tennessee. Shares of Acadia Healthcare Company, Inc. are publicly traded on the Nasdaq under the ticker symbol ACHC.

**Addus HomeCare Corporation ("ADUS") -** Addus HomeCare Corporation provides personal care services to older adults and younger disabled persons in the United States. The company's personal care services offer adult day care and assistance with activities of daily living. Its services include assistance with bathing, grooming, oral care, skincare, assistance with feeding and dressing, medication reminders, meal planning and preparation, housekeeping, and transportation services, as well as other activities of daily living. The company serves individuals who are at risk of hospitalization or institutionalization, such as the elderly, chronically ill, and disabled. Its payor clients include federal, state, and local governmental agencies; managed care organizations; commercial insurers; and private individuals.

PAREDES-0000098

As of December 31, 2016, the company provided its services through 114 individual agencies located in 24 states. Addus HomeCare Corporation was founded in 1979 and is based in Downers Grove, Illinois. Shares of Addus HomeCare Corporation are publicly traded on the Nasdaq under the ticker symbol ADUS.

**Magellan Health, Inc. ("MGLN")** - Magellan Health, Inc. engages in the healthcare management business in the United States. The company's healthcare segment engages in the management of behavioral healthcare services and employee assistance program services; management of other specialty areas, including diagnostic imaging and musculoskeletal management; and the integrated management of physical, behavioral, and pharmaceutical healthcare for special populations comprising individuals with serious mental illness, dual eligibles, long-term services and supports, and other populations with unique and often complex healthcare needs. This segment provides its healthcare services through its comprehensive network of medical and behavioral health professionals, clinics, hospitals, and ancillary service providers.

The company offers its services to health plans and other managed care organizations, employers, labor unions, various military and governmental agencies, and third party administrators. Magellan Health, Inc. was founded in 1969 and is based in Scottsdale, Arizona. Shares of Magellan Health, Inc. are publicly traded on the Nasdaq under the ticker symbol MGLN.

**The Providence Service Corporation ("PRSC")** - The Providence Service Corporation, through its subsidiaries, provides critical healthcare and workforce development services public and private sector entities in the United States and internationally. The company's non-emergency transportation services segment offers non-emergency medical transportation services for Medicaid or Medicare eligible members, whose limited mobility or financial resources hinder their ability to access necessary healthcare and social services. Its workforce development services segment offers workforce development and legal reoffender rehabilitation services, including employment preparation and placement, apprenticeship and training, youth community service programs, and other health related services to clients on behalf of governmental and private entities. This segment serves unemployed, disabled, and individuals seeking new skills, as well as individuals that are coping with medical illnesses, newly graduated from educational institutions, and those that have been released from incarceration.

The company was founded in 1996 and is headquartered in Stamford, Connecticut. Shares of The Providence Service Corporation are publicly traded on the Nasdaq under the ticker symbol PRSC.

**Universal Health Services, Inc. ("UHS")** - Universal Health Services, Inc., through its subsidiaries, owns and operates acute care hospitals, behavioral health facilities, and ambulatory centers. The company's hospitals offer general and specialty surgery, internal medicine, obstetrics, emergency room care, radiology, oncology, diagnostic care, coronary care, pediatric services, pharmacy services, and/or behavioral health services. As of February 28, 2017, it owned and/or operated 26 inpatient

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000099

acute care hospitals, 4 free-standing emergency departments, 1 surgical hospital, and 319 inpatient and 33 outpatient behavioral health care facilities located in 37 states, Washington, D.C.; the United Kingdom; Puerto Rico; and the U.S. Virgin Islands.

Universal Health Services, Inc. was founded in 1978 and is headquartered in King of Prussia, Pennsylvania. Shares of Universal Health Services, Inc. are publicly traded on the NYSE under the ticker symbol UHS.

### General Trading Data

In the following chart we have summarized the general trading data as of the valuation date for the selected guideline companies, including the respective exchange on which the shares are traded, fiscal year end, market price per share, number of shares outstanding, and market value of the total outstanding common shares.

| | | | | | **Fully Diluted** | |
| | | | Form 10-K | Price Per | Shares | Market Value |
| Company | Exchange | Symbol | Date | Share | Outstanding | of Equity |
|---|---|---|---|---|---|---|
| AAC Holdings, Inc. | NYSE | AAC | 31-Dec | $9.13 | 23,872,436 | $217,955,341 |
| Acadia Healthcare Company, Inc. | Nasdaq | ACHC | 31-Dec | $32.85 | 87,172,114 | $2,863,168,084 |
| Addus HomeCare Corporation | Nasdaq | ADUS | 31-Dec | $34.80 | 11,785,000 | $410,118,000 |
| Magellan Health, Inc. | Nasdaq | MGLN | 31-Dec | $97.85 | 25,309,000 | $2,476,485,650 |
| The Providence Service Corporation | Nasdaq | PRSC | 31-Dec | $59.25 | 13,418,640 | $794,987,327 |
| Universal Health Services, Inc. | NYSE | UHS | 31-Dec | $114.22 | 94,900,523 | $10,839,537,737 |

General Information
**Public Guideline Companies**
As of December 31, 2017

The shares of each of the guideline companies are freely and actively traded. AAC Holdings, Inc. is the smallest in terms of market value of equity, and Universal Health Services, Inc. the largest. Studies have shown that larger public companies (on average) have higher price earnings multiples than smaller companies. Since the Company is smaller than the guideline companies, an investor would expect a lower price-earnings multiple (unadjusted) for the Company than that for the guideline companies, other things being equal.

PAREDES-0000100

*Comparisons of Guideline Companies*
*With The Subject Company - Overview*

We compared each of the guideline companies to the subject Company based on a variety of criteria for the purpose of ultimately drawing conclusions as to appropriate valuation multiples to be used. Comparison criteria included size, lines of business and diversification, key person issues, financial performance, risks, and opportunities. The following section highlights some of the key issues identified, followed by a discussion of valuation conclusions.

*Specific Comparisons*

**FINANCIAL STRENGTH** – The following table summarizes income statement data, balance sheet data, and financial ratios of the various public comparables and compares them to the Company.

PAREDES-0000101

### Financial Comparison of Public Guideline Companies to the Subject Company
#### As of December 31, 2017

| Comparable Companies | AAC | ACHC | ADUS | MGLN | PRSC | UHS | CPES |
|---|---|---|---|---|---|---|---|
| **Income Statement Data** | | | | | | | |
| Sales | $ 317,641,000 | $ 2,836,316,000 | $ 425,715,000 | $ 5,838,583,000 | $ 1,623,882,000 | $10,409,865,000 | $ 54,677,906 |
| Cost of Goods Sold | - | - | 310,119,000 | 4,625,680,000 | 1,489,044,000 | 6,085,733,000 | - |
| Gross Profit | 317,641,000 | 2,836,316,000 | 115,596,000 | 1,212,903,000 | 134,838,000 | 4,324,132,000 | 54,677,906 |
| EBIT | (13,294,000) | 412,805,000 | 26,456,000 | 155,314,000 | 65,482,000 | 1,268,843,000 | 2,191,407 |
| Interest | 16,811,000 | 176,007,000 | 4,406,000 | 20,090,000 | 1,278,000 | 133,834,000 | 172,328 |
| Pre-Tax Profit | (30,105,000) | 236,798,000 | 22,050,000 | 135,224,000 | 64,204,000 | 1,135,009,000 | 2,019,079 |
| Net Income | (21,073,500) | 165,758,000 | 15,435,000 | 94,656,800 | 44,942,800 | 794,506,300 | 1,413,355 |
| Tax Rate | 30% | 30% | 30% | 30% | 30% | 30% | 30% |
| Depreciation & Amortization | 21,504,000 | 143,010,000 | 6,663,000 | 115,706,000 | 26,469,000 | 447,765,000 | 721,950 |
| Fully Diluted Shares Outstanding | 23,872,436 | 87,060,114 | 11,632,000 | 24,202,000 | 13,347,466 | 94,227,523 | 912,435 |
| Earnings Per Share | (0.88) | 1.90 | 1.33 | 3.91 | 3.37 | 8.43 | 1.55 |
| Revenue Per Share | 13.31 | 32.58 | 36.60 | 241.24 | 121.66 | 110.48 | 59.93 |
| **Balance Sheet Data** | | | | | | | |
| Cash | $ 13,818,000 | $ 67,290,000 | $ 53,754,000 | $ 709,310,000 | $ 95,310,000 | $ 74,423,000 | $ 4,491,115 |
| Accounts Receivable | 94,096,000 | 360,024,000 | 88,952,000 | 660,775,000 | 164,685,000 | 1,500,898,000 | 5,173,714 |
| Inventory | - | 4,787,000 | - | 40,945,000 | - | 136,177,000 | - |
| Current Assets | 111,936,000 | 471,550,000 | 151,085,000 | 1,483,353,000 | 296,329,000 | 1,798,002,000 | 10,146,016 |
| Total Assets | 428,275,000 | 6,424,502,000 | 267,110,000 | 2,957,234,000 | 704,090,000 | 10,761,828,000 | 19,705,121 |
| Current Liabilities | 60,569,000 | 377,389,000 | 52,170,000 | 892,303,000 | 226,930,000 | 1,848,034,000 | 3,258,719 |
| Working Capital | 51,367,000 | 94,161,000 | 98,915,000 | 591,050,000 | 69,399,000 | (50,032,000) | 6,887,297 |
| Interest Bearing Debt | 225,714,000 | 3,239,888,000 | 42,959,000 | 853,737,000 | 2,984,000 | 4,040,009,000 | 4,026,753 |
| Shareholder's Equity | 136,168,000 | 2,595,288,000 | 175,080,000 | 1,276,494,000 | 336,017,000 | 5,051,436,000 | 12,900,191 |
| Shareholder's Equity Per Share | 5.70 | 29.81 | 15.05 | 52.74 | 25.17 | 53.61 | 14.14 |
| **Financial Ratios** | | | | | | | |
| *Leverage:* | | | | | | | |
| Assets to Equity | 3.15 | 2.48 | 1.53 | 2.32 | 2.10 | 2.13 | 1.53 |
| Total Liabilities to Equity | 2.15 | 1.48 | 0.53 | 1.32 | 1.10 | 1.13 | 0.53 |
| EBIT to Interest | (0.79) | 2.35 | 5.92 | 5.98 | 51.24 | 9.47 | 12.72 |
| *Liquidity:* | | | | | | | |
| Current Ratio | 1.85 | 1.25 | 2.90 | 1.66 | 1.31 | 0.97 | 3.11 |
| Quick Ratio | 1.78 | 1.13 | 2.74 | 1.54 | 1.15 | 0.85 | 2.97 |
| Sales to Working Capital | 6.18 | 30.12 | 4.30 | 9.88 | 23.40 | (208.06) | 7.94 |
| *Activity:* | | | | | | | |
| Accounts Receivable Turnover (Days) | 108.00 | 46.30 | 76.20 | 41.30 | 37.00 | 52.60 | 34.50 |
| *Asset Utilization:* | | | | | | | |
| Revenues/Total Assets | 0.74 | 0.44 | 1.59 | 1.97 | 2.31 | 0.97 | 2.78 |
| *Profitability:* | | | | | | | |
| EBIT Margin (% of sales) | -4.2% | 14.6% | 6.2% | 2.7% | 4.0% | 12.2% | 4.0% |
| Pre-Tax Return on Total Assets | -7.0% | 3.7% | 8.3% | 4.6% | 9.1% | 10.5% | 10.2% |
| Pre-Tax Return on Equity | -22.1% | 9.1% | 12.6% | 10.6% | 19.1% | 22.5% | 15.7% |

CPES compared favorably to the public guideline companies in various financial measurements. Specifically, the Company compared favorably in terms of its interest coverage ratio, receivable turnover ratio, asset utilization, and pre-tax returns on total assets and shareholders' equity. The Company also compared favorably to the public guideline companies in terms of liquidity.

Based on our analysis of operating results and financial positions the comparable companies are reasonable for use as publicly traded guidelines.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000102

**SIZE –** The following chart compares the revenues of the various public comparables to those of the Company:

| Size Comparison<br>As of December 31, 2017 | | |
|---|---|---|
| **Company** | **Annual Revenues** | **Times Larger Than Subject** |
| AAC Holdings, Inc. | $317,641,000 | 6 |
| Acadia Healthcare Company, Inc. | $2,836,316,000 | 52 |
| Addus HomeCare Corporation | $425,715,000 | 8 |
| Magellan Health, Inc. | $5,838,583,000 | 107 |
| The Providence Service Corporation | $1,623,882,000 | 30 |
| Universal Health Services, Inc. | $10,409,865,000 | 190 |
| **Subject Company** | **$54,677,906** | |

The above comparison suggests that AAC Holdings, Inc. is the closest to the subject company in terms of annual revenues. However, each of the guideline companies is within a reasonable size range of the Company for valuation purposes. In *"Adjusting Price/Earnings Ratios For Differences In Company Size-An Update," Business Valuation Review* (September, 1995) by Mr. Jerry O. Peters, AM, the price/earnings multiple of public companies with market values of $25 million or less traded at an average 25.8% discount to those with market values of $50.1 million to $99.9 million. Similar findings have been noted in the annual studies of public equity performance published by Ibbotson Associates.

While there are many possible reasons for the differences in returns (market clout, market share, quality and depth of management, greater access to debt and equity capital, greater public awareness, etc.), the studies suggest that size alone is an important factor in determining returns required by investors. Investors perceive the risks associated with small stocks to be greater, and hence, require greater returns.

In the article "Adjusting Valuation Multiples for Size," published in *Valuation Strategies* (September/ October 2001), the authors outline a procedure for adjusting for size differences. The procedure uses empirical data from stock markets to determine the effect of size on valuation multiples and then adjusts guideline company multiples for those effects. The procedure results in market derived valuation multiples that are appropriate for the subject company.

PAREDES-0000103

Other factors being equal with the guideline companies, we would normally expect an investor to require a higher return on an investment in the Company, because of its smaller size. We typically make adjustments to the valuation multiples of the public companies for the differences in size based on empirical market evidence published by Duff & Phelps. The *Duff & Phelps Handbook* quantifies the differences in historical returns of publicly traded companies based on several size measures. In the case of the subject company, we decreased the selected multiple (when appropriate) to reflect the differences in size between the Company and the selected guideline companies.

**PROFITABILITY, RETURN ON EQUITY** – A high net profit margin can be an indicator of effective management. The ultimate return on equity that a company provides is a function of profitability, efficient asset utilization, and effective use of financial leverage. The Dupont Profitability Analysis ("DPA") is commonly used to analyze the various components of a company's return on equity. DPA enables an investor to analyze return on equity by looking at the components as follows:

| Comparative DuPont Profitability Analysis of Pre-Tax Return on Equity<br>As of December 31, 2017 | | | | |
|---|---|---|---|---|
| | Pre-Tax Profit Margin[1] | Times: Asset Turnover[2] | Times: Leverage[3] | Equals: Return On Equity[4] |
| AAC Holdings, Inc. | -9.50% | 0.74 | 3.15 | -22.20% |
| Acadia Healthcare Company, Inc. | 8.30% | 0.44 | 2.48 | 9.08% |
| Addus HomeCare Corporation | 5.20% | 1.59 | 1.53 | 12.68% |
| Magellan Health, Inc. | 2.30% | 1.97 | 2.32 | 10.53% |
| The Providence Service Corporation | 4.00% | 2.31 | 2.10 | 19.37% |
| Universal Health Services, Inc. | 10.90% | 0.97 | 2.13 | 22.45% |
| Median | 4.60% | 1.28 | 2.23 | 11.61% |
| **Subject Company** | **3.70%** | **2.78** | **1.53** | **15.71%** |

[1] *Adjusted pre-tax profit divided by net sales.*
[2] *Net sales divided by total assets.*
[3] *Total assets divided by total shareholders' equity.*
[4] *Pre-tax profit divided by total shareholders' equity.*

PAREDES-0000104

CPES' pre-tax profit margin and leverage ratio were below the respective medians of the public guideline companies, while its asset turnover ratio was above the median of the publicly traded guideline companies. The overall result is a positive pre-tax return on equity, which compared favorably to the median of the public guideline companies.

**GROWTH RATES** – A higher expected rate of growth typically increases the value of an entity. Frequently, expected growth is estimated based on historical growth rates. The Company's historical growth in revenue and earnings is compared to the guideline companies in the table below:

| Revenue and Earnings Growth Rate Comparisons | | | |
|---|---|---|---|
| As of December 31, 2017 | | | |
| | Revenue Growth[1] | Earnings Growth[1] | Earnings Growth Estimates[2] |
| AAC Holdings, Inc. | 13.50% | -332.50% | 20.00% |
| Acadia Healthcare Company, Inc. | 0.90% | 618.50% | 9.62% |
| Addus HomeCare Corporation | 6.20% | 38.50% | 15.00% |
| Magellan Health, Inc. | 20.70% | -7.10% | 7.85% |
| The Providence Service Corporation | 2.80% | 3518.70% | 12.00% |
| Universal Health Services, Inc. | 6.60% | -1.80% | 9.06% |
| **Subject Company** | **1.60%** | **-6.90%** | |

[1] *Most recent fiscal year end.*
[2] *Analysts' consensus expected long-term growth in diluted earnings per share.*

CPES' revenue increased approximately 1.6%, while earnings decreased 6.9% for the year ended December 31, 2017. The revenue growth rates for the selected public guideline companies ranged from 0.9% to 20.7% and the earnings growth rates for the selected public guideline companies ranged from negative 332.5% to positive 3,518.7%.

In the article, "Adjusting Pricing Multiples for Expected Growth," published in *Business Appraisal Practice* (Spring 2000), the authors, Stephen J. Bravo and Michael Mattson, outline a procedure for adjusting for growth differences between guideline companies and subject companies. The procedure uses established financial analysis to determine the effect of growth on valuation multiples and then adjusts guideline company multiples for those effects. The procedure results in market derived valuation multiples that are more applicable to the subject company. When appropriate, we have adjusted the valuation multiples for differences in expected growth.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000105

**BUSINESS OPPORTUNITIES, DIVERSIFICATION & OTHER FACTORS –** There appear to be no significant differences between the comparable companies and CPES with respect to business opportunities and customer diversification, as all are involved principally in the same or similar business.

### Summary of Market Valuation Multiples

Our analysis does not identify any of the guideline companies as being more comparable than the others. Using the information reported in the respective 10Q's and 10K's, we calculated certain relevant valuation multiples for each of the guideline companies. We considered, calculated, and adjusted several different multiples, including price to earnings, price to revenue, market value of invested capital ("MVIC") to earnings before interest and taxes ("EBIT"), MVIC to earnings before interest, taxes, depreciation and amortization ("EBITDA"), as well as others. As part of our analysis, we adjusted the guideline multiples for extraordinary and non-recurring items, as well as for growth and size as appropriate.

Due to AAC Holdings, Inc. reporting negative earnings for the most recent fiscal year end, we did not utilize its valuation multiples in our determination of an appropriate valuation multiple for CPES as it does not provide a meaningful indication of value under the guideline public company method.

The following table summarizes the valuation multiples for each of the public companies, based on the stock prices shown earlier, and the financial data in the preceding tables:

**Public Guideline Company Market Valuation Multiples**
**(Adjusted for Differences in Size and Growth)**
As of December 31, 2017

| | ACHC | ADUS | MGLN | PRSC | UHS | 25th Percentile | Avg. | 75th Percentile | Med. | Coef. of Var. | Selected Multiple |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Price to Revenue | 0.65 | 0.63 | 0.19 | 0.31 | 0.63 | 0.31 | 0.48 | 0.63 | 0.63 | 0.45 | |
| Price to Earnings | 8.63 | 12.52 | 9.21 | 8.97 | 6.83 | 8.63 | 9.23 | 9.21 | 8.97 | 0.22 | |
| MVIC to Revenue | 1.59 | 0.74 | 0.27 | 0.32 | 0.90 | 0.32 | 0.76 | 0.90 | 0.74 | 0.70 | |
| MVIC to EBIT | 7.66 | 9.18 | 7.84 | 6.75 | 6.04 | 6.75 | 7.50 | 7.84 | 7.66 | 0.16 | **6.50** |
| MVIC to EBITDA | 6.02 | 7.64 | 4.87 | 5.01 | 4.67 | 4.87 | 5.64 | 6.02 | 5.01 | 0.22 | |

*Avg.=Average*
*Med.=Median*
*Coef. of Var.= Coefficient of Variation, Standard Deviation divided by the Average.*

### Multiples Chosen & Resulting Conclusions

We concentrated our analysis on the guideline companies' MVIC to EBIT multiple, which is determined by dividing the total market value of a Company's invested capital (debt and equity) by its annual earnings before interest and taxes. We used this multiple because it is a widely recognized and utilized valuation multiple, and an investor would likely give it significant consideration. For the guideline companies we determined that the median multiple adjusted downwards was most applicable because the Company's restricted access to capital markets and limited geographic diversification in comparison to the publicly traded guideline companies. We applied an average EBIT margin during the five year forecast period (years ending December 31, 2018 through 2022) to the Company's forecast net revenue for the year ending December 31, 2018.

Our computation of an indication of value based on the publicly traded guideline companies is as follows:

---

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000107

## Guideline Public Company Method
### As of December 31, 2017

| | |
|---|---:|
| Earnings Before Interest and Taxes[1] | $ 1,763,866 |
| Multiply by MVIC to EBIT Multiple | 6.50 |
| Indication of Enterprise Value | 11,465,128 |
| Less Interest Bearing Debt[2] | (4,026,753) |
| **Indication of the Value of Operating Equity** | **$ 7,438,375** |
| Non-Operating assets, Controlling Basis[3] | 1,700,000 |
| **Indication of the Value of Total Equity, Controlling Basis** | **$ 9,138,375** |
| **Rounded** | **$ 9,138,000** |

[1] Reflects the average EBIT margin of 3.7% during the forecast period, indicated under the income approach, applied to the forecast revenue for the year ending December 31, 2018. For purposes of determining an appropriate EBIT amount under the market approach, we estimated an EBIT margin into perpetuity based on the average adjusted EBIT margin during the forecast period (2018 through 2022) as indicated under the income approach (see "Computation of Estimated Future Cash Flows to Invested Capital" table).

[2] From audited and consolidated financial statements (draft) as of and for the year ended December 31, 2017.

[3] Reflects non-operating assets on a controlling basis (see discussion under the Cost Approach).

CONFIDENTIAL!

PAREDES-0000108

## COST APPROACH

The cost approach (or asset-based approach) is based on the economic principle of substitution. When properly applied, cost approach methods are some of the more complex and rigorous valuation analyses.

However, the theoretical underpinning of this approach is simple: the value of the business enterprise is the value of all of the subject business assets (both tangible and intangible) less the value of all of the subject business liabilities (both recorded and contingent). Basically, this approach recognizes that all of the economic value of a business comes from, and can be identified with, the productive assets of the business.

The cost approach involves adjusting the Company's individual assets and liabilities up or down to reflect their fair market value, taking into account tangible and intangible assets and any contingent liabilities. Tangible assets can be easily appraised and their actual balance sheet values adjusted to reflect the results accordingly. However, it can be difficult to individually quantify the fair market value of intangible assets such as the name, reputation, trained workforce, and other factors. As such, the cost approach generally is less preferred when valuing a profitable operating company.

### Cost Method Considered

**Adjusted Net Assets –** The adjusted net assets method is an asset-based method. It is used to value a business based on the fair market value of the underlying assets and liabilities. Using this method, the valuator adjusts the book value of the company's assets and liabilities to their fair market values. Both tangible and intangible assets and liabilities are adjusted as needed. Appropriate valuation adjustments are applied to the "net assets" to arrive at final indication of value.

This method of valuation is most appropriately applied in situations where the subject company is an investment company, a holding company, or a company that is marginally profitable. In addition, this method can be used when a significant portion of the company's assets is composed of liquid assets or other investments (such as real estate investments).

## NON-OPERATING ASSETS

In the course of forming an opinion of value, we segregate a company's operations from any non-operating assets and liabilities, as well as any revenue or expenses that the non-operating items may generate. We typically value such assets using the asset approach and add that value to the value of the operations arrived at using other methods.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000109

**Non-Operating Working Capital -** We estimated that CPES had approximately $1.7 million of excess working capital as of the date of valuation. As such, we added this amount as a non-operating asset to arrive at a preliminary indication of value. We determined the amount of the Company's excess working capital as follows:

| Non-Operating Working Capital As of December 31, 2017 | |
|---|---:|
| Current Assets[1] | $ 10,146,016 |
| Less Current Liabilities[1] | (2,778,177) |
| Actual Working Capital | $ 7,367,839 |
| Revenues[1] | $ 54,677,906 |
| Divided by Industry Normalized Sales to Working Capital Ratio[2] | 10.00 |
| Normalized Working Capital | $ 5,467,791 |
| Preliminary Estimated Non-Operating Working Capital | 1,900,048 |
| **Estimated Non-Operating Working Capital[3]** | **$ 1,700,000** |

[1] From audited and consolidated financial statements (draft) as of and for the year ended December 31, 2017.

[2] Based on RMA median sales to working capital ratio for NAICS classification code 623210 and guideline companies' similar ratios.

[3] Based on consideration of the Company's actual working capital balance and a normalized working capital based on an industry median sales to working capital ratio.

### RECONCILIATION

As stated previously, we used the income and the market approaches to arrive at an opinion of value of a 100% equity interest in CPES. We arrived at two different but similar indications of value under the two approaches. The computations under these two approaches are found previously in this report.

In this case, we considered the income approach to be superior to the market approach, as it focuses directly on the expected future cash flow of the Company. As such, we gave more consideration to the income approach in the formation of our opinion.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000110

Our computation and opinion of value based on our consideration of these approaches is as follows:

### Reconciliation of Value
#### As of December 31, 2017

| | Indicated Values | | Weights | | Weighted Amounts |
|---|---|---|---|---|---|
| Income Approach[1] | $ 8,243,000 | X | 75% | = | $ 6,182,250 |
| Market Approach[2] | $ 9,138,000 | X | 25% | = | $ 2,284,500 |
| Total | | | 100% | | $ 8,466,750 |

[1] From the "Discounted Cash Flows Method" table.

[2] From the "Guideline Public Company Method" table.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000111

# ADJUSTMENTS TO PRELIMINARY VALUE

The subject interest of this valuation report is a controlling interest in an S-corporation. It is commonly recognized and well documented that a non-controlling interest generally sells at a price less than a similar interest that has control. Also, an interest that is not readily marketable generally trades at a price lower than a similar interest that is readily marketable.

When an interest lacks certain elements of control and marketability, two discounts are generally appropriate. They are commonly referred to as the discount for lack of control (a.k.a. minority discount) and the discount for lack of marketability.

### *ADJUSTMENTS BASED ON CONTROL FACTORS*

Non-controlling interests in companies are typically less valuable on a per share basis than a controlling interest with all other things being equal. An adjustment for lack of control is defined as:

> An amount or percentage deducted from the pro rata share of value of one hundred percent (100%) of an equity interest in a business to reflect the absence of some or all of the powers of control.

An analysis of merger transactions reveals that controlling interests acquired in mergers typically sell at a premium from their respective publicly traded minority price. The observed premiums suggest that a discount would be applicable when valuing equity interests using methods that result in a control indication of value.

There are many reasons why a control position in a company is typically worth more on a pro-rata basis than a minority position. Some of these reasons are embodied in the rights of controlling shareholders that can:

- Elect directors
- Select and/or remove management
- Set dividend policies
- Establish compensation and benefits
- Set corporate strategies and goals
- Acquire and liquidate assets
- Self-dissolve, or recapitalize the company
- Revise articles of incorporation and bylaws
- Establish or change buy-sell agreements or clauses
- Go public
- Acquire or merge with another company

It is important to note that a controlling interest in the Company possesses all of the rights mentioned above.

PAREDES-0000112

The existence or absence of control can be measured by assessing the amount of influence that can be exerted over business decisions. When assessing control it is important to consider the following factors:

- **Relative Ownership Distribution –** The size of the block of stock being valued in relation to other blocks is important in establishing the degree of control. In a corporation that has hundreds of shareholders, a 20% interest can have a tremendous amount of control while in a corporation with only two shareholders, the owner of a 20% interest can have no control. If there are two shareholders, each owning 50%, neither has absolute control, but both have the ability to block any decision requiring a majority vote.

- **Swing Vote Characteristics –** The existence of "swing vote" characteristics can significantly impact the value of a particular ownership interest. For instance, in a situation where a corporation has only three shareholders, two of them owning 49% each and the third owning 2%, the 2% owner can effectively exert significant control by casting the "swing vote."

- **Supermajority Statutes –** Many states require a supermajority vote, usually 66 2/3%, before certain actions, such as a merger, can take place. In situations requiring a supermajority, a single owner with only a 34% interest is able to "block" the actions of the majority owner(s).

- **Minority Dissolution Statutes –** Some states permit minority interests to sue for dissolution. The specific applicable circumstances and size of the interest varies by state.

- **Articles of Incorporation, Bylaws, and Organizational Agreements –** The rights and restrictions of shareholders contained in the articles of incorporation, bylaws, and organizational agreements can vary greatly from company to company. Such rights and restrictions can affect the ability to control or influence an entity in innumerable ways. The rights and restrictions that are most commonly addressed in organizational documents involve voting rights such as:

  - **Nonvoting Stock –** A holder of nonvoting stock has little influence over the affairs of a corporation. If the holder cannot vote for board members or any other matter that requires a vote of the shareholders, such a holder has no control and little or no influence over the company, even if a shareholder has 99% of the outstanding shares.

  - **Cumulative Voting –** Cumulative voting is a system whereby shareholders are allowed votes in proportion to their ownership percentage. The effect of cumulative voting can be illustrated by considering a vote of shareholders to elect direc-

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000113

tors. Under cumulative voting, a 20% owner can elect 20% of the board members. In situations where cumulative voting is not present, a 51% owner can elect all of the board members and deny board representation to all others. In some states, cumulative voting is mandated by statute.

- ◆ **Contractual Agreements –** Certain contractual arrangements may also restrict control. A shareholders' agreement may preclude shareholders from exerting certain rights. Additionally, shareholders may forfeit the right to do certain things, such as obtaining additional debt.

In order to quantify the appropriate adjustment for lack of control, we analyzed general minority interest discounts that have been derived based on public company acquisitions. These acquisitions were of control positions in publicly traded companies whose stocks traded on a minority basis. In most cases, an acquiring company will pay a "control" or "merger" premium over and above the market price per share of stock of the company to be acquired. By quantifying this control premium, it is possible to then determine the implied discount for lack of control.

*The Mergerstat Control Premium Study, ("Mergerstat" or "the Study")* published by Mergerstat L.P., provides information on merger premiums. It analyzes premiums offered for controlling positions in acquisitions of certain publicly traded companies. Such premiums are computed by taking the difference between the merger offering price and the trading price prior to the announcement of the merger.

From this control price information, *Mergerstat* algebraically derives the implied minority interest discount for each transaction using the following formula:



**Formula for Converting Premiums Paid to Implied Discounts**

$$\text{Implied Discount} = 1 - \frac{1}{(1 + \text{Premium Paid})}$$

*Mergerstat* provides the following historical premiums paid in merger transactions and the respective implied discounts:

| Years of Study | % Median Merger Premium Offered | Implied Minority Interest Discount | Number of Transactions |
|---|---|---|---|
| 2007 | 20.4% | 16.9% | 777 |
| 2008 | 31.4% | 23.9% | 680 |
| 2009 | 43.7% | 30.4% | 448 |
| 2010 | 36.9% | 27.0% | 384 |
| 2011 | 35.1% | 26.0% | 622 |
| 2012 | 37.1% | 27.1% | 518 |
| 2013 | 32.4% | 24.5% | 452 |
| 2014 | 27.2% | 21.4% | 489 |
| 2015 | 31.8% | 24.1% | 540 |
| 2016 | 32.2% | 24.4% | 534 |
| Ten Year Average | 32.8% | 24.6% | 544 |

The ten-year average implied minority interest discount based on the Mergerstat Studies is 24.6%.

The previous analysis indicates that the application of a lack of control discount is generally appropriate in valuing a non-controlling interest. However, if a company is valued using methods based on earnings or cash flows to a minority owner, the resulting value is inherently a non-controlling interest. Conversely, if a company is valued using methods based on earnings or cash flows to a controlling owner, the resulting value is inherently a controlling value.

An investor typically perceives certain quantitative and qualitative advantages to owning a controlling equity interest as opposed to a non-controlling equity interest. Quantitatively, a control owner can dictate the available cash flow by setting levels of compensation and perquisites, determine the capital structure of a company, and dictate other similar discretionary items. Qualitatively, the controlling owner can set policy, elect the board of directors, and change organizational documents. In determining our preliminary controlling per share value of the Company we did not make any adjustments to the earnings or cash flows representing quantitative control benefits. Therefore, we added a control premium of 15% to the preliminary indication of value for CPES, representing the quantitative and qualitative control benefits.

### ADJUSTMENT FOR THE LACK OF MARKETABILITY

Market based methods are often computed using data from studies of securities traded on national exchanges. There are, however, certain marketability differences between an investment in CPES and publicly traded securities. An owner of publicly traded securities can know at all times the market value of his/her holding. The investor can sell that holding on virtually a moment's notice and receive cash, net of brokerage fees, within several working days.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000115

Such is not the case with CPES. Consequently, liquidating a position in the Company would be a more costly and time-consuming process than liquidating an investment in a publicly traded firm. The value of holding any investment is what could be generated from that investment net of the costs of liquidating the investment.

Numerous studies have been conducted on the lack of marketability ("LOM") and have followed two broad approaches to do so:

**Restricted Stock Approach –** "Restricted shares" (also called "letter stocks" or "restricted stock") generally possess the same attributes as freely-traded shares, except that they are restricted from sale on the open market for a specified time period (usually one or two years).

It is generally accepted that the primary difference between freely-traded shares and their restricted counterparts is the relative LOM for the restricted shares. Consequently, the price differences between the two types of shares are cited as measures of the lack of marketability.

From the mid-1960's through the late-1990's, various studies were performed that quantified the value differences between freely-traded common shares of certain public companies and their restricted shares. Studies in this category include the SEC Institutional Investor Study and the Moroney Study, among others.

Restricted stock studies can provide compelling evidence about the lack of marketability of an ownership interest. When relying upon restricted stock studies to determine a discount for lack of marketability, it is important to compare the characteristics of the companies that make up the studies to those of the Company. Revenue Ruling 77-287 amplified Revenue Ruling 59-60 and presents guidelines for valuing restricted securities. This is a good source of information concerning the characteristics of restricted stocks and the companies that issue those types of securities.

RR 77-287 defines a restricted security as follows:

> "… these particular securities cannot lawfully be distributed to the general public until a registration statement relating to the corporation underlying the securities has been filed, and has also become effective under the rules promulgated and enforced by the United States Securities and Exchange Commission (SEC) pursuant to the Federal securities laws."

The following chart summarizes the attributes of restricted stocks listed in Revenue Ruling 77-287 and compares them to the Company:

PAREDES-0000116

## Comparison of Attributes to Restricted Securities

| Common Attributes of Restricted Securities | Positive | Negative | Neutral |
|---|---|---|---|
| Piggyback option to register stock with next registration statement | | X | |
| Option to require registration at seller's expense | | X | |
| Option to require registration at buyer's expense | | X | |
| Right to receive continuous disclosure of information | | X | |
| Right to select one or more directors | | X | |
| Option to purchase additional shares of issuer's stock | | X | |
| Provision giving the buyer the right to a greater voice in operations | | X | |
| Approximately 1 year until marketability | | X | |
| Underlying company is already public | | X | |
| Audited financial statements | | | X |

*Note: This chart compares the attributes of the Company to restricted securities. Each attribute is rated positive, negative, or neutral, depending on whether the respective attribute for the Company's stock is superior, inferior, or the same as representative restricted securities.*

Revenue Ruling 77-287 states that "certain provisions are often found in agreements between buyers and sellers that affect the size of discounts at which restricted stocks are sold." If the above factors, which are fairly common in restricted securities, would reduce the discount, then the absence of these attributes would surely support a discount. This is clearly the case with the Company as the previous chart illustrates.

As part of our analysis related to the lack of marketability for the Company's stock, we considered a number of restricted stock studies and analyses. We have provided a summary of each of the studies as follows:

1. *Institutional Investor Study Report of the Securities and Exchange Commission,* H.R. Doc. 92-64 (Vol. 5), 92nd Cng., 1st Sess., 1971 – Based on more than 300 private transactions of the restricted stocks of corporations that had shares of the same class of stock which were publicly traded. Found that the mean average discount for all restricted stock transactions studied was 25.8%. Found that the mean average discount of restricted stock transactions of over-the-counter non-reporting companies studied was 32.6%.

2. *An Economist-Financial Analyst's Approach to Valuing Stock of a Closely Held Company,* Milton Gelman, *Journal of Taxation*, June, 1972 – Based on 4 registered closed-end investment companies that held a total of 89 blocks of restricted securities. Gelman found that the mean average discount for all restricted stock transactions studied was 33.0%.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000117

3. *Estimation of the Discount Associated with the Transfer of Restricted Securities,* Robert Trout, *Taxes*, June, 1977 – Based on 6 registered mutual companies that held a total of 60 blocks of restricted securities. Trout found that the mean average discount for all restricted stock transactions studied was 33.5%.

4. *Most Courts Overvalue Closely Held Stocks,* Robert Moroney, *Taxes*, March, 1973 – Based on 10 registered investment companies that held a total of 148 blocks of restricted securities. Moroney found that cash-purchase discounts averaged 35.6% in comparison to unrestricted equity securities of the same stock.

5. *Discounts for Lack of Marketability for Closely Held Business Interests,* Michael Maher, *Taxes,* September, 1976 –Based on reports filed with the Securities and Exchange Commission by 4 registered mutual companies for 1969 through 1973, with respect to restricted common stock purchased by them. Maher found that the average mean discount was 35.4%. Discounts were derived by comparing the funds' price paid for the stock to the market values of unrestricted securities of the same classes of stock in the same companies on the acquisition days.

6. *Revenue Ruling 77-287 Revisited*, William Pittock and Charles Stryker, *SRC Quarterly Reports*, Spring, 1983 - Pittock and Stryker, of Standard Research Consultants, analyzed 28 private placement transactions of restricted common stock from October 1978 through June 1982. They found that the median average discount for the transactions was 45.0%.

7. *Discounts on Restricted Stock: The Illiquidity on Stock Prices,* William Silber, Financial Analysts Journal, July-August, 1991 - Silber analyzed 69 private placement transactions of restricted common stock from 1981 through 1989. He found that the mean average discount for the transactions was 33.8%.

8. *Strategies for Obtaining the Largest Valuation Discounts*, Lance Hall and Timothy Polacek, *Estate Planning*, January-February, 1994 - Hall and Polacek, of FMV Opinions, Inc., examined over 100 restricted stock transactions from 1979 through 1992. They found that the mean average discount was 22.1%, but provided no description as to the criteria used for the selection of the transactions.

9. *Discounts Seen in Private Placements of Restricted Stock: The Management Planning, Inc. Long-Term Study (1980-1996)*, Robert Oliver and Roy Meyers, *Handbook of Advanced Business Valuation*, 2000 - Oliver and Meyers, of Management Planning, Inc., studied 53 private placement transactions from 1980 through 1996. They found that the mean average discount was 27.1%.

10. *Restricted Stock Discounts, 1991-95*, Bruce Johnson, *Shannon Pratt's Business Valuation Update*, March, 1999 - Johnson studied 72 private placement transactions that occurred in 1991 through 1995. He found that the mean average discount was 20.0%

---

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000118

11. *Restricted Stock Discounts Decline as Result of 1-Year Holding Period,* Kathryn Aschwald, *Shannon Pratt's Business Valuation Update,* May, 2000 - Aschwald and her associates at Columbia Financial Advisors analyzed restricted stock transactions divided into two time periods, January 1, 1996 through April 30, 1997, and May 1, 1997 through December 31, 1998. The first time period was immediately prior to a regulatory reduction by the SEC in the holding period for restricted stock from 2 years to 1 year. The second time period studied was after the 1-year holding period became effective (April 29, 1997).

They found that the mean average discount for the transactions occurring in the first time period was 21.0% and the mean average discount for the transactions occurring in the second time period was 13.0%. It would seem to make sense that the overall discounts for restricted stocks would decrease as a result of this change. However, the number of transactions in the study was limited. In addition, the number of public companies inherent in the studies was even more limited, as many of the transactions studied involved restricted stocks of the same publicly traded company.

**Initial Public Offering Approach –** While there are several "Pre-IPO" lack of marketability discount studies, we actively considered only those studies conducted by Mr. John Emory, ASA, of Robert W. Baird & Co., as they are the most extensive studies and are updated on a regular basis. As opposed to examining restricted stock, Mr. Emory examined the transaction values of privately held company stock (not freely traded) prior to its initial public offering (IPO), and compared them with prices paid for the shares when the company's stock was taken public.

Prospectuses of IPO's are required to disclose the terms of recent past insider transactions in respective company's shares, enabling a comparison of prices before and after "marketability" being achieved via the IPO. For example, if a shareholder disposes of company stock at $6.00 per share and the stock is subsequently brought public at $10.00 per share, Mr. Emory calculates a marketability discount of 40%.

In Mr. Emory's studies, pre-IPO transactions are limited to the five-month period preceding the IPO, implying that most buyers and sellers are aware of the impending IPO and the potential marketability of the stock. In eight separate studies conducted over 18-month periods since 1980, and an expanded study conducted over a 44-month period, Mr. Emory examined 593 companies and found a mean average discount of 46.44% between the pre-IPO trades and the actual IPO price.

The results of the pre-IPO studies appear in the following table. Immediately following the pre-IPO tables is another table that summarizes the results of each of the studies that we considered in determining an appropriate discount for the lack of marketability for the Company.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000119

### Results of Pre-IPO Lack of Marketability Studies (Emory)

| Time Period | Study | Number of Transactions | Average Marketability Discount |
|---|---|---|---|
| January 1980-June 1981 | Robert W. Baird & Co. | 13 | 60.00% |
| January 1985-June 1986 | Robert W. Baird & Co. | 21 | 43.00% |
| August 1987-January 1989 | Robert W. Baird & Co. | 27 | 45.00% |
| February 1989-July 1990 | Robert W. Baird & Co. | 23 | 45.00% |
| August 1990-January 1992 | Robert W. Baird & Co. | 35 | 42.00% |
| February 1992-July 1993 | Robert W. Baird & Co. | 54 | 45.00% |
| January 1994-June 1995 | Robert W. Baird & Co. | 46 | 45.00% |
| November 1995-April 1997 | Robert W. Baird & Co. | 91 | 43.00% |
| May 1997-March 2000( c) | Robert W. Baird & Co. | 53 | 54.00% |
| May 1997-December 2000(b) | Robert W. Baird & Co. | 36 | 48.00% |
| May 1997-December 2000(a) | Robert W. Baird & Co. | 283 | 50.00% |
| | **Total (d)** | **593** | **46.44%** |

*(a) The Expanded Study*
*(b) The Limited Study*
*( c ) The Dot.Com Study*
*(d) To avoid double counting, transactions from the Dot.Com and Limited Study are included only as part of the Expanded Study*

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000120

### Results of Lack of Marketability Studies

| Time Period | Study | Number of Transactions | Average Marketability Discount |
|---|---|---|---|
| **Based on Restricted Shares of Publicly Traded Companies (Restricted Stock Studies):** | | | |
| 1966-69 | SEC Institutional Investor Study (All Companies Studied) | 398 | 25.80% |
| 1966-69 | SEC Institutional Investor Study | Not available | 32.60% |
| | (For Non-reporting OTC Companies – Generally Small) | | |
| 1968-70 | Gelman | 89 | 33.00% |
| 1968-72 | Trout | 60 | 33.50% |
| 1968-72 | Moroney | 148 | 35.60% |
| 1969-73 | Maher | 33 | 35.40% |
| 1971-72 | Arneson | Not available | 35.00% |
| 1978-82 | Stryker and Pittock | 28 | 45.00% |
| 1981-88 | Silber | 69 | 33.80% |
| 1980-97 | FMV Opinions, Inc. | 243 | 22.10% |
| 1980-96 | Management Planning, Inc. | 53 | 27.10% |
| 1981-84 | Willamette Management Associates Study | 33 | 31.20% |
| 1991-95 | Johnson | 70 | 20.00% |
| 1996-97 | Columbia Financial Advisors | 23 | 21.00% |
| 1997-98 | Columbia Financial Advisors | 15 | 13.00% |
| **Based on Shares in Private Companies That Are Subsequently Taken Public (Pre-IPO Studies):** | | | |
| 1980-2000 | Robert W. Baird & Co. Studies | | 46.44% |

Coupled with the aforementioned studies, we considered the following factors in determining an appropriate lack of marketability discount, factors which are outlined in the *Estate of Mandelbaum (T.C. Memo 1995-255, June 12, 1995)* as impacting marketability.

- ◆ *Private vs. public sales of the stock* – The factor was considered by analyzing the sales of similar interests in like companies via the marketability studies discussed earlier.

- ◆ *Financial statement analysis* – We have analyzed the results of operations and other factors. They indicate that the Company experienced modest increases in revenue for the years ended December 31, 2015, 2016, and 2017. The Company's pre-tax profit as a percentage of revenues was approximately 4.0% and 3.7% in 2016 and 2017, respectively, and compared favorably to the industry peer median in both years. CPES generally compared favorably to the industry peers in terms of its financial position. We believe this factor warrants a below average adjustment for lack of marketability.

PAREDES-0000121

- *Company's dividend policy* – The Company did not pay distributions to shareholders during the analysis period. We believe this factor warrants an average adjustment for lack of marketability.

- *Ability to transfer ownership* – Certain restrictions exist on the transferability of CPES common shares. Such restrictions include the right of first refusal. We believe this warrants an above average adjustment for lack of marketability.

- *Amount of control in transferred interests* – Control reflects a shareholder's ability to direct a corporation in its daily operations. Control of a closely-held corporation represents an element of value that justifies a higher value for a controlling block of stock. A non-controlling shareholder's interest has less marketability given its inability to control. We are valuing a controlling interest in the Company. As such, we believe this factor warrants a below average adjustment for lack of marketability because the studies we are using as benchmarks are based on non-controlling interests.

- *Nature of the company, its history, position in the industry and their economic outlook* – The Company has a long history and has a good reputation for providing quality services. The Company receives government funding, and therefore is subject to certain reporting and oversight requirements. The long-term outlook for the industry and economy is generally positive. We believe this factor warrants an average adjustment for the lack of marketability.

- *Company management* – The Company has a management team that is well educated and experienced. We believe this factor warrants an average adjustment for the lack of marketability.

- *Holding period for owner interests* – An investment is less marketable if an investor must hold it for an extended period of time in order to reap a sufficient profit. Market risk increases and marketability decreases as the holding period gets longer. We believe this factor warrants an above average adjustment for lack of marketability.

- *Company redemption policy* – Whether a company has the right to purchase its stock before it is sold to an outsider is another factor to consider when determining the value of a company. This may be particularly critical if the redemption agreement sets a price on the stock. In this instance, the Company has an employee stock ownership plan. Such plans are required by ERISA to contain a "put" option on shares distributed to plan participant. The put option requires the plan to purchase shares distributed to plan participants at fair market value. We believe that the put option associated with the ESOP creates marketability for the shares that would otherwise be non-marketable.

- *Costs associated with making a public offering* - An above average discount may be warranted if the buyer completely bears the cost of registering a private stock. The discount is lessened if the buyer can minimize his or her registration cost. Due to the relative size of the Company, IPO costs would tend to be above average, justifying an above average adjustment for lack of marketability.

### Applicable Discount

The previously identified studies indicate an average discount for the lack of marketability of approximately 35%. Most of the factors discussed previously diminish the marketability of an investment in the common stock of CPES. As part of our determination of the appropriate discount for lack of marketability we also considered the repurchase liability associated with the obligation to repurchase the ESOP shares. Based on the Company's forecast, which includes an allowance for estimated future repurchase liability obligations, the repurchase liability is essentially incorporated into the previously indicated preliminary value conclusion (pre-discount for lack of marketability). Considering estimated future annual repurchase obligation expenses, as indicated in a repurchase liability study, prepared by SES Advisors, the forecasted allowance appears to be sufficient to meet future repurchase obligations.

The overriding factor in the marketability of the Company's stock is the put option that is required under ERISA rules for ESOP shares. This greatly enhances the liquidity of an ownership interest in the Company. As such, we have applied a reduced adjustment for the lack of marketability of 5%.

### APPLICATION OF DISCOUNT

Based on the previous discussion, we have applied the discount for lack of marketability as follows:

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000123

**Computation of Fair Market Value**
**As of December 31, 2017**

| | | |
|---|---|---|
| Preliminary Indicated Value of Total Equity[1] | $ | 8,466,750 |
| Add Adjustment for Quantitative and Qualitative Control Factors - 15% | | 1,270,013 |
| Indicated Value of a 100% Interest, Controlling, Marketable Basis | $ | 9,736,763 |
| Less Adjustment for Lack of Marketability - 5% | | (486,838) |
| **Fair Market Value of a 100% Interest, Controlling, Non-Marketable Basis** | $ | **9,249,924** |
| **Rounded** | $ | **9,250,000** |
| Divide by the Total Number of Common Shares Outstanding | | 912,435 |
| **Per Share Fair Market Value, on a Controlling, Non-Marketable Basis, of the Common Shares of Community Provider of Enrichment Services, Inc.** | $ | **10.14** |

[1] *From the "Reconciliation of Value" table.*

## Conclusion

We have no present or contemplated financial interest in Community Provider of Enrichment Services, Inc. Our fees for this valuation are based upon hourly billing rates, and are in no way contingent upon the results of our findings. We have no responsibility to update this report for events and circumstances occurring subsequent to the date of this report, although we will be pleased to perform an update valuation should you require one.

This valuation was performed to determine the fair market value of the Company on a controlling, non-marketable per-share basis to comply with regulatory requirements as defined by the U.S. Department of Labor related to the ESOP and is intended for no other purpose. This letter and report are to be distributed only in their entirety, and are intended and restricted for use by the management of Community Provider of Enrichment Services, Inc. This report is not to be copied or made available to any persons without the express written consent of Brueggeman and Johnson Yeanoplos, P.C.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000124

# APPENDIX 1

## COMMUNITY PROVIDER OF ENRICHMENT SERVICES, INC.
### FINANCIAL STATEMENTS



Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000125

## COMMUNITY PROVIDER OF ENRICHMENT SERVICES, INC.
### HISTORICAL BALANCE SHEET SUMMARY

| As of December 31, | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **Assets:** | | | | | |
| **Current Assets** | | | | | |
| Cash | $ 2,146,941 | $ 4,153,829 | $ 6,386,889 | $ 2,760,655 | $ 4,491,115 |
| Accounts Receivable | 4,211,396 | 4,284,593 | 4,760,044 | 5,493,003 | 5,173,714 |
| Block Grant Receivable | - | - | - | 606,263 | - |
| Investment Securities | 1,139,500 | 235,000 | - | - | - |
| **Other Current Assets** | | | | | |
| Prepaid Expenses and Other | 331,458 | 336,861 | 480,345 | 781,029 | 481,187 |
| Other Current Assets | 331,458 | 336,861 | 480,345 | 781,029 | 481,187 |
| **Total Current Assets** | **7,829,295** | **9,010,283** | **11,627,278** | **9,640,950** | **10,146,016** |
| **Property and Equipment** | | | | | |
| Property and Equipment | 10,852,171 | 11,250,071 | 11,479,812 | 11,700,664 | 11,816,938 |
| Accumulated Depreciation | ( 4,092,798) | ( 4,624,932) | ( 5,042,175) | ( 5,428,977) | ( 5,739,285) |
| **Total Fixed Assets - Net** | **6,759,373** | **6,625,139** | **6,437,637** | **6,271,687** | **6,077,653** |
| **Other Assets** | | | | | |
| **Intangible Assets** | | | | | |
| Identifiable Intangible Assets | 2,583,562 | 2,583,562 | 2,583,562 | 2,583,562 | 2,583,562 |
| Accumulated Depreciation | ( 308,813) | ( 446,063) | ( 575,974) | ( 703,440) | ( 830,906) |
| **Intangible Assets - Net** | **2,274,749** | **2,137,499** | **2,007,588** | **1,880,122** | **1,752,656** |
| **Other Non-Current Assets** | | | | | |
| Goodwill | 1,490,186 | 1,490,186 | 1,490,186 | 1,490,186 | 1,490,186 |
| Other Assets | 213,245 | 266,541 | 236,092 | 247,496 | 238,610 |
| **Total Other Non-Current Assets** | **1,703,431** | **1,756,727** | **1,726,278** | **1,737,682** | **1,728,796** |
| **Total Other Assets** | **3,978,180** | **3,894,226** | **3,733,866** | **3,617,804** | **3,481,452** |
| **Total Assets** | **$18,566,848** | **$19,529,648** | **$21,798,781** | **$19,530,441** | **$ 19,705,121** |

Source: Summarized from audited and consolidated financial statements as of and for the years ended December 31, 2013 through 2017(draft), prepared by CliftonLarsonAllen LLP.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000126

## COMMUNITY PROVIDER OF ENRICHMENT SERVICES, INC.
### HISTORICAL BALANCE SHEET SUMMARY

| As of December 31, | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **Liabilities and Equity:** | | | | | |
| **Liabilities** | | | | | |
| **Current Liabilities** | | | | | |
| Accounts Payable | $ 353,408 | $ 399,109 | $ 470,736 | $ 478,482 | $ 576,931 |
| Accrued Expenses | 2,645,857 | 2,795,577 | 2,360,332 | 2,386,865 | 2,201,246 |
| Current Maturities of Capital Lease Oblig. | 144,631 | 76,118 | 45,090 | 83,854 | 136,893 |
| Current Maturities of Long-Term Debt | 1,419,377 | 852,873 | 1,736,017 | 341,025 | 343,649 |
| Deferred Revenue | 1,239,089 | 71,703 | 14,695 | 13,196 | - |
| **Other Current Liabilities** | | | | | |
| Line of Credit | 800,000 | 800,000 | 1,800,000 | - | - |
| Unearned Block Grant Funds | - | 2,503,838 | 2,513,620 | 1,480,327 | - |
| Other Current Liabilities | 800,000 | 3,303,838 | 4,313,620 | 1,480,327 | - |
| **Total Current Liabilities** | **6,602,362** | **7,499,218** | **8,940,490** | **4,783,749** | **3,258,719** |
| **Long-Term Debt** | | | | | |
| Capital Lease Oblig., Less Current Maturities | 93,869 | 57,383 | 8,663 | 218,455 | 241,708 |
| Long-Term Debt, Less Current Maturities | 6,286,612 | 5,521,911 | 4,138,235 | 3,647,125 | 3,304,503 |
| **Total Long-Term Debt** | **6,380,481** | **5,579,294** | **4,146,898** | **3,865,580** | **3,546,211** |
| **Other Liabilities** | | | | | |
| Other Liabilities | - | - | - | - | - |
| **Other Liabilities** | **-** | **-** | **-** | **-** | **-** |
| **Total Liabilities** | **12,982,843** | **13,078,512** | **13,087,388** | **8,649,329** | **6,804,930** |
| **Equity** | | | | | |
| Common Stock | 1,226,291 | 1,226,291 | 1,226,291 | 1,226,291 | 1,226,291 |
| Retained Earnings | 4,357,714 | 5,224,845 | 7,485,102 | 9,654,821 | 11,673,900 |
| **Equity** | **5,584,005** | **6,451,136** | **8,711,393** | **10,881,112** | **12,900,191** |
| **Total Liabilities and Equity** | **$18,566,848** | **$19,529,648** | **$21,798,781** | **$19,530,441** | **$ 19,705,121** |

Source: Summarized from audited and consolidated financial statements as of and for the years ended December 31, 2013 through 2017(draft), prepared by CliftonLarsonAllen LLP.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000127

## COMMUNITY PROVIDER OF ENRICHMENT SERVICES, INC.
### HISTORICAL BALANCE SHEET SUMMARY (COMMON SIZED)

| As of December 31, | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **Assets:** | | | | | |
| **Current Assets** | | | | | |
| Cash | 11.56% | 21.27% | 29.30% | 14.14% | 22.79% |
| Accounts Receivable | 22.68% | 21.94% | 21.84% | 28.13% | 26.26% |
| Block Grant Receivable | 0.00% | 0.00% | 0.00% | 3.10% | 0.00% |
| Investment Securities | 6.14% | 1.20% | 0.00% | 0.00% | 0.00% |
| **Other Current Assets** | | | | | |
| Prepaid Expenses and Other | 1.79% | 1.72% | 2.20% | 4.00% | 2.44% |
| Other Current Assets | 1.79% | 1.72% | 2.20% | 4.00% | 2.44% |
| **Total Current Assets** | **42.17%** | **46.14%** | **53.34%** | **49.36%** | **51.49%** |
| **Property and Equipment** | | | | | |
| Property and Equipment | 58.45% | 57.61% | 52.66% | 59.91% | 59.97% |
| Accumulated Depreciation | -22.04% | -23.68% | -23.13% | -27.80% | -29.13% |
| **Total Fixed Assets - Net** | **36.41%** | **33.92%** | **29.53%** | **32.11%** | **30.84%** |
| **Other Assets** | | | | | |
| **Intangible Assets** | | | | | |
| Identifiable Intangible Assets | 13.91% | 13.23% | 11.85% | 13.23% | 13.11% |
| Accumulated Depreciation | -1.66% | -2.28% | -2.64% | -3.60% | -4.22% |
| **Intangible Assets - Net** | **12.25%** | **10.94%** | **9.21%** | **9.63%** | **8.89%** |
| **Other Non-Current Assets** | | | | | |
| Goodwill | 8.03% | 7.63% | 6.84% | 7.63% | 7.56% |
| Other Assets | 1.15% | 1.36% | 1.08% | 1.27% | 1.21% |
| **Total Other Non-Current Assets** | **9.17%** | **9.00%** | **7.92%** | **8.90%** | **8.77%** |
| **Total Other Assets** | **21.43%** | **19.94%** | **17.13%** | **18.52%** | **17.67%** |
| **Total Assets** | **100.00%** | **100.00%** | **100.00%** | **100.00%** | **100.00%** |

Source: Summarized from audited and consolidated financial statements as of and for the years ended December 31, 2013 through 2017(draft), prepared by CliftonLarsonAllen LLP.

PAREDES-0000128

## COMMUNITY PROVIDER OF ENRICHMENT SERVICES, INC.
### HISTORICAL BALANCE SHEET SUMMARY (COMMON SIZED)

| As of December 31, | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **Liabilities and Equity:** | | | | | |
| **Liabilities** | | | | | |
| **Current Liabilities** | | | | | |
| Accounts Payable | 1.90% | 2.04% | 2.16% | 2.45% | 2.93% |
| Accrued Expenses | 14.25% | 14.31% | 10.83% | 12.22% | 11.17% |
| Current Maturities of Capital Lease Oblig. | 0.78% | 0.39% | 0.21% | 0.43% | 0.69% |
| Current Maturities of Long-Term Debt | 7.64% | 4.37% | 7.96% | 1.75% | 1.74% |
| Deferred Revenue | 6.67% | 0.37% | 0.07% | 0.07% | 0.00% |
| **Other Current Liabilities** | | | | | |
| Line of Credit | 4.31% | 4.10% | 8.26% | 0.00% | 0.00% |
| Unearned Block Grant Funds | 0.00% | 12.82% | 11.53% | 7.58% | 0.00% |
| Other Current Liabilities | 4.31% | 16.92% | 19.79% | 7.58% | 0.00% |
| **Total Current Liabilities** | **35.56%** | **38.40%** | **41.01%** | **24.49%** | **16.54%** |
| **Long-Term Debt** | | | | | |
| Capital Lease Oblig., Less Current Maturities | 0.51% | 0.29% | 0.04% | 1.12% | 1.23% |
| Long-Term Debt, Less Current Maturities | 33.86% | 28.27% | 18.98% | 18.67% | 16.77% |
| **Total Long-Term Debt** | **34.36%** | **28.57%** | **19.02%** | **19.79%** | **18.00%** |
| **Other Liabilities** | | | | | |
| Other Liabilities | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| **Other Liabilities** | **0.00%** | **0.00%** | **0.00%** | **0.00%** | **0.00%** |
| **Total Liabilities** | **69.92%** | **66.97%** | **60.04%** | **44.29%** | **34.53%** |
| **Equity** | | | | | |
| Common Stock | 6.60% | 6.28% | 5.63% | 6.28% | 6.22% |
| Retained Earnings | 23.47% | 26.75% | 34.34% | 49.43% | 59.24% |
| **Equity** | **30.08%** | **33.03%** | **39.96%** | **55.71%** | **65.47%** |
| **Total Liabilities and Equity** | **100.00%** | **100.00%** | **100.00%** | **100.00%** | **100.00%** |

Source: Summarized from audited and consolidated financial statements as of and for the years ended December 31, 2013 through 2017(draft), prepared by CliftonLarsonAllen LLP.

**COMMUNITY PROVIDER OF ENRICHMENT SERVICES, INC.**

**HISTORICAL INCOME STATEMENT SUMMARY**

| For Years Ended December 31, | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Behavioral | $ 12,039,003 | $ 10,823,585 | $ 10,907,732 | $ 11,163,809 | $ 9,863,775 |
| DTA Vocational | 4,939,839 | 5,388,982 | 5,616,275 | 5,441,564 | 5,701,277 |
| Foster Care | 2,898,928 | 3,100,169 | 3,584,446 | 3,721,236 | 3,568,396 |
| Residential and Supportive Living | 30,570,138 | 31,928,860 | 32,076,281 | 32,891,802 | 35,054,933 |
| Other | 774,696 | 789,041 | 736,604 | 620,378 | 489,525 |
| **Total Revenue** | $ 51,222,604 | $ 52,030,637 | $ 52,921,338 | $ 53,838,789 | $ 54,677,906 |
| **Operating Expenses** | | | | | |
| Insurance | 1,539,014 | 1,481,170 | 1,582,420 | 1,581,984 | 1,475,141 |
| Occupancy | 5,062,371 | 5,180,325 | 5,059,565 | 4,940,482 | 5,091,156 |
| Other Operating | 768,021 | 1,075,053 | 1,041,098 | 1,127,397 | 1,825,641 |
| Professional and Consulting | 3,719,523 | 3,385,817 | 3,725,333 | 4,106,677 | 3,599,378 |
| Salaries and Employee Benefits | 35,912,659 | 35,444,127 | 35,336,610 | 36,343,044 | 38,227,398 |
| Supplies | 1,635,314 | 1,700,325 | 1,732,304 | 1,610,638 | 1,492,506 |
| Travel and Conference | 538,882 | 533,076 | 432,835 | 441,167 | 429,111 |
| Vehicles and Transportation | 1,403,741 | 1,336,026 | 1,237,200 | 1,178,457 | 1,209,189 |
| **Total Operating Expenses** | 50,579,525 | 50,135,919 | 50,147,365 | 51,329,846 | 53,349,520 |

| For Years Ended December 31, | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **Subtotal** | 643,079 | 1,894,718 | 2,773,973 | 2,508,943 | 1,328,386 |
| Depreciation and Amortization | 656,220 | 669,384 | 603,235 | 562,912 | 721,950 |
| **Total Operating Profit** | ( 13,141) | 1,225,334 | 2,170,738 | 1,946,031 | 606,436 |
| **Miscellaneous Income/(Expense)** | | | | | |
| Impairment of Goodwill/Intang. | - | - | - | - | - |
| Interest Income | 3,871 | 4,412 | 2,870 | 16,379 | 26,598 |
| Other Income | ( 279,446) | 194,616 | 533,020 | 503,616 | 1,558,373 |
| Start-Up Assistance | - | - | - | - | - |
| **Total Misc. Income/(Expense)** | ( 275,575) | 199,028 | 535,890 | 519,995 | 1,584,971 |
| **Earnings Before Interest and Tax** | ( 288,716) | 1,424,362 | 2,706,628 | 2,466,026 | 2,191,407 |
| Interest Expense | 538,255 | 557,231 | 446,371 | 296,307 | 172,328 |
| Provision for Income Tax | - | - | - | - | - |
| **Net Income/(Loss)** | ($ 826,971) | $ 867,131 | $ 2,260,257 | $ 2,169,719 | $ 2,019,079 |

Source: Summarized from audited and consolidated financial statements as of and for the years ended December 31, 2013 through 2017(draft), prepared by CliftonLarsonAllen LLP.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000130

## COMMUNITY PROVIDER OF ENRICHMENT SERVICES, INC.
### HISTORICAL INCOME STATEMENT SUMMARY (COMMON SIZED)

| For Years Ended December 31, | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Behavioral | 23.50% | 20.80% | 20.61% | 20.74% | 18.04% |
| DTA Vocational | 9.64% | 10.36% | 10.61% | 10.11% | 10.43% |
| Foster Care | 5.66% | 5.96% | 6.77% | 6.91% | 6.53% |
| Residential and Supportive Living | 59.68% | 61.37% | 60.61% | 61.09% | 64.11% |
| Other | 1.51% | 1.52% | 1.39% | 1.15% | 0.90% |
| **Total Revenue** | **100.00%** | **100.00%** | **100.00%** | **100.00%** | **100.00%** |
| **Operating Expenses** | | | | | |
| Insurance | 3.00% | 2.85% | 2.99% | 2.94% | 2.70% |
| Occupancy | 9.88% | 9.96% | 9.56% | 9.18% | 9.31% |
| Other Operating | 1.50% | 2.07% | 1.97% | 2.09% | 3.34% |
| Professional and Consulting | 7.26% | 6.51% | 7.04% | 7.63% | 6.58% |
| Salaries and Employee Benefits | 70.11% | 68.12% | 66.77% | 67.50% | 69.91% |
| Supplies | 3.19% | 3.27% | 3.27% | 2.99% | 2.73% |
| Travel and Conference | 1.05% | 1.02% | 0.82% | 0.82% | 0.78% |
| Vehicles and Transportation | 2.74% | 2.57% | 2.34% | 2.19% | 2.21% |
| **Total Operating Expenses** | **98.74%** | **96.36%** | **94.76%** | **95.34%** | **97.57%** |

| For Years Ended December 31, | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **Subtotal** | **1.26%** | **3.64%** | **5.24%** | **4.66%** | **2.43%** |
| Depreciation and Amortization | 1.28% | 1.29% | 1.14% | 1.05% | 1.32% |
| **Total Operating Profit** | **-0.03%** | **2.36%** | **4.10%** | **3.61%** | **1.11%** |
| **Miscellaneous Income/(Expense)** | | | | | |
| Impairment of Goodwill/Intang. | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Interest Income | 0.01% | 0.01% | 0.01% | 0.03% | 0.05% |
| Other Income | -0.55% | 0.37% | 1.01% | 0.94% | 2.85% |
| Start-Up Assistance | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| **Total Misc. Income/(Expense)** | **-0.54%** | **0.38%** | **1.01%** | **0.97%** | **2.90%** |
| **Earnings Before Interest and Tax** | **-0.56%** | **2.74%** | **5.11%** | **4.58%** | **4.01%** |
| Interest Expense | 1.05% | 1.07% | 0.84% | 0.55% | 0.32% |
| Provision for Income Tax | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| **Net Income/(Loss)** | **-1.61%** | **1.67%** | **4.27%** | **4.03%** | **3.69%** |

Source: Summarized from audited and consolidated financial statements as of and for the years ended December 31, 2013 through 2017(draft), prepared by CliftonLarsonAllen LLP.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000131

# APPENDIX 2

## CERTIFICATION



Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000132

We certify that, to the best of our knowledge and belief:

1.  The statements of fact contained in this appraisal report are true and correct.

2.  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and is our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3.  We have no present or prospective interest in the property that is the subject of this report, and we have no personal interest with respect to the parties involved.

4.  We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5.  We have provided services regarding the property that is the subject of this report or to the parties involved with this assignment within the three-year period immediately preceding acceptance of the assignment, as an appraiser or in another capacity.

6.  Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

7.  Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8.  The economic and industry data included in the valuation report have been obtained from various printed or electronic reference sources that the valuation analyst believes to be reliable. The valuation analyst has not performed any corroborating procedures to substantiate that data.

9.  Our analyses, opinions, conclusions (valuation engagement) and this report has been prepared in conformity with the American Institute of Certified Public Accountants Statement on Standards for Valuation Services No. 1 and the 2018-2019 Uniform Standards of Professional Appraisal Practice standards for conducting and reporting on business valuations.

10. The parties for which the information and use of the valuation report is restricted are identified; the valuation report is not intended to be and should not be used by anyone other than such parties.

11. The valuation analyst has no obligation to update the report or the opinion of value for information that comes to our attention after the date of the report.

---

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000133

12. This report and analysis were prepared under the direction of Kevin R. Yeanoplos, CPA/ABV/ CFF, ASA with significant professional assistance from Clay S. Danielson, ASA. Kevin R. Yeanoplos, CPA/ABV/CFF, ASA is a Certified Public Accountant licensed in the state of Arizona and is accredited in business valuation by the American Institute of Certified Public Accountants. He is also an accredited senior appraiser with the American Society of Appraisers, a certified business appraiser with The Institute of Business Appraisers and a certified valuation analyst with the National Association of Certified Valuation Analysts.

13. The American Society of Appraisers has a mandatory recertification program for its Senior Members. Appraisers are in compliance with that program.

14. No one provided significant professional assistance to the persons signing this report.

Kevin R. Yeanoplos, CPA/ABV/CFF, ASA

Clay S. Danielson, ASA

April 30, 2018

# APPENDIX 3

## CURRICULA VITAE



Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000135

## *CURRICULUM VITAE*

# KEVIN R. YEANOPLOS, CPA/ABV/CFF, ASA

*Certified Public Accountant / Accredited in Business Valuation / Certified in Financial Forensics*
*Accredited Senior Appraiser, Court Appointed Neutral*
*Member AICPA Business Valuation Hall of Fame*



## Brueggeman and Johnson Yeanoplos, P.C.

## Y/S Advisory Services

A Member of The Financial Consulting Group

7363 East Tanque Verde Road, Tucson, AZ 85715 • Telephone (520) 327-8258 • Facsimile (520) 327-7080
601 Union Street, Suite 3501, Seattle, WA 98101 • Telephone (206) 628-3100 • Facsimile (206) 628-0106

**RECENT PRIOR PROFESSIONAL HISTORY**

**Yeanoplos Drysdale Group, PLLC**
Valuation Advisors
Tucson, Arizona
Managing Member

**Beach Fleischman and Co., P.C.**
Certified Public Accountants and Consultants
Tucson, Arizona
Partner

**AREAS OF SPECIAL COMPETENCE**

Over the past three decades, valuation of closely held businesses and intangible assets across the U.S. and internationally, including construction companies, automobile dealers, professional practices, healthcare and other

Determination of reasonable compensation

Litigation support services, economic damages and analysis

Provided expert testimony in Utah, Arizona, Colorado, Pennsylvania, Florida, Illinois, Washington, Tennessee, Oregon, Kansas

Court appointed expert on business valuation

Economic, financial, operational and management consulting for small to medium sized businesses

Healthcare consulting

General business consulting

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000136

*CURRICULUM VITAE*
### KEVIN R. YEANOPLOS
*PAGE 2*



**MAJOR PROJECTS**

Business valuation engagements including financial analyses and management evaluation.

Development of franchise valuation model, utilizing franchise specific factor matrix.

Analysis of medical practice acquisitions relative to private inurement and anti-kickback issues.

Preparation of capital and operating budgets, cash flow analyses and return on investment computations for ongoing businesses as well as proposed, ongoing and/or distressed businesses.

Strategic short- and long-term business and financial planning for various business organizations.

Numerous operational reviews of professional practices and businesses, including evaluation of organizational structure, financial controls and both formal and informal management information systems.

**PROFESSIONAL ACTIVITIES**

Lecturer and instructor for organizations (FBI, AAML, AICPA, ASA, NACVA, UACPA, ISCPA, etc.) throughout the United States on the topic of Business Valuations.

Former Associate Editor of the quarterly *Valuation Examiner*, National Association of Certified Valuation Analysts

Panel of Experts for *Financial Valuation and Litigation Expert*

Editorial Advisory Board for the *Journal of Accountancy*

Editorial Advisory Board for the *Business Valuation Update*

Guest panelist for the H.N. and Frances C. Berger Entrepreneurship Program, Eller College of Business and Public Administration, The University of Arizona

Guest lecturer for Thunderbird American Graduate School of Management, Glendale AZ.

Guest lecturer for David S. Eccles School of Business, University of Utah, Salt Lake City, Utah

Guest lecturer for Daniels College of Business, University of Denver, Denver, Colorado

AICPA Business Valuation Volunteer of the Year 2006

ASCPA Special Award for Dedication to the BV Section 2007

AICPA FVS Consulting Digest Technical Advisory Board

Faculty member AICPA National Business Valuation School

Faculty member AICPA Expert Witness Skills Workshop

Faculty member National Institute for Trial Advocacy

Appointed to Arizona Board of Appraisal by Governor Brewer, elected as Chair 2012-14

Appointed to Arizona Commission on Judicial Performance Review by the Arizona Supreme Court member 2016-2019.

---

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000137



*CURRICULUM VITAE*
**KEVIN R. YEANOPLOS**
*PAGE 3*

**SPECIALIZED TRAINING**    American Society of Appraisers, Principles of Valuation

American Institute of Certified Public Accountants, Business Valuation Certificate of Educational Achievement

American Institute of Certified Public Accountants, Annual National Business Valuation Conferences

Illinois CPA Society, Annual Business Valuation Symposium

Various other relevant training and readings in the area of business valuation

American Arbitration Association, Commercial Arbitrator Training Workshop I and II

Collaborative Divorce Team Training

**COMMUNITY INVOLVEMENT**    Sertoma Club, Charter Member Midvale, Utah Chapter
Past President, United Cerebral Palsy of Utah Housing Corporation
Past Member Finance Committee, Make-A-Wish Foundation of Utah
Past National Treasurer, The Bridge Foundation
Past Member Finance Committee, Ronald McDonald House
Past Chairman, Treasurer, Fort Lowell Shootout
Past Advisor, Women's Sports Foundation - Tucson Chapter
Past Board Member, Desert Dove Farm, Inc.
Past Board Member/Treasurer, Fox Tucson Theatre
Past Board member, KXCI Tucson
Past Member Advocacy Committee, National Association of Recording Arts and Sciences

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000138

*CURRICULUM VITAE*

**KEVIN R. YEANOPLOS**

*PAGE 4*

**PROFESSIONAL & BUSINESS ASSOCIATIONS**

Licensed to practice as a CPA in Utah, Arizona, Washington.

• American Institute of Certified Public Accountants
  • Inducted into Business Valuation Hall of Fame
  • Member, Forensic and Valuation Services Section
  • Past Member ABV Exam Review Task Force
  • Past Commissioner, National Accreditation Commission
  • Past Member, ABV Exam Review Course Task Force
  • Past Member, Virtual Grassroots Panel
  • Past Member, CS Member Development and Communications Subcommittee
  • Past Member, CS Business Valuations and Appraisals Committee
  • Past Member, ABV Exam Writing Subcommittee
  • Past Chair, ABV Credential Committee
  • Chair, 2000 National Bus. Val. Conference
• American Association of Franchises and Dealers
  • Past Chairman, FinancialLine Steering Committee
  • Past Secretary, Trade Association Council
  • Past Member, Fair Franchising Standards Committee
  • Past Member, National Franchisee Training Initiative
• Member of The National Center For Employee Ownership
• American Society of Appraisers
  • Past Secretary/Treasurer, Salt Lake Chapter
  • Past Secretary/Treasurer, Tucson Chapter
  • Past President, Tucson Chapter
  • Past Member, International Board of Examiners
  • Past Member, Education Task Force
• National Association of Certified Valuation Analysts
  • Past Member, Standards Committee
  • Past Member, CVA Grading Team
  • Past Vice-President and Executive Board Member
  • Past Advisory Board Member
  • Past Member, Business Valuation Research Institute
• Utah Association of Certified Public Accountants
  • Past Secretary, Litigation Support Committee
  • Founding Chairman, Business Valuation Committee
• Arizona Society of Certified Public Accountants
  • Past Member, Litigation Support Committee
  • Two-time Chairman, Business Valuation Committee
  • Past Secretary, Treasurer, Southern Chapter
  • Board of Directors 2011-2014



Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000139

*CURRICULUM VITAE*

**KEVIN R. YEANOPLOS**

*PAGE 5*

**PROFESSIONAL & BUSINESS**
**ASSOCIATIONS – CONT.**

- Illinois Society of Certified Public Accountants
  - Past Member, Litigation Support Committee
- Salt Lake Area Chamber of Commerce
  - Past Member, Business Education Partnership Committee
  - Past Member, Business to Business Roundtable
- Tucson Metropolitan Chamber of Commerce
  - Past Member, Business Development Committee
- Financial Consulting Group
  - Past Team Leader, Franchise Industry
  - Past Member, Advisory Board
- Graduate of Greater Tucson Leadership '99
- Past Member American Arbitration Association Commercial Panel
- The Best Lawyers of America Directory of Expert Witnesses
- Past Member of the Medical Group Management Association
- Member of the Arizona Medical Group Management Association

CONFIDENTIAL!

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000140

*CURRICULUM VITAE*

**KEVIN R. YEANOPLOS**

*PAGE 6*

## SELECTED INVOLVEMENT IN PROFESSIONAL PUBLICATIONS AND PRESENTATIONS

1) Using Valuation Master 4.0, text for Certified Professional Education (CPE) Seminars; Black, Green, Yeanoplos & Co., P.C., 1994.
2) Business Valuations: Fundamentals and Techniques, text for CPE Seminars, primary author, Black, Green, Yeanoplos & Co., P.C., 1994.
3) Business Valuations: Case Analysis, text for CPE Seminars, co-author, Black, Green, Yeanoplos & Co., P.C., 1994.
4) Fundamentals of Finance and Accounting, text for CPE Seminars, Black, Green, Yeanoplos & Co., P.C., 1994.
5) So You Need and Expert Witness?, article for Viewpoint on Value, Practice Development Institute, 1995.
6) What Does Federal Rule # 26 Mean For You?, Presentation given at National Association of Certified Valuation Analysts Spring 1995 Semi-Annual Conference.
7) Business Valuation: Opportunities for Success, Presentation given at the Utah Association of CPA's Update '95 Conference.
8) Business Valuation: An Advanced Case Study, Presentation given at the Utah Association of CPA's Update '95 Conference.
9) Estate Valuation: Voo Doo Economics?, Presentation given for Lorman Education Services, Inc., 1996.
10) Working Without a Net: The Case for Engagement Letters, Presentation given at American Institute of Certified Public Accountants 1996 National Business Valuations Conference.
11) What is Value?, Presentation given for Security Financial Group, 1996.
12) The Basics of Business Valuation,, Presentation given at Westminster College's 20th Annual Tax Practitioners' Institute, 1996.
13) Information Sources for Litigation Support: The Where's and Why's, Presentation given at the Utah Association of CPA's 1996 Summer Update.
14) Selecting the Best Equity Structure, Presentation given at American Association of Franchises and Dealers 1996 Annual Meeting and Convention.
15) Show Me the Money!: How to Manage a Competitive Franchise Without Exhausting Your Profits, Presentation given at the Association of Meineke Dealers 1997 Annual Conference.
16) Practical Tips to Maximize Your Profits, Presentation given at American Association of Franchises and Dealers 1997 Annual Meeting and Convention.
17) Overview of the AICPA Business Valuation CEA Program, Article written for *The Journal Entry*, monthly newsletter of the Utah Association of CPA's.
18) Accredited Business Valuator Examination Review Course; First Edition, CPE Seminar, co-author, written for the Utah Association of CPA's, 1997.
19) *Upstart Guide to Evaluating, Buying, and Growing a Franchise*, co-author, written for the Association of Small Business Development Centers, 1997.
20) Selected Tax Aspects of Estate Planning, Presentation given for Lorman Education Services, Inc., 1997.
21) What are the Costs of Being a Franchise?, Presentation given for the Association of Small Business Development Centers, 1997.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000141

**Selected Involvement in Professional
   Publications and Presentations (continued)**

22) Valuation Discounts and Family Limited Partnerships: FliP's or Flops?, Presentation given for the Utah Association of CPA's, 1997.

23) Valuation Discounts and Family Limited Partnerships: FliP's or Flops?, Presentation given for the CPA/Law Forum, Tucson, Arizona, 1997.

24) Considerations for the Appraisal of Donated Property, Presentation given for the American Society of Appraisers, Tucson Chapter, 1997.

25) The Basics of Business Valuation, Presentation given for the Arizona's Women's Society of Certified Public Accountants, 1998.

26) Breaking Up is Hard to Do!  The Taxing Financial Aspects of Marital Dissolutions, Presentation given to the Utah State Bar Association Family Law Section, 1998.

27) Valuation Adjustments and Family Limited Partnerships, Presentation given at Bank of America, Phoenix, Arizona, 1998.

28) Seeing Litigation Through Rose-Colored Eyeshades – Effective Utilization of the CPA, Presentation given at State Bar of Arizona, Family Law Section, Tucson, Arizona, 1998.

29) Preparing for the 1998 Accredited Business Valuator Examination Review Course, CPE seminar, co-author, written for the American Institute of CPA's, 1998.

30) Cases, Places, Faces and All That Jazz!  Presentation given to the Utah Association of CPA's Annual Business Valuation Symposium, 1998

31) "The Price is Right" – Developing Valuation Opportunities, Presentation given to Utah Association of CPA's Annual Tax Symposium, 1998.

32) Maximizing Dollars With Minimum Cents: Buying and Selling A Business, Presentation to American Women's Society of Certified Public Accountants, 1998.

33) International Business Valuations: Overview and Methodologies, AICPA Co-Author, 1998.

34) Case in Point: Valuing a Closely Held Business, Presentation to American Women's Society of Certified Public Accountants, 1998.

35) Working Without a Net: The Case for Engagement Letters, Presentation given for Arizona Society of CPA's, 1999.

36) Breaking Up is Hard to Do!  The Taxing Financial Aspects of Marital Dissolutions, Presentation given to CPA/Law Forum, 1999.

37) The Basics of Business Valuation, Presentation given to National Bank of Arizona, 1999.

38) Preparing for the 1999 Accredited Business Valuator Examination Review Course, CPE seminar, co-author, written for the American Institute of CPA's, 1999.

39) Valuation of Goodwill in a Professional Practice, Presentation given for the Arizona Society of CPA's First Annual Business Valuation Conference, September 1999.

40) Painting a Masterpiece – The Creation of an effective Valuation Report, Presentation given for the American Institute of CPA's National Business Valuation Conference, December 1999.

41) Profits for the Ages: Getting the Most Out of a Closely-held Business, Presentation given for the Arizona Society of CPA's Southern Chapter, December 1999.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000142

### Selected Involvement in Professional
### Publications and Presentations (continued)

42) Preparing for the 1999 Accredited Business Valuator Examination Review Course, CPE seminar, co-author, written for the American Institute of CPA's, 2000.

43) The Basics of Business Valuation Part I, Presentation given to American Society of Appraisers – Southern Arizona Chapter, March 2000.

44) The Basics of Business Valuation Part II, Presentation given to American Society of Appraisers – Southern Arizona Chapter, April 2000.

45) The Valuation of Construction Companies, Presentation given to Construction Financial Managers of America, Southern Arizona Chapter, August 2000.

46) A CPA's Guide to Buying and Selling Businesses, Co-author of CPE program, August 2000.

47) To FMV or Not to FMV, That is the Questions, Presentation given to the Institute of Management Accountants, September 2000.

48) The Business of Valuation, Presentation given to the Southern Arizona Estate Planning Council, October 2000.

49) "Sale"ing – The Seven C's: Helping Your Client Maximize the Value of Their Business, Presentation given for the American Institute of CPA's National Management of an Accounting Practice Conference, November 2000.

50) To FMV or Not to FMV, that is the Questions, Presentation given to Arizona Women's Society of CPA's, November 2000.

51) The Valuation of Restaurants and Bars: A Recipe for Success, Presentation given for the American Institute of CPA's National Business Valuation Conference, November 2000.

52) Practice Makes Perfect – Valuing Professional Entities, Presentation given for the American Institute of CPA's National Business Valuation Conference, November 2000.

53) The Valuation of Goodwill in a Closely Held Business: Hit or Myth?, Presentation given for the Arizona Supreme Court 2001 Domestic Relations Conference, February 2001.

54) The Phantom Menace: Demystifying Valuations of ESOP Companies, Presentation given for the Arizona Society of CPA's, March 2001.

55) 'Sale'ing – The Seven C's:  Helping Your Client Maximize the Value of Their Business, Presentation given for the CPA Law Forum, April 2001.

56) Common Tax Issues in Dissolution Cases, Presentation given for the Pima County Bar Association, April 2001.

57) Advanced Valuation Issues in Domestic Relations Cases, Presentation given for the Arizona State Bar, May 2001.

58) Valuing Professional Practices and Licenses, Third Edition, Published by Aspen Law & Business, contributing author, June 2001.

59) The Invaluable Valuation: It Pays to Know What Your Business Is Worth, Presentation given for CEO Services, August 2001.

60) Whatever Floats Your Boat: Valuing ESOP Companies, Presentation given for the ESOP Association Western States Chapter 2001 Conference, September 2001.

61) Reasonable Compensation and Excess Earnings: Hit or Myth?, Presentation given for the Arizona Society of CPAs 2001 Business Valuation Conference, September 2001.

62) A Fist of Dollars! The Artful Science of Valuing Start-Up Companies, Presentation given for the Fourth Annual Tucson Entrepreneur's Finance Form, October 2001.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000143

## SELECTED INVOLVEMENT IN PROFESSIONAL
### PUBLICATIONS AND PRESENTATIONS (CONTINUED)

63) Don't Slam the Door on the Way Out! Transitioning the Family Business, Presentation given for Research Management Associates, November 2001.

64) Treasure of the Santa Catalinas: ESOPs for the Small Business, Presentation given with Menke and Associates, December 2001.

65) Don't Let the Door Hit You on the Way Out! Transitioning the Family Business, Presentation given for Arizona Women's Society of CPAs, December 2001.

66) Opening the Gift of Employee Ownership. Presentation given for The ESOP Association California/Western State Chapter, March 11, 2002.

67) What You See Is Not What You Get!  Applying Kelly v. Kelly to Public Service Retirement Benefits.  Presentation given for the Arizona State Bar 2002 Advanced Domestic Relations Conference, May 2002.

68) Value Is In The Eye Of The Beholder - The Basics of Business Valuation.  Presentation given for the National Society of Professional Estimators, May 2002.

69) If I Can't Take the Fifth, Can I Take A Six-Pack Instead? A Primer for the Aspiring Expert Witness.  Presentation given for the CPA/Law Forum, June 27, 2002.

70) Equity and Executive Compensation in ESOP Companies.  Presentation given for the ESOP Association California/Western States Chapter 2002 Conference, September 12, 2002.

71) Personal vs. Professional Goodwill - Hit or Myth? Presenter and Moderator for the ASCPA Advanced Business Valuation Roundtable, October 16, 2002.

72) Finance - The Basics, Author and Presenter for Lorman Education Services, November 1, 2002.

73) Getting Down to Brass Tax! Exploring Taxation Issues in Domestic Relations, Presentation given at the Joint Tax Litigation Seminar for the American Women's Society of CPAs Tucson Affiliate, Arizona Society of CPAs Southern Chapter and the Arizona Women's Law Association, November 15, 2002.

74) Is That Your Final Answer?  A Primer For the Aspiring Expert Witness, Presentation given at the AWSCPA 2003 National Conference, Montreal, Canada, June 2003.

75) The Good, The Bad, and The Ugly - ESOPs for the Small Business, Presentation given at the AWSCPA 2003 National Conference, Montreal, Canada, June 2003.

76) You Say Potato, and I Say Potato…Exploring the Differences Between Business Valuation and Damages, Presentation given at the ASCPA 5th Annual Business Valuation Conference, Phoenix, Arizona, September 2003.

77) Exploring Your Options - Understanding Equity Based Compensation, Presentation given to the CPA/Law Forum of Tucson, Arizona, September 2003.

78) Finance - The Basics, Author and Presenter for Lorman Education Services, November 4, 2003.

79) Goodwill in the Closely Held Business - Hit or Myth?, presentation given for the State Bar of Arizona Advanced Domestic Relations Conference, November 2003.

80) Reasonable Compensation and Excess Earnings: Hit or Myth?, article written for the National Litigation Consultants' Review, November 2003, Volume 3, Issue 6.

81) Getting Down to Brass Tax!  Exploring Taxation Issues in Domestic Relations, Presentation given at the Tax Study Group, Tucson, Arizona, April 23, 2004.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000144

## SELECTED INVOLVEMENT IN PROFESSIONAL
### PUBLICATIONS AND PRESENTATIONS (CONTINUED)

82) <u>Don't Let the Door Hit You on the Way Out! Transitioning the Family Business,</u> presentation given for Arizona Society of CPAs, June 2004.

83) <u>Reasonable Compensation and Excess Earnings: Hit or Myth?,</u> Published in the *Journal of forensic Accounting's Special Supplement: Forensic Accounting on Matrimonial Divorce*, September 2004.

84) <u>Panel: A Frank Discussion of Today's Controversial Valuation Issues,</u> presentation given a t the ASCPA's 6th Annual Business Valuation Conference, September 2004.

85) <u>Special Industries – What's Going on in the Marketplace,</u> presentation given at the AICPA National Conference on Fraud and Litigation, September 2004.

86) <u>Cost of Capital: Discount Rates, Capitalization Rates and Other Natural Disasters,</u> presentation given at For Better or For Worse 2005, State Bar of Arizona, January 2005.

87) <u>Forensic Accounting in Matrimonial Divorce,</u> Co-author, R.T. Edwards, 2005.

88) <u>Fundamentals of Business Valuation,</u> presentation given to the Arizona Association of Business Brokers, July 2005.

89) <u>The Basics of Business Valuation,</u> Seminar presented for The Risk Management Association, Souther Arizona Chapter, November 2005.

90) <u>The Basics of Business Valuation,</u> Seminar presented to Lutz and Company, Omaha, Nebraska, October 2005.

91) <u>Valuing Professional Practices,</u> Teleconference presented for BV Resources, LLC., December 2005.

92) <u>Creativity + Efficiency = Profitability,</u> Article written for the *CPA Expert*, Fall 2005 issue.

93) <u>Calculating Goodwill: What is Personal and What is Professional?,</u> Teleconference presented for BV Resources, LLC., January 2006.

94) <u>Financial Valuation: Application and Models, 2nd Edition,</u> Contributing Author, 2006.

95) <u>The Basics of Business Valuation,</u> Seminar presented to the Northwest Entrepreneur Network, Seattle, Washington, June 2006.

96) <u>Goodwill Hunting: Calculating Personal vs. Professional?,</u> Presentation given for the Arizona Society of CPAs 2006 Business Valuation Conference, September 2006.

97) <u>Advanced Topics Discussion Panel,</u> Panel participant at the FCG Semi-Annual Conference, September 2006.

98) <u>Litigation Do's and Don'ts,</u> Presentation given at the Kansas Society of CPAs Business Valuation and Litigation Support Seminar, October 2006.

99) <u>You Say Potato, and I Say Potato…Exploring the Differences Between Business Valuation and Damages,</u> Presentation given at the Kansas Society of CPAs Business Valuation and Litigation Support Seminar, October 2006.

100) <u>Feelin' Hot, Hot, Hot - Exploring Hot Button Issues,</u> Presentation given at the Washington Society of CPAs Business Valuation and Litigation Support Seminar, October 2006.

101) <u>The Qualified Appraiser,</u> Presentation given at the Tax Study Group, Tucson, Arizona, January 19, 2007.

102) <u>The Qualified Appraiser,</u> Presentation given at to the Tucson Chapter of the ASA, March 19, 2007.

103) <u>Where There's Smoke……..,</u> Presentation given to the AWSCPA Tucson Chapter, May 23, 2007.

104) <u>Valuing Auto Dealerships,</u> Teleconference presented for BV Resources, LLC., October 2007.

105) <u>Cost of Capital,</u> Presentation given at the Washington Society of CPAs Business Valuation and Litigation Support Seminar, October 2007.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000145

## SELECTED INVOLVEMENT IN PROFESSIONAL PUBLICATIONS AND PRESENTATIONS (CONTINUED)

106) Guide to Personal v. Enterprise Goodwill, Co-author, published by BV Resources, 2007.

107) Exit Strategies, interviewed for Inside Arizona Business, December 9, 2007, KVOA-TV.

108) Valuing Professional Practices and Licenses, Sixth Edition, Published by Aspen Law & Business, contributing author, June 2008.

109) What Is Reasonable Compensation?, article written for the Pennsylvania Bar Association, July 2008.

110) Practice Management Panel, presentation for the Financial Consulting Group, September 2008.

111) You Say You Want a Revolution?, presentation on fair value accounting given at the 10th Annual Business Valuation Conference for the Arizona Society of CPAs, October 2, 2008.

112) You Say You Want a Revolution? The Impact of Fair Value, presentation on fair value accounting given for Biz-Summits, October 21, 2008.

113) What is Reasonable Compensation?, article written for the Pennsylvania Bar Association's Pennsylvania Family Lawyer magazine, October 2008.

114) Valuation Nuances for the Small Business, presentation for the Financial Consulting Group, November 9, 2008.

115) Practice Makes Perfect Practice, presentation on business valuation practice management given at the AICPA National Annual Business Valuation Conference, November 10, 2008.

116) Productivity Adjustments for Health Care Valuations, presentation given for the Valuation Study Group, New York, November 2008.

117) Cause or Solution?: Understanding Fair Value, presentation given for the CFA Institute, Tucson Chapter, December 2008.

118) Valuing Small Businesses and Professional Practices, moderator for presentation for the Financial Consulting Group, January 2009.

119) Show Me The Money: Defining Income, article written for the American Bar Association, *Family Advocate*, Spring 2009 Issue, Vol. 31, No. 4.

120) Guide to Personal v. Enterprise Goodwill, Co-author, published by BV Resources, 2009.

121) ASCPA Roundtable: Using Transaction Databases, presentation given for the ASCPA, February 12, 2009.

122) Valuing Professional Practices, teleconference given for Business Valuation Resources, April 2009.

123) Where There's Smoke.....There's a Business Valuation?, presentation given for the AICPA's National Practitioners' Symposium, May 2009.

124) The Princess and the Frog...Using Those Pretty Cost of Capital Methods for Small Businesses, presentation given at the California Society of CPAs Annual Business Valuation Conference, May 2009.

125) What Comes Down, Must Go Up?, presentation given for the Honolulu Chapter of the American Society of Appraisers, May 2009.

126) Obsessed...The Ongoing Attacks on DLOMs, presentation given for the Hawaiian Estate Planning Council, May 2009.

127) Practice Makes Perfect Practice, presentation on business valuation practice management given at the AICPA Network Groups, June 2009.

128) Valuing Intellectual Property in Entertainment and the Arts, teleconference given for Business Valuation Resources, June 2009.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000146

*CURRICULUM VITAE*

**KEVIN R. YEANOPLOS**

*PAGE 12*

## SELECTED INVOLVEMENT IN PROFESSIONAL PUBLICATIONS AND PRESENTATIONS (CONTINUED)

129) Auditing Fair Value Measurements and Disclosures, CPE Course written for the American Institute of CPA's, 2009.

130) Fair Value Auditing and Accounting, presentation given for the Southern Ute Growth Fund, Ignacio, Colorado, June 2009.

131) What Comes Down, Must Go Up?, presentation given for the Arizona Society of CPAs Southern Chapter, June 2009.

132) Valuing Restaurants, teleconference given for Business Valuation Resources, August 2009.

133) Forensic Issues in Business Valuation, presentation given for the Federal Bureau of Investigation Annual CPA Conference, September 2009.

134) General Benchmarks Help Determine Cost of Capital, article written for the Financial Valuation and Litigation Expert, Vol. 20, August/September 2009.

135) Practice Makes Perfect Practice, presentation on business valuation practice management given at the Virginia Society of CPAs Annual Business Valuation Conference September 2009.

136) Valuing Professional and Law Practices, presentation given for Business Valuation Resources 2nd Annual Divorce Conference, Chicago, Illinois, September 2009.

137) Feelin' Hot, Hot, Hot, presentation given for the Arizona Society of CPAs 11th Annual Business Valuation Conference, September 2009.

138) Breaking Up Is Hard to Do - Small Business and Professional Practice Issues in Divorce, presentation given at the Financial Consulting Group's Annual Fall Conference, October 2009.

139) Discounts for Lack of Marketability Case Study Workshop, presentation given for the University of San Diego School of Law 2nd Annual Business Valuation and Tax Conference, October 2009.

140) The Death of Discounts for Family Limited Partnerships?, presentation given for the American Society of Women CPAs National Conference, October 2009.

141) Discounts for Lack of Marketability, Quantitative vs. Qualitative Methods, teleconference presented for the Financial Consulting Group, December 2009.

142) Back to the Future? The (Mis)Use of Forecasts in Valuations, presentation given for the Florida Society of CPAs Annual Business Valuation Conference, January 2010.

143) Fair Value Accounting, seminar prepared and presented for the University of Arizona Eller College of Business, February 2010.

144) Terminator - The Final Chapter, The Death of Discounts?, presentation given for the Tax Study Group, February 2010.

145) Terminator - The Final Chapter, The Death of Discounts?, seminar given for the Arizona Society of CPAs, February 2010.

146) Bad Company? The Impact of Economic Challenges on Valuation, presentation given for the Business Law Section of the Arizona State Bar Association, Phoenix Chapter, March 2010.

147) Fair Value Update on FASB ASC 820, (SFAS 157), web seminar moderated for the AICPA, March 2010.

148) Bad Company? The Impact of Economic Challenges on Valuation, presentation given for the Business Law Section of the Arizona State Bar Association, Tucson Chapter, April 2010.

*CURRICULUM VITAE*

**KEVIN R. YEANOPLOS**

*PAGE 13*

## SELECTED INVOLVEMENT IN PROFESSIONAL PUBLICATIONS AND PRESENTATIONS (CONTINUED)

149) Men (and Women) Who Stare at Discount Rates - Cost of Capital for the Small Business, web seminar presented for the AICPA, April 2010.

150) Discounts for Lack of Marketability: A Case Study Approach, presentation given at the 2010 NACVA/IBA Annual Consultants' Conference, Miami, Florida.

151) Valuing Auto Dealerships, webinar given for Business Valuation Resources, July 2010.

152) Adventures in Wonderland: The Use (and Abuse) of Transaction Databases, presentation given at BVR's 3rd Annual Summit on Business Valuation in Divorce, September 2010.

153) Show Me the Money! The Exploration, Examination and Dissection of Reasonable Compensation, presentation given at BVR's 3rd Annual Summit on Business Valuation in Divorce, September 2010.

154) Going Gaga for Valuation Standards, presentation given at the Minnesota Society of CPAs 10th Annual Business Valuation Conference, October 28, 2010.

155) Allocating a Acquisition Under ASC 805 [FASB 141(R)], presentation given at the Minnesota Society of CPAs 10th Annual Business Valuation Conference, October 28, 2010.

156) Assisting Attorneys and Parties in Settling the Financial Aspects of a Divorce Case, web seminar given for the AICPA, November 2, 2010.

157) Look Before You LEAPs: Using LEAPs and Option Collars to Determine a DLOM, presentation given at the AICPA's National Business Valuation Conference, November 2010.

158) Things I Think I Think: The Identification and Valuation of Intellectual Property, presentation given for the ASCPA, November 2010.

159) Reasonable Compensation: Application and Analysis for Appraisal, Tax and Management Purposes, co-author, Business Valuation Resources 2010.

160) Show Me the Money! The Exploration, Examination and Dissection of Reasonable Compensation, presentation given for BVR, December 2010.

161) Financial Valuation: Application and Models, 3nd Edition, Contributing Author, 2011.

162) Valuing a Business Worth Less Than $2 Million, presentation given for Business Valuation Resources, April 2011.

163) Panacea or Perciatelli: The Private Cost of Capital Model, presentation given to NACVA New Jersey Chapter, June 2011.

164) Business Valuation: The Basics and Beyond, presentation given for Business Valuation Resources, June 2011.

165) Things I Think I Think: The Identification and Valuation of Intellectual Property, presentation given for the State Bar of Arizona, June 2011.

166) Things I Think I Think: The Identification and Valuation of Intellectual Property, presentation given for the ASCPA, June 2011.

167) Managing a Business Valuation Niche: Practice Makes Perfect Practice, presentation given for CPA Associates International Inc. Annual Business Valuation Conference, July 2011.

168) Easy as Cake or Hard to Bake: The Asset Approach, webinar given for the AICPA, August 2011.

169) Overview of the IRS' Discount for Lack of Marketability Job Aid, presentation given for the Tucson Tax Study Group, August 2011.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000148

*CURRICULUM VITAE*

**KEVIN R. YEANOPLOS**

*PAGE 14*

### SELECTED INVOLVEMENT IN PROFESSIONAL PUBLICATIONS AND PRESENTATIONS (CONTINUED)

170) Houston We Have a Problem: Exploring Discounts for Lack of Control, webinar given for the AICPA, October 2011.

171) It's a Mad, Mad World: Tackling Ticklish Topics in Business Valuation, presentation given at the 2011 ASCPA Annual Business Valuation Conference, October 2011.

172) Panacea or Perciatelli: The Private Cost of Capital Model, presentation given at the Tennessee Society of CPAs Annual Business Valuation Conference, October 2011.

173) Houston We Have a Problem: Exploring Discounts for Lack of Control, presentation given at the Tennessee Society of CPAs Annual Business Valuation Conference, October 2011.

174) Overview of the IRS' Discount for Lack of Marketability Job Aid, presentation given at the Tennessee Society of CPAs Annual Business Valuation Conference, October 2011.

175) Panacea or Perciatelli: The Private Cost of Capital Model, presentation given at the AICPA National Business Valuation Conference, November 2011.

176) Cost of Capital: Practical Solutions in an Impractical World, presentation given at the AICPA National Business Valuation Conference, November 2011.

177) Damages for Violating Healthcare Noncompetes, presentation given for Business Valuation Resources, November 2011.

178) Point/Counterpoint: Debating the Private Capital Markets Project, presentation given for Business Valuation Resources, March 2012.

179) Industry Specific Issue for Cost of Capital Determination, presentation given for Business Valuation Resources, June 2012.

180) Managing a Business Valuation Niche: Practice Makes Perfect Practice, presentation given for the California Society of CPAs Business Valuation Section, August 2012.

181) A Question of Balance: Exploring Work Life Challenges, presentation given for the Arizona Society of CPAs, September 2012.

182) Managing a Business Valuation Niche: Practice Makes Perfect Practice, presentation given for the Ohio Society of CPAs Business Valuation Section, October 2012.

183) Unlocking the Mysteries of Key Person Value, presentation given for the ASA Advanced Business Valuation Conference, October 2012

184) Managing a Business Valuation Niche: Practice Makes Perfect Practice, presentation given for the Kansas Society of CPAs Business Valuation Section, October 2012.

185) Business Valuation Fundamentals: Applying the Theory of Relativity, presentation given for the Tennessee Society of CPAs Annual Business Valuation Conference, October 2012.

186) Valuing Professional Practices, presentation given for Business Valuation Resources, May 2013.

187) Hitting the Curve: Effective Case Management, presentation given at the AICPA National Divorce Conference, May 2013.

188) Advanced Cost of Capital Workshop, presentation given for Business Valuation Resources, August 2013.

189) A Question of Balance: Exploring Work Life Challenges, presentation given for the University of Utah David S. Eccles School of Business, September 2013.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000149

**SELECTED INVOLVEMENT IN PROFESSIONAL
  PUBLICATIONS AND PRESENTATIONS (CONTINUED)**

190) Advanced Cost of Capital Workshop, presentation given for Arizona Society of CPAs, September 2013.

191) What You See Is What You Get...Or Is It? Dealing With Ancillary Services, presentation given for the Tennessee Society of CPAs Annual Business Valuation Conference, October 2013.

192) A Question of Balance: Exploring Work Life Challenges, presentation given for the Tennessee Society of CPAs Annual Business Valuation Conference, October 2013.

193) Exit Planning and Valuation for M&A Engagements, presentation given for the Kansas Society of CPAs Annual Business Valuation Conference, October 2013.

194) Don't Slam The Door On The Way Out: Succession Planning For The Family Business, presentation given for the Kansas Society of CPAs Annual Business Valuation Conference, October 2013.

195) No Pain No Gain: Firming Up A Business Valuation Practice, presentation given for the AICPA National Business Valuation Conference, November 2013.

196) Valuing Professional Practices, presentation given for CPA Associates International Inc., Jan. 2014.

197) Unlocking the Mysteries of Key Person Value, presentation given for the Business Development Academy, Feb. 2014.

198) Getting Down To Brass Tax: Unlocking The Mysteries of Tax Returns and Financial Statements, presentation given to Pima County Bar Association, May 2014.

199) Breaking Bad: the In's and Out's of a Business Divorce, presentation given to Pima County Bar Association, June 2014.

200) A Question of Balance: Accidental Success, presentation given for the Practice Builder Academy, July 2014.

201) Fast Five for building value: Making Lemonade Out of Lemons, presentation given at the Texas Association of Property Tax Professionals Conference, October 2014.

202) Defining Divorce Engagements: Time to Raise the Standard…of Value, presentation given for the Tennessee Society of CPAs Annual Business Valuation Conference, October 2014.

203) Unlocking the Mysteries of Key Person Value, presentation given for the Tennessee Society of CPAs Annual Business Valuation Conference, October 2014.

204) A Question of Balance: Accidental Success, presentation given for the AICPA National Business Valuation Conference, November 2014.

205) What You See Is What You Get: Effective Financial Statement Analysis, presentation given for the AICPA National Business Valuation Conference, November 2014.

206) Emerging Issues in Cost of Capital, presentation given at the Missouri Society of CPAs Annual Business Valuation Conference, December 2014.

207) Unlocking the Mysteries of Key Person Value, presentation given at the Missouri Society of CPAs Annual Business Valuation Conference, December 2014.

208) A Question of Balance: Accidental Success, presentation given at the Missouri Society of CPAs Annual Business Valuation Conference, December 2014.

209) Unlocking the Mysteries of Key Person Value, presentation given at the Florida Society of CPAs Annual Business Valuation Conference, January 2015.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000150

*CURRICULUM VITAE*

**KEVIN R. YEANOPLOS**

*PAGE 16*

## SELECTED INVOLVEMENT IN PROFESSIONAL PUBLICATIONS AND PRESENTATIONS (CONTINUED)

210) To Err is Human: Avoiding Common Valuation Mistakes, presentation given for Business Valuation Resources, April 2015.

211) Once Bitten Twice Shy? The Continuing Saga of the Double Dip, presentation given at the AICPA Annual Family Law Conference, May 2015.

212) Practice Makes Perfect Practice – Managing a Business Valuation Niche, presentation given at the Kentucky Society of CPAs Annual Forensic Conference, August 2015.

213) You Say Potato, I Say… Contrasting Business Valuation and Damage Calculations, presentation given at the Kentucky Society of CPAs Annual Business Valuation Conference, August 2015.

214) Determining Self Employed Income In A Divorce, presentation given at the ASCPA Annual Forensic Services Conference, September 2015.

215) The Ins and Outs of the Excess Earnings Method, presentation given for the Expert Resource Connection Annual Symposium, September 2015.

216) Working Capital and Value: Gone But Not Forgotten?, presentation given for Business Valuation Resources, October 2015.

217) Building a BV Practice That Is Good For You, presentation given for Valuation Products and Services, October 2015.

218) The Theory of Anything: Effective Management Interviews and Financial Analysis, presentation given for the AICPA National Business Valuation Conference, November 2015.

219) Treasonable Compensation? The Continued Misapplication of the Excess Earnings Method, presentation given for Business Valuation Resources, November 2015.

220) Fast and Furious Two Minute Drill: 25 Hot Valuation and Financial Tips, presentation given at the AAML Midyear Meeting March 2016.

221) A Question of Balance, presentation given at the AAML Midyear Meeting March 2016.

222) (T)reasonable Compensation: The Continuing Search for the Holy Grail, presentation given for the ASCPA, April 2016.

223) Feel the Heat: Valuation of HVAC Companies, webinar given for Business Valuation Resources, May 2016.

224) Managing a Business Valuation or Any Niche, presentation given at the Michigan Society of CPAs Annual Business Valuation Conference, May 2016.

225) Is That Your Final Answer? A Primer for the Aspiring Expert Witness, presentation given at the Michigan Society of CPAs Annual Business Valuation Conference, May 2016.

226) Ethical Responsibilities, Dilemmas in a BVFLS Practice, presentation given at the Michigan Society of CPAs Annual Business Valuation Conference, May 2016.

227) Valuation Jubilee, webinar given for Business Valuation Resources, June 2016.

228) Valuator Know Thy Data: The (Mis)Use of Private Company Databases, presentation given for the ASCPA Annual Business Valuation Conference, September 2016.

229) Fast Five Business Valuation Topics, presentation given for the ASCPA Annual Business Valuation Conference, September 2016.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000151

**SELECTED INVOLVEMENT IN PROFESSIONAL**
  **PUBLICATIONS AND PRESENTATIONS (CONTINUED)**

230)Treasonable Compensation? The Continuing Misapplication of the Excess Earnings Method, presentation given for the ASCPA Annual Litigation Conference, September 2016.

231)Valuator Know Thy Data: The (Mis)Use of Private Company Databases, presentation given for the Tennessee Society of CPAs Annual Business Valuation Conference, October 2016.

232)Courage Under Fire: Current Theory on Discounts and Premiums, presentation given for the Tennessee Society of CPAs Annual Business Valuation Conference, October 2016.

233)Courage Under Fire: Current Theory on Discounts and Premiums, presentation given for the Minnesota Society of CPAs Annual Business Valuation Conference, November 2016.

234)Valuation Lightning Round, presentation given for the AICPA Annual National Business Valuation Conference, November 2016.

235)Practical Application of ASC 805: Case Study in Purchase Price Allocations, presentation given for the AICPA Annual National Business Valuation Conference, November 2016.

236)A Question of Balance: Accidental Success?, presentation given for the AICPA Annual National Business Valuation Conference, November 2016.

237)Analyze This! Hot Topics in Business Valuation, presentation given for the Florida Institute of CPAs Annual Business Valuation Conference, January 2017.

238)Essential Strategies for Business Valuation, presentation given for the Photographic Imaging Association, February 2017.

239)Sudden Impact: Quantifying the Impact of a Key Person, presentation given for the American Society of Appraisers, May 2017.

240)Key Valuation Issues in Family Law, presentation given for the Colorado Bar Association Annual Family Law Conference, June 2017.

241)Key Valuation Issues in Family Law, presentation given for the Arizona Bar Association Annual Family Law Conference, June 2017.

242)Never-ending Story: The Life and Times of the Financial Expert, presentation give at the ASCPA Annual Business Valuation Conference, September 2017.

243)Little Shop of Horrors: Valuing the Small Business, presentation given for the Virginia Society of CPAs Annual Business Valuation Conference, September 2017.

244)You Say Potato….the Never-ending Search for Reasonable Compensation, presentation given for Sageworks, September 2017.

245)Best Practices in Business Valuation, presentation given for the Tennessee Society of CPAs Annual Business Valuation Conference, October 2017.

246)Industry and Financial Statement Analysis, presentation given for the AICPA Annual National Forensic and Valuation Services Conference, November 2017.

247)Good will Hunting: Allocating Professional Goodwill, presentation given for the AICPA Annual National Forensic and Valuation Services Conference, November 2017.

248)Easy as Cake or Hard to Bake: The Asset Approach, presentation given for the UACPA Annual Valuation Conference, November 2017.

COMMUNITY PROVIDER OF ENRICHMENT SERVICES, INC.                                        Page 144
Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000152

*CURRICULUM VITAE*
**KEVIN R. YEANOPLOS**
*PAGE 18*

**SELECTED INVOLVEMENT IN PROFESSIONAL
   PUBLICATIONS AND PRESENTATIONS (CONTINUED)**

249) Various interviews and stories for *MSN, Business Week, Forbes, Phoenix Business Journal, Franchise Times Magazine, LA Business Journal, Fortune, Inside Tucson Business, Las Vegas Business Press, Arizona Daily Star, Business Valuation Update* etc.



Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000153

*CURRICULUM VITAE*

**KEVIN R. YEANOPLOS**

*PAGE 19*

## Selected Courses Instructed

1) <u>Business Valuations: Fundamental, Techniques & Theory</u>, National Association of Certified Valuation Analysts.
2) <u>Business Valuations: Case Analysis Series #1 and Report Writing</u>, National Association of Certified Valuation Analysts.
3) <u>Using Valuation Master 4.0</u>, National Association of Certified Valuation Analysts.
4) <u>Introduction to the Valuation of Businesses & Professional Practices</u>, American Institute of CPA's.
5) <u>An Engagement Approach to Researching, Evaluating & Understanding the Company</u>, American Institute of CPA's.
6) <u>Data Research & the Market Approach to Valuation</u>, American Institute of CPA's.
7) <u>The Income Approach & Asset Based Approach to Valuation</u>, American Institute of CPA's.
8) <u>Special Issues in Business Valuation</u>, American Institute of CPA's.
9) <u>Valuations and Transfers: A Case Study</u>, American Institute of CPA's.
10) <u>The CPA-Valuator-Expert Witness</u>, American Institute of CPA's.
11) <u>A Practical Approach to Valuation Report Writing</u>, American Institute of CPA's.
12) <u>Advanced Valuation Discounts and Premiums</u>, American Institute of CPA's.
13) <u>Preparing for The 1997 AICPA ABV Examination Review Course</u>, American Institute of CPA's.
14) <u>Preparing for The 1998 AICPA ABV Examination Review Course</u>, American Institute of CPA's.
15) <u>Preparing for The 1999 AICPA ABV Examination Review Course</u>, American Institute of CPA's.
16) <u>Preparing for The 2000 AICPA ABV Examination Review Course</u>, American Institute of CPA's.
17) <u>Preparing for The 2002 AICPA ABV Examination Review Course</u>, American Institute of CPA's.
18) <u>Preparing for The 2004 AICPA ABV Examination Review Course</u>, American Institute of CPA's.
19) <u>Preparing for The 2005 AICPA ABV Examination Review Course</u>, American Institute of CPA's.
20) <u>Preparing for The 2007 AICPA ABV Examination Review Course</u>, American Institute of CPA's
21) <u>Fundamentals of Business Valuation, Part 1</u>, American Institute of CPA's.
22) <u>Fundamentals of Business Valuation, Part 2</u>, American Institute of CPA's.
23) <u>Market Approach: Advanced Guideline Company Analysis</u>, American Institute of CPA's
24) <u>Advanced Computing the Cost of Capital</u>, American Institute of CPA's.
25) <u>Small Business Valuation Case Study</u>, American Institute of CPA's.
26) <u>Valuation Issues in Divorce Settings</u>, American Institute of CPA's.
27) <u>Splitting Up is Hard to Do: Advanced Valuation Issues in Divorce</u>, American Institute of CPA's.
28) <u>An Exciting Insight into the Health Care Industry and Medical Practice Valuation</u>, American Institute of CPA's.
29) <u>Exploring Issues in Valuing Stock Options and Other Assets You Can't See</u>, American Institute of CPA's.
30) <u>Valuation Introduction, Research and Analysis, and the Asset Approach</u>, American Institute of CPA's.
31) <u>The Income Approach and Cost of Capital</u>, American Institute of CPA's.
32) <u>The Market Approach, Discount and Premiums</u>, American Institute of CPA's.
33) <u>Reports, Standards, and Tax Valuations</u>, American Institute of CPA's.
34) <u>Valuation of Specialized Areas</u>, American Institute of CPA's.
35) <u>Business Valuation Essentials: Case Study</u>, American Institute of CPA's.
36) <u>Small Business Valuation: A Real Life Case Study</u>, American Institute of CPA's.
37) <u>Valuing Goodwill and Intangible Assets</u>, American Institute of CPA's.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

*CURRICULUM VITAE*

**KEVIN R. YEANOPLOS**

*PAGE 20*

**Selected Courses Instructed** (continued)

38) <u>Introduction to Business Valuation</u>, American Society of Appraisers.
39) <u>Fair Value Accounting: A Critical New Skill for All CPAs</u>, American Institute of CPA's.
40) <u>Fundamentals of Business Valuation: Business Valuation School</u>, American Institute of CPA's.
41) <u>Auditing Fair Value Measurements and Disclosures</u>, American Institute of CPA's.
42) <u>Accounting for Goodwill and Other Intangibles: Fair Value Measurements</u>, American Institute of CPA's.
43) <u>Accounting for Business Combinations Under New SFAS No. 141(R)</u>, American Institute of CPA's.
44) <u>Business Valuation School</u>, American Institute of CPA's.



Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000155

## PROFESSIONAL REFERENCES

Mr. Neil Beaton
Accredited Senior Appraiser
ALVAREZ & MARSAL VALUATION SERVICES
1201 Third Avenue, Suite 750
Seattle, WA 98101

Mr. Marc Fleischman
Certified Public Accountant
BEACH FLEISCHMAN AND CO., P.C.
1985 E. River Road
Tucson, AZ 85718

Mr. Craig H. Kaufman
Attorney at Law
QUARLES & BRADY LLP
1 S. Church, #1700
Tucson, AZ 85701

Mr. Michael Deitch
Certified Public Accountant
SINFONIA HEALTHCARE CORP.
One East Toole
Tucson, AZ 85701

Ms. Jeanne Galvin
Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL,
STATE OF ARIZONA
1275 W. Washington
Phoenix, AZ 85007

Mr. Christopher Gleason
President/CEO
NEXTMED HOLDINGS, LLC.
6339 E. Speedway Blvd.
Tucson, AZ 85710

Mr. Roger Rancourt
Certified Public Accountant
MOSS ADAMS, LLP
999 Third Avenue, Suite 2800
Seattle, WA 98104

Mr. Ron Seigneur
Certified Public Accountant
SEIGNEUR GUSTAFSON
300 Union Blvd., Suite 600
Lakewood, CO 80228

Mr. Greg Torok, Esq.
TOROK LAW FIRM P.L.L.C.
268 S. 1st Avenue
Yuma, AZ 85364

John Casadei
Chief Financial Officer
CAID INDUSTRIES
2275 E. Ganley Road
Tucson, AZ 85706

Mr. Tim Barone
Chief Financial Officer
VANTAGE MOBILITY INTERNATIONAL
5202 S. 28th Place
Phoenix, AZ 85040

Mr. John Aboud
Attorney at Law
ABOUD & ABOUD
100 N. Stone Ave., Suite 303
Tucson, AZ 85701

Mr. Russell Krone
Attorney at Law
THOMPSON KRONE, P.L.C.
4601 East Ft. Lowell Road, Suite 109
Tucson, AZ 85712

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000156

# *CURRICULUM VITAE*

## CLAY S. DANIELSON, ASA

*Accredited Senior Appraiser*



## Brueggeman and Johnson Yeanoplos, P.C.

A Member of The Financial Consulting Group

7363 E. Tanque Verde Rd., Tucson, AZ 85715 • Telephone (520) 327-8258 • Facsimile (520) 327-7080
601 Union Street, Suite 3501, Seattle, WA 98101 • Telephone (206) 628-3100 • Facsimile (206) 628-0106

### PROFESSIONAL HISTORY

Prior

**Ringel Kotzin Valuation Services**
Valuation Advisors
Phoenix, Arizona
Senior Valuation Analyst

**Beacon Valuation Group, Ltd**
Valuation Advisors
Tucson, Arizona
Associate

**Moran, Quick & Yeanoplos, PLLC**
Certified Public Accountants and Consultants
Tucson, Arizona
Associate

### MAJOR PROJECTS

Business valuation engagements for:
> Manufacturing, Wholesale, Retail
> Automobile Dealers
> Distribution
> Intellectual Property
> Restaurants
> ESOP's
> Financial Reporting

### COMMUNITY & PROFESSIONAL INVOLVEMENT

President, American Society of Appraisers - Tucson Chapter
Former Treasurer, American Society of Appraisers - Tucson Chapter
Former Treasurer, Ft. Lowell Youth Soccer Tournament
CASA Support Council for Pima County, Inc. Fundraising Committee Member

PAREDES-0000157

## PROFESSIONAL & BUSINESS ASSOCIATIONS

- American Society of Appraisers (Accredited Senior Appraiser)
- Financial Consulting Group
- Arizona Business Brokers Association

## SELECTED INVOLVEMENT IN PROFESSIONAL PUBLICATIONS AND PRESENTATIONS

1) <u>Valuing Auto Dealerships</u>, Presented for BV Resources, LLC., October 2007.

2) <u>Fundamentals of Business Valuation</u>, Presentation given for the Northern Chapter of the Arizona Society of CPA's, 2012.

## SPECIALIZED TRAINING

American Society of Appraisers, Advanced Business Valuation Conference

American Institute of Certified Public Accountants, Litigation Support and Business Valuation Conferences

Various other relevant training and conferences in the area of business valuation

PAREDES-0000158

# APPENDIX 4

### DEFINITIONS



Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000159

# INTERNATIONAL GLOSSARY OF BUSINESS VALUATION TERMS

To enhance and sustain the quality of business valuations for the benefit of the profession and its clientele, the below identified societies and organizations have adopted the definitions for the terms included in this glossary.

The performance of business valuation services requires a high degree of skill and imposes upon the valuation professional a duty to communicate the valuation process and conclusion, in a manner that is clear and not misleading. This duty is advanced through the use of terms whose meanings are clearly established and consistently applied throughout the profession.

If, in the opinion of the business valuation professional, one or more of these terms needs to be used in a manner that materially departs from the enclosed definitions, it is recommended that the term be defined as used within that valuation engagement.

This glossary has been developed to provide guidance to business valuation practitioners by further memorializing the body of knowledge that constitutes the competent and careful determination of value and, more particularly, the communication of how that value was determined.

Departure from this glossary is not intended to provide a basis for civil liability and should not be presumed to create evidence that any duty has been breached.

**American Institute of Certified Public Accountants**
**American Society of Appraisers**
**Canadian Institute of Chartered Business Valuators**
**National Association of Certified Valuation Analysts**
**The Institute of Business Appraisers**

**Adjusted Book Value Method** – a method within the asset approach whereby all assets and liabilities (including off-balance sheet, intangible, and contingent) are adjusted to their fair market values (NOTE: In Canada on a going concern basis).

**Adjusted Net Asset Method** – see **Adjusted Book Value Method**.

**Appraisal** - see **Valuation**.

**Appraisal Approach** - see **Valuation Approach**.

**Appraisal Date** - see **Valuation Date**.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000160

**Appraisal Method** - see **Valuation Method**.

**Appraisal Procedure** - see **Valuation Procedure**.

**Arbitrage Pricing Theory** – a multivariate model for estimating the cost of equity capital, which incorporates several systematic risk factors.

**Asset (Asset-Based) Approach** - a general way of determining a value indication of a business, business ownership interest, or security using one or more methods based on the value of the assets net of liabilities.

**Beta** - a measure of systematic risk of a stock; the tendency of a stock's price to correlate with changes in a specific index.

**Blockage Discount** - an amount or percentage deducted from the current market price of a publicly traded stock to reflect the decrease in the per share value of a block of stock that is of a size that could not be sold in a reasonable period of time given normal trading volume.

**Book Value** – see **Net Book Value**.

**Business** - see **Business Enterprise**.

**Business Enterprise** - a commercial, industrial, service, or investment entity (or a combination thereof) pursuing an economic activity.

**Business Risk** – the degree of uncertainty of realizing expected future returns of the business resulting from factors other than financial leverage. See **Financial Risk**.

**Business Valuation** - the act or process of determining the value of a business enterprise or ownership interest therein.

**Capital Asset Pricing Model (CAPM)** - a model in which the cost of capital for any stock or portfolio of stocks equals a risk-free rate plus a risk premium that is proportionate to the systematic risk of the stock or portfolio.

**Capitalization** - a conversion of a single period of economic benefits into value.

**Capitalization Factor** - any multiple or divisor used to convert anticipated economic benefits of a single period into value.

**Capitalization of Earnings Method** – a method within the income approach whereby economic benefits for a representative single period are converted to value through division by a capitalization rate.

**Capitalization Rate** - any divisor (usually expressed as a percentage) used to convert anticipated economic benefits of a single period into value.

**Capital Structure** - the composition of the invested capital of a business enterprise, the mix of debt and equity financing.

**Cash Flow** - cash that is generated over a period of time by an asset, group of assets, or business enterprise. It may be used in a general sense to encompass various levels of specifically defined cash flows. When the term is used, it should be supplemented by a qualifier (for example, "discretionary" or "operating") and a specific definition in the given valuation context.

**Common Size Statements** – financial statements in which each line is expressed as a percentage of the total. On the balance sheet, each line item is shown as a percentage of total assets, and on the income statement, each item is expressed as a percentage of sales.

**Control** - the power to direct the management and policies of a business enterprise.

**Control Premium** - an amount or a percentage by which the pro rata value of a controlling interest exceeds the pro rata value of a non-controlling interest in a business enterprise, to reflect the power of control.

**Cost Approach** - a general way of determining a value indication of an individual asset by quantifying the amount of money required to replace the future service capability of that asset.

**Cost of Capital** - the expected rate of return that the market requires in order to attract funds to a particular investment.

**Debt-Free** – *we discourage the use of this term.* See **Invested Capital**.

**Discount for Lack of Control** - an amount or percentage deducted from the pro rata share of value of 100% of an equity interest in a business to reflect the absence of some or all of the powers of control.

**Discount for Lack of Marketability** - an amount or percentage deducted from the value of an ownership interest to reflect the relative absence of marketability.

**Discount for Lack of Voting Rights** – an amount or percentage deducted from the per share value of a minority interest voting share to reflect the absence of voting rights.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000162

**Discount Rate** - a rate of return used to convert a future monetary sum into present value.

**Discounted Cash Flow Method** – a method within the income approach whereby the present value of future expected net cash flows is calculated using a discount rate.

**Discounted Future Earnings Method** – a method within the income approach whereby the present value of future expected economic benefits is calculated using a discount rate.

**Economic Benefits** - inflows such as revenues, net income, net cash flows, etc.

**Economic Life** - the period of time over which property may generate economic benefits.

**Effective Date** - see **Valuation Date**.

**Enterprise** - see **Business Enterprise**.

**Equity** – the owner's interest in property after deduction of all liabilities.

**Equity Net Cash Flows** - those cash flows available to pay out to equity holders (in the form of dividends) after funding operations of the business enterprise, making necessary capital investments, and increasing or decreasing debt financing.

**Equity Risk Premium** - a rate of return added to a risk-free rate to reflect the additional risk of equity instruments over risk free instruments (a component of the cost of equity capital or equity discount rate).

**Excess Earnings** - that amount of anticipated economic benefits that exceeds an appropriate rate of return on the value of a selected asset base (often net tangible assets) used to generate those anticipated economic benefits.

**Excess Earnings Method** - a specific way of determining a value indication of a business, business ownership interest, or security determined as the sum of a) the value of the assets derived by capitalizing excess earnings and b) the value of the selected asset base. Also frequently used to value intangible assets. See **Excess Earnings**.

**Fair Market Value** - the price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arms length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts. {NOTE: In Canada, the term "price" should be replaced with the term "highest price"}

PAREDES-0000163

**Fairness Opinion** – an opinion as to whether or not the consideration in a transaction is fair from a financial point of view.

**Financial Risk** – the degree of uncertainty of realizing expected future returns of the business resulting from financial leverage. See **Business Risk**.

**Forced Liquidation Value** - liquidation value, at which the asset or assets are sold as quickly as possible, such as at an auction.

**Free Cash Flow** – *we discourage the use of this term.* See **Net Cash Flow**.

**Going Concern** - an ongoing operating business enterprise.

**Going Concern Value** - the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of Going Concern Value result from factors such as having a trained work force, an operational plant, and the necessary licenses, systems, and procedures in place.

**Goodwill** - that intangible asset arising as a result of name, reputation, customer loyalty, location, products, and similar factors not separately identified.

**Goodwill Value** - the value attributable to goodwill.

**Guideline Public Company Method** – a method within the market approach whereby market multiples are derived from market prices of stocks of companies that are engaged in the same or similar lines of business, and that are actively traded on a free and open market.

**Income (Income-Based) Approach** - a general way of determining a value indication of a business, business ownership interest, security, or intangible asset using one or more methods that convert anticipated economic benefits into a present single amount.

**Intangible Assets** - non-physical assets such as franchises, trademarks, patents, copyrights, goodwill, equities, mineral rights, securities and contracts (as distinguished from physical assets) that grant rights and privileges, and have value for the owner.

**Internal Rate of Return** – a discount rate at which the present value of the future cash flows of the investment equals the cost of the investment.

**Intrinsic Value** – the value that an investor considers, on the basis of an evaluation or available facts, to be the "true" or "real" value that will become the market value when other investors reach the same conclusion. When the term applies to options, it is the difference between the exercise price or strike price of an option and the market value of the underlying security.

PAREDES-0000164

**Invested Capital** - the sum of equity and debt in a business enterprise. Debt is typically a) all interest bearing debt or b) long-term interest-bearing debt. When the term is used, it should be supplemented by a specific definition in the given valuation context.

**Invested Capital Net Cash Flows** - those cash flows available to pay out to equity holders (in the form of dividends) and debt investors (in the form of principal and interest) after funding operations of the business enterprise and making necessary capital investments.

**Investment Risk** - the degree of uncertainty as to the realization of expected returns.

**Investment Value** - the value to a particular investor based on individual investment requirements and expectations. {NOTE: in Canada, the term used is "Value to the Owner"}.

**Key Person Discount** - an amount or percentage deducted from the value of an ownership interest to reflect the reduction in value resulting from the actual or potential loss of a key person in a business enterprise.

**Levered Beta** - the beta reflecting a capital structure that includes debt.

**Limited Appraisal** – the act or process of determining the value of a business, business ownership interest, security, or intangible asset with limitations in analyses, procedures, or scope.

**Liquidity** - the ability to quickly convert property to cash or pay a liability.

**Liquidation Value** - the net amount that would be realized if the business is terminated and the assets are sold piecemeal. Liquidation can be either "orderly" or "forced."

**Majority Control** - the degree of control provided by a majority position.

**Majority Interest** - an ownership interest greater than 50% of the voting interest in a business enterprise.

**Market (Market-Based) Approach** - a general way of determining a value indication of a business, business ownership interest, security, or intangible asset by using one or more methods that compare the subject to similar businesses, business ownership interests, securities, or intangible assets that have been sold.

**Market Capitalization of Equity** – the share price of a publicly traded stock multiplied by the number of shares outstanding.

**Market Capitalization of Invested Capital** – the market capitalization of equity plus the market value of the debt component of invested capital.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000165

**Market Multiple** – the market value of a company's stock or invested capital divided by a company measure (such as economic benefits, number of customers).

**Marketability** - the ability to quickly convert property to cash at minimal cost.

**Marketability Discount** - see **Discount for Lack of Marketability**.

**Merger and Acquisition Method** – a method within the market approach whereby pricing multiples are derived from transactions of significant interests in companies engaged in the same or similar lines of business.

**Mid-Year Discounting** – a convention used in the Discounted Future Earnings Method that reflects economic benefits being generated at midyear, approximating the effect of economic benefits being generated evenly throughout the year.

**Minority Discount** - a discount for lack of control applicable to a minority interest.

**Minority Interest** - an ownership interest less than 50% of the voting interest in a business enterprise.

**Multiple** - the inverse of the capitalization rate.

**Net Book Value** - with respect to a business enterprise, the difference between total assets (net of accumulated depreciation, depletion, and amortization) and total liabilities as they appear on the balance sheet (synonymous with Shareholder's Equity). With respect to a specific asset, the capitalized cost less accumulated amortization or depreciation as it appears on the books of account of the business enterprise.

**Net Cash Flows** – when the term is used, it should be supplemented by a qualifier. See **Equity Net Cash Flows** and **Invested Capital Net Cash Flows**.

**Net Present Value** – the value, as of a specified date, of future cash inflows less all cash outflows (including the cost of investment) calculated using an appropriate discount rate.

**Net Tangible Asset Value** - the value of the business enterprise's tangible assets (excluding excess assets and non-operating assets) minus the value of its liabilities.

**Non-Operating Assets** - assets not necessary to ongoing operations of the business enterprise. {NOTE: in Canada, the term used is "Redundant Assets"}.

PAREDES-0000166

**Normalized Earnings** – economic benefits adjusted for nonrecurring, noneconomic, or other unusual items to eliminate anomalies and/or facilitate comparisons.

**Normalized Financial Statements** – financial statements adjusted for nonoperating assets and liabilities and/or for nonrecurring, noneconomic, or other unusual items to eliminate anomalies and/or facilitate comparisons.

**Orderly Liquidation Value** - liquidation value at which the asset or assets are sold over a reasonable period of time to maximize proceeds received.

**Premise of Value** - an assumption regarding the most likely set of transactional circumstances that may be applicable to the subject valuation; e.g. going concern, liquidation.

**Present Value** – the value, as of a specified date, of future economic benefits and/or proceeds from sale, calculated using an appropriate discount rate.

**Portfolio Discount** - an amount or percentage deducted from the value of a business enterprise to reflect the fact that it owns dissimilar operations or assets that do not fit well together.

**Price/Earnings Multiple** – the price of a share of stock divided by its earnings per share.

**Rate of Return** – an amount of income (loss) and/or change in value realized or anticipated on an investment, expressed as a percentage of that investment.

**Redundant Assets** – see **Non-Operating Assets**.

**Report Date** – the date conclusions are transmitted to the client.

**Replacement Cost New** – the current cost of a similar new property having the nearest equivalent utility to the property being valued.

**Reproduction Cost New** – the current cost of an identical new property.

**Required Rate of Return** – the minimum rate of return acceptable by investors before they will commit money to an investment at a given level of risk.

**Residual Value** – the value as of the end of the discrete projection period in a discounted future earnings model.

**Return on Equity** – the amount, expressed as a percentage, earned on a company's common equity for a given period.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000167

**Return on Investment** – see **Return on Invested Capital** and **Return on Equity**.

**Return on Invested Capital** – the amount, expressed as a percentage, earned on a company's total capital for a given period.

**Risk-Free Rate** – the rate of return available in the market on an investment free of default risk.

**Risk Premium** – a rate of return added to a risk-free rate to reflect risk.

**Rule of Thumb** – a mathematical formula developed from the relationship between price and certain variables based on experience, observation, hearsay, or a combination of these; usually industry specific.

**Special Interest Purchasers** – acquirers who believe they can enjoy post-acquisition economies of scale, synergies, or strategic advantages by combining the acquired business interest with their own.

**Standard of Value** – the identification of the type of value being used in a specific engagement; e.g. fair market value, fair value, investment value.

**Sustaining Capital Reinvestment** – the periodic capital outlay required to maintain operations at existing levels, net of the tax shield available from such outlays.

**Systematic Risk** – the risk that is common to all risky securities and cannot be eliminated through diversification. The measure of systematic risk in stocks is the beta coefficient.

**Tangible Assets** – physical assets (such as cash, accounts receivable, inventory, property, plant and equipment, etc.).

**Terminal Value** - see **Residual Value**.

**Transaction Method** - see **Merger and Acquisition Method.**

**Unlevered Beta** – the beta reflecting a capital structure without debt.

**Unsystematic Risk** – the risk specific to an individual security that can be avoided through diversification.

**Valuation** – the act or process of determining the value of a business, business ownership interest, security, or intangible asset.

PAREDES-0000168

**Valuation Approach** – a general way of determining a value indication of a business, business ownership interest, security, or intangible asset using one or more valuation methods.

**Valuation Date** – the specific point in time as of which the valuator's opinion of value applies (also referred to as "Effective Date" or "Appraisal Date").

**Valuation Method** – within approaches, a specific way to determine value.

**Valuation Procedure** – the act, manner, and technique of performing the steps of an appraisal method.

**Valuation Ratio** – a fraction in which a value or price serves as the numerator and financial, operating, or physical data serves as the denominator.

**Value to the Owner** – see **Investment Value**.

**Voting Control** – *de jure* control of a business enterprise.

**Weighted Average Cost of Capital (WACC)** – the cost of capital (discount rate) determined by the weighted average, at market value, of the cost of all financing sources in the business enterprise's capital structure.

# APPENDIX 5

## STATEMENT OF ASSUMPTIONS & LIMITING CONDITIONS



PAREDES-0000170

## STATEMENT OF ASSUMPTIONS & LIMITING CONDITIONS

The conclusion of value arrived at herein is valid only for the stated purpose as of the date of the valuation.

We have accepted financial statements and other related information provided by Community Provider of Enrichment Services, Inc. ("CPES") or its representatives, in the course of this engagement, without any verification as fully and correctly reflecting the enterprise's business conditions and operating results for the respective periods, except as specifically noted herein. Brueggeman and Johnson Yeanoplos, P.C. ("BJY") has not audited, reviewed, or compiled the financial information provided to us and, accordingly, we express no audit opinion or any other form of assurance on this information.

We have obtained public information and industry and statistical information from sources we believe to be reliable. However, we make no representation as to the accuracy or completeness of such information and have performed no procedures to corroborate the information.

We do not provide assurance on the achievability of the results forecasted by CPES because events and circumstances frequently do not occur as expected; differences between actual and expected results may be material; and achievement of the forecasted results is dependent on actions, plans, and assumptions of management.

The conclusion of value arrived at herein is based on the assumption that the current level of management expertise and effectiveness would continue to be maintained and that the character and integrity of the enterprise through any sale, reorganization, exchange, or diminution of the owners' participation would not be materially or significantly changed.

This report and the conclusion of value arrived at herein are for the exclusive use of our client for the sole and specific purposes as noted herein. They may not be used for any other purpose or by any other party for any purpose. Furthermore the report and conclusion of value are not intended by the author and should not be construed by the reader to be investment advice in any manner whatsoever. The conclusion of value represents the opinion of BJY based on information furnished to them by CPES and other sources.

Neither all nor any part of the contents of this report (especially the conclusion of value, the identity of any valuation specialist(s), or the firm with which such valuation specialists are connected or any reference to any of their professional designations) should be disseminated to the public through advertising media, public relations, news media, sales media, mail, direct transmittal, or any other means of communication, including but not limited to the Securities and Exchange Commission or other governmental agency or regulatory body, without the prior written consent and approval of BJY.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000171

Future services regarding the subject matter of this report, including, but not limited to testimony or attendance in court, shall not be required of BJY unless previous arrangements have been made in writing.

BJY is not an environmental consultant or auditor, and it takes no responsibility for any actual or potential environmental liabilities. Any person entitled to rely on this report, wishing to know whether such liabilities exist, or the scope and their effect on the value of the property, is encouraged to obtain a professional environmental assessment. BJY does not conduct or provide environmental assessments and has not performed one for the subject property.

BJY has not determined independently whether CPES is subject to any present or future liability relating to environmental matters (including, but not limited to CERCLA/Superfund liability) nor the scope of any such liabilities. BJY's valuation takes no such liabilities into account, except as they have been reported to BJY by Community Provider of Enrichment Services, Inc. or by an environmental consultant working for Community Provider of Enrichment Services, Inc., and then only to the extent that the liability was reported to is in an actual or estimated dollar amount. Such matters, if any, are noted in the report. To the extent such information has been reported to us, BJY has relied on it without verification and offers no warranty or representation as to its accuracy or completeness.

BJY has not made a specific compliance survey or analysis of the subject property to determine whether it is subject to, or in compliance with, the American Disabilities Act of 1990, and this valuation does not consider the effect, if any, of noncompliance.

No change of any item in this report shall be made by anyone other than BJY and we shall have no responsibility for any such unauthorized change.

Unless otherwise stated, no effort has been made to determine the possible effect, if any, on the subject business due to future Federal, state, or local legislation, including any environmental or ecological matters or interpretations thereof.

If prospective financial information approved by management has been used in our work, we have not examined or compiled the prospective financial information and therefore, do not express an audit opinion or any other form of assurance on the prospective financial information or the related assumptions. Events and circumstances frequently do not occur as expected, and there will usually be differences between prospective financial information and actual results, and those differences may be material.

Except as noted, we have relied on the representations of the owners, management, and other third parties concerning the value and useful condition of all equipment, real estate, investments used in the business, and any other assets or liabilities, except as specifically stated to the contrary in this report. We have not attempted to confirm whether or not all assets of the business are free and clear of liens and encumbrances or that the entity has good title to all assets.

PAREDES-0000172

The approaches and methodologies used in our work did not comprise an examination in accordance with generally accepted accounting principles, the objective of which is an expression of an opinion regarding the fair presentation of financial statements or other financial information, whether historical or prospective, presented in accordance with generally accepted accounting principles. We express no opinion and accept no responsibility for the accuracy and completeness of the financial information or other data provided to us by others. We assume that the financial and other information provided to is accurate and complete, and we have relied upon this information in performing our valuation.

The valuation may not be used in conjunction with any other appraisal or study. The value conclusion(s) stated in this appraisal is based on the program of utilization described in this report, and may not be separated into parts. The appraisal was prepared solely for the purpose and party so identified in the report. The report may not be reproduced, in whole or in part, and the findings of the report may not be utilized by a third party for any purpose, without the express written consent of BJY.

Unless otherwise stated in the appraisal, the valuation of the business has not considered or incorporated the potential economic gain or loss resulting from contingent assets, liabilities or events existing as of the valuation date.

The working papers for this engagement are being retained in our files and are available for your reference. We would be available to support our calculated value should this be required. Those services would be performed for an additional fee.

Any decision to purchase, sell or transfer any interest in the subject company or its subsidiaries shall be your sole responsibility, as well as the structure to be utilized and the price to be accepted.

The selection of the price to be accepted requires consideration of factors beyond the information we will provide or have provided. An actual transaction involving the subject business might be concluded at a higher value or at a lower value, depending upon the circumstances of the transaction and the business, and the knowledge and motivational influences which may affect the sale of a business interest, the appraiser assumes no responsibility for the actual price of any subject business interest if sold or transferred.

All facts and data set forth in our letter report are true and accurate to the best of the Appraiser's knowledge and belief.

During the course of the valuation, we considered information provided by management and other third parties. We believe these sources to be reliable, but no further responsibility is assumed for their accuracy.

---

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000173

Any projections of future events described in this report represent the general expectancy concerning such events as of the valuation date(s). These future events may or may not occur as anticipated, and actual operating results may vary from those described in our report.

If applicable, we have used financial projections approved by management. We have not examined the forecast data or the underlying assumptions in accordance with the standards prescribed by the American Institute of Certified Public Accountants and do not express an opinion or any other form of assurance on the forecast data and related assumptions. The future may not occur as anticipated, and actual operating results may vary from those described in our report. In the case that the forecast data differ from the actual future events, our recommendations as to the indication of value may be materially affected.

We have no responsibility or obligation to update this report for events or circumstances occurring subsequent to the date of this report.

In all matters that may be potentially challenged by a Court or other party we do not take responsibility for the degree of reasonableness of contrary positions that others may choose to take, nor for the costs or fees that may be incurred in the defense of our recommendations against challenge(s). We will, however, retain our supporting work papers for your matter(s), and will be available to assist in defending our professional positions taken, at our then current rates, plus direct expenses at actual, and according to our then current Standard Professional Agreement.

No third parties are intended to be benefited. An engagement for a different purpose, or under a different standard or basis of value, or for a different date of value, could result in a materially different opinion of value.

BJY retains all exclusive rights to copyrights to the report and to control the issuance of copies by others, and the client has no right of diffusion, reproduction, distribution or sale. The client may reproduce copies of the report solely for its internal use. Otherwise, the client may not reproduce without the prior written consent of BJY.

Our report will not be used for financing, or included in a private placement or other public documents and may not be relied upon by any third parties.

The report assumes all required licenses, certificates of occupancy, consents, or legislative or administrative authority from any local, state or national government, or private entity or organization have been or can be obtained or reviewed for any use on which the opinion contained in the report are based.

BJY does not consent to be "expertised" with respect to matters involving the Securities and Exchange Commission. For purposes of this report, the foregoing sentence means that BJY shall not

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000174

be referred to by name or anonymously in any filing or document. Should you breach this stipulation and refer to BJY by name or anonymously, you will amend such filing or document upon written consent of BJY.

We express no opinion for matters that require legal or other specialized expertise, investigation, or knowledge beyond that customarily employed by business appraisers.

Unless stated otherwise in this report, we express no opinion as to: 1) the tax consequences of any transaction which may result, 2) the effect of the tax consequences of any net value received or to be received as a result of a transaction, and 3) the possible impact on the market value resulting from any need to effect a transaction to pay taxes.

The dollar amount of any value reported is based on the purchasing power of the U.S. dollar as of the valuation date. The appraiser assumes no responsibility for economic or physical factors occurring subsequent to the date that may affect the opinions reported.

The estimate of fair market value assumes that the Company is a "going concern," based on an all cash purchase, or equivalent terms thereof the Company would have a materially different value in liquidation. No estimate of the value that could be achieved in liquidation is included in this report.

Copyright © 2018 Brueggeman and Johnson Yeanoplos, P.C.

PAREDES-0000175

Exhibit "10"

# Form 5500

Department of the Treasury
Internal Revenue Service

Department of Labor
Employee Benefits Security
Administration

Pension Benefit Guaranty Corporation

## Annual Return/Report of Employee Benefit Plan

This form is required to be filed for employee benefit plans under sections 104 and 4065 of the Employee Retirement Income Security Act of 1974 (ERISA) and sections 6057(b) and 6058(a) of the Internal Revenue Code (the Code).

▸ **Complete all entries in accordance with the instructions to the Form 5500.**

OMB Nos. 1210-0110
1210-0089

## 2017

**This Form is Open to Public Inspection**

| Part I | Annual Report Identification Information |
| --- | --- |

For calendar plan year 2017 or fiscal plan year beginning  01/01/2017                 and ending  12/31/2017

**A** This return/report is for:
- [ ] a multiemployer plan
- [ ] a multiple-employer plan (Filers checking this box must attach a list of participating employer information in accordance with the form instructions.)
- [x] a single-employer plan
- [ ] a DFE (specify) ___

**B** This return/report is:
- [ ] the first return/report
- [ ] the final return/report
- [ ] an amended return/report
- [ ] a short plan year return/report (less than 12 months)

**C** If the plan is a collectively-bargained plan, check here. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▸ [ ]

**D** Check box if filing under:
- [x] Form 5558
- [ ] automatic extension
- [ ] the DFVC program
- [ ] special extension (enter description)

| Part II | Basic Plan Information—enter all requested information |
| --- | --- |

**1a** Name of plan
CPES EMPLOYEE STOCK OWNERSHIP PLAN

**1b** Three-digit plan number (PN) ▸  001

**1c** Effective date of plan
07/01/1994

**2a** Plan sponsor's name (employer, if for a single-employer plan)
Mailing address (include room, apt., suite no. and street, or P.O. Box)
City or town, state or province, country, and ZIP or foreign postal code (if foreign, see instructions)

COMMUNITY PROVIDER OF ENRICHMENT SERVICES, INC.

4825 N. SABINO CANYON ROAD
TUCSON, AZ 85750

**2b** Employer Identification Number (EIN)
86-0393979

**2c** Plan Sponsor's telephone number
520-884-7954

**2d** Business code (see instructions)
624100

**Caution: A penalty for the late or incomplete filing of this return/report will be assessed unless reasonable cause is established.**

Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including accompanying schedules, statements and attachments, as well as the electronic version of this return/report, and to the best of my knowledge and belief, it is true, correct, and complete.

| SIGN HERE | Filed with authorized/valid electronic signature. | 10/03/2018 | TERESA THIENHAUS |
| --- | --- | --- | --- |
| | Signature of plan administrator | Date | Enter name of individual signing as plan administrator |
| SIGN HERE | | | |
| | Signature of employer/plan sponsor | Date | Enter name of individual signing as employer or plan sponsor |
| SIGN HERE | | | |
| | Signature of DFE | Date | Enter name of individual signing as DFE |

**For Paperwork Reduction Act Notice, see the Instructions for Form 5500.**

Form 5500 (2017)
v. 170203

Form 5500 (2017)                                                                                          Page **2**

| 3a | Plan administrator's name and address ☒ Same as Plan Sponsor | **3b** Administrator's EIN |
|---|---|---|
| | | **3c** Administrator's telephone number |

| 4 | If the name and/or EIN of the plan sponsor or the plan name has changed since the last return/report filed for this plan, enter the plan sponsor's name, EIN, the plan name and the plan number from the last return/report: | **4b** EIN |
|---|---|---|
| a | Sponsor's name | **4d** PN |
| c | Plan Name | |

| 5 | Total number of participants at the beginning of the plan year | 5 | 1448 |
|---|---|---|---|

**6** Number of participants as of the end of the plan year unless otherwise stated (welfare plans complete only lines **6a(1), 6a(2), 6b, 6c,** and **6d**).

| | | | |
|---|---|---|---|
| a(1) | Total number of active participants at the beginning of the plan year ................ | **6a(1)** | 794 |
| a(2) | Total number of active participants at the end of the plan year ................ | **6a(2)** | 554 |
| b | Retired or separated participants receiving benefits ................ | **6b** | 63 |
| c | Other retired or separated participants entitled to future benefits ................ | **6c** | 494 |
| d | Subtotal. Add lines **6a(2)**, **6b**, and **6c** ................ | **6d** | 1111 |
| e | Deceased participants whose beneficiaries are receiving or are entitled to receive benefits. ................ | **6e** | 3 |
| f | Total. Add lines **6d** and **6e**. ................ | **6f** | 1114 |
| g | Number of participants with account balances as of the end of the plan year (only defined contribution plans complete this item) ................ | **6g** | 1109 |
| h | Number of participants who terminated employment during the plan year with accrued benefits that were less than 100% vested ................ | **6h** | 0 |

| 7 | Enter the total number of employers obligated to contribute to the plan (only multiemployer plans complete this item) .......... | 7 | |
|---|---|---|---|

**8a** If the plan provides pension benefits, enter the applicable pension feature codes from the List of Plan Characteristics Codes in the instructions:

2I    2P    2Q

**b** If the plan provides welfare benefits, enter the applicable welfare feature codes from the List of Plan Characteristics Codes in the instructions:

| 9a | Plan funding arrangement (check all that apply) | | 9b | Plan benefit arrangement (check all that apply) | |
|---|---|---|---|---|---|
| (1) | ☐ | Insurance | (1) | ☐ | Insurance |
| (2) | ☐ | Code section 412(e)(3) insurance contracts | (2) | ☐ | Code section 412(e)(3) insurance contracts |
| (3) | ☒ | Trust | (3) | ☒ | Trust |
| (4) | ☐ | General assets of the sponsor | (4) | ☐ | General assets of the sponsor |

**10** Check all applicable boxes in 10a and 10b to indicate which schedules are attached, and, where indicated, enter the number attached. (See instructions)

| a | **Pension Schedules** | | | b | **General Schedules** | | |
|---|---|---|---|---|---|---|---|
| (1) | ☒ | **R** (Retirement Plan Information) | | (1) | ☒ | **H** (Financial Information) | |
| (2) | ☐ | **MB** (Multiemployer Defined Benefit Plan and Certain Money Purchase Plan Actuarial Information) - signed by the plan actuary | | (2) | ☐ | **I** (Financial Information – Small Plan) | |
| | | | | (3) | ☐ 0 | **A** (Insurance Information) | |
| | | | | (4) | ☒ | **C** (Service Provider Information) | |
| (3) | ☐ | **SB** (Single-Employer Defined Benefit Plan Actuarial Information) - signed by the plan actuary | | (5) | ☐ | **D** (DFE/Participating Plan Information) | |
| | | | | (6) | ☐ | **G** (Financial Transaction Schedules) | |

Form 5500 (2017)                                                                                    Page **3**

| Part III | Form M-1 Compliance Information (to be completed by welfare benefit plans) |
|---|---|

**11a** If the plan provides welfare benefits, was the plan subject to the Form M-1 filing requirements during the plan year? (See instructions and 29 CFR 2520.101-2.) .........................…….…… ☐ Yes   ☐ No

If "Yes" is checked, complete lines 11b and 11c.

**11b** Is the plan currently in compliance with the Form M-1 filing requirements? (See instructions and 29 CFR 2520.101-2.) ……...... ☐ Yes   ☐ No

**11c** Enter the Receipt Confirmation Code for the 2017 Form M-1 annual report.  If the plan was not required to file the 2017 Form M-1 annual report, enter the Receipt Confirmation Code for the most recent Form M-1 that was required to be filed under the Form M-1 filing requirements. (Failure to enter a valid Receipt Confirmation Code will subject the Form 5500 filing to rejection as incomplete.)

Receipt Confirmation Code_____

| **SCHEDULE C**<br>**(Form 5500)**<br><br>Department of the Treasury<br>Internal Revenue Service<br><br>Department of Labor<br>Employee Benefits Security Administration<br><br>Pension Benefit Guaranty Corporation | **Service Provider Information**<br><br>This schedule is required to be filed under section 104 of the Employee Retirement Income Security Act of 1974 (ERISA).<br><br>▶ **File as an attachment to Form 5500.** | OMB No. 1210-0110<br><br>**2017**<br><br>**This Form is Open to Public Inspection.** |
|---|---|---|

| For calendar plan year 2017 or fiscal plan year beginning | 01/01/2017 | and ending | 12/31/2017 |
|---|---|---|---|

| **A** Name of plan<br>CPES EMPLOYEE STOCK OWNERSHIP PLAN | **B** Three-digit<br>plan number (PN)  ▶ | 001 |
|---|---|---|

| **C** Plan sponsor's name as shown on line 2a of Form 5500<br>COMMUNITY PROVIDER OF ENRICHMENT SERVICES, INC. | **D** Employer Identification Number (EIN)<br>86-0393979 |
|---|---|

---

| **Part I** | **Service Provider Information (see instructions)** |
|---|---|

You must complete this Part, in accordance with the instructions, to report the information required for **each person** who received, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of monetary value) in connection with services rendered to the plan or the person's position with the plan during the plan year.  If a person received **only** eligible indirect compensation for which the plan received the required disclosures, you are required to answer line 1 but are not required to include that person when completing the remainder of this Part.

## 1  Information on Persons Receiving Only Eligible Indirect Compensation

**a** Check "Yes" or "No" to indicate whether you are excluding a person from the remainder of this Part because they received only eligible indirect compensation for which the plan received the required disclosures (see instructions for definitions and conditions)................. ☐ Yes  ☒ No

**b**  If you answered line 1a  "Yes," enter the name and EIN or address of each person providing the required disclosures for the service providers who received only eligible indirect compensation.  Complete as many entries as needed (see instructions).

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

---

**For Paperwork Reduction Act Notice, see the Instructions for Form 5500.**

**Schedule C (Form 5500) 2017**
**v. 170203**

Schedule C (Form 5500) 2017                                    Page **2-** 1

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

Schedule C (Form 5500) 2017                                                Page **3** - ☐1

---

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

SES ADVISORS, INC.                    555 CITY AVENUE, SUITE 910
                                      BALA CYNWYD, PA 19004

04-3760707

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 64 70 | NONE | 51192 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

BRUEGGEMAN JOHNSON AND YEANOPLOS PC        7363 EAST TANQUE VERDE ROAD
                                           TUCSON, AZ 85715

91-1219552

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 34 | NONE | 7250 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| | | | Yes ☐ No ☐ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

Schedule C (Form 5500) 2017                                                          Page **3** - 2

**2.  Information on Other Service Providers Receiving Direct or Indirect Compensation.**  Except for those persons for whom you
answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation
(i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

| (b)<br>Service<br>Code(s) | (c)<br>Relationship to<br>employer, employee<br>organization, or<br>person known to be<br>a party-in-interest | (d)<br>Enter direct<br>compensation paid<br>by the plan.  If none,<br>enter -0-. | (e)<br>Did service provider<br>receive indirect<br>compensation? (sources<br>other than plan or plan<br>sponsor) | (f)<br>Did indirect compensation<br>include eligible indirect<br>compensation, for which the<br>plan received the required<br>disclosures? | (g)<br>Enter total indirect<br>compensation received by<br>service provider excluding<br>eligible indirect<br>compensation for which you<br>answered "Yes" to element<br>(f).  If none, enter -0-. | (h)<br>Did the service<br>provider give you a<br>formula instead of<br>an amount or<br>estimated amount? |
|---|---|---|---|---|---|---|
| | | | Yes ☐  No ☐ | Yes ☐  No ☐ | | Yes ☐  No ☐ |

**(a)** Enter name and EIN or address (see instructions)

| (b)<br>Service<br>Code(s) | (c)<br>Relationship to<br>employer, employee<br>organization, or<br>person known to be<br>a party-in-interest | (d)<br>Enter direct<br>compensation paid<br>by the plan.  If none,<br>enter -0-. | (e)<br>Did service provider<br>receive indirect<br>compensation? (sources<br>other than plan or plan<br>sponsor) | (f)<br>Did indirect compensation<br>include eligible indirect<br>compensation, for which the<br>plan received the required<br>disclosures? | (g)<br>Enter total indirect<br>compensation received by<br>service provider excluding<br>eligible indirect<br>compensation for which you<br>answered "Yes" to element<br>(f).  If none, enter -0-. | (h)<br>Did the service<br>provider give you a<br>formula instead of<br>an amount or<br>estimated amount? |
|---|---|---|---|---|---|---|
| | | | Yes ☐  No ☐ | Yes ☐  No ☐ | | Yes ☐  No ☐ |

**(a)** Enter name and EIN or address (see instructions)

| (b)<br>Service<br>Code(s) | (c)<br>Relationship to<br>employer, employee<br>organization, or<br>person known to be<br>a party-in-interest | (d)<br>Enter direct<br>compensation paid<br>by the plan.  If none,<br>enter -0-. | (e)<br>Did service provider<br>receive indirect<br>compensation? (sources<br>other than plan or plan<br>sponsor) | (f)<br>Did indirect compensation<br>include eligible indirect<br>compensation, for which the<br>plan received the required<br>disclosures? | (g)<br>Enter total indirect<br>compensation received by<br>service provider excluding<br>eligible indirect<br>compensation for which you<br>answered "Yes" to element<br>(f).  If none, enter -0-. | (h)<br>Did the service<br>provider give you a<br>formula instead of<br>an amount or<br>estimated amount? |
|---|---|---|---|---|---|---|
| | | | Yes ☐  No ☐ | Yes ☐  No ☐ | | Yes ☐  No ☐ |

Schedule C (Form 5500) 2017

Page **4 -** 1

| Part I | Service Provider Information (continued) |
|---|---|

**3.** If you reported on line 2 receipt of indirect compensation, other than eligible indirect compensation, by a service provider, and the service provider is a fiduciary or provides contract administrator, consulting, custodial, investment advisory, investment management, broker, or recordkeeping services, answer the following questions for (a) each source from whom the service provider received $1,000 or more in indirect compensation and (b) each source for whom the service provider gave you a formula used to determine the indirect compensation instead of an amount or estimated amount of the indirect compensation.  Complete as many entries as needed to report the required information for each source.

| **(a)** Enter service provider name as it appears on line 2 | **(b)** Service Codes (see instructions) | **(c)** Enter amount of indirect compensation |
|---|---|---|
|  |  |  |

| **(d)** Enter name and EIN (address) of source of indirect compensation | **(e)** Describe the indirect compensation, including any formula used to determine the service provider's eligibility for or the amount of the indirect compensation. |
|---|---|
|  |  |

| **(a)** Enter service provider name as it appears on line 2 | **(b)** Service Codes (see instructions) | **(c)** Enter amount of indirect compensation |
|---|---|---|
|  |  |  |

| **(d)** Enter name and EIN (address) of source of indirect compensation | **(e)** Describe the indirect compensation, including any formula used to determine the service provider's eligibility for or the amount of the indirect compensation. |
|---|---|
|  |  |

| **(a)** Enter service provider name as it appears on line 2 | **(b)** Service Codes (see instructions) | **(c)** Enter amount of indirect compensation |
|---|---|---|
|  |  |  |

| **(d)** Enter name and EIN (address) of source of indirect compensation | **(e)** Describe the indirect compensation, including any formula used to determine the service provider's eligibility for or the amount of the indirect compensation. |
|---|---|
|  |  |

| **Part II** | **Service Providers Who Fail or Refuse to Provide Information** |
|---|---|

**4**  Provide, to the extent possible, the following information for each service provider who failed or refused to provide the information necessary to complete this Schedule.

| **(a)** Enter name and EIN or address of service provider (see instructions) | **(b)** Nature of Service Code(s) | **(c)** Describe the information that the service provider failed or refused to provide |
|---|---|---|
| | | |
| **(a)** Enter name and EIN or address of service provider (see instructions) | **(b)** Nature of Service Code(s) | **(c)** Describe the information that the service provider failed or refused to provide |
| | | |
| **(a)** Enter name and EIN or address of service provider (see instructions) | **(b)** Nature of Service Code(s) | **(c)** Describe the information that the service provider failed or refused to provide |
| | | |
| **(a)** Enter name and EIN or address of service provider (see instructions) | **(b)** Nature of Service Code(s) | **(c)** Describe the information that the service provider failed or refused to provide |
| | | |
| **(a)** Enter name and EIN or address of service provider (see instructions) | **(b)** Nature of Service Code(s) | **(c)** Describe the information that the service provider failed or refused to provide |
| | | |
| **(a)** Enter name and EIN or address of service provider (see instructions) | **(b)** Nature of Service Code(s) | **(c)** Describe the information that the service provider failed or refused to provide |
| | | |

Schedule C (Form 5500) 2017                      Page **6** - [ 1 ]

| **Part III** | **Termination Information on Accountants and Enrolled Actuaries (see instructions)** (complete as many entries as needed) |
|---|---|

**a** Name:                                          **b** EIN:

**c** Position:

**d** Address:                                       **e** Telephone:

Explanation:

---

**a** Name:                                          **b** EIN:

**c** Position:

**d** Address:                                       **e** Telephone:

Explanation:

---

**a** Name:                                          **b** EIN:

**c** Position:

**d** Address:                                       **e** Telephone:

Explanation:

---

**a** Name:                                          **b** EIN:

**c** Position:

**d** Address:                                       **e** Telephone:

Explanation:

---

**a** Name:                                          **b** EIN:

**c** Position:

**d** Address:                                       **e** Telephone:

Explanation:

| **SCHEDULE H**<br>**(Form 5500)** | **Financial Information** | OMB No. 1210-0110 |
|---|---|---|
| Department of the Treasury<br>Internal Revenue Service | This schedule is required to be filed under section 104 of the Employee Retirement Income Security Act of 1974 (ERISA), and section 6058(a) of the Internal Revenue Code (the Code). | **2017** |
| Department of Labor<br>Employee Benefits Security Administration | ▶ **File as an attachment to Form 5500.** | **This Form is Open to Public Inspection** |
| Pension Benefit Guaranty Corporation | | |

For calendar plan year 2017 or fiscal plan year beginning  01/01/2017　　　　　　and ending  12/31/2017

**A** Name of plan
CPES EMPLOYEE STOCK OWNERSHIP PLAN

**B** Three-digit
plan number (PN)　▶　001

**C** Plan sponsor's name as shown on line 2a of Form 5500
COMMUNITY PROVIDER OF ENRICHMENT SERVICES, INC.

**D** Employer Identification Number (EIN)
86-0393979

| **Part I** | **Asset and Liability Statement** |
|---|---|

**1** Current value of plan assets and liabilities at the beginning and end of the plan year. Combine the value of plan assets held in more than one trust. Report the value of the plan's interest in a commingled fund containing the assets of more than one plan on a line-by-line basis unless the value is reportable on lines 1c(9) through 1c(14). Do not enter the value of that portion of an insurance contract which guarantees, during this plan year, to pay a specific dollar benefit at a future date. **Round off amounts to the nearest dollar.** MTIAs, CCTs, PSAs, and 103-12 IEs do not complete lines 1b(1), 1b(2), 1c(8), 1g, 1h, and 1i. CCTs, PSAs, and 103-12 IEs also do not complete lines 1d and 1e. See instructions.

| **Assets** | | **(a) Beginning of Year** | **(b) End of Year** |
|---|---|---|---|
| **a** Total noninterest-bearing cash ............................................................. | **1a** | 201270 | 19957 |
| **b** Receivables (less allowance for doubtful accounts): | | | |
| (1) Employer contributions ..................................................... | **1b(1)** | 12295 | 16631 |
| (2) Participant contributions ..................................................... | **1b(2)** | | |
| (3) Other............................................................................... | **1b(3)** | | |
| **c** General investments: | | | |
| (1) Interest-bearing cash (include money market accounts & certificates of deposit) ................................................................................. | **1c(1)** | 0 | 95104 |
| (2) U.S. Government securities................................................. | **1c(2)** | | |
| (3) Corporate debt instruments (other than employer securities): | | | |
| (A) Preferred ................................................................... | **1c(3)(A)** | | |
| (B) All other ..................................................................... | **1c(3)(B)** | | |
| (4) Corporate stocks (other than employer securities): | | | |
| (A) Preferred ................................................................... | **1c(4)(A)** | | |
| (B) Common ..................................................................... | **1c(4)(B)** | | |
| (5) Partnership/joint venture interests ..................................... | **1c(5)** | | |
| (6) Real estate (other than employer real property) ................. | **1c(6)** | | |
| (7) Loans (other than to participants) ...................................... | **1c(7)** | | |
| (8) Participant loans .............................................................. | **1c(8)** | | |
| (9) Value of interest in common/collective trusts..................... | **1c(9)** | | |
| (10) Value of interest in pooled separate accounts ................... | **1c(10)** | | |
| (11) Value of interest in master trust investment accounts ......... | **1c(11)** | | |
| (12) Value of interest in 103-12 investment entities .................. | **1c(12)** | | |
| (13) Value of interest in registered investment companies (e.g., mutual funds)................................................................................. | **1c(13)** | 278589 | 179057 |
| (14) Value of funds held in insurance company general account (unallocated contracts)................................................................ | **1c(14)** | | |
| (15) Other ............................................................................... | **1c(15)** | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 5500.

Schedule H (Form 5500) 2017
v.170203

Schedule H (Form 5500) 2017                                                     Page **2**

| | | | **(a)** Beginning of Year | **(b)** End of Year |
|---|---|---|---|---|
| **1d** | Employer-related investments: | | | |
| | (1) Employer securities ............................................ | **1d(1)** | 7299480 | 9252096 |
| | (2) Employer real property ....................................... | **1d(2)** | | |
| **e** | Buildings and other property used in plan operation........................... | **1e** | | |
| **f** | Total assets (add all amounts in lines 1a through 1e)........................... | **1f** | 7791634 | 9562845 |

### Liabilities

| | | | | |
|---|---|---|---|---|
| **g** | Benefit claims payable ...................................................... | **1g** | | |
| **h** | Operating payables ......................................................... | **1h** | | |
| **i** | Acquisition indebtedness.................................................... | **1i** | | |
| **j** | Other liabilities.............................................................. | **1j** | 164718 | 2570 |
| **k** | Total liabilities (add all amounts in lines 1g through1j)........................ | **1k** | 164718 | 2570 |

### Net Assets

| | | | | |
|---|---|---|---|---|
| **l** | Net assets (subtract line 1k from line 1f)...................................... | **1l** | 7626916 | 9560275 |

| **Part II** | **Income and Expense Statement** |
|---|---|

**2** Plan income, expenses, and changes in net assets for the year. Include all income and expenses of the plan, including any trust(s) or separately maintained fund(s) and any payments/receipts to/from insurance carriers. Round off amounts to the nearest dollar. MTIAs, CCTs, PSAs, and 103-12 IEs do not complete lines 2a, 2b(1)(E), 2e, 2f, and 2g.

### Income

| | | | **(a)** Amount | **(b)** Total |
|---|---|---|---|---|
| **a** | **Contributions:** | | | |
| | (1) Received or receivable in cash from: **(A)** Employers.............................. | **2a(1)(A)** | 656489 | |
| | **(B)** Participants .................................................. | **2a(1)(B)** | | |
| | **(C)** Others (including rollovers) .................................. | **2a(1)(C)** | | |
| | (2) Noncash contributions .................................... | **2a(2)** | | |
| | (3) Total contributions. Add lines **2a(1)(A), (B), (C),** and line **2a(2)** ............. | **2a(3)** | | 656489 |
| **b** | **Earnings on investments:** | | | |
| | (1) Interest: | | | |
| | **(A)** Interest-bearing cash (including money market accounts and certificates of deposit).......................................... | **2b(1)(A)** | | |
| | **(B)** U.S. Government securities ..................................... | **2b(1)(B)** | | |
| | **(C)** Corporate debt instruments .................................... | **2b(1)(C)** | | |
| | **(D)** Loans (other than to participants) ............................. | **2b(1)(D)** | | |
| | **(E)** Participant loans .............................................. | **2b(1)(E)** | | |
| | **(F)** Other .......................................................... | **2b(1)(F)** | | |
| | **(G)** Total interest. Add lines **2b(1)(A)** through **(F)** ................... | **2b(1)(G)** | | 0 |
| | (2) Dividends: **(A)** Preferred stock ..................................... | **2b(2)(A)** | | |
| | **(B)** Common stock .................................................. | **2b(2)(B)** | | |
| | **(C)** Registered investment company shares (e.g. mutual funds)........... | **2b(2)(C)** | 4421 | |
| | **(D)** Total dividends. Add lines **2b(2)(A), (B),** and **(C)** ............... | **2b(2)(D)** | | 4421 |
| | (3) Rents................................................................ | **2b(3)** | | |
| | (4) Net gain (loss) on sale of assets: **(A)** Aggregate proceeds ..................... | **2b(4)(A)** | | |
| | **(B)** Aggregate carrying amount (see instructions) .................. | **2b(4)(B)** | | |
| | **(C)** Subtract line **2b(4)(B)** from line **2b(4)(A)** and enter result .............. | **2b(4)(C)** | | 0 |
| | (5) Unrealized appreciation (depreciation) of assets: **(A)** Real estate................... | **2b(5)(A)** | | |
| | **(B)** Other ................................................................ | **2b(5)(B)** | 1986195 | |
| | **(C)** Total unrealized appreciation of assets. Add lines **2b(5)(A)** and **(B)** ...................................... | **2b(5)(C)** | | 1986195 |

Schedule H (Form 5500) 2017                                                    Page **3**

| | | (a) Amount | (b) Total |
|---|---|---|---|
| (6) Net investment gain (loss) from common/collective trusts ..................... | **2b(6)** | | |
| (7) Net investment gain (loss) from pooled separate accounts ..................... | **2b(7)** | | |
| (8) Net investment gain (loss) from master trust investment accounts .......... | **2b(8)** | | |
| (9) Net investment gain (loss) from 103-12 investment entities ................... | **2b(9)** | | |
| (10) Net investment gain (loss) from registered investment companies (e.g., mutual funds)............................ | **2b(10)** | | |
| **c** Other income ........................................................................... | **2c** | | |
| **d** Total income. Add all **income** amounts in column (b) and enter total.................... | **2d** | | 2647105 |

## Expenses

| | | (a) Amount | (b) Total |
|---|---|---|---|
| **e** Benefit payment and payments to provide benefits: | | | |
| (1) Directly to participants or beneficiaries, including direct rollovers............. | **2e(1)** | 647021 | |
| (2) To insurance carriers for the provision of benefits ................................. | **2e(2)** | | |
| (3) Other ................................................................................. | **2e(3)** | | |
| (4) Total benefit payments. Add lines **2e(1)** through **(3)** ........................ | **2e(4)** | | 647021 |
| **f** Corrective distributions (see instructions) ............................................. | **2f** | | |
| **g** Certain deemed distributions of participant loans (see instructions)................. | **2g** | | |
| **h** Interest expense.......................................................................... | **2h** | | |
| **i** Administrative expenses: **(1)** Professional fees ............................. | **2i(1)** | 7250 | |
| (2) Contract administrator fees ....................................................... | **2i(2)** | 51192 | |
| (3) Investment advisory and management fees ....................................... | **2i(3)** | 735 | |
| (4) Other ................................................................................. | **2i(4)** | 7548 | |
| (5) Total administrative expenses. Add lines **2i(1)** through **(4)**..................... | **2i(5)** | | 66725 |
| **j** Total expenses. Add all **expense** amounts in column (b) and enter total........ | **2j** | | 713746 |

## Net Income and Reconciliation

| | | (a) Amount | (b) Total |
|---|---|---|---|
| **k** Net income (loss). Subtract line **2j** from line **2d** ............................. | **2k** | | 1933359 |
| **l** Transfers of assets: | | | |
| (1) To this plan............................................................................ | **2l(1)** | | |
| (2) From this plan........................................................................ | **2l(2)** | | |

## Part III   Accountant's Opinion

**3** Complete lines 3a through 3c if the opinion of an independent qualified public accountant is attached to this Form 5500. Complete line 3d if an opinion is not attached.

**a** The attached opinion of an independent qualified public accountant for this plan is (see instructions):

(1) [X] Unqualified   (2) [ ] Qualified   (3) [ ] Disclaimer   (4) [ ] Adverse

**b** Did the accountant perform a limited scope audit pursuant to 29 CFR 2520.103-8 and/or 103-12(d)?   [ ] Yes   [X] No

**c** Enter the name and EIN of the accountant (or accounting firm) below:

(1) Name: CLIFTONLARSONALLEN LLP                    (2) EIN: 41-0746749

**d** The opinion of an independent qualified public accountant is **not attached** because:

(1) [ ] This form is filed for a CCT, PSA, or MTIA.   (2) [ ] It will be attached to the next Form 5500 pursuant to 29 CFR 2520.104-50.

## Part IV   Compliance Questions

**4**   CCTs and PSAs do not complete Part IV. MTIAs, 103-12 IEs, and GIAs do not complete lines 4a, 4e, 4f, 4g, 4h, 4k, 4m, 4n, or 5. 103-12 IEs also do not complete lines 4j and 4l. MTIAs also do not complete line 4l.

During the plan year:

| | | Yes | No | Amount |
|---|---|---|---|---|
| **a** Was there a failure to transmit to the plan any participant contributions within the time period described in 29 CFR 2510.3-102? Continue to answer "Yes" for any prior year failures until fully corrected. (See instructions and DOL's Voluntary Fiduciary Correction Program.)...................... | **4a** | | X | |
| **b** Were any loans by the plan or fixed income obligations due the plan in default as of the close of the plan year or classified during the year as uncollectible? Disregard participant loans secured by participant's account balance. (Attach Schedule G (Form 5500) Part I if "Yes" is checked.) | **4b** | | X | |

Schedule H (Form 5500) 2017

Page **4-** 1

| | | | Yes | No | Amount |
|---|---|---|---|---|---|
| **c** | Were any leases to which the plan was a party in default or classified during the year as uncollectible? (Attach Schedule G (Form 5500) Part II if "Yes" is checked.) ........................................ | **4c** | | X | |
| **d** | Were there any nonexempt transactions with any party-in-interest? (Do not include transactions reported on line 4a. Attach Schedule G (Form 5500) Part III if "Yes" is checked.)................................................................................................ | **4d** | | X | |
| **e** | Was this plan covered by a fidelity bond? ............................................................................. | **4e** | X | | 780000 |
| **f** | Did the plan have a loss, whether or not reimbursed by the plan's fidelity bond, that was caused by fraud or dishonesty? ........................................................................................... | **4f** | | X | |
| **g** | Did the plan hold any assets whose current value was neither readily determinable on an established market nor set by an independent third party appraiser? ............................................. | **4g** | | X | |
| **h** | Did the plan receive any noncash contributions whose value was neither readily determinable on an established market nor set by an independent third party appraiser?................... | **4h** | | X | |
| **i** | Did the plan have assets held for investment? (Attach schedule(s) of assets if "Yes" is checked, and see instructions for format requirements.)........................................................................ | **4i** | X | | |
| **j** | Were any plan transactions or series of transactions in excess of 5% of the current value of plan assets? (Attach schedule of transactions if "Yes" is checked, and see instructions for format requirements.)................................................................. | **4j** | | X | |
| **k** | Were all the plan assets either distributed to participants or beneficiaries, transferred to another plan, or brought under the control of the PBGC?................................................................ | **4k** | | X | |
| **l** | Has the plan failed to provide any benefit when due under the plan? ............................................. | **4l** | | X | |
| **m** | If this is an individual account plan, was there a blackout period? (See instructions and 29 CFR 2520.101-3.)................................................................................................. | **4m** | | X | |
| **n** | If 4m was answered "Yes," check the "Yes" box if you either provided the required notice or one of the exceptions to providing the notice applied under 29 CFR 2520.101-3. ............................................. | **4n** | | | |

**5a** Has a resolution to terminate the plan been adopted during the plan year or any prior plan year?........ ☐ Yes  ☒ No
If "Yes," enter the amount of any plan assets that reverted to the employer this year _____.

**5b** If, during this plan year, any assets or liabilities were transferred from this plan to another plan(s), identify the plan(s) to which assets or liabilities were transferred. (See instructions.)

| **5b(1)** Name of plan(s) | **5b(2)** EIN(s) | **5b(3)** PN(s) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**5c** If the plan is a defined benefit plan, is it covered under the PBGC insurance program (See ERISA section 4021.)? ...... ☐ Yes  ☐ No  ☐ Not determined
If "Yes" is checked, enter the My PAA confirmation number from the PBGC premium filing for this plan year_____. (See instructions.)

| **SCHEDULE R**<br>**(Form 5500)**<br><br>Department of the Treasury<br>Internal Revenue Service<br><br>Department of Labor<br>Employee Benefits Security Administration<br><br>Pension Benefit Guaranty Corporation | **Retirement Plan Information**<br><br>This schedule is required to be filed under sections 104 and 4065 of the Employee Retirement Income Security Act of 1974 (ERISA) and section 6058(a) of the Internal Revenue Code (the Code).<br><br>▶ **File as an attachment to Form 5500.** | OMB No. 1210-0110<br><br>**2017**<br><br>**This Form is Open to Public Inspection.** |
|---|---|---|

For calendar plan year 2017 or fiscal plan year beginning    01/01/2017    and ending    12/31/2017

**A**   Name of plan

CPES EMPLOYEE STOCK OWNERSHIP PLAN

**B**   Three-digit plan number (PN)   ▶   001

**C**   Plan sponsor's name as shown on line 2a of Form 5500

COMMUNITY PROVIDER OF ENRICHMENT SERVICES, INC.

**D**   Employer Identification Number (EIN)

86-0393979

---

| **Part I** | **Distributions** |
|---|---|

All references to distributions relate only to payments of benefits during the plan year.

**1**   Total value of distributions paid in property other than in cash or the forms of property specified in the instructions .......................................................................................................................   **1**    0

**2**   Enter the EIN(s) of payor(s) who paid benefits on behalf of the plan to participants or beneficiaries during the year (if more than two, enter EINs of the two payors who paid the greatest dollar amounts of benefits):

EIN(s):   86-0804057      _____

**Profit-sharing plans, ESOPs, and stock bonus plans, skip line 3.**

**3**   Number of participants (living or deceased) whose benefits were distributed in a single sum, during the plan year .................................................................................................................................   **3**

| **Part II** | **Funding Information** (If the plan is not subject to the minimum funding requirements of section 412 of the Internal Revenue Code or ERISA section 302, skip this Part.) |
|---|---|

**4**   Is the plan administrator making an election under Code section 412(d)(2) or ERISA section 302(d)(2)? ......................... ☐ Yes   ☐ No   ☐ N/A

**If the plan is a defined benefit plan, go to line 8.**

**5**   If a waiver of the minimum funding standard for a prior year is being amortized in this plan year, see instructions and enter the date of the ruling letter granting the waiver.   **Date:**   Month _____ Day _____ Year _____

**If you completed line 5, complete lines 3, 9, and 10 of Schedule MB and do not complete the remainder of this schedule.**

**6**   **a**   Enter the minimum required contribution for this plan year (include any prior year accumulated funding deficiency not waived) ...............................................................   **6a**

     **b**   Enter the amount contributed by the employer to the plan for this plan year .............................   **6b**

     **c**   Subtract the amount in line 6b from the amount in line 6a. Enter the result (enter a minus sign to the left of a negative amount) ..........................................   **6c**

**If you completed line 6c, skip lines 8 and 9.**

**7**   Will the minimum funding amount reported on line 6c be met by the funding deadline? ........................ ☐ Yes   ☐ No   ☐ N/A

**8**   If a change in actuarial cost method was made for this plan year pursuant to a revenue procedure or other authority providing automatic approval for the change or a class ruling letter, does the plan sponsor or plan administrator agree with the change? ........................................................ ☐ Yes   ☐ No   ☐ N/A

| **Part III** | **Amendments** |
|---|---|

**9**   If this is a defined benefit pension plan, were any amendments adopted during this plan year that increased or decreased the value of benefits? If yes, check the appropriate box. If no, check the "No" box. ................................ ☐ Increase   ☐ Decrease   ☐ Both   ☐ No

| **Part IV** | **ESOPs** (see instructions). If this is not a plan described under section 409(a) or 4975(e)(7) of the Internal Revenue Code, skip this Part. |
|---|---|

**10**   Were unallocated employer securities or proceeds from the sale of unallocated securities used to repay any exempt loan? ................ ☐ Yes   ☐ No

**11**   **a**   Does the ESOP hold any preferred stock? ........................................................................... ☐ Yes   ☒ No

     **b**   If the ESOP has an outstanding exempt loan with the employer as lender, is such loan part of a "back-to-back" loan? (See instructions for definition of "back-to-back" loan.) ................................................. ☐ Yes   ☐ No

**12**   Does the ESOP hold any stock that is not readily tradable on an established securities market? ........................ ☒ Yes   ☐ No

For Paperwork Reduction Act Notice, see the Instructions for Form 5500.      Schedule R (Form 5500) 2017<br>v. 170203

Schedule R (Form 5500) 2017                                                     Page **2** - ☐1

| **Part V** | **Additional Information for Multiemployer Defined Benefit Pension Plans** |
|---|---|

**13**  Enter the following information for each employer that contributed more than 5% of total contributions to the plan during the plan year (measured in dollars). See instructions. *Complete as many entries as needed to report all applicable employers.*

**a**  Name of contributing employer

**b**  EIN                                    **c**  Dollar amount contributed by employer

**d**  Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)*  Month _____ Day _____ Year _____

**e**  Contribution rate information *(If more than one rate applies, check this box ☐ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
  (1)  Contribution rate (in dollars and cents) _____
  (2)  Base unit measure: ☐ Hourly    ☐ Weekly    ☐ Unit of production    ☐ Other (specify):

**a**  Name of contributing employer

**b**  EIN                                    **c**  Dollar amount contributed by employer

**d**  Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)*  Month _____ Day _____ Year _____

**e**  Contribution rate information *(If more than one rate applies, check this box ☐ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
  (1)  Contribution rate (in dollars and cents) _____
  (2)  Base unit measure: ☐ Hourly    ☐ Weekly    ☐ Unit of production    ☐ Other (specify): _____

**a**  Name of contributing employer

**b**  EIN                                    **c**  Dollar amount contributed by employer

**d**  Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)*  Month _____ Day _____ Year _____

**e**  Contribution rate information *(If more than one rate applies, check this box ☐ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
  (1)  Contribution rate (in dollars and cents) _____
  (2)  Base unit measure: ☐ Hourly    ☐ Weekly    ☐ Unit of production    ☐ Other (specify): _____

**a**  Name of contributing employer

**b**  EIN                                    **c**  Dollar amount contributed by employer

**d**  Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)*  Month _____ Day _____ Year _____

**e**  Contribution rate information *(If more than one rate applies, check this box ☐ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
  (1)  Contribution rate (in dollars and cents) _____
  (2)  Base unit measure: ☐ Hourly    ☐ Weekly    ☐ Unit of production    ☐ Other (specify): _____

**a**  Name of contributing employer

**b**  EIN                                    **c**  Dollar amount contributed by employer

**d**  Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)*  Month _____ Day _____ Year _____

**e**  Contribution rate information *(If more than one rate applies, check this box ☐ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
  (1)  Contribution rate (in dollars and cents) _____
  (2)  Base unit measure: ☐ Hourly    ☐ Weekly    ☐ Unit of production    ☐ Other (specify): _____

**a**  Name of contributing employer

**b**  EIN                                    **c**  Dollar amount contributed by employer

**d**  Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)*  Month _____ Day _____ Year _____

**e**  Contribution rate information *(If more than one rate applies, check this box ☐ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
  (1)  Contribution rate (in dollars and cents) _____
  (2)  Base unit measure: ☐ Hourly    ☐ Weekly    ☐ Unit of production    ☐ Other (specify): _____

Schedule R (Form 5500) 2017                                                    Page **3**

**14**   Enter the number of participants on whose behalf no contributions were made by an employer as an employer of the participant for:

| | | |
|---|---|---|
| **a**  The current year ................................................................................................................ | **14a** | |
| **b**  The plan year immediately preceding the current plan year............................................... | **14b** | |
| **c**  The second preceding plan year ...................................................................................... | **14c** | |

**15**   Enter the ratio of the number of participants under the plan on whose behalf no employer had an obligation to make an employer contribution during the current plan year to:

| | | |
|---|---|---|
| **a**  The corresponding number for the plan year immediately preceding the current plan year .................. | **15a** | |
| **b**  The corresponding number for the second preceding plan year ....................................... | **15b** | |

**16**   Information with respect to any employers who withdrew from the plan during the preceding plan year:

| | | |
|---|---|---|
| **a**  Enter the number of employers who withdrew during the preceding plan year  ................... | **16a** | |
| **b**  If line 16a is greater than 0, enter the aggregate amount of withdrawal liability assessed or estimated to be assessed against such withdrawn employers | **16b** | |

**17**   If assets and liabilities from another plan have been transferred to or merged with this plan during the plan year, check box and see instructions regarding supplemental information to be included as an attachment. ...................................................................................................................... ☐

| Part VI | Additional Information for Single-Employer and Multiemployer Defined Benefit Pension Plans |
|---|---|

**18**   If any liabilities to participants or their beneficiaries under the plan as of the end of the plan year consist (in whole or in part) of liabilities to such participants and beneficiaries under two or more pension plans as of immediately before such plan year, check box and see instructions regarding supplemental information to be included as an attachment ...................................................................................................................... ☐

**19**   If the total number of participants is 1,000 or more, complete lines (a) through (c)

    **a**  Enter the percentage of plan assets held as:

      Stock: _____%  Investment-Grade Debt: _____%  High-Yield Debt: _____%  Real Estate: _____%  Other: _____%

    **b**  Provide the average duration of the combined investment-grade and high-yield debt:

      ☐ 0-3 years    ☐ 3-6 years    ☐ 6-9 years    ☐ 9-12 years    ☐ 12-15 years    ☐ 15-18 years    ☐ 18-21 years    ☐ 21 years or more

    **c**  What duration measure was used to calculate line 19(b)?

      ☐ Effective duration    ☐ Macaulay duration    ☐ Modified duration    ☐ Other (specify):

**CPES EMPLOYEE STOCK OWNERSHIP PLAN**

**FINANCIAL STATEMENTS AND
SUPPLEMENTAL INFORMATION**

**YEARS ENDED DECEMBER 31, 2017 AND 2016**

CliftonLarsonAllen LLP




WEALTH ADVISORY | OUTSOURCING | AUDIT, TAX, AND CONSULTING


**CPES EMPLOYEE STOCK OWNERSHIP PLAN**
**TABLE OF CONTENTS**
**YEARS ENDED DECEMBER 31, 2017 AND 2016**

| | |
|---|---|
| **INDEPENDENT AUDITORS' REPORT** | **1** |
| **FINANCIAL STATEMENTS** | |
|   **STATEMENTS OF NET ASSETS AVAILABLE FOR BENEFITS** | **3** |
|   **STATEMENTS OF CHANGES IN NET ASSETS AVAILABLE FOR BENEFITS** | **4** |
|   **NOTES TO FINANCIAL STATEMENTS** | **5** |
| **SUPPLEMENTAL INFORMATION (ATTACHMENT TO FORM 5500)** | |
|   **SCHEDULE H, LINE 4i—SCHEDULE OF ASSETS (HELD AT END OF YEAR)** | **14** |



CliftonLarsonAllen LLP
CLAconnect.com

## INDEPENDENT AUDITORS' REPORT

Trustees
CPES Employee Stock Ownership Plan
Tucson, Arizona

### Report on the Financial Statements

We have audited the accompanying financial statements of CPES Employee Stock Ownership Plan (the Plan), which comprise the statements of net assets available for benefits as of December 31, 2017 and 2016, and the related statements of changes in net assets available for benefits for the years then ended, and the related notes to the financial statements.

### *Management's Responsibility for the Financial Statements*

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

### *Auditors' Responsibility*

Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditors' judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the Plan's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Plan's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.



A member of
Nexia
International

(1)

Trustees
CPES Employee Stock Ownership Plan

*Opinion*

In our opinion, the financial statements referred to above present fairly, in all material respects, the net assets available for benefits of the Plan as of December 31, 2017 and 2016, and the changes in net assets available for benefits for the years then ended, in accordance with accounting principles generally accepted in the United States of America.

**Report on Supplementary Information**

Our audits were conducted for the purpose of forming an opinion on the financial statements as a whole. The supplemental Schedule H, line 4i—schedule of assets (held at end of year) as of December 31, 2017 is presented for the purpose of additional analysis and is not a required part of the financial statements but is supplementary information required by the Department of Labor's Rules and Regulations for Reporting and Disclosure under the Employee Retirement Income Security Act of 1974. Such information is the responsibility of the Plan's management and was derived from and relates directly to the underlying accounting and other records used to prepare the financial statements. The information has been subjected to the auditing procedures applied in the audits of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the financial statements or to the financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, the information is fairly stated in all material respects in relation to the financial statements as a whole.

*CliftonLarsonAllen LLP*

**CliftonLarsonAllen LLP**

Tucson, Arizona
September 14, 2018

**CPES EMPLOYEE STOCK OWNERSHIP PLAN**
**STATEMENTS OF NET ASSETS AVAILABLE FOR BENEFITS**
**DECEMBER 31, 2017 AND 2016**

|  | 2017 | 2016 |
|---|---|---|
| **ASSETS** |  |  |
| **NON-INTEREST BEARING CASH** | $ 19,957 | $ 201,270 |
| **INVESTMENTS (At Fair Value)** |  |  |
| Interest Bearing Cash | 4,371 | - |
| Mutual Funds | 179,057 | 278,589 |
| Exchange Traded Funds | 90,733 | - |
| Community Provider of Enrichment Services, Inc. |  |  |
| Common Stock | 9,252,096 | 7,299,480 |
| Total Investments | 9,526,257 | 7,578,069 |
| **EMPLOYER CONTRIBUTION RECEIVABLE** | 16,631 | 12,295 |
| Total Assets | 9,562,845 | 7,791,634 |
| **LIABILITIES** |  |  |
| **TAXES PAYABLE** | - | 119,171 |
| **ADMINISTRATIVE EXPENSES PAYABLE** | 2,570 | 45,547 |
| Total Liabilities | 2,570 | 164,718 |
| **NET ASSETS AVAILABLE FOR BENEFITS** | $ 9,560,275 | $ 7,626,916 |

*See accompanying Notes to Financial Statements.*

(3)

**CPES EMPLOYEE STOCK OWNERSHIP PLAN**
**STATEMENTS OF CHANGES IN NET ASSETS AVAILABLE FOR BENEFITS**
**YEARS ENDED DECEMBER 31, 2017 AND 2016**

|  | 2017 | 2016 |
|---|---|---|
| **ADDITIONS TO NET ASSETS ATTRIBUTED TO:** | | |
| **INVESTMENT INCOME** | | |
| Net Appreciation (Depreciation) in Fair Value of Investments | $ 1,986,195 | $ (937,151) |
| Interest and Dividends | 4,421 | 53 |
| Total Investment Income (Loss) | 1,990,616 | (937,098) |
| **CONTRIBUTIONS** | | |
| Employer | 656,489 | 637,694 |
| Total Additions to (Deductions from) Net Assets | 2,647,105 | (299,404) |
| **DEDUCTIONS FROM NET ASSETS ATTRIBUTED TO:** | | |
| **BENEFITS PAID TO PARTICIPANTS** | 647,021 | 632,178 |
| **ADMINISTRATIVE EXPENSES** | 66,725 | 67,143 |
| Total Deductions from Net Assets | 713,746 | 699,321 |
| **NET INCREASE (DECREASE)** | 1,933,359 | (998,725) |
| **NET ASSETS AVAILABLE FOR BENEFITS:** | | |
| Beginning of Year | 7,626,916 | 8,625,641 |
| End of Year | $ 9,560,275 | $ 7,626,916 |

*See accompanying Notes to Financial Statements.*

(4)

**CPES EMPLOYEE STOCK OWNERSHIP PLAN**
**NOTES TO FINANCIAL STATEMENTS**
**DECEMBER 31, 2017 AND 2016**

**NOTE 1    DESCRIPTION OF PLAN**

The following description of the CPES Employee Stock Ownership Plan (the Plan) provides only general information. The Sponsor of the Plan is Community Provider of Enrichment Services, Inc. (Sponsor or Company). Participants and others should refer to the Plan agreement for a more complete description of the Plan's provisions.

<u>General</u>

Community Provider of Enrichment Services, Inc. established the CPES Employee Stock Ownership Plan effective July 1, 1994. The Plan was last restated effective January 1, 2015 and last amended effective September 9, 2016. The Plan operates, in relevant part, as a leveraged employee stock ownership plan, and is designed to comply with Section 4975(e)(7) and the regulations there under of the Internal Revenue Code of 1986, as amended (IRC) and is subject to the applicable provisions of the Employee Retirement Income Security Act of 1974, as amended (ERISA).

At December 31, 2017, the Plan was administered by Co-Trustees and an Administrative Committee appointed by the Community Provider of Enrichment Services, Inc. Board of Directors.

The Plan purchased Sponsor shares of common stock using the proceeds of a bank loan to the Sponsor, which were loaned to the Plan under the same terms, and two loans from a former shareholder. The borrowings were repaid from Sponsor contributions to the trust fund. As the Plan made each loan payment, an appropriate percentage of stock was allocated to eligible employees' accounts in accordance with applicable regulations under the Code. As of June 30, 2005, all loans were repaid in full and all issued shares of common stock had been allocated.

<u>Eligibility</u>

Employees of the Sponsor are generally eligible to participate in the Plan on the first day of the Plan year after attaining age 19 and completing two years of service providing they worked at least 1,000 hours during each year. Participants who do not have at least 1,000 hours of service during the 12-month Plan year or are not employed on the last working day of the Plan year are generally not eligible for an allocation of Company contributions and forfeitures for the Plan year. Effective January 1, 2013, the Plan was amended to exclude employees of Novelles Developmental Services, Inc. and CPES California, Inc., which are wholly-owned subsidiaries of CPES.

**CPES EMPLOYEE STOCK OWNERSHIP PLAN**
**NOTES TO FINANCIAL STATEMENTS**
**DECEMBER 31, 2017 AND 2016**

**NOTE 1    DESCRIPTION OF PLAN (CONTINUED)**

### Contributions

No participant contributions are permitted under the Plan. Company contributions are made to the Plan in such amounts as may be determined by the Sponsor's Board of Directors, provided they do not exceed the maximum amounts allowed under the IRC.

In addition, Company contributions of shares of common stock can be made to the Plan completely at the discretion of the Sponsor's Board of Directors. These shares are immediately available for allocation to the participants and are valued at the common stock's fair value at the end of the Plan year.

### Participant Accounts

Each participant's account is credited as of the last day of each Plan year with an allocation of shares of the Company's contributions and forfeitures of terminated participants' nonvested accounts. Only those participants who are eligible employees of the Company as of the last day of the Plan year and worked 1,000 hours during the Plan year will receive an allocation. Allocations are based on a participant's eligible compensation, relative to total eligible compensation, as defined by the Plan document. Plan earnings or losses are allocated based on each participant's share of the investment at the beginning of the year, less distributions and withdrawals during the year. The benefit to which a participant is entitled is the benefit that can be provided from the participant's vested account.

### Vesting

Effective January 1, 2007, participants are immediately vested upon meeting the eligibility requirements. Participants who terminated prior to this date were subject to a vesting schedule. As these balances are distributed, nonvested balances are forfeited and are subject to allocations to continuing participants.

### Notes Receivable from Participants

The Plan does not permit participant loans.

### Put Option

The Company stock held by the Plan and its participants is not readily tradeable on the established market and, in accordance with the federal tax regulation, is subject to a put option. The put option is a right to demand that the Company buy any shares of its stock distributed to participants for which there is no market. The put price is representative of the current value of the stock as calculated annually on December 31. The Company can pay for the purchase with interest over a period of five years. The purpose of the put option is to ensure that the participant has the ability to ultimately sell shares for cash.

**CPES EMPLOYEE STOCK OWNERSHIP PLAN**
**NOTES TO FINANCIAL STATEMENTS**
**DECEMBER 31, 2017 AND 2016**

**NOTE 1    DESCRIPTION OF PLAN (CONTINUED)**

### Diversification

Diversification is offered to participants close to retirement so that they may have the opportunity to move part of the value of their investment in Company stock into investments which are more diversified. Participants who are at least age 55 with at least 10 years of service and are currently employed by the Sponsor may elect to diversify a portion of their account. Diversification is offered to each eligible participant over a six-year period. In each of the first five years, a participant may diversify up to 25% of the number of shares allocated to his or her account, less any shares previously diversified. In the sixth year, the percentage increases to 50%. Diversification can be either a cash payment or purchase of other investments as determined by the trustee.

### Payment of Benefits

No distributions from the Plan will be made until a participant retires, dies (in which case payment shall be made to his or her beneficiary or legal representatives), becomes permanently disabled, or otherwise terminates employment with the Sponsor. In the event that a participant incurs separation from service, regardless of cause, the Plan may distribute benefits in a lump sum or in annual installments over a period not to exceed five years.

### Forfeitures

At each Plan allocation date (December 31), forfeitures are reallocated to participants in the same manner as Company contributions. During 2017 and 2016, forfeited, nonvested accounts in the amount of $317,586 and $41,273, respectively, were reallocated to participants. There were no balances in forfeited nonvested accounts at December 31, 2017 and 2016.

### Voting Rights

Each participant, in certain situations, is entitled to exercise voting rights attributable to the shares allocated to his or her account and is notified in writing by the Co-Trustees prior to the time that such rights are to be exercised. The Co-Trustees will vote any shares for which instructions have not been given by a participant. In addition, the Co-Trustees will also vote on behalf of any unallocated shares.

**NOTE 2    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

### Basis of Accounting

The financial statements of the Plan are prepared using the accrual method of accounting.

### Use of Estimates

The preparation of the financial statements in conformity with accounting principles generally accepted in the United States of America requires the trustees to make a number of estimates and assumptions that affect the reported amounts of net assets available for benefits and changes therein. Actual results could differ from those estimates.

**CPES EMPLOYEE STOCK OWNERSHIP PLAN**
**NOTES TO FINANCIAL STATEMENTS**
**DECEMBER 31, 2017 AND 2016**

**NOTE 2     SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)**

### Investment Valuation and Income Recognition

Investments are reported at fair value. Fair value is the price that would be received upon sale of an asset or paid to transfer a liability in an ordinary transaction between market participants at the measurement date. See Note 4 for discussion of fair value measurements.

Purchases and sales of securities are recorded on a trade-date basis. Interest income is recorded on the accrual basis. Dividends are recorded on the ex-dividend date. Net appreciation (depreciation) includes the Plan's gains and losses on investments bought and sold as well as held during the year.

### Cash Equivalents

The Plan considers all highly liquid debt instruments purchased with a maturity of three months or less to be cash equivalents.

The Plan places its cash equivalents with financial institutions. At times, such investments may be in excess of the Federal Deposit Insurance Corporation insurance limit; however, the Plan administrator does not believe the Plan is exposed to any significant credit risk on cash equivalents.

### Taxes Payable

Taxes payable are federal and state tax withholding on benefit payments.

### Administrative Expenses Payable

Administrative expense payable are expenses incurred as of the financial statement date but not paid until after the Plan's year end.

### Payments of Benefits

Benefits paid to participants are recorded when paid.

### Administrative Expenses

The Plan's expenses are paid either by the Plan or the Company, as provided by the Plan document. Expenses paid directly by the Company are excluded from these financial statements. Certain expenses incurred in connection with the general administration of the Plan including recordkeeping, valuation, and bank fees that are paid by the Plan are recorded as deductions in the accompanying statements of changes in net assets available for benefits. In addition, certain investment related expenses are included in net appreciation of fair value of investment presented in the accompanying statements of changes in net assets available for benefits.

**CPES EMPLOYEE STOCK OWNERSHIP PLAN**
**NOTES TO FINANCIAL STATEMENTS**
**DECEMBER 31, 2017 AND 2016**

**NOTE 3    INVESTMENTS**

The Plan's investments in Company common stock at December 31 are presented in the following table:

| | 2017 | 2016 |
|---|---|---|
| Community Provider of Enrichment Services, Inc. Common Stock: | | |
| Number of Shares | 912,435 | 912,435 |
| Cost | $ 9,860,102 | $ 9,860,102 |
| Fair Value | $ 9,252,096 | $ 7,299,480 |

**NOTE 4    FAIR VALUE MEASUREMENTS**

Financial Accounting Standards Board (FASB) *Accounting Standards Codification* (ASC) Topic 820*, Fair Value Measurements and Disclosures*, provides the framework for measuring fair value. That framework provides a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (Level 1 measurements) and the lowest priority to unobservable inputs (Level 3 measurements). The three levels of the fair value hierarchy under FASB ASC 820 are described as follows:

*Level 1* – Inputs to the valuation methodology are unadjusted quoted prices for identical assets or liabilities in active markets that the Plan has the ability to access.

*Level 2* – Inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly or indirectly, such as:

- quoted prices for similar assets or liabilities in active markets;

- quoted prices for identical or similar assets or liabilities in inactive markets;

- inputs other than quoted prices that are observable for the asset or liability;

- inputs that are derived principally from or corroborated by observable market data by correlation or other means.

If the asset or liability has a specified (contractual) term, the Level 2 input must be observable for substantially the full term of the asset or liability.

*Level 3* – Inputs to the valuation methodology are unobservable and significant to the fair value measurement.

**CPES EMPLOYEE STOCK OWNERSHIP PLAN**
**NOTES TO FINANCIAL STATEMENTS**
**DECEMBER 31, 2017 AND 2016**

**NOTE 4    FAIR VALUE MEASUREMENTS (CONTINUED)**

The asset or liability's fair value measurement level within the fair value hierarchy is based on the lowest level of any input that is significant to the fair value measurement. Valuation techniques used need to maximize the use of observable inputs and minimize the use of unobservable inputs.

Following is a description of the valuation methodologies used for assets measured at fair value. There have been no changes in the methodologies used at December 31, 2017 and 2016.

*Interest Bearing Cash*: Investments in interest bearing cash are valued based on cost, which approximates fair value based on yields currently available on comparable securities of issuers with similar credit ratings.

*Mutual Funds and Exchange Traded Funds:* Valued at the daily closing price as reported by the fund. Mutual funds and exchange-traded funds held by the Plan are open-end mutual funds and exchange traded funds that are registered with the Securities and Exchange Commission. These funds are required to publish their daily net asset value (NAV) and to transact at that price. The mutual funds and exchange-traded funds held by the Plan are deemed to be actively traded.

*Community Provider of Enrichment Services, Inc. Common Stock:* The estimated fair value of the Company common stock is based upon an independent appraisal performed annually. The appraisal was based upon a combination of the market and income valuation techniques consistent with prior years. The appraiser took into account historical and projected cash flow and net income, invested capital, weighted average cost of capital, and market comparables. Plan management has concluded that a market participant would also recognize a discount for lack of marketability.

The valuation process involves Plan management's selection of an independent appraiser. Plan management accumulates the data for the appraiser from the audited financial statements of the Company. The appraiser prepares a preliminary report which the Co-Trustees and Administrative Committee reviews in detail, discusses, and approves. The results of this process are documented in minutes of the Administrative Committee.

The methods described above may produce a fair value calculation that may not be indicative of net realizable value or reflective of future fair values. Furthermore, while the Plan believes its valuation methods are appropriate and consistent with other market participants, the use of different methodologies or assumptions to determine the fair value of certain financial instruments could result in a different fair value measurement at the reporting date.

**CPES EMPLOYEE STOCK OWNERSHIP PLAN**
**NOTES TO FINANCIAL STATEMENTS**
**DECEMBER 31, 2017 AND 2016**

**NOTE 4    FAIR VALUE MEASUREMENTS (CONTINUED)**

The following tables set forth by Level, within the fair value hierarchy, the Plan's assets at fair value as of December 31:

| 2017 | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Interest Bearing Cash | $ 4,371 | $ - | $ - | $ 4,371 |
| Mutual Funds | 179,057 | - | - | 179,057 |
| Exchange Traded Funds | 90,733 | - | - | 90,733 |
| Community Provider of Enrichment Services, Inc. Common Stock | - | - | 9,252,096 | 9,252,096 |
| Total Assets at Fair Value | $ 274,161 | $ - | $ 9,252,096 | $ 9,526,257 |

| 2016 | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Mutual Funds | $ 278,589 | $ - | $ - | $ 278,589 |
| Community Provider of Enrichment Services, Inc. Common Stock | - | - | 7,299,480 | 7,299,480 |
| Total Assets at Fair Value | $ 278,589 | $ - | $ 7,299,480 | $ 7,578,069 |

The table below sets forth a summary of changes in the fair value of the Plan's Level 3 assets for the years ended December 31:

| | Community Provider of Enrichment Services, Inc. Common Stock |
|---|---|
| Balance - January 1, 2016 | $ 8,266,666 |
| Unrealized Loss | (967,186) |
| Balance - December 31, 2016 | 7,299,480 |
| Unrealized Gain | 1,952,616 |
| Balance - December 31, 2017 | $ 9,252,096 |

**CPES EMPLOYEE STOCK OWNERSHIP PLAN**
**NOTES TO FINANCIAL STATEMENTS**
**DECEMBER 31, 2017 AND 2016**

**NOTE 5    ADMINISTRATION OF PLAN ASSETS**

The Plan's assets have three custodians. The custodian of the principal asset, which is Community Provider of Enrichment Services, Inc. shares of common stock, is the Co-Trustees who have directed that the physical custody be in a safety deposit box. The custodians of the cash and cash equivalents and other investments are Bank of the West and Wells Fargo Bank, N.A. until March 30, 2017, and Mutual of Omaha Bank as of April 1, 2017.

All of the Plan's assets are nonparticipant directed. Company contributions are managed by the Co-Trustees and Administrative Committee, which invests cash received, interest, and dividend income, and makes distributions to participants.

**NOTE 6    RELATED-PARTY TRANSACTIONS**

Certain Plan investments are managed by Wells Fargo Bank, N.A., the custodian of the Plan until March 30, 2017, and Mutual of Omaha Bank, the custodian of the Plan as of April 1, 2017. The Plan's recordkeeping is performed by SES Advisors. Therefore, these transactions qualify as party-in-interest transactions.

Certain administrative functions are performed by officers or employees of the Sponsor. In addition, officers and employees of the Sponsor have been appointed as Co-Trustees or to the Administrative Committee. No such officer or employee receives compensation from the Plan.

**NOTE 7    FEDERAL INCOME TAX STATUS**

The Plan was restated effective January 1, 2015. The restated Plan has received a determination letter from the Internal Revenue Service dated September 18, 2015, indicating the Plan qualifies as a tax-exempt employee benefit plan. The Plan has been amended since receiving the determination letter. However, the trustees believe the Plan is designed and is currently being operated in compliance with the applicable requirements of the IRC. Therefore, they believe that the Plan was qualified and the related trust was tax-exempt as of December 31, 2017 and 2016.

Accounting principles generally accepted in the United States of America require Plan management to evaluate tax positions taken by the Plan and recognize a tax liability if the organization has taken an uncertain position that more likely than not would not be sustained upon examination by the Internal Revenue Service. The Plan is subject to routine audits by taxing jurisdictions; however, there are currently no audits for any tax periods in progress.

**CPES EMPLOYEE STOCK OWNERSHIP PLAN**
**NOTES TO FINANCIAL STATEMENTS**
**DECEMBER 31, 2017 AND 2016**

**NOTE 8    PLAN TERMINATION**

Although it has not expressed any intent to do so, the Sponsor reserves the right to terminate the Plan at any time, subject to Plan provisions and ERISA. Upon such termination of the Plan, the interest of each participant in the trust fund will be distributed to such participant or his or her beneficiary at the time prescribed by the Plan terms and the Code. Upon termination of the Plan, the Co-Trustees will pay all liabilities and expenses of the trust fund.

**NOTE 9    RISKS AND UNCERTAINTIES**

The Plan may invest in various types of investment securities including Company common stock. Investment securities are exposed to various risks, such as interest rate, market, and credit risks. The stock of the Company is valued annually by a valuation specialist. Because of the inherent subjectivity in any valuation, those estimated values may differ significantly from the values that would have been used had a ready market for the securities existed, and the differences could be material. Due to the level of risk associated with certain investment securities, it is at least reasonably possible that changes in the values of investment securities will occur in the near term and that such changes could materially affect participants' account balances and the amounts reported in the statements of net assets available for benefits.

**NOTE 10   SUBSEQUENT EVENTS**

The Plan has evaluated subsequent events through September 14, 2018 the date the financial statements were available to be issued.

## CPES EMPLOYEE STOCK OWNERSHIP PLAN
### E.I.N. 86-0393979 PLAN NO. 001
### SCHEDULE H, LINE 4i—SCHEDULE OF ASSETS (HELD AT END OF YEAR)
### DECEMBER 31, 2017

| (a) | (b) Identity of Issue, Borrower, Lessor, or Similar Party | (c) Description of Investment Including Maturity Date, Rate of Interest, Collateral, Par, or Maturity Value | (d) Cost | (e) Current Value |
|---|---|---|---|---|
| | **Cash Equivalents:** | | | |
| * | Mutual of Omaha Bank | Federated Government Obligations | $ 4,371 | $ 4,371 |
| | | | | |
| | **Exchange Traded Funds:** | | | |
| | iShares Barclays 1-3 Year Treasury FD | 165 Shares | 13,957 | 13,835 |
| | iShares Core U.S. Aggregate Bond | 130 Shares | 14,154 | 14,213 |
| | Powershares Trust II Senior Loan | 600 Shares | 14,028 | 13,824 |
| | Guggenheim S&P 500 Equal Weight | 245 Shares | 22,202 | 24,752 |
| | Powershares S&P 500 Low Volatility | 505 Shares | 21,973 | 24,109 |
| | | Total Exchange Traded Funds | 86,314 | 90,733 |
| | **Mutual Funds:** | | | |
| | Templeton Global Bond Advisor FD | 243 Shares | 2,947 | 2,879 |
| | MFS Corporate Bond FD | 407 Shares | 5,666 | 5,753 |
| | Principal High Yield FD | 2,742 Shares | 20,642 | 20,458 |
| | MFS Emerging Markets Debt FD | 196 Shares | 2,946 | 2,959 |
| | PIMCO Low Duration FD | 3,964 Shares | 39,167 | 39,089 |
| | Oppenheimer Developing Markets FD | 350 Shares | 11,706 | 15,034 |
| | Oppenheimer International Growth FD | 407 Shares | 11,720 | 17,775 |
| | Principal Real Estate Securities FD | 642 Shares | 12,274 | 15,245 |
| | T Rowe Price Equity Income FD | 801 Shares | 23,405 | 26,718 |
| | T Rowe Price Mid Cap Growth | 147 Shares | 9,274 | 12,772 |
| | Touchstone Sands Capital Growth | 655 Shares | 12,162 | 13,490 |
| | Victory RS Small Cap Growth | 82 Shares | 5,776 | 6,885 |
| | | Total Mutual Funds | 157,685 | 179,057 |
| * | Community Provider of Enrichment Services, Inc. | Common Stock, 912,435 Shares, No Par Value | 9,860,102 | 9,252,096 |
| | | | $ 10,108,472 | $ 9,526,257 |

\*    Represents a party-in-interest to the Plan.





Investment advisory services are offered through CliftonLarsonAllen
Wealth Advisors, LLC, an SEC-registered investment advisor.

| **Form 5500**<br><br>Department of the Treasury<br>Internal Revenue Service<br><br>Department of Labor<br>Employee Benefits Security<br>Administration<br><br>Pension Benefit Guaranty Corporation | **Annual Return/Report of Employee Benefit Plan**<br>This form is required to be filed for employee benefit plans under sections 104 and 4065 of the Employee Retirement Income Security Act of 1974 (ERISA) and sections 6057(b) and 6058(a) of the Internal Revenue Code (the Code).<br><br>▶ **Complete all entries in accordance with the instructions to the Form 5500.** | OMB Nos. 1210-0110<br>1210-0089<br><br>**2017**<br><br>**This Form is Open to Public Inspection** |
|---|---|---|

| Part I | **Annual Report Identification Information** |
|---|---|

For calendar plan year 2017 or fiscal plan year beginning    01/01/2017    and ending    12/31/2017

**A** This return/report is for:  ☐ a multiemployer plan  ☐ a multiple-employer plan (Filers checking this box must attach a list of participating employer information in accordance with the form instructions.)

☒ a single-employer plan  ☐ a DFE (specify) _____

**B** This return/report is:  ☐ the first return/report  ☐ the final return/report

☐ an amended return/report  ☐ a short plan year return/report (less than 12 months)

**C** If the plan is a collectively-bargained plan, check here. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**D** Check box if filing under:  ☒ Form 5558  ☐ automatic extension  ☐ the DFVC program

☐ special extension (enter description)

| Part II | **Basic Plan Information**—enter all requested information |
|---|---|

**1a** Name of plan

CPES EMPLOYEE STOCK OWNERSHIP PLAN

**1b** Three-digit plan number (PN) ▶  001

**1c** Effective date of plan
07/01/1994

**2a** Plan sponsor's name (employer, if for a single-employer plan)
Mailing address (include room, apt., suite no. and street, or P.O. Box)
City or town, state or province, country, and ZIP or foreign postal code (if foreign, see instructions)

COMMUNITY PROVIDER OF ENRICHMENT SERVICES, INC.

4825 N. SABINO CANYON ROAD

TUCSON          AZ 85750

**2b** Employer Identification Number (EIN)
86-0393979

**2c** Plan Sponsor's telephone number
520-884-7954

**2d** Business code (see instructions)
624100

**Caution: A penalty for the late or incomplete filing of this return/report will be assessed unless reasonable cause is established.**

Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including accompanying schedules, statements and attachments, as well as the electronic version of this return/report, and to the best of my knowledge and belief, it is true, correct, and complete.

| SIGN HERE | *[signature]* | 10-3-18 | TERESA THIENHAUS |
|---|---|---|---|
| | Signature of plan administrator | Date | Enter name of individual signing as plan administrator |
| SIGN HERE | | | |
| | Signature of employer/plan sponsor | Date | Enter name of individual signing as employer or plan sponsor |
| SIGN HERE | | | |
| | Signature of DFE | Date | Enter name of individual signing as DFE |

For Paperwork Reduction Act Notice, see the Instructions for Form 5500.

Form 5500 (2017)
v. 170203

## CPES EMPLOYEE STOCK OWNERSHIP PLAN
### E.I.N. 86-0393979 PLAN NO. 001
### SCHEDULE H, LINE 4i—SCHEDULE OF ASSETS (HELD AT END OF YEAR)
### DECEMBER 31, 2017

| (a) | (b) Identity of Issue, Borrower, Lessor, or Similar Party | (c) Description of Investment Including Maturity Date, Rate of Interest, Collateral, Par, or Maturity Value | (d) Cost | (e) Current Value |
|---|---|---|---|---|
| | **Cash Equivalents:** | | | |
| * | Mutual of Omaha Bank | Federated Government Obligations | $ 4,371 | $ 4,371 |
| | | | | |
| | **Exchange Traded Funds:** | | | |
| | iShares Barclays 1-3 Year Treasury FD | 165 Shares | 13,957 | 13,835 |
| | iShares Core U.S. Aggregate Bond | 130 Shares | 14,154 | 14,213 |
| | Powershares Trust II Senior Loan | 600 Shares | 14,028 | 13,824 |
| | Guggenheim S&P 500 Equal Weight | 245 Shares | 22,202 | 24,752 |
| | Powershares S&P 500 Low Volatility | 505 Shares | 21,973 | 24,109 |
| | | Total Exchange Traded Funds | 86,314 | 90,733 |
| | **Mutual Funds:** | | | |
| | Templeton Global Bond Advisor FD | 243 Shares | 2,947 | 2,879 |
| | MFS Corporate Bond FD | 407 Shares | 5,666 | 5,753 |
| | Principal High Yield FD | 2,742 Shares | 20,642 | 20,458 |
| | MFS Emerging Markets Debt FD | 196 Shares | 2,946 | 2,959 |
| | PIMCO Low Duration FD | 3,964 Shares | 39,167 | 39,089 |
| | Oppenheimer Developing Markets FD | 350 Shares | 11,706 | 15,034 |
| | Oppenheimer International Growth FD | 407 Shares | 11,720 | 17,775 |
| | Principal Real Estate Securities FD | 642 Shares | 12,274 | 15,245 |
| | T Rowe Price Equity Income FD | 801 Shares | 23,405 | 26,718 |
| | T Rowe Price Mid Cap Growth | 147 Shares | 9,274 | 12,772 |
| | Touchstone Sands Capital Growth | 655 Shares | 12,162 | 13,490 |
| | Victory RS Small Cap Growth | 82 Shares | 5,776 | 6,885 |
| | | Total Mutual Funds | 157,685 | 179,057 |
| * | Community Provider of Enrichment Services, Inc. | Common Stock, 912,435 Shares, No Par Value | 9,860,102 | 9,252,096 |
| | | | $ 10,108,472 | $ 9,526,257 |

\* Represents a party-in-interest to the Plan.



Exhibit "11"

| | |
|---|---|
| **From:** | Mary Lynn Greenhow |
| **To:** | Miguel Paredes |
| **Cc:** | Douglas Zimmerman; David Johnson; Doug Zimmerman (dzimmerman@cpes.com); Mark G. Monson; Tiki Thompson |
| **Subject:** | Questions for CPES 10.2.20 Board Meeting |
| **Date:** | Wednesday, September 30, 2020 3:39:35 PM |
| **Attachments:** | image001.png |

Good afternoon, Miguel, we have some questions we'd like to discuss at Friday's BOD meeting, please see below:

Describe the close out process for an ESOP that has gone bankrupt and handing things over to the Trustee? Describe the Board of Directors structure after 12/31/20.

What will you charge over time?

If there are distributions to be made, do shareholders need to do anything to receive that money?

What ongoing support does the Trustee need from the organization? If there is a dedicated individual:

Typically for how long and what are typical hours worked on a weekly basis?

What is the typical rate of pay?

What are typical duties of this person?

Is that person(s) paid from the Company estate?

Do they act as an independent contractor or an employee of the Trustee's organization?

Who handles the TPA duties? Internal ESOP Administrator duties?

Are outstanding bills paid from the estate? We have some lawsuits with high deductibles, will those erode what is left? Who manages this?

Corporate records – we currently have Board records, ESOP documents, etc. at our former corporate counsel's office. What needs to happen with those? Does the Trustee maintain them (This may be a Jeremy Pelphrey question).

I imagine other questions will come out of this discussion. If there are important topics not included here please make sure they are added to the list.

Looking forward to speaking with you Friday.

Thank you



Mary Lynn Greenhow

Vice President, Administration

CPES

CPES California, Inc.

Novelles Developmental Services, Inc.

4805 E. Speedway, Tucson, AZ 85712

520/495-6235 Direct Line

520/884-7954

520/884-0383 FAX

*Excellence In Services That Empower Every Person to Achieve Their Highest Quality of Life*

This is a privileged and confidential communication that is intended only for the listed recipient(s) of this message. Any unauthorized review, use, disclosure or distribution is prohibited. If you believe you have received this message in error, please inform me immediately via e-mail at the address set forth above. Thank you.

"All information regarding this case is confidential under ARS §8-542, ARS §36-441, ARS §36-445, ARS §36-2401 through 2404, ARS § 36-2917, ARS §41-1959 and 42 CFR 434.34."

PAREDES-0002101