1  EVE H. KARASIK (State Bar No. 155356)
   JEFFREY S. KWONG (State Bar No. 288239)
2  LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
   2818 La Cienega Avenue
3  Los Angeles, California 90034
   Telephone: (310) 229-1234
4  Email: EHK@LNBYG.COM; JSK@LNBYG.COM
5
   JILLIAN NOLAN SNIDER (Admitted Pro Hac Vice)
6  A.J. WEBB (Admitted Pro Hac Vice)
   FROST BROWN TODD LLP
7  3300 Great American Tower 301 East Fourth Street
   Cincinnati, Ohio 45202
8  Telephone: (513) 651-6800
   Email: JSNIDER@FBTLAW.COM; AWEBB@FBTLAW.COM
9
10 Counsel for Oxford Restructuring Advisors LLC,
   as Liquidating Trustee of the CPES Liquidating Trust
11
12            **UNITED STATES BANKRUPTCY COURT**
        **CENTRAL DISTRICT OF CALIFORNIA (NORTHERN DIVISION)**
13
14 In re:                              ) Lead Case No. 9:20-bk-10554-DS
                                       ) Jointly Administered With:
15 CPESAZ Liquidating, Inc., et al.,   ) Case No. 9:20-bk-10553-DS
     EIN: 86-0804057                   ) Case No. 9:20-bk-10994-DS
16 NDS Liquidating, Inc.               ) Chapter 11 Cases
     EIN: 27-5174435                   )
17 CPESCA Liquidating, Inc.            ) **MOTION PURSUANT TO FEDERAL**
     EIN: 27-2315212                   ) **RULE OF BANKRUPTCY**
18                                     ) **PROCEDURE 9019 FOR ENTRY OF**
            Debtors.                   ) **ORDER APPROVING THE**
19                                     ) **SETTLEMENT AND COMPROMISE**
   _____ ) **BETWEEN THE LIQUIDATING**
20                                     ) **TRUSTEE, MIGUEL PAREDES, THE**
   [•] Affects All Debtors            ) **FORMER FIDUCIARIES OF THE**
21                                     ) **DEBTORS AND THE ESOP, AND THE**
   [ ] CPESAZ Liquidating, Inc.        ) **ARIZONA PLAINTIFFS;**
22 [ ] NDS Liquidating, Inc.           ) **MEMORANDUM OF POINTS AND**
   [ ] CPESCA Liquidating, Inc.        ) **AUTHORITIES; AND DECLARATION**
23                                     ) **OF ANDREW SIMON IN SUPPORT**
            Debtors and Debtors in Possession ) **THEREOF**
24                                     )
                                       ) Hearing:[1]
25                                     ) Date/Time: June 6, 2024 at 11:30 a.m.
26                                     ) Place: 255 East Temple Street
                                       ) Los Angeles, California 90012
27 _____ )
28 [1]   Hearing date and time previously approved by the Court.

1

## **TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................ 2

    I.      INTRODUCTION ................................................................................................ 2

    II.    JURISDICTION AND VENUE ........................................................................ 3

    III.   FACTUAL AND PROCEDURAL BACKGROUND ........................................ 3

        A.    The Bankruptcy Case ............................................................................. 3

        B.    The Fiduciary Policies ........................................................................... 5

        C.    The Liquidating Trustee's Claims ......................................................... 6

        D.    The Arizona Plaintiff's Action ............................................................. 7

        E.    The ADR Process .................................................................................. 7

    IV.   THE SETTLEMENT AGREEMENT ................................................................ 8

        A.    Settlement Agreement ............................................................................ 8

    V.    REQUEST FOR RELIEF ................................................................................ 10

        A.    The Settlement Agreement Meets the Applicable Legal Standard for Approval .......................................................................................... 10

        B.    Satisfaction of the *A&C Factors* ....................................................... 12

        C.    The Releases are Appropriate Under the Circumstances ............................. 14

    VI.   CONCLUSION ................................................................................................ 16

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*In re Adelphia Commc'ns Corp.*,
  327 B.R. 143 (Bankr. S.D.N.Y. 2005) .................................................................. 11

*In re Endoscopy Ctr.*,
  451 B.R. (Bankr. D. Nev. 2011)........................................................................... 11

*In re Hyloft, Inc.*,
  451 B.R. 104 (Bankr. D. Nev. 2011).................................................................... 11

*In re Lion Capital Group*,
  49 B.R. 163 (Bankr. S.D.N.Y. 1985) ................................................................... 11

*Martin v. Kane (In re A&C Properties)*,
  784 F.2d 1377 (9th Cir. 1986), cert. denied, *Martin v. Robinson*, 47 U.S. 854
  (1986) ........................................................................................................ 10, 11, 16

*In re Pacific Gas and Elec. Co.*,
  304 B.R. 395 (Bankr. N.D. Cal. 2004).................................................................. 11

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson*,
  390 U.S. 414 (1958) .............................................................................................. 10

*S.I. Acquisition, Inc. v. Eastway Delivery Serv. Inc. (In re S.I. Acquisition, Inc.)*,
  817 F.2d 1142 (5th Cir. 1987).............................................................................. 16

*Suter v. Goedert*,
  396 B.R. 535 (D. Nev. 2008) ............................................................................... 11

*In re Telesphere Commc'ns, Inc.*,
  179 B.R. 544 (Bankr., N. D. Ill. 1994)................................................................. 11

*United States v. Alaska Nat'l Bank (In re Walsh Const., Inc.)*,
  669 F.2d 1325 (9th Cir. 1982)............................................................................... 10

*In re Walsh Const., Inc.*, 669 F.2d at 1328-29 .................................................... 10

*Woodson v. Fireman's Fund Ins. Co. (In re Woodson)*,
  839 F.2d 610 (9th Cir. 1988)................................................................................. 10

**Federal Statutes**

11 U.S.C.
§ 105 ................................................................................................................ 3
§ 105(a) ...................................................................................................... 1, 10
§ 362 ............................................................................................................. 16


28 U.S.C.
§ 157(b)(2) ..................................................................................................... 3
§§ 157(b) and 1334 ....................................................................................... 3
§§ 1408 and 1409 .......................................................................................... 3

ERISA ............................................................................................................ 7, 15

**Other Authorities**

Fed. R. Bankr. P. 9019 ............................................................................ 1, 3, 11
Fed. R. Bankr. P. 9019(a) ............................................................................. 10

Oxford Restructuring Advisors LLC, as Liquidating Trustee (the "Liquidating Trustee") for the CPES Liquidating Trust (the "Liquidating Trust"), by and through undersigned counsel, pursuant to Section 105(a) of Title 11, United States Code (the "Bankruptcy Code"), and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), respectfully files this motion ("Motion")[2] seeking the entry of an order ("9019 Order"): approving that certain Settlement Agreement ("Settlement Agreement"), an executed copy of which is attached as **Exhibit 1** to the Declaration of Andrew Simon attached as **Exhibit A** hereto, entered into by and among the Liquidating Trustee, Miguel Paredes, as the trustee (the "ESOP Trustee") of the Community Provider of Enrichment Services, Inc. Employee Stock Ownership Plan and related Trust (the "ESOP"), the former directors, officers, fiduciaries, employees, and/or insiders of CPES-AZ Liquidating, Inc., f/k/a Community Provider of Enrichment Services, Inc. d/b/a CPES, Inc. ("CPES-AZ"), NDS Liquidating, Inc., f/k/a Novelles Developmental Services, Inc. ("Novelles") and CPESCA Liquidating, Inc. f/k/a CPES California, Inc. ("CPES-CA," and together with CPESAZ and Novelles, are collectively the "Debtors") and the ESOP, including Mark Monson ("Monson"), David Johnson ("Johnson"), Douglas Zimmerman ("Zimmerman"), and Alberto Tarajano ("Tarajano" and together with Monson, Johnson, and Zimmerman, are collectively with and any and all other former fiduciaries, the "Insureds"); and Robert Bennetti, Linki Peddy, and Linda Mariano on behalf of themselves and all others similarly situated (collectively, the "Arizona Plaintiffs"). The Liquidating Trustee, ESOP Trustee, Insureds, and Arizona Plaintiffs are collectively referred to herein as the "Parties" or singularly as a "Party." In support of this Motion, the Liquidating Trustee states as follows:

---

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Settlement Agreement.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

The Parties have been involved in an alternative dispute resolution process over the past year (the "ADR Process"). As a result of their collective efforts, the Parties have reached a settlement (the "Settlement"), as embodied in the Settlement Agreement, subject to the Court's approval, which resolves all of the Liquidating Trustee's claims against the Insureds and all of the disputes between the Liquidating Trustee, ESOP Trustee, Insureds and the Arizona Plaintiffs. Pursuant to the Settlement, among other things: (i) the Insureds shall cause their primary insurer, Hudson Insurance Group ("Primary Insurer"), to pay to the Liquidating Trustee, for the benefit of the Liquidating Trust and the ESOP, the sum of Two Million Four Hundred Thousand Dollars ($2,400,000.00) ("Settlement Payment"); and (ii) the Parties will mutually release each other as set forth in the Settlement Agreement.

An integral part and requirement of the Settlement Agreement is that the Court enter a 9019 Order in the Debtors' Bankruptcy Cases, which also includes findings that (a) the Claims,[3] including those asserted in the Fiduciary Demand, the LT Draft Complaint, the ESOP Proof of Claim, and the AZ FAC, are derivative in nature and therefore belong to the Liquidating Trust and the ESOP, (b) the Claims resolved pursuant to the Settlement Agreement are fully and finally resolved, and (c) therefore, the releases contained in the Settlement Agreement shall be binding on all ESOP participants and their beneficiaries, all beneficiaries of the Liquidating Trust, and any other person acting through or on behalf of the ESOP or the Debtors.

The Liquidating Trustee respectfully submits that the Settlement is fair and equitable, meets the requirements for approval of settlements and such releases, represents the Liquidating Trustee's prudent business judgment, and is in the best interests of the Parties and the creditors of the Debtors'

---

[3] All undefined capitalized terms shall have the meanings described to them below.

Estates, the Liquidating Trust, the ESOP, the Arizona Plaintiffs, and the participants in and beneficiaries of the Liquidating Trust and the ESOP.

## II. JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding under 28 U.S.C. § 157(b)(2).  The statutory basis for this Motion is Section 105 of the Bankruptcy Code.  The procedural predicate for the requested relief is Bankruptcy Rule 9019.

## III. FACTUAL AND PROCEDURAL BACKGROUND

### A.  **The Bankruptcy Case**

2.      On April 24, 2020 (the "Phase I Petition Date"), CPES AZ and Novelles filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On August 11, 2020 (the "Phase II Petition Date," and together with the Phase I Petition Date, the "Petition Date"), CPES-CA filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3.      The Debtors were liquidated through the chapter 11 cases and the Liquidating Trustee was appointed pursuant to the Debtors' First Amended Joint Chapter 11 Plan of Liquidation ("Plan"), as Modified [Doc. No. 646], and confirmed by Order of the Bankruptcy Court dated May 10, 2021 (the "Confirmation Order") [Doc. No. 836].

4.      The Liquidating Trustee is bound by the Liquidating Trust Agreement, which was approved by the Confirmation Order. The effective date of the Plan was June 17, 2020 (the "Effective Date") [Doc. No. 900].

5.      Under the Plan and Confirmation Order, the Liquidating Trust Assets[4] were transferred to and vested within the Liquidating Trust on the Effective Date.  *See* Plan, §4.4.

6.      The Liquidating Trust Assets include the following:

---

[4]All capitalized terms not defined herein shall have the same meeting as set forth in the Plan.

3

(a) All assets, interests, and rights of the Debtors and their Estates that exist as of the Effective Date (whether received or acquired on or after the occurrence of the Effective Date) and any proceeds thereof, whether choate or inchoate, wherever and by whomever held, including, *inter alia*, the Debtors' Cash, Causes of Action, Insurance Policies, books and records, all of which shall be transferred to the Liquidating Trust on the Effective Date pursuant to the terms of this Plan; (b) the property or assets vested in the Liquidating Trust or the Liquidating Trustee pursuant to the terms of this Plan on or after the Effective Date, and (c) any and all Litigation Claims and Litigation Proceeds. *See* Plan, §1.66.

7.      The Plan defines Causes of Action as:

Any and all claims, actions, causes of action, choses in action, suits, debts, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including all claims and any avoidance, recovery, subordination, or other actions against Insiders and/or any other Entities under the Bankruptcy Code, including Avoidance Actions) of any of the Debtors, the debtors in possession, and/or the Estates (including those actions set forth in the Plan Supplement), whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, that are or may be pending on the Effective Date or commenced by the Liquidating Trustee after the Effective Date against any Entity, based in law or equity, including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order. *See* Plan, §1.13.

8.      The Plan defines Litigation Claims as:

Any and all Causes of Action of any Debtor and/or any of the Estates against any Entity, including but not limited to, (a) all claims and Causes of Action related to or arising out of the ESOP that are not Direct ESOP Claims, (b) the Preserved D&O Claims, (c) all claims and Causes of Action arising under Chapter 5 of the Bankruptcy Code (other than Causes of Action that constitute Purchased Assets), and (d) all claims and Causes of Action against insiders of the Debtors. *See* Plan, §1.69

9.      The Plan defines the Preserved D&O Claims as "any and all claims and Causes of Action (together with any proceeds thereof, including any proceeds of the D&O Insurance) held by the Debtors and their Estates against the Debtors' directors and officers, solely in their capacities as such, including those claims and Causes of Action that are not currently asserted, but could be

4

asserted against them, including but not limited to, Claims held by the Debtors and their Estates relating to the ESOP." *See* Plan, §1.79.

10.    The Plan provides that all rights to commence, prosecute, or settle any and all Causes of Action (excluding Direct ESOP Claims) whether arising prepetition or post-petition vests in the Liquidating Trust and the Liquidating Trustee may enforce all rights to commence, prosecute, or settle all Causes of Action.  *See* Plan, Article V, §5.2.

11.    The Plan provides for the preservation for the Liquidating Trust of any and all rights to conduct investigations under Bankruptcy Rule 2004 as is necessary and relevant to the Liquidating Trust and with respect to the prosecution of Litigation Claims and the administration of the Liquidating Trust Assets.  *See* Plan, §5.3.

12.    The Plan provides that the Liquidating Trustee shall have the sole responsibility, standing (including derivative standing), and authority to prosecute and settle all Litigation Claims under the Plan and the Confirmation Order.  *See* Plan, §5.4.

13.    In order to preserve and protect the Liquidating Trust Assets, the Plan and Confirmation Order provide for a confirmation injunction as follows:

> **… from and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtors, the Estates, the Liquidating Trust, the Liquidating Trustee, their successors and assigns, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim or Equity Interest, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or satisfied or to be released or satisfied under the Plan or the Confirmation Order.** See Confirmation Order ¶32 (emphasis in original); Plan § 9.4.

**B.    The Fiduciary Policies**

14.    Prior to the Petition Date, the Primary Insurer issued a Private Defender (Management Liability Insurance Policy) to CPES-AZ under Policy Number HFP-HN-PRP-5390-010120 ("Hudson Policy"), for the initial policy period from January 1, 2020 to January 1, 2021.

15.    The Hudson Policy provides coverage for the Insureds for claims arising from wrongful acts under both the Director, Officers and Company Liability Coverage Part and the Fiduciary Liability Coverage Part thereof.

16.    Prior to the Petition Date, Westchester Fire Insurance Company ("Chubb" and collectively with the Primary Insurer, the "Insurers") issued an Excess Liability Insurance Policy to CPES-AZ under Policy Number G27072574 007 (the "Excess Policy" and together with the Hudson Policy, the "Fiduciary Policies"), which followed the Hudson Policy.

17.    The Fiduciary Policies are wasting policies in that the insurance coverage limits available to the Debtors' Estate are reduced dollar for dollar by costs and expenses incurred during the defense of an insured.

18.    The Claims (defined below) are the only timely claims made against the Fiduciary Policies.

## C.    The Liquidating Trustee's Claims

19.    On October 27, 2020, and December 28, 2020, the Debtors notified the Insurers of certain claims and causes of action against the Debtors' current and former fiduciaries, including the Insureds (the "Fiduciary Demand").

20.    On or about September 30, 2020, the ESOP Trustee filed a proof of claim against the Debtors' Estates [Claim No. 24-1 and 274], in the amount of $255,150.00, for actual damages suffered by the ESOP as a result of an alleged overvaluation of the Debtors' equity at the end of 2018 (the "ESOP Proof of Claim").

21.    Subsequent to its appointment, the Liquidating Trustee, through its counsel, began investigating the pre-petition actions of the Debtors' former directors and officers (the "Investigation").

22.    As part of the Investigation, the Liquidating Trustee, *inter alia*, conducted Bankruptcy Rule 2004 examinations of the directors and officers and reviewed the corporate records of the

6

Debtors.

23.    At the conclusion of the Investigation, the Liquidating Trustee engaged special litigation counsel to pursue certain claims against the former directors and officers of the Debtors for breaches of their fiduciary duties.

24.    On June 27, 2023, the Liquidating Trustee supplemented the Fiduciary Demand and provided the Insureds and Insurers with a draft complaint (the "LT Draft Complaint") identifying certain causes of action arising under state law and the Employee Retirement Income Security Act of 1974 ("ERISA").  A true and correct copy of the LT Draft Complaint is attached to the Settlement Agreement as **Exhibit A**.

**D.  The Arizona Plaintiff's Action**

25.    On April 24, 2023, the Arizona Plaintiffs filed a class action complaint for numerous violations of ERISA (the "Arizona Action") in the United States District Court for the District of Arizona (Case No. 4:23-cv-00193-RCC) against certain former officers and directors of the Debtors and fiduciaries of the ESOP, namely, Mark Monson, Doug Zimmerman, and David Johnson, as well as the former ESOP Trustee, Alberto Tarajano.

26.    On July 26, 2023, the Arizona Plaintiffs amended their complaint (the "AZ FAC"). A true and correct copy of the AZ FAC is attached to the Settlement Agreement as **Exhibit B**.

27.    The Arizona Action was stayed by the District Court pending the Bankruptcy Court's determination on the ESOP Proof of Claim.

**E.  The ADR Process**

28.    In an effort to preserve the limited funds available under the Fiduciary Policies, the Liquidating Trustee engaged the ESOP Trustee, the Insureds and Insurers in an alternative dispute resolution process: the ADR Process.

29.    In connection with the ADR Process, the Liquidating Trustee and the Insureds (a) entered into a tolling agreement that extended and preserved all applicable statute of limitations, (b)

exchanged several millions of documents pursuant to a confidentiality agreement, and (c) agreed to participate in a pre-suit mediation with a mutually agreeable mediator.

30.     The Parties selected Robert Meyer, Esq. with JAMS to mediate the various disputes and scheduled an in-person mediation for January 24, 2024.

31.     The Liquidating Trustee, the ESOP Trustee, the Insureds, and Insurers invited the Arizona Plaintiffs to participate in the mediation and did not require the Arizona Plaintiffs at no expense to the Arizona Plaintiffs.

32.     The Parties attended an all-day, in-person mediation at the offices of JAMS in Los Angeles, California on January 24, 2024.

33.     At the conclusion of the January 24, 2024 mediation, the Parties did not reach a settlement, but continued to negotiate over the weeks and months that followed.

34.     As a result of the Parties' negotiations, and without admitting the validity of any allegations or any liability in respect thereto, the Parties have reached an agreement, the terms of which are set forth in the Settlement Agreement, providing for a global settlement and corresponding broad releases of any and all claims the Liquidating Trustee, the ESOP Trustee, and the Arizona Plaintiffs have identified or asserted or could assert against the Insureds in any manner that might implicate the Fiduciary Policies, including, without limitation, each of the potential claims identified in the Fiduciary Demand, LT Draft Complaint, ESOP Proof of Claim, and AZ FAC and/or otherwise relating to the operations of the Debtors, the Bankruptcy Cases, or any other claim or action, including any and all indemnification claims that arise from, are related to, or derive from the Debtors or transactions involving or related to them (collectively, "Claims"), on the terms and conditions set forth in the Settlement Agreement and described below (the "Settlement")

## IV.    THE SETTLEMENT AGREEMENT

### A.  Settlement Agreement

35.     The Liquidating Trustee (and the ESOP Trustee and Arizona Plaintiffs) asserts there

8

is merit to the Claims, and the Insureds assert there is not; but each recognized that it was in their best interests to try and amicably resolve their differences out of court through the ADR Process.

36.     As a result of the Parties' good-faith efforts, they successfully resolved their contested issues and entered into the Settlement Agreement which, subject to Bankruptcy Court approval, will resolve all of the Claims without the further cost and expense of litigation and resolve many other inter-Party disputes, which as a result of this Settlement, pave the way towards an expeditious closing of the Estates and distribution to beneficiaries of the Liquidating Trust and ESOP.

37.     The relevant terms of the Settlement, as set forth in more detail in the Settlement Agreement, are summarized as follows:

(a.) **Settlement Payment**. The Insureds shall cause the Primary Insurer to pay to the Liquidating Trustee for the benefit of the Liquidating Trust, the agreed Settlement Payment in the amount of **Two Million Four Hundred Thousand Dollars and no cents ($2,400,000.00)** within fourteen (14) days after the April 30, 2024 Effective Date of the Settlement Agreement. The Settlement Payment shall be made to the Liquidating Trustee's special counsel's trust account, and shall be held pending the entry of a Final Order approving the Settlement and dismissal of the Arizona Action. Upon the 9019 Order becoming a Final Order and dismissal of the Arizona Action, special counsel shall deliver the Settlement Payment, net of costs and attorney's fees to the Liquidating Trustee, and such funds shall be earmarked solely for the ESOP and shall not be used for any purpose other than distribution to the ESOP Trust and the ESOP participants and beneficiaries. If the 9019 Order is not entered by **July 31, 2024**, the Parties agree that special counsel shall return the Settlement Payment to the Primary Insurer.

(b.) **Extension of the Tolling of Agreement**. As part of the ADR Process the Insureds executed a Tolling Agreement, as amended from time to time, extending and preserving all applicable statute of limitations. If the 9019 Order approving the Settlement Agreement does not become a Final Order, the parties shall be returned to the *status quo ante* prior to their entry into the Settlement Agreement, and have agreed to toll the applicable statute of limitations for the Claims through thirty (30) days after any such Order denying approval of the Settlement.

(c.) **Releases**. The Parties shall release each other of all claims each may have against the other that were or could have been raised in connection with the Bankruptcy Case, the Claims, and any other litigation among the Parties related to the Debtors. In order to effectuate the broad general releases, the Parties request that the Court's 9019 Order find and conclude that (a) the Claims, including those asserted in the Fiduciary Demand, the LT Draft Complaint, the ESOP Proof of Claim, and the AZ FAC, are derivative in nature and therefore belong to the Liquidating Trust and the ESOP, (b) the Claims resolved pursuant to the Settlement Agreement are fully and finally resolved, and (c) therefore, the releases contained in the Settlement Agreement shall be binding on all ESOP participants

9

and their beneficiaries, all beneficiaries of the Liquidating Trust, and any other person acting through or on behalf of the ESOP or the Debtors.

## V.    REQUEST FOR RELIEF

### A.    The Settlement Agreement Meets the Applicable Legal Standard for Approval

38.    Bankruptcy Rule 9019(a) generally governs settlements in bankruptcy cases.  It provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).  It empowers the Bankruptcy Court to approve a compromise or settlement if it is (a) fair and equitable and (b) in the best interests of the estate.  *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 424 (1958) (*citing Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)).

39.    It is well established that bankruptcy courts and the law favor compromises. "The purpose of a compromise agreement is to allow the trustee and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims." *Martin v. Kane (In re A&C Properties)*, 784 F.2d 1377, 1380-81 (9th Cir. 1986), cert. denied, *Martin v. Robinson*, 47 U.S. 854 (1986). Moreover, Bankruptcy Code Section 105(a) states "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

40.    The decision to approve a settlement or compromise is within the sound discretion of the bankruptcy court. See 9 Collier on Bankruptcy 9019.02 (16th ed. rev. 2016); *Woodson v. Fireman's Fund Ins. Co. (In re Woodson)*, 839 F.2d 610, 620 (9th Cir. 1988) (bankruptcy court has great latitude in approving compromise agreements."). This Court does not need to conduct an exhaustive investigation into the validity of the merits of the claims that the parties seek to compromise.  See *United States v. Alaska Nat'l Bank (In re Walsh Const., Inc.)*, 669 F.2d 1325, 1328 (9th Cir. 1982).  Rather, this Court need only determine that the outcome of the claim's litigation is open to reasonable doubt.  See *Walsh Const., Inc.*, 669 F.2d at 1328-29.

41.    In this Circuit, a bankruptcy settlement should be approved under Rule 9019 if the settlement is "fair and equitable and in the best interests of the estate." In deciding whether a proposed settlement is fair and equitable, the Ninth Circuit has identified the following four factors that a bankruptcy court should consider in determining whether a proposed settlement is fair and equitable ("*A&C* Factors"):

(i)    The probability of success in the litigation;

(ii)    The difficulties, if any, to be encountered in the matter of collection;

(iii)    The complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

(iv)    The paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*A&C Props.*, 784 F.2d at 1381; *In re Endoscopy Ctr.*, 451 B.R. at 536 (Bankr. D. Nev. 2011); *In re Hyloft, Inc.*, 451 B.R. 104 (Bankr. D. Nev. 2011).

42.    The Liquidating Trustee is not necessarily required to satisfy each of these factors as long as the factors as a whole favor approval of the settlement.  See *In re Pacific Gas and Elec. Co.*, 304 B.R. 395, 416 (Bankr. N.D. Cal. 2004). The settlement need only fall "within the reasonable range of litigation possibilities."  *In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005).   In considering the factors, "a precise determination of likely outcomes is not required, since an exact judicial determination of the values at issue would defeat the purpose of compromising the claim." *In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 553 (Bankr., N. D. Ill. 1994) (internal quotations omitted). Thus, rather than determining various issues of fact and law, the Court should "canvass the issues and see whether the settlement fall[s] below the lowest point in the range of reasonableness."  *In re Lion Capital Group*, 49 B.R. 163, 175 (Bankr. S.D.N.Y. 1985) (internal quotations omitted); see also *Suter v. Goedert*, 396 B.R. 535, 548 (D. Nev. 2008) (quoting *Burton v. Ulrich (In re Schmitt)*, 215 B.R. 417, 423 (B.A.P. 9th Cir. 1997)).   If courts required a more extensive analysis, it would defeat the purpose of Bankruptcy Rule 9019 because

there would be no point compromising, and the parties might as well go ahead and try the case. Nonetheless, as set forth in greater detail below, the terms of the Settlement Agreement satisfy each of the required factors.

**B.  Satisfaction of the _A&C Factors_**

**(i)      Probability of Success in Litigation**

43.    The Liquidating Trustee's Claims against the Insureds involve allegations of, _inter alia_, breach of fiduciary duties and negligence. The probability of the Liquidating Trustee's success in litigating the Claims against the Insureds is uncertain at best, especially considering the defenses already raised by the Insureds in during the ADR Process.  The Claims involve complex factual and legal issues, all of which are contested by the Insureds. Litigation would require further investigation, extensive discovery, retention of experts, preparation and prosecution of pretrial and dispositive motions and preparation for trial. The Liquidating Trustee estimates that rejecting the offer and Settlement Agreement and incurring the costs to litigate the Claims, coupled with the depletion of funds available from the Fiduciary Policies, would net less to the creditors of the Debtors' Estates than the Settlement Payment. By contrast, approval of the Settlement Agreement will eliminate the risk of this uncertainty and provide substantial funds for distributions to creditors of the Debtors' Estates.

**(ii)     The Difficulties, if any, to be encountered in the Matter of Collection**

44.    In the absence of the Settlement Agreement, even if the Liquidating Trustee were to prevail, it is unknown whether he would be successful in collecting the full amount of any judgment from the Insureds.  As discussed supra, the Fiduciary Policies are likely to be exhausted in litigation; whereas, by contrast, the Settlement Agreement provides a significant sum ($2.4 Million) certain to be paid to the Debtors' Estates through the Primary Insurer.

45.    The Settlement memorialized in the Settlement Agreement avoids the risk, uncertainty and delay of litigation and collection by resolving all disputes among the Parties.  This

weighs strongly in favor of approval of the Settlement Agreement.

> (iii)    **The Complexity of the Litigation Involved, and the Expense, Inconvenience, and   Delay Necessarily Attending It**

46.    The proof necessary to substantiate the Claims for relief is substantial and complex. Additionally, the Insureds assert, among other things, a myriad of defenses, including *inter alia* that (i) they did not act in bad faith, breach any fiduciary duty, nor commit any wrongdoing as directors, officers, or representatives of the Debtors or the ESOP; (ii) they relied on professional legal and accounting advice, as well as their own business judgment, for the operations of the Debtors and administration of the ESOP; and (iii) the Claims are barred by numerous other alleged affirmative defenses.

47.    To prove otherwise, the Liquidating Trustee would have to overcome the presumption of the business judgment rule, prove the Insureds intentionally abdicated their directorial duties in the face of a known duty to act, plead all allegations with particularity, and disprove and litigate the host of additional affirmative defenses raised by the Insureds. Moreover, pursuit of the Claims would involve further investigation and discovery spanning Arizona and California, which would be costly to the Debtors' Estates and with no certainty of successfully obtaining any favorable judgment. To the contrary, the Settlement Agreement will provide immediate cash value flowing back to the Debtors' Estates, the Liquidating Trust, the ESOP, the Arizona Plaintiffs, and the participants and beneficiaries of the Liquidating Trust and the ESOP.

48.    Moreover, as a result of the global resolutions reached in the Settlement, the Liquidating Trustee is in a position to wrap up the Liquidating Trust and distribute its *res* to the remaining beneficiaries, namely, the ESOP; which, in turn, will enable the ESOP Trustee to make distributions to the ESOP beneficiaries – former employees of the Debtors who have been waiting for such distribution for years.

/ / /

             **(iv)**     **The Paramount Interest of the Creditors and a Proper Deference to Their Reasonable Views in the Premise.**

49.     The Settlement Agreement produces an assured return for the benefit of the creditors of the Debtors' Estates of $2.4 Million. For this reason and all the reasons discussed above (including the attendant risk and delay associated with litigation), the Settlement Agreement is in the best interests of creditors of the Debtors' Estates.

50.     The terms of the Settlement as memorialized in the Settlement Agreement were the product of lengthy discussions during which each Party analyzed its respective positions with the assistance of counsel, made concessions in an effort to resolve disputed issues and agreed to enter into a compromise because doing so served its independent interests.

51.     It is also worth noting here that the Debtors' Estates' primary constituents, the Liquidating Trustee and the ESOP Trustee, and the ESOP's most outspoken constituents, the Arizona Plaintiffs, all participated in the ADR Process and are Parties to the Settlement.

52.     Thus, the Settlement Agreement is the result of arm's-length, good-faith negotiations by and among the Parties.

**C.  The Releases are Appropriate Under the Circumstances**

53.     An integral component of the Settlement is the Insureds' requirement that the 9019 Order contain the following findings and conclusions:

> a.  the Claims, including those asserted in the Fiduciary Demand, the LT Draft Complaint, the ESOP Proof of Claim, and the AZ FAC, are derivative in nature and therefore belong to the Liquidating Trust and ESOP;
> b.  the Claims resolved pursuant to this Settlement Agreement are fully and finally resolved; and
> c.  therefore, the releases contained in this Settlement Agreement shall be binding on all ESOP participants and their beneficiaries, all beneficiaries of the Trust, and any other person acting through or on behalf of the ESOP.

54.     All of the Claims are either (a) claims for breach of fiduciary duty against former officers and directors of the Debtors, or (b) claims for breach of fiduciary duty against former fiduciaries of the ESOP. None of the claims impact any creditor, shareholder, or participant in or

14

beneficiary of the ESOP uniquely, as opposed to a generalized harm that impacted all such parties. Therefore, as a matter of state law and ERISA law (wherein the Liquidating Trustee stands in the shoes of the ESOP Plan Administrator for purposes of bringing ERISA claims), the Claims are derivative in nature. Moreover, the Plan and Confirmation Order vested the Liquidating Trustee with sole authority for prosecuting and litigating the Litigation Claims (including the Claims) and enjoined all parties from taking any actions to interfere with the implementation or consummation of the Plan. See Plan §§ 5.4 & 9.4; Confirmation Order ¶ 32.

55.    The Settlement is intended to, and does in fact, fully and finally resolve all Claims against the Insureds. The Fiduciary Demand, the LT Draft Complaint, the ESOP Proof of Claim, and the Arizona Action were the only timely claims made that could implicate the Fiduciary Policies. They were brought either on behalf of the Debtors' Estates, the ESOP, or a class of participants and beneficiaries of the ESOP. All proponents of the Claims, including the Liquidating Trustee, the ESOP Trustee, and the Arizona Plaintiffs, have signed off on the Settlement as a full and final resolution of the Claims.

56.    The Liquidating Trustee is providing notice of the Settlement to all of the ESOP participants and beneficiaries and any others with an opportunity to object and assert any claims against the Insureds that such participant, beneficiary or other person believes should not be released as a result of the Settlement. The Court can evaluate whether such claim is direct (and thus belonging solely to the participant or beneficiary) or derivative (and thus resolved as a result of this Settlement).

57.    Binding the ESOP participants and beneficiaries and any others to the releases in the Settlement is fair and reasonable under the circumstances because it guarantees that no person or entity may assert any additional derivative claims against the Insureds, the Fiduciary Policies, or the Insurers. As set forth above, the Liquidating Trustee (or the ESOP Trustee) is the rightful holder of all derivative claims that may implicate the Fiduciary Policies. Simply put, the claims or actions

15

subject to the proposed findings would impact property of the Debtors' Estates and, thus, given the limitations to that release, it is appropriate under the circumstances.  See *S.I. Acquisition, Inc. v. Eastway Delivery Serv. Inc. (In re S.I. Acquisition, Inc.)*, 817 F.2d 1142, 1152-53 (5th Cir. 1987) (holding that since claim was available to all creditors generally and could be brought by a corporation in its own name against its principals under state law, claim was property of the estate and that competing claims that were not personal in nature were stayed under section 362 of the Bankruptcy Code and general bankruptcy policies).  It is also consistent with the relief this Court previously entered in connection with the Plan and Confirmation Order vesting the Claims with the Liquidating Trustee and enjoining others from interfering with the Liquidating Trustee's administration of those assets. See Plan §§ 5.4 & 9.4; Confirmation Order ¶ 32.

58.    Without the findings, the Insureds would not have entered into the Settlement Agreement nor authorize the Primary Insurer to make the Settlement Payment because of the wasting policy limits and the certainty of depletion of those funds defending against other claims. Entry of the 9019 Order ensures that the Fiduciary Policies proceeds, which belong exclusively to the Insureds, are preserved for the benefit of the Debtors' Estates and its creditors, and not wasted defending against other claims in various state and federal courts.

## VI.    CONCLUSION

59.    For the reasons stated above, the Liquidating Trustee respectfully submits that the Settlement meets the applicable legal standards for approval, including satisfying all four of the *A&C* Factors, are in the best interest of the Debtors' Estates and its creditors, and represent the exercise of the Liquidating Trustee's sound and prudent business judgment.  Moreover, subject to the Court's approval, the Settlement will result in meaningful cash to the Debtors' Estates for the benefit of its creditors and avoids lengthy, burdensome, and expensive litigation.

**WHEREFORE**, the Liquidating Trustee respectfully requests that this Court enter an Order, substantially in the form of the proposed order attached hereto as **Exhibit B**: (a) granting the Motion;

16

(b) approving the terms of the Settlement Agreement; and (c) granting any further relief as the Court

deems appropriate.

Dated:  May 3, 2024

**LEVENE, NEALE, BENDER, YOO
& GOLUBCHIK L.L.P.**

By: /s/ Jeffrey S. Kwong
Eve H. Karasik (Cal. Bar No. 155356)
Jeffrey S. Kwong (Cal. Bar No. 288239)
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
EHK@LNBYG.COM; JSK@LNBYG.COM

-and-

**FROST BROWN TODD LLP**
Jillian Nolan Snider (Admitted Pro Hac Vice)
A.J. Webb (Admitted Pro Hac Vice)
3300 Great American Tower 301 E. Fourth St.
Cincinnati, Ohio 45202
Telephone: (513) 651-6800
Facsimile: (513) 651-6981
JSNIDER@FBTLAW.COM;
AWEBB@FBTLAW.COM;

*Counsel for Oxford Restructuring Advisors
LLC, as Liquidating Trustee of the CPES
Liquidating Trust*

0147226.0742316   4871-6289-3751v4

**EXHIBIT A**

EVE H. KARASIK (State Bar No. 155356)
JEFFREY S. KWONG (State Bar No. 288239)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, CA 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: EHK@LNBYG.COM; JSK@LNBYG.COM

JILLIAN NOLAN SNIDER (Admitted Pro Hac Vice)
A.J. WEBB (Admitted Pro Hac Vice)
FROST BROWN TODD LLC
3300 Great American Tower 301 East Fourth Street, Cincinnati, Ohio 45202
Telephone: (513) 651-6800
Facsimile: (513) 651-6981
Email: JSNIDER@FBTLAW.COM; AWEBB@FBTLAW.COM

Counsel for Oxford Restructuring Advisors LLC,
as Liquidating Trustee of the CPES Liquidating Trust

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**NORTHERN DIVISION**

| | |
|---|---|
| In re: | ) Lead Case No. 9:20-bk-10554-DS |
| | ) |
| CPESAZ Liquidating, Inc., et al., | ) Jointly Administered With: |
|   EIN: 86-0804057 | ) Case No. 9:20-bk-10553-DS |
| NDS Liquidating, Inc. | ) Case No. 9:20-bk-10994-DS |
|   EIN: 27-5174435 | ) |
| CPESCA Liquidating, Inc. | ) Chapter 11 Cases |
|   EIN: 27-2315212 | ) |
| | ) |
|     Debtors. | ) **DECLARATION OF ANDREW** |
| | ) **SIMON IN SUPPORT OF THE** |
| ———————————————— | ) **LIQUIDATING TRUSTEE'S** |
| | ) **MOTION PURSUANT TO FEDERAL** |
| [•] Affects All Debtors | ) **RULE OF BANKRUPTCY** |
| [ ] CPESAZ Liquidating, Inc. | ) **PROCEDURE 9019 FOR ENTRY OF** |
| [ ] NDS Liquidating, Inc. | ) **ORDER APPROVING THE** |
| [ ] CPESCA Liquidating, Inc. | ) **SETTLEMENT AND COMPROMISE** |
| | ) **BETWEEN THE LIQUIDATING** |
|     Debtors and Debtors in Possession | ) **TRUSTEE, MIGUEL PAREDES,** |
| | ) **THE FORMER FIDUCIARIES OF** |
| | ) **THE DEBTORS AND ESOP, AND** |
| | ) **THE ARIZONA PLAINTIFFS** |
| | ) |
| | ) |
| | ) |
| | ) |

1

I, Andrew Simon, hereby state and declare as follows:

1.     I am a managing director at Oxford Restructuring Advisors LLC, the Liquidating Trustee (the "Liquidating Trustee") of the CPES Liquidating Trust (the "Liquidating Trust").

2.     I submit this Declaration in support of the Liquidating Trustee's "Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019 for Entry of Order Approving the Settlement and Compromise Between the Liquidating Trustee, Miguel Paredes, the Former Fiduciaries of the Debtors and the ESOP, and the Arizona Plaintiffs" (the "Motion") [1] The Settlement Agreement that is the subject of the Motion is attached as **Exhibit 1** hereto.

3.     Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, and/or my review of relevant documents and other information prepared or collected by the Liquidating Trustee's consultants or professionals.

4.     In making my statements based upon the review of the aforementioned relevant documents, and other information prepared or collected by the Liquidating Trustee's professionals and consultants, I have relied upon these professionals and consultants accurately recording, preparing, or collecting such documentation and other information.

5.     If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, and on my review of the documents referenced above. I am authorized to submit this Declaration on behalf of the Liquidating Trustee.

---

[1] All capitalized terms not defined herein shall have the same meaning as set forth in the Motion.

2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Background

**A.  The Bankruptcy Case**

6.    On April 24, 2020 (the "Phase I Petition Date"), CPES AZ and Novelles filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On August 11, 2020 (the "Phase II Petition Date," and together with the Phase I Petition Date, the "Petition Date"), CPES-CA filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

7.    The Debtors were liquidated through the chapter 11 cases and the Liquidating Trustee was appointed pursuant to the Debtors' First Amended Joint Chapter 11 Plan of Liquidation ("Plan"), as Modified [Doc. No. 646], and confirmed by Order of the Bankruptcy Court dated May 10, 2021 (the "Confirmation Order") [Doc. No. 836].

8.    The Liquidating Trustee is bound by the Liquidating Trust Agreement, which was approved by the Confirmation Order. The effective date of the Plan was June 17, 2020 (the "Effective Date") [Doc. No. 900].

9.    Under the Plan and Confirmation Order, the Liquidating Trust Assets were transferred to and vested within the Liquidating Trust on the Effective Date.  *See* Plan, §4.4.

10.    The Liquidating Trust Assets include the following:

> (a) All assets, interests, and rights of the Debtors and their Estates that exist as of the Effective Date (whether received or acquired on or after the occurrence of the Effective Date) and any proceeds thereof, whether choate or inchoate, wherever and by whomever held, including, *inter alia*, the Debtors' Cash, Causes of Action, Insurance Policies, books and records, all of which shall be transferred to the Liquidating Trust on the Effective Date pursuant to the terms of this Plan; (b) the property or assets vested in the Liquidating Trust or the Liquidating Trustee pursuant to the terms of this Plan on or after the Effective Date, and (c) any and all Litigation Claims and Litigation Proceeds. *See* Plan, §1.66.

3

11.    The Plan defines Causes of Action as:

Any and all claims, actions, causes of action, choses in action, suits, debts, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including all claims and any avoidance, recovery, subordination, or other actions against Insiders and/or any other Entities under the Bankruptcy Code, including Avoidance Actions) of any of the Debtors, the debtors in possession, and/or the Estates (including those actions set forth in the Plan Supplement), whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, that are or may be pending on the Effective Date or commenced by the Liquidating Trustee after the Effective Date against any Entity, based in law or equity, including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order. *See* Plan, §1.13.

12.    The Plan defines Litigation Claims as:

Any and all Causes of Action of any Debtor and/or any of the Estates against any Entity, including but not limited to, (a) all claims and Causes of Action related to or arising out of the ESOP that are not Direct ESOP Claims, (b) the Preserved D&O Claims, (c) all claims and Causes of Action arising under Chapter 5 of the Bankruptcy Code (other than Causes of Action that constitute Purchased Assets), and (d) all claims and Causes of Action against insiders of the Debtors. *See* Plan, §1.69

13.    The Plan defines the Preserved D&O Claims as "any and all claims and Causes of Action (together with any proceeds thereof, including any proceeds of the D&O Insurance) held by the Debtors and their Estates against the Debtors' directors and officers, solely in their capacities as such, including those claims and Causes of Action that are not currently asserted, but could be asserted against them, including but not limited to, Claims held by the Debtors and their Estates relating to the ESOP." *See* Plan, §1.79.

14.    The Plan provides that all rights to commence, prosecute, or settle any and all Causes of Action (excluding Direct ESOP Claims) whether arising prepetition or post-

4

petition vests in the Liquidating Trust and the Liquidating Trustee may enforce all rights to commence, prosecute, or settle all Causes of Action. *See* Plan, Article V, §5.2.

15. The Plan provides for the preservation for the Liquidating Trust of any and all rights to conduct investigations under Bankruptcy Rule 2004 as is necessary and relevant to the Liquidating Trust and with respect to the prosecution of Litigation Claims and the administration of the Liquidating Trust Assets. *See* Plan, §5.3.

16. The Plan provides that the Liquidating Trustee shall have the sole responsibility, standing (including derivative standing), and authority to prosecute and settle all Litigation Claims under the Plan and the Confirmation Order. *See* Plan, §5.4.

17. In order to preserve and protect the Liquidating Trust Assets, the Plan and Confirmation Order provide for a confirmation injunction as follows:

> **… from and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtors, the Estates, the Liquidating Trust, the Liquidating Trustee, their successors and assigns, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim or Equity Interest, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or satisfied or to be released or satisfied under the Plan or the Confirmation Order.** See Confirmation Order ¶32 (emphasis in original); Plan § 9.4.

**B. The Fiduciary Policies**

18. Prior to the Petition Date, the Primary Insurer issued a Private Defender (Management Liability Insurance Policy) to CPES-AZ under Policy Number HFP-HN-PRP-5390-010120 ("Hudson Policy"), for the initial policy period from January 1, 2020 to January 1, 2021.

5

19.    The Hudson Policy provides coverage for the Insureds for claims arising from wrongful acts under both the Director, Officers and Company Liability Coverage Part and the Fiduciary Liability Coverage Part thereof.

20.    Prior to the Petition Date, Westchester Fire Insurance Company ("Chubb" and collectively with the Primary Insurer, the "Insurers") issued an Excess Liability Insurance Policy to CPES-AZ under Policy Number G27072574 007 (the "Excess Policy" and together with the Hudson Policy, the "Fiduciary Policies"), which followed the Hudson Policy.

21.    The Fiduciary Policies are wasting policies in that the insurance coverage limits available to the Debtors' Estate are reduced dollar for dollar by costs and expenses incurred during the defense of an insured.

22.    The Claims (defined below) are the only timely claims made against the Fiduciary Policies.

**C.  The Liquidating Trustee's Claims**

23.    On October 27, 2020, and December 28, 2020, the Debtors notified the Insurers of certain claims and causes of action against the Debtors' current and former fiduciaries, including the Insureds (the "Fiduciary Demand").

24.    On or about September 30, 2020, the ESOP Trustee filed a proof of claim against the Debtors' Estates [Claim No. 24-1 and 274], in the amount of $255,150.00, for actual damages suffered by the ESOP as a result of an alleged overvaluation of the Debtors' equity at the end of 2018 (the "ESOP Proof of Claim").

6

25.    Subsequent to its appointment, the Liquidating Trustee, through its counsel, began investigating the pre-petition actions of the Debtors' former directors and officers (the "Investigation").

26.    As part of the Investigation, the Liquidating Trustee, *inter alia*, conducted Bankruptcy Rule 2004 examinations of the directors and officers and reviewed the corporate records of the Debtors.

27.    At the conclusion of the Investigation, the Liquidating Trustee engaged special litigation counsel to pursue certain claims against the former directors and officers of the Debtors for breaches of their fiduciary duties.

28.    On June 27, 2023, the Liquidating Trustee supplemented the Fiduciary Demand and provided the Insureds and Insurers with a draft complaint (the "LT Draft Complaint") identifying certain causes of action arising under state law and the Employee Retirement Income Security Act of 1974 ("ERISA").  A true and correct copy of the LT Draft Complaint is attached to the Settlement Agreement as **Exhibit "A"**.

**D.  The Arizona Plaintiff's Action**

29.    On April 24, 2023, the Arizona Plaintiffs filed a class action complaint for numerous violations of ERISA (the "Arizona Action") in the United States District Court for the District of Arizona (Case No. 4:23-cv-00193-RCC) against certain former officers and directors of the Debtors and fiduciaries of the ESOP, namely, Mark Monson, Doug Zimmerman, and David Johnson, as well as the former ESOP Trustee, Alberto Tarajano.

30.    On July 26, 2023, the Arizona Plaintiffs amended their complaint (the "AZ FAC").  A true and correct copy of the AZ FAC is attached to the Settlement Agreement as **Exhibit "B**.

31.    The Arizona Action was stayed by the District Court pending the Bankruptcy Court's determination on the ESOP Proof of Claim.

**E.  The ADR Process**

32.    In an effort to preserve the limited funds available under the Fiduciary Policies, the Liquidating Trustee engaged the ESOP Trustee, the Insureds and Insurers in an alternative dispute resolution process: the ADR Process.

33.    In connection with the ADR Process, the Liquidating Trustee and the Insureds (a) entered into a tolling agreement that extended and preserved all applicable statute of limitations, (b) exchanged several millions of documents pursuant to a confidentiality agreement, and (c) agreed to participate in a pre-suit mediation with a mutually agreeable mediator.

34.    The Parties selected Robert Meyer, Esq. with JAMS to mediate the various disputes and scheduled an in-person mediation for January 24, 2024.

35.    The Liquidating Trustee, the ESOP Trustee, the Insureds, and Insurers invited the Arizona Plaintiffs to participate in the mediation and did not require the Arizona Plaintiffs at no expense to the Arizona Plaintiffs.

36.    The Parties attended an all-day, in-person mediation at the offices of JAMS in Los Angeles, California on January 24, 2024.

8

37.    At the conclusion of the January 24, 2024 mediation, the Parties did not reach a settlement, but continued to negotiate over the weeks and months that followed.

38.    As a result of the Parties' negotiations, and without admitting the validity of any allegations or any liability in respect thereto, the Parties have reached an agreement, the terms of which are set forth in the Settlement Agreement, providing for a global settlement and corresponding broad releases of any and all claims the Liquidating Trustee, the ESOP Trustee, and the Arizona Plaintiffs have identified or asserted or could assert against the Insureds in any manner that might implicate the Fiduciary Policies, including, without limitation, each of the potential claims identified in the Fiduciary Demand, LT Draft Complaint, ESOP Proof of Claim, and AZ FAC and/or otherwise relating to the operations of the Debtors, the Bankruptcy Cases, or any other claim or action, including any and all indemnification claims that arise from, are related to, or derive from the Debtors or transactions involving or related to them (collectively, "Claims"), on the terms and conditions set forth in the Settlement Agreement and described below (the "Settlement")

**F.  Settlement Agreement**

39.    The Liquidating Trustee (and the ESOP Trustee and Arizona Plaintiffs) asserts there is merit to the Claims, and the Insureds assert there is not; but each recognized that it was in their best interests to try and amicably resolve their differences out of court through the ADR Process.

40.    As a result of the Parties' good-faith efforts, they successfully resolved their contested issues and entered into the Settlement Agreement which, subject to Bankruptcy Court approval, will resolve all of the Claims without the further cost and expense of

litigation and resolve many other inter-Party disputes, which as a result of this Settlement, pave the way towards an expeditious closing of the Estates and distribution to beneficiaries of the Liquidating Trust and ESOP.

### A&C Factors

41.     As applied to the circumstances presented by this case, I submit that the *A&C* Factors as set forth in the Motion weigh heavily in favor of approval of the proposed Settlement.

### The Probability of Success in Litigation

42.     In the exercise of the Liquidating Trustee's business judgment, informed by my experience as a fiduciary and lawyer, I believe that there is a good and reasonable probability of achieving a successful outcome by litigating the Claims to conclusion.

43.     While I believe that the Liquidating Trustee would be able to present evidence at trial to prevail on these claims, I recognize that there is inherent risk and expense associated with trying and succeeding on these issues.  The proposed Settlement will curtail the enormous administrative expenses that would be required to litigate the Claims to conclusion and through appeal.

44.     On balance, given all of the facts and circumstances presented, in the exercise of the Liquidating Trustee's business judgment, this *A&C* factor weighs heavily in favor of settling the Claims and approving the proposed Settlement.

### The Collection Factor Weighs in Favor of Settlement

45.     In terms of difficulties of collection, in the exercise of the Liquidating Trustee's business judgment, informed by my extensive experience as a fiduciary and lawyer, I believe

that the difficulties in collection factor of the *A&C* standard weighs heavily in favor of approval of the Settlement.

46.    Here, the Liquidating Trust's recovery on any potential judgment against the Insureds is tied to the Fiduciary Policies. As set forth above, those insurance policies are wasting policies with policy proceeds paid first to defense costs. Given the expenses associated with trying the Claims and the pendency of claims in multiple courts, it is likely that the policy limits would be completely eroded through litigation. Therefore, even if successful, the Liquidating Trustee would be required to collect against the Insureds, individually, which collection would be subject to creditor immunities and exemptions under various state laws where the Insureds reside.

47.    Based upon the foregoing, in the exercise of the Liquidating Trustee's business judgment, this *A&C* factor is either neutral or weights in favor of settling the Claims and approving the proposed Settlement.

### *Complexity of Litigation*

48.    In the exercise of the Liquidating Trustee's business judgment, informed by my experience as a fiduciary and lawyer, I believe that the complexity, inconvenience, and delay necessarily attendant to litigating the Claims to conclusion overwhelmingly favors approval of the proposed Settlement.

49.    The Claims involve complex legal issues related to doctrines of fiduciary duty and the defenses thereto. In addition, I suspect that there would be substantial fact intensive inquiries as to the issues of causation and damages that would necessitate expert opinions and trial.

50.    Litigating the Claims to conclusion, especially in light of the collectability issues highlighted above, would be prohibitively expensive, and would create substantial delay with an uncertain and speculative outcome in collection.

51.    The Court can no doubt independently assess and verify my conclusion about this *A&C* factor given the Court's vast experience presiding over complex disputes.

52.    In the exercise of my business judgment, this *A&C* factor heavily weights in favor of settling the Claims and approving the proposed Settlement.

### *Paramount Interests of Creditors*

53.    Here, it is worth noting that the only remaining creditors of the Debtors' Estates and beneficiaries of the Liquidating Trust, are parties to the Settlement.

54.    The Settlement provides a meaningful amount of money to the Liquidating Trust and eliminates the ongoing expense and attendant risk of litigating the Claims. Indeed, the Settlement is roughly a 10x multiple of the damages asserted in the ESOP Proof of Claim and original Fiduciary Demand.

55.    It is also worth noting that the most vocal participants in the ESOP, the Arizona Plaintiffs, participated in the ADR Process mediation,. If the Court approves the Settlement, the Arizona Plaintiffs' will release all Parties to the Settlement, including the current Liquidating Trustee and ESOP Trustee. In light of the indemnification claims those parties have against the Liquidating Trust/Debtors' Estates, this Settlement brings finality to a case that has been pending for over 4 years. Thus, with the Arizona Plaintiffs' support of the Settlement, I do not expect any other party in interest to object to the Settlement.

56.    For the reasons set forth above, in the exercise of my business judgment, informed by my extensive experience as a bankruptcy trustee and lawyer, the proposed Settlement is in the paramount interest of creditors and should be approved.

57.    For all of the foregoing reasons, I request that the Court grant the Motion and approve the proposed Settlement.

### *The Releases are Narrowly Tailored and Appropriate*

58.    As set forth above, the proposed Settlement is conditioned and dependent on the entry of the following findings and conclusions in the 9019 Order regarding the proposed releases:

    a.  the Claims, including those asserted in the Fiduciary Demand, the LT Draft Complaint, the ESOP Proof of Claim, and the AZ FAC, are derivative in nature and therefore belong to the Liquidating Trust and ESOP;

    b.  the Claims resolved pursuant to this Settlement Agreement are fully and finally resolved; and

    c.  therefore, the releases contained in this Settlement Agreement shall be binding on all ESOP participants and their beneficiaries, all beneficiaries of the Trust, and any other person acting through or on behalf of the ESOP.

59.    It was made clear to me that the Insureds and Insurers would not proceed with the Settlement without the strict condition of the approval of these releases.

60.    I have been advised, and in my business judgment, there is ample record evidence and authority to approve the releases.

61.    The LT Draft Complaint and the AZ FAC are attached as Exhibits A and B, respectively, to the Settlement Agreement. All of the Claims are either (a) claims for breach of fiduciary duty against former officers and directors of the Debtors, or (b) claims for breach of fiduciary duty against former fiduciaries of the ESOP. None of the Claims impact any creditor, shareholder, or participant in or beneficiary of the ESOP uniquely, as opposed to a generalized harm

13

that impacted all such parties. Therefore, I am advised that, as a matter of state law and ERISA law (wherein the Liquidating Trustee stands in the shoes of the ESOP Plan Administrator for purposes of bringing ERISA claims), the Claims are derivative in nature.

62.    Moreover, I am also advised that the Plan and Confirmation Order vested the Liquidating Trustee with sole authority for prosecuting and litigating the Litigation Claims (including the Claims) and enjoined all parties from taking any actions to interfere with the implementation or consummation of the Plan. See Plan §§ 5.4 & 9.4; Confirmation Order ¶ 32.

63.    Therefore, because the Claims are derivative in nature, they belong exclusively to either the Liquidating Trust or the ESOP.

64.    The Settlement is intended to, and does in fact, fully and finally resolve all Claims against the Insureds. The Fiduciary Demand, the LT Draft Complaint, the ESOP Proof of Claim, and the Arizona Action were the only timely claims made that could implicate the Fiduciary Policies. They were brought either on behalf of the Liquidating Trust/Debtors' Estates, the ESOP, or a class of participants and beneficiaries of the ESOP. All proponents of the Claims, including the Liquidating Trustee, the ESOP Trustee, and the Arizona Plaintiffs, have signed off on the Settlement as a full and final resolution of the Claims.

65.    Therefore, the Settlement fully and finally resolved all Claims against the Insureds that were or could have been alleged in the Fiduciary Demand, the LT Draft Complaint, the ESOP Proof of Claim, and the Arizona Action.

66.    In connection with the Motion, the Liquidating Trustee is providing notice of the Settlement to all of the ESOP participants and beneficiaries and any others with an opportunity to object and assert any claims against the Insureds that such participant, beneficiary or other person believes should not be released as a result of the Settlement. The Court can certainly evaluate whether such claim is direct (and thus belonging solely to the participant or beneficiary) or

derivative (and thus resolved as a result of this Settlement).

67.    Binding the ESOP participants and beneficiaries and any others to the releases in the Settlement is fair and reasonable under the circumstances because it guarantees that no person or entity may assert any additional derivative claims against the Insureds, the Fiduciary Policies, or the Insurers. Simply put, the claims or actions subject to the proposed findings would impact property of the Debtors' Estates and, thus, given the limitations to that release, it is appropriate under the circumstances.  The releases are also consistent with the relief this Court previously entered in connection with the Plan and Confirmation Order vesting the Claims with the Liquidating Trustee and enjoining others from interfering with the Liquidating Trustee's administration of those assets. See Plan §§ 5.4 & 9.4; Confirmation Order ¶ 32.

68.    As explained above, the proposed Settlement meets the *A&C* Factors, and, in the exercise of my business judgment, benefits the bankruptcy estate and its creditors. Without the benefit of the releases, the bankruptcy estates and their creditors will lose the benefits of the proposed Settlement.

69.    I understand that the proposed releases are aligned with public policy that favors settlements of complex litigation matters.  As such, the releases an integral and required component of the Settlement, directly benefits the Debtors' bankruptcy estates and clearly facilitates and fulfills the longstanding public policy of encouraging pretrial settlements.

70.    This concludes my Declaration.


[signature page to follow]

1

2

Pursuant to Section 1746, Title 28, of the United States Code, I declare under

penalty of perjury that the foregoing is true and correct.

3

4

Respectfully submitted this 3rd day of ___May___, 2024.

5

6

7

8

9

_____

Andrew Simon
Managing Director
Oxford Restructuring Advisors LLC

10

11

12

13

14

0147226.0742316  4857-6251-2005v1

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16

**EXHIBIT 1**

DocuSign Envelope ID: 8BA99EA5-EA09-4665-A874-6328C4D50549

# SETTLEMENT AGREEMENT

This Settlement Agreement (this "**Settlement Agreement**") is made and entered into as of the Effective Date, by and among Oxford Restructuring Advisors LLC ("**Oxford**"), in its capacity as Liquidating Trustee (the "**Liquidating Trustee**") for the CPES Liquidating Trust (the "**Trust**"); Miguel Paredes, as the trustee (the "**ESOP Trustee**") of the CPES Employee Stock Ownership Plan and related Trust (the "**ESOP**"); the former directors, officers, fiduciaries, employees, and/or insiders of CPES-AZ Liquidating, Inc., f/k/a Community Provider of Enrichment Services, Inc. d/b/a CPES, Inc. ("**CPES-AZ**"), NDS Liquidating, Inc., f/k/a Novelles Developmental Services, Inc. ("**Novelles**") and CPESCA Liquidating, Inc. f/k/a CPES California, Inc. ("**CPES-CA**," and together with CPES-AZ and Novelles, are collectively the "**Debtors**"), including Mark Monson ("**Monson**"), David Johnson ("**Johnson**"), Douglas Zimmerman ("**Zimmerman**"), and Alberto Tarajano ("**Tarajano**" and together with Monson, Johnson, and Zimmerman, are collectively with and any and all other former directors and officers, the "**Insureds**"); and Robert Bennetti, Linki Peddy, and Linda Mariano on behalf of themselves and all others similarly situated (collectively, the "**Arizona Plaintiffs**"). The Liquidating Trustee, the Trust, the ESOP Trustee, the ESOP, the Insureds, the Arizona Plaintiffs and any other persons that may separately join in this Settlement Agreement are individually referred to as a "Party" and collectively referred to as the "**Parties**."

## RECITALS:

A.    On April 24, 2020 ("**Petition Date**"), CPES-AZ and Novelles filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Central District of California (the "**Bankruptcy Court**") initiating cases that were subsequently jointly administered and styled *In re Community Provider of Enrichment Services, Inc.*, *dba CPES, Inc.*, *et al.,* Case No. 6:20-bk-10554-DS Jointly Administered (the "**Bankruptcy Case(s)**");

DocuSign Envelope ID: 8BA99EA5-EA09-4665-A874-6328C4D50549

B.      On August 11, 2020, CPES-CA filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court, which case is jointly administered with the Bankruptcy Cases;

C.      Prior to the Petition Date, Hudson Insurance Group (the "**Primary Insurer**") issued a Private Defender (Management Liability Insurance Policy) to CPES-AZ under Policy Number HFP-HN-PRP-5390-010120 ("**Hudson Policy**"), for the initial policy period from January 1, 2020 to January 1, 2021;

D.      The Hudson Policy provides coverage for the Insureds for claims arising from wrongful acts under both Director, Officers and Company Liability Coverage Part and Fiduciary Liability Coverage Part;

E.      Prior to the Petition Date, Westchester Fire Insurance Company ("**Chubb**" and collectively with Hudson, the "**Insurers**") issued an Excess Liability Insurance Policy to CPES-AZ under Policy Number G27072574 007 (the "**Excess Policy**" and together with the Hudson Policy, the "**Fiduciary Policies**"), which followed the Hudson Policy;

F.      The Fiduciary Policies are wasting policies in that the insurance coverage limits available to the Debtors' Estate are reduced dollar for dollar by costs and expenses incurred during the defense of an insured;

G.      On October 27, 2020, and December 28, 2020, the Debtors notified the Insurers of certain claims and causes of action under the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), raised by the Arizona Plaintiffs against the Debtors' current and former fiduciaries, including the Insureds (the "**Fiduciary Demand**"), which claims and causes of action were subsequently investigated and supplemented by the Liquidating Trustee on or about June 27, 2023, with a draft complaint (the "**LT Draft Complaint**," attached hereto as <u>Exhibit A</u>) against the Insureds identifying certain causes of action arising under state law and ERISA;

DocuSign Envelope ID: 8BA99EA5-EA09-4665-A874-6328C4D50549

**Execution Version**

H.    On or about September 29-30, 2020, the Arizona Plaintiffs filed proofs of claim that the Bankruptcy Court later rejected and expunged; thereafter, the ESOP Trustee filed a proof of claim against the Debtors' estate (Claim Nos. 24-1 and 274), in the amount of $255,150.00, for actual damages suffered by the ESOP as a result of an alleged overvaluation of the Debtors' equity at the end of 2018 (the "**ESOP Proof of Claim**");

I.    The Debtors were liquidated through the Bankruptcy Cases and the Liquidating Trustee was appointed pursuant to the Debtors' *First Amended Joint Chapter 11 Plan of Liquidation* (the "**Bankruptcy Plan**"), as *Modified* (Docket Nos. 646 and 802) and confirmed by order of the Bankruptcy Court dated May 10, 2021 (the "**Confirmation Order**") (Docket No. 836);

J.    The effective date of the Bankruptcy Plan was June 17, 2020 (Docket Nos. 900 and 915) and as thereof, the Liquidating Trustee is bound by the Liquidating Trust Agreement, which was approved by the Confirmation Order;

K.    Under section 4.4 of the Bankruptcy Plan and the Confirmation Order, the Liquidating Trust Assets (as defined in the Bankruptcy Plan), including Causes of Action (Bankruptcy Plan, § 1.13) and Litigation Claims (the Bankruptcy Plan, § 1.69), were transferred to and vested within the Liquidating Trust;

L.    Of the Litigation Claims specifically preserved under the Bankruptcy Plan and Confirmation Order, Section 1.79 of the Bankruptcy Plan defines "Preserved D&O Claims" as "any and all claims and Causes of Action (together with any proceeds thereof, including any proceeds of the D&O Insurance) held by the Debtors and their Estates against the Debtors' Directors and Officers, solely in their capacities as such, including those claims and Causes of Action that are not currently asserted, but could be asserted against them, including but not limited to, Claims held by the Debtors and their Estates relating to the ESOP;"

Page **3** of **21**

DocuSign Envelope ID: 8BA99EA5-EA09-4665-A874-6328C4D5D549

M.      Pursuant to the Bankruptcy Plan, Confirmation Order, and Trust Agreement, the Liquidating Trustee has the power, in its business judgment and reasonable discretion, to investigate, prosecute, compromise and settle, with or without further Order of the Bankruptcy Court, any preserved Cause of Action, including the claims identified in the Fiduciary Demand and the LT Draft Complaint;

N.      The Liquidating Trustee has conducted an extensive investigation into the fiduciary liability claims identified in the Fiduciary Demand and the LT Draft Complaint, as well as the claims asserted against the estates by the ESOP Trustee;

O.      In an effort to preserve the limited funds available under the Fiduciary Policies, the Liquidating Trustee engaged the ESOP Trustee, the Insureds and Insurers in an alternative dispute resolution process (the "**ADR Process**"), which included (a) the execution of a tolling agreement that extended and preserved all applicable statute of limitations, (b) the exchange of several millions of documents pursuant to a confidentiality agreement, and (c) an agreement to participate in a pre-suit mediation with a mutually agreeable mediator;

P.      Robert Meyer, Esq. with JAMS was selected to mediate the various disputes and scheduled an in-person mediation for January 24, 2024;

Q.      The Liquidating Trustee asserts that while the Liquidating Trustee's investigation was unfolding, on or about April 24, 2023, based upon the Arizona Plaintiffs' contention of an express reservation of rights on paragraph 37 of the Confirmation Order, the Arizona Plaintiffs initiated a class action on behalf of the ESOP participants and beneficiaries against certain of the Insureds (Monson, Johnson, Zimmerman, and Tarajano) and the ESOP (solely as a necessary party) in the United States District Court for the District of Arizona styled *Bennetti, et al. v. Monson, et al.,* Case No. 4:23-cv-00193-RCC (the "**Arizona Action**"), and filed a First Amended Complaint (the "**AZ FAC**") on July, 26, 2023, attached hereto as Exhibit B;

DocuSign Envelope ID: 8BA99EA5-EA09-4665-A874-6328C4D50549

R.      The Arizona Action was stayed by the District Court presiding over the claims
pending the Bankruptcy Court's determination on the ESOP Trustee's Proof of Claim;

S.      The Liquidating Trustee, the ESOP Trustee, the Insureds, and Insurers invited the
Arizona Plaintiffs to participate in the mediation and did not require the Arizona Plaintiffs to pay
their portion of the mediation fees and expenses;

T.      The Parties attended an all-day, in-person mediation at the offices of JAMS in Los
Angeles, California on January 24, 2024;

U.      At the conclusion of the January 24, 2024 mediation, the Parties did not reach a
settlement, but continued to negotiate over the weeks and months that followed;

V.      The Liquidating Trustee asserts that there is merit to the fiduciary liability claims
identified in the Fiduciary Demand, and the Insureds deny any liability or wrongdoing; but each
of the Parties recognizes that it is difficult at this point to assess the probability of success in
litigation because of (i) the complexity of the claims and issues, (ii) the number of parties involved,
and (iii) the substantial time and expense that the prosecution and defense of the claims would
require;

W.      The Insurers have questioned the coverage that is afforded under the Hudson Policy
for certain of the claims identified in the Fiduciary Demand and reserved all rights and defenses
under the Fiduciary Policies and applicable law;

X.      In an effort to resolve the contested issues efficiently and without litigation, the
Parties and/or their counsel cooperated in the ADR Process and engaged in good-faith, arms'-
length settlement negotiations, including the exchange, review and analysis of documents, legal
analysis, written settlement proposals, mediation conducted by Robert Meyer, Esq., and multiple
telephone and video conference calls;

DocuSign Envelope ID: 8BA99FA5-EA09-4665-A874-6328C4D50549

Y.      As a result of the Parties' negotiations, and without admitting the validity of any allegations or any liability in respect thereto, the Parties have reached an agreement, the terms of which are set forth in this Settlement Agreement, providing for a global settlement and corresponding broad releases of any and all claims the Liquidating Trustee, the ESOP Trustee, and the Arizona Plaintiffs have identified or asserted or could assert against the Insureds in any manner that might implicate the Fiduciary Policies, including, without limitation, each of the potential claims identified in the Fiduciary Demand and/or otherwise relating to the operations of the Debtors, the Bankruptcy Cases, or any other claim or action, including any and all indemnification claims that arise from, are related to, or derive from the Debtors or transactions involving or related to them (collectively, "**Claims**"), on the terms and conditions set forth below (the or this "**Settlement**");

Z.      The Parties have determined that this Settlement is fair, reasonable, and adequate, and is in the best interest of the Parties, the Debtors' bankruptcy estates, the Trust, the ESOP, the Arizona Plaintiffs, and the participants and beneficiaries of the Trust and the ESOP; and

AA.     The Parties intend this Settlement Agreement to be a binding agreement that sets forth the terms and obligations of the Parties for the complete and final resolution of any and all Claims, subject only to the Bankruptcy Court's approval requirement described below.

## AGREEMENT

In consideration of the mutual promises and the performance of the covenants and agreements hereinafter contained, the Parties represent, warrant, consent and agree as follows:

1.      **Adoption of Recitals**. The Parties adopt the above recitals as being true and correct, and incorporate them herein as material parts of this Settlement Agreement.

DocuSign Envelope ID: 8BA99EA5-EA09-465E-A874-6328C4D59549

**Execution Version**

2.      **Effective Date**. The day on which the Liquidating Trustee or its counsel delivers fully signed copies of this Settlement Agreement to counsel for each of the Parties shall be the "**Effective Date**" of this Settlement Agreement.

3.      **Settlement Motion**. Within three (3) business days after the Effective Date, the Liquidating Trustee shall file with the Bankruptcy Court a motion seeking approval of the terms and conditions of this Settlement and entry of the Settlement Approval Order (as defined below) under Rule 9019 of the Federal Rules of Bankruptcy Procedure ("**Approval Motion**"). The Approval Motion shall be in the form and content reasonably acceptable to each of the Parties. The Liquidating Trustee shall provide reasonable notice under the circumstances of the Settlement, including reasonable time to respond and/or object, to all participants in or beneficiaries of the Trust and the ESOP.

4.      **Bankruptcy Court Approval**. The settlement and compromise of the Claims contained herein shall become effective and binding in all respects upon the Settlement Approval Order becoming a Final Order (as defined below). Upon the Settlement Approval Order becoming a Final Order, the Insureds and the Insurer shall relinquish any and all rights to the Settlement Payment and the broad releases contemplated by this Settlement Agreement shall become effective. If the Bankruptcy Court refuses to grant the Approval Motion, or if the Settlement Approval Order is entered by the Bankruptcy Court but is subsequently reversed on appeal by and through a Final Order ("**Reversal Order**"), then: (i) the Parties shall be returned as of such date to the *status quo ante* prior to their entry into this Settlement Agreement; and (ii) the Parties agree that any statute of limitations in respect of the Claims shall be and shall have been tolled through the later of the date of the Reversal Order or as otherwise tolled in this Settlement Agreement, and for an additional period of thirty (30) days thereafter from such date. For purposes of this Settlement Agreement, the terms: (a) "**Settlement Approval Order**" shall mean an order of the

Page **7** of **21**

DocuSign Envelope ID: 8BA99EA5-EA09-4665-A874-6328C4D50549

Bankruptcy Court in form and content acceptable to each of the Parties approving in full this Settlement Agreement and the terms and conditions of this Settlement; and (b) "**Final Order**" shall mean an order or judgment of the Bankruptcy Court that (i) has not been appealed, or (ii) if appealed, has not been reversed, stayed, modified or amended as a result of such appeal and as to which the time to file any subsequent appeal has expired. The Parties shall request that the Settlement Approval Order find and conclude that (a) the Claims, including those asserted in the Fiduciary Demand, the LT Draft Complaint, the ESOP Proof of Claim, and the AZ FAC, are derivative in nature and therefore belong to the Trust and ESOP[1], (b) the Claims resolved pursuant to this Settlement Agreement are fully and finally resolved, and (c) therefore, the releases contained in this Settlement Agreement shall be binding on all ESOP participants and their beneficiaries, all beneficiaries of the Trust, and any other person acting through or on behalf of the ESOP.

       5.      **Settlement Payment**. For and in consideration of each of the terms set forth herein, the Insureds shall cause the Primary Insurer to pay TWO MILLION FOUR HUNDRED THOUSAND AND 00/100 DOLLARS (<u>$2,400,000.00</u>) to the Liquidating Trustee for the benefit of the Trust, payable to "Stearns Weaver Miller et al. Trust Account" (the "**Settlement Payment**"). The Insurers shall deliver the Settlement Payment by overnight mail to Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A. ("**Stearns Weaver**"), special counsel for the Liquidating Trustee, within fourteen (14) days of the Effective Date. Stearns Weaver shall hold the Settlement Payment in a non-interest bearing trust account maintained by Stearns Weaver pending the Settlement Approval Order becoming a Final Order and pending the dismissal of the Arizona Action as contemplated in paragraph 11 below. In no event shall Stearns Weaver be considered,

---

[1] The argument is that the ERISA claims are "derivative" in that the Liquidating Trustee stands in the shoes of the ESOP Plan Administrator, which has rights to bring ERISA claims as a fiduciary.

DocuSign Envelope ID: 8BA99EA5-EA09-4665-A874-6328C4D50549

**Execution Version**

designated, or act as escrow agent in connection with the Settlement Payment. The Parties agree that, if the Settlement Approval Order is not entered by July 31, 2024, then, as soon as practicable thereafter, Stearns Weaver shall return the Settlement Payment to the Primary Insurer. The Arizona Plaintiffs, the Liquidating Trustee, and the ESOP Trustee agree that the Settlement Payment, net of costs and agreed upon attorneys' fees, shall be earmarked solely for the ESOP and shall not be used for any purpose other than distribution to the ESOP Trust and the ESOP participants and beneficiaries.

6.    <u>**General Release of Insureds by the Liquidating Trustee, the Debtors, the Debtors' Estates, the Trust, the ESOP Trustee, and the ESOP**</u>. Effective immediately upon the Settlement Approval Order becoming a Final Order, and in consideration of the Settlement Payment, the Liquidating Trustee, the Debtors, the Debtors' Estates, the Trust, the ESOP Trustee, and the ESOP (collectively the "<u>**Trust and ESOP Releasors**</u>") agree to and shall be deemed to have fully and generally released and discharged the Insureds and all of their agents, employees, attorneys, partners, associates, successors, heirs, insurers, and representatives (collectively the "<u>**Insured Releasees**</u>") from and against any and all manner of claims (including the Claims), causes of actions, suits, debts, dues, accounts, bonds, covenants, contracts, agreements, judgments, losses, damages, liabilities and demands of any kind whatsoever in law or in equity, whether known or unknown, suspected or unsuspected, contingent or fixed, including attorneys' fees and costs that any of the Trust and ESOP Releasors now has, has had, or in the future may have against any of the Insured Releasees arising out of, related to or in connection with, directly or indirectly, the Debtors, the Debtors' Estates, the Trust, the ESOP, and/or the facts, circumstances, acts, or alleged errors and/or omissions underlying the Fiduciary Demand, the ESOP Proof of Claim, and the Claims. For the avoidance of doubt, the releases contemplated herein shall not discharge the Insured Releasees' obligations under this Settlement Agreement.

DocuSign Envelope ID: 8BA99EA5-EA09-4665-A874-6328C4D50549

<strong>Execution Version</strong>

7.      **General Release of Liquidating Trustee, the Debtors, the Debtors' Estates, the Trust, the ESOP Trustee, the ESOP, and the Insureds by the Arizona Plaintiffs**. Effective immediately upon the Settlement Approval Order becoming a Final Order, and in consideration for the obligations herein, the Arizona Plaintiffs and all of their agents, employees, attorneys, partners, associates, successors, heirs, insurers, representatives and assigns (collectively the "**Arizona Releasors**") agree to and shall be deemed to have fully and generally released and discharged the Liquidating Trustee, the Debtors, the Debtors' Estates, the Trust, the ESOP Trustee, the ESOP, the Insureds, and all of their current and former officers, directors, shareholders, members, managers, agents, employees, attorneys, affiliates, partners, associates, successors, heirs, insurers, representatives, assigns and insurers (collectively the "**Arizona FAC Releasees**") from and against any and all manner of claims (including the Claims and those asserted in the Arizona Action), causes of actions, suits, debts, dues, accounts, bonds, covenants, contracts, agreements, judgments, losses, damages, liabilities and demands of any kind whatsoever in law or in equity, whether known or unknown, suspected or unsuspected, contingent or fixed, including attorneys' fees and costs that any of the Arizona Releasors now have, have had, or in the future may have against any of the Arizona FAC Releasees based upon, arising out of, related to, or in connection with, directly or indirectly, the Debtors, the Debtors' Estates, the Trust, the ESOP, and/or the facts, circumstances, acts, or alleged errors and/or omissions underlying the Claims and the Arizona Action. For the avoidance of doubt, the releases contemplated herein shall not release the Arizona Releasors' beneficial interests in the ESOP or the obligations of the Parties under this Settlement Agreement.

8.      **General Release of Liquidating Trustee, the Debtors, the Debtors' Estates, the Trust, the ESOP Trustee, and the ESOP by the Insureds**. Effective immediately upon the Settlement Approval Order becoming a Final Order, and in consideration for the obligations

Page <strong>10</strong> of <strong>21</strong>

DocuSign Envelope ID: 8BA99EA5-EA09-4665-A874-6328C4D59F49

**Execution Version**

herein, the Insureds and all of their agents, employees, attorneys, partners, associates, successors, heirs, insurers, representatives and assigns (collectively the "**Insured Releasors**") agree to and shall be deemed to have fully and generally released and discharged the Liquidating Trustee, the Debtors, the Debtors' Estates, the Trust, the ESOP Trustee, the ESOP, and all of their current and former officers, directors, shareholders, members, managers, agents, employees, attorneys, affiliates, partners, associates, successors, heirs, insurers, representatives and assigns (collectively the "**Trust and ESOP Releasees**") from and against any and all manner of claims (including the Claims), causes of actions, suits, debts, dues, accounts, bonds, covenants, contracts, agreements, judgments, losses, damages, liabilities and demands of any kind whatsoever in law or in equity, whether known or unknown, suspected or unsuspected, contingent or fixed, including attorneys' fees and costs that any of the Insured Releasors now has, has had, or in the future may have against any of the Trust and ESOP Releasees arising out of, related to, or in connection with, directly or indirectly, the Debtors, the Debtors' Estates, the Trust, the ESOP, and/or the facts, circumstances, acts, or alleged errors and/or omissions underlying the Claims. For the avoidance of doubt, the releases contemplated herein shall not discharge the Trust and ESOP Releasees' obligations under this Settlement Agreement.

9.    **General Release of Arizona Plaintiffs by the Liquidating Trustee, the Debtors, the Debtors' Estates, the Trust, the ESOP Trustee, the ESOP, and the Insureds**. Effective immediately upon the Settlement Approval Order becoming a Final Order, and in consideration of the obligations herein, the Trust and ESOP Releasors and the Insured Releasors agree to and shall be deemed to have fully and generally released and discharged the Arizona Plaintiffs and all of their agents, employees, attorneys, partners, associates, successors, heirs, insurers, and representatives (collectively the "**Arizona Releasees**") from and against any and all manner of claims, causes of actions, suits, debts, dues, accounts, bonds, covenants, contracts, agreements, judgments, losses, damages, liabilities and demands of any kind whatsoever in law or in equity,

whether known or unknown, suspected or unsuspected, contingent or fixed, including, without limitation, attorneys' fees and costs that any of the Trust and ESOP Releasors and Insured Releasors now have, have had, or in the future may have against any of the Arizona Releasees arising out of, related to or in connection with, directly or indirectly, the Debtors, the Debtors' Estates, the Trust, and the ESOP. For the avoidance of doubt, the releases contemplated herein shall not discharge the Arizona Releasees' obligations under this Settlement Agreement.

10.    **Waiver of California Civil Code section 1542.** To affect a full and complete general release as described above, the Parties expressly waive and relinquish all rights and benefits of section 1542 of the Civil Code of the State of California, and do so understanding and acknowledging the significance and consequence of specifically waiving section 1542. Section 1542 of the Civil Code of the State of California states as follows:

> A general release does not extend to claims which the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or release party.

Thus, notwithstanding the provisions of Section 1542 of the Civil Code of the State of California, and to implement a full and complete release and discharge of the Parties, the Parties expressly acknowledge that this Settlement Agreement is intended to include in its effect, without limitation, all claims that the Parties do not know or suspect to exist in their favor at the time of signing this Settlement Agreement with respect to the facts and circumstances of the Fiduciary Demand, the Debtors, the LT Draft Complaint, the Debtors' Estates, the Trust, and the ESOP, and the Arizona FAC, and that this Settlement Agreement contemplates the extinguishment of any and all such claims.

11.    **Dismissal of the Arizona Action**. Within three (3) business days of the Settlement Approval Order becoming a Final Order, the Arizona Plaintiffs, the ESOP Trustee and the Insureds shall stipulate to the dismissal of the Arizona Action with prejudice.

DocuSign Envelope ID: 8BA99EA5-EA09-4665-A874-6328C4D50549

**Execution Version**

12.   **No Admissions**. This Settlement Agreement is entered into for settlement and compromise of disputed claims, including the Claims, and shall not be treated as an admission by any Party of any liability or wrongdoing whatsoever or coverage under any policy or as an admission by any Party of any violation of the rights of any other Party or person, or the violation of any law, statute, regulation, duty, or contract whatsoever. By entering into this Settlement Agreement, the Parties do so solely to avoid the inconvenience, expense, and uncertainty of further proceedings and expressly disclaim any liability to any other party or person.

13.   **Attorneys' Fees and Costs**. Each Party will bear its own expenses (including attorneys' fees and costs) incurred in connection with the negotiation and execution of this Settlement Agreement.

14.   **Notices**. Any notice required or permitted to be given pursuant to any provision of this Settlement Agreement shall be in writing (including for such purpose email) and given by email, delivered in person or sent by registered or certified mail, postage prepaid and return receipt requested, or by overnight courier with a parcel tracking system, to the parties at their respective addresses set forth opposite their signature on the signature pages hereof, or to such other address as the party to whom notice is to be given may, from time to time, designate in writing delivered in a like manner. All such notices shall be deemed received as of the date of receipt or, if by mail, five (5) days following deposit in the U.S. Mail.

15.   **Confidentiality**. The Parties agree that they will not disclose the terms of this Settlement Agreement or any drafts of this Settlement Agreement, or make any communications describing the terms of this Settlement Agreement or any draft of this Settlement Agreement, other than to the extent such disclosure is (i) made in the Approval Motion, (ii) consented to by the Parties, (iii) required by a court or government agency order, or (iv) otherwise is required by law. However, nothing in this Settlement Agreement will prohibit the Parties from disclosing any such

DocuSign Envelope ID: 8BA99EA5-EA09-4665-A874-6328C4D59E49

information in confidence to their respective directors, officers, legal counsel, other insurers and their counsel, reinsurers, lenders, underwriters, investors, rating agencies, potential or actual business partners, or auditors, or to any regulatory authority, or from prohibiting the ESOP Trustee, the Liquidating Trustee, and/or counsel for the ESOP participants and beneficiaries from disclosing such information to the ESOP participants and beneficiaries .

16.    **Entire Agreement**. This Settlement Agreement, including the exhibits hereto and thereto, constitute the only existing and binding agreements of settlement among the Parties related to the Claims (and the Parties expressly acknowledge that there may be other agreements between the Parties that are related to professional fees), and the Parties acknowledge that there are no other warranties, promises, assurances or representations of any kind, express or implied, upon which the Parties have relied in entering into this Settlement Agreement, unless expressly set forth herein, provided, however, that the Parties may refer to the terms of the Bankruptcy Plan, the Confirmation Order, and the Trust Agreement in connection with the interpretation of this Settlement Agreement. This Settlement Agreement shall not be modified except by written agreement signed by the Party or Parties whose rights are affected by the modification.

17.    **Parties Affected**. This Settlement Agreement shall bind and inure to the benefit of the Parties and their respective officers, directors, shareholders, employees, partners, attorneys, professionals, affiliates, representatives, spouses, trustees, heirs, successors, assigns, beneficiaries and insurers.

18.    **Bankruptcy Court Jurisdiction**. The Bankruptcy Court shall have jurisdiction to enforce, implement and interpret, this Settlement Agreement and the Parties' obligations hereunder, including the releases granted herein, and the Parties expressly consent to the exercise of personal jurisdiction over them for that limited purpose.

DocuSign Envelope ID: 8BA99FA5-EA09-4665-A874-6328C4D50F49

**Execution Version**

19.    <u>**Acknowledgment of Terms**</u>. The Parties have read and understand the terms of this Settlement Agreement, have consulted with their respective counsel, and understand and acknowledge the significance and consequence of each such term. No Party is relying on information provided by or from the other Party in entering into this Settlement Agreement and there are no duties of disclosure by any Party to another. The Parties executed this Settlement Agreement after arm's-length negotiations among the Parties and their respective counsel, and the Parties' signatures below reflect their conclusion that this Settlement Agreement is in the best interests of the Parties. Each Party represents and warrants that the person executing this Settlement Agreement on his, her, or its behalf has all authority and legal right to do so and separately acknowledges and represents that this representation and warranty is an essential and material provision of this Settlement and shall survive execution of this Settlement Agreement.

20.    <u>**Advice of Counsel**</u>. The Parties acknowledge that they have been represented by counsel of their own choice in the negotiations leading up to the execution of this Settlement Agreement, have read this Settlement Agreement, and have had the opportunity to receive an explanation from legal counsel regarding the legal nature and effect of same. The Parties have had this Settlement Agreement fully explained to them by their respective counsel and understand the terms and provisions of this Settlement Agreement and its nature and effect. The Parties further represent that they are entering into this Settlement Agreement freely and voluntarily, relying solely upon the advice of their own counsel, and not relying on the representation of any other Party or of counsel for any other Party.

21.    <u>**Interpretation.**</u> In the event any dispute arises among the Parties with regard to the interpretation of any term of this Settlement Agreement, all of the Parties shall be considered collectively to be the drafting party and any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall be inapplicable.

DocuSign Envelope ID: 8BA99EA5-EA09-4665-A874-6328C4D50549

22.    **Execution of Documents**. This Settlement Agreement shall be executed in multiple counterparts with the same force and effect as if the Parties had signed the same instrument. All such executed copies shall together constitute the complete Settlement Agreement. The Parties may execute this Settlement Agreement and create a complete set of signatures by exchanging PDF copies of the executed signature pages. Signatures transmitted in PDF format shall have the same effect as original signatures. The Liquidating Trustee and its counsel shall be responsible for collecting and compiling the Parties' counterpart signature pages and delivering electronic (PDF) copies of the same, together with the body of this Agreement and the Exhibits hereto, to each of the parties by email.

23.    **Execution by Client or Counsel**. By execution below, consistent with this Settlement Agreement, each Party agrees and affirmatively represents that it has the full capacity and authority to execute, perform, and be bound by each and every term of this Agreement; and that if its undersigned counsel is executing this Settlement Agreement on its behalf, that such counsel is qualified and has the authority to do so and to bind its client to the terms of this Settlement Agreement as if the Party had actually signed this Settlement Agreement.

24.    **Non-Party Defendants.** Any person or entity that is (a) named in the Fiduciary Demand or the LT Draft Complaint, or could have been named in the Fiduciary Demand or the LT Draft Complaint, including but not limited to Michele Ferrall, Tiki Thompson, Mary Lynn Greenhow, Charles (Chip) Foust, Jr., and Curt Wheeler, and (b) is not signatory to this Settlement Agreement, shall be referred to as a "**Non-Party Defendant(s)**." By entering into this Settlement Agreement, it is the intent of the Parties to reach a global settlement with respect to the Claims; and accordingly, this Settlement Agreement, including the releases contained herein, shall apply to all Non-Party Defendants, whether or not they become a signatory to this Settlement Agreement.

25.  **Divisions and Headings.** The divisions of this Settlement Agreement into sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

26.  **Waiver**. The failure of a Party to enforce any provision of this Settlement Agreement shall not in any way be construed as a waiver of any such provision as to any future violations thereof, nor prevent that Party thereafter from enforcing each and every other provision of this Settlement Agreement. The rights granted the Parties herein are cumulative and the waiver of any single remedy shall not constitute a waiver of such Party's right to assert all other remedies available to it under the circumstances. No extension of time of performance of an act or obligation under this Settlement Agreement shall constitute an extension of time of performance of any other act or obligation.

27.  **Cooperation**. The Parties agree to cooperate with each other to the extent necessary and commercially reasonable, and use their collective best efforts, to enable the Liquidating Trustee to obtain entry of the Settlement Approval Order and to cause the Settlement Approval Order to become a Final Order. The Parties also agree to promptly execute and deliver such further documents and take such other actions as may be reasonably necessary to carry out the purpose and intent of this Settlement Agreement.

28.  **No Public Statements**. The Parties agree to make no public statement disparaging any of the other Parties. The Parties agree that there will be no press releases or public announcements of the Settlement reflected in this Settlement Agreement, other than the Settlement Approval Motion or any other related proceedings in the Bankruptcy Court or the Arizona Court.

29.  **Time is of the Essence**. The time for performance of the Parties hereunder is of the essence of this Settlement Agreement.

*[Counterpart Signature Pages Follow]*

Page **17** of **21**

DocuSign Envelope ID: 8BA99EA5-EA09-4665-A874-6328C4D50549

**Execution Version**

**IN WITNESS WHEREOF**, the undersigned Parties have executed this Settlement

Agreement on the dates indicated below.

| PARTY | NOTICE ADDRESS(ES) |
|---|---|
| **OXFORD RESTRUCTURING ADVISORS LLC, in its capacity as Liquidating Trustee of the CPES Liquidating Trust**<br><br>By: *John Pidcock*<br>Name: John B. Pidcock<br>Title: Senior Managing Director<br>Dated: 4/26/2024 | **Notice to *either* the Liquidating Trustee or the Trust should be given to *both* the Liquidating Trustee and the Trust as follows:**<br><br>**If by Email, to:**<br><br>asimon@oxfordrestructuring.com & jpidcock@oxfordrestructuring.com<br><br>With copies to:<br><br>jsnider@fbtlaw.com<br>awebb@fbtlaw.com |
| | **If by Mail or Courier, to:**<br><br>Andrew M. Simon &<br>John B. Pidcock<br>Oxford Restructuring Advisors, LLC<br>16781 Chagrin Boulevard, Suite 503<br>Shaker Heights, Ohio 44120<br><br>With an additional copy to:<br><br>Jillian Nolan Snider<br>A.J. Webb<br>Frost Brown Todd LLP<br>3300 Great American Tower 301 East Fourth Street<br>Cincinnati, Ohio 45202 |

DocuSign Envelope ID: 8DA99EA5-EA09-466E-A874-6328C4D50F49

**Execution Version**

| PARTY | NOTICE ADDRESS(ES) |
|---|---|
| **MIGUEL PAREDES, in his capacity as trustee of the CPES Employee Stock Ownership Plan** <br><br> DocuSigned by: <br> *Miguel Paredes* <br> EF58564D0C4245C... <br> Dated: _____4/30/2024_____ | **Notice to _either_ the ESOP Trustee or the ESOP should be given to _both_ the ESOP Trustee and the ESOP as follows:** <br><br> **If by Email, to:** <br><br> Brian.jackiw@tuckerellis.com <br><br> **If by Mail or Courier, to:** <br><br> Brian J. Jackiw <br> Tucker Ellis LLP <br> 233 South Wacker Drive, Suite 6950 <br> Chicago, IL 60606 |
| **MARK MONSON** <br><br> DocuSigned by: <br> *MARK MONSON* <br> 98805418C520465... <br> Dated: _____4/26/2024_____ | **If by Email, to:** <br><br> ggotto@kellerrohrback.com <br> eriley@kellerrohrback.com <br><br> **If by Mail or Courier, to:** <br><br> Gary Gotto <br> Erin Riley <br> Keller Rohrback LLP <br> 3101 North Central Avenue, Suite 1400 <br> Phoenix, AZ 85012 |
| **DAVID JOHNSON** <br><br> _____ <br> Dated: _____ | **If by Email, to:** <br><br> Jana.Lubert@lewisbrisbois.com <br><br> **If by Mail or Courier, to:** <br><br> Jana Lubert, Esq. <br> Lewis Brisbois <br> 633 W. 5th Street, Suite 4000 <br> Los Angeles, CA 90071 |

<b>Execution Version</b>

| PARTY | NOTICE ADDRESS(ES) |
|---|---|
| **MIGUEL PAREDES, in his capacity as trustee of the CPES Employee Stock Ownership Plan**<br><br>_____<br><br>Dated: _____ | **Notice to _either_ the ESOP Trustee or the ESOP should be given to _both_ the ESOP Trustee and the ESOP as follows:**<br><br>**If by Email, to:**<br><br>Brian.jackiw@tuckerellis.com<br><br>**If by Mail or Courier, to:**<br><br>Brian J. Jackiw<br>Tucker Ellis LLP<br>233 South Wacker Drive, Suite 6950<br>Chicago, IL 60606 |
| **MARK MONSON**<br><br>_____<br><br>Dated: _____ | **If by Email, to:**<br><br>ggotto@kellerrohrback.com<br>eriley@kellerrohrback.com<br><br>**If by Mail or Courier, to:**<br><br>Gary Gotto<br>Erin Riley<br>Keller Rohrback LLP<br>3101 North Central Avenue, Suite 1400<br>Phoenix, AZ 85012 |
| **DAVID JOHNSON**<br><br>_David Johnson_<br>Dated: 4/29/2024 | **If by Email, to:**<br><br>Jana.Lubert@lewisbrisbois.com<br><br>**If by Mail or Courier, to:**<br><br>Jana Lubert, Esq.<br>Lewis Brisbois<br>633 W. 5th Street, Suite 4000<br>Los Angeles, CA 90071 |

Execution Version

| PARTY | NOTICE ADDRESS(ES) |
|---|---|
| **DOUGLAS ZIMMERMAN**<br><br>_____<br>Dated: _____ | **If by Email, to:**<br><br>Jana.Lubert@lewisbrisbois.com<br><br>**If by Mail or Courier, to:**<br><br>Jana Lubert, Esq.<br>Lewis Brisbois<br>633 W. 5th Street, Suite 4000<br>Los Angeles, CA 90071 |
| **ALBERTO TARAJANO**<br><br>*DocuSigned by:*<br>_____<br>6362EDA37CCE4D4...<br>Dated: _____4/26/2024_____ | **If by Email, to:**<br><br>lgolumbic@groom.com<br><br>**If by Mail or Courier, to:**<br><br>Lars C. Golumbic<br>Groom Law Group, Chartered<br>1701 Pennsylvania Ave., NW, Suite 1200<br>Washington, DC 20006 |
| **ROBERT BENNETTI**<br><br>*DocuSigned by:*<br>Robert Bennetti<br>_____<br>B85CDD571C414F7...<br>Dated: _____4/27/2024_____ | **If by Email, to:**<br><br>greg@gstoltzlaw.com<br>djohanson@hpylaw.com<br><br>**If by Mail or Courier, to:**<br><br>Greg Stoltz, Esq.<br>100 N. Stone Ave., Ste 702<br>Tucson, AZ 85701<br><br>and<br><br>David R. Johanson, Esq.<br>Hawkins Parnell & Young, LLP<br>1776 Second Street<br>Napa, CA 94559 |

DocuSign Envelope ID: E5432D8C-FAE9-4D4E-BB59-61CC71A2A653

**Execution Version**

| PARTY | NOTICE ADDRESS(ES) |
|---|---|
| **DOUGLAS ZIMMERMAN**<br><br>*Douglas Zimmerman*<br>Dated: 4/30/2024 | **If by Email, to:**<br><br>Jana.Lubert@lewisbrisbois.com<br><br>**If by Mail or Courier, to:**<br><br>Jana Lubert, Esq.<br>Lewis Brisbois<br>633 W. 5th Street, Suite 4000<br>Los Angeles, CA 90071 |
| **ALBERTO TARAJANO**<br><br>_____<br>Dated: _____ | **If by Email, to:**<br><br>lgolumbic@groom.com<br><br>**If by Mail or Courier, to:**<br><br>Lars C. Golumbic<br>Groom Law Group, Chartered<br>1701 Pennsylvania Ave., NW, Suite 1200<br>Washington, DC 20006 |
| **ROBERT BENNETTI**<br><br>_____<br>Dated: _____ | **If by Email, to:**<br><br>greg@gstoltzlaw.com<br>djohanson@hpylaw.com<br><br>**If by Mail or Courier, to:**<br><br>Greg Stoltz, Esq.<br>100 N. Stone Ave., Ste 702<br>Tucson, AZ 85701<br><br>and<br><br>David R. Johanson, Esq.<br>Hawkins Parnell & Young, LLP<br>1776 Second Street<br>Napa, CA 94559 |

Execution Version

| PARTY | NOTICE ADDRESS(ES) |
|---|---|
| **LINKI PEDDY**<br><br>DocuSigned by:<br>*Linki D Peddy*<br>ED9D46F03E244A4...<br>Dated: _____ 4/29/2024 _____ | **If by Email, to:**<br><br>greg@gstoltzlaw.com<br>djohanson@hpylaw.com<br><br>**If by Mail or Courier, to:**<br><br>Greg Stoltz, Esq.<br>100 N. Stone Ave., Ste 702<br>Tucson, AZ 85701<br><br>and<br><br>David Johanson, Esq.<br>Hawkins Parnell & Young, LLP<br>1776 Second Street<br>Napa, CA 94559 |
| **LINDA MARIANO**<br><br>DocuSigned by:<br>*Linda Mariano*<br>9CB37C42EFE8425...<br>Dated: _____ 4/28/2024 _____ | **If by Email, to:**<br><br>greg@gstoltzlaw.com<br>djohanson@hpylaw.com<br><br>**If by Mail or Courier, to:**<br><br>Greg Stoltz, Esq.<br>100 N. Stone Ave., Ste 702<br>Tucson, AZ 85701<br><br>and<br><br>David R. Johanson, Esq.<br>Hawkins Parnell & Young, LLP<br>1776 Second Street<br>Napa, CA 94559 |

#12706942 v1

# Exhibit A

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**NORTHERN DIVISION**

| | |
|---|---|
| In re: | ) Lead Case No. 9:20-bk-10554-DS |
| | ) Jointly Administered With: |
| CPES-AZ Liquidating, Inc., et al., | ) Case No. 9:20-bk-10553-DS |
|   EIN: 86-0804057 | ) Case No. 9:20-bk-10994-DS |
| NDS Liquidating, Inc. | ) |
|   EIN: 27-5174435 | ) Chapter 11 Cases |
| CPESCA Liquidating, Inc. | ) |
|   EIN: 27-2315212 | ) **ADVERSARY COMPLAINT** |
| Debtors. | ) |
| | ) |
| OXFORD RESTRUCTURING | ) Adversary Case No. |
| ADVISORS, LLC, AS | ) |
| LIQUIDATING TRUSTEE OF | ) |
| THE CPES LIQUIDATING TRUST, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| MARK MONSON, DAVID | ) |
|  JOHNSON, DOUGLAS | ) |
|  ZIMMERMAN, MICHELE | ) |
|  FERRALL, TIKI THOMPSON, | ) |
| MARY LYNN GREENHOW, | ) |
| CATHY HUNT, CHARLES FOUST, JR., | ) |
|  CURT WHEELER, NANCY GROVE | ) |
|  AND ALBERTO TARAJANO, | ) |
| | ) |
|     Defendants. | ) |
| | ) |

Plaintiff, Oxford Restructuring Advisors, LLC, as Liquidating Trustee of the CPES

Liquidating Trust (the "Plaintiff" or "Liquidating Trustee"), by and through its undersigned

counsel, brings this adversary complaint ("Complaint") against the Defendants Mark Monson,

David Johnson, Douglas Zimmerman, Michele Ferrall, Tiki Thompson, Mary Lynn Greenhow,

1

Cathy Hunt, Charles Foust, Jr., Curt Wheeler, Nancy Grove and Alberto Tarajano and states as follows:

## NATURE OF THE CASE

1.    The defendants are former directors, officers and/or employees of CPES-AZ Liquidating, Inc., f/k/a Community Provider of Enrichment Services, Inc. d/b/a CPES, Inc. ("CPES-AZ"), NDS Liquidating, Inc., f/k/a Novelles Developmental Services, Inc. ("Novelles") and CPESCA Liquidating, Inc. f/k/a CPES California, Inc. ("CPES-CA," and collectively, the "Debtors") and fiduciaries of the CPES Employee Stock Ownership Trust in accordance with the CPES Employee Stock Ownership Plan (the "ESOP Plan").

2.    The Debtors were once profitable behavior health services companies; however, as a direct result of the defendants' gross mismanagement described below – including their refusal to seek advice and assistance from outside professionals in connection with at least three major non-ordinary course transactions including the valuation and sale of the enterprise – the Debtors suffered irreparable financial harm that resulted in and included chapter 11 bankruptcy filings.

3.    The Liquidating Trustee seeks an award of monetary damages for the defendants' conduct in failing to properly perform their fiduciary duties.

## JURISDICTION

4.    The Court has jurisdiction pursuant to 11 U.S.C. §§ 105, 541, 544, 547, 548, 549, 550 and 551, Bankruptcy Rule 7001, 28 U.S.C. § 1334 and pendent jurisdiction with respect to state law causes of action. This adversary proceeding arises under Title 11 of the United States Code and arises in or is related to Chapter 11 Bankruptcy Case Nos. 9:20-bk-10554-DS, 9:20-bk-10553-DS and 9:20-bk-10994-DS (the "Main Case") pending before this Court.

2

5.      This matter is a core proceeding pursuant to 11 U.S.C. §§ 157(b)(2)(A), (E), (F), (H) and (O).

6.      Venue in this Court is proper pursuant to 28 U.S.C. §§1408 and 1409.

## THE PARTIES

7.      On April 24, 2020 (the "Phase I Petition Date"), CPES-AZ and Novelles filed voluntary cases under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court").

8.      On August 11, 2020 (the "Phase II Petition Date", and together with the Phase I Petition Date, the "Petition Date"), CPES-CA filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court.

9.      The Liquidating Trustee was appointed pursuant to the Debtors' *First Amended Joint Chapter 11 Plan of Liquidation* ("Plan"), as modified (Main Case Docket No. 646) and confirmed by Order of the Bankruptcy Court dated May 10, 2021 (the "Confirmation Order") (Main Case Docket No. 836).

10.      The Liquidating Trustee is bound by the Liquidating Trust Agreement, which was approved by the Confirmation Order.

11.      Under the Plan and Confirmation Order, the Debtors' assets, including Litigation Claims and Causes of Action.

12.      Section 5.2 of the Plan provides that all rights to commence, prosecute, or settle any and all Causes of Action (excluding Direct ESOP Claims) whether arising prepetition or post-petition vests in the Liquidating Trust and the Liquidating Trustee may enforce all rights to commence, prosecute, or settle all Causes of Action.

3

Exhibit  A to Settlement Agreement

13.     Defendant Mark Monson ("Monson") is an individual believed to be residing in Tucson, Arizona and is the former President, Chief Executive Officer, member of the ESOP Plan Committee and an insider of the Debtors.

14.     Defendant David Johnson ("Johnson") is an individual believed to be residing in Tucson, Arizona and is the former Chairman of the Board of Directors (the "Board") and an insider of the Debtors.

15.     Defendant Douglas Zimmerman ("Zimmerman") is an individual believed to be residing in Tucson, Arizona and is the former Chief Financial Officer and an insider of the Debtors.

16.     Defendant Michele Ferrall ("Ferrall") is an individual believed to be residing in Santa Maria, California and is a former Director, Regional Vice President of Operations in California and an insider of the Debtors.

17.     Defendant Tiki Thompson ("Thompson") is an individual believed to be residing in Fontana, California and is a former Director, Associate Vice President of Operations in California and an insider of the Debtors.

18.     Defendant Mary Lynn Greenhow ("Greenhow") is an individual believed to be residing in Tucson, Arizona and a former internal ESOP Plan Trustee, Corporate Secretary, Vice President of Administration and an insider of the Debtors.

19.     Defendant Cathy Hunt ("Hunt") is an individual believed to be residing in Tucson, Arizona and is a former Director and an insider of the Debtors.

20.     Defendant Ron Barber ("Barber" and together with Hunt, Greenhow, Thompson, Ferral, Zimmerman, Monson and Johnson, collectively the "D&O Defendants") is an individual believed to be residing in Tucson, Arizona and is a former Director and an insider of the Debtors.

4

21.    Defendant Charles Foust, Jr. ("Foust") is an individual believed to be residing in Tucson, Arizona and is a former member of the ESOP Plan Committee and an insider of the Debtors.

22.     Defendant Curt Wheeler ("Wheeler") is an individual believed to be residing in Tucson, Arizona and is a former member of the ESOP Plan Committee and an insider of the Debtors.

23.    Defendant Nancy Grove ("Grove" and together with Foust and Wheeler, collectively the "ESOP Committee") is an individual believed to be residing Tucson, Arizona and is a former member of the ESOP Plan Committee and an insider of the Debtors.

24.    Defendant Alberto Tarajano ("Tarajano" and together with the D&O Defendants and the ESOP Committee, collectively the "ERISA Fiduciary Defendants") is an individual believed to be residing in Key Biscayne, Florida and is the former ESOP Plan Trustee.

## GENERAL ALLEGATIONS

### *The Prepetition Debtors' Affairs*

25.    At all relevant times, Novelles and CPES-CA were wholly owned subsidiaries of CPES-AZ.

26.    The Debtors' prepetition business activities included providing outpatient mental health services, intensive therapy programs, employee assistance program services, individual and group counseling, addiction recovery programs, child and family services, foster care, training vocational services and support for people with intellectual and developmental disabilities.

27.    The Debtors operated numerous day treatment centers and programs in Arizona and California and operated three thrift stores in Arizona as part of a vocational training program.

5

Exhibit  A to Settlement Agreement

CPES provided residences and services to developmentally disabled individuals in Arizona through over 60 group homes.

28.    The Debtors also provided supportive living services where employees of the Debtors provided support services to individual members in their own homes.

29.    The Debtors' primary source of revenue was insurance reimbursements. As is routine, insurance reimbursement rates are subject to fluctuation and delay.

### *The Directors and Officers Failed to Properly Address Mounting Financial Troubles*

30.    The Debtors started experiencing financial distress as early as 2018, which distress continued through the Petition Date.

31.    Monson testified at a Bankruptcy Rule 2004 Examination that in 2015, 2016 and 2017 the Debtors generated revenue over $2 million per year, but that in 2018, the Debtors suffered a loss in the approximate amount of $485,000.

32.    The losses, according to the D&O Defendants, were attributable to shrinking insurance reimbursement rates for the services the Debtors provided in Arizona.

33.    Thereafter, the Debtors experienced several non-ordinary course events that further weakened their financial position.

34.    Unfortunately, the D&O Defendants completely abdicated their fiduciary duties in addressing these mounting concerns and grossly mismanaged the Debtor's financial affairs in critical times.

### *The Bank of the West Line of Credit*

35.    First, up and until some point in 2019 when it was unilaterally closed by the bank, the Debtors utilized a line of credit open with Bank of the West ("Line of Credit").

6

36.    The Line of Credit was integral to the Debtors' management of cash flow, which was, as referenced above, comprised of unpredictable and delayed insurance reimbursements on the revenue side and regular ordinary course obligations on the expense side.

37.    By way of example, one of the Debtors' largest ordinary course expenses was payroll, which according to the books and records reviewed by the Liquidating Trustee, amounted to $2 million per pay period.

38.    Again, as a result of the unpredictable and delayed nature of their revenue, the Line of Credit was essential to the Debtors' ability to timely meet those payroll obligations, as well as other ordinary course expenses.

39.    Nevertheless, after Bank of the West closed the Line of Credit in 2019, the D&O Defendants undertook less than adequate diligence obtaining replacement financing from another financial institution.

40.    By way of example, the D&O Defendants never retained a broker, investment banker, or other professional to assist the Debtors in seeking replacement financing.

41.    Instead, the D&O Defendants presumed, without any concrete data, advice, or diligence, that no other financial institution would lend the Debtors on a secured or unsecured basis.

42.    To be certain, although the Debtors were experiencing liquidity issues, their balance sheet was healthy: the Debtors owned a number of unencumbered real estate assets that could have served as collateral for a new loan.

43.    The D&O Defendants never did obtain replacement financing for the Debtors.

Exhibit  A to Settlement Agreement

### *The Sale/Leaseback of the Debtors' Real Estate*

44.    Instead, in order to generate cash to meet operational shortfalls, the D&O Defendants authorized CPES-AZ to enter into a series of transactions where it sold between 30-32 Arizona properties (the "Properties") to CapGrow Holdings JV Sub IV LLC ("CapGrow") from 2018 through 2019 and contemporaneously leased the Properties back to continue their operations at those particular sites (collectively, the "Sale/Leaseback Transactions").

45.    The Sale/Leaseback Transactions were far outside the ordinary course of the Debtors' business.

46.    Despite the non-ordinary course nature of the Sale/Leaseback Transactions, the D&O Defendants failed to engage any professionals to advise the Debtors in connection with the transactions.

47.    That error was particularly egregious given the liquidity issues that the Debtors were experiencing. The Debtors could hardly afford to part with assets without maximizing their value. Nor could they afford to take on any further onerous obligations. Moreover, and probably because no outside professional was involved, it does not appear that the D&O Defendants gave any consideration to a sale of the enterprise at this critical juncture before parting with material assets. The Sale/Leaseback Transactions materially impaired the balance sheet of the Debtors and reduced the value achievable through any sale of the enterprise as a whole. The Sale/Leaseback Transactions also unnecessarily risked future revenue streams by subjecting the revenue generating Properties to onerous lease terms, which, once in default, could be repossessed by the landlord.

48.    By way of example, the D&O Defendants failed to retain a broker or real estate agent to assist them with the marketing and sale of the Properties, an appraiser to value the

Properties, or an accountant to conduct a feasibility study in connection with the lease obligations incurred by the Debtors in connection with the proposed Sale/Leaseback Transactions.

49.    Instead, and without the assistance of the proper professionals, the D&O Defendants solicited offers from one or two known entities (as opposed to a running an orderly sale process), exclusively relied on CapGrow's valuation of the Properties (as opposed to independently assessing the value of the Properties), and committed the Debtors to obligations beyond their ability to repay in the near-term (as opposed to negotiating affordable rental terms or financial terms tied to revenue, for example).

50.    Even though the sale of the Properties provided for an immediate cash infusion, the effects of that cash infusion were short-lived and the Debtors were back in the same financial distress situation within a relatively short period.

51.    It is clear that the D&O Defendants took the offer from CapGrow simply to address the Debtors' short-term financial problems without regard to the long-term effects, including the impact of the Sale/Leaseback Transactions on the value of the enterprise.

52.    Were it not for the imprudent and ill-advised Sale/Leaseback Transactions, the Debtors would have had significantly higher going-concern value in their efforts to sell the equity and/or assets of the enterprise.

53.    Further, as a result of the Sale/Leaseback Transactions, the Debtors no longer had significant real estate assets to secure replacement financing when Bank of the West terminated the Line of Credit.

54.    The Debtors eventually defaulted on the leases with CapGrow.

Exhibit  A to Settlement Agreement

55.    As further evidence of the poor terms of the leases, all but three (3) of the leases with CapGrow were ultimately rejected in the bankruptcy cases, which resulted in significant lease rejection damages against the bankruptcy estates.

56.    CapGrow filed proofs of claim in the CPES-AZ bankruptcy case for unpaid lease payments and rejection damages totaling approximately $585,817.70.

### *The Failed Prepetition Sale to National Mentor Health Care, LLC*

57.    As a result of the D&O Defendants' previous failures to secure replacement financing and the reckless Sale/Leaseback Transactions, the enterprise was faced with no available credit and growing operating expenses.

58.    Against this backdrop (as well as the shrinking insurance reimbursement rates in Arizona), the D&O Defendants finally turned their attention to a sale of the enterprise.

59.    Unfortunately, the D&O Defendants did not act in a reasonably prudent manner in their efforts to sell the Debtors' business as a going concern.

60.    Mr. Monson testified that National Mentor Health Care, LLC ("Mentor") initially solicited him for a potential purchase of the Debtors' business operations back in 2015 when he began his employment with CPES and prior to the financial difficulties he oversaw.

61.    Emblematic of the same brazen and misguided decision-making of the D&O Defendants through the credit crunch described above, Mr. Monson further testified that, rather than retain and consult with professionals, he initiated contact with Mentor in 2019. The parties thereafter commenced negotiations.

62.    Prior to and during the Mentor sale negotiations, the D&O Defendants did not engage an investment banker or other professional sales consultant to assist with the marketing and sale of the Debtors' business as a going concern.

10

63.     Nor did the D&O Defendants run a sale process.

64.     Nor did the D&O Defendants obtain a formal valuation or appraisal of the Debtors' business as a going concern.

65.     Rather, the D&O Defendants improperly relied on the 2018 ESOP valuation to value the CPES-AZ stock.

66.     The 2018 ESOP Valuation, a complex valuation created by an actuarial firm, was not a proper or reliable valuation tool for valuing a business as a going concern for a stock sale.

67.     The 2018 ESOP Valuation valued the CPES-AZ stock at approximately $12.00 per share.

68.     Mentor's initial purchase offer valued the company at approximately $15.00 per share, or roughly $13,686,525.

69.     After approximately six months of negotiations without the assistance of experienced professionals, Mentor advised the D&O Defendants that it no longer wished to pursue the sale in late March or early April of 2020.

70.     The D&O Defendants made no efforts to identify an alternative buyer for either the Debtors' equity or their assets.

### *Management's Failure to Secure CARES Act Relief*

71.     As set forth above, the Debtor's largest obligation was payroll, which cost the Debtors $2 million per pay period.

72.     Based on the Liquidating Trustee's investigation, despite widely publicized forgiveable federal loans and tax credits available to the Debtors, the D&O Defendants made little effort to secure what would have been save the enterprise funding.

11

73.    The Debtor's CFO, Mr. Zimmerman, testified that he was not involved in any application process.

74.    As a result, and similar to the line of credit woes discussed above, the D&O Defendants did not secure any relief on behalf of the Debtors.

75.    Nor does it appear that the D&O Defendants took any measures to address their mounting liabilities in the face of the Pandemic.

76.    This last point is important. It does not appear from the minutes of the meetings that the D&O Defendants considered any revenue maximizing alternatives or cost-cutting measures in the wake of the Pandemic. When all other businesses around the globe were scrambling to find ways to keep their businesses afloat, it does not appear that the D&O Defendants considered any such efforts.

77.    Had they engaged in any customary triage efforts whatsoever, the Debtors could have bought enough time to have engaged in an out of court sale process that would have saved at least the outsized administrative expenses attendant to the bankruptcy filings.

### *The Bankruptcy Filings*

78.    Instead, on April 24, 2023, the D&O Defendants authorized CPES-AZ's voluntary petition for relief under chapter 11 of the Bankruptcy Code (and then for CPES-AZ and Novelles at the urging of Mentor).

79.    Ultimately, Mentor purchased the assets of the Debtors out of bankruptcy for $9.35 million, a roughly thirty-two percent (32%) discount off their original purchase price for the equity.

80.    To date, the Debtors' estates have incurred $3 million in administrative expenses.

12

81.    Were it not for the D&O Defendants' failures including their failures to engage professionals to assist them with evaluating their options for resolving their liquidity issues, formally market the equity/assets of the Debtors, and run an official sale process, the Debtors could have achieved a much higher gross sales price and avoided the attendant multiple seven figure administrative expenses resulting from the bankruptcy filings.

82.    As a direct and proximate result of the D&O Defendants' mismanagement, the Debtors were irreparably damaged.

### The ESOP

83.    The equity interests in CPES-AZ are held by the ESOP Plan.

84.    The ESOP Plan, initially known as the Community Psychology & Education Services, Ltd. Employee Stock Ownership Plan, was originally adopted on May 31, 1995, effective as of July 1, 1994.  The ESOP Plan was subsequently amended from time to time, including an amendment effective as of July 1, 2004 and amended most recently as of April 14, 2021.

85.    The ESOP Plan is a stock bonus plan qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended (the "Code"), and an employee stock ownership plan as defined in Section 4975(e)(7)  of the Code and Section 407(d)(6) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). CPES-AZ is the plan administrator of the ESOP.  See ESOP Plan § 16(h).

86.    The ESOP Plan grants the "Board", which consists of the D&O Defendants, with the authority to appoint a committee consisting of "the named fiduciaries with authority to control and manage the operation and administration of the Plan".  See ESOP Plan § 16(a). In addition,

13

the Board may appoint a Trustee or Board of Trustees to hold the trust assets. See ESOP Plan §

2.

87. The ESOP Plan provides that the ESOP Committee shall be the named fiduciaries

under ERISA "with the authority to control and manage the operation and administration of the

Plan". See ESOP Plan § 16(a). The ESOP Committee is permitted to act by written consent

without the need for a meeting and specifically provides that an ESOP Committee member cannot

vote on any action that will impact the member individually. See ESOP Plan, § 16(b). The

Secretary of the ESOP Committee is charged with keeping a record of the ESOP Committee's

records and documents relating to the administration of the ESOP Plan.

88. The ESOP Plan documents establish the interplay of the roles between internal and

external Trustees of the ESOP and the Board. In particular, the Board has delegated the fiduciary

duties under ERISA to the ESOP Committee.

89. The ESOP Plan provides that the ESOP Committee has the vast majority of the

ESOP's administrative powers, including: (1) determining the appropriate allocations to

Participants' accounts; (2) determining the amount of benefits payable to a Participant (or

Beneficiary) and the time and manner in which such benefits are to be paid; (3) directing with the

Trustee for crediting and distribution of the Trust's assets; (4) reviewing the performance of the

Trustee with respect to the Trustee's administrative duties, responsibilities, and obligations under

the ESOP Plan and ESOP Plan Trust Agreement (the "ESOP Trust Agreement"); and (5) selecting

an independent appraiser and determining the Fair Market Value of CPES Stock as of such dates

as it determines to be necessary or appropriate. See ESOP Plan, § 16(c)(1)-(11) (setting forth the

powers of the ESOP Committee).

14

90.     The ESOP Trust Agreement and the ESOP Plan delegate the appointment and removal of the ESOP Trustee to the Board as a whole and not just the ESOP Committee. See ESOP Trust Agreement, M.

91.     Comparatively, the Trust Agreement identifies the powers delegated to the ESOP Trustee, all of which deal with the ESOP Trustee's control of the Trust's assets including the following powers: (1) to contract or otherwise enter into transactions for the purpose of selling CPES-AZ Stock; (2) vote any stock held in the Trust; (3) sell, transfer, mortgage, pledge, lease or otherwise dispose of or grant options with respect to any Trust Assets at public or private sale; (4) participate in reorganizations, recapitalizations, consolidations, mergers and similar transactions with respect to CPES-AZ Stock or any other securities; (5) sue, defend, compromise, arbitrate or settle any suit or legal proceeding or any claim due it or on which it may be liable; and (6) perform all acts which the Trustee shall deem necessary or appropriate to exercise the powers and authority of the Trustee. See Trust Agreement,  N(1)-(10) (outlining the powers of the ESOP Trustees).

92.     Prior to 2016, the Board had appointed a Board of Trustees (the "Board of Trustees") to administer and act as the ERISA named fiduciaries for the ESOP Plan.  In 2016, the Board decided to appoint two trustees to jointly serve and administer the Plan, namely Greenhow and Theresa Thienhaus ("Thienhaus" and together with Greenhow, collectively the "Internal Trustees").

93.     The Board then appointed an ESOP Committee to also serve as named fiduciaries in administering the ESOP Plan.  In 2019, the ESOP Committee determined it was in the best interest of the participants (collectively, the "ESOP Participants") to transition to a professional, external trustee to administer the ESOP Plan.

15

94.    The D&O Defendants had several fiduciary duties under ERISA with respect to the ESOP.

95.    Beginning in 2016, the Board delegated the control, management, and administration of the ESOP to the ESOP Committee and appointed the Internal Trustees.

96.    Then, in or around April 2019, the ESOP Committee and the Board approved the hiring of an external trustee for the ESOP, namely, Alberto Tarajano (the "Former ESOP Trustee").

97.    In May 2020, Mr. Tarajano resigned and the Board and the ESOP Committee approved the hiring of Miguel Paredes (the "Current ESOP Trustee").

98.    The ESOP Trustee and the ESOP Committee are the Named Fiduciaries under the ESOP Plan and ESOP Trust Agreement. However, upon information and belief, the Board is a functional fiduciary under ERISA due to its responsibilities under the ESOP Plan documents in appointing the ESOP Committee and the various ESOP Trustees. Further, outside from the delegated responsibilities, both the Board and the ESOP Committee had a responsibility to monitor any delegated duties to the then-appointed trustee.

### *The Faulty 2018 ESOP Plan Stock Valuation*

99.    By the time Mr. Tarajano was engaged as the external ESOP Trustee, the draft ESOP Plan valuation for the year ending in 2018 was in process.

100.    The Internal Trustees generally testified at their Bankruptcy Rule 2004 Examinations that during the yearly valuation process they would typically review the draft valuation report prepared by the independent actuarial firm, Brueggeman Johnson Yeanoplos, PC ("BJY") and then ask questions or challenge any findings directly with BJY.

16

101.    When Tarajano was hired, he reviewed the draft 2018 valuation and had concerns regarding the method of valuation used by BJY.  Monson testified that Mr. Tarajano reviewed the net assets of the Debtors and then worked with BJY on formulating a different share price based on the asset valuation approach.

102.    The Debtors had traditionally valued the ESOP Plan stock using an income approach method of valuation.  Tarajano changed the valuation methodology to the asset approach for the 2018 ESOP Plan valuation.

103.    During Tarajano's Bankruptcy Rule 2004 examination, Tarajano further explained the analysis and reasoning underlying the change in valuation approach.  He explained that "by accepting a [$]5.92 draft share value, if the assets of the business were worth $12 a share and you have an offer on the table for [$]10, and you got plant, property, and equipment worth [$]7.92, would it be in the participant's best interest to accept a share value of [$]5.92 a share?....[H]ad this [initial draft] value been accepted, I think it would have been inconsistent with my [fiduciary] duties under oath."

104.    The ESOP Committee was provided the draft 2018 ESOP Plan valuation and during a meeting on June 6, 2019, the share valuation for 2018 was presented to the ESOP Committee for review with Greenhow presenting on the price being set based on an asset-based valuation. See ESOP Committee Meeting Minutes dated June 6, 2019.

105.    Despite the Meeting Minutes showing that the ERISA Fiduciaries were aware of the change in valuation approach, the ERISA Fiduciaries had varying degrees of knowledge as to the valuation method selection process and therefore it is believed and averred that all members of the ESOP Committee were not fully knowledgeable when the decision was made to set the share price for 2018.

106.    Further, the lack of understanding of the various delegated roles and responsibilities under the ESOP Plan documents demonstrates potential problems with the ERISA Fiduciaries.  For example, Johnson, in his Bankruptcy Rule 2004 examination, testified that Mr. Tarajano selected the valuation methodology based on the offer price from the Mentor offer.

107.    The change in the valuation approach for the 2018 ESOP Plan valuation resulted in an overvaluation of the ESOP Plan stock.  The Debtors subsequently made distributions to certain ESOP Participants using the 2018 ESOP Plan valuation which resulted in a loss to the ESOP Plan.

## COUNT I
## BREACH OF FIDUCIARY DUTY
### (*D&O Defendants*)

108.    Plaintiff repeats and re-alleges each of the allegations as set forth above and below and is set forth herein.

109.    The D&O Defendants in their respective capacities as directors, executive officers, and/or employees of the Debtors, each individually owed the Debtors fiduciary duties under applicable state corporate law.

110.    These duties required the D&O Defendants to at all times perform their duties in good faith and with the degree of care which an ordinarily prudent person in a like position would use under similar circumstances and to subordinate their own personal interests to the interests of the Debtors.

111.    Those duties also required the D&O Defendants to seek to reasonably maximize corporate value, and to preserve maximum corporate value for distribution to creditors and shareholders in the order of their priority.

112.    The D&O Defendants breached their fiduciary duties to the Debtors by, inter alia:

18

a.  Failing to undertake reasonable and prudent efforts to obtain replacement financing after the Line of Credit was terminated;

b.  Failing to undertake reasonable and prudent efforts to address liquidity concerns resulting from the termination of the Line of Credit, including entering into the Sale/Leaseback Transactions without professional guidance;

c.  Failing to undertake reasonable and prudent efforts in connection with the sale of the Debtors' enterprise prior to the Petition Date, including running an orderly sale process and valuing the assets and equity of the enterprise;

d.  Failing to undertake reasonable and prudent efforts to secure CARES Act relief for the benefit of the Debtors;

e.  Failing to undertake reasonable and prudent efforts and impose sufficient controls to maximize revenue and minimize expenses in light of the Pandemic; and

f.  Failing to evaluate and consider alternatives to bankruptcy that could have reduced the administrative expenses associated with the sale of the Debtors' business.

113.    Each of the foregoing grossly negligent failures is highlighted by equally grossly negligent and contemporaneous failures to take the customary and prudent step of retaining and consulting with professionals to assist the Debtors in addressing each of the non-ordinary course business transactions.

114.    The failure of the D&O Defendants to discharge their fiduciary duties inflicted serious harm on the Debtors and was a contributing factor causing the Debtors to file for bankruptcy.

19

115.    As a result, the D&O Defendants' breaches of the fiduciary duties have therefore damaged the Debtors and their business in an amount to be determined at trial, including, but not limited to:

a.   The reduction in gross sale price achieved through the bankruptcy asset sale to Mentor versus the prepetition equity transaction with the same buyer totaling at least $4.3 million;

b.   The rejection damages claimed by CapGrow resulting from the leases negotiated by the D&O Defendants in the Sale/Leaseback Transactions totaling $585,817.70;

c.   The CARES Act relief that the D&O Defendants failed to secure totaling at least $2 million; and

d.   The administrative expenses incurred by the estates totaling in excess of $3 million.

## COUNT II
## AIDIND AND ABETTING BREACH OF FIDUCIARY DUTY
### (*D&O Defendants*)

116.    Plaintiff repeats and re-alleges each of the allegations as set forth above and below and is set forth herein.

117.    The D&O Defendants in their respective capacities as directors, executive officers, and/or employees of the Debtors, each individually owed the Debtors fiduciary duties under applicable state corporate law.

118.    In the alternative to Count I, the D&O Defendants had actual knowledge of and rendered substantial assistance to the breached of fiduciary duty committed by the other D&O

20

Defendants which proximately caused damage to the Debtors, including all of the acts alleged in Count I.

119.    The significant damages that directly resulted from these acts and omissions exceed $10 million and include, but are not necessarily limited to the damages claimed in Count I.

## COUNT III
## BREACH OF FIDUCIARY DUTY TO ACT PRUDENT
## AND IN ACCORDANCE WITH THE PLAN DOCUMENTS
### (*ERISA Fiduciary Defendants*)

1.    Plaintiff repeats and re-alleges each of the allegations as set forth above and below and is set forth herein.

2.    ERISA Section 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and— (A) for the exclusive purpose of:

(i)providing benefits to participants and their beneficiaries; and

(ii)defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments …..

3.    The ERISA Fiduciary Defendants owe statutory fiduciary duties under ERISA to the ESOP.

21

4.      The ERISA Fiduciary Defendants have a duty to act prudently with respect to their ERISA duties.

5.       The ERISA Fiduciary Defendants did not have clear knowledge and understanding of their fiduciary duties under ERISA.

6.      The ERISA Fiduciary Defendants failed to properly delegate duties and responsibilities between the ESOP Trustees and the ESOP Committee.

7.      Some, if not all the former members of the ESOP Committee, clearly did not see a role or the importance of the ESOP Committee generally, despite being ERISA Fiduciary Defendants.

8.      Additionally, there were disagreements between the roles of the various fiduciaries in general.  For example, the Plan provides that the ESOP Committee is responsible for setting the fair market value of CPES Stock.  However, the Internal Trustees and the Prior ESOP Trustee all had differing views during their Bankruptcy Rule 2004 Examinations on who set the share price. Ms. Greenhow testified that the independent audit firm set the share price based on the information provided; whereas Mr. Tarajano testified that he shared his observations of the initial audit report with the ESOP Committee who ultimately set the share price based on those observations.

9.      There was at all times relevant hereto a misunderstanding as to the specific delegation of the specific duties among the various parties and the administration of the ESOP Plan was required to be conducted pursuant to the Plan Documents.

10.      Further, the fact that former ESOP Committee member, Foust, claims that the ESOP Committee was essentially illusory demonstrates that the ERISA Fiduciary Defendants were not truly acting prudently in performing their responsibilities to the ESOP Participants.

22

11.     As a result of these actions, or inactions, the ERISA Fiduciary Defendants caused the Debtors to suffer damages.

12.     As a result of these actions, or inactions, the ERISA Fiduciary Defendants caused the CPES ESOP to suffer damages.

**COUNT III**
**BREACH OF FIDUCIARY DUTY TO MONITOR ESOP FIDUCIARIES**
(*ERISA Fiduciary Defendants*)

13.     Plaintiff repeats and re-alleges each of the allegations as set forth above and below and is set forth herein.

14.     The ERISA Fiduciary Defendants were unaware of the delegation of responsibilities under the ESOP Plan Documents, the role of the ESOP Committee, and the overall understanding of matters, such as the valuation methods used by BJY.

15.     In particular, Foust's lack of facts and personal knowledge further substantiates the  Liquidating Trustee's conclusions made here from the Bankruptcy Rule 2004 examinations and review of the meeting minutes provided.

16.     To the extent the ERISA Fiduciary Defendants were uninformed as to the change in the traditional ESOP Plan valuation method or the implications of the change in the valuation method, they failed to appropriately monitor Tarajano.

17.     The failure to properly monitor Tarajano, and to allow him to change the valuation methodology for the ESOP Plan resulted in an overvaluation of the ESOP Plan stock and an overpayment to certain ESOP Plan participants.

18.     As a result of these actions, or inactions, the ERISA Fiduciary Defendants caused the Debtors to suffer damages.

Exhibit  A to Settlement Agreement

19.     As a result of these actions, or inactions, the ERISA Fiduciary Defendants caused

the ESOP to suffer damages.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, the Liquidating Trustee respectfully demands judgment as follows:

A.     Entry of judgment against the Defendants in an amount to be determined at trial;

B.     Awarding Plaintiff its attorneys' fees, costs, and other expenses incurred in this
action;

C.     Awarding post-judgment interest at the maximum rate permitted by law; and

D.     Awarding Plaintiff such other and further relief as the Court deems just and
proper.

Dated: _____, 2023.

                                        Respectfully submitted,

                                        *DRAFT*_____
                                        ERIC J. SILVER, ESQ.
                                        Florida Bar Number 057262
                                        esilver@stearnsweaver.com
                                        STEARNS WEAVER MILLER WEISSLER
                                        ALHADEFF & SITTERSON, P.A.
                                        150 West Flagler Street
                                        Museum Tower, Suite 2200
                                        Miami, Florida 33130
                                        Telephone:     (305) 789-3200
                                        *Counsel to Oxford Restructuring Advisors, LLC as*
                                        *Liquidating Trustee for the CPES Liquidating Trust*

24

# Exhibit B

1  Gregory Stoltz (027519)
   GStoltz Law, LLC
2  530 Main Street, Suite B
3  Tucson, Arizona 85701
   (520) 428-4734
4  greg@gstoltzlaw.com

5  *Attorney for Plaintiffs*
6  *Robert Bennetti, Linda Mariano, and Linki Peddy*

7

8              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF ARIZONA
9                    TUCSON DIVISION

10

11  Robert Bennetti; Linda Mariano; and Linki Peddy;    | Case No.: 4:23-cv-00193-RCC
    individually and on behalf of a class of all other
12  persons similarly situated,

13              Plaintiffs,    | **FIRST AMENDED CLASS
                               | ACTION COMPLAINT FOR
14       v.                    | VIOLATIONS OF ERISA**

15

16  Mark G. Monson; David Johnson; Douglas
    Zimmerman; Alberto J. Tarajano; and DOES 1-25,
17
              Defendants.
18

19  and

20  Community Provider of Enrichment Services, Inc.
    Employee Stock Ownership Plan and Trust,
21
              Nominal Defendant
22

23

24

25

26

27

28

1    Plaintiffs Robert Bennetti, Linda Mariano, and Linki Peddy, individually and on behalf

2  of all similarly situated participants[1] in the Community Provider of Enrichment Services, Inc.

3  Employee Stock Ownership Plan and Trust (the "CPES ESOP" or the "Plan") (collectively,

4  "Plaintiffs"), hereby amend their Class Action Complaint for Violations of ERISA against

5  Defendants Mark G. Monson, David Johnson, Douglas Zimmerman, Alberto J. Tarajano, and

6  DOES 1-25 (collectively, "Defendants"), and for their First Amended Class Action Complaint

7  for Violations of ERISA, allege as follows:

8                                **INTRODUCTION**

9    1.    This action arises out the bankruptcy proceeding in the United States District

10  Court for the Central District of California in which Community Provider of Enrichment

11  Services, Inc., now known as CPESAZ Liquidating, Inc. ("CPES-AZ"), an Arizona

12  corporation headquartered in Tucson, Arizona, and its wholly-owned subsidiaries, Novelles

13  Developmental Services, Inc., now known as NDS Liquidating, Inc. ("Novelles"), and CPES

14  California, Inc., now known as CPESCA Liquidating, Inc. ("CPES-CA") (collectively,

15  "CPES" or the "Debtors"), filed Voluntary Petitions for Non-Individuals Filing for Bankruptcy

16  under Chapter 11 of the United States Bankruptcy Code, now styled *In re CPESAZ*

17  *Liquidating, Inc., et al*., No. 9:20-bk-10554-DS (Jointly Administered with No. 9:20-bk-

18  10553-DS and 9:20-bk-10994-DS) (Bankr. C.D. Cal.) (the "Bankruptcy Proceeding").

19    2.    The Debtors were once profitable behavior health services companies; however,

20  as a direct result of the defendants' gross mismanagement described below – including their

21  refusal to seek advice and assistance from outside professionals in connection with a number

22  of major non-ordinary course transactions including the valuation and sale of the enterprise –

23  _____

24  
25  [1] The Employee Income Retirement Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1001, *et seq*., defines "participants" to include "beneficiaries" **"**The term 'participant' means any employee or former employee of an employer or any member or former member of an employee organization, who is or may become eligible to

26  receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, *or whose beneficiaries may be eligible to receive any such benefit*." ERISA

27  Section 3(7), 29 U.S.C. § 1002(7) (emphasis supplied). "The term 'beneficiary' means a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit

28  thereunder." ERISA Section 3(8), 29 U.S.C. § 1002(8). This Class Action Complaint for Violations of ERISA thus uses the term "participants" as including "beneficiaries".

1   the Debtors suffered irreparable financial harm that resulted in and included chapter 11

2   bankruptcy filings.

3       3.   Plaintiffs bring this First Amended Class Action Complaint for Violations of

4   ERISA ("Complaint") to remedy the violations of ERISA they discovered in and during the

5   Bankruptcy Proceeding and after the filing of the initial Complaint herein (as further addressed

6   in paragraph 24.f. below).

7       4.   CPES-AZ is the corporate sponsor of the Community Provider of Enrichment

8   Services Employee Stock Ownership Plan and Trust (the "CPES ESOP" or "Plan") and the

9   Plan Administrator of the CPES ESOP. Since 1994, CPES-AZ has been wholly owned by the

10  CPES ESOP. The CPES ESOP, by its ownership of CPES-AZ, wholly owned Novelles and

11  CPES-CA.

12      5.   The CPES ESOP is the primary, if not the sole, retirement plan for the employees

13  of CPES-AZ. The employees of Novellus and CPES-CA are not participants in the CPES

14  ESOP. Given the CPES ESOP's 100% ownership of CPES-AZ and the fact that CPES-AZ,

15  Novelles, and CPES-CA have not been operating companies for some time, the assets of

16  CPES-AZ, Novelles, and CPES-CA are the assets of the CPES ESOP.

17                              **BACKGROUND**

18      6.   CPES-AZ, Novelles, and CPES-CA were community human services and

19  healthcare organizations and a provider of person-centered, trauma-informed care. CPES-AZ,

20  Novelles, and CPES-CA historically offered a comprehensive array of behavioral health

21  services, including outpatient mental health services, an intensive outpatient therapy program,

22  employee assistance program services, individual and group counseling, addiction recovery

23  programs, child and family services, foster care, training and support for people with

24  intellectual and developmental disabilities, and vocational services. Their employee

25  counselors and clinicians had a variety of experience and specialization. They also integrated

26  their counseling services with overall healthcare services, and one of their core competencies

27  was working with people who experienced multiple and severe co-occurring disorders. They

28  operated and staffed group homes in Arizona (CPES-AZ), in Northern California (Novelles),

1    and in Southern California (CPES-CA), providing residences and services to developmentally

2    disabled individuals, and also provided day treatment services and supportive living services.

3    As of April 24, 2020, the date on which CPES-AZ and Novelles filed their Voluntary Petitions

4    in bankruptcy, CPES-AZ and Novelles had approximately 962 employees. CPES-AZ had

5    approximately 697 employees in Arizona, and Novelles had approximately 265 employees in

6    California. CPES-CA had approximately 250 employees in California.

7         7.    Plaintiffs and the proposed Class are participants in the CPES ESOP. They are

8    the employee-owners of CPES-AZ, Novelles, and CPES-CA.

9         8.    In 1994, CPES-AZ established the CPES ESOP as a retirement plan for the

10   employees of CPES-AZ. Since then, the CPES ESOP has wholly owned CPES-AZ, and by its

11   ownership of CPES-AZ, has wholly owned the CPES-AZ subsidiaries, Novelles and CPES-

12   CA.

13        9.    On April 24, 2020, following the abrupt resignation of then CPES ESOP Trustee,

14   Defendant Tarajano, and his replacement with a successor ESOP Trustee (Miguel Paredes) on

15   or about April 16, 2020, and without notice to or the consent of their individual employee

16   owners, CPES-AZ and Novelles each filed a voluntary Chapter 11 bankruptcy petition in the

17   U.S. District Court for the Central District of California, Northern Division (Santa Barbara,

18   California) (Case Nos. 9:20-bk-10554-DS and 9:20-bk-10553-DS, respectively, and

19   subsequently consolidated for joint administration under Case No. 9:20-bk-10554-DS).

20        10.    On August 11, 2020, without notice to or the consent of its individual employee

21   owners, CPES-CA also filed a voluntary Chapter 11 bankruptcy petition in the U.S. District

22   Court for the Central District of California, Northern Division (Santa Barbara, California)

23   (Case No. 9:20-bk-15456-SY, subsequently consolidated for joint administration with the

24   CPES-AZ and Novelles bankruptcies under Case No. 9:20-bk-10554-DS, collectively, the

25   "Bankruptcy Proceeding").

26        11.    The Bankruptcy Proceeding was initiated by the CPES Board of Directors with

27   the purpose of liquidating all or substantially all of the assets of CPES-AZ, Novelles, and

28   CPES-CA and dissolving those corporations. The CPES Board of Directors intended to

1   liquidate these entities and because the CPES ESOP was the sole owner of CPES-AZ (which

2   in turn owned all of Novelles and CPES-CA), any liquidation proceeds would be payable

3   solely to the CPES ESOP.

4           12.     The entire pretense or pretext for the institution of the Bankruptcy Proceeding,

5   however, was a sham and was based upon multiple substantial conflicts of interest, and to use

6   the Bankruptcy Court to avoid the proscriptions of ERISA and Arizona state law, including to

7   avoid seeking the consent of the CPES ESOP participants to such liquidation and dissolution,

8   or to give them any voice whatsoever in the bankruptcy process, through a necessary direction

9   pass-through shareholder vote, the appointment of an independent chapter 11 trustee, and to

10  avoid the personal liabilities of the Defendants. The Bankruptcy Proceeding needlessly wasted

11  the assets of CPES-AZ, Novelles, and CPES-CA, incurring far in excess of $3,000,000 in

12  unnecessary administrative expenses, attorneys' fees and costs, and other presently unknown

13  expenses – and the fair market value of the retirement accounts of their employees, the CPES

14  ESOP participants – by transferring the exorbitant and excessive costs of the Bankruptcy

15  Proceeding to the residual bankruptcy estate[2], i.e., to the CPES ESOP participants.

16          13.     When CPES-AZ and Novelles first filed the Bankruptcy Proceeding, CPES-AZ

17  and Novelles had no real debt and their assets far outweighed any liabilities. According to the

18  CPES-AZ Schedules of Financial Affairs ("SOFA"), CPES-AZ had slightly more than

19  $2,900,000 in unsecured liabilities, approximately $2,400,000 of which was inter-company

20  "debt" with CPES California. According to the SOFA, CPES-AZ described its assets as being

21  in excess of $12,500,000. As such, no creditors committee was sought or appointed in the

22  Bankruptcy Proceeding. Similarly, CPES-CA's assets vastly outweighed its liabilities at the

23  time of its bankruptcy filing in 2020.

24

25  _____

26     [2] The CPES residual bankruptcy estate is comprised of monies remaining in the CPES
    bankruptcy estate after the payment of the administrative claims and other claims, attorneys'
27  fees, costs of the Liquidating Trustee and its attorneys, and any other "expenses" of the
    Bankruptcy Proceeding, and will inure to the benefit of the ESOP participants as the residual
28  estate is paid to the ESOP.

14.    Indeed, as premeditated, since the filing of the Bankruptcy Proceeding, the assets of CPES-AZ, Novelles and CPES-CA have been fully liquidated, and those entities are now liquidation entities (non-operating entities). Since then, the CPES bankruptcy estate has been depleted and has, since June 30, 2021, consistently been estimated by the Liquidating Trustee in the Bankruptcy Proceeding to be depleted from approximately $15,500,00 to $5,000,000 [CPES Bankruptcy Docket Nos. 1032, 1033, 1130, 1230, 1232, 1302, 1348, 1357], and most recently, as of July 13, 2023, to "roughly approximately" $4,750,000. Such amount likely will be considerably less than that amount when the CPES residual bankruptcy estate is actually distributed to the ESOP participants, and, if the statement of at least one member of the CPES Board of Directors is accurate, likely to be around $3,000,000.

15.    On or about September 30, 2020, all or substantially all of the assets of Novelles and CPES-CA were liquidated in the Bankruptcy Proceeding.

16.    On or about October 15, 2020, all or substantially all of the assets of CPES-AZ were liquidated in the Bankruptcy Proceeding.

17.    On May 10, 2021, over the objection of the individual named Plaintiffs here and 92 other CPES ESOP participants, the Bankruptcy Court approved the Debtors' (CPES-AZ's, Novelles's and CPES-CA's) proposed First Amended Joint Chapter 11 Plan of Liquidation, as Modified [CPES Bankruptcy Docket No. 802, the "CPES Plan of Liquidation"; CPES Bankruptcy Docket No. 836, the "Confirmation Order", dated May 10, 2021].

18.    The Plan of Liquidation became effective on or about June 17, 2021. [CPES Bankruptcy Docket Nos. 900 and 915.]

19.    The Debtors ceased to be "operating companies" – a defined term in the context of ESOPs and in the context of the U.S. Department of Labor's Plan Asset regulations, 29 CFR § 2510.3-101 – when the Board of Directors of Debtors developed a strategic planning effort focused on the liquation of the Debtors and the sale of substantially all of the assets of the Debtors, believed to be at least as early as 2018. To that end, the Ninth Circuit has recognized that the general rule that corporate assets are not plan assets where the plan is an ESOP (29 C.F.R. § 2510.3-101(h)(3)) is inapplicable in the context of a 100% ESOP-owned

1  company taking actions towards liquidation when the ESOP will be the sole beneficiary of the

2  liquidation proceeds. *Johnson v. Couturier*, 572 F.3d 1067, 1081 (9th Cir. 2009). Moreover,

3  29 CFR § 2510.3-101(a)(2) provides:

4     "Generally, when a plan invests in another entity, the plan's assets include

5     its investment, but do not, solely by reason of such investment, include any

6     of the underlying assets of the entity. In the case of a plan's investment in

7     an equity interest of an entity that is neither a publicly-offered security nor a

8     security issued by an investment company registered under the Investment

9     Company Act of 1940 its assets include both the equity interest and an

10    undivided interest in each of the underlying assets of the entity, unless it is

11    established that – (i) The entity is an operating company, or (ii)

12    Equity participation in the entity by benefit plan investors is not significant.

13    Therefore, any person who exercises authority or control respecting the

14    management or disposition of such underlying assets, and any person who

15    provides investment advice with respect to such assets for a fee (direct or

16    indirect), is a fiduciary of the investing plan."

17       20.     As such, the assets of CPES-AZ, Novelles, and CPES-CA became the assets of

18  the CPES ESOP when the Debtors were no longer operating companies, which occurred when

19  the Board of Directors of Debtors developed a strategic planning effort focused on the

20  liquation of the Debtors and the sale of substantially all of the assets of the Debtors, believed

21  to be at least as early as 2018.

22       21.     Under the Plan of Liquidation in the Bankruptcy Proceeding, a Liquidating

23  Trustee (Oxford Restructuring Advisors, LLC) was appointed. [CPES Bankruptcy Docket

24  Nos. 802 and 836.]

25       22.     Upon the effective date of the Plan of Liquidation, June 17, 2021, the

26  Liquidating Trustee succeeded to CPES-AZ, Novelles, and CPES-CA, including, without

27  limitation, in CPES-AZ's role as Plan Administrator of the CPES ESOP. [CPES Bankruptcy

28  Docket No. 802, at Article IV, and CPES Bankruptcy Docket No. 915.]

23.     Under the Plan of Liquidation, as of the confirmation date of the Plan of Liquidation, May 10, 2021, the CPES ESOP formally terminated. [CPES Bankruptcy Docket No. 802, at ¶ 5.7.] The CPES ESOP Employee Stock Ownership Trust was unaffected and continues. [*Id.*] Plaintiffs assert, however, that the filing of the Bankruptcy Proceeding constituted a termination or partial termination of the CPES ESOP [CPES ESOP Plan Document, at Section 19 (Future of the Plan) ("A complete discontinuance of Employer Contributions shall be deemed to be a termination of the Plan for this purpose.").]

24.     a.     This First Amended Class Action Complaint for Violation of ERISA arises out of information that Plaintiffs and 92 other CPES ESOP participants learned during the CPES Bankruptcy Proceeding, and subsequently confirmed by the Liquidating Trustee, namely, that the valuation of CPES-AZ and the CPES ESOP's assets as of December 31, 2018, was improperly and intentionally inflated, contained mistakes, inappropriately changed valuation methodologies and instead used incorrect valuation methodologies, and was incorrect and that, as a result, distributions to certain CPES ESOP participants were made at improperly inflated values, to the detriment of the CPES ESOP.

b.     Defendant Monson testified to this under oath during the Bankruptcy Proceeding on May 28, 2020, at the 341(a) initial Meeting of Creditors therein.

c.     This factual information also was confirmed by the present trustee of the CPES ESOP (Miguel Paredes), who was not initially involved in the December 31, 2018, year-end valuation process and who was retained as "Successor" ESOP Trustee on or about April 16, 2020, eight days before the initial bankruptcy filings.

d.     The present CPES ESOP Trustee, however, has not provided Plaintiffs with any information with respect to his efforts, if any, to correct the improper December 31, 2018, year-end valuation, by seeking to bring the claims herein against the parties personally responsible for the ERISA violations, namely, the Defendants.

e.     Moreover, as of the date of the initial filing of this action, the Liquidating Trustee had not provided Plaintiffs with any information with respect to its efforts, if any, to correct the improper December 31, 2018, year-end valuation, by seeking to bring the claims

1 herein against the parties personally responsible for the ERISA violations, namely, the

2 Defendants.

3          f.      On or about June 28, 2023, Plaintiffs also learned that the Liquidating

4 Trustee prepared a proposed complaint, to be brought as an adversary action in the bankruptcy

5 proceeding, and a demand letter, which the Liquidating Trustee sent to the D&O Complaint

6 defendants (collectively, the "D&O Complaint"). Attached, collectively, as Exhibit "A" is a

7 copy of the Liquidating Trustee's proposed complaint and its demand letter.

8      25.     In addition, this action alleges that CPES-AZ, then the Plan Administrator of the

9 CPES ESOP and the corporate sponsor of the CPES ESOP, acting though one or more of the

10 Defendants, timely failed to provide proper disclosures required by ERISA. The ESOP Plan

11 Administrator and other parties failed (i) to timely and properly determine in good faith the

12 fair market value of the CPES ESOP plan sponsor since December 31, 2019, (ii) to have timely

13 filed certain of the required IRS Forms 5500 (Annual Return/Report of Employee Benefit Plan

14 ("Form 5500") with the U.S. Department of Labor (the "DOL") for the CPES ESOP, namely,

15 the 2020 Form 5500, due on or before October 15, 2021, and the 2021 Form 5500, due on or

16 before October 15, 2022, and (iii), until after December 16, 2022, failed to provide the CPES

17 ESOP participants with participant account statements since they did so in 2019 for the 2018

18 plan year. The ESOP Plan Administrator is required to provide participant account statements

19 to the ESOP participants each year. 29 U.S.C. § 1025(a)(1)(A)(ii). The Plaintiffs and all CPES

20 ESOP participants each have had a pressing need for an accounting of their retirement benefits

21 in the form of their participant account statements, including at significant times such as upon

22 their termination of employment from CPES-AZ, any disability, and/or their vesting upon the

23 filing of the Bankruptcy Proceeding (if not sooner). Because the Plaintiffs and all CPES ESOP

24 participants have been unable to receive such an accounting, their financial planning has been

25 impaired and their effort to enforce the rights and fiduciary obligations imposed by ERISA

26 have been severely hampered.

27      26.     Moreover, the proofs of claim in the Bankruptcy Proceeding filed by or on behalf

28 of the CPES ESOP participants (whether individually or as part of a "class claim") and the

1  proof of claim filed by the present CPES ESOP Trustee [CPES Bankruptcy Claim No. 274]
2  did not and do not provide for the relief requested herein.

3       27.     Accordingly, in order to preserve and enforce their rights and those of all of the
4  CPES ESOP participants, Plaintiffs bring this action for the benefit of the Plan.

5       28.     To that end, the Bankruptcy Court's Confirmation Order expressly provides that
6  "[n]othing in the Plan or this Confirmation Order will affect the rights of any CPES ESOP
7  participant or beneficiary with respect to any claims or causes of action held by any CPES
8  ESOP participant or beneficiary, to the extent any such claims or causes of action exist".
9  [CPES Bankruptcy Docket No. 836, at ¶ 37.] The claims and causes of action set forth herein
10 under ERISA Sections 502(a) and 502(c), 29 U.S.C. §§ 1132(a) and 1132(c), are such claims
11 or causes of action.

12      29.     This class action is thus brought under ERISA Sections 404, 405, 409, 502(a),
13 and 502(c)(1)(A), 29 U.S.C. §§ 1104, 1105, 1109, 1132(a), and 1132(c)(1)(A), for losses
14 suffered by the Plan and its participants, and other relief, caused by Defendants. The Plan has
15 been injured and its participants have been deprived of hard-earned retirement benefits
16 resulting from Defendants' violations of ERISA. Plaintiffs thus bring this action under ERISA
17 to vindicate their rights to be free from Defendants' various breaches of ERISA, including
18 their ERISA fiduciary duties, and to seek recovery on behalf of the Plan from those who are
19 personally liable to make good such losses.

20      30.     When ERISA's strict fiduciary standards are not satisfied, ERISA permits the
21 participants of an ERISA plan (here, the CPES ESOP) to seek relief under ERISA Sections
22 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a), to restore plan losses, to recover unjust
23 profits and to obtain other remedial and equitable relief as a court may deem appropriate.

24      31.     Not only may fiduciaries be held directly responsible for losses and other relief
25 for their own misconduct, but their co-fiduciaries also may be held liable for losses and other
26 relief when those co-fiduciaries participate in, enable or fail to remedy another fiduciary's
27 breach. ERISA Section 405(a)(1)-(3), 29 U.S.C. § 1105(a)(1)-(3).

28

1    32.    Plaintiffs also bring this action under ERISA under the authority of *LaRue v.*

2    *DeWolff, Boberg, and Associates, Inc.*, 552 U.S. 248 (2008), which involved a defined

3    contribution plan like the CPES ESOP, and further demonstrated that "[ERISA] §§ 409(a) and

4    502(a)(2) [29 U.S.C. §§ 1109 and 1132(a)(2)] permit recovery of *all* plan losses caused by a

5    fiduciary breach". *LaRue*, 552 U.S. at 261 (Thomas, J., concurring).

6                          **JURISDICTION AND VENUE**

7    33.    <u>Subject Matter Jurisdiction</u>. This Court has subject matter jurisdiction over this

8    action pursuant to 28 U.S.C. § 1331, and ERISA Section 502(e)(2), 29 U.S.C. §1132(e)(2).

9    34.    <u>Personal Jurisdiction</u>. This Court has personal jurisdiction over Defendants

10   under ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2), which provides for nationwide

11   service of process.

12   35.    <u>Venue</u>. Venue is proper in this District pursuant to ERISA Section 502(e)(2), 29

13   U.S.C. § 1132(e)(2), because (i) the Defendants' breaches and violations of ERISA occurred

14   in this District and/or affected those CPES ESOP participants in this District, (ii) because the

15   CPES ESOP was administered in this District, and (iii) because at least one of the Defendants

16   may be found in this District.

17                              **THE PARTIES**

18   *A.    The Plaintiffs*

19   36.    The named Plaintiffs and the proposed Class members are all participants or

20   beneficiaries in the CPES ESOP, as defined by ERISA Section 3(7) and (8), 29 U.S.C. §

21   1002(7) and (8), who were vested in shares of CPES allocated to their accounts in the Plan.

22   There are believed to be in excess of 1,300 current and former CPES-AZ employees who are

23   participants or their beneficiaries in the CPES ESOP.

24   37.    Plaintiff Robert Bennetti is a former employee of CPES-AZ. Mr. Bennetti is a

25   participant of the CPES ESOP within the meaning of ERISA Section 3(7), 29 U.S.C. §

26   1002(7). He resides in Tucson, Arizona.

27

28

1    38.    Plaintiff Linda Mariano is a former employee of CPES-AZ. Ms. Mariano is a
2  participant of the CPES ESOP within the meaning of ERISA Section 3(7), 29 U.S.C. §
3  1002(7). She resides in Tucson, Arizona.

4    39.    Plaintiff Linki Peddy is a former employee of CPES-AZ. Ms. Peddy is a
5  participant of the CPES ESOP within the meaning of ERISA Section 3(7), 29 U.S.C. §
6  1002(7). She resides in Tucson, Arizona.

7    ***B.    The Defendants***

8    40.    Defendant Mark G. Monson is believed to now be a resident of Wisconsin and
9  to reside in or around Land O' Lakes, Wisconsin. Defendant Monson is subject to the
10  jurisdiction and venue of this Court under ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2).

11    41.    Defendant David Johnson is a resident of Arizona and resides in or around
12  Tucson, Arizona. Defendant Johnson is subject to the jurisdiction and venue of this Court
13  under ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2).

14    42.    Defendant Douglas Zimmerman is a resident of Arizona and a resides in or
15  around Tucson, Arizona. Defendant Zimmerman is subject to the jurisdiction and venue of this
16  Court under ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2).

17    43.    Defendant Alberto J. Tarajano is believed to be a resident of either Florida or
18  North Carolina and resides either in or around Key Biscayne, Florida or Chapel Hill, North
19  Carolina. He is subject to the jurisdiction and venue of this Court pursuant to 28 U.S.C. § 1390,
20  29 U.S.C. § 1132(e)(2).

21    ***C.    The Board Defendants***

22    44.    At all times relevant, Defendant Johnson (as Chairman of the CPES Board of
23  Directors), Defendant Monson (as CPES Chief Executive Officer), and Defendant
24  Zimmerman were members of the Board of Directors of CPES-AZ (collectively, the "Board
25  Defendants").

26    45.    As more fully described herein, the Board Defendants were and have been
27  fiduciaries of the CPES ESOP within the meaning of ERISA Section 3(21)(A), 29 U.S.C. §
28  1002(21)(A).

1     **D.    _The CPES ESOP_**

2     46.    Since 1994, all of the shares of CPES capital stock have been held by the CPES

3     ESOP. The present CPES ESOP was adopted as an amendment and restatement of the

4     Community Psychology & Education Services, Ltd. Employee Stock Ownership Plan, which

5     originally was adopted on May 31, 1995, effective as of July 1, 1994. As of July 1, 2004, the

6     CPES ESOP was renamed the CPES Employee Stock Ownership Plan.

7     47.    Nominal Defendant the CPES ESOP is an "employee pension benefit plan"

8     within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A). The CPES ESOP

9     is a "defined contribution plan" within the meaning of ERISA Section 3(34), 29 U.S.C. §

10    1002(34), and an employee stock ownership plan under ERISA Section 407(d)(6), 29 U.S.C.

11    § 1107(d)(6), that was intended to meet the requirements of Section 4975(e)(7) of the Internal

12    Revenue Code (the "Tax Code") and IRS Regulations § 54.4975-11. The CPES ESOP is a

13    stock bonus plan under 29 U.S.C. § 401(a). The CPES ESOP Trust established under the CPES

14    ESOP was designed to invest primarily in CPES Stock.

15    48.    The CPES ESOP is named as a nominal defendant pursuant to Federal Rule of

16    Civil Procedure 19 to ensure that complete relief can be granted as to Plaintiffs' claims and

17    those brought on behalf of the Class.

18    49.    The written instrument by which the CPES ESOP is maintained within the

19    meaning of ERISA Section 402, 29 U.S.C. § 1102, is the "Community Provider of Enrichment

20    Services, Inc. Employee Stock Ownership Plan, as Amended and Restated, Effective January

21    1, 2015 (Except as otherwise indicated herein)", including "Amendments 1-4 incorporated into

22    Plan Document" (collectively, the "CPES ESOP Plan Document").

23    50.    Essentially, after an employee satisfies certain eligibility requirements under the

24    CPES ESOP Plan Document, the employee automatically becomes a CPES ESOP participant

25    and thereafter becomes a beneficial owner of CPES through allocations of CPES stock

26    pursuant to the terms of CPES ESOP Plan Document, ERISA, and the U.S. Tax Code. The

27    Plaintiffs and the proposed Class members have all satisfied the necessary eligibility

28    requirements and are vested participants in or beneficiaries of the CPES ESOP.

1    51.    The CPES ESOP is governed by ERISA, the CPES ESOP Plan Document, the

2    "CPES Employee Stock Ownership Trust Agreement", dated May 13, 2016 (the "CPES ESOP

3    Trust Agreement"), and the "CPES Employee Stock Ownership Plan Distribution Policy,

4    Effective for Distributions Made on/After October 23, 2019" (the "Distribution Policy"), and,

5    to the extent not superseded by ERISA, Arizona state law.

6    52.    Notice of such governing documents was and is provided to the CPES ESOP

7    Participants in the "Summary Plan Description for the CPES Employee Stock Ownership Plan,

8    as Revised Effective October 1, 2016" (the "CPES ESOP Summary Plan Description").

9    53.    In summary, the CPES ESOP Plan Document and the CPES ESOP Plan Trust

10   Agreement describe the administration of the CPES ESOP, the holding of CPES-AZ stock

11   under trust, and the rights and obligations of certain individuals thereunder.

12   54.    The purpose of the CPES ESOP was "to enable participating [CPES-AZ]

13   Employees to share in the growth and prosperity of CPES[-AZ] and to provide Participants

14   with an opportunity to accumulate capital for their future economic security. The primary

15   purpose of the Plan [was] to enable [CPES ESOP] Participants to acquire stock ownership

16   interests in CPES[-AZ]". [CPES ESOP Plan Document, at Section 1 (Nature of Plan).] The

17   CPES ESOP also was designed, among other things, "[t]o provide Participants with beneficial

18   ownership of CPES[-AZ] Stock, substantially in proportion to their relative Compensation and

19   years of Credited Service". [*Id.*]

20   **E.     The CPES ESOP Plan Administrator**

21   55.    The Plan Administrator of the CPES ESOP has exclusive responsibility and

22   authority to control and manage the operation and administration of the Plan.

23   56.    Under the CPES ESOP Plan Document, CPES-AZ, the Plan Sponsor of the

24   CPES ESOP, was designated as the Plan Administrator. [CPES ESOP Plan Document, at

25   Section 2 (Definitions) ("CPES shall be the Plan Administrator (as defined in Section 3(16)(A)

26   of ERISA and Section 414(g) of the Code) for purposes of the reporting and disclosure

27   requirements of ERISA and the Code. See Section 16.(h).").]

28

1         57.    The duties of the CPES ESOP Plan Administrator are varied, and include, among

2 other things: (i) reviewing and signing the annual Form 5500; (ii) approving or rejecting

3 distributions to the CPES ESOP participants in accordance with the CPES ESOP Plan

4 Document and Trust Agreement; (iii) fixing Plan operational and compliance errors; (iv)

5 monitoring and ensuring adequate CPES ESOP participant education; (v) tracking, applying,

6 and communicating eligibility rules and actions to the CPES ESOP participants; (vi) selecting,

7 documenting, and evaluating Plan service providers; (vii) providing all Plan service providers

8 with complete and identical plan documentation; (viii) performing and documenting annual

9 reviews of all Plan service providers; (ix) assuring and documenting all Plan notifications and

10 communications to the CPES ESOP participants; (x) storing, maintaining, and assuring

11 compliance with the CPES ESOP Plan Document and Trust Agreement; (xi) ensuring annual

12 custodian issuance of 1099-R statements to all CPES ESOP participants; (xii) approving all

13 Plan expenses paid from Plan in accordance the CPES ESOP Plan Document and Trust

14 Agreement; (xiii) monitoring and benchmarking fees and expenses paid from Plan assets; (xiv)

15 reviewing and ensuring that billings and expenses are correct and accurate; and (xv)

16 responding to CPES ESOP participant or Plan sponsor questions in timely manner.

17         58.    Under ERISA Section 3(16)(A), 29 U.S.C. § 1002(16)(A), "the term

18 'administrator' means—(i) the person specifically so designated by the terms of the instrument

19 under which the plan is operated; (ii) if an administrator is not so designated, the plan sponsor

20 or (iii) in the case of a plan for which an administrator is not designated and a plan sponsor

21 cannot be identified, such other person as the Secretary may by regulation prescribe. *See also*

22 29 CFR § 2510.3-16.

23         59.    Under ERISA Section 3(16)(B), 29 U.S.C. § 1002(16)(B), "[t]he term 'plan

24 sponsor' means (i) the employer in the case of an employee benefit plan established or

25 maintained by a single employer.

26         60.    Under ERISA Section 3(5), 29 U.S.C. § 1002(5), "[t]he term 'employer' means

27 any person acting directly as an employer, or indirectly in the interest of an employer, in

28

1  relation to an employee benefit plan; and includes a group or association of employers acting

2  for an employer in such capacity."

3      61.     At all times relevant, the Board Defendants were persons acting indirectly in the

4  interest of any employer in relation to the CPES ESOP and controlled the actions of the CPES

5  ESOP Plan Administrator.

6      62.     The CPES ESOP Plan Document contemplates that an ESOP Administrative

7  Committee would administer the Plan. [CPES ESOP Plan Document, at Section 16(a) ("The

8  members of the Committee shall be the named fiduciaries with authority to control and manage

9  the operation and administration of the Plan. Members of the Committee need not be

10 Employees or Participants").]

11     63.     The CPES ESOP Plan Document also contemplates that the members of such

12 ESOP Administrative Committee would be ERISA fiduciaries. [*Id.*, at Section 16(c) ("The

13 Committee shall perform its duties under the Plan and the Trust Agreement solely in the

14 interests of the Participants (and their Beneficiaries). Any discretion granted to the Committee

15 under any of the provisions of the Plan or the Trust Agreement shall be exercised only in

16 accordance with rules and policies established by the Committee which shall be applicable on

17 a nondiscriminatory basis. The Committee shall have the sole and exclusive authority to

18 construe, interpret and apply the terms of the Plan. The Committee shall be given the greatest

19 possible deference permitted by law in exercise of such discretionary authority").]

20     64.     The CPES ESOP Administrative Committee, however, did not actually perform

21 the contemplated functions of such Committee and was illusory. The CPES Board of Directors

22 and the Board Defendants performed such functions instead.

23     65.     Thus, for example, while the CPES ESOP Plan Document contemplates that the

24 CPES ESOP Administrative Committee would conduct annual valuations of the fair market

25 value of CPES common stock for purposes of the annual Form 5500 filings and for other

26 purposes [*Id.*, at Section 2 (Definition of "Fair Market Value") ("The fair market value of

27 CPES Stock (and/or other Trust Assets as appropriate), as determined by the Committee in

28 good faith (as described in U.S. Treasury Department Regulations Section 54.4975-11(d)(5))

1   for all purposes under the Plan based upon a valuation by an independent appraiser (as defined

2   in Section 401(a)(28)(C) of the [U.S. Tax] Code) on an enterprise basis as of the Valuation

3   Date"), the CPES ESOP Administrative Committee did not actually perform the contemplated

4   functions of such Committee and was illusory. The CPES Board of Directors and the Board

5   Defendants instead performed such functions. Defendant Tarajano also conducted the annual

6   valuation of the fair market value of CPES common stock for purposes of the 2018 annual

7   Form 5500 filing and actively participated in and conspired with the CPES Board of Directors

8   and the Board Defendants in that regard and as set forth herein.

9       66.    Similarly, while the CPES ESOP Plan Document contemplates that the CPES

10  ESOP Administrative Committee would direct the CPES ESOP Trustee with respect to certain

11  functions [*see*, *e.g.*, *id.*, at Sections 5(c), 11, 13, 16(c), 16(e), 16(g), 16(i)], the CPES ESOP

12  Committee did not actually perform the contemplated functions of such Committee and was

13  illusory. The CPES Board of Directors and the Board Defendants instead performed such

14  functions. Again, Defendant Tarajano also conducted the annual valuation of the fair market

15  value of CPES common stock for purposes of the 2018 annual Form 5500 filing and actively

16  participated in and conspired with the CPES Board of Directors and the Board Defendants in

17  that regard and as set forth herein. Defendant Tarajano was not permitted under ERISA to take

18  directions that he knew or reasonably should have known violated ERISA.

19      67.    At all times relevant, Monson and the Board Defendants were acting as Plan

20  Administrator of the CPES ESOP and, as such, were ERISA fiduciaries.

21  **F.    *The Trustee Defendant***

22      68.    At all times relevant, Defendant Tarajano served as a trustee of the CPES ESOP

23  (the "Trustee Defendant").

24      69.    In or about January 2019, CPES-AZ contacted Defendant Tarajano for the

25  purpose of becoming an ESOP Trustee for the purposes of evaluating an offer made to CPES-

26  AZ for the purchase of either all of the stock of CPES-AZ or all of substantially all of the

27  assets of CPES-AZ, Novelles, and CPES-CA, and otherwise being the independent fiduciary

28  and trustee of the CPES ESOP. In or about April 2019, CPES-AZ hired Defendant Tarajano

1     to become the CPES ESOP Trustee. On or about August 6, 2019, CPES and the Board

2     Defendants later "papered" that hiring with a retention agreement notwithstanding that

3     Defendant Tarajano had assumed such duties in or about April 2019.

4         70.     On or about April 16, 2020, Defendant Tarajano abruptly "resigned" and the

5     Board Defendants replaced him with a successor ESOP Trustee (Miguel Paredes).

6         71.     Pursuant to Section 16 of the CPES ESOP Plan Document, the Trustee

7     Defendant is a named fiduciary of the CPES ESOP within the meaning of ERISA Section 402,

8     29 U.S.C. § 1102. Defendant Tarajano also was, at all times relevant, a fiduciary of the CPES

9     ESOP within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

10        72.     The Board Defendants also acted as a *de facto* CPES ESOP Trustee, especially

11    during the bankruptcy, to the extent that they controlled and/or directed any other CPES ESOP

12    Trustee. To that extent, the Board Defendants also are included as "Trustee Defendants".

13        **G.**     ***The DOE Defendants***

14        73.     Plaintiffs do not presently know the identity of other individuals involved in the

15    events described herein. When Plaintiffs ascertain the identities of those not currently named,

16    if any, Plaintiffs will either amend without leave as permitted or seek leave to join them under

17    their true names.

18                  **ADDITIONAL FACTUAL ALLEGATIONS**

19        74.     Plaintiffs allege the following additional allegations, based in part upon their

20    own discovery in the CPES bankruptcy proceeding and based upon the allegations of the

21    Liquidating Trustee's D&O Complaint.

22        75.     CPES experienced several non-ordinary course events that weakened its

23    financial position on or before a subset of Defendants originally filed the Bankruptcy

24    Proceeding in April of 2020.

25        76.     As alleged in the D&O Complaint, the Board Defendants here, "completely

26    abdicated their fiduciary duties in addressing" any of CPES's concerns over CPES-AZ's

27    liquidity and "grossly mismanaged CPES' financial affairs in critical times".

28                  **The Bank of the West Line of Credit**

1   77.    Up and until some point in 2019 when it was unilaterally closed by the bank,

2   CPES utilized a line of credit open with Bank of the West ("Line of Credit").

3   78.    The Line of Credit was integral to CPES's management of cash flow, which

4   comprised of somewhat unpredictable and delayed insurance reimbursements on the revenue

5   side and regular ordinary course obligation on the expense side.

6   79.    By way of example, one of the CPES's largest ordinary course expenses was

7   payroll, which according to the books and records reviewed by the Liquidating Trustee,

8   amounted to $2 million per pay period.

9   80.    Again, as a result of the unpredictable and delayed nature of their revenue, the

10  Line of Credit was essential to CPES's ability to timely meet those payroll obligations, as well

11  as other ordinary course expenses.

12  81.    Nevertheless, after Bank of the West closed the Line of Credit in 2019, the Board

13  Defendants failed to secure replacement financing from another financial institution,

14  evidencing that the Board Defendants had undertaken to liquidate the operations of CPES

15  rather than to continue the business operations of CPES.

16  82.    By way of example, the Board Defendants never retained a broker, investment

17  banker, or other professional to assist CPES in seeking replacement financing.

18  83.    Instead, the Board Defendants presumed, without any concrete data, advice, or

19  diligence, that no other financial institution would lend to CPES on a secured or unsecured

20  basis, and the Board Defendants instead sought to sell or liquidate the CPES assets.

21  84.    To be certain, although the CPES entities were experiencing liquidity issues,

22  their balance sheet was healthy and CPES owned a number of unencumbered real estate assets

23  that could have served as collateral for a new loan. CPES, acting through the Board

24  Defendants, chose to liquidate these assets instead of using them for such collateral.

25  85.    The Board Defendants never did obtain replacement financing for CPES.

26  **The Sale/Leaseback of the Debtors' Real Estate**

27  86.    In order to generate cash to meet operational shortfalls and allow the operations

28  of the business to be sold to third parties in pursuit of a plan to liquidate the business

operations, the Board Defendants authorized CPES-AZ to enter into a series of transactions where it sold between 30-32 Arizona properties (the "Properties") to CapGrow Holdings JV Sub IV LLC ("CapGrow") from 2018 through 2019 and contemporaneously leased the Properties back to continue their operations at those particular sites (collectively, the "Sale/Leaseback Transactions").

87.   The Sale/Leaseback Transactions were far outside the ordinary course of CPES's business and would not have been pursued other than to secure liquidity as part of the overarching goals of the CPES Board of Directors to wind down the corporate operations through sales to third parties.

88.   Despite the non-ordinary course nature of the Sale/Leaseback Transactions, the Board Defendants failed to engage any professionals to advise the Debtors in connection with the transactions.

89.   That error was particularly egregious given the liquidity issues that CPES were experiencing. CPES could hardly afford to part with assets without maximizing their value. Nor could they afford to take on any further onerous obligations. Moreover, and probably because no outside professional was involved, it does not appear that the Board Defendants gave any consideration to a sale of the enterprise at this critical juncture before parting with material assets. The Sale/Leaseback Transactions materially impaired the balance sheet of CPES and reduced the value achievable through any sale of the enterprise as a whole. The Sale/Leaseback Transactions also unnecessarily risked future revenue streams by subjecting the revenue-generating Properties to onerous lease terms, which, once in default, could be repossessed by the landlord.

90.   By way of example, the Board Defendants failed to retain (a) a broker or real estate agent to assist them with the marketing and sale of the Properties, (b) an appraiser to value the Properties, or (c) an accountant to conduct a feasibility study with respect to the lease obligations incurred by CPES in connection with the proposed Sale/Leaseback Transactions.

91.   Instead, and without the assistance of the proper professionals, the Board Defendants solicited offers from one or two known entities (as opposed to a running an orderly

1    sale process), exclusively relied on CapGrow's valuation of the Properties (as opposed to

2    independently assessing the value of the Properties), and committed CPES to obligations

3    beyond their ability to repay in the near-term (as opposed to negotiating affordable rental terms

4    or financial terms tied to revenue, for example).

5        92.    Even though the sale of the Properties provided for an immediate cash infusion,

6    the effects of that cash infusion were short-lived and CPES were back in the same financial

7    distress situation within a relatively short period.

8        93.    It is clear that the Board Defendants took the offer from CapGrow simply to

9    address CPES's short-term financial problems without regard to the long-term effects,

10   including the impact of the Sale/Leaseback Transactions on the value of the enterprise.

11       94.    Were it not for the imprudent and ill-advised Sale/Leaseback Transactions,

12   CPES would have had significantly higher going-concern value in their efforts to sell the

13   equity and/or assets of the enterprise.

14       95.    Furthermore, as a result of the Sale/Leaseback Transactions, CPES no longer

15   had significant real estate assets to secure replacement financing when Bank of the West

16   terminated the Line of Credit.

17       96.    CPES eventually defaulted on the leases with CapGrow.

18       97.    As further evidence of the poor terms of the leases, all but three (3) of the leases

19   with CapGrow were ultimately rejected in the Bankruptcy Proceeding, which resulted in

20   significant lease rejection damages against the bankruptcy estates.

21       98.    CapGrow filed proofs of claim in the CPES-AZ bankruptcy case for unpaid lease

22   payments and rejection damages totaling approximately $585,817.70.

23           **The Failed Pre-petition Sale to National Mentor Health Care, LLC**

24       99.    As a result of the Board Defendants' previous failures to secure replacement

25   financing and the reckless Sale/Leaseback Transactions, CPES was faced with no available

26   credit and growing operating expenses.

27       100.   Against this backdrop, the Board Defendants finally turned their attention to a

28   sale of the enterprise.

1    101.    Unfortunately, the Board Defendants did not act in a reasonably prudent manner

2 in their efforts to sell CPES's business as a going concern.

3    102.    Mr. Monson testified in the Bankruptcy Proceeding that National Mentor Health

4 Care, LLC ("Mentor") initially solicited him for a potential purchase of CPES's business

5 operations back in 2015 when he began his employment with CPES and prior to the financial

6 difficulties he oversaw.

7    103.    Beginning sometime in 2019 and continuing through approximately March or

8 April 2020, the CPES Board of Directors entertained at least one offer to purchase the stock

9 of CPES-AZ, including Novelles and CPES-CA, for at least $12,250,000 from National

10 Mentor Holdings, LLC, and believed to approximately be upwards of $15.05 per share.

11    104.    Emblematic of the same inappropriate decision-making of the Board Defendants

12 through the credit crunch described above, Mr. Monson testified in the Bankruptcy Proceeding

13 that, rather than retain and consult with professionals, he initiated contact with Mentor in 2019.

14 CPES (through the Board Defendants) and Mentor thereafter commenced negotiations.

15    105.    Prior to and during the Mentor sale negotiations, the Board Defendants did not

16 engage an investment banker or other professional sales consultant to assist with the marketing

17 and sale of CPES's business as a going concern.

18    106.    Nor did the Board Defendants run a prudent or appropriate sale process.

19    107.    Nor did the Board Defendants obtain a formal valuation or appraisal of CPES's

20 business as a going concern.

21    108.    Instead, the Board Defendants improperly relied on the 2018 year-end appraisal

22 conducted for purposes of ESOP reporting requirements to value the CPES-AZ stock.

23    109.    The 2018 year-end appraisal, a complex valuation created by an independent

24 appraisal firm, was not a proper or reliable valuation tool for valuing a business as a going

25 concern for a stock sale, nor conducted in an appropriate or permissible manner under ERISA.

26    110.    The 2018 year-end appraisal improperly valued the CPES-AZ stock at

27 approximately $12.00 per share.

28

1    111.    Mentor's initial purchase offer is believed to have valued the CPES at

2    approximately $15.00 per share, or roughly $13,686,525.

3    112.    After the Board Defendants had engaged in approximately six months of

4    negotiations with Mentor without the assistance of experienced investment banking or other

5    sales professionals, Mentor advised the Board Defendants that it no longer wished to pursue

6    the sale in late March or early April of 2020.

7    113.    The Board Defendants made no efforts to identify an alternative buyer for either

8    CPES's equity or their assets.

9    114.    In or about January 2019, CPES-AZ apparently contacted Defendant Tarajano

10    for the purpose of becoming the ESOP Trustee and ostensibly to evaluate the Mentor offer.

11    115.    In or about April 2019, CPES-AZ (through the Board Defendants) hired

12    Defendant Tarajano to become the CPES ESOP Trustee.

13    116.    On or about August 6, 2019, CPES and the Board Defendants later retroactively

14    "papered" that hiring with a retention agreement notwithstanding that Defendant Tarajano had

15    assumed such duties in April 2019.

16    117.    As set forth in the Tarajano Trustee Services Agreement, the Board Defendants

17    were "evaluating a transaction or series of transactions whereby National Mentor Holdings

18    LLC or its affiliate … would either (a) acquire the stock of the Company [CPES] from the

19    CPES Employee Stock Ownership Trust [], which implements and forms a part of the CPES

20    Employee Stock Ownership Plan [] or (b) acquire all or substantially all of the assets of the

21    Company [CPES] and its Subsidiaries [Novelles and CPES California]". [Tarajano Trustee

22    Services Agreement, dated August 6, 2019, at Recital 1.]

23    118.    In addition to all of the powers and obligations under the CPES ESOP Plan

24    Document and the CPES ESOP Trust Agreement, Defendant Tarajano was required to engage

25    a qualified independent appraiser so that he could evaluate the proposed transaction. [*Id*., at

26    Section 3.] Instead, either at the insistence of the CPES Board of Directors or with their

27    consent, Defendant Tarajano used an appraiser (Brueggeman and Johnson Yeanoplos, P.C.)

28

1   that already had been hired by the CPES Board of Directors and had been used by CPES-AZ

2   to conduct valuations of CPES-AZ for a number of previous years.

3       119.   Based upon the sworn testimony of Defendant Tarajano in the Bankruptcy

4   Proceeding, the initial proposed appraisal conducted by Brueggeman and Johnson Yeanoplos,

5   P.C., in approximately early May, 2019, valued the shares of CPES-AZ at $5.92 per share, or,

6   based upon 912,435 issued and outstanding shares of CPES-AZ, valued CPES-AZ at

7   approximately $5,401,615.20.

8       120.   The Trustee Defendants and the Board Defendants, however, improperly

9   inflated and increased that valuation to $12.04 per share, or, based upon 912,435 issued and

10  outstanding shares of CPES-AZ, valued CPES-AZ at approximately $10,990,000. Without

11  justification or excuse, they unilaterally changed or caused to be changed the methodologies

12  and methods of appraisals previously used by Brueggeman and Johnson Yeanoplos, P.C. from

13  a combination of Discounted Cash Flow method (weighed at 75%) and Guideline Public

14  Companies method (weighed at 25%) to a 100% weighted asset-based method, and included

15  incorrect assumptions and contained errors, including improperly subscribing value to the

16  CPES workforce as an intangible asset in violation of accepted and best practices.

17      121.   The appraisal of CPES-AZ as of December 31, 2018, formed the basis of the

18  CPES ESOP's 2018 year-end Form 5500 filing with the DOL on or about October 10, 2019,

19  and signed by Defendant Monson. The 2018 Form 5500 for the CPES ESOP sets forth that, as

20  of December 31, 2018, the CPES shares of common stock owned by the CPES ESOP

21  Participants were valued by the CPES ESOP Board of Directors and the ESOP Trustees at

22  $12.04. That share price was then promoted on the CPES website with the claim that "our

23  share price has recently increased by 18.74%" (formerly https://www.cpes.com/employees)

24  until the CPES website was removed. The publicly available report filed with the DOL shows

25  the aggregate value of CPES shares as of December 31, 2018 as $10,985,723, and the number

26  of shares of company stock held by the CPES ESOP as 912,435, consistent with the $12.04

27  per share price on the statements therein.

28

122.    Based upon that inflated appraisal, Defendants caused CPES-AZ to pay inflated
distributions to certain CPES ESOP participants in an amount to be further determined at trial
but believed to be in excess of $327,304.29. CPES-AZ and the CPES ESOP are believed to
have paid in excess of $644,299.78 in distributions based upon the 2018 Form 5500 valuation.
As such, the approximate amount of the overpaid distributions based upon that valuation is at
least $327,304.29.

123.    Consistent with this, on May 28, 2020, at the initial 341(a) Meeting of Creditors
in the bankruptcy proceeding, CPES CEO Defendant Monson, was questioned, and, among
other things, provided sworn information (i) that the Debtors' management had been trying to
sell CPES for many months; (ii) that CPES was going to file motions to sell CPES through a
Section 363 sale; and (iii) that 2018 year-end valuation of CPES upon which the CPES ESOP
2018 Form 5500 was based was intentionally inflated.

124.    In addition, on May 28, 2020, at the initial 341(a) Meeting of Creditors in the
Bankruptcy Proceeding, Defendant Monson testified that, prior to the Board Defendants' and
Trustee Defendants' acceptance and approval of the valuation of CPES as of December 31,
2018, the independent appraiser for the CPES ESOP servicing the Trustee Defendants
identified an approximately forty (40%) reduction in the fair market value of the CPES stock
held by the CPES ESOP from the previous year as appropriate for December 31, 2018,
consistent with Defendant Tarajano's testimony of a proposed reduction in value from $10.14
per share in 2017 to $5.92 per share in 2018. The change in valuation methodology
implemented by Defendant Tarajano, Defendant Monson, the Board Defendants and the
Trustee Defendants resulted in an increase in value by approximately 23% from the previous
year, a sixty-three percent (63%) difference from what Defendant Monson testified the CPES
stock was worth as of December 31, 2018, during his May 28, 2020, testimony. The 2018
Form 5500 audit report reflects this shift in valuation methodology, stating:

> As of December 31, 2018, the appraisal was based upon the cost or asset
> approach. The appraiser took into account the sponsor's individual assets and
> liabilities and adjusting them to reflect their fair value.

As of December 31, 2017, the appraisal was based upon a combination of the market and income valuation techniques consistent with prior years. The appraiser took into account historical and projected cash flow and net income, invested capital, weighted average cost of capital, and market comparables.

[2018 Form 5500, p. 29 of 36.]

125.    The CPES Board of Directors and the Board Defendants refused to assist the Plaintiffs and the ESOP Participants to further corroborate this information. Moreover, until on or after December 16, 2022, the CPES Plan Administrator, namely, the CPES Board of Directors and the Board Defendants, failed to provide the CPES ESOP participants, including the Plaintiffs and the proposed Class, with their CPES ESOP participant account statements since the 2018 ESOP Plan year, in 2019.

**Management's Failure to Secure CARES Act Relief**

126.    CPES's largest obligation was payroll, which cost the Debtors $2 million per pay period.

127.    Based on the Liquidating Trustee's investigation, despite widely publicized forgivable federal loans and tax credits available to CPES, the Board Defendants made little effort to secure such funding.

128.    CPES's CFO, Mr. Zimmerman, testified in the Bankruptcy Proceeding that he was not involved in any application process.

129.    As a result, and similar to the line of credit woes discussed above, the Board Defendants did not secure any relief on behalf of CPES.

130.    Nor does it appear that the Board Defendants took any measures to address their mounting liabilities in the face of the Pandemic.

131.    Indeed, as the Liquidating Trustee represents, it does not appear from the minutes of the CPES Board of Directors' meetings that the Board Defendants considered any revenue maximizing alternatives or cost-cutting measures in the wake of the Pandemic, and that when all other businesses around the globe were scrambling to find ways to keep their businesses afloat, it does not appear that the Board Defendants considered any such efforts.

1   The Board Defendants were intent on liquidating the business operations long prior to this

2   time and did not consider the benefits of the Pandemic relief that was available to any of the

3   CPES entities during this period based on its payroll that remained.

4      132.   Had they engaged in any customary triage efforts whatsoever, however, CPES

5   could have bought enough time to have engaged in an out of court sale process that would

6   have saved at least the outsized administrative expenses attendant to the Bankruptcy

7   Proceeding, including, without limitation, the costs of the Liquidating Trustee and unnecessary

8   attorneys' fees and expenses.

9                                      **The Bankruptcy Filings**

10     133.   Instead, on April 24, 2023, the Board Defendants authorized CPES-AZ's and

11  Novelles's voluntary petitions for relief under chapter 11 of the Bankruptcy Code (and then

12  for CPES-CA at the urging of Mentor).

13     134.   Ultimately, Mentor purchased the assets of the Debtors out of bankruptcy for

14  $9.35 million, a roughly thirty-two percent (32%) discount off their original purchase price for

15  the equity.

16     135.   To date, the Debtors' bankruptcy estate has incurred in excess of $3 million in

17  administrative expenses and other attorneys' fees and costs that would not have been incurred

18  but for the Bankruptcy Proceeding.

19     136.   Were it not for the Board Defendants' failures, including, without limitation,

20  their failures to engage appropriate professionals to assist them with evaluating their options

21  for resolving their liquidity issues, formally market the equity/assets of CPES, and run a

22  prudent and appropriate sale process, CPES could have achieved a much higher gross sales

23  price and avoided the attendant multiple seven figure administrative (and other) expenses

24  resulting from the Bankruptcy Proceeding.

25     137.   As a direct and proximate result of the Board Defendants' gross negligence and

26  mismanagement of CPES, Plaintiffs and Class members have been irreparably damaged.

27     138.   At all times relevant, Monson and the Board Defendants acted directly and

28  indirectly in the interest of CPES-AZ, the Plan Sponsor and Plan Administrator, in relation to

1    the CPES ESOP and the Plan Administrator's failure to provide annual participant account

2    statements to the ESOP participants after the 2018 Plan year.

3        139.    Moreover, the Board Defendants, as members of the CPES Board of Directors

4    responsible for monitoring the Trustee Defendants, failed to monitor the Trustee Defendants

5    and, more egregiously, knowingly participated in the Trustee Defendants' breaches of ERISA

6    fiduciary duty and conspired with them. Despite actual knowledge of the improper and

7    incorrect 2018 year-end valuation, the Board Defendants and the Trustee Defendants have not

8    taken any action to properly protect the CPES ESOP participants from the inflated valuation

9    of the CPES stock held by the CPES ESOP. No action has been taken to correct the 2018 year-

10   end valuation and the 2018 Form 5500 filing.

11                    **CLASS ACTION ALLEGATIONS**

12       140.    Plaintiffs bring certain of these claims for (i) plan-wide relief pursuant to ERISA

13   Section 502(a)(2), 29 U.S.C. § 1132(a)(2), (ii) for relief against any Defendant, whether acting

14   in a fiduciary or a non-fiduciary capacity, under ERISA Section 502(a)(3), 29 U.S.C. §

15   1132(a)(3), and (iii) as a class action pursuant to Federal Rule of Civil Procedure 23(a) and on

16   behalf of the following Class:[3]

17       All participants in the CPES ESOP on or after December 31, 2018, who
18       vested under the terms of the CPES ESOP, and those participants'
         beneficiaries, excluding Defendants and their immediate family members;
19       any fiduciary of the Plan; the directors of CPES or of any entity in which a
         Defendant has a controlling interest; and any legal representatives,
20       successors, and assigns of any such excluded persons.

21

22       141.    ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), provides that "[a] civil action

23   may be brought ... by a participant, beneficiary or fiduciary for appropriate relief under

24   [ERISA Section 409, 29 U.S.C.] section 1109." In turn, ERISA Section 409(a), 29 U.S.C. §

25   1109(a), states that any fiduciary with respect to an ERISA plan who breaches "any of the

26   responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter *shall be*

27   _____

28   [3] Plaintiff reserves the right to revise the class definition, and to propose other or additional classes or sub-
     classes in subsequent pleadings or a motion for class certification, after discovery in this action.

1  *personally liable to make good to such plan any losses resulting from each such breach*."
2  (Emphasis supplied.)

3      142.    The Supreme Court has explained that Plaintiffs' ERISA Section 502(a)(2), 29
4  U.S.C. § 1132(a)(2), claims are necessarily "brought in a representative capacity on behalf of
5  the plan as a whole." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 (1985). In other
6  words, the relief Plaintiffs seek pursuant to ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2),
7  "inures to the benefit of the plan *as a whole*". *Id.* at 140.

8      143.    *LaRue v. DeWolff, Boberg, and Associates, Inc.*, 552 U.S. 248 (2008), which
9  involved a defined contribution plan like the CPES ESOP, further demonstrated that "[ERISA]
10  §§ 409(a) and 502(a)(2) [29 U.S.C. §§ 1109 and 1132(a)(2)] permit recovery of *all* plan losses
11  caused by a fiduciary breach." *LaRue*, 552 U.S. at 261 (Thomas, J., concurring).

12      *A.      Numerosity*

13      144.    The members of the Class are so numerous that joinder of all members is
14  impracticable. According to the ESOP's 2018 Form 5500 filed with the DOL on October 10,
15  2019, as of December 31, 2018, there were 1,323 participants at the beginning of the 2018
16  Plan year and 1,177 participants with account balances within the meaning of ERISA Section
17  3(7), 29 U.S.C. § 1002(7), in the ESOP at the end of 2018.

18      145.    According to the ESOP's 2019 Form 5500, belatedly filed with the DOL on
19  April 23, 2021 – it was due to be filed no later than October 15, 2020 – as of December 31,
20  2019, there were 1,315 participants at the beginning of the 2019 Plan year and 1,248
21  participants with account balances within the meaning of ERISA Section 3(7), 29 U.S.C. §
22  1002(7), in the ESOP at the end of 2019.

23      146.    As of the date hereof, as set forth on the DOL's eFast2 website, the Plan
24  Administrator for the CPES ESOP has failed to file an IRS Form 5500 for the 2020 and 2021
25  Plan years, which such filing was due for plan year 2020 no later than October 15, 2021, and
26  for plan year 2021 no later than October 17, 2022. Only on or after December 16, 2022, did
27  the Plan Administrator belatedly provided the CPES ESOP participants with their ESOP
28  account statements for Plan years 2019, 2020, and 2021, the first such statements since the

1  Plan Administrator provided them with their 2018 ESOP account statements at some point in

2  2019.

3  **B.  *Commonality***

4  147.  The issues of liability are common to all members of the Class and are capable

5  of common answers, as those issues primarily focus on Defendants' acts or failure to act.

6  Questions of law and fact common to the Class as a whole include the following:

7  a.  Whether Defendants dealt with the assets of the CPES ESOP in their own

8  interest or for their own account or received any consideration for their own account from any

9  party dealing with the CPES ESOP in connection with the valuation of CPES-AZ as of

10  December 31, 2018, the 2018 From 5500 and any distributions made thereunder, the

11  Bankruptcy Proceeding, and any other or related transactions.

12  b.  Whether Defendants, in discharging their responsibilities as ERISA and

13  state law fiduciaries with respect to valuation of CPES as of December 31, 2018, the 2018

14  From 5500 and any distributions made thereunder, the Bankruptcy Proceeding, and any other

15  or related transactions, acted solely in the best interests of the CPES ESOP participants, acted

16  for the exclusive purpose of providing benefits to the CPES ESOP participants, and/or acted

17  with the care, skill, prudence, and diligence under the circumstances then prevailing that a

18  prudent person acting in a like capacity and familiar with such matters would use in the conduct

19  of an enterprise of a like character and with like aims.

20  c.  Whether Defendants, through their failure to discharge their

21  responsibilities as fiduciaries in connection with the valuation of CPES-AZ as of December

22  31, 2018, the 2018 From 5500 and any distributions made thereunder, the Bankruptcy

23  Proceeding, and any other or related transactions, enabled other fiduciaries to breach their

24  duties to the Plan or, having knowledge of a breach by such other fiduciary, failed to make

25  reasonable efforts under the circumstances to remedy their breaches of fiduciary duties or those

26  of others.

27  d.  Whether Defendants used the Bankruptcy Proceeding to shield

28  themselves from personal liability for their actions, including, without limitation, the

1   sheltering of officers and directors and fiduciaries, the wasting of the assets of CPES-AZ,

2   Novelles, and CPES-CA, and the wasting of the retirement plans of the Plaintiffs and Class

3   members.

4              e.      Whether the Board Defendants, in discharging their responsibilities as

5   ERISA and state law fiduciaries, by, *inter alia*, (i) failing to properly address CPES' mounting

6   financial troubles; (ii) failing to undertake adequate due diligence replacement financing for

7   CPES' Bank of the West line of credit; (iii) engaging in the sale/leaseback of CPES' real estate;

8   (iv) failing to appropriately and properly act in a reasonably prudent manner in their efforts to

9   sell CPES as a going concern; and (v) filing the Bankruptcy Proceeding, acted in a grossly

10  negligent manner and acted solely in the best interests of the CPES ESOP participants, acted

11  for the exclusive purpose of providing benefits to the CPES ESOP participants, and/or acted

12  with the care, skill, prudence, and diligence under the circumstances then prevailing that a

13  prudent person acting in a like capacity and familiar with such matters would use in the conduct

14  of an enterprise of a like character and with like aims..

15             f.      The appropriate remedies as a result of Defendants' fiduciary breaches

16  and prohibited transactions, and other violations of ERISA.

17     *C.*     *Typicality*

18     148.   Plaintiffs' claims are typical of those of the Class because their claims arise from

19  the same events, practices, and/or course of conduct. For example, Plaintiffs' claims, on behalf

20  of the Class, allege that Defendants engaged in prohibited transactions or breaches of fiduciary

21  duty in connection with the valuation of CPES as of December 31, 2018, the 2018 From 5500

22  and any distributions made thereunder, and any other or related transactions that adversely

23  affected the ESOP and all of the ESOP participants. Similarly, Plaintiffs' claims, on behalf of

24  the Class, allege that the Board Defendants violated ERISA by (i) failing to properly address

25  CPES' mounting financial troubles; (ii) failing to undertake adequate due diligence

26  replacement financing for CPES' Bank of the West line of credit; (iii) engaging in the

27  sale/leaseback of CPES' real estate; (iv) failing to appropriately and properly act in a

28  reasonably prudent manner in their efforts to sell CPES as a going concern; (v) failing to

1   consider and secure CARES Act relief; and (vi) filing the Bankruptcy Proceeding. Plaintiffs'

2   claims also are typical of the claims of the Class, because they generally seek recovery and

3   relief on behalf of the Plan.

4       **D.**     ***Adequacy***

5       149.   Plaintiffs will fairly and adequately represent and protect the interests of the

6   Class.

7       150.   Plaintiffs do not have any interests antagonistic to or in conflict with those of the

8   Class.

9       151.   Defendants do not have any unique defenses that would interfere with Plaintiffs'

10  representation of the Class.

11      152.   Plaintiffs have retained legal counsel competent and experienced in complex

12  class actions, ERISA, and/or employee benefits litigation and with particular experience and

13  expertise in ESOP litigation of this kind.

14      **E.**     ***Fed. R. Civ. P. 23(b)(1)(A)***

15      153.   Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(1)(A).

16  Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to

17  all similarly situated participants and to act in the best interests of the Plan and its participants.

18  This action challenges whether Defendants acted consistently with their fiduciary duties or

19  otherwise violated ERISA as to the CPES ESOP as a whole, not on an individualized-account

20  CPES ESOP participant basis. As a result, the prosecution of separate actions by individual

21  members would create the risk of inconsistent or varying adjudications that would establish

22  incompatible standards of conduct relating to the Plan.

23      **F.**     ***Fed. R. Civ. P. 23(b)(1)(B)***

24      154.   Class certification also is appropriate pursuant to Fed. R. Civ. P. 23(b)(1)(B).

25  Administration of an ERISA-covered plan requires that all similarly situated participants be

26  treated the same. Resolving whether Defendants fulfilled their ERISA fiduciary obligations to

27  the Plan would, as a practical matter, be dispositive of the interests of the other participants in

28  the CPES ESOP even if they are not parties to this litigation and would substantially impair or

1    impede their ability to protect their interests if they are not made parties to this litigation by

2    being included in the Class.

3          **G.**    **Fed. R. Civ. P. 23(b)(2)**

4         155.   Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(2). Defendants

5    have acted or refused to act on grounds generally applicable to the Class, making declaratory

6    and injunctive relief appropriate with respect to Plaintiffs and the Class as a whole. This action

7    challenges whether Defendants acted consistently with their ERISA and state law fiduciary

8    duties and thereby violated ERISA as to the ESOP as a whole, not on an individualized-

9    account CPES ESOP participant basis. The members of the Class are entitled to declaratory

10   and injunctive relief to remedy Defendants' violations. As ERISA is based on trust law, any

11   monetary relief consists of equitable monetary relief and is either provided directly by the

12   declaratory or injunctive relief or as a necessary consequence of that relief.

13         **H.**    **Fed. R. Civ. P. 23(b)(3)**

14        156.   The requirements of Fed. R. Civ. P. 23(b)(3) also are satisfied. Common

15   questions related to liability will necessarily predominate over any individual questions

16   precisely because Defendants' duties and obligations were uniform to all ESOP participants

17   and therefore to all members of the Class. Plaintiffs and all Class members have been harmed

18   by Defendants' ERISA fiduciary breaches. As relief and any recovery will be on behalf of the

19   Plan, common questions as to remedies will likewise predominate over any individual issues.

20        157.   A class action is a superior method to other available methods for the fair and

21   efficient adjudication of this action. As the claims herein are brought on behalf of the Plan,

22   resolution of the issues in this litigation will be efficiently resolved in a single proceeding

23   rather than multiple proceedings, each of which could seek recovery for the entire Plan. The

24   amounts recoverable by individual Class members are small compared to the expense and

25   burden of individual prosecution of this action. In addition, class certification is superior

26   because it will obviate the need for unduly duplicative litigation which might result in

27   inconsistent judgments about Defendants' ERISA fiduciary duties with regard to the ESOP

28   and otherwise.

158. The following factors set forth in Rule 23(b)(3) also favor certification of this case as a class action:

a. The members of the Class have an interest in a unitary adjudication of the issues presented in this action for the reasons that this case should be certified under Rule 23(b)(1).

b. No other litigation concerning this controversy has been filed by any other member(s) of the Class.

c. There are no anticipated difficulties in managing this case as a class action.

d. This District is the most desirable location for concentrating the litigation for reasons that include, but are not limited to the following: (i) CPES-AZ was headquartered in this District; (ii) the CPES ESOP was administered in this District; (iii) certain non-party witnesses are located in this District; and (iv) most the Defendants and Class members reside, work, and/or transact business in this District.

159. ERISA allows an action to be brought on behalf of a Class of participants in and beneficiaries of the CPES ESOP to restore losses to the CPES ESOP, disgorge any profits, and to obtain other remedies arising out of the current and former fiduciaries' breaches of fiduciary duties and other violations of ERISA. Plaintiffs seek to enforce their rights and those of other participants in the Plan under ERISA, to recover the losses incurred by the Plan as a result of the breaches of fiduciary duty or other violations of ERISA, and to ensure that the Plan and its assets have been properly administered. Among the relief sought for these breaches and violations, Plaintiffs request that the breaching fiduciaries be ordered to pay the losses to the Plan, to disgorge any profits, that the Court order other remedial and equitable relief, and that any monies recovered for the Plan be allocated to the accounts of the Class Participants.

### CAUSES OF ACTION

### COUNT I
**Breaches of Fiduciary Duty Under ERISA Sections 404(a)(1)(A) and (B),
29 U.S.C. §§ 1104(a)(1)(A) and (B) – Inflated 2018 Year-End Valuation
and Associated Distributions Made in Reliance Thereon
(All Defendants)**

160.    Plaintiffs hereby reallege and incorporate the allegations contained in paragraphs 1 through 159 as if the same has been set forth herein.

161.    ERISA Section 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries of a plan, (A) for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan, (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

162.    The fiduciary duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

163.    The duties of loyalty under ERISA Section 404(a)(1)(A) and prudence under ERISA Section 404(a)(1)(B) required the Trustee Defendants and to the extent that the Board Defendants or others directed the Trustee Defendants in connection with the 2018 year-end appraisal, the Board Defendants and others to undertake an appropriate investigation of the fair market value of CPES stock in the 2018 year-end valuation in order to fulfill their fiduciary duties. Among other things, Trustee Defendants and the Board Defendants were required to conduct a thorough and independent review of any "independent appraisal", to make certain that reliance on any and all valuation experts' advice was reasonably justified under the circumstances of the 2018 year-end valuation; to make an honest, objective effort to read and understand the valuation reports and opinions and question the methods and assumptions.

164.    The Trustee Defendants and the Board Defendants were required to undertake an appropriate and independent investigation of the fair market value of CPES as of December 31, 2018, in order to fulfill their respective fiduciary duties, and an appropriate investigation would have revealed that the valuation used for December 31, 2018, did not reflect the fair market value of the CPES stock held by the CPES ESOP.

165.   ERISA requires that the fair market value of the CPES ESOP's asset be determined in good faith by the trustee or named fiduciary. ERISA further requires that the trustee or named fiduciary conducted a prudent investigation to determine the fair market value of the asset.

166.   The Trustee Defendants, and the Board Defendants knew that the change in methodologies and errors and mistakes in the 2018 year-end valuation turned an estimated forty-percent reduction in fair market value to an estimated sixty-three percent increase. These fiduciaries knew that the 2018 year-end valuation did not reflect the fair market value of the CPES stock, was not in the best interests of the Plan participants, and that distributions made on the improper valuation would cause losses to the ESOP.

167.   Defendant Tarajano knew or reasonably should have known that, to the extent he was being directed by the Board Defendants or anyone else, such directions violated ERISA and that he should not have followed such directions. Nonetheless, he did.

168.   Following the inflated valuation, the CPES ESOP made benefit payments based on that valuation. Payments made on an inflated valuation will necessarily be inflated by a factor equal to the over valuation. By Defendant Monson's testimony, that over-valuation could be as high as 63%. Plaintiffs and the ESOP participants suffered losses to the value of their shares of CPES capital stock based on these overpayments.

169.   By failing to make appropriate and independent investigation of the fair market value of CPES as of December 31, 2018, the Trustee Defendants and the Board Defendants breached their fiduciary duties under ERISA Sections 404(a)(1)(A) & (B), 29 U.S.C. § 1104(a)(1)(A) & (B).

170.   Furthermore, the Board Defendants were required to appoint an ESOP trustee or trustees who would discharge his or her duties to the Plan with the loyalty, care, skill, prudence, and diligence required under ERISA. Instead they appointed the Trustee Defendants, who violated ERISA in approving the December 31, 2018 valuation as described herein.

171.   In addition, under ERISA Sections 404(a)(1)(A) and (B), a fiduciary with the authority to appoint and/or remove other fiduciaries has an obligation to undertake an

1   appropriate investigation that the fiduciary is qualified to serve in the position as fiduciary and

2   at reasonable intervals to ensure that the fiduciary who has been appointed remains qualified

3   to act as fiduciary and is acting in compliance with the terms of the Plan and in accordance

4   with ERISA.

5       172.   According to Section 16 of the CPES ESOP Plan Document, CPES "has the sole

6   authority to appoint and remove the Trustee". Pursuant to that authority, Defendant Monson

7   and the Board Defendants had a duty to monitor the CPES ESOP Trustees' conduct and to

8   take appropriate action if the Trustee(s) and ESOP Committee were not adequately protecting

9   the interests of CPES ESOP participants, including removing the CPES ESOP Trustees and

10  correcting any breaches.

11      173.   Defendant Monson, the Board Defendants, and the Trustee Defendants knew or

12  in the exercise of reasonable diligence should have known that the Trustee Defendants

13  breached their fiduciary duties in that the 2018 year-end valuation did not reflect fair market

14  value for the stock of CPES and took no steps to protect the CPES ESOP participants or to

15  otherwise remedy the violations.

16      174.   Indeed, Defendant Monson, the Board Defendants, and the Trustee Defendants

17  have taken no steps to protect the CPES ESOP participants from these breaches, including, but

18  not limited to, stopping or delaying the 2018 year-end valuation, removing the CPES ESOP

19  Trustees and/or remedying these breaches.

20      175.   By failing to properly monitor and/or take appropriate action against the Trustee

21  Defendants, Defendant Monson and the Board Defendants have breached their fiduciary duties

22  under ERISA Sections 404(a)(1)(A) & (B), 29 U.S.C. § 1104(a)(1)(A) & (B).

23      176.   ERISA Section 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who

24  is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations,

25  or duties imposed on fiduciaries by Title I of ERISA shall be *personally liable to make good*

26  to the plan any losses to the plan resulting from each such breach, and additionally is subject

27  to such other equitable or remedial relief as the court may deem appropriate, including removal

28  of the fiduciary. (Emphasis added.)

1      177.    ERISA Section 502(a), 29 U.S.C. § 1132(a), permits a plan participant to bring

2  a suit for relief under ERISA Section 409 and to obtain appropriate equitable relief to enforce

3  the provisions of Title I of ERISA or to enforce the terms of a plan.

4      178.    The Trustee Defendants, Defendant Monson and the Board Defendants have

5  caused losses to the Plan by their breaches of fiduciary duty in amounts to be proved

6  specifically at trial.

7      179.    An appropriate investigation by the Trustee Defendants and the Board

8  Defendants would have revealed that the 2018 year-end valuation did not reflect the fair

9  market value of CPES-AZ, was inflated and contained mistakes, and that the 2018 year-end

10  valuation was not in the best interests of the CPES ESOP participants.

11      180.    An appropriate investigation by the Trustee Defendants and the Board

12  Defendants would have revealed that the 2018 year-end valuation was conducted using an

13  asset-based methodology that deviated from the enterprise basis required under Section 2

14  (Definition of Fair Market Value) of the CPES ESOP Plan Document.

15      181.    By causing CPES-AZ and the CPES ESOP to distribute monies to certain CPES

16  ESOP Plan participants in improper and unjustifiable reliance upon the inflated 2018 year-end

17  valuation, the Trustee Defendants and the Board Defendants violated the terms of the ESOP

18  Plan Document and the ESOP Trust Agreement, breached their fiduciary duties under ERISA

19  Sections 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), and caused losses to the

20  CPES ESOP.

21      182.    To the extent that the Trustee Defendants acted at the direction of the Board

22  Defendants in accepting the improperly inflated 2018 year-end valuation and/or in distributing

23  monies to certain CPES ESOP Plan participants in improper and unjustifiable reliance upon

24  the inflated 2018 year-end valuation, the Board Defendants breached their fiduciary duties

25  under ERISA Sections 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), and caused

26  losses to the CPES ESOP.

27      183.    To the extent that the Trustee Defendants acted at the direction of the Board

28  Defendants or anyone else, the Trustee Defendants still had an obligation under ERISA

1  Section 403(a)(1), 29 U.S.C. § 1103(a)(2), to refuse to follow such direction that either violated

2  the terms of the CPES ESOP Plan Document or that violated ERISA.

3      184.    ERISA Section 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who

4  is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations,

5  or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good

6  to the plan any losses to the plan resulting from each such breach, and additionally is subject

7  to such other equitable or remedial relief as the court may deem appropriate, including removal

8  of the fiduciary.

9      185.    Following the inflated valuation, the CPES ESOP made benefit payments based

10  on that valuation. Payments made on an inflated valuation will necessarily be inflated by a

11  factor equal to the over-valuation. By Defendant Monson's sworn testimony, that over-

12  valuation could be as high as 63%. Plaintiffs and the Class members suffered losses to the

13  value of their shares based on these overpayments.

14      186.    As a result, the Trustee Defendants and the Board Defendants breached their

15  duties under ERISA Sections 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B).

16      187.    The Trustee Defendants and the Board Defendants have caused losses to the Plan

17  by their breaches of fiduciary duty in amounts to be proved specifically at trial.

18                **COUNT II**
**Breaches of Fiduciary Duty Under ERISA Sections 404(a)(1)(A), (B) and (D),**
19  **29 U.S.C. §§ 1104(a)(1)(A), (B) and (D), for Failure to Remedy or**
**Correct the 2018 Year-End Valuation**
20  **(All Defendants)**

21

22      188.    Plaintiffs hereby reallege and incorporate the allegations contained in paragraphs

23  1 through 187 as if the same has been set forth herein.

24      189.    ERISA Section 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary

25  discharge his or her duties with respect to a plan solely in the interest of the participants and

26  beneficiaries of the plan, (A) for the exclusive purpose of providing benefits to participants

27  and the beneficiaries of the plan, (B) with the care, skill, prudence, and diligence under the

28  circumstances then prevailing that a prudent person acting in a like capacity and familiar with

1    such matters would use in the conduct of an enterprise of a like character and with like aims,

2    and (D) in accordance with the documents and instruments governing the plan to the extent

3    that such documents and instruments are consistent with ERISA.

4       190.   Section 16(c) of the CPES ESOP Plan Document provides that the CPES ESOP

5    Administrative Committee, and under circumstances applicable here, the Board Defendants,

6    may "engag[e] any administrative, legal, accounting, clerical or other services that it may deem

7    appropriate".

8       191.    Trustee Defendants also had the authority to engage any legal services they may

9    deem appropriate to assist in the performance of their duties. For example, Defendant

10   Tarajano's "Trustee Services Agreement" with CPES permits him authority to retain and rely

11   upon the advice of independent legal counsel. [Tarajano Trustee Services Agreement, at

12   Section 4.]

13      192.   Section C(8) of the CPES ESOP Trust Agreement provides the Trustee

14   Defendants with the authority to "sue, defend, compromise, arbitrate or settle any suit or legal

15   proceeding or any claim due it or on which it may be liable". As such, the Trustee Defendants

16   had the authority and obligation to institute a lawsuit against any fiduciary, including

17   themselves, who breached his or her ERISA fiduciary duties with respect to the 2018 year-end

18   valuation and were required to remedy any ESOP losses arising from such valuation, including

19   as necessary by employing counsel to bring a legal action to correct such ESOP losses from

20   those personal responsible for such ESOP losses (including themselves). By failing to institute

21   such a lawsuit, the Trustee Defendants breached their ERISA fiduciary duties.

22      193.   Sections 16(c)(9) and (10) of the CPES ESOP Plan Document grant to the CPES

23   ESOP Administrative Committee, and under the circumstances here, to the Board Defendants,

24   the power to "(9) review[] the performance of the Trustee with respect to the Trustee's

25   administrative duties, responsibilities and obligations under the Plan and Trust Agreement;

26   (10) select[] an independent appraiser and determining the Fair Market Value of CPES Stock

27   as of such dates as it determines to be necessary or appropriate."

28

194.    As a result of such powers, the CPES ESOP Administrative Committee, and under the circumstances here, the Board Defendants, had the power, authority and obligation to do one or more of the following: (1) inform the Trustee Defendants that the 2018 year-end valuation and distributions made in reliance thereon were inappropriate and impermissible and would need to be corrected; (2) inform the Board of Directors that the 2018 year-end valuation and distributions made in reliance thereon had likely violated ERISA and the terms of the Plan and recommend that the breaching fiduciaries be removed and replaced with fiduciaries who would correct the 2018 year-end valuation and associated distributions; and/or (3) take steps to correct the defects therein, including if necessary by instituting a lawsuit against any fiduciary, including themselves, who breached his or her duties in the 2018 year-end valuation and associated distributions. By failing to take such steps that would correct the defects in the 2018 year-end valuation and associated distributions, the Board Defendants breached their fiduciary duties.

195.    Section 13.05 of the CPES ESOP Plan Document also provides that the "[s]hares of CPES Stock in the Trust shall be voted in the manner determined by the Trustee". As a result of this authority, the Trustee Defendants had the power to vote the Trust shares of CPES stock in a manner that would have removed the existing Board of Directors, appoint independent Directors who would act appropriately to remove and replace any person who had breached their fiduciary duties (i.e., all of them), and replace them with members of the Committee who would appropriately act to remedy the 2018 year-end valuation and associated distributions. By failing to take such action, the Trustee Defendants breached their fiduciary duties.

196.    By failing to correct the 2018 year-end valuation and associated distributions, the Trustee Defendants breached their fiduciary duties under ERISA §§ 404(a)(1)(A), (B) and (D), 29 U.S.C. §§ 1104(a)(1)(A), (B), and (D), and caused losses to the CPES ESOP and the accounts of the Plaintiffs and Class Members.

197.    By failing to correct the 2018 year-end valuation and associated distributions, the Board Defendants breached their fiduciary duties under ERISA §§ 404(a)(1)(A), (B) and

(D), 29 U.S.C. §§ 1104(a)(1)(A), (B), and (D), and caused losses to the CPES ESOP and the
accounts of the Plaintiffs and Class Members.

### COUNT III
**Breaches of ERISA Fiduciary Duty**
**(Board Defendants)**

198. Plaintiffs hereby reallege and incorporate the allegations contained in paragraphs
1 though 197 as if the same has been set forth herein.

199. The Board Defendants in their respective capacities as directors, executive
officers, and/or employees of the Debtors, each individually owed to the CPES ESOP and the
CPES ESOP Participants fiduciary duties under ERISA. The Ninth Circuit has recognized that
the general rule that corporate assets are not plan assets where the plan is an ESOP ( 29 C.F.R.
§ 2510.3-101(h)(3) is inapplicable in the context of a 100% ESOP owned company taking
actions towards liquidation when the ESOP will be the sole beneficiary of the liquidation
proceeds. *Johnson v. Couturier*, 572 F.3d 1067,1081 (9th Cir. 2009). Accordingly, the ERISA
fiduciary standards are applicable to the actions of Board Defendants, and under applicable
state corporate law.

200. These ERISA fiduciary duties required the Board Defendants to at all times
perform their duties in good faith and with the degree of care which an ordinarily prudent
person in a like position would use under similar circumstances and to subordinate their own
personal interests to the interests of the CPES ESOP and the Debtors.

201. Given that the Debtors were 100% owned by the CPES ESOP, these ERISA
fiduciary duties also required the Board Defendants to seek to reasonably maximize corporate
value, and to preserve maximum corporate value for distribution to the CPES ESOP.

202. The Board Defendants were ERISA fiduciaries with respect to the CPES ESOP
and the CPES ESOP Participants because they exercised authority and control over the
businesses of the Debtors that were assets of the CPES ESOP because all of the recovery from
the intended plan of liquidation of such businesses is recoverable by the ESOP. The Board
Defendants breached their ERISA fiduciary duties to the CPES ESOP and the CPES ESOP
Participants by, inter alia:

1          a.      Failing to undertake reasonable and prudent efforts to address liquidity

2    concerns resulting from the termination of the Line of Credit, including entering into the

3    Sale/Leaseback Transactions without appropriate professional guidance;

4          b.      Failing to undertake reasonable and prudent efforts in connection with the

5    sale of CPES prior to the Petition Date, including running an orderly sale process and valuing

6    the assets and equity of the enterprise;

7          c.      Failing to undertake reasonable and prudent efforts to secure CARES Act

8    relief for the benefit of CPES;

9          d.      Failing to undertake reasonable and prudent efforts and impose sufficient

10   controls to maximize revenue and minimize expenses in light of the Pandemic;

11   and

12         e.      Failing to evaluate and consider alternatives to the Bankruptcy Process

13   that could have reduced the exorbitant administrative expenses associated the Bankruptcy

14   Process.

15         203.    Each of the foregoing grossly negligent failures is highlighted by equally grossly

16   negligent and contemporaneous failures to take the customary and prudent step of retaining

17   and consulting with appropriate professionals to assist the Debtors in addressing each of the

18   non-ordinary course business transactions.

19         204.    The failure of the Board Defendants to discharge their ERISA fiduciary duties

20   inflicted serious harm on CPES, the CPES ESOP and the CPES ESOP Participants, and was

21   the primary factor causing CPES to file for bankruptcy.

22         205.    As a result, the Board Defendants' breaches of their ERISA fiduciary duties and

23   have damaged the Plaintiff and Class members in an amount to be determined at trial,

24   including, but not limited to:

25         a.      The reduction in gross sale price achieved through the bankruptcy asset

26   sale to Mentor versus the prepetition equity transaction with the same buyer totaling at least

27   $4.3 million;

28

1    b.    The rejection damages claimed by CapGrow resulting from the leases

2 negotiated by the D&O Defendants in the Sale/Leaseback Transactions totaling $585,817.70;

3    c.    The CARES Act relief that the D&O Defendants failed to secure totaling

4 at least $2 million; and

5    d.    The administrative expenses, including the attorneys' fees and expenses

6 attributable to the Liquidating Trustee, incurred by the bankruptcy estate totaling in excess of

7 $3 million.

8                                    **COUNT IV**
9    **Breaches of Fiduciary Duty to Disclose and Inform Under**
    **ERISA Sections 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B)**
10                        **(Against the Board Defendants)**

11    206.    Plaintiffs hereby reallege and incorporate the allegations contained in paragraphs

12 1 through 204 as if the same has been set forth herein.

13    207.    An ERISA fiduciary's duty of loyalty and prudence under ERISA Section

14 404(a)(1)(A) and (B) includes a duty to disclose and inform. Those duties not only require that

15 a fiduciary comply with the specific disclosure provisions in ERISA, but also require (a) a

16 duty not to misinform, (b) an affirmative duty to inform when the fiduciary knows or should

17 know that silence might be harmful, and (c) a duty to convey complete and accurate

18 information material to the circumstances of the participants and beneficiaries.

19    208.    Defendant Monson and the Board Defendants have failed to correct the

20 misinformation and misrepresentations described herein, including the failure to correct the

21 misinformation arising from the 2018 year-end valuation.

22    209.    By failing to update the CPES ESOP participants with correct information,

23 Defendant Monson and the Board Defendants have violated ERISA Section 102, 29 U.S.C. §

24 1022, ERISA Section 104(b)(1), 29 U.S.C. § 1024(b)(1), and ERISA Sections 404(a)(1)(A) &

25 (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B).

26    210.    Defendant Monson and the Board Defendants have caused losses to the CPES

27 ESOP and the CPES ESOP Participants by their breaches of ERISA fiduciary duty in amounts

28 to be proved specifically at trial.

1
2
3

**COUNT V**
**Breach of Fiduciary Duty to Act Prudently and in**
**Accordance with the Plan Documents**
**(All Defendants)**

4      211.    Plaintiffs hereby reallege and incorporate the allegations contained in paragraphs

5    1 through 210 as if the same has been set forth herein.

6      212.    ERISA Section 404(a)(l), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall

7    discharge his duties with respect to a plan solely in the interest of the participants and

8    beneficiaries and –

9              (A) for the exclusive purpose of:

10                    (i) providing benefits to participants and their beneficiaries;

11                    and

12                    (ii) defraying reasonable expenses of administering the plan;

13             (B)   with   the   care,   skill,   prudence,   and   diligence   under   the

14             circumstances then prevailing that a prudent man acting in a like

15             capacity and familiar with such matters would use in the conduct of

16             an enterprise of a like character and with like aims;

17             (C) by diversifying the investments of the plan so as to minimize the

18             risk   of   large   losses,   unless   under   the   circumstances   it   is   clearly

19             prudent not to do so; and

20             (D) in accordance with the documents and instruments governing the

21             plan insofar as such documents and instruments .....

22      211.    The Defendants owe statutory fiduciary duties under ERISA to the ESOP.

23      212.    The Defendants have a duty to act prudently with respect to their ERISA duties.

24      213.    The   Defendants   did   not   have   clear   knowledge   and   understanding   of   their

25    fiduciary duties under ERISA.

26      214.    The Defendants failed to properly delegate duties and responsibilities between

27    the ESOP Trustees and the ESOP Committee.

28

1    215.    Additionally, there were disagreements between the roles of the various

2    fiduciaries in general.

3    216.    There was at all times relevant hereto a misunderstanding as to the specific

4    delegation of the specific duties among the various parties and the administration of the CPES

5    ESOP was required to be conducted pursuant to the Plan Documents.

6    217.    Furthermore, the fact that the ESOP Committee was essentially illusory

7    demonstrates that the Defendants were not truly acting prudently in performing their

8    responsibilities to the ESOP Participants.

9    218.    As a result of these actions, or inactions, the Defendants caused the CPES ESOP

10    and the CPES ESOP Participants to suffer damages.

11    **COUNT VI**
**Co-Fiduciary Liability Under ERISA Sections 405(a)(1)-(3),**
12    **29 U.S.C. §§ 1105(a)(1)-(3)**
**(Against All Defendants)**
13

14    219.    Plaintiffs hereby reincorporate and reallege the allegations contained in

15    paragraphs 1 through 218 as if the same has been set forth herein.

16    220.    ERISA Section 405(a)(1), 29 U.S.C. § 1105(a)(1), makes a fiduciary of a Plan

17    liable for another fiduciary of the same plan's breach when "he participates knowingly in, or

18    knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act

19    or omission of such other fiduciary is a breach …".

20    221.    ERISA Section 405(a)(2), 29 U.S.C. § 1105(a)(2), makes a fiduciary of a Plan

21    liable for another fiduciary of the same plan's breach when "by his failure to comply with

22    section 404(a)(1) in the administration of his specific responsibilities which give rise to his

23    status as a fiduciary, he has enabled such other fiduciary to commit a breach …".

24    222.    ERISA Section 405(a)(3), 29 U.S.C. § 1105(a)(3), makes a fiduciary of a Plan

25    liable for another fiduciary of the same plan's breach "if he has knowledge of a breach by such

26    other fiduciary, unless he makes reasonable efforts under the circumstances to remedy such

27    breach".

28

1    223.    As set forth herein, as CPES ESOP fiduciaries, all of the Defendants (a)

2    participated in the others' breach of duty, (b) enabled the others to breach their duties to the

3    CPES ESOP related to various transactions described in this Complaint, (c) knew or should

4    have known of the others' breaches of fiduciary duty and failed to take action regarding the

5    various transactions described in this Complaint, and (d) failed to make reasonable efforts

6    under the circumstances to remedy those breaches of duty. ERISA Sections 405(a)(1)-(3) and

7    502(a)(2) & (5), 29 U.S.C. §§ 1105(a)(1)-(3), 1132(a)(2) & (5).

8    224.    All of the Defendants knew or should have reasonably known that the December

9    31, 2018, year-end valuation was improperly inflated and that the distributions made

10    thereunder also were inflated. The Board Defendants knew that the other Board Defendants

11    were not taking reasonable steps to monitor the Trustee Defendants and that they were not

12    ensuring that Trustee Defendants acted solely in the interests of the CPES ESOP's participants

13    with respect to the 2018 year-end valuation and the associated distributions.

14    225.    Accordingly, all Defendants also are liable as co-fiduciaries for the losses caused

15    by any fiduciary.

16    **COUNT VII**
**Knowing Participation in Fiduciary Breaches**

17    **Under ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**(Against All Defendants)**

18

19    226.    Plaintiffs hereby reallege and incorporate the allegations contained in paragraphs

20    1 through 225 as if the same has been set forth herein.

21    227.    ERISA Section 405(a)(1), 29 U.S.C. § 1105(a)(1), makes a fiduciary of a Plan

22    liable for another fiduciary of the same plan's breach when "he participates knowingly in, or

23    knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act

24    or omission of such other fiduciary is a breach …".

25    228.    ERISA Section 405(a)(2), 29 U.S.C. § 1105(a)(2), makes a fiduciary of a Plan

26    liable for another fiduciary of the same plan's breach when "by his failure to comply with

27    section 404(a)(1) in the administration of his specific responsibilities which give rise to his

28    status as a fiduciary, he has enabled such other fiduciary to commit a breach …".

1    229.    ERISA Section 405(a)(3), 29 U.S.C. § 1105(a)(3), makes a fiduciary of a Plan

2    liable for another fiduciary of the same plan's breach "if he has knowledge of a breach by such

3    other fiduciary, unless he makes reasonable efforts under the circumstances to remedy such

4    breach".

5    230.    Defendants knowingly participated in the fiduciary breaches of each other

6    Defendant as alleged herein because they had both actual and constructive knowledge of the

7    facts that led to such other's fiduciary breaches in this matter.

8    231.    As a result of the foregoing violations of ERISA, Defendants each caused a loss

9    to the CPES ESOP for which each is personally liable.

10
## COUNT VIII
**Breach of Fiduciary Duty Under ERISA Sections 404(a)(1)(A), (B), and (D),**
11
**29 U.S.C. § 1104(a)(1)(A), (B), and (D) for**
**Failure to Monitor the Trustee Defendants**
12
**(Against the Board Defendants)**
13

14    232.    Plaintiffs hereby reallege and incorporate the allegations contained in paragraphs

15    1 through 231 as if the same has been set forth herein.

16    233.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary

17    discharge his or her duties with respect to a plan solely in the interest of the participants and

18    beneficiaries, (A) for the exclusive purpose of providing benefits to participants and the

19    beneficiaries of the plan, (B) with the care, skill, prudence, and diligence under the

20    circumstances then prevailing that a prudent person acting in a like capacity and familiar with

21    such matters would use in the conduct of an enterprise of a like character and with like aims,

22    and (D) in accordance with the documents and instruments governing the plan insofar as such

23    documents and instruments are consistent with ERISA.

24    234.    Under ERISA, a fiduciary charged with the authority to appoint and remove

25    other fiduciaries or who, as a practical matter, in fact appoints other fiduciaries has an ongoing

26    duty to monitor the performance of those persons whom the fiduciary is empowered to remove.

27

28

235.   A monitoring fiduciary must, at reasonable intervals, ensure that the fiduciary that it has appointed is acting in compliance with the terms of the applicable plan, acting in accordance with ERISA and applicable law, and satisfying the needs of the plan.

236.   A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the management of the plan assets.

237.   A monitoring fiduciary must take prompt and effective action to protect the plan and participants when the monitored fiduciaries fail to perform their obligations.

238.   The Board Defendants appointed the Trustee Defendants.

239.   The Board Defendants were fiduciaries of the CPES ESOP under ERISA Section 3(21(A), 29 U.S.C. § 1002(21)(A), because pursuant to Section 2 (Definition of Trustee), the CPES ESOP Plan Document, the Board Defendants were responsible for appointing the Trustee Defendants.

240.   Had the Board Defendants appropriately monitored the Trustee Defendants, they would have determined that the Trustee Defendants had breached their fiduciary duties because (i) the Trustee Defendants' process of establishing the fair market value of CPES-AZ in the 2018 year-end valuation was flawed; (ii) the Trustee Defendants followed an improper direction that the Trustee Defendants should not have followed; and/or (iii) the Trustee Defendants failed to take any corrective action.

241.   By failing to properly monitor the Trustee Defendants, permitting the Trustee Defendants to proceed with the 2018 year-end valuation and associated distributions, and failing to take sufficient steps or corrective action to protect CPES ESOP participants, the Board Defendants breached their fiduciary duties under ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B).

**COUNT IX**
**ERISA Section 410(a), 29 U.S.C. § 1110(a) –**
**Improper Indemnification**
**(Against All Defendants)**

1   242.   Plaintiffs hereby reallege and incorporate the allegations contained in paragraphs

2   1 through 241 as if the same has been set forth herein.

3   243.   There are a number of documents that purport to indemnify Defendants that

4   violate ERISA's prohibition on fiduciary indemnification.:

5   244.   Such indemnification provisions, "which relieve fiduciaries from responsibility

6   or liability for any responsibility, obligation, or duty … shall be void as against public policy"

7   under ERISA Section 410, 29 U.S.C. § 1110.

8   245.   As such, none of the Defendants herein are entitled to indemnification for their

9   defense of this case, for the ESOP's losses, or for the damages and/or attorneys' fees and costs

10  to be awarded against them.

11  **COUNT X**

12  **ERISA Section 502(c), 29 U.S.C. 1132(c)(1) –**
    **Failure to Provide Participant Account Statements**

13  **(Against the Board Defendants)**

14  246.   Plaintiffs hereby reallege and incorporate the allegations contained in paragraphs

15  1 through 245 as if the same has been set forth herein.

16  247.   ERISA § 105(a)(1)(A)(ii), 29 U.S.C. § 1025(a)(1)(A)(ii), requires the CPES

17  ESOP Plan Administrator to "furnish a pension benefit statement– … at least once a calendar

18  year to a participant or beneficiary who has his or her own account under the plan but does not

19  have the right to direct the investment of assets in that account".

20  248.   The Ninth Circuit has also recognized that a fiduciary's duty under ERISA §

21  404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), to disclose is not limited to those specified in the

22  statute, but extends to additional disclosures to the extent that they relate to the provision of

23  benefits or the defrayment of expenses. *See, e.g.*, *Guenther v. Lockheed Martin Corp.*, 972

24  F.3d 1043, 1051 (9th Cir. 2020); *Washington v. Bert Bell/Pete Rozelle NFL Ret. Plan*, 504

25  F.3d 818, 823-25 (9th Cir. 2007) (ERISA imposes "an obligation to convey complete and

26  accurate information material to the beneficiary's circumstance, even when a beneficiary has

27  not specifically asked for the information."); *Hughes Salaried Retirees Action Committee v.*

28

*Administrator of the Hughes Non-Bargaining Retirement Plan*, 72 F.3d 686, 690 (9th Cir. 1995) (*en banc*).

249.   The Board Defendants, acting as CPES ESOP Plan Administrator, had the obligation on behalf of CPES to timely provide Plaintiffs and each of the ESOP participants with their participant account statements for plan years 2019, 2020, and 2021.

250.   ERISA Section 502(c)(1)(A), 29 U.S.C. § 1132(c)(1)(A), provides for penalties for a plan administrator's refusal to provide required information. Under that section of ERISA:

> "(1) Any administrator (A) who fails to meet the requirements of … section 1025(a) of this title with respect to a participant or beneficiary, … may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper. For purposes of this paragraph, each violation described in subparagraph (A) with respect to any single participant, … shall be treated as a separate violation."

251.   While ERISA Section 502(c), 29 U.S.C. § 1132(c), provides a penalty of up to $100 per day, that amount was increased to $110 per day by federal regulation. 29 C.F.R. § 2575.502c-1.

252.   Plaintiffs and the CPES ESOP participants did not receive their participant account statements for ESOP plan years 2019, 2020, and 2021 in a timely manner. As of December 15, 2022, the last participant account statement they received was for ESOP plan year 2018, namely their respective account balances as of December 31, 2018, which they received sometime in 2019. On or after December 16, 2022, the ESOP participants began belatedly receiving their respective participant account statements for ESOP plan years 2019, 2020, and 2021.

253.   The CPES ESOP Plan Administrator, namely, the Board Defendants acting on behalf of CPES-AZ, failed and refused to provide such participant account statements earlier.

254.    There are believed to be in excess of 1,300 current and former CPES-AZ employees who are participants or their beneficiaries in the CPES ESOP who did not timely receive participant account statements.

255.    Plaintiffs and each CPES ESOP participant are, therefore, each entitled to damages in the amount of $110 per day for the Board Defendants' failure to timely provide their CPES ESOP participant account statements for 2019, 2020, and 2021, to be calculated from approximately October 15, 2020, October 15, 2021, and October 15, 2022, respectively, to the present.

**NOTICE TO THE SECRETARY OF LABOR
AND THE SECRETARY OF THE TREASURY**

256.    In accordance with ERISA Section 502(h), 29 U.S.C. § 1132(h), Plaintiffs will serve by certified mail a copy of this First Amended Class Action Complaint for Violations of ERISA upon the Secretary of Labor and Secretary of the Treasury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against all Defendants and for the following relief:

A.    Judgment against Defendants David Johnson, Mark G. Monson, Douglas Zimmerman, and Alberto Tarajano, and any DOE Defendants, jointly and severally, for breach of their fiduciary duties under ERISA to the Plan and the class members;

B.    Judgment against Defendants David Johnson, Mark G. Monson, Douglas Zimmerman, and Alberto Tarajano, and any DOE Defendants, jointly and severally, in an amount to personally make good to the Plan and/or to any successor trust(s) the losses resulting from their breaches of ERISA;

C.    Judgment against Defendants David Johnson, Mark G. Monson, Douglas Zimmerman, and Alberto Tarajano, and any DOE Defendants, jointly and severally, to provide other appropriate equitable relief to the Plan and its participants and beneficiaries;

D.    Judgment against Defendants David Johnson, Mark G. Monson, Douglas Zimmerman and any DOE Defendants (in their capacity as the Plan Administrator of the CPES

1   ESOP), jointly and severally, in the amount of $110 per day for each of the Plaintiffs and class

2   members, for a period time to be determined at trial, for failing to timely provide the CPES

3   ESOP participants and beneficiaries with their CPES ESOP account statements for 2019 and

4   2020;

5        E.      Judgment declaring the proceeds of any recovery for the Plan is to be allocated

6   to the accounts of the Plaintiffs and Class members to make them whole for any injury that

7   they suffered as a result of the breaches of ERISA in accordance with the Court's declaration;

8        F.      Enjoin, strike, void, and declare invalid the portions of the CPES ESOP Plan

9   Documents, CPES ESOP Trust Agreement, and any other agreement which purport to

10  indemnify Defendants at the expense of the CPES ESOP or the debtors (other than valid

11  insurance policies which do not result in additional expenses to the CPES ESOP), and restore

12  all losses to the CPES ESOP which have resulted from such provisions, including, without

13  limitation, immediate preliminary and permanent injunctive relief prohibiting the

14  indemnification of Defendants and the advancement of any attorneys' fees and costs;

15       G.      Order Defendant Alberto J. Tarajano to disgorge any fees and costs for

16  attorneys' fees he received and/or for which he or his attorneys were reimbursed in conjunction

17  with the matters herein, and to enter an Order declaring that any indemnification of Defendant

18  Tarajano and/or any other Defendant is improper and impermissible;

19       H.      Order that Defendants and each of them provide other appropriate equitable

20  relief to the Plan;

21       I.      Award Plaintiffs' reasonable attorneys' fees and costs of suit incurred under

22  ERISA Section 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the common

23  fund;

24       J.      Order Defendants to pay prejudgment and post-judgment interest;

25       K.      Certify this action as a class action under Fed. R. Civ. P. 23;

26       L.      Appoint Plaintiffs Robert Bennetti, Linda Mariano, and Linki Peddy, as class

27  representatives;

28       M.      Appoint Plaintiffs' counsel as Class Counsel; and

1    N.    Award such other and further relief as this Court deems equitable and just.

2

3    Dated:  July 26, 2023                  Respectfully submitted,

4                                            */s/ Gregory Stoltz*
                                            Gregory Stoltz (027519)
5                                            G Stoltz Law, LLC
                                            100 N. Stone Ave., Ste 702
6                                            Tucson, Arizona 85701
                                            (520) 428-4734
7                                            greg@gstoltzlaw.com

8
                                            *Attorneys for Plaintiffs Robert Bennetti, Linda*
9                                            *Mariano, and Linki Peddy and the proposed Class*
                                            *Plaintiffs*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of July, 2023, I caused a copy of the foregoing First Amended Complaint for ERISA Violations to be served via this Court's ECF system (and via e-mail) upon all parties that have entered their appearance herein via their counsel of record and to those parties that have not yet entered their appearance via first class mail:

*Attorneys for Defendant Mark G. Monson*:

Gary A. Gotto, Bar No. 007401
KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel.: 602.248.0088
ggotto@kellerrohrback.com

Erin M. Riley (*pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: 206.623.1900
eriley@kellerrohrback.com

*Attorneys for Defendants David Johnson and Douglas Zimmerman*:

Elise D. Klein (*pro hac vice*)
LEWIS BRISBOIS BISGAARD & SMITH LLP
633 West 5th Street, Suite 4000
Los Angeles, CA 90071
Tel.: 213.680.5153
elise.klein@lewisbrisbois.com

*Attorneys for Alberto J. Tarajano*:

Lars Calvin Golumbic (*pro hac vice*)
Ross Philip McSweeney (*pro hac vice*)
GROOM LAW GROUP CHARTERED
1701 Pennsylvania Ave. NW, Suite 1200
Washington, DC 20006-5811
Tel.: 202.306.3013
lcg@groom.com
rmcsweeney@groom.com

*Attorneys for Nominal Defendant CPES ESOP*:

Chelsea Mikula
TUCKER ELLIS, LLP
950 Main Avenue
Suite 1100
Cleveland, OH 44113-7213
(216) 592-5000
chelsea.mikula@tuckerellis.com


*/s/ Gregory Stoltz*
Gregory Stoltz

**EXHIBIT B**

EVE H. KARASIK (State Bar No. 155356)
JEFFREY S. KWONG (State Bar No. 288239)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234
Email: EHK@LNBYG.COM; JSK@LNBYG.COM

JILLIAN NOLAN SNIDER (Admitted Pro Hac Vice)
A.J. WEBB (Admitted Pro Hac Vice)
FROST BROWN TODD LLP
3300 Great American Tower 301 East Fourth Street
Cincinnati, Ohio 45202
Telephone: (513) 651-6800
Email: JSNIDER@FBTLAW.COM; AWEBB@FBTLAW.COM

Counsel for Oxford Restructuring Advisors LLC,
as Liquidating Trustee of the CPES Liquidating Trust

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA (NORTHERN DIVISION)**

| | |
|---|---|
| In re: | ) Lead Case No. 9:20-bk-10554-DS |
| | ) Jointly Administered With: |
| CPESAZ Liquidating, Inc., et al., | ) Case No. 9:20-bk-10553-DS |
|    EIN: 86-0804057 | ) Case No. 9:20-bk-10994-DS |
| NDS Liquidating, Inc. | ) |
|    EIN: 27-5174435 | ) Chapter 11 Cases |
| CPESCA Liquidating, Inc. | ) |
|    EIN: 27-2315212 | ) **ORDER GRANTING THE** |
| | ) **LIQUIDATING TRUSTEE'S MOTION** |
| Debtors. | ) **PURSUANT TO FEDERAL RULE OF** |
| | ) **BANKRUPTCY PROCEDURE 9019,** |
| _____ | ) **FOR ENTRY OF ORDER APPROVING** |
| [•] Affects All Debtors | ) **SETTLEMENT AND COMPROMISE** |
| | ) **BETWEEN THE LIQUIDATING** |
| [ ] CPESAZ Liquidating, Inc. | ) **TRUSTEE, MIGUEL PAREDES, THE** |
| [ ] NDS Liquidating, Inc. | ) **FORMER FIDUCIARIES OF THE** |
| [ ] CPESCA Liquidating, Inc. | ) **DEBTORS AND THE ESOP, AND THE** |
| | ) **ARIZONA PLAINTIFFS** |
| Debtors and Debtors in Possession | ) |
| | ) <u>Hearing</u>: |
| | ) Date/Time: June 6, 2024 at 11:30 a.m. |
| | ) Place: 255 East Temple Street |
| _____ | ) Los Angeles, California 90012 |
| | ) |

1

On June 6, 2024, the Court held a hearing to consider the "Motion, Pursuant To Federal Rule Of Bankruptcy Procedure 9019, For Entry Of Order Approving Settlement And Compromise Between The Liquidating Trustee, Miguel Paredes, And The Former Fiduciaries of the Debtors and the ESOP, And The Arizona Plaintiffs; Memorandum Of Points And Authorities And Declaration Of John Pidcock In Support Thereof" [ECF No. 1405] ("Motion")[1] filed by Oxford Restructuring Advisors, LLC as Liquidating Trustee for the CPES Liquidating Trust (the "Liquidating Trustee") for CPES-AZ Liquidating, Inc., f/k/a Community Provider of Enrichment Services, Inc. d/b/a CPES, Inc. ("CPES-AZ"), NDS Liquidating, Inc., f/k/a Novelles Developmental Services, Inc. ("Novelles") and CPESCA Liquidating, Inc. f/k/a CPES California, Inc. ("CPES-CA," and together with CPESAZ and Novelles, are collectively the "Debtors").

The Motion seeks the Court's approval of that certain Settlement Agreement ("Settlement Agreement"), a copy of which is attached hereto as Exhibit A, entered into by and among the Liquidating Trustee Miguel Paredes, as the trustee (the "ESOP Trustee") of the Community Provider of Enrichment Services, Inc. Employee Stock Ownership Plan and Trust (the "ESOP"), the former directors, officers, fiduciaries, employees, and/or insiders of CPES-AZ Liquidating, Inc., f/k/a Community Provider of Enrichment Services, Inc. d/b/a CPES, Inc. ("CPES-AZ"), NDS Liquidating, Inc., f/k/a Novelles Developmental Services, Inc. ("Novelles") and CPESCA Liquidating, Inc. f/k/a CPES California, Inc. ("CPES-CA," and together with CPESAZ and Novelles, are collectively the "Debtors") and the ESOP, including Mark Monson ("Monson"), David Johnson ("Johnson"), Douglas Zimmerman ("Zimmerman"), and Alberto Tarajano ("Tarajano" and together with Monson, Johnson, and Zimmerman, are collectively with any and all other former directors and officers and fiduciaries, the "Insureds"); and Robert Bennetti, Linki Peddy, and Linda Mariano on behalf

---

[1] All capitalized terms shall have the same meaning as ascribed in the Motion, unless otherwise defined herein.

2

of themselves and all others similarly situated (collectively, the "Arizona Plaintiffs"). The Settlement will yield a Settlement Payment of $2,400,000.00, plus releases among the Parties. The Court has reviewed the Motion and Settlement Agreement and taken judicial notice of the entire record in this case.  Based on the foregoing, the Court makes the following Findings of Fact and Conclusions of Law:

A.    **Jurisdiction and Authority**: The Court has jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. §§ 157 and 1334; (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

B.    **Good-Faith Negotiations**:  The Court has been apprised of the negotiations that preceded the Settlement Agreement, and the Settlement Agreement is the result of extensive, arms-length bargaining among the Parties and represents a good-faith compromise and resolution of the matters settled. The Settlement Agreement is not the product of any collusion among the Parties and was not negotiated with any intent to prejudice any persons or entities subject to the Settlement Agreement.

C.    **Benefits of Settlement**:  The Settlement Agreement provides, *inter alia*, the following concrete benefits:

        i.    **Settlement Payment**: The Insureds, by and through the Primary Insurer, shall pay to the Liquidating Trustee on behalf of the Liquidating Trust, the sum of Two Million Four Hundred Thousand Dollars and No cents ($2,400,000.00); and

        ii.    **Releases**: Subject to the terms and conditions set forth in the Settlement Agreement, the Parties shall mutually release, acquit and forever discharge each other from all claims, excepting the specific inclusions and exceptions as set forth in the Settlement Agreement.

D.    **Settlement Meets the Standard**:  The Court is familiar with the claims and defenses asserted or that could have been asserted in this Court or otherwise which have been settled pursuant to the Settlement Agreement, and finds that the Settlement Agreement is fair,

3

reasonable, and adequate within the parameters established in *Robinson v. Kane (In re A&C Props.)*, 784 F.2d 1377, 1381 (9th Cir. 1986), including: (i) the probability of success in the litigation; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premises ("*A&C* Factors").  In this instance, the proposed Settlement is fair and equitable, falls above the lowest point in the range of reasonableness and meets all of the *A&C* Factors. The Liquidating Trustee demonstrated the exercise of prudent business judgment in connection with the Settlement Agreement. The Settlement Agreement falls above the lowest point in the range of reasonableness and is in the best interests of creditors and the Debtor's Estates, the Liquidating Trust, the ESOP, the Arizona Plaintiffs, and the participants and beneficiaries of the Liquidating Trust and the ESOP.

E.    **Notice and Opportunity to be Heard**:  The form and means of the notice of the Motion given to creditors and other interested parties is good and proper notice pursuant to the Bankruptcy Rules and Local Rules of this Court and other applicable law, and is determined to be the best notice practicable under the circumstances, and no other or further notice is or shall be required.

F.    **The Releases are Appropriate:** The Claims, including those asserted in the Fiduciary Demand, the LT Draft Complaint, the ESOP Proof of Claim, and the AZ FAC, are derivative in nature and therefore belong to the Liquidating Trust and ESOP. The Claims resolved pursuant to the Settlement Agreement are fully and finally resolved. Therefore, the releases contained in this Settlement Agreement shall be binding on all ESOP participants and their beneficiaries, all beneficiaries of the Liquidating Trust, and any other person acting through or on behalf of the ESOP or the Debtors.

Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT,**

1.    The Motion is GRANTED in its entirety.

4

2.      The Parties are AUTHORIZED to enter into the Settlement Agreement; the Settlement Agreement is APPROVED in its entirety; and the terms and conditions of the Settlement Agreement are incorporated in this Order as if fully stated herein.

3.      This Order is immediately valid and fully effected upon its entry and any stay that may apply hereto is waived.

4.      Any Creditors and Interested Parties that did not file or assert and serve a written objection to the Motion are deemed to have waived any objection they have or may have to the Motion, the Settlement Agreement, and the releases contemplated therein.

5.      The Court retains exclusive jurisdiction to enforce, interpret and resolve any disputes or controversies arising from this Order and the Settlement Agreement.

###

#12717975 v1

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is 2818 La Cienega Avenue, Los Angeles, California 90034.

A true and correct copy of the foregoing document entitled **MOTION PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 FOR ENTRY OF ORDER APPROVING THE SETTLEMENT AND COMPROMISE BETWEEN THE LIQUIDATING TRUSTEE, MIGUEL PAREDES, THE FORMER FIDUCIARIES OF THE DEBTORS AND THE ESOP, AND THE ARIZONA PLAINTIFFS; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF ANDREW SIMON IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **May 3, 2024**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Kyra E Andrassy    kandrassy@raineslaw.com,
  bclark@raineslaw.com;jfisher@raineslaw.com**
- **Lisa D Angelo    langelo@murchisonlaw.com, cthomas@murchisonlaw.com**
- **Gary O Caris    gcaris@btlaw.com, slmoore@btlaw.com;rsutton@btlaw.com**
- **Maria Cho    Maria.Cho@faegredrinker.com**
- **Russell Clementson    russell.clementson@usdoj.gov**
- **Brian David Fittipaldi    brian.fittipaldi@usdoj.gov**
- **Amir Gamliel    amir-gamliel-9554@ecf.pacerpro.com,
  cmallahi@perkinscoie.com;DocketLA@perkinscoie.com**
- **Scott F Gautier    scott.gautier@faegredrinker.com,
  ann.grosso@faegredrinker.com;DocketGeneral@faegredrinker.com**
- **David R Johanson    djohanson@hpylaw.com,
  drubel@hpylaw.com;rthompson@hpylaw.com**
- **Jennifer Kalvestran    jck@amclaw.com, spobrien@gustlaw.com**
- **Eve H. Karasik    ehk@lnbyg.com**
- **Jeffrey S Kwong    jsk@lnbyg.com, jsk@ecf.inforuptcy.com**
- **Douglas L. Lutz    dlutz@fbtlaw.com**
- **Aaron J Malo    amalo@sheppardmullin.com,
  abilly@sheppardmullin.com;rgolder@sheppardmullin.com**
- **Kelsey L Maxwell    kmaxwell@murchisonlaw.com**
- **Scott H McNutt    smcnutt@ml-sf.com**
- **Chelsea Mikula    chelsea.mikula@tuckerellis.com, darlene.hudeck@tuckerellis.com**
- **Kenneth Misken    Kenneth.M.Misken@usdoj.gov**
- **Roksana D. Moradi-Brovia    Roksana@rhmfirm.com,
  matt@rhmfirm.com;rosario@rhmfirm.com;sloan@rhmfirm.com;priscilla@rhmfirm.com;rebeca@rhmfirm.com;david@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;russ@rhmfirm.com**
- **Sean P O'Brien    spobrien@gustlaw.com**
- **Steven P Ordaz    sordaz@bmcgroup.com, tfeil@bmcgroup.com**
- **Christian Oronsaye    christian.oronsaye@gmail.com**
- **Agustin R Pina    apina@wshblaw.com**
- **Don J Pool    dpool@fennemorelaw.com,
  mmeister@fennemorelaw.com;clalonde@fennemorelaw.com**
- **Amelia Puertas-Samara    itcdbgc@edd.ca.gov, itcdgc@edd.ca.gov**
- **Ryan M Salzman    ryan.salzman@faegredrinker.com, susan.carlson@faegredrinker.com**
- **Joshua L Scheer    jscheer@scheerlawgroup.com, jscheer@ecf.courtdrive.com**

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                 **F 9013-3.1.PROOF.SERVICE**

- **Vince Slusher    vince.slusher@proton.me**
- **United States Trustee (ND)    ustpregion16.nd.ecf@usdoj.gov**
- **Adam J Webb    awebb@fbtlaw.com, awebb@ecf.courtdrive.com;jsnider@fbtlaw.com**
- **Scott L Whitman    slw@mwlegal.com, holly@mwlegal.com**
- **Steven W Yuen    syuen@heathandyuen.com, wyang@heathandyuen.com**
- **David B Zolkin    dzolkin@wztslaw.com, maraki@wztslaw.com,sfritz@wztslaw.com**

**2. SERVED BY UNITED STATES MAIL**: On **May 3, 2024**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **May 3, 2024**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| May 3, 2024 | Lisa Masse | /s/ Lisa Masse |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                 **F 9013-3.1.PROOF.SERVICE**